

_____

No. 3:16-CV-489-CWR-RHWR

UNITED STATES OF AMERICA,

*Plaintiff,*

v.

HINDS COUNTY, ET AL.

*Defendants.*

_____

SECOND ORDER OF CONTEMPT

_____

Before CARLTON W. REEVES, *District Judge*.

For the reasons that follow, Hinds County is again held in contempt of court.

## I.   Factual and Procedural History

The factual and procedural history of this case is, by now, well-known. A brief summary of the present situation will do.

The United States brought this suit to end unconstitutional conditions of confinement at Hinds County's Raymond Detention Center. In 2016, the County agreed that the conditions

were unconstitutional and entered into a Consent Decree to remedy the problems.

Since then, compliance has been elusive. Court-appointed independent monitors report that Hinds County is in sustained or substantial compliance with only three of 92 requirements of the Consent Decree. Problems remain with staffing, use of force, basic living conditions, and over-detention, among other issues. Today's Order, though, is about A-Pod.

Among a long string of broken promises, Hinds County vowed to no longer house detainees in A-Pod. The February 2022 Evidentiary Hearing, however, revealed that not only are detainees still being housed in A-Pod, but that is where they will remain indefinitely.

By way of brief background, pursuant to the Stipulated Order, the County is required to renovate all of the Pods used for housing. Many of these deadlines have long passed, and renovations are still not complete. Initially, B-Pod was cleared to complete its renovations, and the plan was to then transfer all detainees in A-Pod to B-Pod, and close A-Pod for good. *See* Docket no. 101 at 28 [hereinafter Fifteenth Monitoring Report]; *see also* Tr. vol. 1 at 93, 95-96.

Recently, however, the County has decided otherwise.

In August, it began to re-populate B-Pod before the renovations were complete. Since then, the County has decided to maintain at least two housing units in A-Pod indefinitely. *See* Tr. vol. 1 at 93, 95-96; *see also* Fifteenth Monitoring Report at 28. In violation of the Stipulated Order, the County has blown through every deadline related to A-Pod and has no plans to renovate it. *See* Fifteenth Monitoring Report at 28 ("Not only does the County have no plan for renovating A-Pod, but the

additional personnel required to operate any of A-Pod under direct supervision conditions is well beyond the current staffing level.").

To be clear, the County is out of compliance with a number of provisions in the Stipulated Order, but A-Pod is in a particularly egregious state. The living conditions, or lack thereof, and near-complete lack of supervision, have contributed to lawlessness in that part of the facility.

This was plainly illustrated by a death in A-Pod on October 18, 2021. The Monitors described the events as follows:

> At about 0430 or 0500 in the morning, video footage showed the inmate being hit in the head by another inmate. A third inmate then stomped on his head several times. He was then dragged across the mezzanine. The video footage shows brief movement by the decedent and then none indicating that he was probably dead at that point but a time of death has not been established. He was eventually dragged back and propped in a sitting position and then later laid on a mat. He was not discovered by officers until 1:45, almost 9 hours later.

Docket No. 96 at 3-4 [hereinafter October 27 Emergency Monitoring Report].

On November 23, 2021, concerned by a string of deaths and Jail Administrator Major Kathryn Bryan's resignation, this Court issued an Order to Show Cause directing the County to explain why it should not be held in contempt of court and why a receivership should not be imposed to run RDC.

3

On February 4, 2022, the Court issued its First Order of Contempt. It found that Hinds County was patently non-compliant with more than two dozen provisions of the Consent Decree. A remedy was withheld pending further proceedings.

From February 14 to March 1, the Court held an Evidentiary Hearing regarding its Order to Show Cause and the County's motion to terminate the July 2016 Consent Decree pursuant to the Prison Litigation Reform Act.

At the hearing, there was substantial evidence concerning the plight of A-Pod. Testimony focused on the County's decision to keep it opened, un-renovated, and not under direct supervision, in violation of the Consent Decree and Stipulated Order.

As Mr. David Parrish, one of the Court's Monitors, testified,

> A-Pod is a disaster. It's filthy; lights don't work; locks don't work; doors can't be secured; cells don't have lights inside them. Inmates since they can't even close the doors, end up hanging blankets down in front of them to have makeshift privacy to their cells. Showers don't work. Everything in the place is torn up. It's just a very bad mess. There's no fire extinguishers inside, of course, because the inmates control that place. There are no officers who work inside the housing units in Alpha. There are no fire hoses. There are not even fire hoses out in the corridors, around the control room in Alpha. That area is ill equipped across the board.

4

Tr. vol. 1 at 96. In this very hearing, the Sheriff himself admitted that A-Pod is unsafe. *See* Tr. vol. 10 at 1930 ("I would consider A-Pod to be unsafe.").

As instructed in *Brown v. Plata*, an institution that deprives detainees of the minimal civilized measure of life's necessities is "incompatible with the concept of human dignity and has no place in civilized society." 563 U.S. 493, 511 (2011). And where officials fail to fulfill their obligations, "the courts have a responsibility to remedy the resulting Eighth Amendment violation. . . . Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Id.*

This Order followed.

## II.   Law

### A.   Consent Decrees

"A consent decree is akin to a contract yet also functions as an enforceable judicial order." *United States v. Chromalloy Am. Corp.*, 158 F.3d 345, 349 (5th Cir. 1998); *see also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004). Consent decrees are commonly used to address ongoing constitutional violations in jail and prison cases. *E.g.*, *DePriest v. Walnut Grove Corr. Auth.*, No. 3:10-CV-663-CWR-FKB, 2015 WL 3795020, at *3 (S.D. Miss. June 10, 2015).

Although "state and local authorities have primary responsibility for curing constitutional violations," *Hutto v. Finney*, 437 U.S. 678, 687 (1978), "[f]ederal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced." *Frew*, 540 U.S. at 440.

### B.    Civil Contempt

"Civil . . . contempt is a sanction to enforce compliance with an order of the court." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) (citations omitted). Courts have inherent power to enforce their orders. *Shillitani v. United States*, 384 U.S. 364, 370 (1966). As for consent decrees, courts have "the power to enforce and modify the terms of the decree and to penalize the noncomplier through contempt proceedings or the issuance of injunctive relief." *B.H. v. McDonald*, 49 F.3d 294, 300 (7th Cir. 1995).

To hold a respondent in civil contempt, the moving party must prove by clear and convincing evidence: "(1) that a court order was in effect; (2) that the order required certain conduct by the respondent; and (3) that the respondent failed to comply with the court's order." *Petroleos Mexicanos v. Crawford Enters.*, 826 F.2d 392, 401 (5th Cir. 1987).

"The contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000). That means "[g]ood faith is not a defense to civil contempt." *Chao v. Transocean Offshore, Inc.*, 276 F.3d 725, 728 (5th Cir. 2002). "An act does not cease to be a violation of a law and of a decree merely because it may have been done innocently." *McComb*, 336 U.S. at 191.

"If a state agency refuses to adhere to a court order, a financial penalty may be the most effective means of insuring compliance." *Frew*, 540 U.S. at 440 (citation omitted); *see also Am. Airlines*, 228 F.3d at 585.

### III. Discussion

The first two elements of the civil contempt standard are satisfied. A Court Order was in effect that required certain conduct of Hinds County. The County agreed to a judicially-enforceable contract when it voted to enter into the Consent Decree and Stipulated Order.

The remaining element asks whether Hinds County failed to comply with the Court Orders. The answer is "yes." The below sections explain why.

### A. Gang Committees

Confinement in a jail "where terror reigns" is cruel and unusual punishment. *Jones v. Diamond*, 636 F.2d 1364 (5th Cir. 1981) (overruled on other grounds by *International Woodworkers of America, AFL-CIO and its Local No. 5-376 v. Champion Intern. Corp.*, 790 F.2d 1174 (5th Cir. 1986)). "[P]rison officials have a duty . . . to protect prisoners from violence at the hand of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offense against society." *Id.* at 834. "Specifically, failure to control or separate prisoners who endanger the physical safety of other prisoners can constitute cruel and unusual punishment." *Stokes v. Delcambre*, 710 F.2d 1120, 1122 (5th Cir. 1983). Put another way, terror reigns where "officials permit violent offenders to hold sway over part or all of the facility — creating 'a pervasive risk of harm and a failure to take reasonable steps to prevent the known risk'" *Anderson v. Morris*, No. 4:16-CV-101-DMB-JMV, 2017 U.S. Dist. LEXIS 159954, at *12 (N.D. Miss. July 18, 2017) (quoting *Stokes*, 710 F.2d at 1120).

That is the case with A-Pod. *See e.g.*, Tr. vol. 1 at 96 (Mr. Parrish testifying that "Inmates control A-Pod."); *see also, e.g.*, Tr. vol. 11 at 1930 (Sheriff Tyree Jones admitting that he "would consider A-Pod to be unsafe.").

The detainees in A-Pod have established "gang committees" or "inmate committees" that "essentially run the unit and . . . decide if there's someone on the unit that they don't want on the unit." Tr. vol. 3 at 460; Tr. vol. 6 at 1096; Tr. vol. 8 at 1404. The committees coordinate attacks on unwelcome detainees (*i.e.*, "they will harass, steal from, assault that inmate") until the detainee requests to be moved. Tr. vol. 8 at 1404.

The Fifteenth Monitoring Report details two such incidents:

> In [Incident Report] #211384, the officer stated that a detainee was being put out of A-4 by other detainees. They placed his property by the gate. He was moved to C-2. Again, in [Incident Report] #211385 in A-3, several detainees called the officer over to say that two other detainees had to be moved. They then beat one of the detainees. It is not clear from the report if and where the detainees were moved.

Ultimately, the committees direct detainees' housing placements—and security staff comply. The moves contravene the jail's classification system and violate paragraph 42(f) of the consent decree. Tr. vol 6 at 1096; *see also* Fifteenth Monitoring Report at 34-37. Gang activity within a correctional facility, as this Court has noted previously, can lead to riots, underreporting of assaults and other crimes and gang-imposed discipline. *Depriest*, 2015 WL 3795020, at 13.

8

It is undisputed the committees also decide who eats and who doesn't eat. *See* Tr. vol. 6 at 1124. Because officers have delegated some of their duties to detainees themselves, such as meal distribution, the committees withhold meals from some detainees. *Id.* This practice is incompatible with the jails' Eight Amendment obligation to at the very least, provide "basic sustenance." *Brown*, 563 U.S. at 510-11.

These behaviors are enabled by the County's decision to use "gang pods," or grouping detainees in housing units based on their gang affiliation. *See* Fifteenth Monitoring Report at 35. This practice was once abated but is again prevalent. *Id.* Paragraph 42(f) of the consent decree requires an end to this practice, but the County has not complied.

### B. Unprecedented Violence

It is well-established that violence is pervasive at RDC. At the February 22 Evidentiary Hearing, Mr. Parrish testified to "an excessive number of assaults," such that violence is "a constant ongoing problem throughout the Raymond Detention Center." Tr. vol. 1 at 103. Ms. Simpson calculated that 77 assaults were reported between October 2021 and January 2022. Tr. vol. 2 at 289. This figure breaks down to "about 20 [assaults] per month, one of them being an assault that resulted in the inmate being beaten to death." *Id.* at 104.

The violence is not exclusive to A-Pod—but based on the assaults that are actually reported by staff, many of these assaults occur in A-Pod. *See* PX-32. One detainee's numerous violent encounters, and staff's inept handling of the threat, is revealing.

On July 5, 2021, in A-Pod, Unit 1, a detainee was stabbed. *See* PX-32 at 88; *see also id.* at 99. The event resulted in a rapid

9

notification and required medical transport, which both indicate that it was likely serious in nature. *See* PX-32 at 88. In the corresponding incident report, there is reference to an earlier assault involving the same detainee for which there is no incident report. *See* Fifteenth Monitoring Report at 46.

On December 1, 2021, the same detainee, on the same housing unit, was stabbed again. *See* PX-88 at 126. The corresponding incident report reflects that after this incident, the detainee was transported to medical, and then returned to the same housing unit. At this point, the detainee has been the victim of at least three assaults, two of which were stabbings. Yet, as noted by the Monitor, he has been placed on the same housing unit again and again. *See* Fifteenth Monitoring Report at 46; *see also* PX-32 at 99.

Even knowing as much as the undersigned does, the full scale of violence is understated.

First, staff do not report all incidents. *See* Fifteenth Monitoring Report at 46 ("Inmate on inmate assaults continue at a high rate. Particularly concerning is the indication that many assaults go unreported.").

Second, where incidents are reported by staff, the reports often lack sufficient information, fail to indicate the location of the incident, and are mislabeled. *See id.* at 75; *see also* Tr. vol. 1 at 224 (Mr. Parrish testifying "That's been a long-standing problem, that incident reports are, in my words, mislabeled. They're titled with the wrong thing. It may reflect disorderly conduct or something like that when it's actually an assault of one person on another or that sort of thing.").

Third, because detainees, especially in A-Pod, are "left unattended throughout the day and night," many assaults just go

10

unreported. Fifteenth Monitoring Report at 31, 46. To the extent officers learn of the violence, it is most often after the fact. *Id.* at 31. For example, Ms. Simpson highlights one Incident Report where "staff were informed of an assault and the need for protective custody for an inmate in A-1 by the inmate's wife and his attorney who called the Jail with this information. That is how staff located the injured inmate and sent him to the hospital for treatment." *Id.* at 29.

The Court has the very real sense that we have not begun to grasp the extent of violence detainees are subject to at RDC. *See also, e.g.*, Fifteenth Monitoring Report at 28 (Monitor describing an Incident Report in which "[i]nmates in A-2 told the Detention Officer serving breakfast that they were in fear of their lives and asked to be moved[,]" as a "commonplace occurrence.")

## C. Staff Refuse Shifts in A-Pod Due to Fear of Violence

A-Pod housing units are routinely left unattended. As Mr. Parrish testified, "on Monday, the first day of my most recent site inspection, when we went into Alpha Pod, there was one officer working in the whole pod in the control room. There were no officers on the floor for all four housing units. None." Tr. vol. 1. at 98. This remote surveillance approach violates the Consent Decree's requirement for direct supervision and contributes to continuous damage of the facility and violence within the facility. *See* Tr. vol. 11 at 2085-87.

Yet, this does not seem likely to change soon, considering staff members are afraid to work certain housing units and refuse to go into them. Indeed, staff reportedly "call out sick or just not show up for work" because they are "afraid to work a pod." Tr. vol. 3 at 407.

Ms. Priscilla Dawson, the Quality Assurance Coordinator, described this firsthand:

> After visiting that area, talking about A-Pod Unit 1, it was clear why some female staff were apprehensive about entering the unit. This was the only unit I did not enter because I did not feel comfortable doing so even though I had male staff accompanying me. A few of the detainees made lewd and crude remarks and generally acted out. My visit to this unit ended abruptly.

PX-106 at 6.

Current staffing numbers are the lowest they have ever been. *See* Tr. vol. 1 at 123, 134. Turnover is significant. Even basic recommendations to increase retention, such as instituting bi-weekly pay rather than monthly pay, and providing direct deposit, have been rejected. *Id.* at 135-36. Despite spending nearly six years under the Consent Decree, the County appears unwilling or unable to abide by its requirements.

### D. Still, the Cell Doors Don't Lock

It has long been known that many of the security doors and locks at RDC are not functional. As best explained in the Sixth and Seventh Monitoring Reports, the control system for security doors is beleaguered by electrical and mechanical problems, rendering it inoperative. Docket Nos. 24 at 34; 27 at 33.

This is particularly pronounced when it comes to cell doors. *See* October 27 Emergency Monitoring Report at 4 (stating that "[h]ousing inmates in units where cell doors do not lock" is an ongoing life-threatening safety issue). Inmates can open and close the door, enter and exit, as opportunity permits. In

A-Pod, where majority of the cell doors do not lock, detainees are largely permitted to roam as they please. This presents substantial risks to detainees and staff alike.

It is true that some of the cell doors have been repaired in recent years. As it stands, however, the recent hearing showed that the doors remain in an unacceptable state of disrepair in A-Pod. *See* Tr. vol. 8. at 1500 (Gary Chamblee of Benchmark Construction confirming that the cell doors in A-Pod still do not work: "the cell door[s] [are] not operational so they're really not doing anything right now, so . . . .").

### E. The Lights Do Not Work

Over a year ago, the monitors reported that "[i]nmates live in darkness much of the time because most of the lights do not work." Docket No. 83 at 3 [hereinafter Thirteenth Monitoring Report]. The County, however, reported shortly after the February 2021 visit that "it has invested a substantial amount of time and money in repairing the detention facilities to comply with the Consent Decree" and had "repaired the lighting in Pod A where the detainees were living in the dark for protracted periods of time." *Id.* At 4.

Yet in the February 2022 Evidentiary Hearing, it was confirmed that there are still few working lights. *See* Tr. vol. 8 at 1532. The detainees spend most of their time in the dark, both in their cells and in the dayroom. Officers must use flashlights to complete well-being checks. *See* Tr. vol. 10 at 1856.

As Mr. Parrish testified, it's important to see what's going on in the cell. "There could be contraband. There could be fights. Somebody could be injured, could be ill, could be overdosing. So, yes, you need to see what's -- in the well-being checks, you need to be able to see the individual." Tr. vol. 8 at 1407. Sheriff

13

Tyree Jones agrees that the combination of cell doors that do not lock and lack of lighting presents serious safety and security issues. *See* Tr. vol. 11 at 1957.

### F. A-Pod Is at Risk of Burning Down

Indifference to fire safety remains a life-threatening concern in A-Pod. The Monitoring Team reports that there is no fire alarm system in RDC and no sprinkler system in the inmate housing areas. *See* Thirteenth Monitoring Report at 3. In A-Pod there are neither fire hoses nor extinguishers. Tr. vol. 8. at 1516; Tr. vol. 1. at 96; *see also Gates v. Collier*, 501 F.2d, 1291, 1300 (5th Cir. 1974) ("there is a lack of adequate fire fighting equipment making it, as stated by the Penitentiary Superintendent, 'almost impossible to put out a fire at Parchman.'").

This problem is exacerbated by the number of fires at RDC. The potential ramifications are obvious and devastating.

### G. Trash Dumpster Cells

Well over a year ago, the Monitoring Team reported that a handful of cells had become trash receptacles. *See* Thirteenth Monitoring Report at 3; *see also* Docket No. 94 at 4, 30 [hereinafter Fourteenth Monitoring Report]. These "trash dumpster cells" were damaged cells in A-Pod that the County chose to weld shut rather than repair. Inmates, meanwhile, were able to deposit trash through the cells' broken windows. As a result, the cells served "as a breeding ground for vermin." Fourteenth Monitoring Report at 4.

Since this issue was brought to the attention of RDC, the number of trash dumpster cells increased to 30. *Id.* Reportedly, some of the cells have recently been emptied and cleaned, while the majority remain welded shut, awaiting repairs. *Id.*

At the February 2022 Evidentiary Hearing Mr. Parrish explained that at his January 2022 site visit he counted no less than seven trash dumpster cells in just one of the four housing units in A-Pod. *See* Tr. vol. 1. at 173. Mr. Parrish approximates that there are likely still about 30 trash dumpster cells today. *Id*.

On cross-examination, Mr. Parrish added that he was told that the County has since taken additional measures to avoid the same problem from happening again. Tr. vol. 1. at 261-62. Given the County's long history of making promises and then failing to abide them, it is difficult to credit this testimony until an independent Monitor corroborates it.

The trash dumpster cell saga illustrates the level of dysfunction at RDC. As Mr. Parrish put it,

> I mean, from an operational point of view, they're short of space, so now we have 30 cells that are shut down and can't be used. That's the equivalent of a whole housing unit. That's 60 beds. And that hurts classification's ability to separate people and put them in the proper places. And from a sanitation point of view and an operational point of view, it's totally counterproductive to a well-run jail. You don't just weld doors shut and seal them up because things are broken. You fix them. And that's an ongoing problem that has yet to be resolved.

Tr. vol. 1 at 174; *see also* Fifteenth Monitoring Report at 32 (Stating that at least until September 2021, due to a lack of dedicated areas for quarantine in A-Pod, "inmates were assigned to sleep on the floor in A-Pod. They had no assigned

15

cell so no access to a toilet. Without an officer present inmates had to ask the inmates in the assigned cells to use the toilet and sometimes were required to pay for the use.").

### H. Disrepair and Unlivable Conditions

The February 2022 Evidentiary Hearing demonstrated that the problems in A-Pod are numerous and severe with no end in sight.

For example, detainees have reported that most of the showers in A-Pod do not work, Tr. vol. 1 at 96, and this has been a "consistent problem," Tr. vol. 8 at 1408-09. "[T]he HVAC system doesn't work." Tr. vol. 6. at 1123. And there are plumbing and electrical issues. *Id*.

To this day, despite being repeatedly urged by this Court, the County has failed to provide detainees with chairs to sit in or tables on which to eat. Tr. vol. 8. at 1408.

When the Court addressed this issue in 2019, the County assured the Court that it had indeed provided detainees with tables and chairs. The then-County Attorney reiterated the Court's concern then: "But you asked me two questions in September which were very serious. One . . . why on earth anyone would have to eat sitting on the floor?" Docket No. 55 at 97. The then-County Attorney represented the following:

> I can verify as an officer of the Court, my personal inspection Thursday before last, that what you witnessed in August is no longer occurring. There's appropriate modular furniture, both chairs and tables that was bought[.]

*Id*. at 96.

And yet, the February 2022 Evidentiary Hearing revealed that there are still no table and chairs. As a result, detainees must eat on the floor or in their dark cells—the same cells with leaky or clogged toilets. Tr. vol. 8 at 1408. Unfortunately, the County's word has been and still is seriously called into question on many fronts, and this is but one emblematic showing.

The disrepair of A-Pod goes beyond furnishings and maintenance; it is also structural. Detainees can access the roof, and there have been "breaches." Tr. vol. 8. at 1516. As Mr. Parrish testified, detainees routinely escape, breaking out through the roof, only to return with contraband. *See* Tr. vol. 2 at 129.

One recent breach in A-Pod is illustrative. On December 27, 2021, an officer "observed two detainees on the roof." PX-88, at 469-70. "One detainee was helping the other detainee get back on the top of the roof from the side of the building." *Id.* Within moments, the detainees disappeared from the camera's view. *Id.* The detainees still in the unit placed mats high up along the periphery to obstruct officers' view. *Id.* The officers tried to enter "but the detainees would not let [them] into the unit." *Id.* One detainee was seen dropping a white bag from the ceiling. *Id.*

When officers were finally able to enter, they saw a "piece of board that seem[ed] to look out of place" on the ceiling above the stairwell. *Id.* An officer tapped the board and it fell, revealing a hole in the ceiling. *Id.* A shakedown later that day uncovered tobacco, cigarettes, cellphone chargers, and homemade shanks. *Id* at 414.

RDC has a long history of escapes and not all escapees return.[1] It is an understatement that the deteriorating roof presents "[m]ajor security issues." Tr. vol. 11 at 2117.

None of this will likely change soon as renovations only occur occasionally, "when the weather is good," in short intervals, and are essentially stalled while A-Pod continues to house detainees. *See* Tr. vol. 8 at 1500, 1507, 1522-23.

This impasse was evidenced by Gary Chamblee from Benchmark Construction's response to the Court's question:

> Q. So if A-Pod is to be rendered safe, what type of door work has to be completed there?
>
> A. Well, first of all, they need to determine if they're going to use A-Pod as [continued housing].

*See* Tr. vol. 8 at 1500.

## IV.    Conclusion

For these reasons, there is clear and convincing evidence that Hinds County and its Board of Supervisors have failed to comply with the Consent Decree and Stipulated Order as they pertain to A-Pod. Accordingly, the County is hereby found to be in civil contempt of court.

Imposition of "an appropriate sanction for that contempt" is again reserved pending the PLRA termination motion. *See Petroleos Mexicanos*, 826 F.2d at 398 (collecting cases).

---

[1] *See* Tr. vol. 1 at 321 (Mr. Parrish reporting that "there was an escape from the work release center several months ago. One inmate was recaptured. The other one[] is still on the lam.").

**SO ORDERED**, this the 23rd day of March, 2022.

s/ C<span>ARLTON</span> W. R<span>EEVES</span><br>
*United States District Judge*