IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF MISSISSIPPI

NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.: 3:16-cv-00489-CWR-RHWR |
| | ) | |
| | ) | |
| HINDS COUNTY, ET AL., | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| _____ | ) | |

## Court-Appointed Monitor's Sixteenth Monitoring Report

Elizabeth E. Simpson
Court-Appointed Monitor

David M. Parrish                Jim Moeser                Dr. Richard Dudley
Corrections Operations       Juvenile Justice           Corrections Mental Health

1

## EXECUTIVE SUMMARY

The recent surge of COVID-19 associated with the Omicron variant impacted this site visit in several respects. The Corrections Operations expert was on site the entire week of the site visit. The Juvenile expert was recovering from COVID and conducted his site visit remotely the week following the scheduled site visit. The Psychiatrist expert conducted his site visit remotely. The Lead Monitor spent two days on site and two days remotely. Additional days the following week were required because a staff member was out with COVID during the week of the site visit. As with prior visits there was extensive review of documents prior to the site visit.

**Corrections Operations**

In the 15th Monitoring Report the employment of Kathryn Bryan as the Jail Administrator was recognized as a progressive move on the part of Sheriff Vance toward compliance with the terms of the Settlement Agreement.  Unfortunately, shortly thereafter, he passed away from COVID. The Board of Supervisors then appointed Marshand Crisler as the Interim Sheriff until a new election could be held.  Since that time, Interim Sheriff Crisler has been replaced by Sheriff Tyree Jones, who won the runoff election in November and took office on December 3, 2021. Subsequently, the Sheriff terminated and/or accepted the resignation of Major Bryan on January 31, 2022, and the Sheriff brought Frank Shaw on board to fill her position.  However, Mr. Shaw does not meet the requirements of the Settlement Agreement to serve as the Jail Administrator because his entire career has been limited to state prison operations and he has no jail management experience.  Sheriff Jones has designated him as the Interim Jail Administrator for up to six months while a nationwide search is conducted to find a qualified candidate.

The lack of personnel has routinely been noted as the most significant problem facing the Jail System.  Based on the most recent version of the Revised Staffing Analysis, 359 positions are required to operate the Work Center (WC) and Raymond Detention Center (RDC) assuming that A-Pod Housing Units 3 and 4 remain open.  For the past two years, each Monitoring Report has reflected declining numbers of staff, from a high of 256 filled positions to a new low of only 191 in January 2022.  In response to this, rather than address the recruitment and retention problem, the County has unfunded 48 of the 281 authorized and funded positions.

Currently the average daily census of the Jail System is close to 650 inmates.  That is more than the Raymond Detention Center (RDC) and Work Center (WC) can reasonably accommodate considering the fact that there are approximately 30 cells (equal to one entire Housing Unit) in A-Pod at the RDC that have been welded shut for at least a year because the County has not repaired the damaged cells and put them back on-line.

2

The County previously approved a 5% salary increase for Detention personnel. More recently, a subsequent increase in entry level salary to $31,000 was approved, but has not yet been implemented.  Approximately three years ago a merit-based career ladder was proposed by the HCSO, but it was never addressed by the Board of Supervisors (BOS).  As a step in the right direction, Sheriff Jones has proposed a career ladder that deals with each rank and addresses longevity.  While it was recently submitted to the BOS, it was only an "information" item that did not call for definitive action.  The BOS would be well advised to take immediate action, particularly considering the fact that the Mississippi Department of Corrections (MDOC) is currently considering raising the entry level salary for correctional officers to $38,300.

The Settlement Agreement specifies that all facilities in the Jail System are to be operated under the principles of Direct Supervision.  The WC is able to comply with that standard.  The RDC should be able to do so as well because it was originally designed as a Direct Supervision facility, and it actually operated that way from 1994, when it opened, until 2012, when then Sheriff Lewis removed the Detention Officers from the Housing Units.  The riot that ensued and destruction of C-Pod resulted in a two-year reconstruction effort.  A few years later the same Pod had to be reconstructed again because of new damage that was caused by the inmates who were still left unattended and unsupervised.  Consequently, when C-Pod re-opened in October 2020, it was supposed to be as a Direct Supervision housing area with an officer always posted inside each Housing Unit.  That did not happen. Direct Supervision was not re-instituted and damage to the facility continues.  The same thing happened when B-Pod was reconstructed.  It has still not been certified for occupancy, but inmates have been placed back in the Housing Units without Direct Supervision by Detention Officers, so the results are predictable.

The improper use of holding cells in Booking to house inmates for days, weeks, and months still continues even though it was supposed to stop in 2016, when monitoring began.  Holding cells have no windows, day room space, or visitation and recreation areas normally associated with housing areas.  A detainee should not be kept in a holding cell for more than eight hours.  The HCSO routinely violates this standard.  This practice needs to cease permanently.

Classification is understaffed with two vacancies, two officers who are assigned to Classification but not trained to complete classifications, one of whom is also a supervisor in booking, and a third officer assigned to Classification who is trained to classify but not enter the classification into the system. With this deficiency in staffing, Classification cannot reliably provide 24/7 classification. Classification is using an objective classification tool, but it is still not the case that an objective risk instrument is governing the housing placement of inmates when there continue to be gang pods, inmate committees rejecting housing placements, security moving inmates without Classification involvement, lack of bed space and limitations on the use of some housing units.

As previously reported, the accuracy of records has improved, however there continue to be issues with over detention and mistaken releases. During this reporting period, seven instances of over detention were discovered and 2 instances of mistaken release. No incident reports were prepared for these occurrences.

The PREA Coordinator returned on January 3, 2022 after an extensive absence. As a result of her absence, very little PREA activity occurred during the reporting period. One case was investigated, however, several PREA complaints went uninvestigated. There was no inmate education and no in-service training of officers.

**Medical and Mental Health**

The current protocols in place for the management of COVID-19 have been effective, despite the fact that the combination of a shortage of security staff and difficulties with the physical plant have limited the housing options for infected and possibly exposed detainees.  It should be noted however that since an increase in the percentage of detainees who are willing to be tested and vaccinated would still be helpful, the idea of developing and implementing a combination broad-sweeping educational program and incentive program should be reconsidered.

The shortage of security staff also continues to compromise the ability of medical and mental health staff to perform their duties.  Although there are clearly a lot of demands placed on existing security staff, it continues to be important to make supporting medical and mental health staff a high priority.

Most of the planning for the mental health unit has been completed.  However, there have been delays in completing the renovation of the space, there have been delays in the training of security staff who will be assigned to the unit, and there continues to be too few mental health staff to adequately staff the unit.  All three of these issues will need to be addressed/resolved in order for the mental health unit to provide the level of care that it is intended to provide. Even once implemented, the mental health unit will only serve men.

After action reports have only been prepared on one of the seven deaths that occurred in the facility during 2021.  The failure to review/look more closely at the circumstances surrounding those deaths has been a missed opportunity to better understand how an improved working relationship between security and medical/mental health staff could improve safety and security in the jail.

**Youthful Offenders**

At the time of the February virtual visit (conducted January 31-February 3, 2022) there were twenty-six Juveniles Charged as Adults (JCAs) placed at the Henley Young facility, including one female. There has been a steady and notable increase in the Average Daily Population (ADP), contrary to the trend in the prior period. This increases concerns associated with staffing vacancies and the facility's ability to meet the expectations in the agreement.

Similarly, there has been an uptick in the number of more serious incidents involving JCAs, focusing primarily on suicide/self-harm incidents, fights between/among youth, and contraband in the facility. A relatively recent increase in the salary for Youth Care Professionals (YCP), the staff providing direct supervision of youth in the facility, has yet to bear fruit in terms of recruitment. Increased recruitment efforts have been implemented and the job description has been modified to better reflect the role these staff play in the facility, but vacancies and turnover has continued and severely limits the ability of the program to move forward in meeting many requirements of the agreement.

The prior note of stability in the leadership team of staff was disrupted by the sudden resignation of Mr. Frazier as Executive Director on January 3, 2022. The Board/County Administrator moved quickly to appoint Mr. Marshand Crisler to the role of Executive on January 5, 2022. Mr. Crisler had previously served as the Interim Sheriff following the passing of Sheriff Vance in the summer of 2021. Mr. Crisler has a good academic resume and a strong law enforcement background as well as having held various leadership posts but has limited experience working with youth or leading a youth confinement facility. With the exception of a current vacancy for one of the two Qualified Mental Health Practitioner posts, most of the other leadership positions have remained filled by staff on board during the time of the previous report.

Modular units to provide additional and more appropriate education, program, and treatment space are available for use, but staffing shortages has resulted in infrequent utilization. Additional recommendations related to facility plant improvements have not been implemented, and additional needs related to the roof and water system have been developed and need to be addressed.

The education program remains a significant concern, hampered mostly by a shortage of YCP staff to provide adequate supervision, even beyond some restrictions related to COVID. JCA youth are receiving only one-half of the minutes/week of instruction required by Mississippi education standards.

Related to the January 2020 Stipulated Order, the Treatment Coordinator was brought on board in the fall of 2021 and remains on staff. However, continued work needs to be done to secure

additional psychological support/consultation to best meet the requirements of the Stipulated Order. A daily schedule for all programming has been developed but staffing shortages have made consistent implementation difficult.

Overall, consistent leadership continues to be a concern.  Mr. Crisler is serving as the fifth Executive Director since monitoring began in 2016 (four individuals, five periods of appointment) and only time will tell if he will be successful at moving things forward and/or if he will remain in this role for the time needed to successfully implement and sustain needed changes.  One should assume that a sustained commitment over a three-to-five-year period will be needed to get past the "tipping point" toward compliance and operating a fully safe and programmed facility.

**Criminal Justice System Issues**

A CJCC meeting was held on January 13, 2022. There was not a quorum and the meeting was primarily informational. The CJCC continues to be essentially non-functional. The Public Defender, District Attorney and Sheriff have agreed to co-chair the CJCC. The participation of the Sheriff as a co-chair is a good showing of County involvement and leadership in the CJCC. An effective CJCC is important in working towards solutions to some of the criminal justice system issues that contribute to length of stay and overcrowding the Jail. The Monitoring Team has consistently recommended that staff support is essential for a functioning CJCC, but this has not been provided. The length of stay at the Hinds County Jail continues to be approximately double the national average and puts a significant strain on the limited resources of staffing and the physical plant. An effective CJCC can assist in addressing this problem but requires the necessary investment to make it an effective body.

The County has hired a full-time individual to implement the pretrial program. The application to be a learning site for implementation of the Arnold Public Safety Assessment has been rejected because of lack of support by the City of Jackson. This would have met the requirement of the Stipulated Order, although long overdue, to retain a consultant to assist with the development of a pretrial program. Although the new pre-trial director appears to have great energy and motivation, she does not have experience with a pretrial program. Without technical assistance, development of a pretrial program is unlikely.

## STIPULATED ORDER UPDATE

On January 16, 2020, the Court entered a Stipulated Order resolving the pending Motion for Contempt. This triggered the deadlines in the Stipulated Order for remedial measures to move towards compliance with the Settlement Agreement. All of the provisions of the Settlement Agreement remain in effect. The following table tracks compliance with the Stipulated Order.

**STIPULATED ORDER UPDATE**

| Compliance Due Dates | Stipulations | Full compliance by due date? (Yes/No/N/A) | When was full compliance achieved? (Date) | Status Update |
|---|---|---|---|---|
| 02-16-20 | II. B. 1. Within 30 days, the County shall retain an appropriately credentialed corrections recruitment and retention consultant, with input from the Monitor. | Yes, but not consistently utilized | 10/2019 | Consultant was retained through the Monitoring Team. However, there was not regular engagement by HCDS staff and the contract was dropped. Jail Administrator Bryan was utilizing the contract. It is unclear whether the services will continue to be utilized. |
| | III. C. 1. Within 30 days, the Jail shall ensure that handheld video recorders are available and planned uses of force are video recorded. | No | 3/2020 (but cameras at RDC no longer function) | As yet, there have been no video recordings of planned Uses of Force (UOF) although there have been some incidents that should have been considered planned UOF. The cameras at the WC still function but the cameras at RDC do not. It is reported that new cameras have been ordered. However, this is some months ago. |
| | V. A. Within 30 days, the County will post at a locally competitive salary for a full time clinical social worker or psychologist to serve as a treatment director or coordinator. | | 5/22/20-but vacant and filled | A full-time Treatment Coordinator was hired in mid-August 2021. Her certification is at a master's level in counseling, and discussions will continue related to securing additional psychologist support and/or consultation but have yet to result in any agreement/contract. |

| | | No | in mid-August 2021 | The opening for a psychologist remains posted, but there is no evidence of additional outreach efforts to secure this support. |
|---|---|---|---|---|
| | I. A. The County shall use a qualified security contractor, with the assistance and oversight of an architect with corrections experience to accomplish the safety and security measures at RDC. The architect shall conduct periodic inspections. | No | 4/15/20 | The County has entered into a contract with Benchmark Construction (Project Manager and Contractor) and Cooke, Douglas, Farr & Lemons Architects & Engineers (CDFL, PA). This was reportedly on 4/15/20. The Monitoring Team has not seen the documentation of any inspections by CDFL. |
| 03-16-20 | II. C. 1. Within 60 days, the County shall adjust the Jail Administrator job description as needed to adhere to the minimum qualifications and post the position at a locally competitive salary. | Yes | 2/6/20 | Job description revised and posted on 2/6/20 |
| | III. A.1. Within 60 days, the County shall provide a Table of Contents listing the policies and procedures to be developed, anticipated deadlines for completion of each draft policy, and deadlines for submission of each draft policy to the Monitor and DOJ. The Table of Contents deadlines shall prioritize policies that are necessary for safety and security. | Yes | 3/16/20 | |
| 3-30-20 | III. A. 3. Within 14 days of receiving the Table of Contents, DOJ will identify policies that may be disseminated to staff on an interim basis before the Settlement- | | | |

| | | | | |
|---|---|---|---|---|
| | required policy review and approval process is completed. | Yes | 3/27/20 | |
| 04-16-20 | II. A. Within 3 months, the County shall create a staffing plan to increase the supervision of inmates at RDC. The plan shall include the following:<br>II.A. 1. A plan to provide direct supervision for Pod C when it reopens. | Yes | 4/13/20 | The Revised Staffing Plan was developed in April 2020.  It specified direct supervision staffing for all three pods at the RDC.  On August 1, 2020, the Sheriff issued an order that called for direct supervision staffing in C-Pod upon its reopening (which occurred on October 22, 2020).  C-Pod has never been operated as a direct supervision Pod. |
| | II.A. 2. A staffing plan which optimizes the use of available staff to provide supervision at all three facilities including, among other strategies, rotation of staff from JDC and the WC to RDC to increase the staff coverage of RDC. | No | | The staffing plan does not address this paragraph. The prior Jail Administrator reassigned some supervisors from the WC to RDC but this has not kept pace with the number of officers leaving. |
| | II.A. 3. An increase in the time that officers are in the housing units at RDC by having the control officers fill out the housing unit logs based on radio communication from the housing unit officers and utilize welfare check sheets at the cell doors of those inmates held in segregation. | No | | Directive issued on 9/27/19 by the previous Jail Administrator; radios assigned. Review of incident reports discloses that the directive is not followed as has also been noted in the QA reports. |
| | II. A. 4. At the Work Center, installation of an alarm system on the housing unit fire exit doors. The County will add a camera that covers each of the four fire exit doors. This will allow only one officer to manage each housing unit and will result in an opportunity to assign 20.4 positions to other | | | The alarms and cameras were installed in April 2020. The operations did not shift to direct supervision with one officer in the unit until September, 2020. |

| | | | | |
|---|---|---|---|---|
| | areas or facilities. This work will be completed within 3 months. | Yes | 4/2/20 | |
| | III. B. 1. Within 3 months of the United States' and Monitor's approval of each policy or procedure, the County shall develop the curriculum and materials for training on the new policy or procedure. | No | | New policies have been provided to staff. In service training recommenced in April 2021, but all officers have not been trained on the policies for which training has been developed and training has not been developed for all new approved and adopted policies. |
| | III. B. 2. Within 3 months of the United States' and Monitor's approval of each policy or procedure, the County shall develop the training plan for training new and current detention officers and staff on the new policy or procedure, with dates for completion of each set of training. | No | | Training on the Use of Force Policy, adopted 2/1/20, had been postponed several times due to COVID. In the interim, UOF training has been provided to all supervisors as of March 2020. In-service training has now recommenced but not all officers or new supervisors have been trained on UOF. |
| | V. B. Within 3 months, Henley-Young shall administer a daily program, including weekends and holidays, to provide structured educational, rehabilitative, and/or recreational programs for youth during all hours that youth shall be permitted out of their cells. Programming shall include:<br>1. Activities which are varied and appropriate to the ages of the youth;<br>2. Structured and supervised activities which are intended to alleviate idleness and develop concepts of cooperation and sportsmanship; | | | A more complete daily schedule has been developed that outlines times for more structured activities. Per staff involved in leading many of the activities there has been no improvement, and perhaps a decline, in attendance and limited expectations for staff to support/reinforce attendance by not simply turning that time into "free time" in which youth play cards/dominos or simply watch TV. Challenges with sufficient staffing |

| | | | |
|---|---|---|---|
| | 3. Supervised small group leisure activities, such as a wide variety of card and table games, arts and crafts, or book club discussions; and<br>4. Hinds County, by and through its County Administrator and/or Executive Director at Henley-Young, shall maintain exclusive control and maintenance of any facilities or technology that promotes compliance with this provision. | No | | and facility space options continue to plague full compliance. |
| | V. C. The programming described in Paragraph B shall include group and individual psychosocial skill building programs designed to address criminogenic needs and promote positive youth development such as:<br>1. cognitive behavioral programming;<br>2. independent living skill training;<br>3. relationship and positive communication skills;<br>4. anger management;<br>5. peer refusal skills;<br>6. trauma informed programming; and<br>7. pre-vocational skill building. | No | | The mental health team (Youth Support Specialists and QMHPs) have worked to identify and implement evidence-based curriculum/programs in the areas outlined.  The frequency and duration of those sessions remains too limited as well as integrating those activities into a facility-wide behavior management and skill development framework. |
| 05-16-20 | I.  A. 1. In any occupied pod, the County will convert all control room doors, housing unit entry doors, recreation yard doors (that open into the "horseshoe"), isolation doors and "cage doors" to electronically controlled swing doors to the control panel so they can be electronically operated with a CML type locking mechanism. | No | | This has been completed in C-Pod and A Pod and now in B-Pod. Although the security doors in A-Pod have been changed from a sliding to a swinging configuration, and they now lock, their operation is still by key, not electronic control. |

| | | | | |
|---|---|---|---|---|
| | I. A. 2. Within 4 months, the County shall reinforce all C Pod cell doors with a strip of steel to reduce the risk of tampering as part of the ongoing renovation of this Pod. | Yes | 4/30/20 | |
| | I. A. 3. In B Pod, the County shall modify the control room doors, housing unit doors, and recreation doors to swinging doors. The County also shall install a new electronic control panel so that all doors can be electronically controlled. The "cage" doors have a keyway on only one side. The County also shall upgrade the "cage" doors so that there is a keyway on each side (as is currently the case in C Pod). The County shall repair the primary security door that controls access between the main corridor (Great Hall) and B Pod as a part of the B Pod modifications so that it can be controlled electronically from master control. | No | 9/21 | This work has now been completed in B-Pod although other issues prevent B-Pod from being fully occupied. |
| | I. A. 4. The County will reinstall the fire hoses in secured cabinets as part of the renovation process of each pod. | No | | Fire hoses have been installed in C Pod during the renovation but have been removed in some units because inmates destroyed the cabinets. They have not been reinstalled in the other 2 pods the renovation of which is now overdue. |
| | I. B. 1. Retain a consultant with experience in master planning to facilitate the process of long-term planning The County will retain the consultant within 4 months. | Yes | 4/15/20 | CDFL and HDR, Architects, have been retained. |
| | I. B. 4. Form a committee to develop and implement the Master Plan, which will | | | County contracted with facilitators and formed a committee to work |

| | | | | |
|---|---|---|---|---|
| | include the County Administrator, the Sheriff, the Jail Administrator, the facility captains, and the Board of Supervisors President. Other members may be included at the discretion of the County and the Sheriff. | Yes but not fully because facility captains not included | 4/28/20 | with the facilitators. The consultants completed the master plan recommendations on January 15, 2021. They are now working on phased implementation of Option 2 of the Master Plan. |
| | II. B. 2. Within 4 months, the County shall hire or designate a full-time Recruitment Officer within the Detention Division specifically for recruitment of detention officers. | No | 6/1/20 | There has been frequent turnover in this position. It has been vacated several times and is now filled again. |
| | II. B. 3. Within 4 months, with the assistance of the recruitment and corrections consultant, the County shall develop a Recruitment and Retention Plan to implement the substantive requirements of the Settlement. | No | | A Recruitment and Retention Plan has been developed by the HR Consultant and the prior Jail Administrator. It is not clear whether the County will commit to the work outlined in the plan. |
| | IV. A. The County shall develop a Pretrial Services program to provide for long-term population management which will maximize the options in facility use. The program shall include the following: 1. Within 4 months, the County shall retain a consultant experienced in the area of implementation of pretrial services programs. | No | | The County has not retained a consultant. The County has not been selected as a learning site with Advancing Pretrial Policy and Research because not all stakeholders agreed to provide a letter of support. |
| | IV. A. 2. Within 4 months, the County shall hire a full time individual qualified to oversee the development and implementation of a pretrial services program. This individual shall have or within 12 months shall obtain certification | | | The County has hired a Director who started on November 9, 2021. She has not been certified by NAPSA. |

|  |  |  |  |  |
|---|---|---|---|---|
|  | by the National Association of Pretrial Services Agencies (NAPSA). | No |  |  |
|  | IV. A. 3. The County shall engage stakeholders in the implementation of a pretrial services program either through the CJCC or a specially formed committee. | No |  | The development of a pretrial program has been discussed at CJCC meetings but has not included all necessary stakeholders or focused on actual implementation. |
|  | IV. A. 4. The County shall provide the technical support for implementation of a risk assessment instrument for purposes of pretrial release decision-making. | No |  |  |
| 5-16-20 (1 month to post and 3 months to make an offer) | V. A. If there is a qualified candidate(s) for HY treatment director or coordinator, the County will make an offer within 3 months of posting the position. If there is not a qualified candidate, the County will consult with the Monitor and United States to determine appropriate adjustments to the recruiting process and will report regularly, and at each status conference, regarding its efforts. If a clinical social worker is hired for the position, the County will contract with a psychologist to provide any assessment, therapeutic or consultation services needed in addition to the services of the clinical social worker. The County will consult with the Monitor to set the appropriate number of contract hours. | No |  | The position was not posted until 5/22/20. The position was filled in late September, 2020 with the hiring of a clinical social worker but she resigned after 8 weeks. The County filled the position as of May 30, 2021 with a half-time person who left shortly thereafter. A new Treatment Coordinator began full-time in mid-August. As of February 2022, the County has not yet contracted with a psychologist to provide additional services or consultation, although some technical assistance is being provided via an arrangement through SPLC. Although helpful, it does not meet the letter or intent of this section. |
| 06-16-20 | III. C. 2. Within 5 months, an individual experienced in corrections shall train |  |  | Training was scheduled but had been delayed due to COVID. UOF |

| | | | | |
|---|---|---|---|---|
| | deputies on a Settlement-compliant use of force policy, including Settlement requirements for reporting of use of force. | No | | training is provided to new recruits during the basic academy. Now that in-service training has recommenced UOF training for existing staff is being provided but not all officers have been trained yet. |
| | III. C. 3. Within 5 months, supervisors shall be trained on use of force reviews so that they include collection and preservation of videos, witness statements, and medical records. This training shall emphasize supervisors' responsibility for ensuring complete use of force reports and for referring staff for training and investigation, as required by the Settlement. | No | 9/2020 | Training on supervisory review of UOF incidents was included in the UOF training of the supervisors. Incident reports indicate that supervisors are approving reports that disclose improper use of force. Since the time of the supervisors' training, new supervisors have been promoted and need training. |
| 07-16-20 | I. A. 5. The County shall convert the cell doors in B Pod Units 3 and 4 to swinging doors with the CML type locking mechanism that is in place in the sample cell in C Pod. The County shall also reinforce the cell doors in Units 1 and 2 with a strip of steel as is being used in C Pod. These renovations will be completed within 6 months. | No | 10/21 | |
| | I. A. 6. If A Pod is not utilized for housing, renovation of A Pod recreation yard and cage doors and the control panel may be postponed until such time as it is used for housing. If A pod is used even on an occasional basis, these doors will be | | | Since the renovation of B Pod is still underway, A Pod continues to be used contrary to the time line in the Stipulated Order. At the time of the site visit the plan was to continue to use two housing units on A-Pod which will require renovation. The |

| | | | | |
|---|---|---|---|---|
| | converted to secure swinging doors and tied to a new control panel. | No | | County recently informed the Monitors that now the plan is not to use A-Pod. No other information or timeline has been provided at this time. |
| | I. A. 7. The County shall replace all holding cell doors in the booking area with modern full transparent panel (both top and bottom) security doors to facilitate deputies conducting a documented fifteen-minute well-being check on each multi-person cell and occupied single cell. The County will discontinue the use of the holding cells that are not directly visible from the booking station. This will be completed 6 months. | No | | Multiple person cell doors have been replaced but single cells continue to be used for housing without the required doors. It was anticipated that Booking would no longer be used for housing when C Pod opened. However, it continues to be used for housing. |
| | II. B. 4. Within 6 months, the County shall develop and implement a process that provides criteria for merit-based promotion and establishes a career ladder. | No | | A draft Career Development Plan had been submitted to the Board of Supervisors with no action. The new Sheriff has submitted a Plan for information purposes. |
| 7-16-20 (2 months to post and 4 months after that to offer) | II. C. 2. If there is a qualified candidate(s) for Jail Administrator, the County shall make an offer to hire an individual to fill the position within 4 months of posting the position. If there is not a qualified candidate, the County, Monitor and United States will confer to determine next steps and will report to the Court regarding the same. | Yes | 6/1/20 | A new well qualified Jail Administrator was hired in June 2021. However, she is no longer employed by the County. The interim Jail Administrator does not have the experience in jail administration although does have experience in prison administration. |
| 8-16-20 (2 months to post, 4 months to | II. C. 3. Within 30 days of hiring the Settlement-compliant Jail Administrator, this individual shall evaluate the organizational structure of the three-facility | | | The prior Jail Administrator did an assessment and moved some supervisors from the WC to RDC. |

| | | | | |
|---|---|---|---|---|
| offer, and 1 month evaluate structure | jail system and develop a plan to reassign staff consistent with any change in the organizational structure. | No | | |
| 10-16-2020 | IV. A. 5. The County shall authorize the free attendance at NIC training for pretrial executives for individuals involved in the development of the pretrial program within 9 months. | No | | |
| 11-16-2020 | II. B. 5. Within 10 months, the County shall implement a plan for retention pay based on merit, time in service, or a combination. | No | | |
| | II. B. The County shall improve recruitment and retention initiatives to ensure adequate levels of competent staffing to provide reasonably safe living conditions in the Jail. | No | | A Recruiting Officer is working on initiatives to hire qualified Detention Officers. A 5% pay raise for detention officers and a $31,000 base pay has been approved. Other initiatives have not been addressed. |
| | I. B. Within 10 months, the County shall complete a Master Plan to determine the long-term use of each of the three facilities and evaluate the option of building a new facility or further renovating existing facilities. | No | 1/15/21 | The master plan recommendations report was completed on 1/15/21. The Master Planning Committee is now proceeding with planning a phased implementation of Option 2 of the Master Plan. |
| | I. B. 2. The master plan will include deadlines for other necessary safety and security repairs and renovations at all three facilities, as long as they remain open, including deadlines for installing necessary fire suppression/prevention systems, all of which will be conducted by a qualified security contractor. | No | 1/15/21 but not fully because deadlines for renovations not included | The master plan recommendations report includes a listing of necessary safety and security repairs. The report does not include and the County has not adopted a master plan with deadlines for making those repairs. |

| | | | |
|---|---|---|---|
| 4/16/21 | IV. A. 4. The risk assessment tool shall be implemented within one year after retaining the pretrial services consultant. | No | | |
| Ongoing | I. B. 3. [The County shall. . .] [w]ork with the monitoring team to gather the information that is needed for the long-term planning process. | Yes | | |
| | III. A. 2. The County's policy committee will provide draft policies to the monitoring team and DOJ consistent with the timeline identified in the Table of Contents, will notify the Monitor and DOJ of any anticipated delays to meeting projected submission dates and will implement an identified plan to correct the delays. The monitoring team and DOJ will make a good faith effort to return comments and suggestions about the draft policies within a two-week time frame. The policy committee will make a good faith effort to incorporate those suggestions and consider those comments. | No | | The policy development and review process has been proceeding with 36 policies now approved. Not all projected deadlines have been met. Progress was stalled. The prior Jail Administrator was working on the development of new policies. During this time a new point person was assigned to work on policies for HCDS. She has been moving some policies forward but it is too early to tell what pace will be maintained in the upcoming months. |

**Monitoring Activities**

The Monitoring Team conducted a Remote Site Visit October 4, 2021, through October 8, 2021 with some follow up interviews. The site visit schedule was as follows:

Site Visit Schedule

January 24-February 4, 2022

| Date and Time (CT) | Lisa Simpson | Dave Parrish | Dr. Rick Dudley |
|---|---|---|---|
| Monday, Jan. 24th | | | |
| 9:00 | Major Bryan, Chief Simon, Captains Caston and Conner | Major Bryan, Chief Simon, Captains Caston and Conner | HSA Weinfield |
| 10:30 | Tour RDC | Tour RDC | 11:00 Representative from Nursing Staff |
| 1:30 | Sgt Tillman | Tour WC, interview Sgt and return to RDC | Major Bryan |
| 2:30 | | | MH Coordinator Ms. Martin |
| 3:30 | PREA-Sheena Fields | | |
| Tuesday, Jan. 25th | | | |
| 9:00 | Lt. George | Tour WC | Medical Nurse Practitioner Lott |
| 10:00 | 10:30 Priscilla Dawson | Priscilla Dawson | Mental Health Nurse Practitioner Bell |
| 12:00 | Lt. Childs (and IAD investigator) | Lt. Childs (and IAD investigator) | Nurse Gray |
| 1:00 | Lt. Holmes, Investigators Elkins and Edwards | Lt. Holmes, Investigators Elkins and Edwards | 1:30 Mental Health Unit with Ms. Martin, Krista Chick, and others designated by QCHC |
| 2:00 | Tony Gaylor and County Administrator Jones | Tony Gaylor and County Administrator Jones | |
| 3:00 | | | |
| 4:00 | Sheriff Jones | Sheriff Jones | |
| | | | |
| Wednesday, Jan. 26th | | | |
| 9:00 | travel | Doris Coleman | |

| 10:30 | | Mioka Laster | Person with full access to EMR for medical records review |
|---|---|---|---|
| 1:00 | | Tony Hannah | HSA Winfield |
| 3:00 | | RDC Sgt | |
| Thursday, Jan. 27th | | | |
| 9:00 | | Captain Burley and Lt. Knox | |
| 11:00 | Tanecka Moore | | |
| 1:00 | Erika Scott, Court Liaison | Sgt. Booking | |
| 2:30 | | Tour RDC | |
| Friday, 28th | | | |
| 9:00 | Master Planning | Master Planning | |
| 11:00 | Ms. Boykins, Pretrial Serves Director and Tanecka Moore | | |
| Tuesday, Feb. 1st | | | |
| 12:00 | Sgt. Jones, Classification | | |
| 3:00 | Jimikia Scott, Grievance Coordinator | | |

| Date/Time | Interviews conducted by Jim Moeser (via Zoom) |
|---|---|
| Monday, Jan. 31 | |
| 9:00 | Mr. Crisler, Interim Director |
| 10:30 | Eric Dorsey, Quality Assurance Manager |
| 1:00 | Ms. Carol Warfield, Treatment Coordinator |
| 2:30 | Ms. Brenda Drake (f/k/a Frelix), QMHP |
| | |
| Tuesday, February 1 | |
| 9:00 | Mr. Caldwell, School Principal |
| 10:00 | Court Status conference |
| 1:00 | Mr. Eddie Burnside, Operations Manager |
| 2:30 | YSS/Case Managers Barber and Jones |
| 3:30 | Ms. Andrea Baldwin, Program Coordinator |
| | |
| Wednesday, February 2 | |
| 11:30 | Youth Care Supervisor Marshall |
| 10:30 | Learning/Development/Training coordinator (Ms. Foster) |
| 1:00 | Mr. Foster, Training Coordinator |

| | |
|---|---|
| 2:30 | Supervisor Lily Young (recently assigned to Training) |
| | |
| Thursday, February 3 | |
| 10:30 | Exit call w. Mr. Crisler |

## COMPLIANCE OVERVIEW

The Monitoring Team will track progress towards compliance with the following chart. This chart will be added to with each Monitoring Report showing the date of the site visit and the number of Settlement Agreement requirements in full, partial or non-compliance. Sustained compliance is achieved when compliance with a particular Settlement Agreement requirement has been sustained for 24 months or more. (This was changed from 18 months in order to align with paragraph 164 which requires 2 years of substantial compliance for termination of the Agreement). The count of 92 requirements is determined by the number of Settlement Agreement paragraphs which have substantive requirements. Introductory paragraphs and general provisions are not included. Some paragraphs may have multiple requirements which are evaluated independently in the text of the report but are included as one requirement for purposes of this chart. The provisions on Youthful Offenders are now only evaluated for compliance at Henley Young. The reason for this is that there are no more juveniles at RDC.

| Site Visit Date | Sustained Compliance | Substantial Compliance | Partial Compliance | NA at this time | Non-Compliant | Total |
|---|---|---|---|---|---|---|
| 2/7-10/17 | 0 | 1 | 4 | 2 | 85 | 92 |
| 6/13-16/17 | 0 | 1 | 18 | 2 | 71 | 92 |
| 10/16-20/17 | 0 | 1 | 26 | 1 | 64 | 92 |
| 1/26-2/2/18 | 0 | 1 | 29 | 0 | 62 | 92 |
| 5/22-25/18 | 0 | 1 | 30 | 0 | 61 | 92 |
| 9/18-21/18 | 1 | 0 | 37 | 0 | 54 | 92 |
| 1/15-18/19 | 1 | 1 | 44 | 0 | 46 | 92 |
| 5/7-10/19 | 1 | 6 | 42 | 0 | 43 | 92 |
| 9/24-29/19 | 1 | 6 | 47 | 0 | 38 | 92 |
| 1/21-24/20 | 1 | 6 | 49 | 0 | 36 | 92 |
| 6/8-12/20 | 1 | 6 | 51 | 0 | 34 | 92 |
| 10/5-21/20 (corrected) | 1 | 6 | 54 | 0 | 31 | 92 |
| 2/8-11/21 | 2 | 6 | 53 | 1 | 30 | 92 |
| 6/7-11/21 | 2 | 2 | 59 | 1 | 28 | 92 |
| 10/4-8/21 | 3 | 0 | 59 | 1 | 29 | 92 |

| 1/24-28/22 & 1/31 to 2/3/22 | 3 | 0 | 59 | 1 | 29 | 92 |
|---|---|---|---|---|---|---|

## INTRODUCTORY PARAGRAPHS

Text of paragraphs 1-34 regarding "Parties," "Introduction," and "Definitions" omitted.

## SUBSTANTIVE PROVISIONS

## PROTECTION FROM HARM

Consistent with constitutional standards, the County must take reasonable measures to provide prisoners with safety, protect prisoners from violence committed by other prisoners, and ensure that prisoners are not subjected to abuse by Jail staff.  To that end, the County must:

37. Develop and implement policies and procedures to provide a reasonably safe and secure environment for prisoners and staff.  Such policies and procedures must include the following:

    a.  Booking;
    b.  Objective classification;
    c.  Housing assignments;
    d.  Prisoner supervision;
    e.  Prisoner welfare and security checks ("rounds");
    f.  Posts and post orders;
    g.  Searches;
    h.  Use of force;
    i.  Incident reporting;
    j.  Internal investigations;
    k.  Prisoner rights;
    l.  Medical and mental health care;
    m.  Exercise and treatment activities;
    n.  Laundry;
    o.  Food services;
    p.  Hygiene;
    q.  Emergency procedures;
    r.  Grievance procedures; and
    s.  Sexual abuse and misconduct.

**Partial Compliance**

As was previously reported, the Stipulated Order calls for a total of 90 policies that need to be developed and implemented.  Of those, 48 are identified as priority policies. So far, 38 policies

have been approved by the DOJ and all 38 have been adopted by the Sheriff.  Of the 19 policy areas listed above, 15 have been addressed in whole or in part by policies that have been adopted. "Housing Assignments" has been addressed in a housing plan. Five policies are currently in some level of the review process. Although progress is being made, the target dates for policy development have not been met.

The process of policy development and approval/adoption has been hampered by the constant change of key personnel within the Hinds County Sheriff's Office (HCSO) and Detention Services Division.  That includes four Sheriffs and four Jail Administrators and the staff overseeing policy development.  The current person coordinating policy development appears competent to do so and, hopefully without more turnover, the process will proceed more swiftly. As has been previously noted, no Post Orders have been issued to date.  Their issuance is dependent upon the adoption of policies, which have yet to be developed as required.

The development of a complete set of policies, approved by the DOJ and adopted by the Sheriff, is moving forward but this has been at a less than satisfactory rate.  The first two years of the monitoring process resulted in virtually no progress, but the addition of a coordinator employed through the Monitor resulted in positive movement. With changes in HCDS personnel there was less engagement by HCDS staff in the policy development process which slowed the pace. While the review process has never been accomplished at a satisfactory level, there was some recent improvement. There has now been another change in the Jail Administrator position so the next few months will be indicative of how this process will continue.

There is still a concern that some of the adopted policies do not appear to be implemented or fully implemented. Neither the officers or supervisors have received in-service training on most of the policies although new cadets receive such training. Implementation of policies requires the training of all staff on each policy as it is approved and adopted.  A detailed analysis of the training effort is contained in paragraph 45, but the training effort has been hampered by both COVID restrictions and the lack of staff.  Both problems have prevented new policies from being put into practice as they should be. The failure to adequately implement adopted policies is reflected in incident reports which indicate that on occasion officers, including supervisors, continue to use OC as a coercive measure in order to make inmates comply with verbal directives. Other examples of where policies have not been implemented include the failure to conduct well-being checks as required by the Supervision and Post Operations Policy, 9-200 or provide required recreation as required by the Recreation Policy, 16.500.

38. Ensure that the Jail is overseen by a qualified Jail Administrator and a leadership team with substantial education, training and experience in the management of a large jail, including at least five years of related management experience for their positions, and a bachelor's degree. When the Jail Administrator is absent or if the position becomes vacant, a qualified deputy

administrator with comparable education, training, and experience, must serve as acting Jail Administrator.

**Non-Compliant**

This paragraph was carried as Partial Compliance because the new Jail Administrator, who was hired in June 2021, met all of the qualifications to hold the position.  Her education, experience and credentials in the field of pretrial (jail) corrections set her apart from any of her predecessors. The previous Assistant Jail Administrator did not meet the educational requirement of the position; however, he was terminated for cause in October 2021.  His replacement, who was appointed shortly thereafter, did not have the required education, but he had been enrolled at Hinds County Community College since January of 2021.  All of this changed on January 31, 2022, when the recently elected Sheriff let go the Jail Administrator. Subsequently, the Sheriff hired an Interim Jail Administrator who took up his duties on February 21, 2022.  Although he meets the education requirement, his resume indicates that he does not have any experience in jail operations or administration.  In fact, his entire career has been spent working in state prisons in Illinois, Mississippi and Arizona.  Until such time as a qualified Jail Administrator is appointed, this paragraph reverts to Non-Compliant.

39. Ensure that all Jail supervisors have the education, experience, training, credentialing, and licensing needed to effectively supervise both prisoners and other staff members.  At minimum, Jail supervisors must have at least 3 years of field experience, including experience working in the Jail.  They must also be familiar with Jail policies and procedures, the terms of this Agreement, and prisoner rights.

**Partial Compliance**

During the past monitoring period there have been only two promotions.  The Captain in charge of the WC was promoted to Assistant Jail Administrator.  While he did not meet the college education requirement, his experience as commander of the only Direct Supervision facility prepared him well for the responsibilities of his new position.  Subsequently, he was designated as the Acting Jail Administrator upon the termination of the Jail Administrator.  The Lieutenant assigned to the WC was subsequently promoted to the rank of Captain in charge of that facility. He is well qualified for that position.

As was noted in Paragraph 37, in-service training has recommenced, starting with a review of several approved and adopted policies.  A concerted effort is required in order to provide that training to all supervisors on all such policies.  That has not been accomplished to date.

40. Ensure that no one works in the Jail unless they have passed a background check, including a criminal history check.

**Sustained (Substantial) Compliance**

The HCSO continues to comply with the requirement that all applicants have passed a background check, including a criminal history check.  That was confirmed by the Director of Human Resources during the January site visit as well as a review of the personnel files of recently employed Detention Officers. The prior Jail Administrator expressed concern that the background checks were not thorough enough and stated that she was working to enlist investigators to assist in this process. This will be followed. It should be noted that it was not possible to meet with the Screening Investigator/Recruiting Officer during the January site visit.

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail housing units.

**Non-Compliant**.

The HCSO has never addressed the provisions of this paragraph adequately.  In previous Monitoring Reports lengthy and detailed explanations have been provided.  Rather than reiterate what has been previously stated, it is sufficient to note that the Jackson Detention Center (JDC), which has been closed for two years, can never meet the standard of Direct Supervision operation because of its physical design (Linear Intermittent Surveillance).  Its closure actually makes it possible for the HCSO to eventually comply with this paragraph without having to wait for a new Direct Supervision jail to be built.  However, operation of the transfer waiting area on the first floor still has to be upgraded in order to comply with the Direct Supervision standard.

The Work Center (WC) was originally designed as a minimum security "Joint State County Work Center", but has since been modified and improved so that it actually functions as a reduced custody Direct Supervision jail holding 64 inmates in each of its four housing units. Currently, one officer is supposed to be assigned to each unit at all times, with no exceptions. Staffing shortages, in part due to the recent surge of COVID cases, resulted in officers covering more than one unit. Indicative of the benefits of Direct Supervision, there was an increase in the number and severity of incidents in that time frame. See, e.g., IR#220003 where an assault occurred when an officer was covering two units instead of having an officer in each unit.

The Raymond Detention Center (RDC), opened in 1994, was designed to be a Direct Supervision jail with an officer assigned to each housing unit at all times.  That system worked, in spite of the poor design and construction of the facility, until 2012, when the (then) Sheriff pulled the officers out of the housing units.  That resulted in a total loss of control of the facility and a major riot which caused C-Pod to be closed for two years so that it could be completely renovated.  It was subsequently closed again for a second renovation due to inmate damage resulting from lack of supervision.  When it re-opened (for the second time) on October 20, 2020, it was supposed to be under the principles and staffing requirements of Direct Supervision. Unfortunately, that did not happen.  Over the past year and three months, housing units have

been routinely left unattended.  This fact was previously documented in incident reports as identified in the 15th Monitoring Report, and see more recently, e.g., IR# 220049,220051, 220111.  It was substantiated by the review of housing unit logs during the January site visit which verified that no officer was present for hours and sometimes days on end.  These findings are substantiated by the findings of the Quality Assurance Officer (see her November, December and January reports). In fact, the January report states that in a weekend in January there were only three officers working the pods, one officer in each control room and no officers in the units.

During the January site visit the Corrections Operations member of the Monitoring Team noted that there was only one officer on duty to supervise inmates in C-4 and C-4 ISO over a period of four days.  C-4 is a confinement (lockdown) housing unit which requires that two officers be assigned at all times to conduct 30-minute well-being checks.  C-4 ISO is a small unit adjacent to C-4, that is used for the constant supervision of inmates on suicide watch.  The single officer noted above was responsible for handling the job of three officers—a physical impossibility. The log that he maintained indicated compliance with policy—30-minute well-being checks in C-4 and 15-minute notations dealing with constant supervision on the inmates under suicide watch.  It should be noted that those inmates were locked down in individual cells inside C-4 ISO, making it impossible to observe them constantly.  The officer's log indicated that all required well-being checks and constant observation notations (at 15-minute intervals) were completed.  In fact, they were not, based on the observations of the Monitoring Team member.

The failure to provide Direct Supervision is, no doubt, in part due to the lack of sufficient staff. However, the unit officers who are supposed to be in the units are often sitting in the control rooms. This was previously addressed as set out in the Stipulated Order by ensuring that the unit officers had radios and could call in their well-being checks to the Control Room Officer. A directive was issued to this effect. This directive is routinely ignored and not enforced. The Quality Assurance Officer reports that every time she goes into the pods she finds the unit officers in the control room. The incident reports often reflect this. For example, in IR # 220049, the officer states that he was sitting in the control room when he saw an inmate run across the recreation yard and slide something under C-1 door. This report was approved without any apparent discipline.

The fact is that C-Pod housing units have been left unattended for extended periods of time which has resulted in them being heavily damaged again.  The officer's bathroom door in C-2 was literally ripped off its hinges and the room was basically unusable.  The fire hose had been removed from the housing unit because the cabinet was no longer lockable.  The same applied to the fire extinguisher because there was no secure place to keep it within the housing unit.  While C-Pod was supposed to reopen as a Direct Supervision housing area, the reality of the situation

for over a year has been that the inmates still have control whenever an officer is not present, and that is frequently.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Jail.  The parties recognize that the Board allocates to the Sheriff lump sum funding on a quarterly basis.  The Sheriff recognizes that sufficient staffing of the Jail should be a priority for utilizing those funds.  To that end, the County must at minimum:

    a.  Hire and retain sufficient numbers of detention officers to ensure that:

        i.  There are at least two detention officers in each control room at all times;

        ii.  There are at least three detention officers at all times for each housing unit, booking area, and the medical unit;

        iii.  There are rovers to provide backup and assistance to other posts;

        iv.  Prisoners have access to exercise, medical treatment, mental health treatment, and attorney visitation as scheduled;

        v.  There are sufficient detention officers to implement this Agreement.

    b.  Fund and obtain a formal staffing and needs assessment ("study") that determines with particularity the minimum number of staff and facility improvements required to implement this Agreement.  As an alternative to a new study, the September 2014 study by the National Institute of Corrections may be updated if the updated study includes current information for the elements listed below.  The study or study update must be completed within six months of the Effective Date and must include the following elements:

        i.  The staffing element of the study must identify all required posts and positions, as well as the minimum number and qualifications of staff to cover each post and position.

        ii.  The study must ensure that the total number of recommended positions includes a "relief factor" so that necessary posts remain covered regardless of staff vacancies, turnover, vacations, illness, holidays, or other temporary factors impacting day-to-day staffing.

        iii.  As part of any needs assessment, the study's authors must estimate the number of prisoners expected to be held in the Jail and identify whether additional facilities, including housing, may be required.

    c.  Once completed, the County must provide the United States and the Monitor with a copy of the study and a plan for implementation of the study's recommendations.  Within one year after the Monitor's and United States' review of the study and plan, the County must fund and implement the staffing and facility improvements recommended by the study, as modified and approved by the United States.

   d.  The staffing study shall be updated at least annually and staffing adjusted
       accordingly to ensure continued compliance with this Agreement.  The parties
       recognize that salaries are an important factor to recruiting and retaining qualified
       personnel, so the County will also annually evaluate salaries.
   e.  The County will also create, to the extent possible, a career ladder and system of
       retention bonuses for Jail staff.

**Non-Compliant**

The Sheriff's Office and County have not complied with the provisions of this paragraph.  In
fact, the failure to comply has become more pronounced with time.  The lack of personnel has
routinely been noted as the most significant problem facing the Jail System.  Based on the most
recent version of the Revised Staffing Analysis, 359 positions are required to operate the Work
Center (WC) and Raymond Detention Center (RDC) assuming that A-Pod Housing Units 3 and 4
remain open.  For the past two years, each Monitoring Report has reflected declining numbers of
staff, from a high of 256 filled positions to a new low of only 191 in January 2022.  Previously,
that number had fluctuated between 204 and 256.  The inability to fill and retain required
positions makes compliance with the entire Settlement Agreement, not just this paragraph,
problematic, if not impossible.

The career ladder specified in this paragraph was first proposed by the HCSO approximately
three years ago, but the Board of Supervisors never took action on the plan.  The current Sheriff,
who took office in December 2021, has recently proposed a more detailed and comprehensive
step plan that incorporates both merit and longevity raises for the various ranks, not just entry
level personnel.  The Board of Supervisors would be well advised to follow up on the Sheriff's
proposal and to implement it as quickly as possible.  Considering the fact that the Mississippi
Department of Corrections (MDOC) currently pays new recruits $32,000 per year after six
months on the job, which is above the $31,000 that is proposed for HCSO Detention Officers
(DO's), but that they still do not receive, competition is intense.  Further, according to a recent
article in the Clarion Ledger, the MDOC is proposing an entry level salary of $38,300, which
will far exceed what is proposed in the Sheriff's pay plan.  The HCSO has never had as many
officers on duty as the Revised Staffing Analysis calls for.  In fact, the Post Assignment Sheet
for the RDC does not even specify that an escort officer and two exercise officers are required
for each pod.  The inconsistencies between each need to be rectified immediately.

The problem in reaching adequate staffing appears to be related more to retention than
recruitment although the issues related to both overlap. The reason that the work force numbers
have not improved is caused by the low salary, lack of a step plan and dangerous and frustrating
working conditions, particularly at the RDC.  In November, the detention officers staged a
walkout and listed a series of needs and concerns. These included previously mentioned items
such as direct deposit of pay checks, bi-weekly pay, a step plan, having the locks in the facility

fixed and a contingency plan for staff shortages. There were also some modest requests that indicate the lack of attention to basic needs such as chairs for staff to sit in, heaters, certification training for weapons such as tasers, cleaning supplies and sufficient handcuffs and radios.

Numerous incident reports indicate that many of the inmate-on-inmate assaults and fires occur when there is no officer in the housing unit. Officers learn of assaults after the fact when the inmate calls control (IR# 220002), calls them to the cage or window (IR# 220036, 220100) informs an officer (IR # 220065, 220085), when injuries are observed (IR #220052, 220063) or when alerted by other inmates (IR #211543). The number and severity of assaults are indicative of the lack of staffing. In November, there were 21 assaults at RDC with 9 hospitalizations; in December, there were 11 assaults with 1 hospitalization; in January, there were 13 assaults with 4 hospitalizations. The lack of staff also allows for inmates to control access to basic needs of other inmates such as meals as described in the January QA report and identified in a December grievance.

It has been noted in prior reports that the shortage of security staff, the apparent failure of at least some security staff to follow policies and procedures, and unresolved problems with the physical plant continue to compromise the safety of medical and mental health staff and often make it difficult for staff to perform their duties.  In the October 2021 report, this was discussed in more detail, at least in part based on the findings of a 50-day log of incidences where these issues compromised the ability of medical and mental health staff to perform their duties.  Since then, some efforts have been made to address these issues.  However, the overall shortage of security staff continues to be such a major issue that the provision of adequate security staff support to medical and mental health staff continues to be virtually impossible (especially during the evenings and on weekends), even if the provision of such support is a security staff priority.  In addition, some of the physical plant issues related to medical and mental health staff safety (such as inadequate lighting on the pods, problems with cell door locks, and inoperable security cameras in the medical department) still need to be addressed.

     f.  Develop and implement an objective and validated classification and housing assignment procedure that is based on risk assessment rather than solely on a prisoner's charge.  Prisoners must be classified immediately after booking, and then housed based on the classification assessment. At minimum, a prisoner's bunk, cell, unit, and facility assignments must be based on his or her objective classification assessment, and staff members may not transfer or move prisoners into a housing area if doing so would violate classification principles (e.g., placing juveniles with adults, victims with former assailants, and minimum security prisoners in a maximum security unit).  Additionally, the classification and housing assignment process must include the following elements:

i.   The classification process must be handled by qualified staff who have additional training and experience on classification.

ii.  The classification system must take into account objective risk factors including a prisoner's prior institutional history, history of violence, charges, special needs, physical size or vulnerabilities, gang affiliation, and reported enemies.

iii. Prisoner housing assignments must not be changed by unit staff without proper supervisor and classification staff approval.

iv.  The classification system must track the location of all prisoners in the Jail and help ensure that prisoners can be readily located by staff.  The County may continue to use wrist bands to help identify prisoners, but personal identification on individual prisoners may not substitute for a staff-controlled and centralized prisoner tracking and housing assignment system.

v.   The classification system must be integrated with the Jail prisoner record system, so that staff have appropriate access to information necessary to provide proper supervision, including the current housing assignment of every prisoner in the Jail.

vi.  The designation and use of housing units as "gang pods" must be phased out under the terms of this Agreement.  Placing prisoners together because of gang affiliation alone is prohibited.  The County must replace current gang-based housing assignments with a more appropriate objective classification and housing process within one year after the Effective Date.

**Partial Compliance**

Classification staffing continues to be inadequate to provide coverage around the clock. Classification is reported to have only one vacancy. However, with nine authorized positions, two are vacant. In addition, two classification officers are not able to classify individuals. One is a recent transfer from a kitchen post and has been slow in training and the other is a supervisor in Booking and so is not available to classify most times and has not been trained. As a result, there are in essence four vacancies. A third classification officer also fills another post. He has been trained to classify but not to enter information into this system. Classification personnel cannot always provide 24-hour coverage with this limited workforce.

Wristbands were not apparent on any inmates during the January site visit.  When questioned about the problem during the January site visit the prior Jail Administrator noted that the wristband machine in Booking had not functioned in over six months.  She stated that a replacement machine had been requested but that the County had not agreed to purchase standard corrections quality equipment.  Subsequently a new machine was purchased, but it is not yet operational.

31

The Classification supervisor and Booking Lieutenant both confirmed that inmates are once again housed according to gang affiliation regardless of classification criteria.  This was a practice that was stopped shortly after the monitoring process began in 2016, but once again, perhaps because of the continuing turnover of Jail Administrators and Sheriffs, and also because of the lack of staff to adequately fill required posts, the classification system has relapsed. The Inmate Services Manager indicated that the practice of unauthorized inmate committees controlling the units is still a problem particularly in A-Pod. While policy puts the responsibility over inmate transfers and movement in the hands of Classification, some incident reports make it appear that officers and supervisors sometimes make those decisions.  This is no doubt at least in part due to the shortage of classification staff.

Booking cells continue to be used to house, rather than just hold for eight hours, inmates.  From the very first monitoring site visit the HCSO has promised to end the practice, but that has never happened.  During the January site visit four inmates were identified who were being housed in holding cells for extended periods of time, some for days and weeks.  The Monitoring Team has repeatedly stated that Booking is not appropriate housing. Now that the cell door windows in C-Pod have been replaced, these individuals should be housed in C-4 if segregation is needed. C-4 is supposed to have two officers in the unit. The segregation unit is intended to be operated and staffed for management problem inmates. Even with B-Pod being used for housing before it is ready to be reopened, and without adequate staff to operate as a Direct Supervision housing area, the HCSO has been unable to end the use of holding cells for the long-term housing of inmates.

A review of the Classification Logs for November and December indicated that some inmates were not classified in a timely manner. In November, ten inmates were classified after two days or more. One inmate was not classified for 16 days. In December, seven inmates were classified after two days or more with one inmate not classified for 19 days. At the time of the October site visit, the Classification Supervisor stated that they had probably been moved and then lost in the system. During this site visit, she stated that some might be classified but entered into the system late because there is one officer who can classify but not enter the results into the system. The Inmate Services Manager indicated that the late classifications are probably due to the lack of classification staff.

A review of the initial classification scoring sheets for the first two weeks of December was completed.  A number of the practices that previously undermined the use of the objective scoring system (e.g., the routine use of overrides and the lack of access to the NCIC) have been rectified. As previously reported Classification is now using the NCIC to score the criminal history. However, the Classification Supervisor indicated that the NCIC system frequently cannot be accessed and, in fact, she said it was not working at the time of the interview and had not been working for over a week. The section on management issues on the Classification form

was routinely not used even where there were indications of gang affiliation or mental health issues. There were several math errors, one which would have changed the classification level from medium to maximum. There were several scoring errors and some sheets where the criminal history was missing, perhaps because the NCIC could not be accessed.

The segregation logs for November and December showed four individuals in administrative segregation. RDC now keeps a separate disciplinary log. Some of the entries show individuals being given disciplinary segregation but these are not entered in the segregation log. One entry for an individual who was placed on disciplinary segregation stated he would have a mental health evaluation within 30 days of segregation. As noted below, individuals with mental health issues are supposed to be evaluated by a QMHP before being placed in segregation. A disciplinary process is in place but there do not appear to be any disciplinary hearings taking place at RDC. There is still no Classification Committee. Such a committee should not only review placements into administrative segregation but all placements in restrictive housing within 24 hours and then conduct a review every seven days. Although there is no Classification Committee, seven-day reviews are now being conducted. This is done weekly by a combination of security and mental health staff. Documentation of the mental health input is being kept in the EMR. It does not appear that anyone has been moved off of segregation as a result of this process. This should change with the opening of the mental health unit. See paragraph 77(i) for further discussion of these reviews. It has also been recommended that the segregation log have a column added showing the date of the last seven-day review.

Assigning appropriate housing for individuals has been complicated by the COVID outbreak that occurred again during this monitoring period. With the surge in cases and the effort to quarantine positive inmates, housing options became limited. As a result, inmates were once again sleeping on the floor as reported during the January site visit. In addition, the population has been rising, further putting a strain on housing inmates appropriately. With the surge having tapered off, this has not been as much of a problem after January.

Although improvements have been made in the area of Classification, it is still not the case that an objective risk instrument is governing the housing placement of inmates when there continue to be gang pods, inmate committees rejecting housing placements, security moving inmates without Classification involvement, lack of bed space and limitations on the use of some housing units.

    g.  Develop and implement positive approaches for promoting safety within the Jail including:

        i.  Providing all prisoners with at least 5 hours of outdoor recreation per week;

      ii.  Developing rewards and incentives for good behavior such as additional commissary, activities, or privileges;

     iii.  Creating work opportunities, including the possibility of paid employment;

     iv.  Providing individual or group treatment for prisoners with serious mental illness, developmental disabilities, or other behavioral or medical conditions, who would benefit from therapeutic activities;

      v.  Providing education, including special education, for youth, as well as all programs, supports, and services required for youth by federal law;

     vi.  Screening prisoners for serious mental illness as part of the Jail's booking and health assessment process, and then providing such prisoners with appropriate treatment and therapeutic housing;

    vii.  Providing reasonable opportunities for visitation.

h.  Ensure that policies, procedures, and practices provide for higher levels of supervision for individual prisoners if necessary due to a prisoner's individual circumstances.  Examples of such higher level supervision include (a) constant observation (i.e., continuous, uninterrupted one-on-one monitoring) for actively suicidal prisoners (i.e., prisoners threatening or who recently engaged in suicidal behavior); (b) higher frequency security checks for prisoners locked down in maximum security units, medical observation units, and administrative segregation units; and (c) more frequent staff interaction with youth as part of their education, treatment and behavioral management programs.

i.  Continue to update, maintain, and expand use of video surveillance and recording cameras to improve coverage throughout the Jail, including the booking area, housing units, medical and mental health units, special management housing, facility perimeters, and in common areas.


**Partial Compliance**

Regarding (g)(i), five hours of outside recreation per day is provided to inmates at the WC based on a review of records and logs.  As was noted in the last Monitoring Report, the inmates at the RDC do not receive the requisite recreation time regardless of what the records there say.  The January site visit confirmed that finding again, but not just from a review of documents. Based on personal observations while on site, there were no officers present in many of the housing units to make the recreation record entries that were submitted.  The control room officers have no way to determine which inmates are in the recreation yards at any particular time.  The best that can be said is that the recreation yard doors are left open for extended periods throughout the day, but there is no way that they can determine which inmates had access to recreation and when, regardless of what the records show.  In addition, in segregation, ISO units and Booking there is no way it documents out of cell time or rec time.

Regarding (g)(ii), rewards and incentives for good behavior are not in place in either the WC or RDC.

Regarding (g)(iii), work opportunities, including the possibility of paid employment, are not available to inmates.  Some are permitted to work as trusties in the kitchen, laundry and on cleaning details.

Regarding 42 (g) (iv), again, during the period covered by this site visit, the mental health caseload has continued to grow; there are now about 200 detainees on the caseload; and this means that over the last several monitoring periods, the case load has increased by more than 50%.  In addition, as was detailed in prior monitoring reports, the acuity of the population has also increased over the last several monitoring periods, meaning that there is a larger percentage of detainees on the caseload who are suffering from acute, extremely serious mental illness. For a significant sub-set of these more seriously ill and unstable detainees, their illness is having a significant impact on their ability to function within the facility. Although some of this sub-set of detainees have refused or been noncompliant with prescribed treatment, others have complications that have rendered them difficult to stabilize.

Major Bryan negotiated with QCHC (the Contract Provider of medical and mental health services) for more mental health staff.  As a result, on January 1, 2022, the Psychiatric Nurse Practitioner's schedule was increased from half-time to full-time.  In addition, the number of QMHPs was increased from 2.5 to 3.5; one of those QMHPs was named Mental Health Coordinator; but since one of the QMHPs had left the facility (leaving only 1.5 QMHPs), at the time of the site visit a search was underway for 2 QMHPs.

Given all of the mental health services that are to be provided by QMHPs, even prior to the opening of the mental health unit, the 3.5 QMHPs are still not enough staff to perform all of those services.  Prior monitoring reports have included a list of the services QMHPs are required to perform.  However, for this monitoring report, in order to more clearly delimitate this concern, we have included the attached chart, entitled 'estimate of QMHP hours/week required to be in compliance with the provisions of the settlement agreement'.  As noted in the footnotes for the chart (that explain each task/responsibility and how the estimate of hours/week was made), the chart reflects the very minimum amount of QMHP time required/week to obtain compliance with the Settlement Agreement and meet the detainees' basic mental health needs.  Even using this very modest estimate, a total of about 4.5 QMHPs would be required to obtain compliance, and again, this is prior to opening the mental health unit.  Once the mental health unit is opened, at least one additional QMHP will be required.

It should be noted that the estimate of QMHP hours/week noted here is considered to be a very modest estimate for several reasons.  First of all, it is based on the very minimum amount of time

required to perform each task.  However, in reality, these tasks often take more time due to a detainee's mental status, and/or disruptions in the provision of mental health services due to an inadequate number of security staff to support the provision of services.  In addition, the fact that on any given week there will be detainees who require more than the minimum amount of services is not factored into the time estimates.  Of course, in addition, a QMHP can't provide 40 hours/week of direct services; they need/require breaks; and they also rotate weekend mental health call coverage of the facilities.

Although the existing mental health staff is working hard, there are simply not enough of them to perform all of the duties required to come into full compliance with the agreement.  As a result, staff have focused on the most urgent tasks.  More specifically, for example, initial mental health assessments are performed, as is suicide watch, the monitoring of detainees being held in segregation, and the assessments of detainees referred to mental health on an emergency basis. On the other hand, more stable detainees do not receive individual, face-to-face therapeutic sessions as frequently as they should; treatment plans are not consistently up to date; and there is no group therapy being provided.  Although the additional QMHP that has already been approved will be very helpful, once the mental health unit opens and the disciplinary review process is in place, staff will be stretched even further.

Obviously, there is still a need for more mental health staff.  Even when all existing positions are filled, mental health staff will continue to be overwhelmed with their current responsibilities, and therefore, attempting to open the mental health unit without additional staff would be unconscionable.  There is also the need for better security support for mental health staff, including the identification, training and assignment of a set of security officers and supervisor(s) for the mental health unit.  It is imperative that these issues be addressed as quickly as possible, given that it remains extremely important to move towards the opening of the mental health unit where a program for the most severely ill and unstable population can be implemented.

Regarding 42 (g) (vi), as has been noted in prior reports, the screening of new detainees for serious mental illness is part of the jail's booking and initial health assessment process.  At the time of this site visit, about 70% of the 200 detainees who are currently on the mental health caseload were identified during that screening process, which is similar to the findings of earlier site visits.  Given that there are detainees on the mental health caseload for whom a referral source is not noted (about 5%), it could actually be that as much as 75% of detainees were identified during the screening process.  It should be noted that there are two parts to that mental health screening process – the initial health and mental health assessment performed by the intake nurse(s), and the 'Form 3', which is a form completed by each new admission as part of the booking process.  A review of the collected data revealed that of those identified as in need of mental health services at intake, about 72% were identified by both screening processes, about 24% were identified by the intake nurse only, and about 4% were identified by the 'Form 3'

only.  Although the assessments performed by the intake nurse identified about 96% of the detainees found to be in need of mental health services at intake, it appears that the use of the 'Form 3' is still useful, especially given that all of those identified by the 'Form 3' only were later given SMI diagnoses by the mental health staff.  With regard to the about 30% of detainees on the mental health caseload who were first identified as in need of mental health services at some point after their admission to the facility, they are about equally divided between those referred by medical, those who were self-referred and those first identified when found to be suicidal.  The fact that about 7% of the detainees on the mental health caseload were first identified as in need of mental health services when they presented as suicidal (after not having been identified at intake) is of concern and will be discussed in the suicide prevention section of this report.

As has always been the case, it is difficult to know if detainees who were identified and placed on the mental health caseload at some point after admission were suffering from or had suffered from major mental health difficulties that had been missed, masked or denied during the booking and intake process, and/or whether their mental health status deteriorated while incarcerated. This is an issue that clearly requires further exploration once additional mental health staff are on board to review and assess this issue.

This is the third site visit where it was found that there were no delayed intake screenings because a new admission would not or could not be interviewed (and the nurse failed to seek help from mental health).  Whether this was due to the fact that there were no new admissions who were difficult to assess or whether it was due to the fact that the intake nurse immediately asked for help with any difficult new admission could not be determined without reviewing the medical records of all new admissions.  However, finding again that there were no delays in performing intake screenings was a very positive finding.

With regard to the initial mental health assessments, performed on detainees referred to mental health for such an assessment, the timeliness of these assessments or at least the timeliness of attempts to perform these assessments has been good (with most performed on the day of referral), and the quality of these assessments has continued to be quite good.

Although the percentage of detainees who at least initially refused a mental health assessment remained unchanged (about 25%), that means that there is still a significant amount of staff time consumed by repeated attempts to perform initial mental health assessments on such detainees, especially since many of those who initially refuse require that staff make multiple attempts before a mental health assessment is finally performed.  Such a delay in obtaining an initial mental health assessment can also delay the initiation of treatment, which can be especially problematic when the detainee is acutely ill.  It is important to note that the most severely ill of these newly admitted detainees end up being placed in segregation (apparently due to their

37

inability to control their behavior and/or their vulnerability to being harmed by other detainees), which makes it all the more difficult to make repeated attempts to perform that initial mental health assessment.   Once the MHU is operational, such acutely ill detainees are likely to be placed on the MHU (even in the absence of a full mental health assessment) where a more rigorous effort to engage them is an integral part of the treatment program.  In recent weeks, mental health staff have begun to have such detainees brought down to the medical unit for a mental health assessment (instead of trying again on the segregation unit). This at least appears to have been a successful effort, in that these detainees did finally cooperate with the assessment process; and this would suggest that having such detainees on a mental health unit instead of in segregation will, in fact, make it much more possible to engage them and initiate treatment.

The requirement of 42(g)(vi) to provide therapeutic housing is addressed in paragraph 77(g) below.

Regarding (g) (vii), the provision of reasonable opportunities for visitation.  As has been noted in previous Monitoring Reports, all inmate visitation with family and friends in conducted via a video system; it is not in person or face to face.  In addition, records previously reflected that the typical inmate is able to have only approximately 2.8 visits per year.  Because use of the equipment in the lobby of the RDC was eliminated as a result of COVID concerns, it was necessary for family and friends to pay for the opportunity to visit, at the rate of $12.99 per minute for a 20-minute visit.  The previous Jail Administrator proposed reducing that charge to $4.99, but it is not known whether or not that renegotiated change with Securus, the video visitation provider, has yet been implemented.

Regarding 42 (h), policies and procedures provide for higher levels of supervision for individual prisoners if necessary due to individual circumstances.  Specifically, they call for hourly well-being checks on inmates in general population, 30-minute well-being checks on inmates in confinement (segregation), 15-minute well-being checks on inmates in Booking holding cells and constant supervision (with 15-minute notations) of inmates on suicide watch.  Compliance with those policies has not been achieved in that some supervisors do not know what the standards are, some logs are kept according to policy, but many are not, and the inconsistency of documentation, often due to lack of staffing, is prevalent. As noted previously, during the January site visit, one officer was assigned to provide the position of two officers in Housing Unit C-4 and provide the constant supervision of the suicide ISO unit- a physical impossibility.

The medical and mental health related circumstances where higher levels of supervision is required, which staff (medical, mental health and security) are responsible for providing such higher levels of supervision, and what their respective responsibilities are, and where a detainee is housed while being so supervised have all been described in prior reports.  As noted below, there are some areas of compliance with this provision that remain variable.

Some special medical observation (for example, for acutely ill detainees) is managed in the medical unit, while other less severe situations (for example, uncomplicated withdrawal from substances) are managed on the detainee's regular housing unit, with visits to the medical unit as indicated.  In both situations there is an appropriate higher level of supervision provided by medical staff.  However, there are situations where a detainee refuses to comply with the recommendation that he/she be housed in the medical unit or make frequent visits to the medical unit. With the possible exception of a life-threatening situation, medical staff cannot force a detainee to comply and, in such situations, the ability of medical staff to provide adequate supervision and care is compromised. In addition, due to the shortage of security staff, the ability of security staff to provide a higher level of supervision to detainees on special medical observation in the infirmary is variable. More specifically, as has been previously noted, on days when there are no security staff in the medical department, such detainees are locked within the infirmary and the nursing staff cannot enter in order to attend to them.  If the detainee has to make frequent (such as daily) visits to the medical unit, both the shortage of security staff in the medical department and the shortage of staff on the units (to bring detainees to the medical department) can compromise care.

Suicide watch is managed in suicide-resistant cells.  There is an appropriate higher level of supervision provided by mental health and medical staff.  Here too, due to the shortage of security staff, the ability of security staff to provide a higher level of supervision to detainees on suicide watch is variable.  More specifically, there are times when there is no officer available to provide the constant supervision of detainees on suicide watch that is required by approved policy and procedures.

Although suicide watch is usually managed well by medical and mental health staff (except for the above noted concern), the recent number of completed suicides raises concern about certain other important aspects of the facility's suicide prevention program and related enhanced supervision issues that have been raised before.  Resultant areas of concern include (1) the capacity of all staff to identify and manage detainees who might be or are at high risk of becoming suicidal, (2) the management and supervision of more complicated cases, and (3) the performance of an interdisciplinary mortality review/after incident review in instances where there has been a successful suicide or other unnatural death.

Concerns about the capacity of all staff (security, medical and mental health staff) to identify and manage detainees who might be or are at high risk of becoming suicidal have been discussed in prior reports.  However, by way of review, it is important to assure that all staff are trained to recognize the known (well established) high risk factors for becoming suicidal while incarcerated so that such high-risk detainees can be identified.  A protocol should be developed for providing such high-risk detainees with the enhanced security, mental health and medical monitoring and

supervision that they require, which will in turn require that they are housed in a place where such enhanced monitoring and supervision can occur.  In addition, there must be a good working relationship between security and mental health staff so that if such a detainee becomes actively suicidal, the situation can be quickly addressed/the detainee can be quickly moved to active suicide watch.  Similarly, concerns about the capacity to manage and supervise more complicated cases has also been discussed in prior reports.  This too continues to be a staff training and development issue that needs to be addressed.

The recent suicides and other deaths at the facility has brought more into focus the issues related to the performance of an interdisciplinary mortality review/after incident review.  More specifically, there has only been one review of the type where security, medical and mental health staff meet together with administration to review everything that each staff unit knew about the deceased, identify any problems in the treatment and management of the deceased, regardless of whether or not the problem was directly causative of the deceased's death, and develop a corrective action plan to address any identified problems.  Deaths that occurred earlier in 2021 have not been similarly reviewed, and therefore to date, the opportunity to learn from such reviews has been a missed opportunity.

Until the mental health unit is open/operational, there really is no appropriate housing for detainees who require special mental health observation due to the fact that they are seriously impaired as a result of their mental illness.  Instead, such detainees continue to be placed on a segregation unit.  Although mental health staff make regularly scheduled rounds on detainees who are being held in segregation, this does not constitute the higher level of mental health supervision that such severely mentally ill detainees require (which will hopefully be made available to them once the mental health unit is operational).  Although there are security staff who manage detainees who are being held in segregations, this does not constitute the higher level of security supervision that such mentally ill detainees require (which will hopefully be made available to them once the mental health unit is operational, especially if security staff assigned to the mental health unit are given the enhanced mental health training that they will be expected to have and such security staff are active members of the mental health unit treatment team).

Regarding 42 (i), the surveillance camera problem, that has been ongoing for years, but has become critical within the past year, is still unresolved. Approximately 60 cameras at the RDC do not function, which makes follow up on incidents difficult for supervisors and investigators. Plans have been underway for months to identify the system problems and to determine which cameras need to be replaced.  Various vendors have been called upon to do the necessary analysis and work, but to date the problem persists.  It is well past time for this matter to be corrected.  As has been previously noted on multiple occasions, the CID and IAD investigators

now have direct access to the video recording system, but they still have to go through IT in order to obtain copies of videoed events.

43. Include outcome measures as part of the Jail's internal data collection, management, and administrative reporting process.  The occurrence of any of the following specific outcome measures creates a rebuttable presumption in this case that the Jail fails to provide reasonably safe conditions for prisoners:

      a.  Staff vacancy rate of more than 10% of budgeted positions;

      b.  A voluntary staff turnover rate that results in the failure to staff critical posts (such as the housing units, booking, and classification) or the failure to maintain experienced supervisors on all shifts;

      c.  A major disturbance resulting in the takeover of any housing area by prisoners;

      d.  Staffing where fewer than 90% of all detention officers have completed basic jailer training;

      e.  Three or more use of force or prisoner-on-prisoner incidents in a fiscal year in which a prisoner suffers a serious injury, but for which staff members fail to complete all documentation required by this Agreement, including supervision recommendations and findings;

      f.  One prisoner death within a fiscal year, where there is no documented administrative review by the Jail Administrator or no documented mortality review by a physician not directly involved in the clinical treatment of the deceased prisoner (e.g. corporate medical director or outside, contract physician, when facility medical director may have a personal conflict);

      g.  One death within a fiscal year, where the death was a result of prisoner-on-prisoner violence and there was a violation of Jail supervision, housing assignment, or classification procedures.

**Non-Compliant**

The Quality Assurance Coordinator's (QAC) monthly reports now provide a new insight into daily operations and conditions within the Jail System in that they reflect activities as seen by an officer who has access to activities on a daily basis, not just once every four months as is the case of the Monitoring Team members.  The QAC's monthly reports are detailed, insightful and comprehensive.

As of January 2022, there were only 191 personnel on board within Detention Services.  Until the last Monitoring Report this figure had fluctuated between a high of 256 and a low of 204.  While the County recently reduced the number of funded positions from 281 to 233, the vacancy rate within Detention Services still stands at 32% (based on funded positions), three times higher than the 10% figure specified in this paragraph and 53% of the needed 359 positions, five times higher than the figure provided in this paragraph.  The County cannot move the benchmark for

measurement of this paragraph by simply un-funding existing positions.  In fact, the basis for measurement should be the number of required positions (359) which the County should fund in order to comply with the Revised Staffing Analysis.

The total turnover rate based on the number of funded positions during most of 2021 (281) is 40%. As described above, the inability to retain staff has resulted in housing units being unsupervised contrary to policy and the requirement of direct supervision.

There has been no major riot during the last reporting period.  New recruits are now put to work immediately, but with a training officer, in order to prevent their departure while waiting for the next academy to begin.  This Field Training Officer (FTO) program was initiated by the previous Jail Administrator separate and apart from the Training Bureau of the Sheriff's Office by utilizing a Lieutenant who worked at the WC.  Greater detail will be provided in the paragraph regarding training.

There have been many more than three uses of force and inmate on inmate assaults in the last year without the documentation required by policy and the Settlement Agreement. The Monitoring Team has repeatedly noted the lack of required documentation and in particular the lack of supervisory recommendations and findings. This is addressed in greater detail below under Incident Reporting.

The Jail has failed to provide an After-Action Report on the death of an inmate in multiple instances during the past year.  The only After-Action Report that was prepared in accordance with this paragraph was for the October beating death of an inmate at the RDC that was written by the previous Jail Administrator. That incident resulted in the termination of three officers, but the previous incidents did not reflect findings regarding appropriateness of the actions of the officers in the other documented cases. In addition, that death occurred in the context of a lack of supervision. There was no officer in the housing unit when the assault was initiated and intervention was possible. The assault continued and death resulted.

44. To complement, but not replace, "direct supervision," develop and implement policies and procedures to ensure that detention officers are conducting rounds as appropriate.  To that end:

    a.   Rounds must be conducted at least once every 30 minutes in general population housing units and at least once every 15 minutes for special management prisoners (including prisoners housed in booking cells).

    b.   All security rounds must be conducted at irregular intervals to reduce their predictability and must be documented on forms or logs.

    c.   Officers must only be permitted to enter data on these forms or logs at the time a round is completed.  Forms and logs must not include pre-printed dates or times.

       Officers must not be permitted to fill out forms and logs before they actually conduct their rounds.

    d.   The parties anticipate that "rounds" will not necessarily be conducted as otherwise described in this provision when the Jail is operated as a "direct supervision" facility.  This is because a detention officer will have constant, active supervision of all prisoners in the detention officer's charge. As detailed immediately below, however, even under a "direct supervision" model, the Jail must have a system in place to document and ensure that staff are providing adequate supervision.

    e.   Jail policies, procedures, and practices may utilize more than one means to document and ensure that staff are supervising prisoners as required by "direct supervision," including the use and audit of supervisor inspection reports, visitation records, mealtime records, inmate worker sheets, medical treatment files, sick call logs, canteen delivery records, and recreation logs.  Any system adopted to ensure that detention officers are providing "direct supervision" must be sufficiently detailed and in writing to allow verification by outside reviewers, including the United States and Monitor.

**Partial Compliance**

As has been previously reported, the Settlement Agreement calls for a higher standard for well-being checks than is required by the American Correctional Association Performance Based Standards for Adult Local Detention Facilities that are issued by the Commission of Accreditation for Corrections.  In an effort to move Detention Services forward, the Monitoring Team has approved the standard which is now incorporated into Policy 9-200, Supervision and Post Operations.  It calls for a documented 60-minute well-being check for inmates in general population, a 30-minute well-being check for inmates in lockdown status and a 15-minute well-being check for inmates in Booking holding cells.  Inmates who are on a suicide watch are to be under constant supervision with logged notations made every 15 minutes.

Since the JDC has been closed for more than a year, there are no documents/logs to review there with regard to the housing areas on the third and fourth floors.  Only the transfer/waiting area on the ground level is still operational.  There the control room is staffed around the clock and the holding cell and open seating waiting space is manned Monday through Friday from approximately 0600 to 1800 hours.  There have never been any records provided to the Monitoring Team which reflect that well-being checks are conducted on inmates kept in the two holding cells, nor has the Corrections Operations Member ever seen logs such as those that are maintained on all inmates who are kept in the holding cells in Booking.  In the 15th Monitoring Report, the need to conduct 15-minute well-being checks on inmates detained in the holding cells at the JDC was specified; however, that practice was not initiated.  This failure to take

action is indicative of the ongoing problems that plague the HCSO/Detention Services with regard to Settlement Agreement compliance.

During the January site visit, 15-minute well-being checks in Booking were current and complete on all four days of inspection at RDC, which is the first time that such a record has been maintained.  However, it was noted that the times listed on all well-being check forms were identical for each cell, which was a physical impossibility considering the amount of time required to check on the status of each inmate in the multiple occupancy cells and single cells that were in use.  Further, the officer who conducted well-being checks never opened individual single cells where visibility inside was so poor that it was not possible to determine the physical condition of the respective inmates.

A review of well-being checks in confinement/segregation housing at the RDC (C-4) and suicide watch there (C-4 ISO) makes it appear that compliance with the 30-minute and 15-minute standards is being maintained, with periodic exceptions.  However, the validity and accuracy of those well-being checks was thrown into question by the observations of Corrections Operations Member of the Monitoring Team during the January site visit.  Over a period of four days he found only one Detention Officer responsible for supervising C-4 and C4-ISO (suicide watch) instead of the three that are required.  The officer could not possibly be making the well being checks in C-4 and providing constant supervision for the detainees on suicide watch. Further, his chair and apparent post was located in the horseshoe corridor outside both units.  There are supposed to be two officers inside C-4 at all times, not in the corridor.  When the suicide watch procedure was set in place (but not specifically spelled out in the approved policy) with the then Jail Administrator, the Detention Officer was supposed to be physically inside the ISO Unit at all times, and the watched inmate(s) was supposed to be in the dayroom area, not inside a cell.  Over time this practice has slowly degenerated into current procedure where suicide watch inmates are often locked into single cells in the ISO Unit where the supervising officer cannot even see them and constant supervision is totally impossible.

To make matters worse, the log book maintained by the assigned officer reflected appropriate 30-minute well-being checks on inmates in C-4 and 15-minute notations on suicide watch inmates in C-4 ISO.  His log could not be accurate because he could not be doing the well-being checks and the constant supervision that were recorded.  The fabrication of the observation logs has also been consistently reported by the QA Coordinator in her monthly reports.

The review of the logs reflect that well-being checks are not being conducted as required. Investigation of several of the deaths in the last year also disclosed that well-being checks were not being conducted as required. The prior Jail Administrator recommended that an electronic rounds system be purchased which would require the Housing Unit Officer to approach each cell. It would not guarantee that checks were being made properly but it would ensure that the

Housing Unit Officer was making timely rounds. The purchase of the electronic rounds system was approved by the Board. However, at the time of the January site visit, it was still not in place.

Fortunately, the same problem with well-being checks does  not exist at the WC.  There, a review of Housing Unit logs, well-being checks in the two five cell Special Housing Units and suicide watch logs reflect compliance with the standards required by this paragraph.

45. Ensure that all correctional officers receive adequate pre- and post-service training to provide for reasonably safe conditions in the Jail.  To that end, the County must ensure that the Jail employs Qualified Training Officers, who must help to develop and implement a formal, written training program.  The program must include the following:

  a. Mandatory pre-service training.  Detention officers must receive State jailer training and certification prior to start of work.  Staff who have not received such training by the Effective Date of this Agreement must complete their State jailer training within twelve months after the Effective Date of this Agreement.  During that twelve-month period, the County must develop an in-house detention training academy.

  b. Post Order training.  Detention officers must receive specific training on unit-specific post orders before starting work on a unit, and every year thereafter.  To document such training, officers must be required to sign an acknowledgement that they have received such training, but only after an officer is first assigned to a unit, after a Post Order is updated, and after completion of annual retraining.

  c. "Direct supervision" training.  Detention officers must receive specific pre- and post service training on "direct supervision."  Such training must include instruction on how to supervise prisoners in a "direct supervision" facility, including instruction in effective communication skills and verbal de-escalation.  Supervisors must receive training on how to monitor and ensure that staff are providing effective "direct supervision."

  d. Jail administrator training.  High-level Jail supervisors (*i.e.*, supervisors with facility-wide management responsibilities), including the Jail Administrator and his or her immediate deputies (wardens), must receive jail administrator training prior to the start of their employment.  High-level supervisors already employed at the Jail when this Agreement is executed must complete such training within six months after the Effective Date of this Agreement.  Training comparable to the Jail Administration curriculum offered by the National Institute of Corrections will meet the requirements of this provision.

  e. Post-service training.  Detention officers must receive at least 120 hours per year of post-service training in their first year of employment and 40 hours per year after their first year.  Such training must include refresher training on Jail policies.

The training may be provided during roll call, staff meetings, and post-assignment meetings.  Post-service training should also include field and scenario-based training.

    f.   Training for Critical Posts.  Jail management must work with the training department to develop a training syllabus and minimum additional training requirements for any officer serving in a critical position.  Such additional training must be provided for any officer working on a tactical team; in a special management, medical or mental health unit; in a maximum security unit; or in booking and release.

    g.   Special management unit training.  Officers assigned to special management units must receive at least eight hours of specialized training each year regarding supervision of such units and related prisoner safety, medical, mental health, and security policies.

    h.   Training on all Jail policies and procedures including those regarding prisoner rights and the prevention of staff abuse and misconduct.

**Partial Compliance**

Regarding 45 (a), new recruits continue to complete the basic entry academy before they are turned loose to operate on their own, but they often are temporarily assigned to work with a "training officer" until such time as the next academy begins.  Although this does not meet the requirements of the Settlement Agreement, this practice was instituted in order to immediately employ candidates rather than wait until the next academy is scheduled.  Under the previous Jail Administrator, a Field Training Officer (FTO) program was initiated under the supervision of a Lieutenant assigned to the WC who had not completed an FTO training program.  This was done outside of the direction of the Training Lieutenant who had completed an FTO training program.  During that timeframe, the Training Lieutenant was transferred from the Training component of the HCSO under the command of a Captain, and was assigned to the previous Jail Administrator.  Since her departure on January 31, 2022, the Lieutenant has been reassigned to HCSO Training.

Regarding 45 (b), there has been no change in post order training.  Since there are no approved post orders, the only training ever provided was on those post orders that were in place at the beginning of the monitoring process.

Regarding 45 (c), Direct Supervision training, which began in 2020, is part of the pre-service program for new personnel.  While it was provided to some supervisors and existing personnel, there are many who would benefit from a refresher course in that there is a distinct lack of understanding on the part of HCSO and Detention Services personnel concerning the principles and dynamics of Direct Supervision.

Regarding 45 (d), specialized training for command level staff has not been provided as required. The previous Jail Administrator was the only member who met the provisions of this paragraph, but she is no longer on board. According to the Training Lieutenant, he did provide command staff members access to on-line courses that are available through the American Jail Association.

Regarding 45 (e) and (h), COVID restrictions and the extreme shortage of personnel have made compliance with this paragraph problematic at best, but an innovative work around has made it possible to move forward.  Using salary funds from vacant positions, four-hour blocks of overtime for off duty personnel made it possible, and attractive, for them to participate in in-service training blocks covering policies and procedures.  At the pace of this in service training if it continues throughout the year, officers will have received 30 hours of in service training, short of the 40 hours required by the Settlement Agreement. Briefer orientation sessions are also provided during roll call training, but that is not as consistent or comprehensive.  To date, this training is not scenario based.

As noted in prior reports, there is no additional training for security staff assigned to the medical department, which includes the small infirmary, the medical clinic and the mental health clinic. As has also been noted in prior reports, given the security problems that can arise and have arisen when physically and/or mentally ill detainees are off their units/brought to the medical department, security staff assigned to the medical department would benefit from additional training, focused on the best security management of that critical post, including assuring the safety of medical and mental health staff.  It should again be noted that at present, there are an inadequate number of security staff assigned to the medical department (i.e., one security officer); then, due to the shortage of security staff, there are days when there are no security officers in the medical department; and there are also days when there is a shortage of security staff to transport detainees to and from the medical department.  Therefore, until the medical department is adequately staffed with security staff, any additional training that might be developed and provided will have to take this issue into consideration.

In anticipation of the opening of a mental health unit, security staff and security staff supervisors who will be assigned to that unit will have to be given additional training.  Issues related to the identification and selection of security staff for the mental health unit, the reasons why additional training will be required, and the nature of such additional training have all been outlined in prior reports.  An update on progress towards this goal is outlined in the paragraph 77.

As noted in paragraph 42(h), some special medical observation is carried out on regular units. Even once the mental health unit is operational, there will continue to be seriously mentally ill detainees on regular units, and so since there will continue to be detainees with special medical and mental health needs on all units, it is important for all security staff to have a reasonable amount of training on serious medical and mental health difficulties and the management of

detainees with such difficulties.  Although some training on mental health is provided in the academy, prior monitoring reports have discussed the inadequacy of that training. In addition, since security staff will continue to play an important role with regard to identifying detainees who might require special medical or mental health services, their training should also focus on enhancing their ability to suspect that a detainee might have special medical or mental health needs and how to facilitate their access to the medical or mental health services that they might require.

It is the understanding of the mental health expert on the Monitoring Team that an effort had been initiated to provide additional mental health training to officers likely to be assigned to the mental health unit and a broader number of security staff, in part because it was going to be impossible to assign specific security staff to the mental health unit (given the shortage of security staff) and in part because it was felt that all security staff could benefit from additional mental health training.  However apparently, that training effort has stalled after only a third of the three module training was provided, due to fiscal issues and the fact that the shortage of security staff has been so great that it was difficult to release staff to attend the training.

46. Develop and implement policies and procedures for adequate supervisory oversight for the Jail. To that end, the County must:

    a. Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the authority to make personnel decisions necessary to ensure adequate staffing, staff discipline, and staff oversight.  This personnel authority must include the power to hire, transfer, and discipline staff.  Personal Identification Numbers (PINs) allocated for budget purposes represent a salaried slot and are not a restriction on personnel assignment authority.  While the Sheriff may retain final authority for personnel decisions, the Jail's policies and procedures must document and clearly identify who is responsible for a personnel decision, what administrative procedures apply, and the basis for personnel decisions.

    b. Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the ability to monitor, ensure compliance with Jail policies, and take corrective action, for any staff members operating in the Jail, including any who are not already reporting to the Jail Administrator and the Jail's chain of command.  This provision covers road deputies assigned to supervise housing units and emergency response/tactical teams entering the Jail to conduct random shakedowns or to suppress prisoner disturbances.

    c. Ensure that supervisors conduct daily rounds on each shift in the prisoner housing units, and document the results of their rounds.

    d.   Ensure that staff conduct daily inspections of all housing and common areas to identify damage to the physical plant, safety violations, and sanitation issues. This maintenance program must include the following elements:

        i.   Facility safety inspections that include identification of damaged doors, locks, cameras, and safety equipment.

        ii.   An inspection process.

        iii.   A schedule for the routine inspection, repair, and replacement of the physical plant, including security and safety equipment.

        iv.   A requirement that any corrective action ordered be taken.

        v.   Identification of high priority repairs to assist Jail and County officials with allocating staff and resources.

        vi.   To ensure prompt corrective action, a mechanism for identifying and notifying responsible staff and supervisors when there are significant delays with repairs or a pattern of problems with equipment.  Staff response to physical plant, safety, and sanitation problems must be reasonable and prompt.

**Partial Compliance**

Regarding 46 (a) and (b), while the Sheriff has final authority concerning employment, assignment and disciplinary matters, the intent of this paragraph has been to ensure that the Jail Administrator is free to manage the Jail System and to make recommendations about all daily operational decisions.  That has not been the case under previous Sheriffs and Jail Administrators.  While the current Sheriff now says that the Jail Administrator can make employment and disciplinary recommendations as a member of the HCSO Disciplinary Review Board (DRB), the events during this reporting period involving terminations and transfers has demonstrated that she did not have that involvement.  In fact, even access to CID and IAD investigations was not previously available to the Jail Administrator. It remains to be seen whether the new Jail Administrator will have the authority/participation in personnel decisions anticipated by this paragraph.

Regarding 46 (c), supervisors do not maintain a separate log to indicate whether or not they have made rounds on a daily basis, nor is that recommended.  Another documentation requirement would be counterproductive.  Rather, they sign off on logs, well-being check sheets and other documents that are maintained throughout the Jail.  This would be sufficient documentation, however, the problem is that they simply sign, and virtually never make comments or recommendations on those documents.  The monthly Quality Assurance Reports document many discrepancies which should be addressed by supervisors as they make their rounds.  Part of the problem is attributable to the shortage of staff.  Because there are not enough officers available to fill essential posts, supervisors often fill in to assist with Detention Officer duties, leaving them insufficient time to address their supervisory responsibilities.

Regarding 46 (d) (i) through (vi), maintenance issues have always been at the forefront in the Jail System, but particularly at the RDC.  Over the years the Monitoring Reports have included numerous recommendations to address the problem, but the only major actions taken by the County and the Sheriff have been to hire Benchmark Construction to oversee the County's maintenance responsibilities and the creation of the Chief Safety and Security Officer to collect and track all work orders from within the Jail, to coordinate their submission to Benchmark and to follow up and monitor corrective action.  While those two changes have had a dramatic effect on the bureaucratic relationship between the HCSO/Detention Services and the County, they have not rectified the situation.

The Monitor has recommended that the County should create a line item within the HCSO budget to deal with routine maintenance items.  Although that proposal was submitted years ago, the County has not taken any action to date.  The problem of trash dumpster cells was addressed by unwelding the cells, cleaning out the trash and repairing some cells and rewelding approximately 30 cells in A-Pod. The fact that 30 cells (the equivalent of an entire Housing Unit) are off-line, with their doors welded shut, is unacceptable.  The damaged cells should have been repaired and been made available for housing inmates. The County reported in its comments that its current plan is not to use A-Pod and so does not want to repair those cells. However, no plan including a timeline for housing the A-Pod detainees elsewhere has been provided at this time.

During the January site visit numerous primary security doors throughout the RDC were found to be inoperable.  They included the Great Hall to Booking and the horseshoe corridor to C-2 and C-3.  Since then, some have been repaired, but the frequency of such major security breaches is not acceptable in a jail.  In addition, many other doors throughout the facility have not functioned for so long that hand operated deadbolts or hasps and padlocks have been installed to keep them closed.  These include the loading dock doors in the kitchen, all of the cell doors in the Medical infirmary area and both doors leading into the Booking office.  Finally, the two doors leading from the administrative corridor to the Maintenance Room (where the electrical equipment and HVAC chillers are housed) do not even have latches or closing mechanisms anymore.  They cannot be secured.  During the January site visit it was possible to walk into this area, which should have restricted access, and to then exit the building through the unsecured exterior door.  The lack of fire safety equipment has been noted elsewhere but, as noted, at the time of the January site visit fire hoses were not installed in the housing units of B-Pod or C-2 housing unit the cabinet had been damaged by unsupervised inmates. There were no fire extinguishers in the B or C-Pod housing units. There continue to be many maintenance issues noted elsewhere in this report including many inoperable cameras, HVAC and plumbing issues, laundry equipment, fire alarms, kitchen repairs, IT issues, and multiple problems with A Pod.

Officers and supervisors have become so accustomed to malfunctioning locks and doors, that they frequently fail to follow normal security measures when entering or exiting areas of the RDC where locks and doors do work.  As evidence of this the Corrections Operations Member (COM) of the Monitoring Team observed the following security breaches during the January site visit.

- While entering the Great Hall from the Administrative wing of the jail, Master Control opened both sliding doors of the safety vestibule simultaneously for the COM, then left them standing open for a full minute after he entered the Great Hall.  Both doors of a safety vestibule should never be opened simultaneously.
- While in C-Pod control the COM observed the first entry door to C-1 standing ajar.  The control room officer explained the situation by stating that the Unit officer had recently gone through that doorway.  The door should have been closed and latched.
- While in B-Pod the COM walked unimpeded into HU B-2 where inmate workers were housed.  Both doors to the safety vestibule leading into the HU were propped open.  The control room officer's explanation for this situation was that the doors were left open because B-2 held inmate workers.  There is no excuse for allowing such a breach of security regardless of the classification or security level of the inmates in the Housing Unit.
- While conducting an interview with the Booking Sergeant in the Booking Office, the COM observed a Detention Officer exit Master Control and gently close the door behind him so that it did not latch.  A few minutes later he returned to Master Control while carrying some food.  He then opened the unsecured door and entered without having to be let in by the other officer who was working inside Master Control.  The Sergeant did not take any action to counsel, correct or reprimand the officer.
- The door from the Great Hall to B-Pod was propped open. Initially, it was thought that this door was not repaired. However, it was learned that it was repaired but was propped open.

Maintenance of equipment is almost as big a problem as maintenance of the structural integrity of the facility at the RDC.  During the January site visit three of the four washers and two of the three dryers in the Laundry were inoperable.  According to the Laundry Officer, the machines had been out of commission for more than two months.  This shortage of critical machinery has resulted in inmates at the RDC being issued only half of their usual allotment of uniforms, linens and towels.

Finally, the lack of communication between the HCSO/Detention and the County with regard to significant maintenance and equipment issues is reflected in the status of C-Pod and B-Pod at the RDC which are both supposed to be equipped with moveable tables and chairs as a part of their re-opening as Direct Supervision housing areas.  When C-Pod was re-opened on October 20, 2020, after two years of renovation the referenced tables and chairs were supposed to be in place.

As of the January site visit (over a year later) the inmates still have no tables and chairs where they can eat or conduct daily activities.  Because of the rapid turnover of Sheriffs, Jail Administrators, and County Administrators over the past few years, none of the present placeholders in those positions are able to answer why furniture is still not available in the Housing Units.

47. Ensure that staff members conduct random shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband.  Such shakedowns must be conducted in each housing unit at least once per month, on an irregular schedule to make them less predictable to prisoners and staff.

**Partial Compliance**

The random shakedown of Housing Units at the RDC and WC reflects the difference between a Direct Supervision facility (WC) and a jail where the inmates still have operational control over most of the facility because of the lack of staff and failure to keep an officer inside each Housing Unit at all times (the RDC).  At the WC little or no contraband is found when a shakedown is conducted.  At the RDC that is not the case.  Cell phones, chargers, shanks, knives, drugs and even cash are routinely confiscated.  Officers have been fired for the introduction of contraband on numerous occasions.  The HCSO investigators recommended certain procedures to control the introduction of contraband particularly by detention staff. This seemed to help with the situation. However, these initiatives appear to have relaxed particularly on second shift when only one officer is on duty in the front office. The Monitoring Team did observe some personal items in the facility inconsistent with the new policies. In addition, the restrictions on bringing in items that might contain contraband have appeared to increase the practice of inmates going through the roof to obtain contraband from outside source. The efforts of HCSO indicate that the HCSO is serious about dealing with the problem, but it also reflects the magnitude of the problem.

48. Install cell phone jammers or other electronic equipment to detect, suppress, and deter unauthorized communications from prisoners in the Jail.  Installation must be completed within two years after the Effective Date.

**Non-Compliant**

This paragraph was previously downgraded from Partial Compliance to Non-Compliant because the County took no further action after issuing a request for proposal (RFP).  There appears to be renewed action on this item but no action has been taken to implement this paragraph.

49. Develop and implement a gang program in consultation with qualified experts in the field that addresses any link between gang activity in the community and the Jail through appropriate provisions for education, family or community involvement, and violence prevention.

**Non-Compliant**

There has been no change in the status of this paragraph for the past four years. Since the JDC is closed due to maintenance problems, only the RDC and WC are currently affected. Regardless, after an officer was initially assigned in 2017, to work on this issue, nothing further has been done.

## USE OF FORCE STANDARDS

Consistent with constitutional standards, the County must take reasonable measures to prevent excessive force by staff and ensure force is used safely and only in a manner commensurate with the behavior justifying it. To that end, the County must:

50. Develop and implement policies and procedures to regulate the use of force. The policies and procedures must:

    a. Prohibit the use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff or visitors;

    b. Prohibit the use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, visitors, or property;

    c. Prohibit the use of force against a prisoner after the prisoner has ceased to resist and is under control;

    d. Prohibit the use of force as punishment or retaliation;

    e. Limit the level of force used so that it is commensurate with the justification for use of force; and

    f. Limit use of force in favor of less violent methods when such methods are more appropriate, effective, or less likely to result in the escalation of an incident.

**Partial Compliance**

There has been development of a Use of Force policy and implementation through training although not all officers have been trained on the policy. While the policy complies with sub-paragraphs (a) through (f) above, and implementation through training followed, actual practice was not consistent with written policy. Officers were exonerated by IAD, even when their actions were in direct violation of approved policy. Follow up by the Monitoring Team with the IAD investigator resulted in a recent significant change. Officers who violated policy have subsequently held accountable following IAD investigative findings. Now IAD investigations still reflect that some officers are in violation of the UOF policy when they use force or deploy OC or a Taser, but they appear to be held accountable. However, OC spray continues to be used as a method of obtaining compliance instead of as a protective measure (See, e.g., IR #211639,

211610, 220035, 220074). This was less during January, 2022 and, hopefully especially with the actions of IAD, is a trend to greater understanding of this policy. This will continue to be tracked to determine whether IAD continues to hold officers accountable.

At present there are two troublesome IAD investigations dealing with the apparent misuse of a Taser to force an inmate to comply with a verbal order.  Ironically, they deal with both CID investigators.  The first case was identified in the 15th Monitoring Report and is recorded in IR 211376.  Since nothing was done as a result of that record, a copy of the IR was provided to the Lieutenant in charge of IAD by the Monitor during the January site visit for follow up.  The second case involves the other CID investigator, similarly using his Taser to make an inmate comply with his verbal order.  That case is outlined in IR 220157; it is currently being investigated by IAD.

Of great concern are two incidents that occurred in October 2021, and March 2022.  They both involved shakedowns at the RDC where officers from other agencies were brought in to assist with the operations.

On October 21, 2021, officers from the HCSO, MDOC Probation SRT Unit, and Rankin County Sheriff's Office conducted a "mass shakedown" of the entire RDC—Pods A, B and C.  In a brief Incident Report (# 211444) the contraband items recovered were listed: "…22 cellphones, Twenty-one dollars in cash, approximately 30 chargers, several handmade Shanks, Loose Pills, and other nuisance contraband."  No injuries were mentioned in the IR. However, Medical reported the following injuries during the shakedown. Eight were hit by rubber bullets and two received medical attention for hands on UOF.  There was no information in the IR regarding the justification for the use of force. The officers involved were not noted.  There was no other information provided.

On March 18, 2022, officers from the HCSO and Rankin County Sheriff's Office conducted another shakedown of the RDC that was apparently limited to Pods A and C.  According to Incident Report # 220257, the following contraband items were found:  23 cellphones, 22 lighters, 7 Top paper packets, 8 packs of cigarettes, 67 shanks and one bag containing 12 individually wrapped packs of tobacco.  The IR included a list of seven inmates who were struck by non-lethal bean bags and one on whom a Taser was deployed.  The UOF was attributed to Rankin County officers, none of whom were identified in the report. (The County subsequently and upon request provided Rankin County UOF reports).  In the HCSO IR, in each case where inmates were shot with non-lethal bean bags, or where a Taser was deployed, the justification for the UOF was listed as "In order to prevent a forcible felony" and "verbal non-compliance", while the inmate's state was listed as "hostile behavior".  The IR states that the affected inmates were seen by medical staff and returned to their units.  The only other meaningful information recorded was the Housing Unit in which force was used. A review of the Ranking County UOF

reports indicates that only one was justified. All of the others were used to gain compliance to a verbal order.

The two incidents have bearing on not only this paragraph (50), but also paragraphs 51 and 56 through 61, in that procedures and documentation specified by them were not followed or provided as required.  Beginning with the fact that the actions of the officers were in violation of the UOF Policy (5-500) because less than lethal weapons were used to coerce inmates into following verbal instructions, and that the required UOF documentation was not provided, including video recordings, there is an even bigger question regarding authority.  Who requested and authorized officers from another county to participate in the two shakedowns and why was it necessary to do so?  That information is not provided in either incident report.  In addition, it does not appear that the RDC's Captain was even present in that IR # 220257 states that he was "notified" regarding the UOF while IR #211444 makes no mention of anyone being notified. Assuming that an IAD investigation finds that officers from other agencies violated the HCSO policy on UOF, what can be done to hold them accountable?

At a time when compliance with the UOF Policy appeared to be improving, these two incidents reflect a quantum step backward.  Interestingly enough, the October shakedown occurred during the tenure of the previous Jail Administrator, while the March shakedown occurred during the tenure of the current Interim Jail Administrator.  Since they both came from outside the HCSO, it is unlikely that they individually came up with the same flawed approach to address the need to conduct shakedowns.  Whether or not the driving force for such action came from within the command staff of Detention Services, or from some other component of the HCSO on the law enforcement side, all future shakedowns should be conducted by Detention Services personnel, supported by other HCSO officers only when necessary. This also further demonstrates the need to repair or replace the Go Pro cameras so that future shakedowns can be recorded.

51. Develop and implement policies and procedures to ensure timely notification, documentation, and communication with supervisors and medical staff (including mental health staff) prior to use of force and after any use of force.  These policies and procedures must specifically include the following requirements:

> a. Staff members must obtain prior supervisory approval before the use of weapons (*e.g.*, electronic control devices or chemical sprays) and mechanical restraints unless responding to an immediate threat to a person's safety.
>
> b. If a prisoner has a serious medical condition or other circumstances exist that may increase the risk of death or serious injury from the use of force, the type of force that may be used on the prisoner must be restricted to comply with this provision. These restrictions include the following:

      i. The use of chemical sprays, physical restraints, and electronic control devices must not be used when a prisoner may be at risk of positional asphyxia.

      ii. Electronic control devices must not be used on prisoners when they are in a location where they may suffer serious injury after losing voluntary muscle control (e.g., prisoner is standing atop a stairwell, wall, or other elevated location).

      iii. Physical strikes, holds, or other uses of force or restraints may not be used if the technique is not approved for use in the Jail or the staff member has not been trained on the proper use of the technique.

c. Staff members must conduct health and welfare checks every 15 minutes while a prisoner is in restraints.  At minimum, these checks must include (i) logged first-person observations of a prisoner's status while in restraints (e.g. check for blood flow, respiration, heart beat), and (ii) documented breaks to meet the sanitary and health needs of prisoners placed in emergency restraints (e.g., restroom breaks and breaks to prevent cramping or circulation problems).

d. The County must ensure that clinical staff conduct medical and mental health assessments immediately after a prisoner is subjected to any Level 1 use of force. Prisoners identified as requiring medical or mental health care during the assessment must receive such treatment.

e. A first-line supervisor must personally supervise all planned uses of force, such as cell extractions.

f. Security staff members must consult with medical and mental health staff before all planned uses of force on juveniles or prisoners with serious mental illness, so that medical and mental health staff may offer alternatives to or limitations on the use of force, such as assisting with de-escalation or obtaining the prisoner's voluntary cooperation.

g. The Jail must have inventory and weapon controls to establish staff member responsibility for their use of weapons or other security devices in the facility. Such controls must include:

      i. a sign-out process for staff members to carry any type of weapon inside the Jail,

      ii. a prohibition on staff carrying any weapons except those in the Jail's tracked inventory, and

      iii. random checks to determine if weapons have been discharged without report of discharge (e.g., by checking the internal memory of electronic control devices and weighing pepper spray canisters).

h. A staff member must electronically record (both video and sound) all planned uses of force with equipment provided by the Jail.

i. All staff members using force must immediately notify their supervisor.

j.  All staff members using a Level 1 use of force must also immediately notify the shift commander after such use of force, or becoming aware of an allegation of such use by another staff member.

**Partial Compliance**

The status of this paragraph shows little change overall since the 15th Monitoring Report. Regarding 51 (a), incident reports still do not reflect that supervisory approval is obtained before less than lethal weapons are accessed and used.

Regarding 51 (b), there is no contact with Medical regarding health risks and any information on their medical condition or other circumstances that may increase the risk of death or serious injury from the use of force.

Regarding 51 (c), Detention Services does not utilize the restraint chair.  Handcuffs are sometimes used when physical restraint is required, but most frequently, when inmates need to be restrained, they are placed in a single cell.

Regarding 51 (d), Medical staff routinely examine inmates when a UOF incident results in them being referred to Medical.  The problem that persists is that Medical staff do not have the capability of making JMS entries.  As has been previously recommended on multiple occasions, they should be granted full access to the JMS so that they can initiate incident reports and can prepare supplements.  The Jail Administrator and IT Director should take prompt action on this matter.

Regarding 51 (e), there is no documentation to support supervisory approval of a planned use of force.  To date, incidents which should have been categorized as "planned" have been routinely treated as operational matters.

Regarding 51 (f), there is no record of a cooperative process being followed.  Security staff and Medical/Mental Health staff have not worked together in advance of a documented planned use of force.

Regarding 51 (g), the Jail has an inventory form that shows when less than lethal weapons are checked out and returned to the armory.

Regarding 51 (h), the Jail now has Go Pro camera equipment that should make the video recording of planned UOF cases possible; however, there have been none to date, rather the cameras have been used to record shakedowns.  As was reported in the September Quality Assurance Report, those cameras became inoperable due to full memory cards and batteries that would not hold a charge.  Since then, shakedowns have been recorded at the WC, but not at the

RDC.  New cameras have been ordered, but the status of their requisition is unclear.  During the January site visit County staff stated that they were not aware of the lack of functioning Go Pro cameras at RDC.

Regarding 51 (i), supervisors are routinely notified after an incident escalates to the point that force must be used.

Regarding 51 (j), shift commanders are routinely notified whenever incidents require the use of force.

**USE OF FORCE TRAINING**

52. The County must develop and implement a use of force training program.  Every staff member who supervises prisoners must receive at least 8 hours of pre-service use of force training and annual use of force refresher training.

**Partial Compliance**

All new officers now receive eight hours of UOF training in the basic recruit academy and there is a plan to have all existing staff receive the specified refresher instruction during annual in-service training; however, the in-service portion of this requirement is still underway.

53. Topics covered by use of force training must include:
    a.  Instruction on what constitutes excessive force;
    b.  De-escalation tactics;
    c.  Methods of managing prisoners with mental illness to avoid the use of force;
    d.  Defensive tactics;
    e.  All Jail use of force policies and procedures, including those related to documentation and review of use of force.

**Partial Compliance**

There has been no change in the status of this paragraph.  The UOF training includes a continuum of appropriate force responses to escalating situation, de-escalation tactics and defensive tactics, but it does not yet include specific measures for managing inmates with mental illness, nor does it include scenario-based training.

54. The County must randomly test at least 5 percent of Jail Staff members annually to determine whether they have a meaningful, working knowledge of all use of force policies and procedures. The County must also evaluate the results to determine if any changes to Jail policies and procedures may be necessary and take corrective action.  The results and recommendations of such evaluations must be provided to the United States and Monitor.

**Non-Compliant**

The UOF policy was adopted by the HCSO on January 27, 2020.  Training has been provided to supervisors and staff, but testing of five percent of staff is not yet planned, nor is it possible to make recommendations regarding changes to the UOF policy.

55. The County must update any use of force training within 30 days after any revision to a use of force policy or procedure.

**Not Applicable**

This paragraph is not applicable at this time.  The UOF policy was adopted two years ago, but it has not been reviewed or revised since that time; therefore, UOF training has not been updated.

**USE OF FORCE REPORTING**

To prevent and remedy the unconstitutional use of force, the County must develop and implement a system for reporting use of force.  To that end, the County must:

56. Develop and implement use of force reporting policies and procedures that ensure that Jail supervisors have sufficient information to analyze and respond appropriately to use of force.

**Partial Compliance**

There has been no change in the status of this paragraph.  The following comments are consistent with what was submitted in the 15th Monitoring Report.

The Use of Force Policy, 5-500, was adopted two years ago.  It complies with the requirements of the Settlement Agreement, but even after more than a year and half of training, it is questionable whether or not supervisors realize that they are to do more than sign off on reports. They should make comments, recommendations and approve or disapprove of the force used. That information is not routinely contained in the UOF incident reports generated by officers and supplements, which are often written by supervisors.

Although the problems associated with the content and quality of UOF reports has been covered in previous Monitoring Reports, the same issues and shortcomings continue.  The incident reports do not document use of force incidents as required.  There is a check box to indicate whether or not force was used.  This then requires additional information regarding the use of force.  The box is rarely checked even when the narrative of the report is clear that force was used.  As a result, the additional information required for instances of use of force is not provided.

At the WC the quality of UOF reports (and incident reports in general) has improved. They are usually properly titled and identified according to content. At the RDC many of the UOF reports are not identified as such. Unique tracking numbers and the officers involved are routinely included, but witness statements are seldom noted. A description of the injuries is sometimes listed. The classification of the housing where the incident occurred is never specified. This applies to both facilities.

57. Require each staff member who used or observed a use of force to complete a Use of Force Report as promptly as possible, and no later than by the end of that staff member's shift. Staff members must accurately complete all fields on a Use of Force Report. The failure to report any use of force must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination. Similarly, supervisors must also comply with their documentation obligations and will be subject to re-training and discipline for failing to comply with those obligations.

**Partial Compliance**

There has been no change with regard to this paragraph. While it is not yet possible to determine when a UOF incident report was generated from the IR itself, that information is now available on the Incident Reporting Spreadsheet. A review of that document reflects UOF incident reports are completed by the end of the staff member's shift. Although that is an improvement, this paragraph is still carried as being in Partial Compliance because some incident reports involving the use of force continue to be titled as something other than UOF and the use of force check box is not checked, resulting in the additional required information not being provided.

58. Ensure that Jail use of force reports include an accurate and detailed account of the events. At minimum, use of force reports must document the following information:

    a. A unique tracking number for each use of force;

    b. The names of all staff members, prisoner(s), and other participants or witnesses;

    c. Housing classification and location;

    d. Date and time;

    e. A description of the events leading to the use of force, including what precipitated or appeared to precipitate those events.

    f. A description of the level of resistance, staff response, and the type and level of force (including frequency and duration of use). For instance, use of force reports must describe the number of discharges from electronic control devices and chemical munitions canisters; the amount of discharge from chemical munitions canisters; whether the Staff Member threatened to use the device or actually discharged the device; the type of physical hold or strike used; and the length of time a prisoner was restrained, and whether the prisoner was released from restraints for any period during that time;

    g.  A description of the staff member's attempts to de-escalate the situation without use of force;

    h.  A description of whether the staff member notified supervisors or other personnel, including medical or mental health staff, before or after the use of force;

    i.  A description of any observed injuries to staff or prisoners;

    j.  Whether medical care was required or provided to staff or prisoners;

    k.  Reference to any associated incident report or prisoner disciplinary report completed by the reporting officer, which pertains to the events or prisoner activity that prompted the use of force;

    l.  A signature of the staff member completing the report attesting to the report's accuracy and completeness.

**Partial Compliance**

The quality of UOF reports continues to improve. By and large the majority of the requirements of this paragraph are covered in UOF reports. The primary discrepancies involve the lack of witness statements and the total failure to specify the classification of the housing area where the incident occurred. The quality of IR/UOF reports is often so poor that it is difficult to determine what actually occurred. Officers need to take the time to review their work product to determine whether or not their report can stand alone. That means that the uninformed reader should be able to determine what transpired simply by reading the report, without interpretation or supplemental information from the author. Supervisors need to follow up on each UOF report to ensure that this standard is met and maintained. That is something that they do not currently do.

## USE OF FORCE SUPERVISOR REVIEWS

59.    The County must ensure that Jail supervisors review, analyze, and respond appropriately to use of force. At minimum:

    a.  A supervisor must review all use of force reports submitted during the supervisor's watch by the end of the supervisor's watch.

    b.  A supervisor must ensure that staff members complete their use of force reports by the end of their watch.

    c.  Reviewing supervisors must document their findings as to the completeness of each staff member's use of force report, and must also document any procedural errors made by staff in completing their reports.

    d.  If a Use of Force report is incomplete, reviewing supervisors must require Staff Members to provide any required information on a revised use of force report, and the Jail must maintain both the original and any revised report in its records.

    e.  Any supervisor responsible for reviewing use of force reports must document their use of force review as described in Paragraph 62 sufficiently to allow auditing to determine whether an appropriate review was conducted.

f.     All Level 1 uses of force must be sent to the shift commander, warden, Jail Administrator, and IAD.

g.     A Level 2 use of force must be referred to the shift commander, warden, Jail Administrator, and IAD if a reviewing supervisor concludes that there may have been a violation of law or policy.  Level 2 uses of force may also be referred to IAD if the County requires such reporting as a matter of Jail policy and procedure, or at the discretion of any reviewing supervisor.

**Partial Compliance**

The fact that there has been no change with regard to the status of this paragraph is readily apparent when one reviews the identical comments from the 14th and 15th Monitoring Reports. They still apply today.  On a day-to-day basis, supervisors are actively involved in dealing with incidents, sometimes more so than would be expected.  That is primarily due to the fact that supervisors at the RDC tend to handle routine matters, such as well-being and security checks, that should be the responsibility of Detention Officers.  This situation is primarily attributable to the shortage of personnel.  Supervisors follow through on UOF cases by notifying the appropriate chain of command and investigative authorities.  As has always been the case, however, supervisors do not evaluate incidents, reach conclusions and make recommendations. Future training for supervisors needs to concentrate on the fact that a signature is not sufficient. A finding regarding the appropriateness of UOF is required.

60.     After any Level 1 use of force, responding supervisors will promptly go to the scene and take the following actions:

a.     Ensure the safety of everyone involved in or proximate to the incident. Determine if anyone is injured and ensure that necessary medical care is or has been provided.

b.     Ensure that photos are taken of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in a use of force incident. Photos must be taken no later than two hours after a use of force.  Prisoners may refuse to consent to photos, in which case they should be asked to sign a waiver indicating that they have refused consent.  If they refuse to sign a waiver, the shift commander must document that consent was requested and refused.

c.     Ensure that staff members and witnesses are identified, separated, and advised that communications with other staff members or witnesses regarding the incident are prohibited.

d.     Ensure that victim, staff, and witness statements are taken confidentially by reviewing supervisors or investigators, outside of the presence of other prisoners or involved staff.

e.     Document whether the use of force was recorded.  If the use of force was not recorded, the responding supervisors must review and explain why the event was

not recorded.  If the use of force was recorded, the responding supervisors must ensure that any record is preserved for review.

**Non-Compliant**

This paragraph continues to be carried as Non-Compliant because the primary components required are not addressed in supervisory review of UOF cases.  Specifically, they do not require that photographs be routinely taken, nor do they ever indicate that an inmate has refused to sign a waiver when photographs are refused.  Witnesses are seldom identified, nor are witness statements taken.  Finally, they do not explain why an incident was not recorded if there is no video evidence.

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift.  All level 1 uses of force must also be reviewed by a supervisor of Captain rank or above who was neither involved in nor approved the use of force.  The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

**Non-Compliant**

There continues to be no change in the status of this paragraph.  The spread sheet on incident reports which includes the full text of the narrative and supplemental narratives and includes additional information not found in the hard copy incident reports including supervisor approval. This frequently reflects the supervisors' approval, there is little or no indication of findings or recommendations in the spread sheet or separate reports.  Command level Detention staff indicate that they review incident reports, but there is no record of their recommendations for change, update or action.

62. Reviewing supervisors must document the following:
- a.  Names of all staff members, prisoner(s), and other participants or witnesses interviewed by the supervisor;
- b.  Witness statements;
- c.  Review date and time;
- d.  The findings, recommendations, and results of the supervisor's review;
- e.  Corrective actions taken;
- f.  The final disposition of the reviews (e.g., whether the Use of Force was found to comply with Jail policies and procedures, or whether disciplinary action was taken against a staff member);
- g.  Supporting documents such as incident reports, logs, and classification records. Supervisors must also obtain and review summary medical and mental health records describing –

      i.      The nature and extent of injuries, or lack thereof;

      ii.     The date and time when medical care was requested and actually provided;

      iii.    The names of medical or mental health staff conducting any medical or mental health assessments or care.

h.     Photos, video/digital recordings, or other evidence collected to support findings and recommendations.

**Non-Compliant**

There has been no change in the status of this paragraph for the past several reporting periods. The incident report summary spreadsheet has a column for supervisors' notes. This would be an appropriate place for them to make comments/recommendations.

## INCIDENT REPORTING AND REVIEW

To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement a system for reporting and reviewing incidents in the Jail that may pose a threat to the life, health, and safety of prisoners. To that end, the County must:

63.    Develop and implement incident reporting policies and procedures that ensure that Jail supervisors have sufficient information in order to respond appropriately to reportable incidents.

**Partial Compliance**

Policy 1-500, Incident Reports, was approved and adopted on April 14, 2021. Since all officers have not yet received orientation regarding its requirements through in-service training, emphasis needs to be placed on training for all supervisors and staff so that compliance can be achieved. Not just supervisors but line staff must be trained so that they write incident reports that include sufficient information to allow supervisors to respond appropriately.

64.    Ensure that Incident Reports include an accurate and detailed account of the events. At minimum, Incident Reports must contain the following information:

     a.     Tracking number for each incident;

     b.     The names of all staff members, prisoner, and other participants or witnesses;

     c.     Housing classification and location;

     d.     Date and time;

     e.     Type of incident;

     f.     Injuries to staff or prisoner;

     g.     Medical care;

     h.     All staff involved or present during the incident and their respective roles;

i.      Reviewing supervisor and supervisor findings, recommendations, and case dispositions;

j.      External reviews and results;

k.      Corrective action taken; and

l.      Warden and Administrator review and final administrative actions.

**Partial Compliance**

There has been no change in the status of this paragraph since the 15th Monitoring Report. Rather than repeat the very detailed analysis that was included in that report, reference is made to it as the basis for continuation of the Partial Compliance finding.  The poor quality of incident reports is reported in the QA reports and apparent in IR #211524 as an example. In that report, the officer was in the Control Room and heard yelling coming from A-1. She went to investigate. It is not clear whether she was the unit officer and was improperly in the Control Room or was the Control Room Officer and left the Control Room unattended. She saw multiple inmates beating on another. She called for assistance. The inmate was taken to Medical. There is no description of how the disturbance was handled, no identification of the inmates involved other than the victim, no identification of the responding officers, no indication of whether or not force was used, and no description of the injuries.

There continue to be concerns about the lack of incident reporting. In IR #211698, there is an incident report on a medical transport for a broken hand. The designation on the report is that it is the result of an injury. However, there is no report on the assault that resulted in the medical transport. In IR #220052 there is a report on an inmate being stabbed. However, it was learned that a second inmate was stabbed and taken to medical. This was not included in the incident report. Nor was a second incident report prepared when it was discovered that a second inmate had been stabbed. The January QA report states an ongoing concern that fires aren't being reported. The Fire Safety Officer reports that the fire extinguishers are being used without an associated incident report. The CID log for November indicates an aggravated assault on November 10th and an assault on November 30th neither of which have an incident report.

At present, incident reports filed by security staff may reference the direct involvement of medical or mental health staff and/or the transfer of a detainee to medical, but the reports often fail to include medical or mental health findings.  In addition, there are times when a review of related medical records provides additional information that should be included in the incident report (for example, that an injury was the result of an assault that was not included in the incident report submitted by security staff, or the detainee's altered mental status was the result of intoxication or a drug overdose that was not noted in the incident report submitted by security staff).  Therefore, these larger issues regarding how best to include information available from medical and mental health staff in incident reports still need to be more fully explored and addressed.  In addition, some of this information only obtainable from medical and mental health

(for example, unreported assaults, identified by medical staff due to the seriousness and nature of injuries and/or identified by mental health staff when the detainee reveals such during a treatment session, the identification of drugs taken, based on clinical and laboratory findings, or the relationship between the deterioration of a detainee's mental health status and his/her problematic behavior) is information that senior security staff might want to know about and consider as they attempt to address larger security concerns.

65. Require each staff member directly involved in a reportable incident to accurately and thoroughly complete incident reports as promptly as possible, by the end of the staff member's shift.  At minimum:

    a.    Staff members must complete all fields on an Incident Report for which they have responsibility for completion.  Staff members must not omit entering a date, time, incident location, or signature when completing an Incident Report.  If no injuries are present, staff members must write that; they may not leave that section blank.

    b.    Failure to report any reportable incident must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination.

    c.    Supervisors must also comply with their documentation obligations and will also be subject to re-training and discipline for failing to comply with those obligations.

**Partial Compliance**

While Detention staff generally fill out the required areas of incident reports over which they have responsibility, the failure to even generate a report when an inmate is released from custody either before or after his/her authorized/scheduled release date still stands as a major violation of 66 (b.). There were seven late releases and one mistaken release discovered during the January site visit, none of which had an associated incident report. See paragraph 92. To date there has been only one incident report written to document or explain the circumstances of such an error even though numerous examples have been identified during the document review associated with site visits.  In addition, there have been only a few reports written to document the loss of inmate money or property. As mentioned in paragraph 65, there continues to be a concern about the lack of incident reports when fire extinguishers have been used. In the incident report described above, IR#211524, the officer called for assistance. There were no supplemental reports entered by any of the responding officers.

66. Ensure that Jail supervisors review and respond appropriately to incidents.  At minimum:

    a.    Shift commanders must document all reportable incidents by the end of their shift, but no later than 12 hours after a reportable incident.

    b.    Shift commanders must report all suicides, suicide attempts, and deaths, no later than one hour after the incident, to a supervisor, IAD, and medical and mental health staff.

c.  Any supervisor responsible for reviewing Incident Reports must document their incident review within 24 hours of receipt of an Incident Report sufficiently to allow auditing to determine whether an appropriate review was conducted. Such documentation must include the same categories of information required for supervisor use of force reviews such as names of individuals interviewed by the supervisor, witness statements, associated records (e.g. medical records, photos, and digital recordings), review dates, findings, recommendations, and case dispositions.

d.  Reportable incidents must be reviewed by a supervisor not directly involved in the incident.

**Partial Compliance**

In order to be consistent with other findings this paragraph is upgraded from Non-Compliant to Partial Compliance, not because conditions have materially changed; rather because supervisors do make an effort to comply with the timeliness requirements. Their review of incident reports, however, has not improved. They still routinely simply "sign and send" reports forward without approving or disapproving the actions of the officers involved, making findings or recommending corrective action.

**SEXUAL MISCONDUCT**

67.  To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement policies and procedures to address sexual abuse and misconduct. Such policies and procedures must include all of the following:

a.  Zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations;

b.  Staff training on the zero tolerance policy, including how to fulfill their duties and responsibilities to prevent, detect, report and respond to sexual abuse and sexual harassment under the policy;

c.  Screening prisoners to identify those who may be sexually abusive or at risk of sexual victimization;

d.  Multiple internal ways to allow both confidential and anonymous reporting of sexual abuse and sexual harassment and any related retaliation, including a mechanism for prisoners to directly report allegations to an outside entity;

e.  Both emergency and ongoing medical and mental health care for victims of sexual assault and sexual harassment, including rape kits as appropriate and counseling;

f.  A complete ban on cross-gender strip searches or cross-gender visual body cavity searches except in exigent circumstances or when performed by a medical examiner;

g.      A complete ban on cross-gender pat searches of women prisoners, absent exigent circumstances;

h.      Regular supervisory review to ensure compliance with the sexual abuse and sexual harassment policies; and

i.      Specialized investigative procedures and training for investigators handling sexual abuse and sexual harassment allegations.

**Non-Compliant**

This paragraph was changed to non-compliant in the 15th Monitoring Report. The PREA Coordinator was not on site from mid-July until January 3, 2022. It was reported that several officers were assigned the PREA duties but there is no documentation that they were trained on PREA or were undertaking the full extent of those duties. As previously reported, there were no PREA reports for July, August, or September. During that reporting period there were three inmates transported to the hospital for the stated reason of "PREA evaluations." There was one PREA investigation that occurred in October by one of the assigned officers filling in for the PREA Coordinator. That investigation found the complaint to be unsubstantiated. Another investigation took place in January upon the PREA Coordinator's return. That case involved an officer inappropriately engaging in lewd behavior with an inmate. The investigation was conducted by IAD and the PREA Coordinator and was found to be substantiated and an officer was terminated. There was virtually no other PREA activity. Now with the Coordinator's return, the requirements of this paragraph will be revisited in the next reporting period.

As before, there were a number of incident reports and/or grievances during this reporting period that should have been referred to the PREA Coordinator but there is no documentation of any referral or investigation. The October investigation did result from a referral from the Grievance Coordinator based on a grievance she had reviewed. This is to be commended. However, there was another grievance in December and an incident report (IR #211490) in November that should also have been referred but there is no PREA investigation associated with those incidents. This indicates the need for continued in-service training of officers. The June Quality Assurance report states that there was a PREA training in June attended by 13 officers. There was no reported in-service training of current employees. The Coordinator reported that PREA training was done for the new cadets during her absence. The Coordinator did not do the training and requested documentation has not been received. The PREA Coordinator has reportedly provided some training since her return and since the time of the site visit. The details and documentation of this has not been received.

Nursing staff continue to be involved in the screening of newly admitted detainees in an attempt to identify those who may be sexually abusive or at risk of sexual victimization as part of the intake screening process, and new admissions so identified are referred to the PREA officer.

If/when the PREA officer refers any so identified new admissions to mental health, mental health will perform an assessment and provide any treatment that might be indicated.

If medical or mental health staff identify a PREA eligible detainee who was not previously identified at intake, that detainee is referred to the PREA officer. If there is an actual PREA defined incident, medical staff will perform or facilitate the performance of any indicated assessment and provide any medically indicated treatment; mental health staff will perform an assessment and provide any indicated mental health treatment; and medical and mental health staff will confirm that the PREA officer is aware of the incident.

Both medical and mental health staff continue to provide any clinically indicated emergency and ongoing medical and mental health care for victims of sexual assault and/or sexual harassment. It should be noted that if a detainee alleges having just been raped, the detainee is immediately sent to the hospital emergency room for a full, forensic medical assessment, which includes the use of a rape kit.  It should also be noted that when indicated, medical and mental health services are also provided to alleged detainee perpetrators of sexual assault or sexual harassment.

As noted, the PREA officer was out on leave for an extended period of time, and during that time, the medical and mental health staff were unclear about who had assumed the responsibilities for PREA.  Therefore, although both medical and mental health staff continued to identify PREA-related cases and provide the above described services to such identified individuals, there was no real coordination with a PREA officer.

As previously reported, detainees can report a PREA complaint confidentially through a separate line in the kiosk system. It should be noted, that the PREA Coordinator had the cell phone that is linked to the PREA reporting line through the kiosk while she was out. She stated that no calls came through that line during her absence. However, for future extended absences, it would be preferable to assign the phone to the person assuming those duties.

Detainees can also report a complaint directly to the Mississippi Coalition Against Sexual Assault. An outside line has been implemented such that inmates can call the Coalition directly from the kiosk in the unit without charge. Third party reporting is still available through friends and family. As stated above, PREA complaints can also be reported through the kiosk directly to the PREA Coordinator or through submitting a grievance at the kiosk.

The Coalition also provides counseling for PREA complainants. In the October incident, even though the complaint was found to be unsubstantiated, the investigating officer and Jail Administrator decided that counseling would be appropriate and arranged for three counseling sessions with the Coalition. The first session occurred. The investigating officer then went out on leave and the second two sessions were not facilitated. The PREA Coordinator stated that she

was informed that the former Jail Administrator denied the second two sessions. The former Jail Administrator states that the sessions did not occur because the investigating officer who had arranged for them was on leave. The Monitor did not resolve these conflicting views of what transpired. However, once it was decided that counseling was appropriate and available, the sessions should have occurred.

There were no PREA inmate education activities reported. The education process needs to be expanded once it is recommenced.

One concern related to the ability to provide for sexual safety and adequately investigate allegations is that the 56 cameras that have not been working are still not working. The same for the 14 that were missing and 10 that needed adjusting.

The individual housed in Booking who is there because he alleges suicidal thoughts in order to be placed in the suicide ISO unit where he engages in sexual behavior is still housed in booking. This has been for months now. The Monitoring Team has repeatedly stated that Booking is not appropriate for housing. The suicide ISO unit needs to be under constant supervision by an officer in the unit such that it is safe for inmates. It is essential for the sexual safety of staff and inmates that the housing units be adequately supervised and that Booking not be used for housing.

Given the various above noted roles and responsibilities that medical and mental health staff assume with regard to PREA and PREA-involved detainees, staff may have knowledge about and an understanding of any given PREA-involved detainee that is not readily available elsewhere. Therefore, when there is a PREA investigation, the investigator should fully gather and integrate information obtained from medical and mental health staff into the investigation.  As has been noted in prior reports, although a considerable amount of such information will be available in the detainee's medical records, in many instances, actual investigatory interviews of medical and/or mental health staff might also be indicated.

## INVESTIGATIONS

68.     The County shall ensure that it has sufficient staff to identify, investigate, and correct misconduct that has or may lead to a violation of the Constitution.  At a minimum, the County shall:

        a.     Develop and implement comprehensive policies, procedures, and practices for the thorough and timely (within 60 days of referral) investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury, in accordance with this Agreement, within 90 days of its Effective Date. At a minimum, an investigation will be conducted if:

       i.      Any prisoner exhibited a serious injury;

      ii.     Any staff member requested transport of the prisoner to the hospital;

     iii.    Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

     iv.    Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

b.    Per policy, investigations shall:

       i.      Be conducted by qualified persons, who do not have conflicts of interest that bear on the partiality of the investigation;

      ii.     Include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

     iii.    Include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to the incident, physical evidence, and video or audio recordings.

c.    Provide investigators with pre-service and annual in-service training so that investigators conduct quality investigations that meet the requirements of this Agreement;

d.    Ensure that any investigative report indicating possible criminal behavior will be referred to the appropriate criminal law enforcement agency;

e.    Within 90 days of the Effective Date of this Agreement, IAD must have written policies and procedures that include clear and specific criteria for determining when it will conduct an investigation.  The criteria will require an investigation if:

       i.      Any prisoner exhibited serious, visible injuries (e.g., black eye, obvious bleeding, or lost tooth);

      ii.     Any staff member requested transport of the prisoner to the hospital;

     iii.    Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

     iv.    Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

f.    Provide the Monitor and United States a periodic report of investigations conducted at the Jail every four months.  The report will include the following information:

       i.     a brief summary of all completed investigations, by type and date;

      ii.     a listing of investigations referred for administrative investigation;

      iii.    a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

      iv.    a listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

      v.    a description of any corrective actions or changes in policies, procedures, or practices made as a result of investigations over the reporting period.

    g.    Jail management shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review.  The review and recommendations will be documented and provided to the Monitor and United States.

**Partial Compliance**

Policy 1-600, Investigations, was approved and adopted two years ago (March 25, 2020).  It calls for thorough CID and IAD investigations that are consistent with the requirement of the Settlement Agreement.  There are now two CID investigators because the case load is higher than that of the one IAD investigator.  The officer who held that position for the past five years resigned in November 2020, and went to work for the State of Mississippi.  His replacement was identified, but he was still in training at the time of the January site visit.  Consequently, recent IAD investigations were conducted by the Lieutenant in charge of IAD.

While IAD investigations are compiled on a weekly basis, supplemented by a monthly summary, there is no longer a running status report on all cases.  Thus, it not possible to track the status of investigations once they have been initiated.  If a case is not resolved promptly, determining the disposition becomes problematic.  A four-month report is not provided. The monthly reports would suffice but as noted, if the investigation is completed after the month it was initiated, the disposition does not appear in any of the monthly reports. A brief summary is not provided although the type and date are listed. If any corrective actions or policy changes have been made as a result of investigative findings they are not noted.

The ability of investigators to review incidents is still hampered by the excessive number (approximately 60) of mal-functioning or out of service cameras and the lack of functioning Go Pro cameras.  Without a video record of many incidents, they cannot be properly investigated. This problem has been reported previously; in fact in the 15th Monitoring Report it was stated: "This technical problem should be corrected before the next site visit."  The problem has not been rectified.

The CID spreadsheet is a valuable tool for tracking significant incidents within the Jail System; however, when the Monitoring Reports are prepared data regarding all four months of the period

under review is generally not available.  In the current case the following analysis covers the months of October through December 2021.  During that time frame there were 51 CID investigations of which nine were referred internally within the HCSO, ten were turned over to the Grand Jury and none resulted in specific indictments.

During the same three months, an analysis of incident reports revealed that there were 78 assaults within the Jail System.  They ranged from minor to the beating death of an inmate in October at the RDC.  Of these incidents the vast majority occurred at the RDC.  There were 18 incidents at the WC, one in the transfer waiting area of the JDC, three in Booking, two in Medical, two unspecified, 27 in A-Pod, six in B-Pod and 19 in C-Pod.  It is not clear why there were 27 assaults that were not investigated by CID.

The November CID log listed two aggravated assaults for which there was no corresponding CID investigations.

IAD investigations follow a similar pattern in that almost all of them deal with incidents at the RDC.  During the October through December 2021 time frame only one case was investigated at the WC, one concerned the death of an inmate at the hospital and the thirty other cases all revolved around incidents at the RDC.

**GRIEVANCE AND PRISONER INFORMATION SYSTEMS**

Because a reporting system provides early notice of potential constitutional violations and an opportunity to prevent more serious problems before they occur, the County must develop and implement a grievance system.  To that end:

69.     The grievance system must permit prisoners to confidentially report grievances without requiring the intervention of a detention officer.

**Partial Compliance**
There has been no change in the status of this requirement. The County has installed a kiosk system that allows detainees to file grievances without the intervention of a detention officer. However, there are some gaps in access to the kiosks. There are no kiosks in Booking where people are inappropriately housed as well as no kiosks in the ISO units. As stated in prior Monitoring Reports, it will be necessary to track whether there is a concern about the confidentiality of the use of the grievance system once there is an officer consistently on the unit as required in C Pod by the Stipulated Order. As previously stated, the incident reports indicate that this is still not the case. Until then, it will not be possible to know if the physical setting of the kiosks which does not allow for privacy results in issues with the confidentiality of filing a

grievance. However, it should be noted that inmates are using the system and there has been no stated concern about officers observing the use of the kiosk.

The grievance policy provides that an inmate may submit a written grievance and will be provided a form and an envelope that can be sealed. This can be given to the housing officer or the area supervisor when he or she is doing their rounds. This would allow an additional avenue to submit a grievance confidentially although not without some involvement of a Detention Officer.  It has not been confirmed whether forms and envelopes are available in Booking or the ISO units or the housing units. Paragraph 72 below requires that the grievance system accommodate individuals with cognitive, literacy or language barriers. The failure to do so impacts compliance with this paragraph in that detainees with those barriers cannot confidentially report grievances. The grievance policy requires that if there are cognitive or communication barriers, the Detention Officer refers the issue to the Area Supervisor for communication assistance or problem resolution. It does not appear that this provision of the policy has been implemented or that the inmates have been informed of it. In addition, without an officer regularly in the units, an inmate would not have easy and confidential access to a Detention Officer.  The kiosk system is not programmed to provide information or instruction for use in any other language. Non-English speaking persons and persons with disabilities still require the intervention of another inmate or officer.

70.     Grievance policies and procedures must be applicable and standardized across the entire Jail.

**Partial Compliance**

A Grievance Policy has now been approved and adopted. There are still some aspects of the policy that are not fully implemented. Once the policy is fully implemented, it would be applicable and standardized across the entire Jail. At present, the kiosk system works the same across facilities. The Grievance Coordinator stated that she now reviews all grievances including those at the WC, determines whether they are grievances and then assigns the grievance to staff for a response. However, a review of the grievance responses indicates that the Grievance Officer at the WC is receiving grievances that she denies as not being a grievance even though this is supposed to be the role of the Grievance Coordinator. It appears that the system of having the Grievance Coordinator determine whether the grievance presents a grievable issue which is according to policy, is not being consistently followed leading to inconsistency in this area. The Grievance Coordinator has addressed this, but it continues to be an issue. There is inconsistency in how grievances are responded to once assigned. In addition to some responders not providing any response through the system, described below, some responders research the grievance and respond substantively whereas others simply say the matter will be looked into. The Grievance Coordinator stated that she advised staff to respond substantively to the grievances. There appears to be some improvement in this area but some responses are still inadequate. Even with the policy in place, there will need to be training on how to properly respond and ensure

promised response to grievances are implemented in order to achieve consistency. The grievance policy requires that a percentage of grievance responses be audited on a periodic basis. Once this is implemented, it will be possible to target appropriate training and corrective action.

71.     All grievances must receive appropriate follow-up, including a timely written response by an impartial reviewer and staff tracking of whether resolutions have been implemented or still need implementation.  Any response to a medical grievance or a grievance alleging threats or violence to the grievant or others that exceeds 24 hours shall be presumed untimely.

**Partial Compliance**

As previously reported, the Grievance Coordinator maintains a spread sheet to track the grievances and grievance responses. Many of the fields are pulled electronically from the Securus system. However, she has to manually add the type of grievance, the date of response, and the date of an appeal. The Grievance Coordinator previously reported that some officers do not respond to grievances through the Securus system and, as a result, there is no documentation of a response to some grievances. This appears to be a significant problem. The timeliness of responses is also an issue. Standard grievances are supposed to receive a response within 7 days. Emergency and medical grievances are supposed to receive a response in 24 hours. The chart below reports the findings for late and no responses.

|  | Denied as Not a Grievance | Number Assigned | No Response | Late Response Standard | Late Response Medical | Late Response Emergency |
|---|---|---|---|---|---|---|
| November | 72 | 129 | 10 (3 medical) | 5 | 8 | 15 |
| December | 73 | 75 | 20 (5 medical-2 emergency) | 4 | 0 | 4 |

As noted in prior reports, it appears that many of the emergency grievances are not emergencies. It will be important to educate the inmates on what constitutes an emergency so that true emergencies aren't overlooked among the many emergency grievances. Also as stated before, the Grievance Coordinator has also suggested that a timely response to emergency grievances could be better ensured if the system had an alert signal for emergency grievances. The Grievance Coordinator works regular business hours and will not see an emergency grievance submitted in the evening or on the weekend until the next business day.

One concern is that when an inmate submits a grievance regarding a medical issue on a medical grievance form, the Grievance Coordinator cannot assign it to Medical. Although this is helpful in tracking grievances by category, it means that the inmate is told he has to resubmit on the

proper form. This could delay needed medical attention. Some of these grievances related to COVID and should have been addressed promptly. The Grievance Coordinator stated that she would ask IT if the system could allow her to assign regular grievances to Medical. There was also a problem during this reporting period with not having an assigned Medical person able to respond to grievances.

There needs to be some training on what constitutes a grievance as opposed to a request, what is an adequate response, oversight to determine that promised actions are taken and then some quality assurance to check the adequacy of responses. There continue to be some grievances that were denied as non-grievable but in fact were.  In December there were approximately 16 such denials. This included issues of alleged over-detention, failure to get prescribed medications, missing money, and not getting recreation. One such grievance was an individual complaining that inmates were assigned to pass out food trays. It was denied as not a grievance. As noted in the January QA report, this puts an inmate in charge of who gets meals and this practice has been abused with at least two detainees reported to have experienced significant weight loss.

There are still some grievances where the adequacy of the response needs improvement but this appears to be improving. There were still a few responses stating that the officer "will look into it." There is no way of knowing whether the promised action was completed. When possible, it would be better to address the grievance and then report what was done. The new grievance policy requires that the Quality Assurance Officer do a monthly audit of grievances and responses to determine the timeliness and appropriateness of the responses. This has not been implemented yet but should provide some oversight in this area.

Two responses to program requests are mentioned here in that they indicate a violation of either the Settlement Agreement or policy. One inmate requested a copy of the Consent Decree. He was told that the responding officer did not have a copy. Both staff and inmates are required to have access to the Settlement Agreement. Another request was that the inmate had only one jumpsuit. He was told that was all he was allowed. By policy inmates are supposed to have two jumpsuits. Otherwise, when they send their jumpsuit to the laundry they have to walk around in their underwear.

Medical and mental health related grievances are triaged by the HSA.  A review of the HSA's grievance file indicates that medical and mental health related grievances are responded to in a timely manner, and when it appears to be an emergency, the response is immediate.  However, it appears that there continue to be some differences between the grievance file maintained by the HSA and the grievance file/system maintained by the grievance officer.  The HSA should meet with the grievance officer in an effort to figure out and address this ongoing problem.

In addition, although a file of medical and mental health grievances and written responses is maintained by the HSA, there is still no attached documentation of a final resolution of each matter (i.e., whether or not the response to the grievance actually resolved the grievance matter). Therefore, such documentation of resolution must be added to the records maintained by the HSA.

72.     The grievance system must accommodate prisoners who have physical or cognitive disabilities, are illiterate, or have LEP, so that these prisoners have meaningful access to the grievance system.

**Non-Compliant**

The grievance policy requires that if there are cognitive or communication barriers, the Detention Officer refers the issue to the Area Supervisor for communication assistance or problem resolution. Under this system non-English speaking persons and persons with disabilities would still require the intervention of an officer which is not ideal but at least there is a specified means to address this issue. There is no indication that this provision of the policy is being implemented or that inmates have been informed of this option. Prisoners are assisting one another but that carries the risk of them accessing and using another prisoner's PIN number in addition to the potential of having to disclose private information. This may inhibit the use of the grievance system and also allows access to the prisoner's funds.

The Securus system should at some point be programmed to include the most common foreign languages.

73.     The County must ensure that all current and newly admitted prisoners receive information about prison rules and procedures.  The County must provide such information through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics:  understanding the Jail's disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse, battery, and assault; accessing medical and mental health care; emergency procedures; visitation; accessing the grievance process; and prisoner rights.  The County must provide such information in appropriate languages for prisoners with LEP.

**Non-Compliant**

The Inmate Handbook, which is given to all detainees during the booking process, is out of date and is not available in Spanish or any other language.  This shortcoming has been brought to the attention of the HCSO/Jail Administrator since the very first Monitoring Report.  Over the past five years, various command staff were assigned the task of updating the handbook, but that was never accomplished.  During the January site visit the (then) Jail Administrator said that she did not wish to issue an updated Inmate Handbook until she was able to provide the services that would be outlined in it.  Because she has since been replaced by an Interim Jail Administrator, it

is now up to him to deal with this long-standing shortcoming.  There is no excuse for allowing a relatively simplistic matter to go unaddressed for over five years.

## RESTRICTIONS ON THE USE OF SEGREGATION

In order to ensure compliance with constitutional standards and to prevent unnecessary harm to prisoners, the County must develop and implement policies and procedures to limit the use of segregation.  To that end, this Agreement imposes the following restrictions and requirements:

74.     Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term housing where staff will provide access to exercise, meals, and other services.

**Non-Compliant**
This paragraph continues to be carried as Non-Compliant because the practice of housing inmates in Booking holding cells has not been corrected for the full five year duration of the monitoring process.  Regardless of the commitments made by the HCSO, to rectify the situation, each site visit (whether in person or remote) has revealed that holding cells continue to be used for the housing of problematic inmates for days, weeks and months.  These cells have no windows, no dayroom space, video visitation link, access to a recreation yard or even a convenient shower.  They are rated to hold a detainee for no more than eight hours.  During the January site visit four long term housing inmates were identified in Booking holding cells.

As noted above, the Classification log for November indicates that ten inmates were classified two days or more after booking, up to sixteen days. In December, seven inmates were classified two days or more after booking up to 19 days. It may be that the classification is getting entered late. However, this should be rectified so that timely classification can be tracked. This should be aided by having a full complement of trained classification staff.

At present, this is not happening for new admissions for whom 'appropriate long-term housing' would be a mental health unit.  This is because there is no mental health unit; there is no unit that even approximates 'appropriate' for such new admissions; and those who are most unstable and unpredictable are likely to end up being placed in segregation, which is clearly not appropriate housing.  However, once the mental health unit becomes operational, this should all change; it will be possible to immediately place seriously mentally ill detainees in more appropriate housing, directly from intake, and mental health and classification have been working out the details for how this will be accomplished.

75.     The County must document the placement and removal of all prisoners to and from segregation.

**Partial Compliance**

Segregation logs submitted for the recent site visits reflect better record keeping than had been maintained in the past, but there were inconsistencies noted between files from the WC as compared to the RDC.  Command staff need to set and enforce uniform procedures as well as standardized forms and documentation throughout the Jail System.

The Segregation Log used at the WC now has a column to list the charge against an inmate, when he was placed in segregation, when a disciplinary hearing was held and when the inmate was returned to general population and to what location.  The WC appears to routinely include the charge and usually indicates the date of a disciplinary hearing and the number of days imposed. RDC has discontinued using the segregation log for individuals on disciplinary segregation. The log kept for disciplinary segregation does not include when the individual went into segregation and when they left (as required by paragraph 107 below). If RDC intends to continue using a separate log for disciplinary segregation, it should add this required information. It would be better to have the logs standardized between facilities. The segregation log used at the WC would work for RDC and has the required information. The Monitoring Team has recommended that the log include the date of the most recent seven-day review so that compliance with that policy requirement can be tracked.

76.    Qualified Mental Health Professionals must conduct mental health rounds at least once a week (in a private setting if necessary, to elicit accurate information), to assess the mental health status of all prisoners in segregation and the effect of segregation on each prisoner's mental health, in order to determine whether continued placement in segregation is appropriate.  These mental health rounds must not be a substitute for treatment.

**Partial Compliance**

Mental health staff continue to perform weekly rounds for detainees who are being held in segregation.  When indicated, staff offers mental health services to a detainee who is not already on the mental health caseload.  When indicated, staff makes available adjustments in the treatment that is being provided to a detainee who is already on the mental health caseload, but currently (i.e., until the mental health unit becomes operational), available adjustments in treatment (such as modification of medication) may be far less than what the detainee requires.

During the June 2021 site visit, it at least appeared that a mechanism for interdisciplinary review of detainees who are being held in segregation was finally being implemented.  Essentially, since then, there has been an every seven day review by security, classification, and mental health, in the form of a joint MAC/IDT/SEG REVIEW MEETING; each detainee being held in segregation is discussed, but to date, although it appears that each detainee is discussed, the documentation simply indicates that the detainee's behavior (a product of the detainee's mental illness) was such that he couldn't be removed from segregation and housed in general population.  However, as noted in various sections of the agreement, no seriously mentally ill

detainee should be held in long-term segregation; even placement in short-term segregation should only be for some documented, extraordinary reason; and when a seriously mentally ill detainee is being held in segregation, there must be an interdisciplinary plan developed for removing him/her from segregation as quickly as possible.

The existing reviews and review documentation do not reflect full compliance with these provisions or the principles that underlie the need for an interdisciplinary review of seriously mentally ill detainees being held in segregation.  More specifically, there is no indication of the impact, if any, of segregation on the detainee's mental status; there is no indication of whether or not the detainee even understood why he/she was placed in segregation; and so ultimately, there is no sense obtainable from the documentation whether placement in segregation was helpful or harmful to the detainee.  In addition, the review documents/forms do not include a plan for removal of each detainee from segregation (even such as altering the approach to treating an unstable detainee in an effort to better stabilize the detainee, or identifying an alternative "safe" but less restrictive placement for a vulnerable detainee) or some explanation as to why an implementable plan cannot be developed (for example, the absence of a mental health unit that would be a suitable alternative placement).  Instead, the review documents appear to indicate that segregation is the most appropriate place for each detainee, and there is not even a discussion about whether or not any adjustments could or should be made (like more out of cell time or increased access to more services or activities).

There is also no evidence that any effort was made to engage each detainee in the review process of his/her case, and there was no indication that each detainee had been found to be so incompetent (due to mental illness, intellectual disability or other cognitive difficulty) that he/she was unable to credibly participate.  In addition, for any of the detainees who had refused treatment and were considered to be too dangerous to be housed in general population, there was no discussion about whether or not the degree of danger to others that they posed was enough that a plan should be made to initiate involuntary treatment.

77.     The County must develop and implement restrictions on the segregation of prisoners with serious mental illness.  These safeguards must include the following:

      a.   All decisions to place a prisoner with serious mental illness in segregation must include the input of a Qualified Mental Health Professional who has conducted a face-to-face evaluation of the prisoner in a confidential setting, is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

      b.   Segregation must be presumed contraindicated for prisoners with serious mental illness.

      c.   Within 24 hours of placement in segregation, all prisoners on the mental health caseload must be screened by a Qualified Mental Health Professional to

determine whether the prisoner has serious mental illness, and whether there are any acute mental health contraindications to segregation.

d.  If a Qualified Mental Health Professional finds that a prisoner has a serious mental illness or exhibits other acute mental health contraindications to segregation, that prisoner must not be placed or remain in segregation absent documented extraordinary and exceptional circumstances (i.e. for an immediate and serious danger which may arise during unusual emergency situations, such as a riot or during the booking of a severely psychotic, untreated, violent prisoner, and which should last only as long as the emergency conditions remain present).

e.  Documentation of such extraordinary and exceptional circumstances must be in writing.  Such documentation must include the reasons for the decision, a comprehensive interdisciplinary team review, and the names and dated signatures of all staff members approving the decision.

f.  Prisoners with serious mental illness who are placed in segregation must be offered a heightened level of care that includes the following:

   i.  If on medication, the prisoner must receive at least one daily visit from a Qualified Medical Professional.

   ii.  The prisoner must be offered a face-to-face, therapeutic, out-of-cell session with a Qualified Mental Health Professional at least once per week.

   iii.  If the prisoner is placed in segregation for more than 24 hours, he or she must have his or her case reviewed by a Qualified Mental Health Professional, in conjunction with a Jail physician and psychiatrist, on a weekly basis.

g.  Within 30 days of the Effective Date of this Agreement, A Qualified Mental Health Professional will assess all prisoners with serious mental illness housed in long-term segregation.  This assessment must include a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Prisoners requiring follow-up for additional clinical assessment or care must promptly receive such assessment and care.

h.  If a prisoner on segregation decompensates or otherwise develops signs or symptoms of serious mental illness, where such signs or symptoms had not previously been identified, the prisoner must immediately be referred for appropriate assessment and treatment by a Qualified Mental Health Professional.  Any such referral must also result in a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner.  Signs or symptoms requiring assessment or treatment under this clause include a deterioration in cognitive, physical, or

verbal function; delusions; self-harm; or behavior indicating a heightened risk of suicide (e.g., indications of depression after a sentencing hearing).

i.   The treatment and housing of prisoners with serious mental illness must be coordinated and overseen by the Interdisciplinary Team (or Teams), and guided by formal, written treatment plans.  The Interdisciplinary Team must include both medical and security staff, but access to patient healthcare information must remain subject to legal restrictions based on patient privacy rights.  The intent of this provision is to have an Interdisciplinary Team serve as a mechanism for balancing security and medical concerns, ensuring cooperation between security and medical staff, while also protecting the exercise of independent medical judgment and each prisoner's individual rights.

j.   Nothing in this Agreement should be interpreted to authorize security staff, including the Jail Administrator, to make medical or mental health treatment decisions, or to overrule physician medical orders.

**Partial Compliance**

Regarding 77(a), at present, there is no participation by a QMHP in the decision to place someone with serious mental illness in segregation and there is no policy that would address this provision.

As noted in prior monitoring reports, this provision applies to all detainees who are already on the mental health caseload, and those who are not already on the mental health caseload but the behavior they exhibited around the time of the infraction that might cause them to be placed in segregation could reasonably lead security staff to suspect that they might be suffering from a mental illness.

The mental health assessment performed in connection with security's review of a detainee's infraction(s) should be performed by a mental health clinician who is not the detainee's primary therapist, in order to avoid complicating the treatment process.  The assessment should be focused on the following:

- Whether or not the detainee's mental status is such that he/she cannot credibly participate in the disciplinary review process
- Whether or not the detainee's infraction/behavior is actually a symptom(s) of or the result of his/her mental illness
- Given the detainee's mental status, whether or not the detainee is actually able to learn anything (or otherwise benefit) from being placed in segregation
- Whether or not placement of the detainee in segregation is likely to be harmful to the detainee/cause further deterioration of his/her mental status

- Whether or not, given the detainee's mental illness and current mental health status, there is an intervention that is more appropriate than placement in segregation, such as altering the detainee's mental health treatment pan and/or a punishment that doesn't include placement in segregation

The exception to this policy would be detainees who are housed on the mental health unit. If a detainee on the mental health unit commits an infraction, the treatment team (which includes security staff) will have the responsibility and authority to decide what should be done, the team's decision should be documented in the detainee's medical records, and an emergency treatment plan should be generated to further document the team's decision.

Regarding 77 (b) given the number of individuals with serious mental illness in segregation and the lack of process surrounding their placement and continued placement, it cannot be said that segregation of individuals with serious mental illness is contraindicated. As has been noted in each prior report, there are detainees with serious mental illness housed on the segregation unit and held in segregation in the isolation sections of other units. It is anticipated that the program design for the mental health unit will be such that these detainees can be moved to the mental health unit once it is operational.

Regarding 77 (c) at present, individuals on the mental health caseload are not being screened within 24 hours of being placed in segregation. In fact, mental health staff are not even notified when a detainee is placed in segregation, even when the detainee is known to be on the mental health caseload. As explained in prior reports, mental health staff review the housing location of those on the mental health caseload to determine if someone has been moved to segregation.

Regarding 77 (d) and (e) As noted in paragraphs 77(a) and 77(c), the mental health staff are not being offered the opportunity to assess any detainees prior to their placement in segregation. Therefore, the security policy and procedures that would address this provision must be developed and implemented.

Security staff are aware of the fact that there are seriously mentally ill detainees being held in segregation. However, there is no specific documentation regarding the 'extraordinary and exceptional circumstances' that have required their placement in segregation. Also note that this provision outlines additional specific requirements with regard to the review and approval of the 'extraordinary and exceptional circumstances' that have been asserted. In addition, the placement of these detainees in segregation has not been short term. Furthermore, there is only one situation within the last two years where an individualized plan was developed to get a detainee out of segregation as quickly as possible.

Although the opening of the mental health unit will provide a more appropriate housing option for seriously mentally ill detainees who are currently placed in segregation, it will still be important to develop and implement policies and procedures that would address this provision.

Regarding 77(f)(i) as part of medication pass, the nurses offer daily visits to detainees being held in segregation who are on medication.  However, as noted in other sections of this report, there are times when nurses are attempting to pass medication that they are unable to actually even see some detainees due to the fact that there are not enough security staff available to support the medication pass function.

Regarding 77(f)(ii) detainees on the mental health caseload who are being held in segregation do have therapeutic sessions with a QMHP, but due to the shortage of mental health staff, these sessions are not consistently scheduled on a weekly basis.  Then, due to the shortage of security staff, the therapeutic sessions that are scheduled do not always occur. There are times when this is all further complicated by problems with the physical plant (for example, cell doors that don't lock, which makes it virtually impossible for security staff to assure the safety of the mental health staff who were scheduled to come on the unit) and although such cancelled sessions are rescheduled, this can take a while due to the shortage of mental health staff.  In addition, when scheduled sessions do occur, due to the shortage of security staff they are often not out-of-cell sessions, but rather sessions held at the detainee's cell door.  Such cell door sessions are far less adequate, in that they do not allow for the type of privacy, comfort and opportunity to fully engage the detainee that out-of-cell sessions allow for.

Regarding 77(f)(iii), a QMHP makes weekly rounds for all detainees being held in segregation, during which each detainee's mental status and need for mental health services is assessed. However, as has been repeatedly noted in prior reports, there is no on-site jail medical physician or psychiatrist. The responsibilities that might be assumed by such physicians are assumed by a medical/primary care nurse clinician/practitioner and a psychiatric nurse clinician/practitioner, both of whom have physician collaborators.

Regarding 77(g) there have been documented efforts to assess all detainees with serious mental illness housed in long-term segregation. Most have been successfully assessed but some have continued to refuse to be assessed, despite repeated efforts to assess them.  More recently, mental health staff have made efforts to bring detainees who have repeatedly refused to be assessed down to the medical department for an assessment.  Although making this effort has been difficult given the limited availability of security staff, most detainees who had been refusing mental health assessments complied when taken out of segregation and brought to the medical department.  This effort has increased compliance with this provision, while also demonstrating that such seemingly resistant detainees can be engaged when the right type of effort is made to engage them.  However, to date, there has been no appropriate housing for such detainees that

could be recommended based on those assessments (see Paragraph 77(b)).  As noted in prior reports and in Paragraph 77(b) of this report, it is anticipated that the new mental health unit will provide appropriate alternative housing for this population, at which point this provision can be more fully addressed.

Why the development of a mental health unit is required in order to address the needs of the seriously mentally ill detainee population and comply with this provision and many of the other provisions of this agreement has been outlined in prior reports.  The various issues that need to be addressed in order to get to the point where the mental health unit becomes operational have also been outlined in prior reports.  Therefore, all of the above noted will not be outlined again here, and instead, we will simply offer a status update.

As noted in prior reports, there has been a fully interdisciplinary planning team for the mental health unit. The team has met on a monthly basis, with full participation and more detailed planning went on in between the monthly meetings.  Based upon a review of the meeting minutes and interviews conducted during the site visit, most of the critical operational policies and procedures have been finalized, the clinical program/menu of therapeutic interventions has been developed, designed to meet the needs of the population that is expected to be housed on the unit, and at least an initial staffing plan has been developed.

At present, the next steps include the following: With regard to operational policies and procedures, policies and procedures for how disciplinary infractions will be managed within the unit (instead of through the facility's normal disciplinary review process, given that it is already established that all detainees on the unit are SMI) still need to be developed, including the range of disciplinary options that might be available and how any use of discipline will be integrated with a detainee's treatment plan.  With regard to the clinical program, the actual content of the various group therapies needs to be developed.  As noted in other sections of this report, the training of security staff who will be assigned to the unit, having adequate mental health staff to provide services on the unit, and the completion of the renovation of the unit are also issues that still need to be addressed.

Initially, the plan was to have designated security staff and supervisory security staff for the MHU.  However, given the shortage of security staff, the current plan is to provide additional mental health training to a larger group of security officers (phase one of the training has occurred), which will allow for more flexibility with assignments to the MHU on any given shift, and then to eventually provide this additional training to all security officers, which will allow for even greater flexibility with shift assignments to the MHU. It should be noted however that although this approach does help to assure security coverage for the MHU despite the shortage of security staff, not having security officers who are fully designated to work on the MHU does mean that there will not be a set of security officers who will benefit from the type of on-the-job

training that will come with consistent placement on the MHU, and SMI detainees on the unit will not have a fixed set of security officers who they can develop a working relationship with. Although phase one of the training has been provided, the second and third phase have not apparently, in part, because the trainer was not paid by the County and, in part, because there are insufficient security staff to allow for training.

The renovation of the space for the mental health unit has been underway with the renovation of B Pod which started in October 2020. There is still no furniture or needed IT connections. The MHU planning team did have an opportunity to provide input into how the space would be renovated in order to make it as usable for this purpose as possible but a projected date for completion of the renovations was not provided.  In addition, it should be noted that although still off in the future, a mental health unit is in the first phase of the County's plan to build a new jail, and so hopefully, lessons learned while operating a mental health unit in the repurposed space at RDC can help inform the design of the proposed MHU for the new jail.

Regarding 77(h) when it has been discovered that a detainee's mental health status has deteriorated while being held in segregation, this has usually been discovered by mental health staff during weekly segregation rounds or during an individual session with a detainee.  Nursing staff have also identified such detainees during their weekly segregation rounds or during medication pass.  It does not appear that security staff identify such deteriorating detainees. The reason(s) for this is unclear, and so this issue requires further assessment and then the development of a corrective action plan but during the course of such an assessment, a lack of focus on this issue by security staff and/or the need for additional mental health training for security staff should be considered as possible contributing factors.

When it has been found that a detainee's mental health status has deteriorated while being held in segregation, mental health staff assess mental health treatment needs. If the detainee is already on the mental health caseload, any indicated changes to his/her treatment plan are made (when an 'indicated' treatment option is not currently available at the facility, the best available option is employed); and if the detainee is not already on the mental health caseload, he/she is added to the caseload and a treatment plan is developed.  Although this is documented in a detainee's medical records, it is not consistently documented in the records of segregation review meetings.

See paragraph 76 and 77(a) with regard to the implementation of policy/mechanisms whereby mental health staff would have input into housing decisions being made for mentally ill detainees who are being held in segregation, including those who have deteriorated while being held in segregation.  Ideally, the implementation of that policy will also help to establish an improved working relationship between classification, security staff responsible for disciplinary review and segregation review, and mental health staff, whereby appropriate housing for any given detainee who has deteriorated while being held in segregation can be discussed and addressed at any time

(not just during a regularly scheduled meeting), especially when the deterioration is severe enough that the need for action has become urgent.

If a detainee's deterioration in mental status is such that the detainee is suicidal, alternative housing/placement is available in the form of suicide watch in a suicide-resistant cell.  However, as noted in prior reports and in other sections of this report, until the planned mental health unit is operations, there is no appropriate, alternative housing/placement for other acutely mentally ill and unstable detainees.

Regarding 77(i) a major issue in having a functioning IDT is the development of a good working relationship between security staff and medical/mental health staff.  This is accomplished through policies and procedures, regular/ongoing interdisciplinary meetings, and the establishment of a culture where there is mutual/reciprocal respect, understanding and appreciation for the contributions that can be made by security staff and medical/mental health staff.  For years, this did not exist at Hinds County Jail, and instead, the relationship between security staff and medical/mental health staff could be better described as adversarial.  However, this began to change when Jail Administrator, Major Bryan, came aboard.

By the time of the October 2021 site visit, Major Bryan had reinstated weekly interdisciplinary team meetings (IDT meetings), for senior security staff and medical/mental health staff.  By the time of the January site visit, it was clear that the IDT meetings were beginning to have a very positive effect.  More specifically, the IDT meetings were being used to finally implement the existing policy on 'segregation review', in that the meetings included an interdisciplinary review and discussion of detainees held in segregation.  The IDT meetings were also being used to discuss other difficult to manage detainees, especially those on the mental health caseload who were far less than fully compliant with treatment.  In addition, the meetings were an opportunity for medical and mental health staff to raise other identified concerns and seek solutions along with security staff.  Although initially it seemed as if the same concerns were discussed over and over again without any resolution, more recently senior security staff have been much more focused on helping to resolve issues raised.  For example, medical and mental health staff had been reporting that many detainees held in segregation were not receiving meals. For some time, the issue went unaddressed by security staff, but recently senior security staff investigated the situation, identified the problem, and corrected the problem.

Given the progress that has been made with regard to the development of a much improved working relationship between senior security staff and medical/mental health staff, the discussion at this most recent site visit began to focus on what could/should be done to similarly improve the working relationship between front line security staff assigned to the units and medical/mental health staff (which means fostering a cultural shift at the facility).  Such improvement at the front-line level is an important undertaking that will allow for a more

rapid/immediate response by security and medical/mental health staff to day-to-day changes in a detainee's mental and/or physical health status…a critical 'corrective action' in response to at least some of the difficulties that have existed at the facility.  For example, a possible lesson to be learned from the April 2021 suicide in booking is the need to add a protocol for detainees at high risk of becoming suicidal, which would involve identification of such detainees, followed by heightened monitoring and review of such detainees by mental health staff, security staff and classification.  Similarly, a possible lesson to be learned from the August 2021 drug overdose death (in addition to the need to control the introduction of drug contraband into the facility) is the need to assure that security and medical/mental health staff work together to better identify early signs and symptoms of drug overdose when there is still time for life-saving medical intervention.

Regarding 77(j), it does appear that security staff understand that they cannot make mental health treatment decisions or overrule physician medical orders.

**YOUTHFUL PRISONERS**

As long as the County houses youthful prisoners, it must develop and implement policies and procedures for their supervision, management, education, and treatment consistent with federal law, including the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482.  Within six months of the Effective Date of this Agreement, the County will determine where it will house youthful prisoners. During those six months, the County will consult with the United States, the monitor of the Henley Young Juvenile Detention Center Settlement Agreement, and any other individuals or entities whose input is relevant. The United States will support the County's efforts to secure appropriate housing for youthful prisoners, including supervised release. Within 18 months after the Effective Date of this Agreement, the County will have completed transitioning to any new or replacement youthful prisoner housing facility.

**Sustained Compliance**
Although the paragraph above is not an enumerated item in the agreement, it is relevant to note that except for the three-week placement of a youth under eighteen at the Raymond Detention Center (RDC) as noted in the prior report, there have been no youth placed at RDC since February 2019. The court may recall the unique circumstances of that youth's (T.G.) placement but given the overall nature of the county's response it is appropriate to rate the status of this item to Sustained Compliance.

By all appearances, Henley Young Patton remains the best short-term/intermediate option for holding JCAs, but the absence of physical plant improvements suggests that the county may not intend that to be a longer-term solution. It is my understanding that the county has opted to move forward with a limited option included in the overall facility Master Plan that does not include housing JCAs, suggesting that Henley Young Patton (HYP) may very well be the long-term plan.

It would be helpful for the County to outline the longer-term master plan for JCA's, even if there are provisional stages of development being discussed related to housing youth charged as adults. This seeming lack of a clear intermediate and/or longer-term plan risks leaving Henley Young Patton as an "afterthought" in overall county planning.

<u>Population Summary</u>

As of January 7, 2022, there were twenty-eight JCAs and five Youth Court youth held at Henley Young Patton. Some basic data includes:

- Twenty-seven JCAs were male, one was female.
- As noted in Chart 1 below, the daily roster indicated that nine of the JCAs held for at least 90 days have been indicted, and six remained unindicted.
- Of the twenty-eight JCAs in placement on February 7, 2022, thirteen youth had been admitted within the prior 57 days. This represents a notable increase in the "pace" of admissions.
- In terms of length of stay, the number of days in confinement ranges from 1 to 880, with two youth being held for over one year and another four youth for over ten months. Chart 4 below illustrates the length of stay for youth that have been in placement over 90 days.
- The ages of JCA youth in custody is illustrated in the Chart 2 below. Only four youth currently in placement will turn eighteen in the first half of 2022.
- Chart 3 shows the Average Daily Population (ADP) at Henley Young Patton from October 2021 through January 25, 2022.
- There was some movement over the last reporting period, in part due to youth turning eighteen and moving to the Raymond Detention Center. Between mid-October '22 and mid-January '22 there were fourteen youth admitted and eleven youth released.
- In addition to the twenty-eight JCAs (27 boys, one girl) in placement there were also five Youth Court youth (four boys, one girl) youth in placement. This total of thirty-three is one above the maximum number of youth allowed under the SPLC agreement, but most importantly the twenty-eight JCAs is the largest number of JCAs in custody since the beginning of this agreement and the first baseline visit in the fall of 2016.

A prior report highlighted the concerns expressed by the current Youth Court Judge, Judge Carlyn Hicks, that housing JCAs with youth under her jurisdiction is contraindicated by state statutes and the complications that result when there are JCA girls as well as Youth Court girls held at the same time. In the period between October 1, 2021, and January 25, 2022, there was at least one Youth Court or JCA girl in custody 93% of the days.  There were only eight days when no girl was in placement, and on 65% of the days there were both JCA and Youth Court girls in care. Along with a notable increase in the overall population, this overlap in both Youth Court and JCA girls requires additional staffing to properly maintain proper separation and supervision to address the concerns of Judge Hicks.

In contrast to some optimism noted in the prior report that the population had stabilized a bit, this most recent period confirms concerns expressed earlier by Hinds County officials in 2021 about trends of increasing crime that is impacting both the adult and youth systems. This has been very noticeable in the last few months.  In short, related to population:

- It seems that through the first half of 2022, and perhaps longer, the "new norm" for the ADP at Henley Young Patton could very well be at or above thirty youth (or more), both approaching the 32-youth limit in the SPLC agreement, the functional capacity of HYP, and further exacerbating the staffing challenges at HYP.
- The "overlap" of Youth Court and adult court youth at HYP (boys and/or girls) is an additional complicating factor related to the proper classification and supervision of youth, requiring additional staff at a time when they are well-short of filling allotted positions.
- Any progress in moving JCAs through the court process has stalled, as noted in the last report the result of a combination of COVID challenges and the underfunded court, attorney, and criminal justice system in Hinds County and the state.



90



Chart 2: Age of Youth Charged as Adult @ HYP
as of February 7, 2022



Chart 3: HENLEY YOUNG PATTON ADP
October '21 thru January 25 '22

| | OCT | NOV | DEC | JAN |
|---|---|---|---|---|
| Non-JCA female | 1.3 | 2.4 | 2.7 | 1.4 |
| Non-JCA male | 2.6 | 3.9 | 3.7 | 4.2 |
| JCA Female | 1.3 | 2.0 | 1.1 | 0.0 |
| JCA male | 16.1 | 18.4 | 19.5 | 20.4 |



<u>Personnel Changes</u>

Rarely has the axiom "the more things change, the more they stay the same" been true than at Henley Young Patton.  On January 3, 2022, Mr. Fernandeis Frazier resigned from his position as Executive Director of HYP, citing significant concerns about the lack of both internal and external support and collaboration during his tenure since April 2021.  The County promptly appointed an Interim Director, Mr. Marshand Crisler, on January 5, so the gap in that position was certainly short compared to prior instances in which the Director position was vacant for significant periods of time.  Ironically, in Mr. Frazier's resignation letter he cited rumors about him being replaced by Mr. Crisler and had difficulty determining whether this was "in the works."  In this case it appears the rumor was true, given the rapid appointment of Mr. Crisler. In fact, since the baseline visit for this agreement in the fall of 2016 there have now been five different periods for Directors (Mr. Johnnie McDaniels, Mr. Greg Harrington, Mr. Fernandeis Frazier (two occasions), and now Mr. Crisler).  Over the roughly sixty months of time since that baseline visit, there has been no formal Executive Director for an estimated 12-14 months.  That time was normally "filled" by leadership from Mr. Eddie Burnside (Operations Manager) and Mr. Eric Dorsey (Quality Assurance Manager), both of whom have been with HYP for over ten years.

Although the gap in replacing Mr. Frazier was short, this constant "churning" of the Director position is certainly problematic as it relates to any long-term success of HYP meeting the conditions of the agreement.  Mr. Crisler had previously been appointed by the Board as the Interim Sheriff in the summer of 2021 after the untimely passing of Sheriff Vance.  His background in working with youth and/or providing day-to-day leadership for a confinement program is limited, something that has been true of prior Directors as well. The county has posted the opening for Executive Director of HYP, so it is too soon to tell if Mr. Crisler will be continuing in the months ahead. One can only hope that <u>if</u> Mr. Crisler is the right person in this role, he will stay in that role for the next few years, the time it may be necessary to bring HYP into full compliance.  Unfortunately, the Board does not have a history of hiring a qualified individual who remains for an extended period of time. Mr. Crisler cites a good relationship with Mr. Burnside, the Operations Manager, as well as seeming to enjoy the support of at least some members of the Board of Supervisors.  Only time will tell if those positive relationships result in the internal and external support necessary to make the changes needed.

Ms. Warfield continues in the role of Treatment Coordinator and is receiving support and technical assistance from Ms. Monique Khumalo, a consultant whose services were secured through a grant received by SPLC.  Ms. Khumalo has extensive experience with youth trauma and treatment issues, relevant to HYP, and her beginning focus with Ms. Warfield is on streamlining and improving the initial assessment and case planning processes.  The quality of the mental health services provided for youth is dependent on good assessment and case planning, so it will be a step forward if/when that process improves.  As they go forward Ms.

Khumalo and Ms. Warfield can work on building an integrated mental health and behavioral management program.

Still lacking is significant psychologist support.  Although there is an MOU with Hinds County Behavioral Health (HCBC) for some additional treatment services, oddly Ms. Warfield does not have the authority needed to properly supervise and/or integrate those services with other staff at HYP.  Mr. Crisler and Ms. Warfield should look at that agreement and take steps to renegotiate it to secure some on-going psychologist consulting time or other needed supports (or pursue contractual services through a different provider). The "disconnect" between what is viewed as needed by Ms. Warfield and what is taking place under the current MOU needs to be addressed in the coming months. Ms. Khumalo may be able to provide some recommendations in this regard, and the January 2020 Stipulated Order requires that the County get the input of the monitor as to the number of hours contracted for.

There has been turnover in one of the clinician positions with the departure of Mr. Caples who had been serving as a Qualified Mental Health Provider (QMHP) in the second half of 2021, leaving Ms. Brenda Drake (f/k/a Frelix) as currently the lone QMHP on staff.  Fortunately, Ms. Drake has extensive experience at HYP and solid qualifications to support the needed mental health services, but any extended vacancy in the other position risks overwhelming her in performing her duties.  It would be a loss to HYP if Ms. Drake left HYP. Even with the hopeful addition of a second QMHP soon, the increased number of youth in placement will make it difficult for HYP to meet the full mental health needs of youth.  This makes it particularly important that resources currently used for the HCBH be redirected to what is viewed as needed by Ms. Warfield.

Other key personnel positions of note include:
- Ms. Foster continues as the Learning and Development Coordinator, primarily responsible for development and implementation of a complete training program for new staff as well as developing more advanced programs for existing staff.  Ms. Foster also serves as the PREA Coordinator, although she really does need additional training to properly meet PREA requirements. Additional comments about the training program will be included in subsequent sections of this report.
- Ms. Young, who most recently was serving as a Youth Care Professional Supervisor but had previously filled the role of leading training, has just been returned to work with Ms. Foster to support training for staff.
- Ms. Baldwin and her two Recreation Specialists remain on staff to lead a variety of recreational and personal development programming.
- Two of the three Youth Support Specialist positions are filled, along with a Case Manager assigned through RDC (helping to focus on youth prior to/following transfer to RDC), provide additional day-to-day support and contact working with youth to address

concerns they may have, maintain contact with family members, track court progress (or lack thereof), and hopefully support Youth Care Professionals in managing youths' behavior in the facility.

In discussions with Mr. Crisler, he is making some structural changes to the HYP organization that hopefully can lead to a stronger connection between policy/procedure and actual staff performance. Mr. Crisler correctly understands the critical role that Youth Care Supervisors play in making sure that the performance of Youth Care Professionals is consistent with policy/procedure and subsequent training. Without going into much detail, his interest in clarifying the roles, responsibilities, accountability, and authority of supervisors and other leadership team members is appropriate. In reading Incident Reports and follow up discussions during and between virtual visits, it is apparent that too often staff are not adhering to basic safety and security procedures (e.g., locking youth doors when they are out of their room, quality of searches, intervening early when there are signs of disruption or conflict, and others), that Incident Reports lack sufficient context or information needed to understand what happened, that Observation Logs are completed cavalierly, that staff may leave a unit unattended for brief periods of time, and that staff may not be placing themselves in the proper position to be able to listen for/observe youth in ways that could prevent incidents from occurring. By creating a more direct line of authority from the Operations Manager to the Resident Hall Manager (a new position), to the three Shift Supervisors, and the Senior Youth Care Professionals ideally each position can help train and hold accountable those individuals they are responsible for. Only time will tell if that helps reduce the disconnect between policy and performance.

It is difficult to fully assess the consistent quality of performance of these individuals based on periodic site visits, whether on-site or virtual. While the pieces may be in place for HYP to move forward toward compliance, there are several things that have resulted in "two steps forward, one step back" or even "one step forward, two steps back." For example:

- As noted, the constant "churning" in the Executive Director position only adds to the instability of a program, despite the stability of some of the other positions. Until the County hires, supports, and retains a qualified Executive Director for an extended period, the pattern is likely to continue to be one of limited progress to a "plateau" and alternating periods of progress and regression.
- The lack of an expressed and/or coherent mid to long-term plan for housing JCAs (and even the Youth Court youth) leaves HYP "in limbo." As noted in prior reports, if HYP is the longer-term plan, then support it (e.g., make facility improvements, increase staff salaries, work with the Youth Court Judge to resolve challenges related to managing a "dual use" facility, etc.). If it is not, then take steps to move to a new plan as soon as possible.
- The adult court system needs to find ways to expedite and/or modify the court processes to move the JCA youth through the court process. This issue is not solely related to

youthful offenders, but youthful offenders lingering at HYP (or RDC for that matter) are particularly impacted by the length of time needed to get to some conclusion in their case. Whatever the outcome of their case, it needs to be done faster.  There has been no apparent effort to revitalize the type of review process that had been implemented by Judge McDaniels that was noted in previous reports to help expedite cases.

Most importantly, the substantial number of vacant Youth Care Professional (YCP) positions negatively impacts all aspects of the operations at HYP, from providing sufficient safety and security for youth and staff up through the various programming requirements of the agreement. The most recent organizational chart provided in January 2022 shows seventeen of the 42 Youth Care Professional positions allotted as being vacant (40%).  This is a "moving number" that has hovered around twenty vacancies in recent months, and frequently as staff are brought on for training, they may subsequently leave the position within 6-9 months.  Fortunately, the three YCP Supervisor positions are filled as are the Senior YCP positions and the newly created Resident Hall Manager position.

As noted in the prior report and in Mr. Frazier's resignation letter, to get a raise for YCP staff at HYP, seven YCP allocated positions were eliminated and those funds applied to the remaining YCP positions. However, it is important to note that although the increase for YCP staff was notable:

- The new salary still falls short of being competitive with the Mississippi Department of Corrections and other counties as they hire similar staff.
- The hourly rate for a newly hired YCP staff member calculates to be roughly $13.21/hour, and there is no "step" or pay progression system based on longevity and/or merit such that staff can expect to get increases as they stay on staff.
- The increase applied only to YCP positions, resulting in only a minimal "gap between YCP and Supervisory positions. For staff looking for any kind of "career advancement," this narrow gap is a disincentive to remaining at HYP.
- Apparently, the County Board has approved an increase to over $31,000 (just short of $15.hour) for the starting salary for detention officers, a salary that would be more competitive, although it remains to be seen if that will help for the adult jail. As noted earlier in this report, that salary will still fall short of competitive salaries at MDOC.
- The remaining forty-two YCP positions represent the "base" level of staffing needed for HYP, not necessarily the desired or fully functional staffing level, particularly with any substantive vacancy rate.  While it may have been a necessary short-term decision to eliminate positions to pay for others, if population growth continues those deleted positions will need to be reinstated.

If not already clear, being able to meet many requirements of this agreement depends on being able to recruit, retain, train, and retain an adequate number of well-qualified YCP positions as well as filling (and keeping) qualified individuals in key leadership and program positions.

Physical Plant Changes

Work on the modular program units has been completed and the units are available for use. With rare exceptions staffing shortages have prevented movement to/supervision of youth in the units for programming purposes. Staff indicate that the units, although small, are more appropriate for conducting group discussion and other activities that too often are conducted on the living units or in the multi-purpose room. As noted in prior reports, the actual housing/living units are not properly furnished to make them a suitable space in which to conduct meaningful youth development activities, and the multi-purpose room has multiple distractions that challenge proper programming. The living unit acoustics are worse than functional, furniture is not movable, and youth not directly participating in a scheduled activity distract those that are participating.

Additional physical plant changes that have been recommended in the past have not been addressed, including (1) dealing with limited use of outdoor recreation space related to weather (e.g., cold, rain, darkness). Whether one of the four new modular rooms created can help address that remains to be seen particularly given staff shortages; (2) making changes in the living units to improve acoustics and furnishings to make those units more "livable" and appropriate for adolescents, particularly youth placed for long periods of time; and (3) creating more flexible use spaces that can be used for "cooling off periods" or alternate supervisions spaces so youth can be safely supervised without having to be placed in confinement for disciplinary purposes. Considerable reference has been made in prior reports about the importance of making these living unit changes and the benefit they will bring to overall program operations, including behavior management. To date, none of those changes have been made, and they continue to be a recommendation.

Operations of Henley Young Patton are frequently challenged with the lack of water pressure because of the poor infrastructure in Jackson and the location of the facility.  The number of times that the facility is without running water seems to be increasing, and arrangements to get youth to the Raymond facility for showers is increasingly difficult as well. While this problem may not be unique to Henley Young Patton, it certainly creates challenges for adequate sanitation and operation of a 24/7 youth facility.  Efforts to construct a water tower/source that can serve HYP and any new jail on that property are apparently underway, but it will be some time before this issue is resolved. Roof repairs to address problems related to water leaking through the roof into units and other parts of the facility have yet to be completed.

Finally, at some point in recent months the oversight of maintenance staff that were previously assigned to HYP has been changed so that various maintenance requests must be submitted through a centralized county maintenance process that may hinder the efficient resolution of mechanical/facility issues and/or make it less likely the facility will be cleaned on a routine basis. Any assessment of this concern could not be done on through a virtual visit, but subsequent on-site visits may provide some information as to whether this creates a problem for HYP.

**For any youthful prisoners in custody, the County must:**

78.     Develop and implement a screening, assessment, and treatment program to ensure that youth with serious mental illness and disabilities, including developmental disabilities, receive appropriate programs, supports, education, and services.

**Partial Compliance**

Prior reports have outlined the basic screening and mental health services provided for youth at Henley Young Patton, including the use of initial screening tools (MAYSI-II and interviews conducted by qualified mental health clinicians), the provision and documentation of one-on-one counseling and therapeutic services performed by the two qualified mental health practitioners (QMHP; one currently vacant), and the group work and day-to-day check-in counseling provided by the three (one position currently vacant) Youth Support Specialists (YSS).  In 2021, an additional assessment was created, called SNAP, which was intended to capture additional demographic and social history of youth.  However, there is a concern that the SNAP may gather some personal offending history that may be prejudicial for pre-conviction/pre- adjudication youth, including youth in the Youth Court.  Ms. Khumalo is working with Ms. Warfield to review current assessment practice to utilize the most appropriate tools as well as reduce the "paperwork" workload for QMHP staff.  This may include reinstituting the use of a strength/needs type assessment that helps identify more detailed elements for a case plan as well as provide some ideas for how to program for youth more successfully. Given Ms. Khumalo's background, this kind of technical assistance is a welcome addition to the program, and further assessment of changes can be made in subsequent visits.

The county continues to hold open a position for a Licensed Clinical Psychologist, and we had discussions about the need to develop additional resources (likely on a contractual basis, as needed and/or part-time regular consultation) with a Licensed Psychologist to assist Ms. Warfield in ensuring that there is adequate assessment and treatment for youth in care. This is another area in which TA provided by Ms. Khumalo will be beneficial, and as noted earlier may result in altering the current MOU with HCBH.

Ms. Warfield estimated that 75+% of youth are taking some form of psychotropic medications, suggesting a need for more time provided through the county's health care contract for services provided by Dr. Bell.  Dr. Bell is viewed positively by staff, but her availability is limited due to the large scope of her responsibilities in other facilities, and the increase in population also adds to concerns about the limited availability.

During the period since the last visit, most of the programming provided by the mental health team members continued, including holding regular treatment team meetings and the provision of group programming by YSS and the Qualified Mental Health Clinicians (QMHC). The content of these group programs is appropriate but still evolving as they continue to gather materials and curriculum to use with youth. Ms. Warfield has focused initial efforts on ensuring that case plans are individualized, and that sufficient documentation is done to capture the work that is going on. Issues remain with attendance and being able to conduct groups in an appropriate environment. Support from YCP staff has been sporadic at best, and staff shortages have often resulted in groups either not being conducted or having to be done on the unit. That said, the general expectation remains that each youth participate in 2-3 group sessions each week, but those sessions mostly remain noticeably short (i.e., 30 minutes instead of an expected 60 minutes), which is simply not enough time to achieve any meaningful results.  Ms. Warfield started to work with staff to provide longer meetings with youth, but the only time available for that was to work with youth who were not in school that day.  Even that effort has been hampered by staff shortages.

As noted in the prior report, intentions by YSS and QMHC staff to implement these group programs is positive, but (1) having to conduct groups on the living units is a significant barrier to effective program delivery, (2) limiting groups to 30 minutes (staff indicate that previous attempts to run groups longer led to more behavior issues) reduces the quality of programming, (3) YCP staff could benefit by learning to help facilitate some of the groups, but they are minimally involved in doing so at this point; and (4) there is not an overarching program framework into which these groups "fit" so that all aspects of the facility program work together so as to send a consistent message to youth.

That programming has been augmented by the activities developed by Ms. Baldwin, the Program Coordinator. To her credit, Ms. Baldwin, with the assistance of two recreation staff, has continued to evolve appropriate materials and curriculum that fit into the Unit Activities included in the daily schedule. Examples of themes/concepts covered by these activities include *Emotional Intelligence, Understanding/Managing Anger, health and physical fitness, creative writing, Life Skills,* etc. With the support of two recreation staff Ms. Baldwin seems to have developed a plan to engage youth in many of these activities, but actual implementation and participation is sporadic at best.  Ms. Baldwin reports at best marginal support from YCP staff in running activities as intended.  One benefit of being on site would be to be able to review the

actual unit logs that are to be completed on each shift and should provide documentation of things that go on during a shift, including these programs. It was not possible to view those via a virtual visit, but in conversation with Ms. Anne Nelson, the monitor for the SPLC agreement, she did review selected unit logs and indicated to me that there was frequently a disconnect between what was scheduled and actually done and documented. Ms. Baldwin and her staff appear to have been doing their best to make this work, but absent more support from YCPs and leadership and a more appropriate setting, it will be difficult to complete this work.

Ms. Baldwin also reported that there have been multiple occasions on the weekend when her staff come in to lead activities only to find youth are still in their rooms following a meal or incidents that have occurred; that YCP staff are not diligent or consistent in getting youth out of their rooms timely and the scheduled activity needs to be canceled.

Ms. Baldwin also has responsibility for overseeing the "point system" and has made some adjustments to that over time. However, she continues to represent that staff use of the system is inconsistent at best and neglectful at its worst. That reinforces prior concerns that although the point/incentive system exists, it is like any tool that if not used properly has little to no value; in this case limited value in helping to shape and reinforce positive behaviors of youth. Optimism expressed in the prior report related to changes has not been fulfilled. Ms. Baldwin has continued to look for ways to incentive participation in various structured activities, but that also has met with limited success and support from YCP staff.

On a positive note, the mental health team has continued holding treatment team meetings regularly, i.e., at this point every Wednesday, focusing on the individual assigned to the various YSS staff. That team meeting includes the YSS assigned, the assigned QMHP, Mr. Caldwell from the school program, the youth, and when possible, a YCP staff member. Ms. Warfield's commitment to more fully engaging YCP staff members in the treatment team is a positive. COVID restrictions again resulted in those meetings not being open to in-person participation by parent/caretaker, but hopefully that can change soon. Those team meetings provide an opportunity for all parties to review the youth's progress toward meeting treatment goals, set new goals as appropriate, identify ways in which progress can be supported, answer questions the parent/guardian may have, and offer the youth an opportunity to provide input on how things are going at Henley Young Patton. Ms. Warfield has made slight modifications to the process in which the youth themselves "take the lead" in explaining what they believe are their goals; a good technique to give them a voice in the process as well as get a sense of how well the youth understands those goals.

79.     Ensure that youth receive adequate free appropriate education, including special education.

**Non-Compliance**

Normally, evaluating the education program by conducting a virtual visit has significant limitations (e.g., difficulty in reviewing attendance, individual education plans, observing teachers and their engagement with youth, talking directly with youth about their schoolwork, etc.).  Ironically, given the current situation, it is easy to change this rating from partial compliance to non-compliance, because:

- Attendance records were not provided prior to the virtual visit.  That said, those records are less important because

- HYP has, due to shortage of staff and safety reasons, continued to operate on an A/B school schedule in which the two JCA units are in class on alternating days. The plan provides that when youth are not in the classroom receiving direct instruction they are supposed to be working on packets provided by the teachers.  However, it is clear from reading Incident Reports and talking with staff that this classroom on the unit takes up at most one hour of the day.  There are multiple Incident Reports in which youth are clearly simply moving around the unit, in and out of their rooms, and engaging on activities other than coursework.  In fact, the program staff have periodically tried to make the best of the time by running various groups during school time that would normally have been done in the afternoon/evening. The bottom line is that of the minimum 330 minutes of instruction youth are to receive daily (5.5 hours/day/per Mississippi Department of Education regulations), JCA youth receive at most one-half (115 minutes) of that requirement.

- Although the county did add portable classrooms to the facility, providing some needed alternative space, the lack of YCP staff and limited teaching staff suggest that there is no reason to expect the status of compliance with this requirement will change soon.

With few exceptions, the youth placed at HYP are far behind their peers in terms of education, often have been evaluated to need specialized education services, and have a poor attendance history.  Prior to the 2020-21 school year, leadership of the Jackson Public School (JPS) program at HYP suggested that they met the minimum requirements for programming.  Is that adequate (the standard for this item) for these youth?  Not only is the program no longer meeting the minimum requirements, if anything, these youth should receive accelerated and more substantial program that might allow them to catch up and/or be prepared for wherever they go next. Fortunately, current JPS leadership has been making progress in this area.

Conversations with Mr. Caldwell, the School Principal, again were positive.  This report will not repeat items from the prior report that details some of the outreach efforts he has made, beginning back in the 2020-21 school year. Mr. Caldwell has clearly taken a proactive approach to individualizing programming where possible, identifying and securing additional educational resources (software, programs), and making the best of a demanding situation.  He has continued

to identify youth who may be eligible to obtain a Graduation Equivalency Degree (GED) and has been able to assist several youth getting a degree prior to their departure from HYP.  Mr. Caldwell has been proactive in working with JPS to assist youth in efforts to "catch up" through varied credit recovery programs.  Mr. Caldwell supervises four classroom teachers and one Special Education teacher.  As noted in the prior report, a teacher that began in the 2021-22 was terminated in October 2021 pursuant to an incident in which the teacher allegedly touched a youth in the classroom after normal school hours. That teacher was replaced by a newly trained teacher and given the circumstances and needs of the youth at HYP it will certainly be a challenge for a new teacher to be fully successful.

Most importantly, Mr. Caldwell brings a notable increase in energy and creativity to the program compared to prior years and has been proactive in breaking down some of the institutional barriers of Jackson Public Schools to advocate for the youth at Henley Young Patton.

As noted above, those positive efforts remain offset by the challenges created by limited staffing at Henley Young Patton and the inadequate education space of the facility. The program is further complicated by the variance between the needs of the Youth Court, short-term youth, and the adult court JCAs. While the focus of this agreement is on the JCAs, it is important to remember that the Youth Court youth also need adequate educational programming, which is difficult to deliver in a "mixed" environment and on such a short-term basis (i.e., 21 days placement limit). Youth Court Judge Hicks has appropriately elevated her concerns that Youth Court youth get education services (often by obtaining work from their home school) but also is an advocate for proper education of all youth.

As previously reported, unless additional information is provided by the county and verified by the monitoring team, young adults held in the Jackson or Raymond Detention Center(s) who are legally eligible for continued special education services are not receiving that support. Whatever progress youth have made in their education program while at Henley Young Patton stops when they are transferred to RDC which does provide some GED preparation programming but little else. That fact has, in part, spurred Mr. Caldwell's strong interest not yet actualized in accelerating youth's progress as fast as possible while confined at Henley Young Patton.

80.     Ensure that youth are properly separated by sight and sound from adult prisoners.

**Sustained (Substantial) Compliance**
As noted earlier, the last youth "aged out" of RDC in February 2019, so as of this report, this complete separation has been in effect for over two years (with the brief exception for youth T.G. noted in the last reporting period). Transitioning Henley Young Patton to serve these long-term youth has not been without substantial challenges but remains a significant achievement, even if viewed as a temporary solution.

81.     Ensure that the Jail's classification and housing assignment system does not merely place all youth in the same housing unit, without adequate separation based on classification standards. Instead, the system must take into account classification factors that differ even within the youth sub-class of prisoners.  These factors include differences in age, dangerousness, likelihood of victimization, and sex/gender.

**Partial Compliance**

There has been no change related to compliance with this requirement although staff purport that Policies/Procedures have been updated and documentation of classification is occurring. A copy of the most recent Classification Policy has now been provided along with a copy of the form used to document the classification information gathered that is intended to guide which of the JCA housing units the youth is assigned to. While the policy is appropriate and staff purport they are considering relevant factors, use of the form to document placement decisions is still not being done. This then falls under the category of "…if it's not documented, it didn't happen," so until the use of the form can be observed and/or verified, full compliance is not possible. This can best be done via an on-site visit, but copies of completed forms have been not been forthcoming. If the form and process is followed, it should be relatively easy to meet this requirement even though the population of youth is increasing, and it will be increasingly difficult to properly separate even the JCAs let alone maintain appropriate separation and supervision with Youth Court youth.

Classification at Henley Young Patton is less of an issue than is true at RDC or a larger facility in that all JCA youth receive the same programming regardless of any "classification."  There is some classification and difference between housing and programming for JCA and Youth Court youth, but that is more a programming than specifically a classification issue.

Henley Young Patton does have a process to classify youth related to levels of "precautionary status" in the event of suicidal ideation and/or attempts. That status can range from a low "alert" status in which staff are to be more aware of a particular youth's demeanor/behavior up through the highest level in which there may be one staff member assigned to always observe/monitor a youth. Appropriately, a youth can be placed on a precautionary status by a supervisor but only "removed" from that status by/after consulting a member of the mental health team. The policy/procedure may be more complicated than it needs to be, so this is another area in which Ms. Warfield may work with Ms. Khumalo to reevaluate the details. This is another area, however, in which staff shortages cause concern about the ability of staff to properly supervise youth, particularly on the highest levels of precaution. In the period from October through mid-January 2022, there were twenty instances of youth suicide ideation or action of one kind or another.  In one incident on December 31, the youth (G.B.) was found unresponsive and needed

transport to a medical facility to recover.  That was a close call, and staff shortages make it difficult to complete the routine and/or suicide well-being checks in a timely manner.

82.     Train staff members assigned to supervise youth on the Jail's youth-specific policies and procedures, as well as on age-appropriate supervision and treatment strategies. The County must ensure that such specialized training includes training on the supervision and treatment of youth, child and adolescent development, behavioral management, crisis intervention, conflict management, child abuse, juvenile rights, the juvenile justice system, youth suicide prevention and mental health, behavioral observation and reporting, gang intervention, and de-escalation.

**Partial Compliance**
Ms. Jacqueline Foster has continued as the Learning and Development Manager, and just recently Ms. Lilly Young was transferred back to the training unit (which she had previously been responsible for) from her role as a YCP Supervisor.  A request was made for the monitor to receive a list of trainings conducted/who participated since early October, and records provided indicate that:

- Four formal training sessions were conducted, including:
  - A two-hour training related to LGBTQI youth issues: (5 YCP staff, twelve other staff)
  - A two-hour overview of requirements of the Prison Rape Elimination Act (PREA): (5 YCP staff, six other staff)
  - Mississippi Peace Officer Training (120 hours provided by a state-certified instructor for new staff):  ten staff total
  - A three-hour training program for volunteers (7 community volunteers)

Note the limited formal training provided as well as the small number of YCP staff participating in the training.  Completing additional training was limited by COVID restrictions imposed from mid-December until January 10, and clearly this record does not represent progress toward completing some of the more advanced trainings listed in paragraph 82.

Ms. Foster did provide a list of what could be considered the core courses, including:

- Crisis Prevention Institute (CPI) Training (16 hours focusing on training staff on de-escalation and physical safety skills)
- CPI Refresher training (16 hours) required to maintain certification
- Initial Policy & Procedure Training and Refresher training
- Suicide Prevention (8 hours) and Refresher (2 hours)

- CPR Training (2 hours)
- PREA Training (1.5 hours)
- MS Peace Officer Training (120 hours for new staff certification)
- Training on LGBTQI Issues (2 hours)

As is evident from the list, some of these are initial trainings that should be completed early on during a staff member's tenure, and then various refresher trainings should be done annually thereafter.  In reviewing the records provided for this visit as well as prior records, it does appear that a small percentage of YCP staff are getting these core courses on a regular basis. Ms. Foster's role includes tracking required trainings and organizing training as needed to keep staff up to date, but being able to schedule and complete trainings is complicated by significant staff shortages and turnover.  For example, although it may be possible to schedule some training, it may not always be possible for the staff member assigned to get off their assigned housing unit for the training.  Secondly, a high percentage of YCP staff have second jobs to supplement their income, making it difficult to expect them to participate in trainings that might be scheduled before/after their shift or on a day off.

There are two strategies that should help improve the scheduling and completion of required trainings: (1) Ms. Foster should develop a training plan for 2022; in fact, she has started a "Training Logistics" process, but a complete calendar that includes the basic courses and begins introducing more advanced training should be done; and (2) if at some point sufficient staff are hired and on board it may be possible to relieve staff more often to complete training.

As noted in prior reports, little to none of the training implemented to date could be considered "advanced."  Additional training related to things like trauma-informed care/interventions, adolescent sexuality, use of cognitive behavioral techniques, advanced report writing, additional verbal de-escalation skills, teamwork strategies, juvenile rights and the juvenile system, understanding the role/use of psychotropic medications, advanced understanding of youth mental health issues, and others are examples of training that needs to be developed and scheduled over the course of each year.  Ms. Foster should also research potential "offsite" training that may be relevant through on-line (e.g., Relias training) or community-based programs and make those available to YCP and other staff as may be appropriate.

For a previous report, Ms. Foster provided a copy of the On-the-Job Training (OJT) form that is supposed to be used to identify some of the basic required skills for duties related to supervision of youth, Central Control operations, booking/Intake procedures, and transporting residents. Use of that form continues to be inconsistent.  The intended structure of the basic training program and expectations seems appropriate but getting new staff on board has been difficult which means that getting a solid complement of well-trained staff on the units has been even more difficult. Having new staff with limited training covering a lot of the shifts/units is a recipe for problems.

83.     Specifically prohibit the use of segregation as a disciplinary sanction for youth. Segregation may be used on a youth only when the individual's behavior threatens imminent

harm to the youth or others. This provision is in addition to, and not a substitute, for the provisions of this Agreement that apply to the use of segregation in general. In addition:

a. Prior to using segregation, staff members must utilize less restrictive techniques such as verbal de-escalation and individual counseling, by qualified mental health or other staff trained on the management of youth.

b. Prior to placing a youth in segregation, or immediately thereafter, a staff member must explain to the youth the reasons for the segregation, and the fact that the youth will be released upon regaining self-control.

c. Youth may be placed in segregation only for the amount of time necessary for the individual to regain self-control and no longer pose an immediate threat. As soon as the youth's behavior no longer threatens imminent harm to the youth or others, the County must release the individual back to their regular detention location, school or other programming.

d. If a youth is placed in segregation, the County must immediately provide one-on-one crisis intervention and observation.

e. The County must specifically document and record the use of segregation on youth as part of its incident reporting and quality assurance systems.

f. A Qualified Medical Professional, or staff member who has completed all training required for supervising youth, must directly monitory any youth in segregation at least every fifteen (15) minutes. Such observation must be documented immediately after each check.

g. Youth may not be held in segregation for a continuous period longer than one (1) hour during waking hours. If staff members conclude that a youth is not sufficiently calm to allow a break in segregation after one hour, they must contact a Qualified Mental Health Professional. The Qualified Mental Health Professional must assess the youth and determine whether the youth requires treatment or services not available in the Jail. If the youth requires mental health services that are not provided by the Jail, the Qualified Mental Health Provider must immediately notify the Jail Administrator and promptly arrange for hospitalization or other treatment services.

h. If a youth is held in segregation for a continuous period longer than two (2) hours, Staff Members must notify the Jail Administrator.

i. Any notifications or assessments required by this paragraph must be documented in the youth's individual record.

**Partial Compliance**

Records provided for this virtual visit indicate a remarkable reduction in the use of Due Process Isolation/Confinements (DPI) as a disciplinary tool. In fact, records indicate that in October there were only two instances of DPIs, only one in November, and none in December. This is despite periodic incidents that include levels of aggression that heretofore resulted in use of a DPI. There was no record for January 2022, but staff purport that they have reduced, perhaps

eliminated, using DPIs for discipline because "they didn't work".  Hopefully this progress reflects (1) improved staff efforts to prevent the kinds of incidents that result in the use of DPI or intervene in other ways (since incidents still do occur), and/or (2) increased efforts to resolve conflicts, separate and/or supervise youth better, work with youth to improve their behavior, and better address some of the mental health/trauma needs of youth in custody. Time will tell whether HYP is able to fully eliminate use of extended DPIs. If they are, it will be a significant step forward toward compliance.

It remains a concern that HYP does not routinely document the limited use of Emergency Behavior Management Confinement (EBMC) (in Policy referred to as Behavior Management Isolation – BMI) if needed to ensure safety and security. Policy requires that if a BMI is implemented:
(1) The youth should only remain confined if needed to determine if the youth can safely be returned to the general population/dayroom,
(2) the Shift Supervisor be notified immediately, and an Observation Form needs to be initiated that includes basic information (e.g., start time, nature of incident, staff member implementing the BMI),
(3) the Supervisor must meet with the resident and determine whether continued confinement beyond one hour is needed and document that determination, and
(4) repeat that assessment at least once every hour until the resident can be returned to the unit. A copy of that Observation Record is to be placed in the youth's master file, but absent being able to review that file it is not possible to confirm it is occurring. What is possible to confirm is that due to staff shortages, on many shifts the Supervisor is assigned to a unit to perform basic YCP duties and is not available to perform the required check or documentation, and information related to any room confinement that exceeded one hour was requested but not provided.

It is entirely reasonable that some incidents require one or more youth to be placed in their room/cell for a brief period (e.g., 15-60 minutes) to calm down, provide an opportunity for YCP and Supervisory staff to determine what happened and then safely return the youth to the living unit. Interestingly, the Incident Report form includes a section for staff to indicate if they utilize EMBC, but that is inconsistently noted even on Incident Reports (IR) in which the IR narrative includes a specific reference to placing/returning a youth to their room/cell.  This is clearly inconsistent documentation that should be noted and corrected through a Supervisor review process and Quality Assurance process. Given this inconsistency and uncertainty of when/how long youth may be placed in their room after an incident, it is not possible to conclude use of this confinement/segregation is consistent with this requirement.  Procedures should be put in place to: (1) ensure and reinforce the expectation that anyone completing the IR properly document the use of EMBC (Emergency Management Behavior Confinement) if in fact they place a youth in their room; (2) reinforce the supervisor's role in reviewing the confinement per policy and correcting omissions in this regard; (3) ensure that the use of EMBC is documented in both the

unit log and reported to the Quality Assurance Manager so that he/she can track the use of EMBC and make sure its use is consistent with the agreement and be able to report such to the monitoring team.

There are multiple components to this requirement related to additional steps that need to be taken, including ensuring that proper wellness checks are made for any youth so confined, but the staff shortage again makes it difficult to always meet that requirement.  The physical structure of the facility is unfortunately not conducive to supporting efforts to eliminate some use of confinement. Adding some moveable furniture/tables to the unit so a youth could be directed to sit away from others or even modifying a room as an unlocked "cool down" room could provide other ways for staff to respond to incidents and further reduce even use of the EMBCs.

Also note that many elements of this requirement are appropriate for even relatively short periods of time, particularly those related to notifying mental health staff, using less restrictive techniques if possible, ensuring appropriate observation, etc.  It is important that YCP and YCP Supervisors are fully aware of the risks anytime a youth is placed in their room/cell following an incident, since youth's emotions and frustrations may lead to self-harm behaviors to express that frustration. That is one reason it is important that staff explain to youth the reason for the temporary separation, what will be happening next, and what the youth needs to do before they can be allowed back in general population.

This report will not detail the specifics relative to each of the sub-items (see last report), but in general the policies/procedures are consistent with the expectations, but there is little to no documentation of the required actions.

Facility leadership needs to remain vigilant in ensuring that documentation related to the use of isolation, both for initial behavioral reasons or disciplinary reasons, is accurately completed, reviewed, and made available for review on subsequent visits.  This includes documentation of whether youth do, in fact, take the opportunity to be out of their room during any disciplinary period and whether required mental health checks are being made.

An aspect of discussions during prior virtual visits and with Mr. Crisler during this visit was related to the lack of any consistent Critical Incident Debriefing (CID) process and documentation of leadership follow up/investigations through consistent completion/sharing of After-Action Reports (AAR). Mr. Burnside, and previously Mr. Frazier, when questioned about a particular incident would verbally relate their practice related to review of youth behavior and staff response (review video footage, talk with staff, and obtain youth statements, when possible, etc.).  While not specifically required in this agreement, best practice in confinement facilities would be to routinely use a CID process in specific incident types (e.g., self-harm/suicide, physical assault of youth or staff, use of force by staff, and medical emergencies). This kind of

follow up and documentation is a valuable tool in continuing to train staff, identify potential policy/procedure changes that could prevent incidents from occurring, and fully document what actions were taken by leadership to rectify the situation.  Mr. Crisler indicated agreement that this process should be more routine, so subsequent reports may reflect that improvement.

84.     Develop and implement a behavioral treatment program appropriate for youth. This program must be developed with the assistance of a qualified consultant who has at least five years of experience developing behavioral programs for institutionalized youth. The Jail's behavioral program must include all of the following elements:

      a.  The behavioral program must include positive incentives for changing youth behavior, outline prohibited behaviors, and describe the consequences for prohibited behaviors.

      b.  An individualized program must be developed by a youth's interdisciplinary treatment team, and properly documented in each youth's personal file. Documentation requirements must include the collection of data required for proper assessment and treatment of youth with behavioral issues. For instance, the County must track the frequency and duration of positive incentives, segregation, and targeted behaviors.

      c.  The program must include safeguards and prohibitions on the inappropriate use of restraints, segregation, and corporal punishment.

**Partial Compliance**

Related to the use of a consultant to help develop the behavior management program, the history of HYP is mixed.  They have received some technical assistance from the prior SPLC Monitor (Mr. Dixon) and receive some assistance from the current SPLC Monitor (Ms. Nelsen) in the form of weekly calls with leadership staff.  In addition, HYP has recently begun receiving assistance from Ms. Monique Khumalo with various aspects of the mental health program. Initial work in that regard has focused on the assessment and case planning process but eventually should include support in developing an integrated mental health and behavior management program.  In addition, this monitor has provided written resources to leadership staff including Ms. Warfield, the Treatment Coordinator and linked them with an individual in Wisconsin who has been integrally involved in development of programming and behavior management components of the state's youth correctional facility. Hopefully, Ms. Khumalo can clearly be engaged to work on this aspect of the agreement.

The modification to the point/incentive sheet used by YCP staff to document youth's behavior on a shift was done prior to the prior virtual visit and has not been changed since that time. Unfortunately, both Ms. Warfield and Ms. Baldwin (Program Coordinator) report that there has been no substantive improvement in how staff utilize this tool, that in many cases YCPs appear to simply "fill in the form" with little to no meaningful evaluation of the youth's behavior.  Prior

point sheets that have been viewed during on-site visits rarely included written explanations of how/why a particular "score" was given to a youth for specific expectations. This is even though this modified tool does provide more observable, less subjective, measures of behavior for staff to track over the course of a shift and is hopefully a step forward in helping both staff and youth identify specific desired behaviors.

The point sheet does maintain similar incentives as the prior format, although continued work can be done to expand the type of incentives that youth can earn as a reward. Most of the items are properly framed in terms of the "desired" behavior vs. the often more common "do not" behaviors that one sees in a correctional program, including in many youth correctional programs. This "frame" is consistent with best practices, as it is often easy for youth to understand what "not" to do but substantive behavior change occurs only when they understand what that means they "should" do.

As noted in the prior report, three specific recommendations related to this aspect of the behavioral system remain: (1) increase and reinforce staff training in how best to use the "point tool" to shape youth behaviors, most often by actively engaging youth directly as behaviors are being observed and "scored"; (2) adding one or more individualized goals for each youth that is/are consistent with their treatment plan, thus making this aspect of the program more integrated with other aspects of the overall mental health/behavioral program. Reinforcing youth for "new and improved" behaviors is critical to successfully gradually shaping behaviors and moving youth closer to a situation in which they are more proactively involved in managing their own behavior vs. relying on "outside" forces/reinforcers; and (3) the format provides for written comments that staff can include to further explain what they observed, both positively and negatively. A simple "No" for example tells the youth little about what they did "wrong," and conversely a simple "Yes" can be reinforced with additional comments so a youth can understand what needs to be repeated.

The QMHP and YSS staff do maintain and regularly review individualized treatment goals during treatment team meetings held every three weeks for each youth. That meeting includes the school principal, when possible, a parent/guardian, and more recently a YCP staff if someone is available. It is important that a YCP staff member attend when staffing levels permit, and there has been discussion about the important role they can play in the treatment team. YCP staff are, in fact, the staff that have the most contact with youth and can be critical in providing input to the treatment team as well as helping to reinforce treatment goals daily. YCP participation in the past has been passive, but Ms. Warfield is hoping to gradually train and support YCP staff to be a more integral part of the discussion going forward. That is a good step toward more fully integrating treatment goals on a system-wide basis. Those treatment goals are documented in the youth's mental health record(s), although review of those records was not done on this off-site visit.

Although there are some elements of a behavioral program partially developed, there is not what could be considered a behavioral treatment program in place, and HYP is only beginning to engage with sufficient technical assistance From Ms. Khumalo to put together a treatment program. There are a number of competent and committed staff in many of the positions, and there seems to be mostly appropriate communication across staff. However, there is not an articulated overarching treatment model/approach the ties together various program elements, the incentive/point system remains essentially disconnected from treatment goals established for youth, YCP staff are largely unaware of what the individual youth's treatment goals are, it remains difficult to train staff in responding to youth in a consistent and trauma-informed/preventive approach, there is no articulated way in which discipline (particularly the use of DPIs) fit with other treatment elements, and there has been limited training or development of alternative means of discipline.

There was a recommendation in the prior report that the full-time Treatment Coordinator, Ms. Warfield, should be tasked by the Executive Director to lead a team of staff (e.g., YCP staff, YSS, QMHP, a leadership staff person, Learning/Development Coordinator, Program Coordinator) to develop a written Behavior Management plan that weaves together how each of the program elements and roles fit within a treatment model appropriate for youth held for longer periods of time in a youth facility such as Henley Young Patton. The hope was that progress toward that goal could be made by the Spring of 2022, but that work remains to be done.

**LAWFUL BASIS FOR DETENTION**

Consistent with constitutional standards, the County must develop and implement policies and procedures to ensure that prisoners are processed through the criminal justice system in a manner that respects their liberty interests.  To that end:

85. The County will not accept or continue to house prisoners in the Jail without appropriate, completed paperwork such as an affidavit, arrest warrant, detention hold, or judge's written detention order.  Examples of inadequate paperwork include but are not limited to undated or unsigned court orders, warrants, and affidavits; documents memorializing oral instructions from court officers that are undated, unsigned, or otherwise fail to identify responsible individuals and the legal basis for continued detention or release; incomplete arresting police officer documents; and any other paperwork that does not establish a lawful basis for detention.

**Partial Compliance**
The records were reviewed on site during the January site visit. The files selected for review all had the status and chrono sheets. The status sheet is required by policies and procedures and should greatly assist in both the Jail staff's and the Monitors' assessment of whether the

paperwork supports the booking and ongoing detention. It is a face sheet that lists each charge and the status of the charge such as whether there is a bond, an indictment, a next court date, a dismissal etc. It would also list any detainers/warrants with the jurisdiction and contact information. There was one file where there was an indication that the individual had a charge out of Vicksburg but no indication as to why she was being held in Hinds County. There was another file where the status sheet showed a charge that the individual did not have. And a third file where the individual had returned from the state hospital but no indication of his current status. With respect to over detention or mistaken releases, see paragraph 92 below.

It should be noted that since monitoring began there has been significant improvement in the quality of the records, the accuracy of the JMS system, and the presence of paperwork supporting booking and detention. There continue to be improved systems in place to track individuals and release them timely.

86. No person shall be incarcerated in the Jail for failure to pay fines or fees in contravention of the protections of the United States Constitution as set forth and discussed in <u>Bearden v. Georgia</u>, 461 U.S. 660 (1983) and <u>Cassibry v. State</u>, 453 So.2d 1298 (Miss. 1984).  The County must develop and implement policies consistent with the applicable federal law and the terms of this Agreement.

**Partial Compliance**
The Records Supervisor stated that she had not received any unlawful orders for fines and fees during this reporting period. This paragraph had been listed as in substantial compliance because even though some unlawful fines and fees orders were received, there were other charges holding the individual. No one had been held solely on an unlawful order. It was previously recommended that these orders be presented for revision even though they weren't holding the individual. The reason for this was clearly seen during the June site visit. One individual was entitled to release on his felony charge but he could not be released because of an unlawful mittimus on fines and fees. Given that the last time such an order came in, the requirements of these paragraphs on unlawful orders was not followed, this and the related paragraphs will continue to be listed as partial compliance to determine if these orders are corrected when they do come in. These orders should be corrected so that release is not delayed if release conditions change or the felony charges are dropped.

The County had previously arranged for education of the judges which should be considered again. It is beneficial to the individual to be able to get credit towards fines and fees if they are otherwise being held and in getting the orders corrected this should be specified. At RDC, inmates have not been receiving credit towards fines and fees when they are otherwise held on a felony. This should be clarified with the judges and credit given. Reportedly, credit is given for individuals held at the WC although this does not appear in the spreadsheet maintained at the

WC. As previously reported, policies on Pre-Booking, Booking, and Records have been completed and adopted. The Pre-booking policy provides that no person can be committed at the Jail absent documentation that a meaningful analysis of the person's ability to pay was conducted and written findings that any failure to pay was willful. It will be necessary to implement the process described in paragrpahs 88 and 89 to ensure that this policy is followed.

87. No person shall be incarcerated in the Jail for failure to pay fines or fees absent (a) documentation demonstrating that a meaningful analysis of that person's ability to pay was conducted by the sentencing court prior to the imposition of any sentence, and (b) written findings by the sentencing court setting forth the basis for a finding that the failure to pay the subject fines or fees was willful.  At a minimum, the County must confirm receipt from the sentencing court of a signed "Order" issued by the sentencing court setting forth in detail the basis for a finding that the failure to pay fines or fees was willful.

**Partial Compliance**
See paragraph 86. When the change in practice requiring a finding of willfulness was introduced, the County was pro-active in ensuring that valid court orders were utilized. It appears that education in this area will need to be revisited. The policy on pre-booking is consistent with this paragraph.

88. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a person for failure to pay fines or fees, Jail staff must promptly notify Jail administrators, Court officials, and any other appropriate individuals to ensure that adequate documentation exists and must obtain a copy to justify continued detention of the prisoner.  After 48 hours, that prisoner must be released promptly if the Jail staff cannot obtain the necessary documentation to verify that the failure to pay fines or fees was willful, and that person is incarcerated only for the failure to pay fines or fees.

**Partial Compliance**
See paragraph 86.

89. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a prisoner for failure to pay fines or fees, and if that person is incarcerated for other conviction(s) or charge(s), other than the failure to pay fines and/or fees, Jail staff must promptly notify Jail administrators, Court officials, and other appropriate individuals to ensure that adequate documentation exists and to ascertain the prisoner's length of sentence.  If Jail staff cannot obtain a copy of the necessary documentation within 48 hours of the prisoner's incarceration, Jail staff must promptly arrange for the prisoner's transport to the sentencing court so that the court may conduct a legally sufficient hearing and provide any required

documentation, including the fines or fees owed by the prisoner, and an assessment of the prisoner's ability to pay and willfulness (or lack thereof) in failing to pay fines or fees.

**Partial Compliance**
See paragraph 86.

90. Jail staff must maintain the records necessary to determine the amount of time a person must serve to pay off any properly ordered fines or fees.  To the extent that a sentencing court does not specifically calculate the term of imprisonment to be served, the Jail must obtain the necessary information within 24 hours of a prisoner's incarceration.  Within 48 hours of incarceration, each prisoner shall be provided with documentation setting forth clearly the term of imprisonment and the calculation used to determine the term of imprisonment.

**Partial Compliance**
The WC continues to maintain a spreadsheet but the monitor did not receive the spreadsheet as part of the current site visit. Previously, the spreadsheet reflects that there are no individuals currently incarcerated with an order to pay fines and fees. It is reported that individuals otherwise incarcerated for a new felony but have an order for fines and fees receive credit towards those at the WC but that is not reflected in the spreadsheet. At RDC, inmates have not been receiving credit towards fines and fees when otherwise incarcerated. There was no documentation that prisoners were provided with documentation of their release date although they do typically have the orders from the court and the case manager typically provides court information upon request.

91. No pre-trial detainee or sentenced prisoner incarcerated by the County solely for failure to pay fines or fees shall be required to perform physical labor.  Nor shall any such detainee or prisoner receive any penalty or other adverse consequence for failing to perform such labor, including differential credit toward sentences.  Any physical labor by pre-trial detainees or by prisoners incarcerated solely for failure to pay fines or fees shall be performed on a voluntary basis only, and the County shall not in any way coerce such pre-trial detainees or prisoners to perform physical labor.

**Partial Compliance**
This has become a limited issue now that there are no individuals solely working off fines and fees. The stated policy was that if Medical determined that the individual could not perform physical labor the individual got full credit. This is carried as partial compliance because there needs to be a written policy requiring that individuals who cannot work because of a medical or mental health condition or other disability receive full credit towards fines and fees.

92. The County must ensure that the Jail timely releases from custody all individuals entitled to release.  At minimum:

    a.    Prisoners are entitled to release if there is no legal basis for their continued detention.  Such release must occur no later than 11:59 PM on the day that a prisoner is entitled to be released.

    b.    Prisoners must be presumed entitled to release from detention if there is a court order that specifies an applicable release date, or Jail records document no reasonable legal basis for the continued detention of a prisoner.

    c.    Examples of prisoners presumptively entitled to release include:

        i.    Individuals who have completed their sentences;

        ii.    Individuals who have been acquitted of all charges after trial;

        iii.    Individuals whose charges have been dismissed;

        iv.    Individuals who are ordered released by a court order; and

        v.    Individuals detained by a law enforcement agency that then fails to promptly provide constitutionally adequate, documented justification for an individual's continued detention.

**Partial Compliance**

There were 7 late releases discovered during this reporting period. Three people were held beyond the 21 days allowed for probation violation holds without action by Probation and Parole. These were for 16, 8 and 5 days. There was one individual who had a "notification," that is, a requirement to notify the U.S. Marshal's office when released. This was entered as a hold and was not discovered until his release was 7 days overdue. Another individual finished his time at MDOC but was returned to Hinds County because a prior Hinds County hold had not been lifted. This should have been discovered at booking and he should not have been booked. It was discovered the next day and he was released. One person completed his sentence but was released one or two days late (depending on which screen is used in the JMS system as described below). One person was released one day late again depending on which screen is used in the JMS system. There was one mistaken release because a warrant did not appear in the JMS system. And there was an old mistaken release which was discovered during this reporting system when the individual returned to Hinds County and is worthy of mention. The individual had a pending charge in Hinds County but went to Pearl to deal with a case there. There was apparently no hold put in the NCIC to have him returned to Hinds County when he finished his case there and he was released instead of being returned to Hinds County. He was later picked up on new charges in Hinds County when this was discovered. As noted above, incident reports were not prepared for these incidents of over detention or mistaken release.

There are several systemic problems related to these items. The late releases on probation violations are not an uncommon occurrence. Some of this is due to inputting problems and some due to technology limitations of the JMS system. The Records Supervisor cannot run a report to

115

find everyone that is in on a probation violation because sometimes it is entered as a charge and sometimes it is entered as a hold. This needs to be addressed. A draft Booking Manual has been created that would clarify this. It needs to be finalized and have all booking and records clerks and supervisors trained on it. Even with that, however, the JMS system does not have the capability of generating a list of people that are due to be released on a particular day. This is somewhat complicated with probation violations because the 21 days does not begin to run until all other charges holding the person are no longer a basis for detention (e.g., a bond is paid on all other pending charges). Regardless of this complication, an IT solution to this should be explored. The Records Supervisor keeps a manual spreadsheet on probation and parole holds but this is prone to human error or even just her absence.

A related problem is that the JMS system does not provide an alert when an individual is entitled to release on a sentence. There are very few people serving a sentence in the Hinds County facilities and most of them are at the WC where a manual spreadsheet is maintained. However, there are occasionally individuals serving a sentence at RDC and there is no spreadsheet being maintained. The Booking Sargeant stated that they just have to remember them. Given the number of individuals incarcerated at RDC relying on memory is not the best option. Again, an IT solution should be explored. Another IT issue is that the release date is calculated differently depending on which screen in the JMS system is used. The Records staff have settled on an agreed approach on this, but again an alert system in the JMS system would ensure consistency. And, as described in prior reports, there is an issue with holds not being entered or being entered some time after booking without informing Records. One of the mistaken releases was the result of a hold not being entered. As noted above, this could also have been a result of the NCIC access being down frequently. An NCIC report should be run at the time of booking. If it is not functioning, booking staff cannot get information on holds outside Hinds County. If it is still not functioning at the time of release, holds might be missed entirely.

One troubling practice came to light during the January site visit. When the issue of bookings on misdemeanors was raised in prior site visit exit conferences, it was stated by Sheriff Vance that some people booked on misdemeanors stayed only a matter of hours. However, it was not stated that they were not released by a court or delegated release authority from a court. During the January visit, one individual was described in the paperwork as an "in and out." Upon inquiry it was discovered that some individuals are booked on an arrest report that states to hold the individual for "x" hours and then release. The booking is appropriate but the release is unauthorized. Delegated release authority is an option in some jurisdictions but the authority has to come from a court order or rule or state statute. Upon inquiry, no such authority was provided. Without such authority, these releases are unauthorized. This is a source of potential liability as well as a source for possible abuse. This should be addressed promptly.

Although there has been ongoing improvement in the area of releasing, these incidents require ongoing work in this area.

93. The County must develop and implement a reliable, complete, and adequate prisoner records system to ensure that staff members can readily determine the basis for a prisoner's detention, when a prisoner may need to be released, and whether a prisoner should remain in detention. The records system must provide Jail staff with reasonable advance notice prior to an anticipated release date so that they can contact appropriate agencies to determine whether a prisoner should be released or remain in detention.

**Partial Compliance**

As previously stated, the condition of inmate files has improved since monitoring began. As described in paragraph 85, the new Records policy establishes the use of a status/summary that should greatly improve the reliability of the prisoner record system. With the ongoing pace of auditing files, a review of all files should soon be completed. There are problems relying on the JMS system to accurately track the status of inmates. Holds that come in subsequent to booking are not routinely brought to the attention of Records staff. As a result, they are not able to contact the jurisdiction prior to the release date potentially causing a delay in releasing. Similarly, Records staff cannot reliably use the JMS system to identify people with a probation hold and, as a result, they create a manual spread sheet to track this. This has the potential to miss individuals. Reportedly the JMS system does not accurately track sentences and cannot run a report for anyone entitled to release on a sentence each day. At present, the Jail is still partially reliant on inmate requests and grievances to identify people who are being over detained. The auditing process, however, continues to improve and should help correct errors involving entry into the JMS system.

94. Jail record systems must accurately identify and track all prisoners with serious mental illness, including their housing assignment and security incident histories.  Jail staff must develop and use records about prisoners with serious mental illness to more accurately and efficiently process prisoners requiring forensic evaluations or transport to mental hospitals or other treatment facilities, and to improve individual treatment, supervision, and community transition planning for prisoners with serious mental illness. Records about prisoners with serious mental illness must be incorporated into the Jail's incident reporting, investigations, and medical quality assurance systems.  The County must provide an accurate census of the Jail's mental health population as part of its compliance reporting obligations, and the County must address this data when assessing staffing, program, or resource needs.

**Non-Compliant**

The electronic medical records system and the various tracking logs that are maintained by medical and mental health have been described in prior reports.  The various ways these records

and logs can be used has also been previously described.  Essentially, this data collection record keeping and use of data addresses the section of this provision of the agreement that are totally within the purview of medical and mental health.  It should be noted however that although these data and records are used by the monitor to assess compliance, there is not an internal, formalized review of these data and records as part of a medical/mental health self-assessment process, largely due to the extreme shortage of staff.  It is anticipated that once additional staff are brought on board, a staff person can be designated to perform this more internal, ongoing, formalized self-assessment.  It should also be noted that the information available in these systems was also used to assess staffing needs included in Attachment A (see Paragraph 42(g) (iv)).

With regard to prisoners requiring forensic evaluations, these evaluations are performed by staff at the state mental hospital (some remote and some on site). Medical and mental health staff are not informed when a Court orders such a forensic evaluation; and medical and mental health staff are only made aware of the fact that a forensic evaluation will be done shortly before it is to be done/when the state mental hospital submits a request for the detainee's medical records. Historically, detainees waited an unacceptably long time for such forensic evaluations due to a shortage of beds at the state mental hospital.  However, for about the last 6-8 months, the state mental hospital has been performing forensic evaluations by way of telepsychiatry; but the limited role played by the facility's medical and mental health staff has remained the same and despite the use of telepsychiatry, there are still detainees who require actual transfer to the state mental hospital for forensic evaluations.

The extent of any backlog of detainees awaiting transfer to the state mental hospital for a forensic evaluation or for restoration of competency is difficult to accurately determine.  Reports from the state mental hospital appear that the number of days waiting for a competency evaluation is relatively short. However, the delay in getting a second evaluation or a commitment bed appears to be potentially lengthy. The Monitor received the state hospital list of the status of Hinds County inmates awaiting action by the state hospital and the internal list maintained by Hinds County after the site visit and so will investigate the consistency or lack thereof during the next site visit. The wait times listed on the state hospital list are not lengthy with three exceptions. Three individuals waiting for "2nd evaluation needed/awaiting bed" category have been waiting 130, 280, 441 days. It is not clear if they are waiting for a court order on a 2nd evaluation or the availability of a bed. The status of these individuals should be investigated, if it has not already been, to determine if there is a solution to moving their status forward. An internal list is now being prepared. Additional recommendations will be made with respect to adding useful information to the list such as the length of time awaiting state hospital action.

At present, detainees are not transferred to outside hospitals for mental health treatment.

Neither medical nor mental health staff play a significant role in the incident reporting and review process, and staff are rarely even consulted or interviewed as part of those processes (although there have been times when a section of a detainee's medical/mental health records were requested), even when an incident might indicate that medical and/or mental health staff were involved at some point during the incident or it was apparent that medical and/or mental health was involved with or had information about the detainee(s) who was involved in the incident.  Therefore, there continues to be incident reports that do not include all potentially available and relevant information from medical and/or mental health, gathered at the time of the incident or during the incident review process.  As noted in other sections of this report, this is an issue that should be reviewed and addressed.

With regard to transition planning, see Paragraph 96(d) on discharge planning.

95. All individuals who (i) were found not guilty, were acquitted, or had charges brought against them dismissed, and (ii) are not being held on any other matter, must be released directly from the court unless the court directs otherwise.  Additionally:

    a.    Such individuals must not be handcuffed, shackled, chained with other prisoners, transported back to the Jail, forced to submit to bodily strip searches, or returned to general population or any other secure Jail housing area containing prisoners.

    b.    Notwithstanding (a), above, individuals may request to be transported back to the Jail solely for the purpose of routine processing for release.  If the County decides to allow such transport, the County must ensure that Jail policies and procedures govern the process.  At minimum, policies and procedures must prohibit staff from:

        i.    Requiring the individual to submit to bodily strip searches;

        ii.    Requiring the individual to change into Jail clothing if the individual is not already in such clothing; and

        iii.    Returning the individual to general population or any other secure Jail housing area containing prisoners.

**Non-Compliant**

Individuals are not being released from the Court at this time and they are returned to the Jail as other inmates. In connection with the drafting of policies and procedures, Jail staff are working on a process of releasing individuals from the downtown facility, JDC. Further collaboration with the courts will be necessary to allow for release from the court. In particular, the courts will need to develop the capability to provide a written release order in the courtroom for an individual to be released from court. In addition, HCDS staff will need to have a system to identify individuals with holds at the time of the court order releasing the individual to ensure that the individual does not have some other basis for detention. The new Jail Administrator has been working on outstanding policies including the policy on Releasing which would address

these issues. The policy on Releasing has been pending for several years because of this issue but there appears to be renewed commitment to address it.

96. The County must develop, implement, and maintain policies and procedures to govern the release of prisoners.  These policies and procedures must:

a. Describe all documents and records that must be collected and maintained in Jail files for determining the basis of a prisoner's detention, the prisoner's anticipated release date, and their status in the criminal justice system.

b. Specifically, detail procedures to ensure timely release of prisoners entitled to be released, and procedures to prevent accidental release.

c. Be developed in consultation with court administrators, the District Attorney's Office, and representatives of the defense bar.

d. Include mechanisms for notifying community mental health providers, including the County's Program of Assertive Community Treatment ("PACT") team, when releasing a prisoner with serious mental illness so that the prisoner can transition safely back to the community.  These mechanisms must include providing such prisoners with appointment information and a supply of their prescribed medications to bridge the time period from release until their appointment with the County PACT team, or other community provider.

**Non-Compliant**

The Jail does not yet have an adopted policy on Releasing. A draft policy has been reviewed and is in the process of being finalized. This has been delayed in an effort to address the requirement of the prior paragraph that individuals be released from the court. This delay has been a matter of years, however, there appears to be a renewed commitment to finalize the policy. The issues related to the timely release of detainees are discussed in the section on lawful basis of detention.

At the time of the October 2021 site visit, the discharge nurse who had the primary responsibility for compliance with this provision of the agreement had left the facility; a new discharge nurse was designated; but reportedly, since documents and reports generated by the prior discharge nurse, including a list of contacts for community-based medical and mental health services, were unavailable, the new discharge nurse was starting over.  At the time of the January site visit, that new discharge nurse had left the facility, and the HSA was in the process of identifying another nurse to assume the responsibilities of the discharge nurse position. This turnover in the position and the lack of proper transitioning of information negatively impacts compliance with paragraph 96 (b).

The various different activities/tasks that need to be performed in order to comply with this provision have been described in prior site visit reports.  However, given that there is about to be a new discharge nurse, and given that it is unclear what will be handed over to that new

discharge nurse, the following is being offered as possible urgent priorities for the new discharge nurse.

- The identification of community-based medical and mental health service providers who will accept released detainees who require medical and/or mental health services (including regular outpatient treatment, day treatment and residential treatment); obtain a clear sense of the range of services they provide and/or the type(s) of individuals they are prepared to treat; and identify a person(s) at each place who can be contacted to discuss new referrals and make intake appointments
- In cooperation with the detainee's provider(s) of medical and/or mental health services and the detainee, develop a discharge plan for each detainee (focused on where he/she will go for community-based treatment services as well as other services he/she might require to make a successful return to the community, such as housing, etc.)
- Develop 'discharge planning groups', and work with other staff to develop other groups that prepare detainees for discharge, such as educational groups regarding illness, the need for ongoing treatment, medication management, and how to best participate in one's treatment, etc.
- Prepare a discharge packet for each detainee who is likely to be discharged that includes (in writing) important information that he/she will need (such as the program(s) to which he/she is referred, scheduled appointment information, contact information, and what to do if there is an emergency prior to the scheduled appointment, as well as information about where to go to activate benefits or seek other assistance that might be required)
- Continue to work with security staff to assure that all detainees stop by medical as part of the release process in order to pick up their discharge packet and enough medication to carry them until their scheduled appointment with a community-based provider
- Track successful and unsuccessful referrals (i.e., track whether or not released detainees actually follow-through with appointments made for them), and attempt to determine what might be done to increase the percentage of successful referrals

In addition to these more urgent concerns, there are other more medium-range tasks and goals that the new discharge nurse might consider.  For example, following up with discussions that had been held with Hinds Behavioral Health, regarding sending a staff person to the jail to meet with detainees who will be referred to Hinds Behavioral Health upon their release, in order to begin to develop a working relationship with these detainees (in an effort to increase the possibility of a successful referral).  For example, exploring whether there might be steps that can be taken prior to a detainee's release to facilitate the establishment or re-establishment of needed benefits (in an effort to help detainees stabilize more quickly upon their release and have coverage for community-based treatment services as quickly as possible).  For example, establishing a practice of interviewing those who return to the jail, regarding why they did or did

not follow-through with obtaining the treatment services they required (in an effort to identify what discharge planning efforts work and what efforts could be improved upon).

97. The County must develop, implement, and maintain appropriate post orders relating to the timely release of individuals.  Any post orders must:

      a.      Contain up-to-date contact information for court liaisons, the District Attorney's Office, and the Public Defender's Office;

      b.      Describe a process for obtaining higher level supervisor assistance in the event the officer responsible for processing releases encounters administrative difficulties in determining a prisoner's release eligibility or needs urgent assistance in reaching officials from other agencies who have information relevant to a prisoner's release status.

**Non-Compliant**

The County has not yet developed post orders in this area. The Records Supervisor and the individual working with County Court appear to have developed working relationships with individuals in the court systems.

98. Nothing in this Agreement precludes appropriate verification of a prisoner's eligibility for release, including checks for detention holds by outside law enforcement agencies and procedures to confirm the authenticity of release orders.  Before releasing a prisoner entitled to release, but no later than the day release is ordered, Jail staff should check the National Crime Information Center or other law enforcement databases to determine if there may be a basis for continued detention of the prisoner.  The results of release verification checks must be fully documented in prisoner records.

**Partial Compliance**

Although Booking staff have been running an NCIC report at the time of booking and release, as noted above, the access to NCIC has been intermittent during this reporting period according to the Classification Supervisor. This is an issue that should be addressed promptly as the inability to run NCIC reports compromises the ability to comply with this paragraph and could result in the release of individuals for whom a hold exists. This may have been the problem with the mistaken release discovered during this reporting period.

As mentioned above holds coming in after booking may not come to the attention of Records. As a result, they are identified when the inmate is otherwise entitled to release. The process of then contacting the jurisdiction with the hold and determining if they want to pick up the inmate can delay the release. The Booking Sargeant interviewed at the time of the site visit indicated that they did not have the full complement of staff for booking and releasing.

99. The County must ensure that the release process is adequately staffed by qualified detention officers and supervisors.  To that end, the County must:

    a.    Ensure that sufficient qualified staff members, with access to prisoner records and to the Jail's e-mail account for receiving court orders, are available to receive and effectuate court release orders twenty-four hours a day, seven days a week.

    b.    Ensure that staff members responsible for the prisoner release process and related records have the knowledge, skills, training, experience, and abilities to implement the Jail's release policies and procedures.  At minimum, the County must provide relevant staff members with specific pre-service and annual in-service training related to prisoner records, the criminal justice process, legal terms, and release procedures.  The training must include instruction on:

        i.    How to process release orders for each court, and whom to contact if a question arises;

        ii.    What to do if the equipment for contacting other agencies, such as the Jail's fax machine or email service, malfunctions, or communication is otherwise disrupted;

        iii.    Various types of court dispositions, and the language typically used therein, to ensure staff members understand the meaning of court orders; and

        iv.    How and when to check for detainers to ensure that an individual may be released from court after she or he is found not guilty, is acquitted, or has the charges brought against her or him dismissed.

    c.    Provide detention staff with sufficient clerical support to prevent backlogs in the filing of prisoner records.

**Partial Compliance**

Booking personnel oversee booking and release. The Revised Staffing Analysis calls for two Detention Officers to handle data entry, two more to supervise and monitor inmates in the holding cells and to process new detainees as they are delivered to Booking by arresting officers, and one additional officer to handle the ID function (mug shots, fingerprints and wristbands). In actuality, there are often only two Detention Officers on duty, one in the office and one on the floor, instead of the five that should be there.

There are now policies and procedures on Booking, Pre-Booking, and Records. A policy on Releasing has been circulated and returned with comments. These policies will assist in coming into compliance in this area. In addition, a staff member has updated and expanded the Booking and Release Manual which will provide the detailed guidance required by this paragraph. It is not clear that the updated Booking and Release Manual has been approved and is being utilized. The Records Supervisor appears to be knowledgeable in her duties and has good relationships with the courts and other agencies. There is no record of formal initial or in-service training for the

booking and records clerks. As has been previously recommended, training of the relevant staff on the process on mental health related orders would be useful. As noted above, there is still an issue with detainers that come in after booking such that releasing is not delayed.

100.    The County must annually review its prisoner release and detention process to ensure that it complies with any changes in federal law, such as the constitutional standard for civil or pre-trial detention.

**Non-Compliant**

At the time of the site visit, there had not been an initial review of this process to determine consistency with federal law.

101.    The County must ensure that the Jail's record-keeping and quality assurance policies and procedures allow both internal and external audit of the Jail's release process, prisoner lengths of stay, and identification of prisoners who have been held for unreasonably long periods without charges or other legal process.  The County must, at minimum, require:

    a.    A  Jail log that documents (i) the date each prisoner was entitled to release; (ii) the date, time, and manner by which the Jail received any relevant court order; (iii) the date and time that prisoner was in fact released; (iv) the time that elapsed between receipt of the court order and release; (v) the date and time when information was received requiring the detention or continued detention of a prisoner (e.g., immigration holds or other detainers), and (vi) the identity of the authority requesting the detention or continued detention of a prisoner.

    b.    Completion of an incident report, and appropriate follow-up investigation and administrative review, if an individual is held in custody past 11:59 PM on the day that she or he is entitled to release.  The incident report must document the reason(s) for the error.  The incident report must be submitted to the Jail Administrator no later than one calendar day after the error was discovered.

**Partial Compliance**

This paragraph has been changed to partial compliance because of the improvement in the internal auditing process and the implementation of the status summary sheet. The Lieutenant over Inmate Services has started keeping a release log. It does not include all of the items required by subparagraph (a), most notably when the court order was entered and when it was received. It does include a column for whether the release was timely but this cannot be confirmed by the other information on the log. In addition, determining whether a release is timely can involve a deeper review of the records which is not being done. This would be a time-consuming process for the lieutenant because she is not routinely involved in the release process and has to look up the information for each individual. It is recommended that the Booking Sergeant or Records Supervisor enter the information in real time and provide a deeper review

where indicated. Incident reports are not routinely prepared for over detention. As mentioned above, the use of a log consistent with this paragraph and the completion of incident reports for over detention and erroneous releases would greatly assist command staff and the Monitor in tracking and addressing late releases or mistaken releases.

102.    The County must appoint a staff member to serve as a Quality Control Officer with responsibility for internal auditing and monitoring of the release process.  This Quality Control Officer will be responsible for helping prevent errors with the release process, and the individual's duties will include tracking releases to ensure that staff members are completing all required paper work and checks.  If the Quality Control Officer determines that an error has been made, the individual must have the authority to take corrective action, including the authority to immediately contact the Jail Administrator or other County official with authority to order a prisoner's release.  The Quality Control Officer's duties also include providing data and reports so that release errors are incorporated into the Jail's continuous improvement and quality assurance process.

**Partial Compliance**
The Sheriff's Office hired an individual with the title of Quality Control Coordinator in June 2020. Her list of duties includes monitoring records to ensure that inmate files are current. She has developed a timeline for the audits required by the Settlement Agreement and policies including inmate records. This work does appear to be on the right track. As described elsewhere, she has developed checklists to gather information for a very useful monthly Quality Assurance report. The QA Coordinator does audit a sampling of records. It is recommended that the QA Coordinator review the Release Log once revised to include the required information. A deeper dive into the records may be required to identify issues of over detention and mistaken releases. Understanding the court system and related paperwork is a formidable task and training for the QA Coordinator in this area is recommended.

103.    The County must require investigation of all incidents relating to timely or erroneous prisoner release within seven calendar days by appropriate investigators, supervisors, and the Jail Administrator.  The Jail Administrator must document any deficiencies found and any corrective action taken. The Jail Administrator must then make any necessary changes to Jail policies and procedures.  Such changes should be made, if appropriate, in consultation with court personnel, the District Attorney's Office, members of the defense bar, and any other law enforcement agencies involved in untimely or erroneous prisoner releases.

**Non-Compliant**
There were at least seven untimely releases discovered during monitoring as described in paragraph 92 above. None had an incident report or an IAD investigation. This has been an ongoing deficiency. There should be clarification as to who has the responsibility for completing

the report.  It was recommended by the Corrections expert of the Monitoring Team that the Detention Administrator issue an HCDS Order requiring documentation of all such mistaken or untimely releases.

104.    The County must conduct bi-annual audits of release policies, procedures, and practices. As part of each audit, the County must make any necessary changes to ensure that individuals are being released in a timely manner.  The audits must review all data collected regarding timely release, including any incident reports or Quality Control audits referenced in Paragraph 102 above.  The County must document the audits and recommendations and must submit all documentation to the Monitor and the United States for review.

**Non-Compliant**

There has been no annual review pursuant to this paragraph.

105.    The County must ensure that policies, procedures, and practices allow for reasonable attorney visitation, which should be treated as a safeguard to prevent the unlawful detention of citizens and for helping to ensure the efficient functioning of the County's criminal justice system.  The Jail's attorney visitation process must provide sufficient space for attorneys to meet with their clients in a confidential setting and must include scheduling procedures to ensure that defense attorneys can meet with their clients for reasonable lengths of time and without undue delay.  An incident report must be completed if Jail staff are unable to transport a prisoner to meet with their attorney, or if there is a delay of more than 30 minutes for transporting a prisoner for a scheduled attorney visit.

**Partial Compliance**

At the WC there was never an area within the facility that was designed for attorney/client visitation, but staff offices have routinely been made available to meet that need.  At the RDC the attorney/client visitation spaces in each of the three Pods have not been used for that purpose since the riot of 2012.  Instead, staff have had to escort inmates to the courtroom area in the front of the facility.  Not only is that contrary to the concept of Direct Supervision (which says that services are taken to inmates rather than taking inmates to services), it has placed an additional, and unnecessary, burden on Detention staff at a time when there are insufficient officers available to fill required posts.  As an alternative, the previous Jail Administrator proposed the addition of a video conferencing capability at the WC and RDC so as to more easily accommodate attorney/client visitation through the Securus system.  The required contract change took over two months for the Board of Supervisors to approve, and it has yet to be implemented.

**CONTINUOUS IMPROVEMENT AND QUALITY ASSURANCE**

The County must develop an effective system for identifying and self-correcting systemic violations of prisoner's constitutional rights.  To that end, the County must:

106.    Develop and maintain a database and computerized tracking system to monitor all reportable incidents, uses of force, and grievances.  This tracking system will serve as the repository of information used for continuing improvement and quality assurance reports.

**Partial Compliance**

The Monitoring Team has received the electronic monthly reports on incidents which include the complete narrative of the primary report and supplemental reports. There is a field in JMS which appears on the spread sheet for checking use of force which then brings up an additional screen for information related to the use of force. However, this field is frequently not checked when force is used and so the additional information is not provided. Although the spreadsheet is helpful in that it provides a computerized listing of incidents including use of force, it does not include all of the information listed in paragraph 107 and 108 below and that would be needed to provide the information that could inform continuing improvement or quality assurance reports. More problematic is that it has not been complete or accurate. The Quality Assurance Coordinator began creating a master spreadsheet with information on incidents, use of force, training activity and other areas. For the incident reports and use of force she was pulling the information from the JMS. However, it quickly became apparent that this was inaccurate. The use of force field was often not checked and the type of incident listed is inconsistent. The Quality Assurance Coordinator now uses checklists for the different departments. The checklist has boxes to fill in with the information needed. For example, the use of force checklist goes to the Lieutenant over Investigations.

However, there still appears to be some discrepancies. In December, the QA report indicated two uses of OC when a review of the actual incident reports showed 8 such uses. The number of fires was listed as 2 when the incident reports indicated 6. The number of inmate-on-inmate assaults was listed as 5 when there were eleven. Even though the checklists provide greater accuracy than the JMS system listed incident types (although still inaccurate), it does not constitute an ongoing data base that could be used to run a statistical report. To do that, the information in the JMS system would have to have improved accuracy. Officers should be encouraged through training to check use of force in the JMS system and to accurately characterize incidents.  The IT officer has now deleted "Failure To Comply" as an incident type. This should improve the use of "Use of Force" as an incident type.  As previously noted, some incidents such as over detention are unreported or underreported also limiting the accuracy of the JMS data base.

The computerized grievance system does not allow for the compilation of a useful summary grievance report. However, the data in the system can now be pulled into an Excel spreadsheet which can be used to generate reports. The spreadsheet generated by Securus does not include

some critical fields that are in the system but can't be pulled into the spreadsheet such as type of grievance and date of response. The Grievance Officer manually creates a separate spreadsheet that pulls the information from Securus and then manually inserts the type of grievance, the date of response and the date of the response to an appeal. There is also a limitation in that some staff do not respond to grievances assigned to them in the system. The Grievance Officer clears these out of the system when the inmate is released, but it is not possible to determine whether the grievance was responded to and what the response was. The policy to reject grievances that are actually inmate requests and direct inmates to use the inmate request category appears to be effective. This policy allows a more accurate depiction of grievances although, as mentioned above, a number of the grievances rejected for this reason should have been considered grievances. The inmates seem to be using the Emergency Grievance form when in many cases, it is not an emergency but is a grievance. For an accurate picture of grievances, it would be preferable if the system could reflect that a submitted emergency grievance was a grievance but not an emergency rather than rejecting it.  The Quality Assurance Coordinator does have a checklist from the Grievance Coordinator but this does not include an assessment of the adequacy of the responses. This type of audit is required by the Grievance Policy but has not yet been implemented.

107.    Compile an Incident Summary Report on at least a monthly basis.  The Incident Summary Reports must compile and summarize incident report data in order to identify trends such as rates of incidents in general, by housing unit, by day of the week and date, by shift, and by individual prisoners or staff members.  The Incident Summary reports must, at minimum, include the following information:

a.   Brief summary of all reportable incidents, by type, shift, housing unit, and date;
b.   Description of all suicides and deaths, including the date, name of prisoner, housing unit, and location where the prisoner died (including name of hospital if prisoner died off-site);
c.   The names and number of prisoners placed in emergency restraints, and segregation, and the frequency and duration of such placements;
d.   List and total number of incident reports received during the reporting period;
e.   List and Total number of incidents referred to IAD or other law enforcement agencies for investigation.

**Partial Compliance**

The Quality Assurance reports now being prepared are a major step forward in compliance with this requirement and appear to have the envisioned effect of helping to guide quality improvement. As mentioned above, the Quality Assurance Coordinator is using checklists to compile accurate data so that trends and problem areas can be identified. She prepares a narrative that evaluates that data. The reports appear to be thorough and contain good analysis. Under the last Sheriff, the reports have been reviewed by the Sheriff's Office and discussed in a monthly

meeting. This prompted focus on a number of problem areas such as report writing and training. Hopefully, this process will be continued with the current Sheriff. The Monitoring Team recommends continuing review of the QA reports by the new Sheriff which reportedly is now taking place.

This paragraph envisions a narrative like what is now being produced. It also envisions back up statistical data. As noted above, it will be difficult to produce that kind of data until the JMS system information is more reliable.  With the checklists being utilized, the information in the report is more reliable but discrepancies still exist. The spreadsheet currently being provided has the text of the narrative of the initial incident report and the text of the supplemental reports. Additional information includes the date and time of the incident, the location, the type of incident, the name of the inmate involved, the name of the initial responding officer, a field for use of force, the supervisor reviewing the report, the date and time of review, and whether the report was approved. At this time, it does not include all of the information required by this paragraph (e.g., use of restraints, segregation, referral to IAD) including information that would be necessary to be fully informed regarding the nature of the incident. (The segregation log could provide the needed information for segregation).

Most importantly, the spreadsheet does not have an actual summary of the incident. The spreadsheet now pulls in the first incident report and all supplements. This provides more information than was previously available. A brief summary of the incident that incorporates information from the various narratives and includes information from medical, which is often not included in the narratives, should be incorporated. The JMS system includes a field for supervisor's notes. This does not appear in the current spreadsheet but would be a good location to include a brief summary of the incident as required by this paragraph (and findings or recommendations as required by paragraph 64).

Additional types of incidents that could be identified should be explored. For example, "assault" is used whether it is an inmate-on-inmate assault or an inmate on officer assault. Only by reading the narrative, can that be discerned. The spreadsheet also does not include the incidents or the total number of incidents referred to investigation. As noted above RDC and the WC are not using the same form for segregation so this would have to be resolved. This is not in Excel but could be drawn from manually to create the same type of trend analysis envisioned by this paragraph. At this time, there is no report tracking the use of restraints.

108.    Compile a Use of Force Summary Report on at least a monthly basis.  The Use of Force Summary Reports must compile and summarize use of force report data in order to identify trends such as rates of use in general, by housing unit, by shift, by day of the week and date, by individual prisoners, and by staff members.  The Use of Force Summary reports must, at minimum, include the following information:

a.    Summary of all uses of force, by type, shift, housing unit, and date;
b.    List and total number of use of force reports received during the reporting period;
c.    List and total number of uses of force reports/incidents referred to IAD or other law enforcement agencies for investigation.

**Partial Compliance**

The monthly Incident spreadsheet has a column for whether or not force was used. As noted above, this is not routinely checked when force is used so can't be relied upon for this information. The checklist being used by the Quality Assurance Coordinator should be producing more accurate data which is incorporated in her spread sheet and the narrative summary report. However, as described above, there are still concerns about the accuracy of the QA spread sheet when compared to a review of the incident reports. This paragraph envisions back up statistical data which ideally would be run from the JMS system. Also as noted above, the JMS system does not provide for a summary of the use of force. Neither does it have a field for referral for investigation. The spreadsheet being created by the CID and IAD investigator could be used to provide that listing. If relying on different documents to provide information required by this paragraph, those documents should at some point be brought together in a single packet for review.

109.    Compile a Grievance Summary Report on at least a monthly basis.  The Grievance Summary Reports must compile and summarize grievance information in order to identify trends such as most frequently reported complaints, units generating the most grievances, and staff members receiving the most grievances about their conduct.  To identify trends and potential concerns, at least quarterly, a member of the Jail's management staff must review the Grievance Summary Reports and a random sample of ten percent of all grievances filed during the review period.  These grievance reviews, any recommendations, and corrective actions must be documented and provided to the United States and Monitor.

**Partial Compliance**

As mentioned above, the limitations of the reporting from the Securus system have led the Grievance Coordinator to manually create a spreadsheet. The spreadsheet has the location of the kiosk terminal where the grievance was submitted although this might not reflect the location of the event giving rise to the grievance. Neither system can generate a report by location, shift, or persons involved. There are additional limitations. Any inmate response is treated by the system as an appeal when often the inmate has just responded by saying thank you. Again, this makes tracking what is actually happening difficult unless it is done manually. Also, as mentioned above, some of the staff are not entering responses in the system. One option would be to expand the manual spreadsheet kept by the Grievance Coordinator to include the information required by this paragraph. This should enable staff to generate a report consistent with this provision. However, even though the volume of grievances has been reduced apparently due to the effort to

have detainees use program requests instead of grievances when appropriate, maintaining an expanded manual spreadsheet would be a very time intensive process. At the present time, there is no management review process in the grievance system. The Quality Assurance Officer is reviewing the Grievance Coordinator's spreadsheet but is not yet reviewing and reporting on a review of a random sampling of grievances as is required by the Grievance Policy.

110.    Compile a monthly summary report of IAD investigations conducted at the Facility.  The IAD Summary Report must include:

- a.    A brief summary of all completed investigations, by type, shift, housing unit, and date;
- b.    A listing of investigations referred for disciplinary action or other final disposition by type and date;
- c.    A listing of all investigations referred to a law enforcement agency and the name of the agency, by type and date; and
- d.    A listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures.  This list must also contain the specific misconduct and/or violation.

**Partial Compliance**

The IAD spreadsheet tracks investigations according to most of this paragraph's criteria.  In addition, IAD issues a weekly synopsis of cases under investigation.  From October through December 2021, there were a total of 32 cases initiated.  Three of those resulted in termination. Seventeen of the cases involved the use of force.  While some cases have resulted in exoneration, twenty-two are still under review.  There continues to be a problem with the Monitoring Team receiving timely access to IAD investigations in order to track compliance with this paragraph. This was discussed during the January site visit and hopefully resolved. Also, the monthly logs have not shown completion of investigations commenced in prior months. As a result, investigations completed in a subsequent month are not included in the monthly log contrary to paragraph 110. This makes it very difficult to track the results of the investigations. This was also discussed and hopefully resolved going forward. The monthly logs include a category of incident but do not include the information required by paragraph 110(a).

111.    Conduct a review, at least annually, to determine whether the incident, use of force, grievance reporting, and IAD systems comply with the requirements of this Agreement and are effective at ensuring staff compliance with their constitutional obligations.  The County must make any changes to the reporting systems that it determines are necessary as a result of the system reviews.  These reviews and corrective actions must be documented and provided to the United States and Monitor.

**Non-Compliant**

There has been no annual review pursuant to this paragraph.

112.    Ensure that the Jail's continuous improvement and quality assurance systems include an Early Intervention component to alert Administrators of potential problems with staff members. The purpose of the Early Intervention System is to identify and address patterns of behavior or allegations which may indicate staff training deficiencies, persistent policy violations, misconduct, or criminal activity.  As part of the Early Intervention process, incident reports, use of force reports, and prisoner grievances must be screened by designated staff members for such patterns.  If misconduct, criminal activity, or behaviors indicate the need for corrective action, the screening staff must refer the incidents or allegations to Jail supervisors, administrators, IAD, or other law enforcement agencies for investigation.  Additionally:

   a.    The Early Intervention System may be integrated with other database and computerized  tracking systems required by this Agreement, provided any unified system otherwise still meets the terms of this Agreement.

   b.    The Early Intervention System must screen for staff members who may be using excessive force, regardless of whether use of force reviews concluded that the uses complied with Jail policies and this Agreement.  This provision allows identification of staff members who may still benefit from additional training and serves as a check on any deficiencies with use of force by field supervisors.

   **c.**    The Jail Administrator, or designee of at least Captain rank, must personally review Early Intervention System data and alerts at least quarterly.  The Administrator, or designee, must document when reviews were conducted as well as any findings, recommendation**s,** or corrective actions taken.

   d.    The County must maintain a list of any staff members identified by the Early Intervention System as possibly needing additional training or discipline.  A copy of this list must be provided to the United States and the Monitor.

   e.    The County must take appropriate, documented, and corrective action when staff members have been identified as engaging in misconduct, criminal activity, or a pattern of violating Jail policies.

   f.    The County must review the Early Intervention System, at least bi-annually, to ensure that it is effective and used to identify staff members who may need additional training or discipline.  The County must document any findings, recommendations, or corrective actions taken as a result of these reviews.  Copies of these reviews must be provided to the United States and the Monitor.

**Partial Compliance**

The previously created Quality Assurance spreadsheet indicated an initial implementation of an Early Intervention program. However, there has been no indication that such a program is currently active. This will be further evaluated during the next site visit.

113.     Develop and implement policies and procedures for Jail databases, tracking systems, and computerized records (including the Early Intervention System), that ensure both functionality and data security.  The policies and procedures must address all of the following issues: data storage, data retrieval, data reporting, data analysis and pattern identification, supervisor responsibilities, standards used to determine possible violations and corrective action, documentation, legal issues, staff and prisoner privacy rights, system security, and audit mechanisms.

**Non-Compliant**

The initial P&P Manual that was issued in April, 2017 did not include policies and procedures covering this matter. There is no draft of such a policy at this time.

114.     Ensure that the Jail's medical staff are included as part of the continuous improvement and quality assurance process.  At minimum, medical and mental health staff must be included through all of the following mechanisms:

       a.      Medical staff must have the independent authority to promptly refer cases of suspected assault or abuse to the Jail Administrator, IAD, or other law enforcement agencies;

       b.      Medical staff representatives must be involved in mortality reviews and systemic reviews of serious incidents.  At minimum, a physician must prepare a mortality review within 30 days of every prisoner death.  An outside physician must review any mortalities associated with treatment by Jail physicians.

**Non-Compliant**

Medical staff are not included in the review of serious incidents. Mortality reviews have been completed on some of the deaths during this calendar year. However, as noted above these appear to be minimal and pro forma. There has been little communication between medical and security staff regarding interrelated issues involved in assaults or deaths. The incident reports and mortality reviews reflect this lack of communication.

**CRIMINAL JUSTICE COORDINATING COMMITTEE**

115.     Hinds County will establish a Criminal Justice Coordinating Committee ("Coordinating Committee") with subject matter expertise and experience that will assist in streamlining criminal justice processes and identify and develop solutions and interventions designed to lead to diversion from arrest, detention, and incarceration.  The Coordinating Committee will focus particularly on diversion of individuals with serious mental illness and juveniles.  Using the Sequential Intercept Model, or an alternative acceptable to the Parties, the Coordinating Committee will identify strategies for diversion at each intercept point where individuals may encounter the criminal justice system and will assess the County's current diversion efforts and

unmet service needs in order to identify opportunities for successful diversion of such individuals. The Committee will recommend appropriate changes to policies and procedures and additional services necessary to increase diversion.

**Partial Compliance**

Hinds County had previously contracted with Justice Management Institute (JMI) to provide consulting and assist in implementing a CJCC. Those efforts were primarily focused on getting the CJCC implemented and developing a strategic plan. The CJCC discontinued meetings when COVID hit and although has met more recently has not been functional since then. The term of the prior CJCC chairperson expired and for a period there was no one serving as chair. The County Administrator agreed to serve as chair until the CJCC is functioning again. A meeting was held on September 24, 2021. There was not a quorum and the meeting was primarily informational. A meeting was held on January 13, 2022. Again, a quorum was not present. At this time, it was decided that the co-chairs would be the Public Defender, the District Attorney and the Sheriff but this could not be voted on because of the lack of a quorum. The failure to settle on leadership certainly impacts the ability of the CJCC to function. It will be important for the County to provide leadership in working towards solutions to some of the criminal justice system issues. This will encourage broader participation and begin to effectuate needed changes. Hopefully, with the leadership including the Sheriff this will be the case. The prior Jail Administrator had received approval for a Jail and Justice System Assessment to be completed by the National Institute of Corrections. The previous Sheriff declined to move forward with the assessment. This would greatly benefit the work of the CJCC and should be revisited.

As has been previously reported, this paragraph is carried as partial compliance because it also requires that Hinds County establish a CJCC that has the subject matter expertise and experience to identify and develop solutions and interventions. Although the stakeholders that do participate have expertise within their areas, the participants do not have the expertise in criminal justice system reform including diversion that would allow the CJCC to meet the requirements of this paragraph. As both JMI when they were providing consultation and the Monitoring Team have recommended, in order to have a CJCC with sufficient subject matter expertise and experience to carry out the mandate of this paragraph, the County will need to provide staff support. Among other duties, staff duties will include collection and analysis of data, facilitation, research and analysis, presentation, project management, consultation, and distribution of information to the policy makers on the committee so that they have the information they need to make policy decisions. The County has designated the Criminal Justice and Quality Control staff person to be the CJCC Coordinator. To date, she has not performed the duties described above. This may be because she is also filling a number of other roles. She oversees GPS monitoring, tracks mental health evaluations and commitments, responds to queries regarding court cases, and has been overseeing efforts to implement a pretrial services program. A pretrial services program director has now been hired. This may give the Criminal Justice and Quality Control more time to focus

on the CJCC but she still has a number of other duties that so far have not allowed her to provide the staff support needed by the CJCC. The requirement that the Committee identify opportunities for diversion and recommend measures to accomplish them has not been achieved. At this time, the County will need to drive the process of the CJCC identifying opportunities for diversion.

As previously reported the Sequential Intercept Mapping required by this paragraph took place under a grant to the Hinds County Behavioral Health from the GAINS Center on August 16-17, 2017. The Sequential Intercept Model provides a conceptual framework for communities to use when considering the interface between the criminal justice and mental health systems as they address concerns about the criminalization of inmates with mental health illness. The GAINS center completed the report for Hinds County Behavioral Health. It includes recommendations for creating or improving intercepts in the Jail and at release. This provides a useful road map for CJCC and for achieving compliance with the diversion and discharge planning requirements of the Settlement Agreement. However, staff support will still be needed to drive this effort. An update of the Sequential Intercept Map should be considered as the initial mapping is now almost four years old. This would be a useful activity for the CJCC.

116.     The Coordinating Committee will include representation from the Hinds County Sheriff's Office and Hinds County Board of Supervisors. The County will also seek representation from Hinds County Behavioral Health Services; the Jackson Police Department; Mississippi Department of Mental Health; Mississippi Department of Human Services, Division of Youth Services; judges from the Hinds County Circuit, Chancery, and County (Youth and Justice) Courts; Hinds County District Attorney Office; Hinds County Public Defender Office; relevant Jackson city officials; and private advocates or other interested community members.

**Partial Compliance**

As noted above the CJCC met on January 13, 2022. A quorum was not met and the meeting was primarily informational. Not all of the identified agencies have been invited or represented at prior meetings. The reported intention is to expand representation after further development. Although the County cannot control the participation of others, staff support and active participation by the County and the Sheriff's Office will assist in engaging other stakeholders.

117.     The Coordinating Committee will prioritize enhancing coordination with local behavioral health systems, with the goal of connecting individuals experiencing mental health crisis, including juveniles, with available services to avoid unnecessary arrest, detention, and incarceration.

**Non-Compliant**

The CJCC adopted its strategic plan. Enhancing behavioral health services for justice involved individuals is included as a strategic priority. Hinds County Behavioral Health has participated in the CJCC in the past but there has not been much recent activity. Further observation of the CJCC and the County's leadership in the CJCC will be necessary to determine if behavioral health services are a priority in CJCC actions and deliberation. This paragraph has been down graded to non-compliant due to the lack of any effort in this area since the strategic plan was adopted three years ago.

118.    Within 30 days of the Effective Date and in consultation with the United States, the County will select and engage an outside consultant to provide technical assistance to the County and Coordinating Committee regarding strategies for reducing the Jail population and increasing diversion from criminal justice involvement, particularly for individuals with mental illness and juveniles.  This technical assistance will include (a) a comprehensive review and evaluation of the effectiveness of the existing efforts to reduce recidivism and increase diversion; (b) identification of gaps in the current efforts, (c) recommendations of actions and strategies to achieve diversion and reduce recidivism; and (d) estimates of costs and cost savings associated with those strategies.  The review will include interviews with representatives from the agencies and entities referenced in Paragraph 116 and other relevant stakeholders as necessary for a thorough evaluation and recommendation.  Within 120 days of the Effective Date of this Agreement, the outside consultant will finalize and make public a report regarding the results of their assessment and recommendations.  The Coordinating Committee will implement the recommended strategies and will continue to use the outside consultant to assist with implementation of the strategies when appropriate.

**Partial Compliance**
The County did contract with an outside consultant, JMI, to provide technical assistance in developing the CJCC. However, that contract did not encompass the requirements listed above regarding an assessment of and recommendations for strategies to reduce recidivism and increase diversion.  And the contract did not include ongoing assistance in implementing the recommended strategies. That contract ended over three years ago and the County has not renewed the contract with JMI. Hinds County applied to be a learning site with Advancing Pretrial Services. The application has not been accepted because necessary stakeholders have not provided a letter of support. Even if acceptance can be obtained, that assistance does not include the breadth of the efforts included in this paragraph. The County did hire a Pretrial Services Director in November. Although she does have some experience with the criminal justice system, she does not have experience with a pretrial services program. Significant effort will need to be made to provide the training she will need to develop a pretrial program.

**IMPLEMENTATION, TIMING, AND GENERAL PROVISIONS**

Paragraphs 119 and 120 regarding duty to implement and effective date omitted.

121. Within 30 days of the Effective Date of this Agreement, the County must distribute copies of the Agreement to all prisoners and Jail staff, including all medical and security staff, with appropriate explanation as to the staff members' obligations under the Agreement.  At minimum:

      a.      A copy of the Agreement must be posted in each unit (including booking/intake and medical areas), and program rooms (e.g., classrooms and any library).

      b.      Individual copies of the Agreement must be provided to prisoners upon request.

**Partial Compliance**

Not only has there been no progress made in this area, both staff and inmates are unaware of the requirement as well as how to access the information.  During the January site visit the Training Lieutenant reaffirmed that a copy of the Settlement Agreement is provided to all new officers as they go through the required pre-service training (academy).  In addition, command staff indicated that copies of the Settlement Agreement and the individual Monitoring Reports were available to staff in the control rooms at each jail.  Further, the Settlement Agreement is supposed to be available to inmates on the Securus kiosks in each Housing Unit.

When individual officers and supervisors were questioned during the January site visit, most were unable to confirm that they had a copy of the Settlement Agreement (SA).  Copies of the SA were found in most control rooms (after lengthy searches on the part of control room officers).  When questioned about the availability of the SA on the kiosk system, neither inmates nor officers/supervisors were aware of it.  A physical examination of a Housing Unit kiosk revealed that the SA is actually available there. However, in December, one inmate requested through a program request, a copy of the Settlement Agreement. The response from the responding staff was that they did not have a copy of it.

**POLICY AND PROCEDURE REVIEW**

130.    The County must review all existing policies and procedures to ensure their compliance with the substantive terms of this Agreement.  Where the Jail does not have a policy or procedure in place that complies with the terms of this Agreement, the County must draft such a policy or procedure, or revise its existing policy or procedure.

**Partial Compliance**

An initial attempt to draft policies and procedures was made in early 2017. The Monitoring Team and DOJ provided comments but the policies really needed to be rewritten.  The plan to hire outside consultants fell through and there was no apparent progress. Since that time, Jail staff has been working with Karen Albert retained through the Monitoring Team to develop policies and procedures. A number of draft policies have been provided and at this time, 36

policies have been approved and all 36 have been signed. It does not appear that there is a system in the policy development process to incorporate requirements of the Settlement Agreement. There are some concrete requirements in the Settlement Agreement that could be addressed in the draft policies that get missed. A systematic approach to incorporating Settlement Agreement requirements in the draft policies would be valuable. As noted above, there is the additional concern about the actual implementation of policies that have been adopted. The process of policy development has been slower than satisfactory and there is still a major concern that even once adopted officers are not being trained on the policies and the policies are not being implemented.

131. The County shall complete its policy and procedure review and revision within six months of the Effective Date of this Agreement.

**Non-Compliant**

Thirty-six policies and procedures have now been approved and several others have been drafted and circulated. There are many outstanding policies to be written but progress is being made. This does not meet the deadline set by this provision.

132.    Once the County reviews and revises its policies and procedures, the County must provide a copy of its policies and procedures to the United States and the Monitor for review and comment.  The County must address all comments and make any changes requested by the United States or the Monitor within thirty (30) days after receiving the comments and resubmit the policies and procedures to the United States and Monitor for review.

**Partial Compliance**

Draft policies are being provided to DOJ and the Monitor for review. As noted above, many policies still have to be written.

133.    No later than three months after the United States' approval of each policy and procedure, the County must adopt and begin implementing the policy and procedure, while also modifying all post orders, job descriptions, training materials, and performance evaluation instruments in a manner consistent with the policies and procedures.

**Non-Compliant**

In addition to completing the development of policies, this paragraph also requires that all the steps necessary to appropriately implement the new policies be undertaken. Not all policies have been developed and training has not been completed on the ones that have been adopted. The training process for the new policies will require extensive effort to develop training materials and provide training to all staff. Although training is hampered by COVID and understaffing, it is concerning that some supervisors seem unfamiliar with the requirements of newly adopted

policies or disinclined to ensure those policy requirements are implemented even those adopted long before COVID began.

134.    Unless otherwise agreed to by the parties, all new or revised policies and procedures must be implemented within six months of the United States' approval of the policy or procedure.

**Partial Compliance**
There have been thirty-six policies approved by DOJ and all thirty-six adopted. It does not appear that the policies have been fully incorporated into the training curriculum and some of the procedures have not yet been implemented. Most importantly, there are many policies yet to be drafted.

135.    The County must annually review its policies and procedures, revising them as necessary. Any revisions to the policies and procedures must be submitted to the United States and the Monitor for approval in accordance with paragraphs 129-131 above.

**Non-Compliant**
This paragraph is now carried as non-compliant instead of not applicable because under the timeline established by the consent decree an annual review would now be due.

**COUNTY ASSESSMENT AND COMPLIANCE COORDINATOR**

Paragraphs 136 through 158 on Monitor duties omitted.

159. The County must file a self-assessment compliance report.  The first compliance self-assessment report must be filed with the Court within four months of the Effective Date and at least one month before a Monitor site visit.  Each self-assessment compliance report must describe in detail the actions the County has taken during the reporting period to implement this Agreement and must make specific reference to the Agreement provisions being implemented. The report must include information supporting the County's representations regarding its compliance with the Agreement such as quality assurance information, trends, statistical data, and remedial activities.  Supporting information should be based on reports or data routinely collected as part of the audit and quality assurance activities required by this Agreement (e.g., incident, use of force, system, maintenance, and early intervention), rather than generated only to support representations made in the self-assessment.

**Non-Compliant**
At the time of the October 2017 site visit, the County provided its first self-assessment. The self-assessment was not provided prior to the May 2018 site visit. A self-assessment was provided the

week prior to the September 2018 site visit. The assessment was a significant step forward but did not include the level of detail required by this paragraph. A self-assessment was not provided prior to the January, May, or September, 2019 or the January, June or October 2020 or February, 2021, June 2021or October site visit or January 2022 site visit. This paragraph is now carried as Non-Compliant based on this history. It should be noted that this requirement is not intended to be merely a bureaucratic requirement. Internal tracking of the Settlement Agreement requirements, remedial efforts, and progress towards the goals is a useful, if not essential, strategy in achieving compliance. The County has provided a self-assessment of the requirements of the Stipulated Order. However, this provision of the Settlement Agreement requires a self-assessment of compliance with the requirements of the entire Settlement Agreement.

160.    The County must designate a full-time Compliance Coordinator to coordinate compliance activities required by this Agreement.  This person will serve as a primary point of contact for the Monitor.  Two years after the Effective Date of this Agreement, the Parties may consult with each other and the Monitor to determine whether the Compliance Coordinator's hours may be reduced.  The Parties may then stipulate to any agreed reduction in hours.

**Sustained Compliance**
The County has designated a full-time Compliance Coordinator who is coordinating compliance activities.

## EMERGENT CONDITIONS

161. The County must notify the Monitor and United States of any prisoner death, riot, escape, injury requiring hospitalization, or over-detention of a prisoner (i.e. failure to release a prisoner before 11:59 PM on the day she or he was entitled to be released), within 3 days of learning of the event.

**Partial Compliance**
Immediate notifications are being provided. Recently, the immediate notifications have not been uploaded in a timely fashion. This process has improved recently. However, because incident reports are not completed for over-detention, these have not been provided in immediate notifications.

Paragraphs 162-167 regarding jurisdiction, construction and the PLRA omitted.

**Attachment A**

**ESTIMATED STAFF QMHP HOURS/WEEK**
**REQUIRED TO BE IN COMPLIANCE**
**WITH THE PROVISIONS OF THE SETTLEMENT AGREEMENT** (1) (2)

Initial Mental Health Assessments:
- New/initial assessment (3)                                       25 hours
- Repeated attempts at an assessment (4)                           10 hours

Treatment Planning:
- Initial treatment plan (5)                                       12 hours
- Treatment plan review (6)                                         8 hours

Therapeutic Sessions:
- Scheduled individual therapy sessions (7)                        87 hours
- Group therapy sessions (8)                                        6 hours
- Emergency and urgent, non-scheduled sessions (9)                 10 hours

Suicide Watch: (10)
- Suicide assessments                                              3 hours
- Daily monitoring of those on suicide watch                      10 hours

Monitoring All Detainees in Segregation: (11)
- Weekly mental health rounds                                      3 hours
- Address concerns with security staff                            1 hour

Administrative:
- Maintain and review tracking logs (12)                          2 hours
- Meetings (13)                                                    2 hours

TOTAL HOURS                                                      179  hours
(2,14)

FOOTNOTES:

1. This should be viewed as a modest estimate of hours, in that it is based on the minimum amount of time required to complete each task, it does not include time required to move within and between each facility (i.e., RDC and WC), and it does not include various things that can disrupt a QMHP's schedule (for example, a particularly agitated or distressed detainee who might require additional time, delays caused by a failure by security staff to bring a detainee to medical in a timely manner, delays caused by a disturbance on a unit when the QMHP is trying to see someone on the unit, etc., etc.)

2. This estimate does NOT include functions/tasks that are not currently being performed by QMHPs, but will eventually need to be performed in order to achieve full compliance with the settlement agreement.  More specifically, when the facility's disciplinary review process becomes fully operational, in connection with disciplinary proceedings QMHPs will be expected to perform mental health assessments on detainees on the mental health caseload who are charged with disciplinary infractions (as well as those who are not on the mental health caseload, when security staff suspect that the detainee has mental health difficulties), and opine on a range of issues (for example, their competency to participate in a disciplinary hearing, to what extent their misbehavior should be considered a product of their mental illness, and the appropriateness of various possible responses/interventions, including alterations in their treatment plan and other punishments that they might qualify for).  Even more significantly, this estimate does not include the QMHP staff hours required to operate the mental health unit, once it is opened.

3. There are approximately 25 new/initial mental health assessments performed each week, including detainees identified as possibly in need of mental health services at intake, and detainees later so identified and referred to mental health by medical staff, security staff or self-referred.  Although for the purpose of this analysis it is estimated that in most cases, completing the assessment and the assessment report that becomes a part of the detainee's electronic medical records (EMR) will take 1 hour, the assessment of a severely acutely ill detainee will likely take much longer.

4. Some detainees initially refuse to undergo an initial mental health assessment, and multiple repeated attempts to perform the assessment are often required in order to complete it.  Staff have estimated that they spend about 10 hours/week on this effort.

5. An initial treatment plan must be developed for each of the 25 detainees assessed and added to the mental health caseload each week.  The treatment plan is a document kept in the detainee's EMR.

6. Treatment plans are to be reviewed every 3 months, and revised when indicated.  The estimate of 8 hours per week is based on the fact that there are over 200 detainees on the

mental health caseload, which would mean that on average, 17 treatment plans would need to be reviewed and updated each week.

7. As noted above, there are 200 detainees on the mental health caseload; about 75% (150 detainees) are considered to be 'seriously mentally ill' (SMI); and such SMI detainees are to receive one face-to-face, individual therapeutic session each week.  Allowing 30 minutes for each such individual session and the entering of a note in the detainee's EMR, this would take 75 hours/week.  The other 25% of detainees on the mental health caseload (50 detainees) are seen as needed; for the purpose of this analysis, we have estimated that they are seen every 2 weeks; and this would require 12 hours/week (also allowing 30 minutes for the session and the EMR note).  Again, the total of 87 hours/week allowed for individual, face-to-face therapeutic sessions is a modest estimate, given that many detainees will require longer sessions, many detainees will require more frequent sessions (especially when in crisis), and various things occur that delay the provision of this service or require that a scheduled service be rescheduled.

8. There is also supposed to be a group therapy program at the facility.  As noted in many of the monitor's reports, mental health staff have identified a range of therapeutic, support and psychoeducational groups that they see as required to meet the needs of detainees on the mental health caseload.  Therefore, the estimate of 6 hours is an extremely modest estimate for the group therapy program, in that it estimates only 3 1-hour groups each week, with 1 hour of preparation/development time for each group session.  At best, this would mean that only 30 of the more than 200 detainees on the mental health caseload could participate in a group therapy session each week.  Given the number of detainees on the mental health caseload who might benefit from the range of groups envisioned by staff, it is hoped that the group therapy program could expand significantly once there are more staff available.

9. In addition to scheduled individual and group therapy sessions, QMHPs have unplanned emergency and urgent sessions.  The QMHPs might identify a detainee who needs an extra session due to some acute difficulty, or a detainee might be referred to them on an emergency or urgent basis by medical staff or security staff, or a detainee might self-refer on an emergency or urgent basis.  The estimate of 10 hours for this activity was provided by the QMHPs and confirmed by a review of the sick call log.

10. The number of detainees on suicide watch each week is highly variable, and can range from 1-7 detainees.  For the purpose of this analysis, I am estimating 3 detainees on suicide watch each week (the average, based on a review of the suicide watch data), which would mean 3 hours spent performing initial suicide assessments, and about 10 hours for the daily monitoring of each of the 3 detainees on suicide watch (0.5 hours/detainee/day).  As with all of the other clinical tasks performed by QMHPs, the performance of these tasks and clinical findings are documented in the detainee's EMR.

11. Mental health rounds are performed on ALL detainees being held in segregation on a weekly basis. Although the QMHPs estimate that this takes about 3 hours/week, this doesn't really take into consideration the fact that they must travel to several units within each facility to accomplish this task. Once these rounds are completed, the QMHPs attempt to share any concerns identified with appropriate security staff.

12. The QMHP/Mental Health Coordinator is also responsible for the maintenance of various tracking logs, as well as the weekly review of these logs in an effort to perform an internal assessment of compliance with the provisions of the agreement.

13. Administrative meetings include, but are not limited to the weekly Interdisciplinary Team Meeting (which involves security staff, medical staff and mental health staff) and the weekly mental health team meeting. The estimate of 2 hours for these meetings is extremely modest since all of the QMHPs (not just one QMHP) would be attending these meetings.

14. Again, it is important to note that this estimate of QMHP work hours/week does NOT include functions/tasks that are not currently being performed by QMHPs, but will eventually need to be performed in order to achieve full compliance with the settlement agreement (see footnote #2). Once the mental health unit opens/becomes operational, it will house the most severely acutely ill inmates (most of whom are non-compliant with treatment and currently housed in segregation) and some of the more chronically ill inmates that cannot safely be housed on a general population unit (due to their compromised ability to fully control their behavior, and/or due to their vulnerability to being abused by other, more high functioning detainees). An intensive treatment program has been designed to meet the needs of this most difficult to manage and treat detainee population, all of whom require a very individualized approach to treatment. Therefore at minimum, 1 additional QMHP will be required to adequately staff the mental health unit (although each of the QMHPs may provide different clinical services on the mental health unit, at least 1 additional QMHP will be required to ensure that there is always a clinical staff person on the unit while the rest of the mental health staff continue to perform all of the other duties noted above).