

_____

No. 3:16-CV-489-CWR-RHWR

UNITED STATES OF AMERICA,

*Plaintiff,*

*v.*

HINDS COUNTY, ET AL.

*Defendants.*

_____

ORDER AMENDING CONSENT DECREE

_____

Before CARLTON W. REEVES, *District Judge.*

When this case started in 2016, it held some promise for improving the basic conditions of confinement at Hinds County's Raymond Detention Center (RDC). Conditions then were miserable; violence was endemic. A United States Department of Justice investigation the prior year found that the facility had experienced "at least three major riots, two alleged homicides, and numerous assaults on prisoners and staff members." Docket No. 3-3 at 2.

In the intervening six years, the County has made a few changes to attempt to bring the facility up to minimum constitutional standards. It fixed some door locks. It has approved (but not implemented) a 5% raise for correctional officers. It says it is working on cameras and other problems, like trash dumpster cells.

The underlying fundamentals, though, are unchanged. Staffing levels, perhaps the most critical and consistent problem over the years, are now at an all-time low. Violence remains endemic: the facility is averaging 20 assaults a month, while it experienced an unprecedented seven in-custody deaths in 2021. And in January 2022—the same month the County said the Consent Decree should be *terminated*—mental health staff discovered two inmates, covered in feces and sores, who had suffered "considerable weight loss" since their last well-being check. PX-106 at 5. The problem was caused by staff ceding control of some living units to gangs, who mistreated vulnerable detainees by denying them food and showers.

There will be consequences for the County's inaction. This Order, however, is focused solely on the County's motion to terminate or modify the Consent Decree under the Prison Litigation Reform Act (PLRA).

After a lengthy evidentiary hearing and a comprehensive review of the constitutional minimums, the Court finds that ongoing constitutional violations require a limited number of provisions of the Consent Decree to remain in place. At the same time, the County's alternative request—for the Consent Decree to be dramatically scaled back—is also due to be granted.

What follows sets out the provisions of the Consent Decree that shall remain, those that shall be deleted, and the reasons for those decisions.

### I.       Factual and Procedural History

### A.       The Political Landscape

RDC opened in 1994 under Sheriff Malcolm McMillin. He had been elected in 1991, replacing J.D. McAdory, who had served as Sheriff since 1972. Leah Rupp, *In the Limelight Again*, Clarion-Ledger (Nov. 18, 2007). McMillin, like McAdory, would remain in office for 20 years. *Id.*

The 2011 election saw the beginning of a series of one-term Sheriffs. That year, Tyrone Lewis unseated McMillin. *Former Hinds County Sheriff Malcolm McMillin dies*, WJTV (Dec. 22, 2016).[1] Four years later, the voters replaced Lewis with Victor Mason. Jimmie E. Gates, *Hinds to settle feds' OT case*, Clarion-Ledger (Dec. 28, 2016). In 2019 the voters rejected Mason after only one term, this time in favor of Lee Vance. Jimmie E. Gates, *Lee Vance defeats incumbent Hinds Sheriff Victor Mason in Democratic runoff*, Clarion-Ledger (Aug. 27, 2019). Sadly, Vance did not complete his term. He died on August 3, 2021. Therese Apel, *Sheriff Lee Vance Passes Away After A Medical Emergency At Home*, Darkhorse Press (Aug. 4, 2021).

The Hinds County Board of Supervisors appointed Marshand Crisler to be Interim Sheriff. *Marshand Crisler named interim Hinds County Sheriff*, Jackson Advocate (Aug. 16, 2021). A

---

[1] As Sheriff McMillin explained in testimony before the Department of Justice, Office of Justice Programs, the voters "turned him out to pasture." Review Panel on Prison Rape, Hearings on Rape and Sexual Misconduct in U.S. Jails 447 (Sept. 16, 2011) [hereinafter OJP Testimony].

special election was then held on November 2. Thirteen candidates offered themselves to the voters. Brendan Hall, *Meet the Hinds County Sheriff candidates before casting your vote on Nov. 2*, WLBT (Oct. 30, 2021). When no candidate drew a majority of voters' support, a runoff was necessary between the top two candidates: Crisler and Tyree Jones, who was part of Vance's command staff.

The runoff election was held on November 23. Tyree Jones won. He was sworn into office on December 3, 2021 and presently serves as Hinds County Sheriff.

Like the Sheriff's Office, in the 27 years that RDC has existed, there has been turnover in the Board of Supervisors and the Board's top staff position. None of the current members of the Board were Supervisors when RDC opened. Only two current board members, Robert Graham and Bobby "Bobcat" McGowan, were Supervisors in 2014, when the U.S. Department of Justice notified Hinds County that it was "commencing an investigation into conditions of confinement at the Hinds County Detention Center." Docket No. 3-1. Graham and McGowan were also the only two sitting Supervisors in office when this action was filed on June 23, 2016.

### B.      The Conditions of Confinement

"There is a long tradition of professional excoriation of jail conditions." Margo Schlanger, *Inmate Litigation*, 116 Harv. L. Rev. 1555, 1686 n.434 (2003). Experts have called jails "the worst blight in American corrections." *Id.* (citation omitted). They are "more dangerous" and "more chaotic" than prisons, with less regular routines, more idle time, and detainees who are more likely to be experiencing a crisis. *Id.* at 1686-87.

4

The Supreme Court summed up jails as "generally deplorable" institutions that can have a "destructive effect on human character." *Barker v. Wingo*, 407 U.S. 514, 520 (1972). "The time spent in jail is simply dead time." *Id.* at 532-33.

RDC in particular has been troubled since it opened. As one writer explained, since its inception, "the jail designed to improve conditions for detainees has faced a myriad of problems: structural deficiencies, chronic understaffing and poor management. But fixing those problems ha[s] been elusive under whatever sheriff and Hinds County Board of Supervisors are in elected office at a given time." Kayode Crown, *One Jail's Tale: Hinds County Detention Center At Risk Of Federal Takeover*, Miss. Free Press (Oct. 15, 2021).

Captain Diane Riley testified shortly after RDC's opening that "the new jail's doors were inadequate to provide security." *Dean v. Thomas*, 933 F. Supp. 600, 608 (S.D. Miss. 1996). That is, the cell doors failed to lock. Nearly three decades later, the cell doors still fail to lock. *See* Docket No. 94 at 4 [hereinafter Fourteenth Monitoring Report]; *see also* Ruth Ingram, *Year after riot, cell doors at Hinds County jail still don't lock*, Clarion-Ledger (July 23, 2013); Ruth Ingram, *Officials: 'Antsy' juvenile inmates flood area at Hinds jail in Raymond*, Clarion-Ledger (July 19, 2013) ("We have doors with no locks," the Sheriff's spokesman candidly admitted.); Docket No. 31 at 20 ("the Jail continues to lack even the most basic security and safety features, such as lockable cell doors . . . ."); Docket No. 60 at 4 ("At RDC, doors and locks are broken. Prisoners can break out of their

5

cells, break out of their housing units and even enter a jail control room.").[2]

A significant riot in 2012 brought the facility's problems to the forefront. "[P]risoners destroyed fixtures and walls, sprayed water hoses and fire extinguishers, and left ceilings in shambles," the State's newspaper of record reported. Ruth Ingram, *Jail getting repairs; much more needed*, Clarion-Ledger (Nov. 7, 2012). "It's no secret that the door locks need to be replaced," Chief Deputy Chris Picou added. "I don't know that the jail has ever been up to industry standards." *Id.*

A series of escapes in 2012 and 2013 shed additional light upon the conditions at the jail. *See* Ruth Ingram, *Escape draws attention to jail, policies*, Clarion-Ledger (Apr. 22, 2013) ("Escapes this year and last have been blamed on faulty locks and security for jail and cell doors. The county last year ordered

---

[2] The faulty locks have cost the County dearly. In one case, it was reported that Hinds County "agreed to pay . . . inmate Michael Burnley[] $3 million after another inmate jimmied open a cell door and attacked Burnley, leaving him paralyzed. . . . The county has spent at least $13 million on repairs since." Heather Civil, *Jail Conditions*, Clarion-Ledger (Aug. 15, 2008). In the lawsuit, Sheriff McMillin admitted that the locks were faulty and had been an ongoing problem. A member of the Board of Supervisors, meanwhile, explained that the settlement "was about the best deal" the County was likely to get, and he did not know "where the financially strapped county was going to get the money" to pay the settlement. *Mississippi Jail Prisoner Wins $3,000,000 in Failure to Protect Suit*, Prison Legal News (Aug. 2008) (brackets omitted). There have been many lawsuits. *See, e.g., Lewis v. Hinds County*, No. 3:14-CV-450-TSL-JCG (S.D. Miss. June 6, 2014); *Bennett v. Hinds County*, No. 3:14-CV-753-DPJ-FKB (S.D. Miss. Sept. 25, 2014*); Veal v. Hinds County*, No. 3:19-CV-485-CWR-FKB (S.D. Miss. July 10, 2019); *Cleveland v. Hinds County*, No. 3:19-CV-486-CWR-FKB (S.D. Miss. July 10, 2019). The suits keep coming. *See Richardson v. Hinds County*, No. 3:22-CV-41-DPJ-FKB (S.D. Miss. Jan. 28, 2022).

emergency repairs in April on doors that had been problematic and a security risk since the facility opened in 1994."). Sheriff Lewis, who had commissioned a 500-page report on the previous administration, blamed the escapes on "malfunctioning doors and conditions at the aging facility." Monique Valeris, *Lewis says he's not pointing blame at McMillin*, WAPT (Aug. 8, 2012).

In 2013, Hinds County Circuit Judge Tomie Green convened a special grand jury to investigate conditions at RDC. The reporting this time centered on safety concerns:

> On Sunday, a SWAT team stormed the facility after a dozen inmates broke out of their cells, in part because of faulty locks. Last week, a group of juveniles flooded a portion of the jail by turning on a fire hydrant. Reports also surfaced that several inmates were stabbed and a number of deputies and jailers sustained minor injuries. In June, one inmate died and another was hurt in a string of violent episodes that also left three deputies with injuries.

Emily Le Coz, *Grand jury probes Hinds jail issues*, Clarion-Ledger (July 26, 2013). The grand jury concluded that RDC was "in a deplorable condition and inadequately staffed." Docket No. 3-4 at 5.

In 2014 and 2015, the U.S. Department of Justice's Civil Rights Division investigated conditions at RDC and the two other facilities that comprise Hinds County's jail system: the Work Center and the downtown jail. Docket No. 3-1. It concluded that the County was violating the Eighth and Fourteenth Amendments by, among other things described in its 29-page

report, failing to provide "minimum levels of protection from violence," failing to have "sufficient numbers of trained staff," and incarcerating persons "beyond their court-ordered release dates." Docket No. 3-3 at 2-3. The problems had resulted in "at least three major riots, two alleged homicides, and numerous assaults on prisoners and staff members." *Id.* at 2. The Findings Letter led the Mississippi Department of Corrections to remove state inmates from RDC. *State inmates removed from troubled jail in Hinds County*, Corrections 1 (May 27, 2015). "[W]e believe removing the state inmates is in the best interest of the State of Mississippi and the inmates," said State Corrections Commissioner Marshall Fisher. *Id.*

The Department of Justice filed this lawsuit in 2016. Its complaint described an inability to meet minimum constitutional standards with respect to detainee-on-detainee violence, staff-on-detainee violence, "dangerously low staffing levels," jail policies and procedures, housing and classification systems, the physical plant, internal investigations, detention of persons who should have been released, and the treatment of juvenile and suicidal detainees. Docket No. 1 at 3-5. The Department alleged that the constitutional violations "have been obvious and known to Defendants for a substantial period of time." *Id.* at 5. The Attorney General herself signed the complaint. *Id.* at 7, 10.

The parties immediately entered into a Consent Decree. Docket Nos. 3; 8-1. In particular, the County agreed that the Consent Decree addressed the litany of constitutional violations alleged by the United States. Docket No. 8-1 at 4. The Consent Decree required Hinds County to implement dozens of minimal constitutional standards. Hinds County expressly agreed that the Consent Decree was "narrowly drawn,

extends no further than necessary to correct the violations of federal rights," and "is the least intrusive means necessary to correct these violations." *Id*. at 61. That is the standard required by the PLRA.

A Monitoring Team was also established. *Id.* at 54; *see also* Docket No. 10; *Gates v. Collier*, 501 F.2d 1291, 1321 (5th Cir. 1974). It includes lead Monitor Elizabeth Simpson, David Parrish, Jim Moeser, and Dr. Richard Dudley. They are subject-matter experts in corrections, corrections operations, juvenile justice, and corrections mental health, respectively. The Monitor and her team began to provide technical assistance, conduct regular site visits, and serve as the eyes and ears of the Court[3] as the parties attempted to meet the requirements of the Consent Decree.

Hinds County's efforts have borne fruit at one of its jails—the Work Center.[4] The Monitoring Team describes the Work Center as a functional jail for the citizens of Hinds County. *See, e.g.*, Fourteenth Monitoring Report at 29. This Court's own visits to the County's jail facilities, in 2019 and 2022, confirm that something about the Work Center's culture is effective; it largely operates as a jail should.

The story is not the same for RDC.

---

[3] The Consent Decree and Monitoring Team were approved by U.S. District Judge William H. Barbour, Jr. The case was transferred to the undersigned in December 2018 upon Judge Barbour taking senior status. Immediately upon being assigned the case, this Court held a status conference and "received an update as to the progress toward compliance with the Consent Agreement from the parties and the Court Appointed Monitor." *See* Minute Entry of Jan. 15, 2019.

[4] Hinds County's third facility, the downtown jail, was closed in 2020.

In 2019, the Department of Justice filed a Motion for an Order to Show Cause outlining a litany of ongoing constitutional violations at RDC. Docket No. 31. It described the County's "continued failure to comply with nearly all provisions of the Settlement, including provisions regarding security, medical screening, suicide prevention, mental health care, youth services, fire safety, sanitary conditions, and release procedures." *Id.* at 5. As any elementary school child understands, the County was flunking, miserably. The result was rioting, stabbings, a murder, staff-on-detainee assaults, and a "major disturbance" during a Monitoring Team site visit that resulted in eight emergency room transports. *Id.* at 7-8, 14. The Department added that the situation on the ground was "likely worse" than it could adequately summarize because of poor record-keeping at RDC. *Id.* at 8.

The parties again avoided significant litigation by agreeing to a Stipulated Order. *See* Docket Nos. 60 and 60-1; *accord Plata v. Schwarzenegger*, 603 F.3d 1088, 1091 (9th Cir. 2010). This Court begrudgingly approved their agreement even though the County had reached sustained compliance "in only one of the 92 requirements of the Consent Decree." Docket No. 60 at 7. "While a finding of contempt is warranted," the undersigned wrote, "the parties' stipulated order outlines what is perhaps the most comprehensive remedial plan for Hinds County to become compliant that the Court has seen from the parties." *Id.* at 11. "Ten months from today, the County should have made significant progress on developing and implementing policies, making repairs to the physical plant and ensuring incarcerated youth have necessary programming, among other necessary investments." *Id.* Monitoring continued; periodic status conferences were held. The facility limped along into the present.

The situation deteriorated significantly in 2021. The Four-teenth Monitoring Report explains:

> There were a record number of fights and as-saults at RDC in May [2021], there continue to be fires set by inmates, there is an extremely large amount of contraband in the facility in-cluding drugs, there have been a number of overdoses although no deaths from those over-doses, and there have been three deaths, two by suicide. Although there is some cause for opti-mism with the new Detention Administrator being hired, **this is a very disturbing trend.**

Fourteenth Monitoring Report at 3 (emphasis added). The sit-uation became more uncertain when Sheriff Vance, the elected official with primary responsibility for RDC,[5] passed away unexpectedly on August 3, 2021.

### C.   The 2021 Death Toll

On October 18, 2021, RDC experienced its sixth death of the year. The Monitoring Team filed an emergency report on Oc-tober 27 characterizing the pattern of deaths as "especially alarming." Docket No. 96 at 2 [hereinafter October 27 Emer-gency Monitoring Report].

A brief summary of each death is provided here.

The first death, on March 19, 2021, happened when a nurse ordered an arrestee to be taken to the hospital and no one car-ried out her order. *Id.* at 2. The arrestee subsequently

---

[5] As Sheriff McMillin explained at his OJP testimony, "I am, as Sheriff, responsible for safely operating the correctional facilities in Hinds County and take that responsibility seriously." OJP Testimony at 445.

collapsed. An oxygen concentrator was obtained but would not turn on because the electrical outlet was faulty. Someone ran to get an AED unit from Medical, but the AED unit had no pads. The arrestee died. RDC staff then "took the position that he was not an inmate because he had not been accepted/booked." *Id.* An after-action report has not been completed for this death.[6]

The second death, on April 18, was a suicide by a detainee being housed in a booking cell, a practice "that the Monitoring Team has repeatedly stated should not be done and is contrary to the Settlement Agreement." *Id.* The Officer who discovered the body could not enter the unit because he lacked keys, and the Officer who was supposed to be on duty at booking was not at his post. "The last documented well-being check was made at 1105, more than three hours before the incident." *Id.* No after-action report was completed.

The third death occurred on July 6. It was another death by hanging—although the available record is silent on whether it was a suicide. The Officer charged with performing 30-minute head counts "left the unit" for unknown reasons. *Id.* at 3. When he returned to look in, he did so from a vantage point "from where he could not possibly see each inmate to conduct an accurate count." *Id.* No after-action report was completed.

Death number four was a drug overdose on August 3. "An IAD [Internal Affairs] investigation is still underway, but inmates on the unit reported that they had been calling for

---

[6] An after-action report is a way for officials and monitors to "gather facts, identify problems, examine staff performance, and develop a plan to prevent future" major disturbances. *Depriest v. Walnut Grove Corr. Auth.*, No. 3:10-CV-663-CWR-FKB, 2015 WL 3795020, at *11 (S.D. Miss. June 10, 2015).

assistance for five hours and that there had been no response to their cries for help." *Id.* The condition of the body indicated that the detainee had been dead for some time when he was discovered. No after-action report has been completed.

The fifth death occurred the next day, when a detainee died in the hospital from COVID complications. "Although the death appears to be medically related," the Monitoring Team wrote, "there are questions regarding when his symptoms first appeared and whether they were timely and adequately responded to as well as . . . the adequacy of the precautions being taken by the Jail to prevent the spread of the virus." *Id.* No investigation into his death was conducted.

The sixth death, on October 18, was an assault in a unit where the doors do not lock and staff supervision is "minimal." *Id.* The Monitors' description relayed the following:

> At about 0430 or 0500 in the morning, video footage showed the inmate being hit in the head by another inmate. A third inmate then stomped on his head several times. He was then dragged across the mezzanine. The video footage shows brief movement by the decedent and then none indicating that he was probably dead at that point but a time of death has not been established. He was eventually dragged back and propped in a sitting position and then later laid on a mat. He was not discovered by officers until 1:45, almost 9 hours later.

*Id.* at 3-4.

The Monitoring Team concluded its Emergency Report with a recommendation "that the Court set a status

conference/hearing to address immediate measures that need to be taken to address the concerns raised above and prevent the future loss of life." *Id.* at 5.

On November 10, the Jail Administrator submitted her letter of resignation. She described "a distinct lack of support" and relayed in detail a recent directive from the Interim Sheriff that she found "reckless and dangerous." She had served for a total of only five months before submitting her letter of resignation.

On November 23, 2021, concerned by the string of deaths and the Jail Administrator's resignation, this Court issued an Order to Show Cause directing the County to explain why it should not be held in contempt of court and why a receivership should not be imposed to run RDC.

In the County's response to the Order to Show Cause, it explained that there was actually a seventh in-custody death in 2021, one related to a medical issue. The County then begged this Court to delay its decision on contempt until July 1, 2022, so that it could continue "turning the RDC battleship towards a new and better heading." Docket No. 105 at 1.

Instead of turning the battleship around, the County and its new attorneys decided to just abandon ship. Hinds County filed a motion to terminate the Consent Decree pursuant to the PLRA on January 21, 2022. Docket No. 111.

On February 4, 2022, the Court issued its First Order of Contempt. It found that Hinds County was patently non-compliant with more than two dozen provisions of the Consent Decree. A remedy was withheld pending further proceedings.

14

The Court held the Evidentiary Hearing regarding its Order to Show Cause and the County's PLRA motion to terminate from February 14 to March 1, 2022.

On March 23, 2022, the Court issued its Second Order of Contempt. The Order found that the condition of A-Pod was unsafe and unsuitable for human habitation.

This Order followed.

## II.      February 2022 Evidentiary Hearing

The County's approach to the February 2022 Evidentiary Hearing is best described as the "Blame Game." The game works like this: simply blame your predecessor for everything wrong with RDC.

For example, the defendants argued that the Consent Decree should be terminated because Sheriff Tyree Jones just recently took office. He was elected on November 23, 2021, the date this Court issued its Order to Show Cause, and was sworn in on December 3, 2021.

Though new to the role of Sheriff, Tyree Jones previously served as a key member of Sheriff Lee Vance's command staff—as Captain of the Criminal Investigation Division, an area that has been and still is at issue in the Consent Decree. *See* Tr. vol. 10 at 1964, 1971. The Sheriff's campaign, meanwhile, was predicated in part on him being the natural successor to his friend and mentor, Sheriff Vance. The notion that the County has turned a page with new leadership, therefore, is unworthy of credence. The same system is producing the same outcomes.

The County made a similar feint with its Administrators. Over the course of the Consent Decree, the role of County

Administrator has been held by Carmen Davis, Jennifer Riley-Collins, Scherrie Prince, and now Kenny Wayne Jones. Tr. vol. 8 at 1359. Except for Jones, each Administrator was hired and then fired by the Board of Supervisors. Apparently, Jones maintains the confidence of at least three board members. But, as the evidence shows, that can change at any time. Each Administrator promises that the Consent Decree is a priority while they serve, and the Court readily credits their good faith. When each Administrator moves on, though, the County besmirches their work as inadequate.

It does not end there. The same goes for the Board of Supervisors. Board President Credell Calhoun testified,

> Let me just say this: We've been in office for two years. We've been working overtime at that facility as a Board. We've spent over $4 million in the last two years trying — that's as much as they've spent over the last six years —well, the four years prior to that. So we're not kicking the can down the road with this Board.

Tr. vol. 9 at 1730. But when asked how long he had served on the Board, he counted he and his wife's tenure jointly, claiming "I did replace her. She served 28. I've served two. That's 30 together." Tr. vol. 8 at 1734. In other words, his family's tenure on the Board of Supervisors eclipses the very existence of RDC. Even then, his own wife's legacy was not too precious to be underbused: when asked whether his wife's decision to approve the Consent Decree was error, Supervisor Calhoun agreed, stating "well, to bring into compliance, it wasn't possible." *Id.*

16

The finger-pointing does not end with the Board of Supervisors, either. The witnesses for the County and the Sheriff pitched blame at their Compliance Officer, Tr. vol. 10 at 1811, 1820, 1882; their prior counsel, Tr. vols. 9 at 1737; 11 at 2160-61; and even the Monitoring Team, Tr. vols. 9 at 1604; 10 at 1963,[7] to the point of accusing one of the members of the Monitoring Team of engaging in conduct that the Sheriff "considered unlawful and unethical."

As one member of the Monitoring Team testified about the frequent leadership changes, "every time we look at what is going to be done, it's – we're a new broom, we're just starting and that's why we're here. So I have problems with an expectation that suddenly everything is going to turn around." Tr. vol. 2 at 235.

The County's refusal to take responsibility during the February 2022 Evidentiary Hearing is concerning to the Court. It is not reasonable to suggest that the constitutional violations at issue in the Consent Decree are absolved by mere changes in leadership. *See Oliver v. Gusman*, No. 18-7845, 2020 U.S. Dist. LEXIS 47478, at *12 (E.D. La. Mar. 18, 2020).

This applies to all leadership changes, which happen all too frequently in this case. One prime example, on which the parties focused during the evidentiary hearing, is the departure of Major Kathryn Bryan. Once the County's hero, Major Bryan is now the County's scapegoat.

In summer 2021, the County hired Major Bryan to serve as Jail Administrator. At a status conference following her hiring,

---

[7] Sheriff Jones objected that "half of the things Ms. Simpson brought to the table, I'd never heard before," Tr. vol. 9 at 1604; however, Sheriff Jones admitted that he does not read the monitoring reports himself. *Id.* at 1633.

counsel for the County declared that Major Bryan "comes with a wealth of information" and that "[t]he sheriff has 1,000 percent faith and trust in her." Docket No. 93 at 52. The County's attorney went on to state that "now with the addition of Ms. Bryan, I can represent to the Court that things are going to be evolving at a very rapid pace, at a very positive pace, and the safety and security of our inmates and our staff is the number one priority of the sheriff." *Id.* at 67.

Then-Sheriff Vance was even more effusive. Analogizing to basketball, Sheriff Vance expressed his complete backing of Major Bryan, emphasizing that "there's no need in having Michael Jordan on your team if you're not going to let him shoot the ball." *Id.* at 60. The Monitoring Team agreed that Major Bryan was "very well qualified" to serve. Fourteenth Monitoring Report at 3. Her hiring constituted a moment of hope in an otherwise bleak situation.

Tragically, Major Bryan and Sheriff Vance worked together for only a week. Vance died of COVID-19 on August 3, 2021.

Interim Sheriff Crisler's relationship with Major Bryan was apparently less productive, because on November 10, Major Bryan submitted her letter of resignation. She described "a distinct lack of support" and relayed a directive from the Interim Sheriff that she found "reckless and dangerous." She had served for a total of only five months before submitting her letter of resignation. She planned to leave in mid-February 2022.

The parties later learned exactly what Major Bryan found so reckless and dangerous. On November 8, 2021, jail staff at booking decided that an arrestee needed medical attention before he could be accepted into the facility. Major Bryan later

18

testified that her staff was correctly following procedure. Without seeking her input, however, the Interim Sheriff "called the jail . . . and directed them to accept custody" of the arrestee. Tr. vol. 5 at 797. Major Bryan explained that the decision could have resulted in a serious in-custody medical event for the arrestee, as well as considerable unnecessary expense to the County. *Id.*

Unfortunately, the new Sheriff's relationship with Major Bryan was also unproductive. As Major Bryan explained in her testimony, in both the Crisler and Jones' administrations, "I was being circumvented so that they could continue — sheriffs and sheriffs' senior staff could continue to apply law enforcement reasoning, law enforcement remedies to a detention problem, and that never works. It might work by accident once, but that's not a sustainable model for a successful jail." *Id.* at 799.

On January 31, 2022, Sheriff Jones relieved Major Bryan of her duties, telling her to clean out her car and find her own way home. Tr. vol. 4 at 434. He explained at the trial why he had become dissatisfied with her service. *See, e.g.*, Tr. vol. 10 at 1907-08 (testifying that detention officers sleeping on duty and failing to render medical aid to a detainee in crisis "happened under her leadership as the jail administrator, and she knew about it at the time that it happened"). Captain Anthony Simon became the acting Jail Administrator.

The County has now shifted all of its focus to a new Jail Administrator and a new jail, rather than the constitutional violations at hand. But neither of these is a panacea.

Start with the new, supposedly-temporary Jail Administrator—Frank Shaw. Shaw has experience running prisons for

the Illinois Department of Corrections and a private prison company called "Management & Training Corporation" (MTC). Whether he can successfully transform a dysfunctional culture is up for debate.[8] For present purposes, though,

---

[8] On one hand, the County argues that Shaw's leadership skills were blessed by former District Judge Barbour, who presided over the East Mississippi Correctional Facility litigation while Shaw was Warden there. *See Dockery v. Hall*, 443 F. Supp. 3d 726 (S.D. Miss. 2019). On the other hand, we have Shaw's Arizona tenure.

In 2015, while with MTC, Shaw presided over a series of riots at the Kingman Complex in Arizona. Several prison units were rendered uninhabitable and required tactical intervention. More than 1,200 inmates had to be moved to other facilities. As a result, the Governor of Arizona terminated the contract with MTC and the local government experienced a ratings downgrade.

The Arizona Department of Corrections (ADC) conducted an assessment of the riots. It concluded that there was:

- An MTC culture of disorganization, disengagement, and disregard of ADC policies and fundamental inmate management and security principles;

- MTC failure to conduct critical staff training and substantial dilution and compression of contractually mandated staff training, and its withholding of these failures and deficiencies from ADC;

- MTC failure to promptly and effectively quell the riots allowed the inmate rampage and property destruction to continue for many more hours;

- The targeted destruction of MTC property, together with the near absence of destruction of inmate personal property and the absence of inmate-on-inmate violence, strongly suggest that the riots were more likely precipitated by inmate dissatisfaction with

it is enough to say that Shaw is not a jail administrator. He lacks "substantial education, training and experience in the management of a large jail." Docket No. 8-1 at 11. Accordingly, he fails to meet the explicit textual standard in paragraph 38 of the Consent Decree.

After this shortcoming was raised in the February 2022 Evidentiary Hearing, the County backtracked, and assured the Court that Shaw's appointment is temporary, and a national search for a qualified jail administrator is underway. That remains to be seen.

As for the new jail, according to the County's architect for the new facility, Robert Earl Farr, II, Phase 1A will be complete by June 2025. This phase includes 200 beds and all administrative spaces. Tr. vol. 8. at 1554. Phase 1B will be completed by June 2026 and will have (a total of) 600 beds and medical and mental health spaces. *Id.* Phase 2 will be completed January 2028 and have (a total of) 792 beds. Of course, this is all "based on funding streams[.]" Tr. vol. 8. at 1554-55. Ultimately, the project calls for $123 million, which will be raised by an as-of-yet unknown millage increase. *Id.* at 1573.

The new jail to be completed in 2025 cannot credibly solve today's constitutional problems.

First, even were the Court to assume that the County will indeed have the requisite funding streams to complete this project on the timetable provided, its completion is at least three

---

MTC's operation of the prison than by anger among the inmates themselves.

*Arizona State Prison-Kingman Riots Assessment*, "Executive Summary" at 1 (2015).

years away. And even then, it will only have 1/3 of the beds that RDC currently does.

Second, the County's representations are, at this point, of questionable worth.

The undersigned has been involved in this case since December 2018. Since then, the County has made many promises—big and small. For example, tables and chairs. In 2019, the Court urged the County to immediately provide detainees with chairs to sit in and tables on which to eat, asking, rhetorically, "why on earth anyone would have to eat sitting on the floor?" At the next status conference, the then-County Attorney responded as follows:

> I can verify as an officer of the Court, my personal inspection Thursday before last, that what you witnessed in August is no longer occurring. There's appropriate modular furniture, both chairs and tables that was bought[.]

Docket No. 55 at 96.

And yet, the February 2022 Evidentiary Hearing revealed that there are still no tables and chairs in several of the living units. As a result, detainees must eat on the floor or in their cells—the same unlit cells with leaky and clogged toilets. Tr. vol. 8 at 1408.

Such contradictions call into question the County's credibility on many fronts, including its representations regarding construction of the new jail. Indeed, on the campaign trail, Sheriff Jones said:

> Hinds County is in no shape, form, or fashion ready to build a new jail right now. How can we

22

> build a new jail when we can't currently main-
> tain the one we have right now to come from up
> under the consent decree?

Tr. vol. 10 at 1983. The Court agrees.

### III.    PLRA Analysis

Under the Prison Litigation Reform Act, "federal courts may grant or terminate prospective relief in prison litigation, subject to delineated standards." *Ruiz v. United States*, 243 F.3d 941, 943 (5th Cir. 2001) (citing 18 U.S.C. § 3626). Specifically, the PLRA forbids prospective relief "unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). Put another way, the PLRA requires that prison injunctions "be supported by findings and precisely tailored to what is needed to remedy the violation of a federal right." *Miller v. French*, 530 U.S. 327, 347 (2000).

"[A] defendant or intervenor may move to terminate prospective relief that does not meet this standard." *Id.* at 333 (citing 18 U.S.C. § 3626(b)(2)). "The PLRA does not deprive courts of their adjudicatory role, but merely provides a new legal standard for relief and encourages courts to apply that standard promptly." *Id.* at 350.

The Court conducts the PLRA analysis below. It determines, provision-by-provision, which elements of the Consent Decree are necessary, narrowly drawn, and extend no further than necessary to correct ongoing constitutional violations.

### A.     The Work Center

Much of the testimony elicited during the February 2022 evidentiary hearing focused on conditions at RDC; however, the Consent Decree also applies to the Work Center. *See* Docket Nos. 8-1 at 4 ¶ 4; 7 ¶ 16.

The Work Center differs from RDC in several key respects. Unlike RDC, "the [W]ork [C]enter is considered a minimum or low custody facility—because it was designed as a work center." Tr. vol. 1 at 114. Additionally, whereas RDC was designed to operate as a direct supervision facility, *see infra* 45-48, the Work Center was originally not, *see* Tr. vol. 1 at 114.

Ironically, then, while the record indicates that RDC has failed to successfully implement direct supervision, *see infra* 45-48, Sheriff Jones testified that "the work center does work under direct supervision." Tr. vol. 10 at 1989; *see also* Fifteenth Monitoring Report at 3 ("Direct Supervision of all facilities is mandated by the Settlement Agreement, but to date it has only been implemented successfully at the WC.").

Upon review of the complete record, the Court finds that the County's operation of the Work Center meets the constitutional minimum. Among other reasons, the "current attitudes and conduct" of its staff do not amount to deliberate indifference. *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

Unlike at RDC, the Work Center consistently provides detainees with "clean clothes, clean linens." Tr. vol 1 at 105. Mr. Parrish commended the Work Center for its record-keeping, emphasizing "that some of the reports that I read now at the work center are better than anything that I have seen in the past," in that "[t]hey actually reflect what happened." Tr. vol. 1 at 145. The Fifteenth Monitoring Report noted that staff at

24

the Work Center "routinely comply with the standards" for protection from harm, and that the facility "has been training on policies during roll call training," in contrast to RDC. Docket No. 101 at 25. Logs indicate that the Work Center staff "continue to monitor inmates appropriately." *Id.* at 49. And "there is little problem with connecting attorneys with their clients at the [Work Center]," in contrast to the difficulties observed at RDC. *Id.* at 124.

Staff at the Work Center have not "acted or failed to act with deliberate indifference," *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006), to detainees' "constitutional rights," *Whitley v. Hanna*, 726 F.3d 631, 640 (5th Cir. 2013). On the contrary, evidence presented at the February 2022 hearing reinforced the Court's impression that the Work Center serves "as a functional jail for the citizens of Hinds County." Docket No. 100 at 8. The Court therefore holds that the Consent Decree no longer applies to the Work Center.

The Court acknowledges that other evidence suggests that the Work Center should remain a part of the Consent Decree. In its Proposed Findings of Fact and Conclusions of Law, DOJ noted that the "Consent Decree defines the Jail to include . . . the Work Center." Docket No. 138 at 3 n.1. At the evidentiary hearing, Mr. Parrish testified that RDC and the Work Center "should not have different policies and procedures." Tr. vol. 1 at 116. Similarly, when asked, "[c]ould the work center be governed separately from the rest of the jail," Ms. Simpson responded that "[i]t shouldn't be." Tr. vol. 7 at 1325.

Notwithstanding this testimony, the record also indicates that the Work Center's conditions do not fall below the constitutional standard. By extension, the Consent Decree as applied to the Work Center is not "narrowly drawn" such that it

25

"extends no further than necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(b)(2). The Court must terminate the Consent Decree as to the Work Center. *See id.*

## B.       Substantive Provisions

### 1.       Protection from Harm

The Consent Decree provisions regarding protection from harm are reproduced here:

37. Develop and implement policies and procedures to provide a reasonably safe and secure environment for prisoners and staff. Such policies and procedures must include the following:

a.       Booking;

b.       Objective classification;

c.       Housing assignments;

d.       Prisoner supervision;

e.       Prisoner   welfare   and   security   checks ("rounds");

f.       Posts and post orders;

g.       Searches;

h.       Use of force;

i.       Incident reporting;

j.       Internal investigations;

k.       Prisoner rights;

l.       Medical and mental health care;

m.       Exercise and treatment activities;

n.    Laundry;

o.    Food services;

p.    Hygiene;

q.    Emergency procedures;

r.    Grievance procedures; and

s.    Sexual abuse and misconduct.

38. Ensure that the Jail is overseen by a qualified Jail Administrator and a leadership team with substantial education, training and experience in the management of a large jail, including at least five years of related management experience for their positions, and a bachelor's degree. When the Jail Administrator is absent or if the position becomes vacant, a qualified deputy administrator with comparable education, training, and experience, must serve as acting Jail Administrator.

39. Ensure that all Jail supervisors have the education, experience, training, credentialing, and licensing needed to effectively supervise both prisoners and other staff members. At minimum, Jail supervisors must have at least 3 years of field experience, including experience working in the Jail. They must also be familiar with Jail policies and procedures, the terms of this Agreement, and prisoner rights.

40. Ensure that no one works in the Jail unless they have passed a background check, including a criminal history check.

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail housing units.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Agreement, and

allow for the safe operation of the Jail. The parties recognize that the Board allocates to the Sheriff lump sum funding on a quarterly basis. The Sheriff recognizes that sufficient staffing of the Jail should be a priority for utilizing those funds. To that end, the County must at minimum:

a.      Hire and retain sufficient numbers of detention officers to ensure that:

     i.      There are at least two detention officers in each control room at all times;

     ii.     There are at least three detention officers at all times for each housing unit, booking area, and the medical unit;

     iii.    There are rovers to provide backup and assistance to other posts;

     iv.     Prisoners have access to exercise, medical treatment, mental health treatment, and attorney visitation as scheduled;

     v.      There are sufficient detention officers to implement this Agreement.

b.      Fund and obtain a formal staffing and needs assessment ("study") that determines with particularity the minimum number of staff and facility improvements required to implement this Agreement. As an alternative to a new study, the September 2014 study by the National Institute of Corrections may be updated if the updated study includes current information for the elements listed below. The study or study update must be completed within six months of the Effective Date and must include the following elements:

i. The staffing element of the study must identify all required posts and positions, as well as the minimum number and qualifications of staff to cover each post and position.

ii. The study must ensure that the total number of recommended positions includes a "relief factor" so that necessary posts remain covered regardless of staff vacancies, turnover, vacations, illness, holidays, or other temporary factors impacting day-to-day staffing.

iii. As part of any needs assessment, the study's authors must estimate the number of prisoners expected to be held in the Jail and identify whether additional facilities, including housing, may be required.

c. Once completed, the County must provide the United States and the Monitor with a copy of the study and a plan for implementation of the study's recommendations. Within one year after the Monitor's and United States' review of the study and plan, the County must fund and implement the staffing and facility improvements recommended by the study, as modified and approved by the United States.

d. The staffing study shall be updated at least annually and staffing adjusted accordingly to ensure continued compliance with this Agreement. The parties recognize that salaries are an important factor to recruiting and retaining qualified personnel, so the County will also annually evaluate salaries.

29

e.     The County will also create, to the extent possible, a career ladder and system of retention bonuses for Jail staff.

f.     Develop and implement an objective and validated classification and housing assignment procedure that is based on risk assessment rather than solely on a prisoner's charge. Prisoners must be classified immediately after booking, and then housed based on the classification assessment. At minimum, a prisoner's bunk, cell, unit, and facility assignments must be based on his or her objective classification assessment, and staff members may not transfer or move prisoners into a housing area if doing so would violate classification principles (e.g., placing juveniles with adults, victims with former assailants, and minimum security prisoners in a maximum security unit). Additionally, the classification and housing assignment process must include the following elements:

i.     The classification process must be handled by qualified staff who have additional training and experience on classification.

ii.     The classification system must take into account objective risk factors including a prisoner's prior institutional history, history of violence, charges, special needs, physical size or vulnerabilities, gang affiliation, and reported enemies.

iii.     Prisoner housing assignments must not be changed by unit staff without proper supervisor and classification staff approval.

30

iv.     The classification system must track the location of all prisoners in the Jail and help ensure that prisoners can be readily located by staff. The County may continue to use wrist bands to help identify prisoners, but personal identification on individual prisoners may not substitute for a staff-controlled and centralized prisoner tracking and housing assignment system.

v.      The classification system must be integrated with the Jail prisoner record system, so that staff have appropriate access to information necessary to provide proper supervision, including the current housing assignment of every prisoner in the Jail.

vi.     The designation and use of housing units as "gang pods" must be phased out under the terms of this Agreement. Placing prisoners together because of gang affiliation alone is prohibited. The County must replace current gang-based housing assignments with a more appropriate objective classification and housing process within one year after the Effective Date.

g.    Develop and implement positive approaches for promoting safety within the Jail including:

i.      Providing all prisoners with at least 5 hours of outdoor recreation per week;

ii.     Developing rewards and incentives for good behavior such as additional commissary, activities, or privileges;

31

iii.     Creating work opportunities, including the possibility of paid employment;

iv.     Providing individual or group treatment for prisoners with serious mental illness, developmental disabilities, or other behavioral or medical conditions, who would benefit from therapeutic activities;

v.     Providing education, including special education, for youth, as well as all programs, supports, and services required for youth by federal law;

vi.     Screening prisoners for serious mental illness as part of the Jail's booking and health assessment process, and then providing such prisoners with appropriate treatment and therapeutic housing;

vii.     Providing reasonable opportunities for visitation.

h.     Ensure that policies, procedures, and practices provide for higher levels of supervision for individual prisoners if necessary due to a prisoner's individual circumstances. Examples of such higher level supervision include (a) constant observation (i.e., continuous, uninterrupted one-on-one monitoring) for actively suicidal prisoners (i.e., prisoners threatening or who recently engaged in suicidal behavior); (b) higher frequency security checks for prisoners locked down in maximum security units, medical observation units, and administrative segregation units; and (c) more frequent staff interaction with youth as part of their

32

education, treatment and behavioral management programs.

i.      Continue to update, maintain, and expand use of video surveillance and recording cameras to improve coverage throughout the Jail, including the booking area, housing units, medical and mental health units, special management housing, facility perimeters, and in common areas.

43. Include outcome measures as part of the Jail's internal data collection, management, and administrative reporting process. The occurrence of any of the following specific outcome measures creates a rebuttable presumption in this case that the Jail fails to provide reasonably safe conditions for prisoners:

a.      Staff vacancy rate of more than 10% of budgeted positions;

b.      A voluntary staff turnover rate that results in the failure to staff critical posts (such as the housing units, booking, and classification) or the failure to maintain experienced supervisors on all shifts;

c.      A major disturbance resulting in the takeover of any housing area by prisoners;

d.      Staffing where fewer than 90% of all detention officers have completed basic jailer training;

e.      Three or more use of force or prisoner-on-prisoner incidents in a fiscal year in which a prisoner suffers a serious injury, but for which staff members fail to complete all documentation required by this

Agreement, including supervision recommendations and findings;

f.    One prisoner death within a fiscal year, where there is no documented administrative review by the Jail Administrator or no documented mortality review by a physician not directly involved in the clinical treatment of the deceased prisoner (e.g. corporate medical director or outside, contract physician, when facility medical director may have a personal conflict);

g.    One death within a fiscal year, where the death was a result of prisoner-on-prisoner violence and there was a violation of Jail supervision, housing assignment, or classification procedures.

44. To complement, but not replace, "direct supervision," develop and implement policies and procedures to ensure that detention officers are conducting rounds as appropriate. To that end:

a.    Rounds must be conducted at least once every 30 minutes in general population housing units and at least once every 15 minutes for special management prisoners (including prisoners housed in booking cells).

b.    All security rounds must be conducted at irregular intervals to reduce their predictability and must be documented on forms or logs.

c.    Officers must only be permitted to enter data on these forms or logs at the time a round is completed. Forms and logs must not include pre-printed dates or times. Officers must not be permitted to fill out forms and logs before they actually conduct their rounds.

d.      The parties anticipate that "rounds" will not necessarily be conducted as otherwise described in this provision when the Jail is operated as a "direct supervision" facility. This is because a detention officer will have constant, active supervision of all prisoners in the detention officer's charge. As detailed immediately below, however, even under a "direct supervision" model, the Jail must have a system in place to document and ensure that staff are providing adequate supervision.

e.      Jail policies, procedures, and practices may utilize more than one means to document and ensure that staff are supervising prisoners as required by "direct supervision," including the use and audit of supervisor inspection reports, visitation records, mealtime records, inmate worker sheets, medical treatment files, sick call logs, canteen delivery records, and recreation logs. Any system adopted to ensure that detention officers are providing "direct supervision" must be sufficiently detailed and in writing to allow verification by outside reviewers, including the United States and Monitor.

45. Ensure that all correctional officers receive adequate pre- and post-service training to provide for reasonably safe conditions in the Jail. To that end, the County must ensure that the Jail employs Qualified Training Officers, who must help to develop and implement a formal, written training program. The program must include the following:

a.      Mandatory pre-service training. Detention officers must receive State jailer training and certification prior to start of work. Staff who have not received such

training by the Effective Date of this Agreement must complete their State jailer training within twelve months after the Effective Date of this Agreement. During that twelve month period, the County must develop an in-house detention training academy.

b.      Post Order training. Detention officers must receive specific training on unit-specific post orders before starting work on a unit, and every year thereafter. To document such training, officers must be required to sign an acknowledgement that they have received such training, but only after an officer is first assigned to a unit, after a Post Order is updated, and after completion of annual retraining.

c.      "Direct supervision" training. Detention officers must receive specific pre- and post service training on "direct supervision." Such training must include instruction on how to supervise prisoners in a "direct supervision" facility, including instruction in effective communication skills and verbal de-escalation. Supervisors must receive training on how to monitor and ensure that staff are providing effective "direct supervision."

d.      Jail administrator training. High-level Jail supervisors (i.e., supervisors with facility-wide management responsibilities), including the Jail Administrator and his or her immediate deputies (wardens), must receive jail administrator training prior to the start of their employment. High-level supervisors already employed at the Jail when this Agreement is executed must complete such training within six months after the Effective Date of this Agreement. Training

36

comparable to the Jail Administration curriculum offered by the National Institute of Corrections will meet the requirements of this provision.

e.　　　Post-service training. Detention officers must receive at least 120 hours per year of post-service training in their first year of employment and 40 hours per year after their first year. Such training must include refresher training on Jail policies. The training may be provided during roll call, staff meetings, and post-assignment meetings. Post-service training should also include field and scenario-based training.

f.　　　Training for Critical Posts. Jail management must work with the training department to develop a training syllabus and minimum additional training requirements for any officer serving in a critical position. Such additional training must be provided for any officer working on a tactical team; in a special management, medical or mental health unit; in a maximum security unit; or in booking and release.

g.　　　Special management unit training. Officers assigned to special management units must receive at least eight hours of specialized training each year regarding supervision of such units and related prisoner safety, medical, mental health, and security policies.

h.　　　Training on all Jail policies and procedures including those regarding prisoner rights and the prevention of staff abuse and misconduct.

46. Develop and implement policies and procedures for adequate supervisory oversight for the Jail. To that end, the County must:

a.      Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the authority to make personnel decisions necessary to ensure adequate staffing, staff discipline, and staff oversight. This personnel authority must include the power to hire, transfer, and discipline staff. Personal Identification Numbers (PINs) allocated for budget purposes represent a salaried slot and are not a restriction on personnel assignment authority. While the Sheriff may retain final authority for personnel decisions, the Jail's policies and procedures must document and clearly identify who is responsible for a personnel decision, what administrative procedures apply, and the basis for personnel decisions.

b.      Review and modify policies, procedures, and practices to ensure that the Jail Administrator has the ability to monitor, ensure compliance with Jail policies, and take corrective action, for any staff members operating in the Jail, including any who are not already reporting to the Jail Administrator and the Jail's chain of command. This provision covers road deputies assigned to supervise housing units and emergency response/tactical teams entering the Jail to conduct random shakedowns or to suppress prisoner disturbances.

c.      Ensure that supervisors conduct daily rounds on each shift in the prisoner housing units, and document the results of their rounds.

d.      Ensure that staff conduct daily inspections of all housing and common areas to identify damage to the physical plant, safety violations, and sanitation issues.

This maintenance program must include the following elements:

      i.     Facility safety inspections that include identification of damaged doors, locks, cameras, and safety equipment.

      ii.     An inspection process.

      iii.     A schedule for the routine inspection, repair, and replacement of the physical plant, including security and safety equipment.

      iv.     A requirement that any corrective action ordered be taken.

      v.     Identification of high priority repairs to assist Jail and County officials with allocating staff and resources.

      vi.     To ensure prompt corrective action, a mechanism for identifying and notifying responsible staff and supervisors when there are significant delays with repairs or a pattern of problems with equipment. Staff response to physical plant, safety, and sanitation problems must be reasonable and prompt.

47. Ensure that staff members conduct random shakedowns of cells and common areas so that prisoners do not possess or have access to dangerous contraband. Such shakedowns must be conducted in each housing unit at least once per month, on an irregular schedule to make them less predictable to prisoners and staff.

48. Install cell phone jammers or other electronic equipment to detect, suppress, and deter unauthorized communications

from prisoners in the Jail. Installation must be completed within two years after the Effective Date.

49. Develop and implement a gang program in consultation with qualified experts in the field that addresses any link between gang activity in the community and the Jail through appropriate provisions for education, family or community involvement, and violence prevention.

\* \* \*

"Jail conditions must not fall below a minimum standard of decency required by the Eighth Amendment. Conditions which 'alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities . . . could be cruel and unusual under the contemporary standard of decency . . . .'" *Alberti v. Klevenhagen*, 790 F.2d 1220, 1223 (5th Cir. 1986) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1984)). "Violence and sexual assault among inmates may rise to a level rendering conditions cruel and unusual," such as when conditions result in a carceral setting "'where terror reigns.'" *Id.* at 1224 (quoting *Jones v. Diamond*, 636 F.2d 1364, 1373 (5th Cir. 1981)).

"[E]ven where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices." *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 644 (5th Cir. 1996). Indeed, "[w]hether the State's obligation is cast in terms of a duty to provide medical care or protection from harm, its ultimate constitutional duty is 'to assume some responsibility [for] the safety and general well-being' of persons whose state-occasioned confinement renders them unable to

fend for themselves." *Id.* (quoting *Deshaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 200 (1989)).

"It is well established that prison officials have a constitutional duty to protect prisoners from violence at the hands of their fellow inmates." *Longoria v. Texas*, 473 F.3d 586, 592 (5th Cir. 2006). As recognized by the Supreme Court, "pretrial detainees, who have not been convicted of any crimes, retain *at least* those constitutional rights that we have held are enjoyed by convicted prisoners." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979) (emphasis added). This means that the Fourteenth Amendment Due Process standard of confinement for persons detained before trial is higher than the Eighth Amendment standard for convicted persons imprisoned. *See id.* at 531. Accordingly, cases outlining the Eighth Amendment standard can serve as guideposts in the Fourteenth Amendment analysis of pretrial detention conditions. Conditions that violate the Eighth Amendment's Cruel and Unusual Punishment Clause necessarily also violate the protections of the Fourteenth Amendment's Due Process Clause. *See Hare*, 74 F.3d at 639.

To prevail under the Eighth Amendment, plaintiffs must also prove that the defendants acted with deliberate indifference. Under the deliberate indifference test,

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious

41

> harm exists, and he must also draw the infer-
> ence.

*Farmer v. Brennan*, 511 U.S. 825, 837 (1970).

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842. In assessing whether a risk exists, "it does not matter whether the risk comes from a single source or other multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Id.* at 843. "An official acts with the requisite deliberate indifference if he is aware of an 'excessive risk to inmate . . . safety' and disregards that risk." *Longoria*, 473 F.3d at 592 (quoting *Farmer*, 511 U.S. at 837). Moreover,

> if . . . plaintiff presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."

*Farmer*, 511 U.S. at 842-43.

Deliberate indifference, moreover, has been found in situations "where terror reigns," in that "the level of violence and sexual assault may alone suffice to support a finding of liability under the Eighth Amendment." *Alberti*, 790 F.2d at 1224.

The Protection from Harm section of the Consent Decree touches upon a wide variety of subjects, from staffing and supervision to assaults and deaths. This Court will attempt to address the evidence presented on each issue.

### a. Staffing

Inadequate levels of staffing have been a perennial focus of this litigation. Indeed, the word "staffing" came up over 360 times during trial. *See* Tr. vols. 1-11. Mr. Parrish described the defendants as "totally in noncompliance" with the staffing provisions of the Consent Decree. Tr. vol. 1 at 85. As of January 2022, RDC reported staffing "at an all-time low" of 191 officers. *Id.* at 85-86. For context, a recent staffing analysis conducted by Mr. Parrish and Major Bryan recommended "329 [officers] . . . if Alpha Pod was left completely closed and 351 if Alpha 3 and 4 were kept open." *Id.* at 132. This means that (1) despite the Consent Decree's express provisions regarding staffing, the defendants' recruitment and retention of staff has gotten worse over time; and (2) staffing is currently at just 58% (or less) of the minimum level identified by experts. This is untenable and evinces the County's deliberate indifference toward maintaining staffing levels sufficient to prevent terror from reigning at RDC.

Sufficient staffing is essential for safeguarding detainees' constitutional right to protection from harm. Indeed, Mr. Parrish remarked that "staffing is critical to everything in the operation of a jail." *Id.* at 100. In practical terms, such low levels of

staffing translate to dangerous scenarios like "one officer working in the whole pod in the control room." *Id.* at 98. Inadequate supervision means that "officers in the jail are responsive to problems, not able to prevent problems." Tr. vol. 3 at 227. As the County knows too well, it can also contribute to detainee deaths. *See* Tr. vol. 1 at 167; *see also infra* 48-51.

Another staffing issue that contributes to dangerous conditions at RDC is the failure to retain a qualified jail administrator. "The jail administrator is the top supervisor of the jail responsible for all jail operations." Tr. vol. 3 at 389. Over the course of this case, however, there have been five jail administrators: Major Rushing, Warden Fielder, Major Bryan, Chief Simon, and now, the current interim director, Major Frank Shaw.[9] *See* Tr vol. 8 at 1359. Major Bryan was hired almost as if she would be a savior for the RDC's woes. To borrow DOJ's description, though, "[a]fter just a few months on the job, Defendants' resistance to the Jail Administrator and failure to follow through on their commitments led [Major Bryan] to submit a letter of resignation." Docket No. 138 at 91.

---

[9] As discussed above, Mr. Shaw's qualifications to serve as jail administrator are disputed. Although Mr. Shaw previously presided over prisons, his CV does not reflect any experience running a jail. *See* Tr. vol. 8 at 1392. This distinction is key, as experts and courts routinely distinguish between the constitutional and practical concerns posed by prisons and those by jails. *See* Tr. vol. 8 at 1392-93; *Bell*, 441 U.S. at 537 ("This Court has recognized a distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may."). As of the February 2022 evidentiary hearing, the defendants had "[n]ot yet" begun the process of searching for a permanent jail administrator to take the helm upon termination of Mr. Shaw's interim employment. Tr. vol. 9 at 1755.

### b.    Direct supervision

Many provisions in the Protection from Harm section are designed to alleviate the dangerous conditions that existed in 2016 and still exist today. Of these, the requirement to implement direct supervision is critical.

As defined in the Consent Decree, "'[d]irect supervision' is a term of art used by corrections professionals and refers to a model for safely operating and supervising a correctional facility. The direct supervision method for supervising a correctional facility requires placing detention officers inside housing units, where such officers have continuous direct contact with prisoners and are not routinely separated from prisoners by physical barriers. Officers are required to provide active supervision of housing areas, which includes routinely interacting with, and checking on, prisoners in their charge." Docket No. 8-1 at 5-6, ¶ 9.

RDC has three housing areas, A-Pod, B-Pod, and C-Pod, and each Pod has four units which each hold about 64 detainees, for a total of up to 256 detainees on each Pod. *See* Tr. vol. 5 at 83; *see also* Tr. vol. 2 at 410. Each Pod also has one control room for computer surveillance. In practice, direct supervision means "an officer is inside the housing unit with up to 64 inmates face-to-face . . . 24 hours a day, seven days a week." Tr. vol. 1 at 100. According to Mr. Parrish, "direct supervision," as opposed to camera surveillance, "is the only practical way to run a jail." *Id.* at 101.[10]

---

[10] This approach to detainee surveillance improves safety by "tak[ing] all of the services to the inmates," such that staff need not "move inmates around," thereby removing the potential security and safety risks associated with transporting detainees. Tr. vol. 1 at 142.

Yet, Ms. Simpson testified that "in early January [2022] there was at least one weekend where [RDC] only had three officers assigned to the pods for the weekend, so one officer in each control room and no officers on the floor." Tr. vol. 6 at 1095. This means that each officer supervised about 250 detainees via video surveillance, exclusively.

Major Bryan confirmed that this is a normal occurrence. She testified that RDC requires at least five officers per Pod: one officer in the control room, and an officer in each of the four housing units. Tr. vol. 3 at 410-411. She explained,

> [t]here are other positions on top of that, but at a minimum we're talking five officers. During my tenure there, we were lucky on a shift to have three officers. There were times that we just had one officer. So that one officer is in the control room, and those pods that hold approximately 60 inmates apiece were unmanned. So, yes, I was gravely concerned.

*Id.*

At the evidentiary hearing, the County pushed back on the appropriateness of direct supervision, insinuating that it was impossible. For example, counsel for the Sheriff belittled the notion of direct supervision, recounting how he asked the Sheriff "are those two little girls," referring to two female detention officers, "going to be able to handle business" while touring RDC in January 2022. Tr. vol. 10 at 1992.

The Court disagrees with the notion that direct supervision is untenable at RDC. Indeed, RDC was designed and built to function as a direct supervision facility. *See* Tr. vol. 11 at 2086 (Sheriff Jones testifying "that the Raymond Detention Center

was built as a direct supervision jail and it actually func-tion[ed] that way from 1994 up until 2012 when the officers were pulled out of the housing units and they were left unat-tended"). The Constitution does not mandate direct supervi-sion, but where, as here, an institution is designed to operate as a direct supervision facility, direct supervision *is* the mini-mum constitutional requirement.

The most egregious consequence of RDC's failure to imple-ment direct supervision is the failure to prevent detainee deaths. J.M., the detainee found over eight hours after his death, was housed in what "should have been a direct super-vision housing unit." Tr. vol. 1 at 161. This means that "the office[r] should have been aware of what was going on in the housing unit. Instead, it was an inmate who brought it to the officer's attention" many hours after J.M.'s death. *Id.*

Failure to implement direct supervision directly contributes to the perpetuation of unconstitutional harm to detainees at RDC. Implementing direct supervision is critical to ensuring that RDC can reach and maintain the constitutional minimum conditions for pretrial detention. Jail staff's persistent failure to supervise detainees exacerbates violence at RDC, and ac-cordingly, the unconstitutional harm to detainees. *See infra* at 48-51. So long as RDC fails to implement direct-supervision, Mr. Parrish testified, the facility will never "get a handle on their gang problem." Tr. vol. 1 at 126.[11] By Ms. Simpson's es-timation, that lack of supervision is a prime cause of the high level of assaults at RDC. *Id.*

---

[11] The record, as informed by the Court's own site visits, proves that direct supervision functions effectively at the Work Center.

The record supports that the County has been, and continues to be, deliberately indifferent to the need to properly implement direct supervision. Such behavior falls below the constitutional minimum.

### c.     Gangs

Gangs are pervasive at RDC: testimony established a rate of "80 percent gang affiliation" among those detained at RDC and the Work Center. Tr. vol. 2 at 272. When determining detainees' housing assignments, RDC's practice is to rely on gang affiliation in spite of other, more credible forms of classification, such as offense level. This practice violates the Consent Decree and is one of the chief contributors to major problems at the facilities. Tr. vol. 1 at 125.

Given this practice, it is no surprise that gangs run the pods. As described by Ms. Simpson, "inmate committees . . . essentially decide if somebody isn't welcome in the unit, and then they're moved." Tr. vol. 6 at 1096. To effectuate such policies, gangs will "set up assaults or harassment until [the undesired detainees] leave" the unit. *Id.* at 1097.

To adequately address the gang problem, Mr. Parrish testified, requires adequate staffing and supervision of detainees. Tr. vol. 1 at 126. Currently, defendants have not achieved the recommended levels of staffing or supervision. *See supra* 43-44. Indeed, they fall far short. This creates serious risk of harm in the jail. *Id.* at 171.

### d.     Assaults and deaths

It is well-established that violence at RDC is pervasive. Based on her site visits and analyses of RDC documents, Ms. Simpson calculated that at least 77 assaults occurred just between October 2021 and January 2022. Tr. vol. 2 at 289. Mr. Parrish

testified that this is "an excessive number of assaults,"[12] such that violence is "a constant ongoing problem throughout Raymond Detention Center." Tr. vol. 1 at 103. The figures break down to "about 20 [assaults] per month, one of them being an assault that resulted in the inmate being beaten to death." *Id.* at 104. At the evidentiary hearing, Ms. Simpson attributed the deaths, in part, to "significant problems of misuse of housing areas, [and] failure to follow proper procedures on well-being checks." Tr. vol. 1 at 169.

The October 2021 death of M.R. was the culmination of an appalling series of events. Records indicate that other inmates dragged the decedent into A-Pod, Unit 4, where they proceeded to beat him to death. The After-Action Report prepared by Major Bryan underscores that the decedent "was assaulted at 0528hrs" and went "undetected by jail staff until 1343 hours," over eight hours after the assault began. PX-20 at 2. Further, "[w]hile the responding officer did call for assistance" upon discovering the decedent, "he did not provide emergency first aid, nor did he contain the area and remove inmates from the area." PX-20 at 3.

Video footage of the assault "did not support" the staff's entries indicating routine wellness checks. *Id.* at 5. Implicitly, lack of "[a] robust rounds system" increases opportunities for violent, even deadly, attacks like the one described above. *Id.* Additionally, "from 7am until nearly 8am, there was not an officer in the pod control chair." *Id.* at 6. Lack of an officer's station in A-Pod, "an industry standard," reduces officers' ability to supervise detainees and respond to emergencies. *Id.*

---

[12] Mr. Parrish obtained these statistics from a spreadsheet on assaults Ms. Simpson made, based on her analysis of incident reports. Tr. vol. 1 at 148.

at 7. The defendants' failure to adequately supervise detainees, then, contributes to ongoing violation of detainees' constitutional right to protection from harm.

Incident reports from the April 18, 2021 death are similarly alarming. They demonstrate how compounding errors lead to tragic results. In one, an officer recounted walking past booking, where J.M. was housed, to discover J.M. "hanging from the ceiling." PX-63 at 5. The officer who discovered J.M. could not enter the cell to respond, as he lacked keys to the unit. *See* Docket No. 134 at 10. And the officer assigned to booking was not at his post. *Id.* Prior to the arrival of emergency services, RDC staff (1) attempted to unravel the sheet from around J.M.'s neck; (2) when that didn't work, "called for scissors;" (3) retrieved scissors, and tried (unsuccessfully) to cut the sheet from around J.M.'s neck; (4) eventually managed to cut J.M. from the ceiling, and laid him on the floor to administer CPR; (5) while performing CPR, realized that the medical personnel who arrived on the scene "did not have the proper equipment"; and (6) allowed the medical personnel to return with AED equipment, which they used alongside CPR administration until AMR finally arrived. *Id.* J.M. died.

Other, non-lethal violent incidents occur when housing units are left unsupervised. On July 6th, during mealtime, a detainee was discovered by a Detention Officer to be bleeding. *See* Fifteenth Monitoring Report at 31. He had been stabbed. Not once. Not five times. Not 10 or even 15 times, but 17 times. *Id.* He reported that no officer was on the unit, C-3, at the time. *Id.* In addition to assaults occurring in the absence of supervision, numerous incident reports disclose fires being set. On October 13th, a pass-through hole was discovered between

50

units C-2 and C-3, reflecting that the lack of supervision will lead to the destruction once again of the renovated C-Pod. *Id.*

In sum, the record reveals that RDC is a facility with unconscionably high levels of violence, even amongst other detention centers. The pervasiveness and severity of such incidents distinguish RDC as a place where "terror reigns." *Alberti*, 790 F.2d at 1224. These conditions demonstrate the County's deliberate indifference to protecting detainees from harm, and violate detainees' rights under the Constitution.

### e.  Reporting and documentation

The Use of Force section also touches on reporting, which has been "a long-standing problem." Tr. vol. 2 at 224. Inadequate reporting means that it is "very routine that inmates self-report that they've been assaulted . . . or worse yet, sometimes information gets out to family or friends on the outside and it's been called in to the jail, and that's how the staff finds out about what's actually happening within the facility." *Id.* at 226.

Consider how the facility documents the worst of all incidents: deaths. The incident information generated for the August 4, 2021 death, for instance, is comprised solely of a three-line paragraph. *See* PX-50. It fails to identify causation, instead relying on the passive voice (i.e., "[decedent] was confirmed deceased . . ."). *Id.* Although RDC personnel did conduct a mortality review, the meeting focused on the actions of "the quality correctional health care team." PX-70. This is insufficient. Dr. Dudley testified that records did not indicate that security staff recognized the decedent's health needs, and that his opinion, the decedent required greater mental health treatment than he received. Tr. vol. 4 at 621-22.

The incident report for the July 6, 2021 death of a detainee by apparent suicide is similarly inadedquate. At scarcely a paragraph long, the report presents a bare-bones accounting of the officer's discovery of and response to the detainee's condition. *See* PX-51. In the report, the officer indicates that after finding the decedent "still warm," she performed CPR on him. *Id.* Medical staff from RDC also arrived shortly thereafter to assist. *Id.* The reporting officer recounted hearing another staff member "ask did anyone call the cor[o]ner." *Id.*

One staff member spent scarcely more than 50 words reporting the apparent death by suicide of a detainee found hanging in his cell on July 7, 2021. *See* PX-52 at 1. Other staff members who responded to the death submitted supplemental narratives. *See id.* at 2-12. But none of these entries contained the systems-level analysis required by the Consent Decree.

After-Action Reports provide systems-level analysis of issues, and responses to those issues. But the defendants routinely fail to produce After-Action Reports. Accordingly, for all but one of the deaths discussed above, the incident reports prepared by staff provided the only accounts of responses to the deaths. Such paltry analysis fails to equip the defendants to correct violations of detainees' constitutional rights.

### f.    Contraband

Contraband, a problem at any carceral facility, exists at RDC at dangerous levels. Detainees who manage to break free from most any other carceral institution leave with the intention of permanently escaping. Not so at RDC. Instead, RDC's detainees routinely break out and then return with contraband. *See* Tr. vol. 2 at 325. Whether it's more profitable to return with the contraband or the contraband brings some level of

protections to detainees, it is not wholly clear. But, as Mr. Parrish said, "I'd never seen anything like that before." Tr. vol. 2 at 325. Employees also introduce contraband into the facility. *See* Tr. vol. 3 at 455.[13] Ms. Simpson testified that "the volume of contraband in the facilities is such that it's definitely a danger to the detainees." Tr. vol. 7 at 1262. This is an untenable state of affairs.

Notwithstanding the above analysis, because the County conducts shakedowns, it has not been deliberately indifferent to contraband within RDC. Thus, the Court will strike paragraph 47.

### g.   Medical and mental health training

Inadequate medical and mental health training also imperils detainees' wellbeing. For example, Dr. Dudley testified that while "[t]he first phase of training has been conducted" for mental health staff, "the second and third phases have been delayed for an unspecified time." Tr. vol. 4 at 653. This delay stems from the County's failure to pay for a nationally certified trainer. *Id.* The defendants' failure to adequately train mental health care staff is particularly concerning given the high volume of mentally ill individuals detained at RDC.[14] *Id.*

---

[13] Mr. Moeser also cited contraband as a "top three" concern at Henley-Young. Tr. vol. 5 at 156. To the County's credit, it reportedly recently fired several detention officers caught bringing contraband into the facility.

[14] Dr. Dudley affirmed the findings of the December 2021 quality assurance report, PX-86 at 16, that "'[i]n December 2021, Hinds County Detention Services had 202 mentally ill persons, with 153 of those being SMIs, seriously mentally ill detainees, of which 54 are noncompliant with medication.'" Tr. vol. 4 at 653.

This failure amounts to deliberate indifference to detainees' medical and mental health.

### h.    Conclusion

Detainees "depend on the jail systems for their very lives." PX-20 at 8. DOJ stressed in its closing argument that, at present, "almost a year after [J.M.]'s death, there remains no formal mechanism for security or mental health staff to ramp up monitoring when needed." Tr. vol. 11 at 2123. This renders detainees vulnerable to violence, even death, as staff cannot effectively respond to crises. Ms. Simpson similarly cited "the number of assaults" as one factor indicating that RDC currently subjects inmates to "significant risk of harm." Tr. vol. 7 at 1190. She also testified that if the consent decree is terminated, the County is "not prepared to provide the level of supervision and provide the security that's necessary" to protect detainees from assaults or violence. Tr. vol. 2 at 239. When asked whether "the defendants will be able to protect detainees from inmate-on-inmate violence if the consent decree were to be terminated" Ms. Simpson simply responded, "no." Tr. vol. 7 at 1191.

Given this record, the Court concludes that some provisions of the Protection from Harm section of the Consent Decree must be retained. As demonstrated by their brevity relative to the existing Consent Decree, the below paragraphs are narrowly drawn, extend no further than necessary, and are the least intrusive means necessary to comply with the

Constitution.[15] The Court will strike, however, all subsections, as they exceed the constitutional minimum.

38. Ensure that the Jail is overseen by a qualified Jail Administrator and a leadership team with substantial education, training and experience in the management of a large jail.

39. Ensure that all Jail supervisors have the education, experience, training, credentialing, and licensing needed to effectively supervise both prisoners and other staff members.

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail housing units.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Injunction, and allow for the safe operation of the Jail.

44. Develop and implement policies and procedures to ensure that detention officers are conducting rounds as appropriate.

45. Ensure that all correctional officers receive adequate pre- and post-service training to provide for reasonably safe conditions in the Jail.

> c.    "Direct supervision" training. Detention officers must receive specific pre- and post service training on "direct supervision." Such training must include instruction on how to supervise prisoners in a "direct supervision" facility, including instruction in effective communication skills and verbal de-escalation. Supervisors must receive training on how to monitor and

---

[15] The Court also strikes ¶ 40 of the Consent Decree, for, as DOJ concedes, the defendants are in sustained compliance with this provision. *See* Docket No. 138 at 6 n.2.

ensure that staff are providing effective "direct super-vision."

46. Develop and implement policies and procedures for adequate supervisory oversight for the Jail.

## 2.      Use of Force Standards

The Consent Decree provisions regarding use of force standards are reproduced here:

50. Develop and implement policies and procedures to regulate the use of force. The policies and procedures must:

> a.      Prohibit the use of force as a response to verbal insults or prisoner threats where there is no immediate threat to the safety or security of the institution, prisoners, staff or visitors;

> b.      Prohibit the use of force as a response to prisoners' failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff, visitors, or property;

> c.      Prohibit the use of force against a prisoner after the prisoner has ceased to resist and is under control;

> d.      Prohibit the use of force as punishment or retaliation;

> e.      Limit the level of force used so that it is commensurate with the justification for use of force; and

> f.      Limit use of force in favor of less violent methods when such methods are more appropriate, effective, or less likely to result in the escalation of an incident.

56

51. Develop and implement policies and procedures to ensure timely notification, documentation, and communication with supervisors and medical staff (including mental health staff) prior to use of force and after any use of force. These policies and procedures must specifically include the following requirements:

a.      Staff members must obtain prior supervisory approval before the use of weapons (e.g., electronic control devices or chemical sprays) and mechanical restraints unless responding to an immediate threat to a person's safety.

b.      If a prisoner has a serious medical condition or other circumstances exist that may increase the risk of death or serious injury from the use of force, the type of force that may be used on the prisoner must be restricted to comply with this provision. These restrictions include the following:

i.      The use of chemical sprays, physical restraints, and electronic control devices must not be used when a prisoner may be at risk of positional asphyxia.

ii.      Electronic control devices must not be used on prisoners when they are in a location where they may suffer serious injury after losing voluntary muscle control (e.g., prisoner is standing atop a stairwell, wall, or other elevated location).

iii.      Physical strikes, holds, or other uses of force or restraints may not be used if the technique is not approved for use in the Jail or the

staff member has not been trained on the proper use of the technique.

c.      Staff members must conduct health and welfare checks every 15 minutes while a prisoner is in restraints. At minimum, these checks must include (i) logged first-person observations of a prisoner's status while in restraints (e.g. check for blood flow, respiration, heart beat), and (ii) documented breaks to meet the sanitary and health needs of prisoners placed in emergency restraints (e.g., restroom breaks and breaks to prevent cramping or circulation problems).

d.      The County must ensure that clinical staff conduct medical and mental health assessments immediately after a prisoner is subjected to any Level 1 use of force. Prisoners identified as requiring medical or mental health care during the assessment must receive such treatment.

e.      A first-line supervisor must personally supervise all planned uses of force, such as cell extractions.

f.      Security staff members must consult with medical and mental health staff before all planned uses of force on juveniles or prisoners with serious mental illness, so that medical and mental health staff may offer alternatives to or limitations on the use of force, such as assisting with de-escalation or obtaining the prisoner's voluntary cooperation.

g.      The Jail must have inventory and weapon controls to establish staff member responsibility for their use of weapons or other security devices in the facility. Such controls must include:

i.      a sign-out process for staff members to carry any type of weapon inside the Jail,

ii.     a prohibition on staff carrying any weapons except those in the Jail's tracked inventory, and

iii.    random checks to determine if weapons have been discharged without report of discharge (e.g., by checking the internal memory of electronic control devices and weighing pepper spray canisters).

h.     A staff member must electronically record (both video and sound) all planned uses of force with equipment provided by the Jail.

i.      All staff members using force must immediately notify their supervisor.

j.      All staff members using a Level 1 use of force must also immediately notify the shift commander after such use of force, or becoming aware of an allegation of such use by another staff member.

\* \* \*

In the correctional setting,

The state . . . has the unquestioned duty to provide reasonable safety for all residents and personnel within the institution. And it may not restrain residents except when and to the extent professional judgment deems this necessary to assure such safety or to provide needed training.

*Youngberg v. Romeo*, 457 U.S. 307, 324 (1982). "To be sure, an inmate must be protected from the 'unnecessary and wanton infliction of pain' by prison officials." *Ort v. White*, 813 F.2d 318, 321-22 (11th Cir. 1987). Yet, cognizant of the challenges presented by carceral settings, "a court must keep in mind the paramount concerns of maintaining order and discipline in an often dangerous and unruly environment." *Id.* at 322.

"[I]t is the Due Process Clause that provides the appropriate constitutional basis for determining whether a detention official's use of deliberate force on such a [pretrial] detainee is excessive." *Valencia v. Wiggins*, 981 F.2d 1440, 1449 (5th Cir. 1993). To make out an excessive force claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015). "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

As put succinctly by Ms. Simpson at trial, RDC officials "have to follow the use-of-force policy in terms of not using force when it's not required and using it when it is required." Tr. vol. 11 at 2063. Put another way by Mr. Parrish, use of force, such as chemical spray, is "not meant to punish somebody." Tr. vol. 1 at 118. Instead, use of a "nonlethal weapon" is meant "to protect the officer if somebody is trying to assault him, or to break up a problem where two inmates are fighting." *Id.*

Ms. Simpson testified that Hinds County has failed to implement the Consent Decree provisions that are reasonably necessary to protect detainees from unnecessary or excessive use of force by staff. Tr. vol. 6 at 1119. For example, Ms. Simpson listed officers using force on detainees who refuse to obey

orders, particularly those with mental health issues; failing to deploy force incrementally; and failing to involve mental health providers in use of force decisions as conduct that violates the Consent Decree's use of force provision *Id.* at 1119-20. These failures pose risk of injury to inmates. *Id.* They can even lead to death. Tr. vol. 8 at 1377.

Staff also misuse tasers. Mr. Parrish testified about an incident where an investigator "used a Taser to coerce an inmate into putting his hands behind his back so he could be handcuffed." Tr. vol. 1 at 185. This occurred while the inmate was "laying flat on his face on the ground." *Id.* This incident constituted "a direct violation of the use-of-force policy." Tr. vol. 2 at 317. It also subjected the detainee to "unnecessary and wanton pain and suffering." *Valencia*, 981 F.2d at 1446. Just as an unprovoked assault violates the Constitution, *see McCoy v. Alamu*, 950 F.3d 226, 235 (5th Cir. 2020) (Costa, J., dissenting) *cert. granted, judgment vacated*, 141 S. Ct. 1364 (2021), so does the gratuitous tasing of an individual who is not resisting, complying with commands, and poses no threat to anyone's safety. *Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012). As such, it constituted conduct beneath the constitutional minimum.

Given the evidence, the Court finds that one paragraph is necessary to comply with the Constitutional floor. It is narrowly drawn, extends no further than necessary, and is the least intrusive means necessary to comply with the Constitution:

50. Develop and implement policies and procedures to regulate the use of force, including policies and procedures to ensure timely notification, documentation, and communication with supervisors and medical staff (including mental health staff) prior to and after any use of force.

### 3.      Use of Force Training

The Consent Decree provisions regarding use of force training are reproduced here:

52. The County must develop and implement a use of force training program. Every staff member who supervises prisoners must receive at least 8 hours of pre-service use of force training and annual use of force refresher training.

53. Topics covered by use of force training must include:

> a.      Instruction on what constitutes excessive force;

> b.      De-escalation tactics;

> c.      Methods of managing prisoners with mental illness to avoid the use of force;

> d.      Defensive tactics;

> e.      All Jail use of force policies and procedures, including those related to documentation and review of use of force.

54. The County must randomly test at least 5 percent of Jail Staff members annually to determine whether they have a meaningful, working knowledge of all use of force policies and procedures. The County must also evaluate the results to determine if any changes to Jail policies and procedures may be necessary and take corrective action. The results and recommendations of such evaluations must be provided to the United States and Monitor.

55. The County must update any use of force training within 30 days after any revision to a use of force policy or procedure.

*  *  *

A pretrial detainee "is entitled to minimally adequate training"–that "training required by the Constitution"–because it "may be reasonable in light of [the detainee's] liberty interests in safety and freedom from unreasonable restraints." *Youngberg*, 457 U.S. at 322 (discussing the constitutional training requirements in the analogous context of civil commitment). Failure to train detention staff can violate the Constitution if such failure constitutes "deliberate indifference" to the harm imposed by excessive use of force. *See Poole v. City of Shreveport*, 691 F.3d 625, 634 (underscoring that the deliberate indifference standard applies to failure to train claims in the analogous context of police use-of-force). Appropriate training is also essential to ensure that correctional staff do not subject pretrial detainees to excessive force, as "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" *Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2014) (quoting *Ingraham v. Wright*, 430 U.S. 651, 671-72, n.40 (1977)).

During the February 2022 hearing, DOJ attorneys emphasized that Hinds County's "failure to complete and implement policies and staff training is particularly acute with use of force." Tr. vol. 1 at 34.

Mr. Parrish testified that newly hired officers do not receive use-of-force training prior to beginning work at RDC. *See* Tr. vol. 1 at 111. Major Bryan explained that officers instead receive roll call training—when officers discuss new policies while transitioning between shifts. But this training lasts "[j]ust a few minutes." Tr. vol. 2 at 309. When asked whether she believed that such training was adequate, Major Bryan testified that she "did not." *Id*. Instead, Major Bryan called for "scenario training," such that officers can practice responding

to situations they may encounter while on duty. Tr. vol. 3 at 421.

In response, Hinds County argues that it has increased its cadet training to four weeks. It is unclear whether this training speaks to use of force.

Inadequate training can lead to inappropriate use of force, such as deployment of chemical spray for compliance purposes. *See* Tr. vol. 1 at 118. RDC policy prohibits coercive use of chemical spray. Such use is meant, as Mr. Parrish stated, "to protect the officer . . . or break up a problem where two inmates may be fighting," not to force a detainee to do something. Tr. vol. 1 at 118.

In one disturbing instance, officers armed with beanbag gun shot a sleeping detainee "in the face and in the stomach" because he did not rise for a shakedown conducted at "two or three o'clock" in the morning. Tr. vol. 2 at 377. This incident is particularly alarming given Major Bryan's testimony that "none of the detention officers are certified" to carry beanbag shotguns. Tr. vol. 3 at 523. Use of chemical spray or beanbag shots to force detainee compliance is "excessive in relation to that purpose." *Kingsley*, 576 U.S. at 398. It therefore violates the constitutional rights of pretrial detainees.

Recent introduction of tasers at RDC highlights the dangers of Hinds County's current approach. On January 20, 2022, Sheriff Jones sent an email to staff stating that "Detention Supervisors should be issued tasers immediately." PX-76 at 3. He further specified that "[a]ny other training after they are issued the tasers should be considered 'in-service training' to correspond with the certification they already have." *Id.* He made no mention of taser-specific training. Indeed, during

64

her testimony at trial, Major Bryan indicated that Hinds County does not have any scenario-based training on tasers. *See* Tr. vol. 3 at 419.

Major Bryan responded to Sheriff Jones' initiative in an email. She expressed concern that "detention staff have not been sufficiently trained and are not yet prepared to make sound use of force decisions with tasers." PX-76 at 2. Use of tasers absent such training, Major Bryan cautioned, results in "creating a greater liability in high risk situations." *Id.* She further expressed concern that providing tasers to RDC staff without appropriate training "potentially compromises the already fragile level of safety within the facility, not to mention the potential encroachment upon our detainees 4th, 8th. And 14th amendment rights." *Id.*

These fears were well-founded. As recounted above, a staff member misused the taser, relying on the weapon for coercive, not protective, purposes. Introduction of tasers at RDC, then, highlights the defendants' deficient approach to use-of-force training.

Staff at Henley Young also receive inadequate training. Mr. Moeser testified that "basic training" for a position in a youth detention facility should take "40 hours," "ideally" followed by "at least 40 hours of on-the-job training with mentoring from someone else." Tr. vol. 5 at 901. That is not happening. Rather, Mr. Moeser testified that staff receive some "initial training," but that staffing shortages mean that that staff "really never get beyond these sort of basic elements of training." *Id.* at 904.

This level of compliance is insufficient to safeguard youth detainees' constitutional right to protection from harm.

A recent incident at Henley-Young is illustrative. On January 10, 2022, a Youth Care Professional (YCP) responded to two residents' statements that they were not going to follow her directions by grabbing one of the residents and restraining her on the floor. *See* PX-73 at 2. Dr. Dudley described this approach as "risky and dangerous," as it "can . . . result in injury." Tr. vol. 5 at 907. In an email shortly after the incident, Henley-Young's Interim Director, Marshand Crisler, admitted that the YCP "had NOT received proper training at the time of the incident." PX-75 at 1.  Indeed, the YCP, who began working at Henley-Young just two weeks prior to the incident, "ha[d] yet to receive ANY formal training." *Id.* As demonstrated by this episode, allowing new staff to begin work prior to receiving any training violates the Consent Decree and subjects detained youth-tried-as-adults to heightened risk of unconstitutional use-of-force.

Major Bryan also testified that the County's failure to train staff on use-of-force issues resulted in staff "inappropriately applying force." Tr. vol. 3 at 418. She explained, "when you're talking about a constitutional issue like use of force, it is critically important that there be extensive scenario training on all the myriad of situations that officers could find themselves in and require them to use force, not just Taser force but any force." *Id.* at 421. Some problems cited by Major Bryan include officers attempting "to avoid [use-of-force] at all costs" or using force in a "heavy-handed" manner. *Id.*

The Court finds that some of the use of force training paragraphs are necessary for minimal compliance with the Constitution. The following paragraphs are narrowly drawn, extend no further than necessary, and are the least intrusive means necessary to comply with the Constitution.

52. The County must develop and implement a use of force training program.

53. Topics covered by use of force training must include:

    a.      Instruction on what constitutes excessive force;

    b.      De-escalation tactics;

    c.      Methods of managing prisoners with mental illness to avoid the use of force;

    d.      Defensive tactics;

    e.      All Jail use of force policies and procedures, including those related to documentation and review of use of force.

55. The County must update any use of force training after any revision to a use of force policy or procedure.

### 4.      Use of Force Reporting

The Consent Decree provisions regarding use of force reporting are reproduced here:

56. Develop and implement use of force reporting policies and procedures that ensure that Jail supervisors have sufficient information to analyze and respond appropriately to use of force.

57. Require each staff member who used or observed a use of force to complete a Use of Force Report as promptly as possible, and no later than by the end of that staff member's shift. Staff members must accurately complete all fields on a Use of Force Report. The failure to report any use of force must be treated as a disciplinary infraction, subject to re-training and staff discipline, including termination. Similarly, supervisors must also comply with their documentation obligations and

will be subject to re-training and discipline for failing to comply with those obligations.

58. Ensure that Jail use of force reports include an accurate and detailed account of the events. At minimum, use of force reports must document the following information:

a.     A unique tracking number for each use of force;

b.     The names of all staff members, prisoner(s), and other participants or witnesses;

c.     Housing classification and location;

d.     Date and time;

e.     A description of the events leading to the use of force, including what precipitated or appeared to precipitate those events.

f.     A description of the level of resistance, staff response, and the type and level of force (including frequency and duration of use). For instance, use of force reports must describe the number of discharges from electronic control devices and chemical munitions canisters; the amount of discharge from chemical munitions canisters; whether the Staff Member threatened to use the device or actually discharged the device; the type of physical hold or strike used; and the length of time a prisoner was restrained, and whether the prisoner was released from restraints for any period during that time;

g.     A description of the staff member's attempts to de-escalate the situation without use of force;

    h.     A description of whether the staff member notified supervisors or other personnel, including medical or mental health staff, before or after the use of force;

    i.     A description of any observed injuries to staff or prisoners;

    j.     Whether medical care was required or provided to staff or prisoners;

    k.     Reference to any associated incident report or prisoner disciplinary report completed by the reporting officer, which pertains to the events or prisoner activity that prompted the use of force;

    l.     A signature of the staff member completing the report attesting to the report's accuracy and completeness.

59. The County must ensure that Jail supervisors review, analyze, and respond appropriately to use of force. At minimum:

    a.     A supervisor must review all use of force reports submitted during the supervisor's watch by the end of the supervisor's watch.

    b.     A supervisor must ensure that staff members complete their use of force reports by the end of their watch.

    c.     Reviewing supervisors must document their findings as to the completeness of each staff member's use of force report, and must also document any procedural errors made by staff in completing their reports.

d.      If a Use of Force report is incomplete, reviewing supervisors must require Staff Members to provide any required information on a revised use of force report, and the Jail must maintain both the original and any revised report in its records.

e.      Any supervisor responsible for reviewing use of force reports must document their use of force review as described in Paragraph 62 sufficiently to allow auditing to determine whether an appropriate review was conducted.

f.      All Level 1 uses of force must be sent to the shift commander, warden, Jail Administrator, and IAD.

g.      A Level 2 use of force must be referred to the shift commander, warden, Jail Administrator, and IAD if a reviewing supervisor concludes that there may have been a violation of law or policy. Level 2 uses of force may also be referred to IAD if the County requires such reporting as a matter of Jail policy and procedure, or at the discretion of any reviewing supervisor.

60. After any Level 1 use of force, responding supervisors will promptly go to the scene and take the following actions:

a.      Ensure the safety of everyone involved in or proximate to the incident. Determine if anyone is injured and ensure that necessary medical care is or has been provided.

b.      Ensure that photos are taken of all injuries sustained, or as evidence that no injuries were sustained, by prisoners and staff involved in a use of force incident. Photos must be taken no later than two hours

70

after a use of force. Prisoners may refuse to consent to photos, in which case they should be asked to sign a waiver indicating that they have refused consent. If they refuse to sign a waiver, the shift commander must document that consent was requested and refused.

c.      Ensure that staff members and witnesses are identified, separated, and advised that communications with other staff members or witnesses regarding the incident are prohibited.

d.      Ensure that victim, staff, and witness statements are taken confidentially by reviewing supervisors or investigators, outside of the presence of other prisoners or involved staff.

e.      Document whether the use of force was recorded. If the use of force was not recorded, the responding supervisors must review and explain why the event was not recorded. If the use of force was recorded, the responding supervisors must ensure that any record is preserved for review.

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift. All level 1 uses of force must also be reviewed by a supervisor of Captain rank or above who was neither involved in nor approved the use of force. The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

62. Reviewing supervisors must document the following:

a.      Names of all staff members, prisoner(s), and other participants or witnesses interviewed by the supervisor;

b.      Witness statements;

c.      Review date and time;

d.      The findings, recommendations, and results of the supervisor's review;

e.      Corrective actions taken;

f.      The final disposition of the reviews (e.g., whether the Use of Force was found to comply with Jail policies and procedures, or whether disciplinary action was taken against a staff member);

g.      Supporting documents such as incident reports, logs, and classification records. Supervisors must also obtain and review summary medical and mental health records describing –

   i.      The nature and extent of injuries, or lack thereof;

   ii.     The date and time when medical care was requested and actually provided;

   iii.    The names of medical or mental health staff conducting any medical or mental health assessments or care.

h.      Photos, video/digital recordings, or other evidence collected to support findings and recommendations.

* * *

As Major Bryan emphasized during her testimony, accurately reporting use-of-force is critical, as "using force is a constitutional issue." Tr. vol. 3 at 514. Accordingly, staff must file a report "after every use of force." *Id.* Reports such as after-action reviews, Ms. Simpson testified, can reduce risk of harm by identifying "what issues might have come to the fore," and "what corrective actions might have been put into place" in response to the incident. Tr. vol. 4 at 684.

Mr. Parrish testified that supervisors often fail to review use-of-force and incident reports, and that this poses a risk of serious harm to inmates. Tr. vol. 1 at 172. Similarly, Ms. Simpson emphasized that paragraph 43(e) of the Consent Decree specifies that the occurrence of three or more use-of-force or prisoner-on-prisoner incidents without proper documentation violates the agreement. Tr. vol. 7 at 1217. "For the most part," Ms. Simpson testified, staff fail to submit reports regarding use-of-force. *Id.* at 1263. Photographs, required under Consent Decree ¶ 60(b), are also "not routinely taken" as part of use-of-force documentation. *Id.* at 1264.

Testimony put on by the defendants reinforces these concerns. In discussing the October 2021 death of M.R., Sheriff Jones agreed that "there were several policy violations surrounding that incident," and that "[b]ased on those type of policy violations, there should have been corrective action taken immediately following that death." Tr. vol. 10 at 1951. Additionally, of the seven deaths that occurred at RDC in

2021, the Sheriff had "only seen one after-action report." *Id.* at 1972.[16]

Many of the inadequacies in documenting use-of-force stem from staff's persistent failure to "check the box" on a form. Tr. vol. 7 at 1329. If officers fail to check the box that force was used, then they cannot fill out the use-of-force reporting information. *Id.* This inhibits collection and tracking of use-of-force incidents.

The Court finds that parts of five of the use of force reporting paragraphs are necessary for minimal compliance with the Constitution. The resulting paragraphs are narrowly drawn, extend no further than necessary, and are the least intrusive means necessary to comply with the Constitution.

56. Develop and implement use of force reporting policies and procedures that ensure that Jail supervisors have sufficient information to analyze and respond appropriately to use of force.

57. Require each staff member who used or observed a use of force to complete a Use of Force Report as promptly as possible. Staff members must accurately complete all fields on a Use of Force Report.

58. Ensure that Jail use of force reports include an accurate and detailed account of the events.

59. The County must ensure that Jail supervisors review, analyze, and respond appropriately to use of force.

---

[16] Indeed, Sheriff Jones testified that "[t]he first time [he] became familiar with an after-action report was when [he] read the one for the death of MR . . . completed by the former jail administrator," Major Bryan. Tr. vol. 10 at 1972. Prior to that, he did not know what an after-action report was.

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift. All level 1 uses of force must also be reviewed by a supervisor who was neither involved in nor approved the use of force. The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

### 5.    Incident Reporting and Review

The Consent Decree provisions regarding incident reporting and review are reproduced here:

63. Develop and implement incident reporting policies and procedures that ensure that Jail supervisors have sufficient information in order to respond appropriately to reportable incidents.

64. Ensure that Incident Reports include an accurate and detailed account of the events. At minimum, Incident Reports must contain the following information:

a.    Tracking number for each incident;

b.    The names of all staff members, prisoner, and other participants or witnesses;

c.    Housing classification and location;

d.    Date and time;

e.    Type of incident;

f.    Injuries to staff or prisoner;

g.    Medical care;

  h. All staff involved or present during the incident and their respective roles;

  i. Reviewing supervisor and supervisor findings, recommendations, and case dispositions;

  j. External reviews and results;

  k. Corrective action taken; and

  l. Warden and Administrator review and final administrative actions.

65. Require each staff member directly involved in a reportable incident to accurately and thoroughly complete incident reports as promptly as possible, by the end of the staff member's shift. At minimum:

  a. Staff members must complete all fields on an Incident Report for which they have responsibility for completion. Staff members must not omit entering a date, time, incident location, or signature when completing an Incident Report. If no injuries are present, staff members must write that; they may not leave that section blank.

  b. Failure to report any reportable incident must be treated as a disciplinary infraction, subject to retraining and staff discipline, including termination.

  c. Supervisors must also comply with their documentation obligations and will also be subject to retraining and discipline for failing to comply with those obligations.

66. Ensure that Jail supervisors review and respond appropriately to incidents. At minimum:

a.      Shift commanders must document all reportable incidents by the end of their shift, but no later than 12 hours after a reportable incident.

b.      Shift commanders must report all suicides, suicide attempts, and deaths, no later than one hour after the incident, to a supervisor, IAD, and medical and mental health staff.

c.      Any supervisor responsible for reviewing Incident Reports must document their incident review within 24 hours of receipt of an Incident Report sufficiently to allow auditing to determine whether an appropriate review was conducted. Such documentation must include the same categories of information required for supervisor use of force reviews such as names of individuals interviewed by the supervisor, witness statements, associated records (e.g. medical records, photos, and digital recordings), review dates, findings, recommendations, and case dispositions.

d.      Reportable incidents must be reviewed by a supervisor not directly involved in the incident.

* * *

The Constitutional rights of a pretrial detainee "flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." *Kitchen v. Dallas Cnty.*, 759 F.3d 468, 477 (5th Cir. 2014). At a minimum, this requires officials to "take reasonable measures to guarantee the safety of the inmates[.]" *Farmer*, 511 U.S. at 832 (quotations omitted); *see also Kitchen*, 759 F.3d at 482.

As to incident reporting and review, neither the Constitution nor federal law mandates reporting mechanisms or effective

review of episodic events. Yet failure to take reasonable measures to abate risks of serious harm can lead to constitutional deprivation. *See Medlock v. Hutchinson*, No. 5:17-CV-108, 2019 U.S. Dist. LEXIS 40472, at *12 (E.D. Tex. Feb. 12, 2019); *see also Snyder v. Whittier*, No. 9:05-CV-1284 (TJM/DEP), 2008 U.S. Dist. LEXIS 125344, at *33-34 (N.D.N.Y. Dec. 12, 2008).

In *Snyder v. Whittier*, a § 1983 claim for failure to report, the Northern District of New York explained that, "it is clear that a corrections worker has an obligation to intercede and prevent an ongoing or future constitutional violation where he or she has a reasonable opportunity to do so," but found no liability on the part of a corrections worker's failure to report "an incident which has occurred in the past, and where no similar future conduct has recurred[.]" 2008 U.S. Dist. LEXIS 125344, at *33-34. This finding is in keeping with Supreme Court precedent. *See Farmer*, 511 U.S. at 833-34 ("[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners"; they are "not free to let nature take its course."). Accordingly, failure to report or meaningfully review can implicate a failure to protect or intervene, where there is a pattern or risk of ongoing or recurring harm.

At RDC the risk of ongoing and recurring harm is well-known. At the February 22 Evidentiary Hearing, Mr. Parrish testified that violence is "a constant ongoing problem throughout the Raymond Detention Center." Tr. vol. 1 at 103. Ms. Simpson calculated that 77 assaults were reported between October 2021 and January 2022. Tr. vol. 2 at 289. This figure breaks down to "about 20 [assaults] per month, one of them being an assault that resulted in the inmate being beaten to death." Tr. vol. 1 at 104.

One incident illustrates how a failure to report and meaningfully review implicates a failure to protect.

On July 5, 2021, in A-Pod, Unit 1, a detainee was stabbed. *See* PX-32 at 88; *see also id.* at 99. It required a rapid notification and medical transport, which both indicate that it was likely serious in nature. *See* PX-32 at 88. In the corresponding incident report, there is reference to an earlier assault for which there is no incident report. *See* Fifteenth Monitoring Report at 46.

On December 1, 2021, the same detainee, on the same housing unit, was stabbed—again. *See* PX-88 at 126. The corresponding incident report reflects that after this incident, the detainee was transported to medical, and then returned to the same housing unit again.

The Monitor noted that this detainee had been the victim of at least three assaults, two of which were stabbings, and yet he had been placed on the same housing unit again and again and again. *See* Fifteenth Monitoring Report at 46; *see also* PX-32 at 99. These events occurred on the notorious A-Pod, which "inmates control" and even Sheriff Tyree Jones considers unsafe. Tr. vol. 1 at 96; Tr. vol. 10 at 1930 ("I would consider A-Pod to be unsafe.").

Even so, the full scale of violence at RDC is severely understated because neither detainees nor staff report all incidents. *See* Fifteenth Monitoring Report at 46 ("Inmate on inmate assaults continue at a high rate. Particularly concerning is the indication that many assaults go unreported.").

For example, after-action reviews (and corresponding reports), to be completed after any serious incident, are rare. Serious incidents, however, are not. Only one of seven deaths

last year were subject to an after-action review. The report regarding the murder of M.R. revealed several problems, including a practice in which officers were delegating their duties to detainees themselves,[17] failing to conduct welfare checks, and sleeping instead of manning the cameras in the control room. Tr. vol. 11 at 1977. Three officers were fired because of their actions (or inaction) during the murder. Tr. vol. 3 at 498. Those firings, however, do not erase or cure the constitutional violations.

Given that deaths don't warrant reports, it comes as no surprise that reports are also not completed when detainees are held beyond their release date, Tr. vol. 1 at 143-44, when inmates are assaulted, Fifteenth Monitoring Report at 46, when inmates escape,[18] or when staff use and/or deplete fire extinguishers, PX-106 at 7. The latter being a violation of obvious and grave risk being that "in the event of a fire . . . there will not be any means to extinguish it." *Id.* And there are often fires at RDC, three in January 2022 alone. *Id.*

Where incidents are reported, the record shows that the County still has a ways to go. At the Work Center, Mr. Parrish praised reports as "better than anything that I have seen in the past." Tr. vol. 1 at 145. Reports from RDC, though, were

---

[17] The after-action review report states that rather than having inmates line up to receive their individual trays, multiples trays were given to some inmates for them to distribute. Had individual meals been distributed, officers would have realized M.R. was not downstairs for morning meal service. PX-19 at 8.

[18] *See* Tr. vol. 1 at 321 (Mr. Parrish reporting that "there was an escape from the work release center several months ago. One inmate was recaptured. The other ones is still on the lam. There has never been an after-action report done on that.").

described as "inept," "unintelligible," and "incomplete." *Id.*
He added that he has "never read worse incident reports than
what [he] routinely read in Hinds County." *Id.* This has ram-
ifications for inmate-on-inmate violence.

Reporting mechanisms and effective review are integral to the
prevention, intervention, and remediation of constitutional
violations. After a review of the complete record, the Court
finds that paragraphs 63, 64, and 66 as modified below are
necessary to ensure a safe facility and address the substantial
risk of serious harm to which detainees remain exposed. Par-
agraph 65, however, is deleted. The retained paragraphs are
narrowly drawn, extend no further than necessary, and the
least intrusive means necessary to comply with the Constitu-
tion:

63. Develop and implement incident reporting policies and
procedures that ensure that Jail supervisors have sufficient in-
formation to respond appropriately to reportable incidents.

64. Ensure that Incident Reports include an accurate and de-
tailed account of the events.

66. Ensure that Jail supervisors review and respond appropri-
ately to incidents.

### 6.    Sexual Misconduct

The Consent Decree provision regarding sexual misconduct
is reproduced here:

67. To prevent and remedy violations of prisoners' constitu-
tional rights, the County must develop and implement poli-
cies and procedures to address sexual abuse and misconduct.
Such policies and procedures must include all of the follow-
ing:

81

a.    Zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations;

b.    Staff training on the zero tolerance policy, including how to fulfill their duties and responsibilities to prevent, detect, report and respond to sexual abuse and sexual harassment under the policy;

c.    Screening prisoners to identify those who may be sexually abusive or at risk of sexual victimization;

d.    Multiple internal ways to allow both confidential and anonymous reporting of sexual abuse and sexual harassment and any related retaliation, including a mechanism for prisoners to directly report allegations to an outside entity;

e.    Both emergency and ongoing medical and mental health care for victims of sexual assault and sexual harassment, including rape kits as appropriate and counseling;

f.    A complete ban on cross-gender strip searches or cross-gender visual body cavity searches except in exigent circumstances or when performed by a medical examiner;

g.    A complete ban on cross-gender pat searches of women prisoners, absent exigent circumstances;

h.    Regular supervisory review to ensure compliance with the sexual abuse and sexual harassment policies; and

> i.   Specialized investigative procedures and training for investigators handling sexual abuse and sexual harassment allegations.

* * *

The Consent Decree provision regarding sexual misconduct largely tracks the requirements of the Prison Rape Elimination Act (PREA), passed by Congress in 2003. Expert testimony at the hearing, as well as the Fifteenth Monitoring Report, reveal that the jail is non-compliant with PREA, and has not provided detainees reasonable safety and protection from sexual misconduct and sexual violence.

A little over a year ago, the County's PREA compliance efforts were touted as an area of improvement. The Monitor reported that the quality of the PREA coordinator's reports had improved, and that the coordinator was "really circling back to ensure that victims are getting the services that they need." Docket No. 79 at 61-62; *see also* Tr. vol. 7 at 1269.

That progress has all but deteriorated.

The PREA coordinator was on leave from mid-July to December 2021. During that time, essentially no one else took over her duties. Tr. vol. 6 at 1131; Fifteenth Monitoring Report at 71-73. For instance, during her leave there were a number of PREA incidents, as gleaned from medical and mental health staff, with neither reports nor investigations. Tr. vol. 6 at 1131; Fifteenth Monitoring Report at 71-73. The PREA cellphone went unanswered and unattended. Tr. vol. 8 at 1411-12.

"The Eighth Amendment affords prisoners protection against injury at the hands of other inmates." *Johnston v. Lucas*, 786 F.2d 1254, 1259 (5th Cir. 1986). A claim, however, requires a showing that officials were deliberately indifferent, unless a

detainee can show that the jail environment is one in which "terror reigns." *Jones v. Diamond*, 636 F.2d 1364 (5th Cir. 1981) (overruled on other grounds by *International Woodworkers of America, AFL-CIO and its Local No. 5-376 v. Champion Intern. Corp.*, 790 F.2d 1174 (5th Cir. 1986)). The Fifth Circuit has held that terror reigns where "officials permit violent offenders to hold sway over part or all of the facility — creating 'a pervasive risk of harm and a failure to take reasonable steps to prevent the known risk'" *Anderson v. Morris*, No. 4:16-CV-101-DMB-JMV, 2017 U.S. Dist. LEXIS 159954, at *12 (N.D. Miss. July 18, 2017) (quoting *Stokes v. Delcambre*, 710 F.2d 1120 (5th Cir. 1983)).

It is no secret that RDC is unsafe, especially A-Pod. The Sheriff admits that. *See* Tr. vol. 10 at 1930 ("I would consider A-Pod to be unsafe."). Staff reportedly "call out sick or just not show up for work" because they are "afraid to work a pod." Tr. vol. 3 at 407. The inmates in A-Pod, and C-Pod, Unit 3, have established "inmate committees" or "gang committees" that "essentially run the unit and among other things they decide if there's someone on the unit that they don't want on the unit." Tr. vol. 3 at 460; Tr. vol. 6 at 1096; Tr. vol. 8 at 1404. The committees deprive unwelcome detainees of food and "will harass, steal from, assault that inmate" until the detainee requests to be moved. Tr. vol. 8 at 1404. There is no lighting, no way to see inside the cells from outside, and the cell doors don't lock. Tr. vol. 8 at 1123, 1307.

Mr. Parrish testified that

> A-Pod is a disaster. It's filthy; lights don't work; locks don't work; doors can't be secured; cells don't have lights inside them. Inmates since they can't even close the doors, end up hanging

> blankets down in front of them to have make-
> shift privacy to their cells. Showers don't work.
> Everything in the place is torn up. It's just a very
> bad mess. There's no fire extinguishers inside,
> of course, because the inmates control that
> place. There are no officers who work inside the
> housing units in Alpha. There are no fire hoses.
> There are not even fire hoses out in the corri-
> dors, around the control room in Alpha. That
> area is ill equipped across the board.

Tr. vol. 1 at 96. This testimony tracks the Court's own in-per-
son observations during its February 2022 visit to the facility.

It was in this environment that sexual misconduct, including
sexual assaults, went essentially unchecked while the PREA
coordinator was out for six months. That failure constitutes
deliberate indifference to the sexual violence facing detainees.
Lack of adequate staffing, supervision, and cameras exacer-
bate the risk of sexual violence, particularly in A-Pod, but are
not exclusive to A-Pod. *See* Tr. vol. 7 at 1256 ("PREA issues
involve the Work Center.").

One of several disturbing incidents shared during the hearing
shows that incidents of sexual misconduct and violence un-
fortunately also extend to Henley-Young. S*ee* Tr. vol. 6 at 956-
57, 962; *see also* PX-47. On October 8, 2021, a minor visited one
of the mental health therapists and reported that earlier in the
day he was attacked. PX-47. While playing cards, he got up to
grab water when several other residents grabbed him by his
feet and dragged him into an empty room. *Id.* Once inside the
room, they sexually assaulted him. *Id.* Other residents even-
tually broke up the assault. *Id.* The minor reported that an of-
ficer witnessed the event but did not intervene. *Id.*

Mr. Moeser testified that after a review of the camera footage, the attack was verified, and that an Officer "was on the unit sitting at a table and did nothing." Tr. vol. 6 at 956.

The Court finds that non-compliance with PREA, as well as current and ongoing sexual misconduct that the County has taken little to no efforts to abate in the past six months, requires the sexual misconduct provision to remain intact.

The retained paragraph is narrowly drawn, extends no further than necessary, and is the least intrusive means necessary to comply with the Constitution:

67. To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement policies and procedures to address sexual abuse and misconduct. Such policies and procedures must include all of the following:

> a.     Zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations;

> b.     Staff training on the zero tolerance policy, including how to fulfill their duties and responsibilities to prevent, detect, report and respond to sexual abuse and sexual harassment under the policy;

> c.     Screening prisoners to identify those who may be sexually abusive or at risk of sexual victimization;

> d.     Multiple internal ways to allow both confidential and anonymous reporting of sexual abuse and sexual harassment and any related retaliation, including a

mechanism for prisoners to directly report allegations to an outside entity;

e.　　Both emergency and ongoing medical and mental health care for victims of sexual assault and sexual harassment, including rape kits as appropriate and counseling;

f.　　A complete ban on cross-gender strip searches or cross-gender visual body cavity searches except in exigent circumstances or when performed by a medical examiner;

g.　　A complete ban on cross-gender pat searches of women prisoners, absent exigent circumstances;

h.　　Regular supervisory review to ensure compliance with the sexual abuse and sexual harassment policies; and

i.　　Specialized investigative procedures and training for investigators handling sexual abuse and sexual harassment allegations.

### 7.　　Investigations

The Consent Decree provision regarding investigations is reproduced here:

68. The County shall ensure that it has sufficient staff to identify, investigate, and correct misconduct that has or may lead to a violation of the Constitution. At a minimum, the County shall:

a.　　Develop and implement comprehensive policies, procedures, and practices for the thorough and timely (within 60 days of referral) investigation of alleged staff misconduct, sexual assaults, and physical

assaults of prisoners resulting in serious injury, in accordance with this Agreement, within 90 days of its Effective Date. At a minimum, an investigation will be conducted if:

     i.     Any prisoner exhibited a serious injury;

     ii.     Any staff member requested transport of the prisoner to the hospital;

     iii.     Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

     iv.     Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

b.     Per policy, investigations shall:

     i.     Be conducted by qualified persons, who do not have conflicts of interest that bear on the partiality of the investigation;

     ii.     Include timely, thorough, and documented interviews of all relevant staff and prisoners who were involved in or who witnessed the incident in question, to the extent practicable; and

     iii.     Include all supporting evidence, including logs, witness and participant statements, references to policies and procedures relevant to

the incident, physical evidence, and video or audio recordings.

c.      Provide investigators with pre-service and annual in-service training so that investigators conduct quality investigations that meet the requirements of this Agreement;

d.      Ensure that any investigative report indicating possible criminal behavior will be referred to the appropriate criminal law enforcement agency;

e.      Within 90 days of the Effective Date of this Agreement, IAD must have written policies and procedures that include clear and specific criteria for determining when it will conduct an investigation. The criteria will require an investigation if:

      i.      Any prisoner exhibited serious, visible injuries (e.g., black eye, obvious bleeding, or lost tooth);

      ii.     Any staff member requested transport of the prisoner to the hospital;

      iii.    Staff member reports indicate inconsistent, conflicting, or suspicious accounts of the incident; or

      iv.     Alleged staff misconduct would constitute a violation of law or Jail policy, or otherwise endangers facility or prisoner safety (including inappropriate personal relationships between a staff member and prisoner, or the smuggling of contraband by a staff member).

f.      Provide the Monitor and United States a periodic report of investigations conducted at the Jail every four months. The report will include the following information:

      i.      a brief summary of all completed investigations, by type and date;

      ii.      a listing of investigations referred for administrative investigation;

      iii.      a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

      iv.      a listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures. This list must also contain the specific misconduct and/or violation.

      v.      a description of any corrective actions or changes in policies, procedures, or practices made as a result of investigations over the reporting period.

g.      Jail management shall review the periodic report to determine whether the investigation system is meeting the requirements of this Agreement and make recommendations regarding the investigation system or other necessary changes in policy based on this review. The review and recommendations will be documented and provided to the Monitor and United States.

*   *   *

The Hinds County Sheriff's Office has two investigative divisions. The Criminal Investigation Division (CID) "is intended to investigate criminal activity, typically involving an inmate that's being investigated." Tr. vol. 6 at 1130. The Internal Affairs Division (IAD), meanwhile, "involves investigati[on] of staff persons regarding potentially criminal activity, but also violations of policy and procedure." *Id.*

Expert testimony at the hearing established that CID investigations "have improved over the years, but they're still not very thorough." Tr. vol. 6 at 1117. The County now employs a second CID investigator, with at least one focused on contraband mitigation efforts. Tr. vol. 8 at 1436-37. The Fifteenth Monitoring Report expressed dismay that "[c]onsidering the significant number of assaults, the fact that none resulted in a criminal indictment is unusual." Fifteenth Monitoring Report at 76.

Turning to IAD, on November 30, 2021, the County's only investigator resigned. PX-14. In his letter of resignation, he stated that he worked "long and hard to try to keep up with the workload," "with tireless effort," "even though this work should have three people to get everything done in a proper time." *Id.* Consequently, there is no IAD investigator. A current employee is slated to fill that position. Tr. vol. 8 at 1436-37.

Mr. Parrish testified that "it's very difficult for us to track [IAD investigations] . . . because we sometimes don't get any reports and sometimes get it very, very late." Tr. vol. 6 at 1117. This "impacts our ability to provide direct assistance and to inform the Court in that area for proper response. To the extent that staff who need to see those reports don't get them, it

certainly impacts the ability for that staff to take appropriate corrective or remedial action." *Id.*

Mr. Parrish also testified that in the IAD investigation of a suicide in July 2021, the report failed to mention that upon finding the inmate hanging in his cell, a sergeant and officer delayed cutting the detainee down: "[i]nstead of going in and taking some action to cut him down, or do anything, they left him hanging there and went back to the control room in Charlie where the sergeant called up a shift commander in booking to let him know what was going on." Tr. vol. 1 at 154-55. He added, "[b]ut the first action should have been to take him down, and that was with a supervisor right there. There was nothing ever written up about that in the IAD investigation, and I questioned that. It didn't seem to me that the supervisor was being held accountable for his lack of action." *Id.*

According to Mr. Parrish, another death was not investigated until the Monitoring Team pressed. *See* Tr. vol 1 at 156 ("The jail and the sheriff's office took the position that since he had not been physically booked, even though he was held in a holding cell, he was not their inmate. And that was contrary to what the settlement agreement calls for, and we asked to have an investigation conducted."). That investigation ultimately revealed significant issues with emergency medical equipment, or lack thereof, as well as initial intake screening. *Id.*

Investigations are further hampered by the lack of functioning cameras. At last count, "56 cameras were not working, 14 were missing and 10 needed adjusting." Fifteenth Monitoring Report at 72.

92

Despite the obvious shortcomings of failing to investigate, the Fifth Circuit has held that failure to investigate cannot give rise to due process violations, and such claims are "indisputably meritless." *Geiger v. Jowers*, 404 F.3d 371, 373-74 (5th Cir. 2005) (citing *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Orellana v. Kyle*, 65 F.3d 29, 31-32 (5th Cir. 1995)); *see also Bernhart v. Gusman*, No. 15-1800, 2015 U.S. Dist. LEXIS 172688, at *38 (E.D. La. Nov. 16, 2015). In accordance with this decision, insofar as Consent Decree provisions speak to due process violations stemming from inadequate investigations, those provisions cannot stand.

This is not to say that failure to investigate or inadequate investigations cannot cause a constitutional deprivation. The guiding principle requires officials to "take reasonable measures to guarantee the safety of the inmates," *Farmer*, 511 U.S. at 832, and thus where failures to investigate or inadequate investigations are the driving force behind ongoing or future constitutional violation, they may indeed be actionable. *See Snyder*, 2008 U.S. Dist. LEXIS 125344, at *33-34; *see also Bell v. Fowler*, 99 F.3d 262, 270 (8th Cir. 1996) (citing *Parrish v. Luckie*, 963 F.2d 201 (8th Cir. 1992), wherein the court "affirmed a § 1983 jury verdict against the City of North Little Rock for failing to investigate *prior* complaints that an officer had been committing acts of violence and sexual misconduct, where the failure to act resulted in a sexual assault on the plaintiff.").

The County's efforts in this regard have borne some fruit as to CID Investigations and the Court does not find that the County has been deliberately indifferent there. Though this must be balanced with serious inadequacies on the IAD side. Ultimately, the divisions function as two parts of a whole, and

the inadequate investigations staff and lack of functioning cameras all but guarantee that deficient investigations will continue to plague the County and place inmates at substantial risk of serious harm.

Though paragraph 68 directly addresses staffing, it has been substantially revised below to be "narrowly drawn" and the "least intrusive means necessary." *See* 18 U.S.C. § 3626(b)(2). It is explicitly tied to remedying constitutional violations, as discussed above.

68. The County shall ensure that it identifies, investigates, and corrects misconduct that has or may lead to a violation of the Constitution. The County must:

a.     Develop and implement comprehensive policies, procedures, and practices for the thorough and timely investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury.

f.     Provide the Monitor and United States a periodic report of investigations conducted at the Jail every four months. The report will include the following information:

i.     a brief summary of all completed investigations, by type and date;

ii.     a listing of investigations referred for administrative investigation;

iii.     a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

94

> iv.    a listing of all staff suspended, termi-
> nated, arrested or reassigned because of mis-
> conduct or violations of policy and procedures.
> This list must also contain the specific miscon-
> duct and/or violation.
>
> v.    a description of any corrective actions or
> changes in policies, procedures, or practices
> made as a result of investigations over the re-
> porting period.

### 8.    Grievance and Prisoner Information Systems

The Consent Decree provisions regarding grievance and pris-
oner information system are reproduced here:

69. The grievance system must permit prisoners to confiden-
tially report grievances without requiring the intervention of
a detention officer.

70. Grievance policies and procedures must be applicable and
standardized across the entire Jail.

71. All grievances must receive appropriate follow-up, includ-
ing a timely written response by an impartial reviewer and
staff tracking of whether resolutions have been implemented
or still need implementation. Any response to a medical
grievance or a grievance alleging threats or violence to the
grievant or others that exceeds 24 hours shall be presumed
untimely.

72. The grievance system must accommodate prisoners who
have physical or cognitive disabilities, are illiterate, or have
LEP, so that these prisoners have meaningful access to the
grievance system.

73. The County must ensure that all current and newly admitted prisoners receive information about prison rules and procedures. The County must provide such information through an inmate handbook and, at the discretion of the Jail, an orientation video, regarding the following topics: understanding the Jail's disciplinary process and rules and regulations; reporting misconduct; reporting sexual abuse, battery, and assault; accessing medical and mental health care; emergency procedures; visitation; accessing the grievance process; and prisoner rights. The County must provide such information in appropriate languages for prisoners with LEP.

\* \* \*

Expert testimony at the hearing, as well as the Fifteenth Monitoring Report, established that the County has come "relatively close" to implementing the Consent Decree provisions on grievances, but that there are an "unacceptable number that receive no response and receive late responses, a number that are denied as not being grievances, and a number that are accepted as a grievance but don't have an appropriate response." Tr. vol. 6 at 1131-32.

In *Geiger v. Jowers*, the Fifth Circuit held that there is no "federally protected liberty interest in having grievances resolved to [] satisfaction." 404 F.3d 371, 374 (5th Cir. 2005). Though, where a grievance implicates a constitutional right, failure to consider it may give rise to a legally cognizable injury. *Bell v. Woods*, 382 F. App'x 391, 393 (5th Cir. 2010).

The record shows that grievances are critical indications of constitutional deprivations yet are still routinely ignored. In one grievance, for example, a detainee states,

> I was stabbed in my temple and in my forehead and in the back of my head,my eye socket is cracked,i filled out a protected custody form that was ignored by the officers which lead up to me almost losing my life im partially blind in my right eye i cant sleep at night because im traumatized.i was brutally beating by multiple guys.this would have never happened if they would have put me on protected custody like i asked.i filled out a protected custody form and it was ignored.my right side of my face was very swollen inmates was trying to exstort me out of money they beat me and stabbed me and posted it on social media[.]

PX-27. To which the County responded in writing, "I understand your complaint but this is a grievance form. What is your grievance so i direct you to the right person." *Id.*; *see also* Tr. vol. 6 at 1105; *Whitley v. Hanna*, 726 F.3d 631, 652 n.2 (5th Cir. 2013) (Elrod, J. concurring) (explaining that deliberate indifference occurs when the defendant is guilty of "turning a blind eye").

The Court finds that grievances like this—pleas for help and ignored requests for protective custody—provide clear indications that the recurrence of harm is obvious, predictable, and likely. Having "potential victims dare[] not sleep" and "spend the night clinging to the bars" alone is deeply concerning in of itself. *Farmer*, 511 U.S. at 833-34 (citing *Hutto v. Finney*, 437 U.S. 678, 681-82 (1978)).

The evidence indicated that grievance forms are essential to the County's compliance with basic Constitutional requirements. The County relies on grievances to identify people

who are being over-detained in violation of the Constitution, *see infra* 110-25, and the Monitors rely on grievances to quantify and assess assaults. *See* Tr. vol. 6 at 1061-62. As Mr. Parrish testified, however, the County "repeatedly" fails to appropriately respond to grievances. Tr. vol. 6 at 1006. Indeed, detainees have resorted to setting fires as a common method to get the attention of staff regarding their complaints. *See* Thirteenth Monitoring Report at 19.

After a review of the complete record, the Court finds that modified versions of paragraphs 69, 71, and 72 are necessary to ensure a safe facility and address the substantial risk of serious harm to which prisoners remain exposed. Paragraphs 70 and 73, however, are deleted. The retained paragraphs are narrowly drawn, extend no further than necessary, and the least intrusive means necessary to comply with the Constitution:

69. The grievance system must permit prisoners to confidentially report grievances without requiring the intervention of a detention officer.

71. All grievances must receive appropriate follow-up.

72. The grievance system must accommodate prisoners who have physical or cognitive disabilities, are illiterate, or have LEP, so that these prisoners have meaningful access to the grievance system.

### 9.    Restrictions on the Use of Segregation

The Consent Decree provisions regarding restrictions on the use of segregation are reproduced here:

74. Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term

housing where staff will provide access to exercise, meals, and other services.

75. The County must document the placement and removal of all prisoners to and from segregation.

76. Qualified Mental Health Professionals must conduct mental health rounds at least once a week (in a private setting if necessary, to elicit accurate information), to assess the mental health status of all prisoners in segregation and the effect of segregation on each prisoner's mental health, in order to determine whether continued placement in segregation is appropriate. These mental health rounds must not be a substitute for treatment.

77. The County must develop and implement restrictions on the segregation of prisoners with serious mental illness. These safeguards must include the following:

a.       All decisions to place a prisoner with serious mental illness in segregation must include the input of a Qualified Mental Health Professional who has conducted a face-to-face evaluation of the prisoner in a confidential setting, is familiar with the details of the available clinical history, and has considered the prisoner's mental health needs and history.

b.       Segregation must be presumed contraindicated for prisoners with serious mental illness.

c.       Within 24 hours of placement in segregation, all prisoners on the mental health caseload must be screened by a Qualified Mental Health Professional to determine whether the prisoner has serious mental illness, and whether there are any acute mental health contraindications to segregation.

d.      If a Qualified Mental Health Professional finds that a prisoner has a serious mental illness or exhibits other acute mental health contraindications to segregation, that prisoner must not be placed or remain in segregation absent documented extraordinary and exceptional circumstances (i.e. for an immediate and serious danger which may arise during unusual emergency situations, such as a riot or during the booking of a severely psychotic, untreated, violent prisoner, and which should last only as long as the emergency conditions remain present).

e.      Documentation of such extraordinary and exceptional circumstances must be in writing. Such documentation must include the reasons for the decision, a comprehensive interdisciplinary team review, and the names and dated signatures of all staff members approving the decision.

f.      Prisoners with serious mental illness who are placed in segregation must be offered a heightened level of care that includes the following:

i.      If on medication, the prisoner must receive at least one daily visit from a Qualified Medical Professional.

ii.     The prisoner must be offered a face-to-face, therapeutic, out-of-cell session with a Qualified Mental Health Professional at least once per week.

iii.    If the prisoner is placed in segregation for more than 24 hours, he or she must have his or her case reviewed by a Qualified Mental

100

Health Professional, in conjunction with a Jail physician and psychiatrist, on a weekly basis.

g.      Within 30 days of the Effective Date of this Agreement, A Qualified Mental Health Professional will assess all prisoners with serious mental illness housed in long-term segregation. This assessment must include a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner. Prisoners requiring follow-up for additional clinical assessment or care must promptly receive such assessment and care.

h.      If a prisoner on segregation decompensates or otherwise develops signs or symptoms of serious mental illness, where such signs or symptoms had not previously been identified, the prisoner must immediately be referred for appropriate assessment and treatment by a Qualified Mental Health Professional. Any such referral must also result in a documented evaluation and recommendation regarding appropriate (more integrated and therapeutic) housing for the prisoner. Signs or symptoms requiring assessment or treatment under this clause include a deterioration in cognitive, physical, or verbal function; delusions; self-harm; or behavior indicating a heightened risk of suicide (e.g., indications of depression after a sentencing hearing).

i.      The treatment and housing of prisoners with serious mental illness must be coordinated and overseen by the Interdisciplinary Team (or Teams), and guided by formal, written treatment plans. The Interdisciplinary Team must include both medical and security staff, but access to patient healthcare information must

remain subject to legal restrictions based on patient privacy rights. The intent of this provision is to have an Interdisciplinary Team serve as a mechanism for balancing security and medical concerns, ensuring cooperation between security and medical staff, while also protecting the exercise of independent medical judgment and each prisoner's individual rights.

j.      Nothing in this Agreement should be interpreted to authorize security staff, including the Jail Administrator, to make medical or mental health treatment decisions, or to overrule physician medical orders.

\* \* \*

Segregation, also referred to as isolation, is a single-cell housing area. Inmates there are let out of their cells for just one hour per day to shower and use the telephone, and then return to their cells for the remaining 23 hours. Tr. vol. 1 at 92. Segregation is comprised of high-security inmates, *id.*, and inmates with serious mental illnesses (SMI), Tr. vol. 4 at 597, 603.

Dr. Dudley explained that detainees with SMI housed in segregation are there because of behavioral difficulty or because they are seen as particularly vulnerable to victimization in the general population. *Id.* at 605. Simply put, although housing detainees with SMI there is unnecessary and inappropriate, there is no alternative housing available. *Id.* at 607.

The use of booking cells as housing, like segregation, also imposes severe restrictions on detainees' time spent out of the cells. Mr. Parrish testified that booking cells "were designed to hold people for no more than eight hours. . . . There's no

102

recreation area. There's no visitation space. There's only one shower that services the whole area, and that's not even located right there. It's down around the corner. It's not designed for housing[.]" Tr. vol. 1 at 102. They, too, are used to house inmates with serious mental health issues, like "being housed in segregation, as almost like an alternative unit." Tr. vol. 4 at 617.

Segregation and booking carry the same risk of serious harm, especially for the seriously mentally ill, and have long been considered inappropriate for housing those inmates.

Dr. Dudley explained that these environments exacerbate detainees' health needs. He described it as "spiraling." Tr. vol. 4 at 605. Access to mental and medical care is difficult because nurses must enter each cell rather than passing medication through bars, and thus, require an officer escort. Tr. vol. 5 at 808, 836. Because staffing is insufficient, though, escorts may not be available, and medical visits can be delayed or skipped altogether. *Id.* There is no privacy so mental health staff find it difficult to try to engage someone in a therapeutic session. Tr. vol. 4 at 614.

Welfare checks, required every 15 minutes in booking and every 30 minutes in segregation, are not being performed adequately, if at all. *See* PX-106 at 7. In booking, you cannot see into the cell without opening the door. *See id.* Yet officers are simply not opening the door, claiming that "there is no need to open the cell doors if the detainee is responsive when an observation is performed." *Id.* But observation logs are "inaccurate," *id.*, if not outright fabricated. *See e.g.*, Tr. vol. 1. at 168, vol. 5 at 930-31, vol. 10 at 1897-99. Given the longstanding warnings by the Monitoring Team that it is critical that booking not be used for housing, *see* Tr. vol. 1 at 101-02, and

considering there were two deaths in booking last year, a suicide and an overdose, the Court finds this completely unacceptable. Notably, in the case of J.M.'s suicide, "it was later determined that there had been a lapse of about three hours without any well-being checks on him." *Id.* at 159.

The same deficiencies are present in the segregation units. Dr. Dudley testified that there had been some concern that detainees housed in segregation were not receiving their meals and access to hygiene support. Tr. vol. 4 at 613; Tr. vol. 6 at 1124. These concerns were verified by the January 2022 Quality Assurance Report, which reported that nursing staff recently found two seriously mentally ill detainees "covered in feces," and that they "had suffered considerable weight since their last checks[]" and were "covered in sores with (1) having to be transported to the hospital for treatment." PX-106 at 5-6.

"'[F]ilthy, unsanitary' cells can violate the Eighth Amendment*." Taylor v. Stevens*, 946 F.3d 211, 219 (5th Cir. 2019) (quoting *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999)), *overruled on other grounds* by *Taylor v. Riojas*, 141 U.S. 52 (2020). The Eighth Amendment "does not mandate comfortable prisons, but neither does it permit inhumane ones*." Farmer*, 511 U.S. at 832. At a minimum, prison officials "must provide humane conditions of confinement" and "ensure that inmates receive adequate food, clothing, shelter, and medical care." *Id.* "They cannot deprive prisoners of the 'basic elements of hygiene' or the 'minimal civilized measure of life's necessities.'" *Taylor*, 946 F.3d at 219 (quoting *Palmer v. Johnson*, 193 F.3d 346, 352-53 (5th Cir. 1999)).

The problems with segregation and booking have existed "since the beginning[,]" Mr. Parrish testified. Tr. vol. 1 at 73.

Still, the County has failed in its efforts to develop more adequate housing for the seriously mentally ill.

The County retorts that it is constructing a mental health unit for detainees with SMI. Docket No. 140 at 7. Ms. Simpson brought the mental health unit up as a prime example of one of the County's many broken promises. Tr. vol. 7 at 1189. Talks about it date back to 2020, "if not before[.]" *Id.* at 1148. The County envisioned opening it in C-Pod because it was the first unit to be renovated. Then the County decided not to open it in C-Pod, and decided that the mental health unit would have to wait until B-Pod was renovated. And now "the unit that's been designated to be the mental health unit is not ready for occupancy, and it doesn't have the needed furnishings for opening the unit as a mental health unit." *Id.*

The Consent Decree does not contain a dedicated section for medical and mental health. Certain provisions pertain to medical and mental health but are included within other sections. Because of the County's continued use of segregation and booking for the seriously mentally ill, and grossly inadequate ability to care for, protect, and even provide suicide prevention, medical, and mental health care to these detainees, paragraphs 74-77 will remain. All subsections, however, are deleted.

The resulting paragraphs are narrowly drawn, extend no further than necessary, and the least intrusive means necessary to comply with the Constitution:

74. Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term housing where staff will provide access to exercise, meals, and other services.

105

75. The County must document the placement and removal of all prisoners to and from segregation.

76. Qualified Mental Health Professionals must conduct mental health rounds at least once a week (in a private setting if necessary, to elicit accurate information), to assess the mental health status of all prisoners in segregation and the effect of segregation on each prisoner's mental health, in order to determine whether continued placement in segregation is appropriate. These mental health rounds must not be a substitute for treatment.

77. The County must develop and implement restrictions on the segregation of prisoners with serious mental illness.

### 10.    Youthful Prisoners

The Consent Decree provisions regarding youthful prisoners are reproduced here:

78. Develop and implement a screening, assessment, and treatment program to ensure that youth with serious mental illness and disabilities, including developmental disabilities, receive appropriate programs, supports, education, and services.

79. Ensure that youth receive adequate free appropriate education, including special education.

80. Ensure that youth are properly separated by sight and sound from adult prisoners.

81. Ensure that the Jail's classification and housing assignment system does not merely place all youth in the same housing unit, without adequate separation based on classification standards. Instead, the system must take into account classification factors that differ even within the youth sub-

106

class of prisoners. These factors include differences in age, dangerousness, likelihood of victimization, and sex/gender.

82. Train staff members assigned to supervise youth on the Jail's youth-specific policies and procedures, as well as on age-appropriate supervision and treatment strategies. The County must ensure that such specialized training includes training on the supervision and treatment of youth, child and adolescent development, behavioral management, crisis intervention, conflict management, child abuse, juvenile rights, the juvenile justice system, youth suicide prevention and mental health, behavioral observation and reporting, gang intervention, and de-escalation.

83. Specifically prohibit the use of segregation as a disciplinary sanction for youth. Segregation may be used on a youth only when the individual's behavior threatens imminent harm to the youth or others. This provision is in addition to, and not a substitute, for the provisions of this Agreement that apply to the use of segregation in general. In addition:

    a.    Prior to using segregation, staff members must utilize less restrictive techniques such as verbal de-escalation and individual counseling, by qualified mental health or other staff trained on the management of youth.

    b.    Prior to placing a youth in segregation, or immediately thereafter, a staff member must explain to the youth the reasons for the segregation, and the fact that the youth will be released upon regaining self-control.

    c.    Youth may be placed in segregation only for the amount of time necessary for the individual to regain

107

self-control and no longer pose an immediate threat. As soon as the youth's behavior no longer threatens imminent harm to the youth or others, the County must release the individual back to their regular detention location, school or other programming.

d.      If a youth is placed in segregation, the County must immediately provide one-on-one crisis intervention and observation.

e.      The County must specifically document and record the use of segregation on youth as part of its incident reporting and quality assurance systems.

f.      A Qualified Medical Professional, or staff member who has completed all training required for supervising youth, must directly monitory any youth in segregation at least every fifteen (15) minutes. Such observation must be documented immediately after each check.

g.      Youth may not be held in segregation for a continuous period longer than one (1) hour during waking hours. If staff members conclude that a youth is not sufficiently calm to allow a break in segregation after one hour, they must contact a Qualified Mental Health Professional. The Qualified Mental Health Professional must assess the youth and determine whether the youth requires treatment or services not available in the Jail. If the youth requires mental health services that are not provided by the Jail, the Qualified Mental Health Provider must immediately notify the Jail Administrator and promptly arrange for hospitalization or other treatment services.

h.　　If a youth is held in segregation for a continuous period longer than two (2) hours, Staff Members must notify the Jail Administrator.

i.　　Any notifications or assessments required by this paragraph must be documented in the youth's individual record.

84. Develop and implement a behavioral treatment program appropriate for youth. This program must be developed with the assistance of a qualified consultant who has at least five years of experience developing behavioral programs for institutionalized youth. The Jail's behavioral program must include all of the following elements:

a.　　The behavioral program must include positive incentives for changing youth behavior, outline prohibited behaviors, and describe the consequences for prohibited behaviors.

b.　　An individualized program must be developed by a youth's interdisciplinary treatment team, and properly documented in each youth's personal file. Documentation requirements must include the collection of data required for proper assessment and treatment of youth with behavioral issues. For instance, the County must track the frequency and duration of positive incentives, segregation, and targeted behaviors.

c.　　The program must include safeguards and prohibitions on the inappropriate use of restraints, segregation, and corporal punishment.

\* \* \*

109

The original sin leading to these sections of the Consent Decree was the placement of youth at RDC prior to 2016. There have been no youth placed at the RDC since February 2019. Fifteenth Monitoring Report at 91. Accordingly, the County is in sustained compliance with paragraphs 77 and 80 of the Consent Decree.

Though the County is only in partial compliance with paragraphs 78, 79, 81, 82, 83, and 84, there is a separate Consent Decree governing the County's detention center for Youthful Prisoners, Henley-Young. The Court wishes to avoid interference with that Consent Decree. On a going-forward basis, therefore, concerns about Henley-Young are best submitted to the discretion and sound judgment of the Presiding Judge in that case. *See J.H. v. Hinds County*, No. 3:11-CV-327-DPJ-FKB (S.D. Miss. filed June 1, 2011).

Accordingly, this entire section is deleted.

### 11.    Lawful Basis for Detention

The Consent Decree provisions regarding unlawful detention are reproduced here:

85. The County will not accept or continue to house prisoners in the Jail without appropriate, completed paperwork such as an affidavit, arrest warrant, detention hold, or judge's written detention order. Examples of inadequate paperwork include but are not limited to undated or unsigned court orders, warrants, and affidavits; documents memorializing oral instructions from court officers that are undated, unsigned, or otherwise fail to identify responsible individuals and the legal basis for continued detention or release; incomplete arresting police officer documents; and any other paperwork that does not establish a lawful basis for detention.

110

86. No person shall be incarcerated in the Jail for failure to pay fines or fees in contravention of the protections of the United States Constitution as set forth and discussed in *Bearden v. Georgia*, 461 U.S. 660 (1983) and *Cassibry v. State*, 453 So. 2d 1298 (Miss. 1984). The County must develop and implement policies consistent with the applicable federal law and the terms of this Agreement.

87. No person shall be incarcerated in the Jail for failure to pay fines or fees absent (a) documentation demonstrating that a meaningful analysis of that person's ability to pay was conducted by the sentencing court prior to the imposition of any sentence, and (b) written findings by the sentencing court setting forth the basis for a finding that the failure to pay the subject fines or fees was willful. At a minimum, the County must confirm receipt from the sentencing court of a signed "Order" issued by the sentencing court setting forth in detail the basis for a finding that the failure to pay fines or fees was willful.

88. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a person for failure to pay fines or fees, Jail staff must promptly notify Jail administrators, Court officials, and any other appropriate individuals to ensure that adequate documentation exists and must obtain a copy to justify continued detention of the prisoner. After 48 hours, that prisoner must be released promptly if the Jail staff cannot obtain the necessary documentation to verify that the failure to pay fines or fees was willful, and that person is incarcerated only for the failure to pay fines or fees.

89. If the documentation described in paragraph 87 is not provided within 24 hours of incarceration of a prisoner for failure to pay fines or fees, and if that person is incarcerated for other conviction(s) or charge(s), other than the failure to pay fines

and/or fees, Jail staff must promptly notify Jail administrators, Court officials, and other appropriate individuals to ensure that adequate documentation exists and to ascertain the prisoner's length of sentence. If Jail staff cannot obtain a copy of the necessary documentation within 48 hours of the prisoner's incarceration, Jail staff must promptly arrange for the prisoner's transport to the sentencing court so that the court may conduct a legally sufficient hearing and provide any required documentation, including the fines or fees owed by the prisoner, and an assessment of the prisoner's ability to pay and willfulness (or lack thereof) in failing to pay fines or fees.

90. Jail staff must maintain the records necessary to determine the amount of time a person must serve to pay off any properly ordered fines or fees. To the extent that a sentencing court does not specifically calculate the term of imprisonment to be served, the Jail must obtain the necessary information within 24 hours of a prisoner's incarceration. Within 48 hours of incarceration, each prisoner shall be provided with documentation setting forth clearly the term of imprisonment and the calculation used to determine the term of imprisonment.

91. No pre-trial detainee or sentenced prisoner incarcerated by the County solely for failure to pay fines or fees shall be required to perform physical labor. Nor shall any such detainee or prisoner receive any penalty or other adverse consequence for failing to perform such labor, including differential credit toward sentences. Any physical labor by pre-trial detainees or by prisoners incarcerated solely for failure to pay fines or fees shall be performed on a voluntary basis only, and the County shall not in any way coerce such pre-trial detainees or prisoners to perform physical labor.

112

92. The County must ensure that the Jail timely releases from custody all individuals entitled to release. At minimum:

   a.   Prisoners are entitled to release if there is no legal basis for their continued detention. Such release must occur no later than 11:59 PM on the day that a prisoner is entitled to be released.

   b.   Prisoners must be presumed entitled to release from detention if there is a court order that specifies an applicable release date, or Jail records document no reasonable legal basis for the continued detention of a prisoner.

   c.   Examples of prisoners presumptively entitled to release include:

      i.   Individuals who have completed their sentences;

      ii.   Individuals who have been acquitted of all charges after trial;

      iii.   Individuals whose charges have been dismissed;

      iv.   Individuals who are ordered released by a court order; and

      v.   Individuals detained by a law enforcement agency that then fails to promptly provide constitutionally adequate, documented justification for an individual's continued detention.

93. The County must develop and implement a reliable, complete, and adequate prisoner records system to ensure that staff members can readily determine the basis for a prisoner's detention, when a prisoner may need to be released, and

whether a prisoner should remain in detention. The records system must provide Jail staff with reasonable advance notice prior to an anticipated release date so that they can contact appropriate agencies to determine whether a prisoner should be released or remain in detention.

94. Jail record systems must accurately identify and track all prisoners with serious mental illness, including their housing assignment and security incident histories. Jail staff must develop and use records about prisoners with serious mental illness to more accurately and efficiently process prisoners requiring forensic evaluations or transport to mental hospitals or other treatment facilities, and to improve individual treatment, supervision, and community transition planning for prisoners with serious mental illness. Records about prisoners with serious mental illness must be incorporated into the Jail's incident reporting, investigations, and medical quality assurance systems. The County must provide an accurate census of the Jail's mental health population as part of its compliance reporting obligations, and the County must address this data when assessing staffing, program, or resource needs.

95. All individuals who (i) were found not guilty, were acquitted, or had charges brought against them dismissed, and (ii) are not being held on any other matter, must be released directly from the court unless the court directs otherwise. Additionally:

> a.    Such individuals must not be handcuffed, shackled, chained with other prisoners, transported back to the Jail, forced to submit to bodily strip searches, or returned to general population or any other secure Jail housing area containing prisoners.

114

b.      Notwithstanding (a), above, individuals may request to be transported back to the Jail solely for the purpose of routine processing for release. If the County decides to allow such transport, the County must ensure that Jail policies and procedures govern the process. At minimum, policies and procedures must prohibit staff from:

i.      Requiring the individual to submit to bodily strip searches;

ii.     Requiring the individual to change into Jail clothing if the individual is not already in such clothing; and

iii.    Returning the individual to general population or any other secure Jail housing area containing prisoners.

96. The County must develop, implement, and maintain policies and procedures to govern the release of prisoners. These policies and procedures must:

a.      Describe all documents and records that must be collected and maintained in Jail files for determining the basis of a prisoner's detention, the prisoner's anticipated release date, and their status in the criminal justice system.

b.      Specifically, detail procedures to ensure timely release of prisoners entitled to be released, and procedures to prevent accidental release.

c.      Be developed in consultation with court administrators, the District Attorney's Office, and representatives of the defense bar.

115

d.      Include mechanisms for notifying community mental health providers, including the County's Program of Assertive Community Treatment ("PACT") team, when releasing a prisoner with serious mental illness so that the prisoner can transition safely back to the community. These mechanisms must include providing such prisoners with appointment information and a supply of their prescribed medications to bridge the time period from release until their appointment with the County PACT team, or other community provider.

97. The County must develop, implement, and maintain appropriate post orders relating to the timely release of individuals. Any post orders must:

a.      Contain up-to-date contact information for court liaisons, the District Attorney's Office, and the Public Defender's Office;

b.      Describe a process for obtaining higher level supervisor assistance in the event the officer responsible for processing releases encounters administrative difficulties in determining a prisoner's release eligibility or needs urgent assistance in reaching officials from other agencies who have information relevant to a prisoner's release status.

98. Nothing in this Agreement precludes appropriate verification of a prisoner's eligibility for release, including checks for detention holds by outside law enforcement agencies and procedures to confirm the authenticity of release orders. Before releasing a prisoner entitled to release, but no later than the day release is ordered, Jail staff should check the National

Crime Information Center or other law enforcement databases to determine if there may be a basis for continued detention of the prisoner. The results of release verification checks must be fully documented in prisoner records.

99.     The County must ensure that the release process is adequately staffed by qualified detention officers and supervisors. To that end, the County must:

a.     Ensure that sufficient qualified staff members, with access to prisoner records and to the Jail's e-mail account for receiving court orders, are available to receive and effectuate court release orders twenty-four hours a day, seven days a week.

b.     Ensure that staff members responsible for the prisoner release process and related records have the knowledge, skills, training, experience, and abilities to implement the Jail's release policies and procedures. At minimum, the County must provide relevant staff members with specific pre-service and annual in-service training related to prisoner records, the criminal justice process, legal terms, and release procedures. The training must include instruction on:

i.     How to process release orders for each court, and whom to contact if a question arises;

ii.     What to do if the equipment for contacting other agencies, such as the Jail's fax machine or email service, malfunctions, or communication is otherwise disrupted;

iii.     Various types of court dispositions, and the language typically used therein, to ensure

117

staff members understand the meaning of court orders; and

iv.     How and when to check for detainers to ensure that an individual may be released from court after she or he is found not guilty, is acquitted, or has the charges brought against her or him dismissed.

c.     Provide detention staff with sufficient clerical support to prevent backlogs in the filing of prisoner records.

100. The County must annually review its prisoner release and detention process to ensure that it complies with any changes in federal law, such as the constitutional standard for civil or pre-trial detention.

101. The County must ensure that the Jail's record-keeping and quality assurance policies and procedures allow both internal and external audit of the Jail's release process, prisoner lengths of stay, and identification of prisoners who have been held for unreasonably long periods without charges or other legal process. The County must, at minimum, require:

a.     A Jail log that documents (i) the date each prisoner was entitled to release; (ii) the date, time, and manner by which the Jail received any relevant court order; (iii) the date and time that prisoner was in fact released; (iv) the time that elapsed between receipt of the court order and release; (v) the date and time when information was received requiring the detention or continued detention of a prisoner (e.g., immigration holds or other detainers), and (vi) the identity of the

authority requesting the detention or continued detention of a prisoner.

b.      Completion of an incident report, and appropriate follow-up investigation and administrative review, if an individual is held in custody past 11:59 PM on the day that she or he is entitled to release. The incident report must document the reason(s) for the error. The incident report must be submitted to the Jail Administrator no later than one calendar day after the error was discovered.

102. The County must appoint a staff member to serve as a Quality Control Officer with responsibility for internal auditing and monitoring of the release process. This Quality Control Officer will be responsible for helping prevent errors with the release process, and the individual's duties will include tracking releases to ensure that staff members are completing all required paper work and checks. If the Quality Control Officer determines that an error has been made, the individual must have the authority to take corrective action, including the authority to immediately contact the Jail Administrator or other County official with authority to order a prisoner's release. The Quality Control Officer's duties also include providing data and reports so that release errors are incorporated into the Jail's continuous improvement and quality assurance process.

103. The County must require investigation of all incidents relating to timely or erroneous prisoner release within seven calendar days by appropriate investigators, supervisors, and the Jail Administrator. The Jail Administrator must document any deficiencies found and any corrective action taken. The Jail Administrator must then make any necessary changes to

Jail policies and procedures. Such changes should be made, if appropriate, in consultation with court personnel, the District Attorney's Office, members of the defense bar, and any other law enforcement agencies involved in untimely or erroneous prisoner releases.

104. The County must conduct bi-annual audits of release policies, procedures, and practices. As part of each audit, the County must make any necessary changes to ensure that individuals are being released in a timely manner. The audits must review all data collected regarding timely release, including any incident reports or Quality Control audits referenced in Paragraph 102 above. The County must document the audits and recommendations and must submit all documentation to the Monitor and the United States for review.

105. The County must ensure that policies, procedures, and practices allow for reasonable attorney visitation, which should be treated as a safeguard to prevent the unlawful detention of citizens and for helping to ensure the efficient functioning of the County's criminal justice system. The Jail's attorney visitation process must provide sufficient space for attorneys to meet with their clients in a confidential setting and must include scheduling procedures to ensure that defense attorneys can meet with their clients for reasonable lengths of time and without undue delay. An incident report must be completed if Jail staff are unable to transport a prisoner to meet with their attorney, or if there is a delay of more than 30 minutes for transporting a prisoner for a scheduled attorney visit.

\* \* \*

120

"The Constitution itself protects physical liberty." *Jauch v. Choctaw Cty.*, 874 F.3d 425, 430 (5th Cir. 2017) (citations omitted); *see* U.S. Const., amend. XIV. "Prohibition against improper use of the formal restraints imposed by the criminal process lies at the heart of the liberty interests protected by the Fourteenth Amendment due process clause." *Jones v. City of Jackson*, 203 F.3d 875, 880 (5th Cir. 2000) (quotation marks omitted).

"A person lawfully committed to pretrial detention has not been adjudged guilty of any crime. He has had only a judicial determination of probable cause as a prerequisite to the extended restraint of his liberty following arrest." *Bell*, 441 U.S. at 536 (cleaned up). As a result, "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt." *Id.* at 535 (collecting cases).

Because a detainee "has a right to be timely released from custody, his over detention, or detention absent (or beyond the expiration of) legal process, violates an incarcerated person's right to due process." *Traweek v. Gusman*, 414 F. Supp. 3d 847, 862 (E.D. La. 2019); *see also Sheffield v. Reece*, 201 Miss. 133, 142 (1947).

Fifth Circuit law is instructive. In *Jones*, a Hinds County "clerical error" caused the plaintiff to be over-detained for a total of nine months. 203 F.3d at 878. The District Court denied the Sheriff's motion for qualified immunity, and the Fifth Circuit affirmed. "The Fourteenth Amendment's protection of Jones's liberty interest was clearly established in 1994–95," it held, "and Jones's alleged nine month detention without proper due process protections was not objectively reasonable in light of the clearly established legal rules." *Id.* at 881.

121

In another case, a Texas sheriff was found liable when a communications error caused a detainee to "languish[] in jail for almost nine months after all charges against him were dismissed." *Whirl v. Kern*, 407 F.2d 781, 785 (5th Cir. 1968). "There is no privilege in a jailer to keep a prisoner in jail beyond the period of his lawful sentence." *Id.* at 791 (collecting cases). "The law does not hold the value of a man's freedom in such low regard." *Id.* at 792.[19]

Hinds County has not reached sustained or substantial compliance with any of the Consent Decree provisions protecting persons from unlawful detention. Specifically, the County is in partial compliance with paragraphs 85, 86, 87, 88, 89, 90, 91, 92, 93, 98, 99, 101, 102, and 105, and is non-compliant with paragraphs 94, 95, 96, 97, 100, 103, and 104. Fifteenth Monitoring Report at 109-24.

Consistent with these categorizations, the substance of the Monitoring Reports in this area indeed paints a mixed picture of partial progress and no progress at all. Most concerningly, a sampling of files and grievances late last year and early this year showed that the County is still over-detaining persons, sometimes by months. *Id.* at 110; Tr. vol. 6 at 1139-40. While the jail has made "significant improvement" in record-keeping, Fifteenth Monitoring Report at 110, without a functional database it "is still partially reliant on inmate requests and grievances to identify people who are being over-detained,"

---

[19] There is nothing talismanic about the nine-month periods found unlawful in these cases. "[T]he great weight of precedent suggests that release must occur within a matter of hours after the right to it accrues, and that after some period of hours—not days—a presumption of unreasonableness, and thus unconstitutionality, will set in." *Barnes v. D.C.*, 242 F.R.D. 113, 117 (D.D.C. 2007); *see also* Docket 3-3 at 17 (collecting cases).

*id.* at 115. Also concerning is the fact that persons released by the court are returned to RDC, instead of being released immediately. *Id.* at 117. The Monitoring Team adds that any progress made in this area, like many others, has been inconsistent. For example, the County's booking and release manual was never implemented, Tr. vol. 6 at 1141-42, and the County has backslid on the Consent Decree's main fines and fees provision regarding holding of inmates on unlawful fines and fees orders, Fifteenth Monitoring Report at 111.

As Mr. Parrish testified at the hearing, if a detainee is "allowed to be released by the courts, then he should be released that day. If his sentence is up, he should be released at the end of his sentence." Tr. vol. 1 at 143. But in Hinds County, "bad releases happen all too frequently." *Id.* at 144.[20]

Between the Fifteenth Monitoring Report and the testimony presented at the evidentiary hearing, the Court finds that a limited number of the Consent Decree provisions are necessary to protect detainees' clearly-established liberty interests. The Court has kept the minimum number of paragraphs which declare the key principles at stake, and excised those paragraphs that, while probably helpful to line employees, deal more with "how" the County goes about achieving the constitutional minimum. The resulting paragraphs are narrowly drawn, extend no further than necessary, and the least intrusive means necessary to comply with the Constitution:

---

[20] Obviously, having detainees in the facility who should not be there compounds many other issues. For example, it affects the staffing ratio and impacts detainee supervision. Moreover, detainees who are released are not subjected to in-custody gang violence, assaults, homicide, or even the county's medical regime.

85. The County will not accept or continue to house prisoners in the Jail without appropriate, completed paperwork such as an affidavit, arrest warrant, detention hold, or judge's written detention order.

86. No person shall be incarcerated in the Jail for failure to pay fines or fees in contravention of the protections of the United States Constitution as set forth and discussed in *Bearden v. Georgia*, 461 U.S. 660 (1983) and *Cassibry v. State*, 453 So. 2d 1298 (Miss. 1984).

92. The County must ensure that the Jail timely releases from custody all individuals entitled to release. At minimum:

    a.    Prisoners are entitled to release if there is no legal basis for their continued detention. Such release must occur no later than 11:59 PM on the day that a prisoner is entitled to be released.

    b.    Prisoners must be presumed entitled to release from detention if there is a court order that specifies an applicable release date, or Jail records document no reasonable legal basis for the continued detention of a prisoner.

    c.    Examples of prisoners presumptively entitled to release include:

        i.    Individuals who have completed their sentences;

        ii.    Individuals who have been acquitted of all charges after trial;

        iii.    Individuals whose charges have been dismissed;

     iv.    Individuals who are ordered released by a court order; and

     v.    Individuals detained by a law enforcement agency that then fails to promptly provide constitutionally adequate, documented justification for an individual's continued detention.

The remaining paragraphs shall be omitted from the new Injunction.

**12.    Continuous Improvement and Quality Assurance**

The Consent Decree provisions regarding continuous improvement and quality assurance are reproduced here:

106. Develop and maintain a database and computerized tracking system to monitor all reportable incidents, uses of force, and grievances. This tracking system will serve as the repository of information used for continuing improvement and quality assurance reports.

107. Compile an Incident Summary Report on at least a monthly basis. The Incident Summary Reports must compile and summarize incident report data in order to identify trends such as rates of incidents in general, by housing unit, by day of the week and date, by shift, and by individual prisoners or staff members. The Incident Summary reports must, at minimum, include the following information:

     a.    Brief summary of all reportable incidents, by type, shift, housing unit, and date;

     b.    Description of all suicides and deaths, including the date, name of prisoner, housing unit, and location where the prisoner died (including name of hospital if prisoner died off-site);

    c.      The names and number of prisoners placed in emergency restraints, and segregation, and the frequency and duration of such placements;

    d.      List and total number of incident reports received during the reporting period;

    e.      List and Total number of incidents referred to IAD or other law enforcement agencies for investigation.

108. Compile a Use of Force Summary Report on at least a monthly basis. The Use of Force Summary Reports must compile and summarize use of force report data in order to identify trends such as rates of use in general, by housing unit, by shift, by day of the week and date, by individual prisoners, and by staff members. The Use of Force Summary reports must, at minimum, include the following information:

    a.      Summary of all uses of force, by type, shift, housing unit, and date;

    b.      List and total number of use of force reports received during the reporting period;

    c.      List and total number of uses of force reports/incidents referred to IAD or other law enforcement agencies for investigation.

109. Compile a Grievance Summary Report on at least a monthly basis. The Grievance Summary Reports must compile and summarize grievance information in order to identify trends such as most frequently reported complaints, units generating the most grievances, and staff members receiving the most grievances about their conduct. To identify trends and potential concerns, at least quarterly, a member of the

Jail's management staff must review the Grievance Summary Reports and a random sample of ten percent of all grievances filed during the review period. These grievance reviews, any recommendations, and corrective actions must be documented and provided to the United States and Monitor.

110. Compile a monthly summary report of IAD investigations conducted at the Facility. The IAD Summary Report must include:

> a.      A brief summary of all completed investigations, by type, shift, housing unit, and date;

> b.      A listing of investigations referred for disciplinary action or other final disposition by type and date;

> c.      A listing of all investigations referred to a law enforcement agency and the name       of       the agency, by type and date; and

> d.      A listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures. This list must also contain the specific misconduct and/or violation.

111. Conduct a review, at least annually, to determine whether the incident, use of force, grievance reporting, and IAD systems comply with the requirements of this Agreement and are effective at ensuring staff compliance with their constitutional obligations. The County must make any changes to the reporting systems that it determines are necessary as a result of the system reviews. These reviews and corrective actions must be documented and provided to the United States and Monitor.

112.    Ensure that the Jail's continuous improvement and quality assurance systems include an Early Intervention component to alert Administrators of potential problems with staff members. The purpose of the Early Intervention System is to identify and address patterns of behavior or allegations which may indicate staff training deficiencies, persistent policy violations, misconduct, or criminal activity. As part of the Early Intervention process, incident reports, use of force reports, and prisoner grievances must be screened by designated staff members for such patterns. If misconduct, criminal activity, or behaviors indicate the need for corrective action, the screening staff must refer the incidents or allegations to Jail supervisors, administrators, IAD, or other law enforcement agencies for investigation. Additionally:

a.    The Early Intervention System may be integrated with other database and computerized  tracking systems required by this Agreement, provided any unified system otherwise still meets the terms of this Agreement.

b.    The Early Intervention System must screen for staff members who may be using excessive force, regardless of whether use of force reviews concluded that the uses complied with Jail policies and this Agreement. This provision allows identification of staff members who may still benefit from additional training and serves as a check on any deficiencies with use of force by field supervisors.

c.    The Jail Administrator, or designee of at least Captain rank, must personally review Early Intervention System data and alerts at least quarterly. The Administrator, or designee, must document when

128

reviews were conducted as well as any findings, recommendations, or corrective actions taken.

d.      The County must maintain a list of any staff members identified by the Early Intervention System as possibly needing additional training or discipline. A copy of this list must be provided to the United States and the Monitor.

e.      The County must take appropriate, documented, and corrective action when staff members have been identified as engaging in misconduct, criminal activity, or a pattern of violating Jail policies.

f.      The County must review the Early Intervention System, at least bi-annually, to ensure that it is effective and used to identify staff members who may need additional training or discipline. The County must document any findings, recommendations, or corrective actions taken as a result of these reviews. Copies of these reviews must be provided to the United States and the Monitor.

113. Develop and implement policies and procedures for Jail databases, tracking systems, and computerized records (including the Early Intervention System), that ensure both functionality and data security. The policies and procedures must address all of the following issues: data storage, data retrieval, data reporting, data analysis and pattern identification, supervisor responsibilities, standards used to determine possible violations and corrective action, documentation, legal issues, staff and prisoner privacy rights, system security, and audit mechanisms.

114. Ensure that the Jail's medical staff are included as part of the continuous improvement and quality assurance process. At minimum, medical and mental health staff must be included through all of the following mechanisms:

a.    Medical staff must have the independent authority to promptly refer cases of suspected assault or abuse to the Jail Administrator, IAD, or other law enforcement agencies;

b.    Medical staff representatives must be involved in mortality reviews and systemic reviews of serious incidents. At minimum, a physician must prepare a mortality review within 30 days of every prisoner death. An outside physician must review any mortalities associated with treatment by Jail physicians.

\* \* \*

After a complete review of the record, it is clear that paragraphs 106-14, while helpful, go beyond the minimum standards required by the Constitution. That is, although these sections were designed to aid the County in complying with its basic obligations, they exceed the Constitutional "floor" and thus, do not survive the County's termination motion.

Accordingly, this section is deleted in full.

### 13.    Criminal Justice Coordinating Committee

The Consent Decree provisions regarding the criminal justice coordinating committee are reproduced here:

115. Hinds County will establish a Criminal Justice Coordinating Committee ("Coordinating Committee") with subject matter expertise and experience that will assist in streamlining criminal justice processes and identify and develop

solutions and interventions designed to lead to diversion from arrest, detention, and incarceration. The Coordinating Committee will focus particularly on diversion of individuals with serious mental illness and juveniles. Using the Sequential Intercept Model, or an alternative acceptable to the Parties, the Coordinating Committee will identify strategies for diversion at each intercept point where individuals may encounter the criminal justice system and will assess the County's current diversion efforts and unmet service needs in order to identify opportunities for successful diversion of such individuals. The Committee will recommend appropriate changes to policies and procedures and additional services necessary to increase diversion.

116. The Coordinating Committee will include representation from the Hinds County Sheriff's Office and Hinds County Board of Supervisors. The County will also seek representation from Hinds County Behavioral Health Services; the Jackson Police Department; Mississippi Department of Mental Health; Mississippi Department of Human Services, Division of Youth Services; judges from the Hinds County Circuit, Chancery, and County (Youth and Justice) Courts; Hinds County District Attorney Office; Hinds County Public Defender Office; relevant Jackson city officials; and private advocates or other interested community members.

117. The Coordinating Committee will prioritize enhancing coordination with local behavioral health systems, with the goal of connecting individuals experiencing mental health crisis, including juveniles, with available services to avoid unnecessary arrest, detention, and incarceration.

118.    Within 30 days of the Effective Date and in consultation with the United States, the County will select and engage

an outside consultant to provide technical assistance to the County and Coordinating Committee regarding strategies for reducing the Jail population and increasing diversion from criminal justice involvement, particularly for individuals with mental illness and juveniles. This technical assistance will include (a) a comprehensive review and evaluation of the effectiveness of the existing efforts to reduce recidivism and increase diversion; (b) identification of gaps in the current efforts, (c) recommendations of actions and strategies to achieve diversion and reduce recidivism; and (d) estimates of costs and cost savings associated with those strategies. The review will include interviews with representatives from the agencies and entities referenced in Paragraph 116 and other relevant stakeholders as necessary for a thorough evaluation and recommendation. Within 120 days of the Effective Date of this Agreement, the outside consultant will finalize and make public a report regarding the results of their assessment and recommendations. The Coordinating Committee will implement the recommended strategies and will continue to use the outside consultant to assist with implementation of the strategies when appropriate.

\* \* \*

After a complete review of the record, the Court finds that paragraphs 115-18, while helpful, go beyond the minimum standards required by the Constitution. Although these sections were designed to aid the County in complying with its basic obligations, they exceed the Constitutional "floor" and thus, do not survive the County's termination motion.

Accordingly, this entire section is deleted.

132

### 14.        Implementation, Timing, and General Provisions

The Consent Decree provisions regarding implementation, timing, and general provisions, are reproduced here:

119. Consistent with the Prison Litigation Reform Act, the Constitution, and termination procedures of this Agreement, the County must substantially implemental all provisions of this Agreement.

120. The County must begin implementing the requirements of this Agreement immediately upon the Effective Date. Unless otherwise provided in this Agreement, all provisions of the Agreement must be implemented within one year of the Effective Date.

121. Within 30 days of the Effective Date of this Agreement, the County must distribute copies of the Agreement to all prisoners and Jail staff, including all medical and security staff, with appropriate explanation as to the staff members' obligations under the Agreement. At minimum:

  a.        A copy of the Agreement must be posted in each unit (including booking/intake and medical areas), and program rooms (e.g., classrooms and any library).

  b.        Individual copies of the Agreement must be provided to prisoners upon request.

122. This Agreement is applicable to and binding upon all parties, their officers, agents, employees, assigns, and their successors in office.

123. This Agreement is enforceable only by the Parties. No person or entity is intended to be a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action. Accordingly, no person or

entity may assert any claim or right as a beneficiary or protected class under this Agreement.

124. All parties must bear their own costs, including attorney fees.

125. The parties agree to defend the provisions of this Agreement. The parties must notify each other of any court challenge to this Agreement. In the event any provision of this Agreement is challenged in any local or state court, the parties will seek to remove the action to a federal court.

126. The failure by either party to enforce this entire Agreement or any provision thereof, with respect to any deadline or any other provision herein, must not be construed as a waiver of its right to enforce any deadlines or provisions of this Agreement.

127. If any unforeseen circumstance occurs that causes a failure to timely carry out any requirements of this Agreement, the County must notify the Monitor and the United States in writing as soon as possible, and in any case no later than 14 days after the County becomes aware of the unforeseen circumstance and its impact on the County's ability to perform under the Agreement. The notice must describe the cause of the failure to perform and the measures taken to prevent or minimize the failure. The County must implement all reasonable measures to avoid or minimize any such failure.

128. In the event any provision of this Agreement is declared invalid for any reason by a court of competent jurisdiction, said finding does not affect the remaining provisions of this Agreement.

129. All subheadings in this Agreement are written for convenience of locating individual provisions. If questions arise

as to the meanings of individual provisions, they should be
resolved by the text of each provision,

\* \* \*

Of these paragraphs, the only provision evaluated by the
Monitoring Team is paragraph 121. The Court will restrict its
PLRA analysis to that paragraph.

According to the Fifteenth Monitoring Report, "some officers
and supervisors have indicated that they do not have a copy
when questioned during remote site visits." *Id.* at 135. The
County remains under the Consent Decree. Paragraph 121 is
a means of notifying detainees of their rights and RDC's obli-
gations under the Consent Decree. It also increases the likeli-
hood that the County will comply. Accordingly, paragraph
121 will remain intact.

121. Within 30 days of the Effective Date of this Injunction, the
County must distribute copies of the Injunction to all prison-
ers and Jail staff, including all medical and security staff, with
appropriate explanation as to the staff members' obligations
under the Injunction. At minimum:

> a.      A copy of the Injunction must be posted in each
> unit (including booking/intake and medical areas), and
> program rooms (e.g., classrooms and any library).

> b.       Individual copies of the Injunction must be pro-
> vided to prisoners upon reasonable request.

### 15.      Policy and Procedure Review

The Consent Decree provisions regarding policy and proce-
dure review are reproduced here:

130. The County must review all existing policies and proce-
dures to ensure their compliance with the substantive terms

of this Agreement. Where the Jail does not have a policy or procedure in place that complies with the terms of this Agreement, the County must draft such a policy or procedure, or revise its existing policy or procedure.

131. The County shall complete its policy and procedure review and revision within six months of the Effective Date of this Agreement.

132. Once the County reviews and revises its policies and procedures, the County must provide a copy of its policies and procedures to the United States and the Monitor for review and comment. The County must address all comments and make any changes requested by the United States or the Monitor within thirty (30) days after receiving the comments and resubmit the policies and procedures to the United States and Monitor for review.

133. No later than three months after the United States' approval of each policy and procedure, the County must adopt and begin implementing the policy and procedure, while also modifying all post orders, job descriptions, training materials, and performance evaluation instruments in a manner consistent with the policies and procedures.

134. Unless otherwise agreed to by the parties, all new or revised policies and procedures must be implemented within six months of the United States' approval of the policy or procedure.

135. The County must annually review its policies and procedures, revising them as necessary. Any revisions to the policies and procedures must be submitted to the United States and the Monitor for approval in accordance with paragraphs 129-131 above.

\* \* \*

Expert testimony at the hearing established that the County's former policies and procedures were, to the extent they existed, "totally inadequate across the board." Tr. vol. 1 at 84. As a result, the Consent Decree included a variety of provisions designed to strengthen if not create a functional policy and procedure manual.

In *Gates v. Cook*, the prison conditions case, the Fifth Circuit held that an injunction requiring a written policy on "preventative maintenance" was not "independently supported" by constitutional violations, and therefore had to be vacated. 376 F.3d at 339. In accordance with this decision, all of the Consent Decree's policy and procedure provisions that lack an independent constitutional basis cannot stand.

This Court's review of the record as a whole suggests that there are ongoing constitutional violations at RDC. They have been enumerated paragraph-by-paragraph in the preceding pages. Applying *Gates* suggests that the Court should require written policies and procedures to deal with only these enumerated sections.

The Court determines that paragraph 130 should be retained and modified slightly to conform to *Gates*. The new paragraph now reads as follows:

130. The County must review all existing policies and procedures to ensure their compliance with the constitutional violations addressed in this Injunction. Where RDC does not have a policy or procedure in place that complies with this Injunction, the County must revise or draft such a policy or procedure.

Paragraphs 131-35, however, are deleted.

### 16.      Monitoring

The Consent Decree provisions regarding monitoring are reproduced here:

136. This Agreement must be monitored by an individual approved by the Court. Within thirty (30) days after the Effective Date, the United States and the County must jointly submit a proposed Monitor to the Court for approval. If the parties cannot agree on a joint Monitor, each party must submit the names and curricula vitae of three proposed candidates to the Court for approval, and the Court will select one of the candidates from the parties' lists.

137. If the Monitor position becomes vacant during the life of the Agreement, within 90 days of the vacancy, the United States and the County will jointly submit a new proposed Monitor to the Court for approval. If the parties cannot agree on a joint Monitor, each party must submit the names and curricula vitae of up to three proposed candidates to the Court for approval, and the Court will select one of the candidates from the parties' lists.

138. The cost of the Monitor's fees and expenses will be borne by the County. The County will contract with the Monitor to provide these monitoring services. As part of that contract, a reasonable budget will be agreed upon by and between the County and the Monitor to include a maximum dollar amount that can be spent in a given twelve (12) month period. The County will provide the Monitor with a budget sufficient to carry out the responsibilities described in this Agreement.

139. The Monitor only has the duties, responsibilities, and authority conferred by this Agreement. The Monitor must be

subject to the supervision and orders of the Court and applicable law.

140. Neither the County nor the United States, nor any of their employees or agents, may have any supervisory authority over the Monitor's activities, reports, findings, or recommendations. The Monitor may be terminated only by (i) joint stipulation of the parties; or (ii) for good cause unrelated to the Monitor's findings, as approved by the Court.

141. The Monitor may contract or consult with other individuals or entities to assist in the evaluation of compliance. The Monitor will pay for the services out of his/her budget. These individuals and entities must be governed and bound by the terms of this Agreement as the Monitor is governed and bound by those terms. The Monitor may engage in ex parte communications with the County and the United States regarding this Agreement.

142. The Monitor and United States will have full and complete access to the Jail, Jail documents and records, prisoner medical and mental health records, staff members, and prisoners.

143. The Parties shall have the opportunity to participate in all monitoring site visits.

144. The County must maintain sufficient records to document that the requirements of this Agreement are being properly implemented and must make such records available to the United States or Monitor at all reasonable times for inspection and copying. The County must maintain, and submit upon request, records or other documents to verify that the County has taken such actions as described in any self-assessment compliance reports (e.g., census summaries, policies,

procedures, protocols, training materials and incident reports).

145. The County will direct all employees, contractors, and agents to cooperate fully with the Monitor and United States.

146. Consistent with federal law, the Local Rules of the Court, and the Federal Rules of Civil Procedure, all information obtained by the Monitor will be maintained in a confidential manner.

147. Within seven days of receipt, the Monitor will distribute to the United States all documents, forms, assessments, and reports submitted by the County to the Monitor unless the County has already distributed a copy of such items to the United States.

148. Within three months of the Effective Date, the Monitor will conduct a baseline site visit of the Jail to assess the Jail's status regarding the obligations under this Agreement. This baseline visit will include a preliminary evaluation of how County policies and practices address each paragraph of this Agreement. As a result of the baseline site visit, the Monitor will design a monitoring plan. The baseline site visit will allow the Monitor to become familiar with the Jail and this Agreement. It will also allow the Monitor to inform the County and United States regarding what information the Monitor will require the County to routinely report and with what frequency, consistent with this Agreement.

149. The Monitor must conduct an on-site inspection and issue a Compliance Report four months after the baseline visit. The Monitor must then conduct an on-site inspection at least every four months thereafter, and issue a draft Compliance Report 30 days after each inspection. A draft Report must be

provided to the County and the United States for comment at least thirty (30) days prior to its issuance as a final Report. If any party wishes to comment, comments must be submitted to the Monitor no later than 10 business days after the draft is provided to the patties. The Monitor must consider the comments of the County and the United States, if any, before issuing each final Compliance Report.

150. The Compliance Reports must describe the steps taken by the County to implement this Agreement and evaluate the extent to which the County has complied with each substantive provision of the Agreement. Findings in the Monitor's Reports will be considered persuasive, but rebuttable, in Court. Each Report:

a.      Must evaluate the status of compliance for each provision of the Agreement using the following standards: (1) Substantial Compliance; (2) Partial Compliance; and (3) Noncompliance.

b.      Must be based on the Monitor's review of a sufficient number of pertinent documents and interview a sufficient number of staff and prisoners to accurately assess current conditions.

c.      May include information received by the Monitor through communication with former prisoners and staff, family members, local officials, criminal justice officials (including representatives of both the District Attorney's Office and Public Defender's Office), private defense attorneys, and relevant community members, so long as such communication is consistent with applicable law.

d.      Must describe the steps taken by the Monitor to analyze conditions and assess compliance. This description must

include identifying any documents reviewed and individuals interviewed, and the factual basis for each of the Monitor's findings. The report, however, must be prepare with due regard for the privacy interests of individuals.

e.      Must contain the Monitor's independent verification of representations from the County regarding progress toward compliance.

f.      Must provide recommendations to assist the County in attaining compliance with the Agreement, including a proposed outline of corrective actions that the County should implement within the next six months after issuance of the Monitor's report.

g.      Must be filed with the Court.

151. Nothing in this Section prohibits the Monitor from issuing interim letters or reports to the United States, the County, or the Court in this case, should the Monitor deem such correspondence necessary.

152. The Monitor may not make any public statements (at a press conference or otherwise) with regard to any act or omission of the County, or disclose information provided to the Monitor pursuant to this Agreement, except as authorized by this Agreement, the Court, or by joint stipulation of the parties.

153. The Monitor may not testify in any other litigation or proceeding with regard to any act or omission of the County, or the County's agents, representatives, or employees, as those acts or omissions relate to this Agreement. The preceding restriction does not apply to any legal action brought by the Monitor against the County to obtain compensation for past services or to enforce the Monitor's rights under this

Agreement. Unless called to testify by the Court or one of the parties to this Agreement, the Monitor may not testify regarding any matter or subject that he or she may have learned as a result of his or her performance under this Agreement. Unless such conflict is waived in writing by the County and the United States, the Monitor must not accept employment or provide consulting services that would present a conflict of interest with the Monitor's responsibilities under this Agreement, including being retained (on a paid or unpaid basis) by any current or future private litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the County or the United States, including their departments, officers, agents or employees, regarding the subject matter of this case. If the parties cannot agree on whether to waive a conflict, they may seek appropriate relief from the Court. The mere fact that the Monitor provides expert opinion or consulting services regarding civil rights or institutional reform does not itself constitute a conflict, where such opinion or services are provided in another jurisdiction.

154, The Monitor is not a State, County or local agency; nor is the Monitor an agent thereof. Accordingly, records maintained or in the custody of the Monitor must not be deemed public records subject to public inspection.

155. The Monitor will provide the County with technical assistance as reasonably requested. Technical assistance requests must not interfere with the Monitor's independence and ability to assess compliance.

156. The Monitor will convene regular monthly conference calls with the County and the United States to discuss implementation of the terms of the Agreement, updates, and any other items that the Monitor or the parties wish to discuss.

157. The County, including its agents, representatives, and employees, is prohibited from retaliating against any person for providing information or assistance to the Monitor or the United States relating to this Agreement. If the Court finds that such retaliation has occurred, it may issue appropriate relief, including issuance of an appropriate protective order, sanctions, and referral for criminal prosecution.

158. The Monitor must treat all personally identifiable information obtained pursuant to this Agreement as confidential. While the Monitor may comply with this provision by using pseudonyms, codes, or initials when describing individual prisoners in any Compliance Report, the Monitor must also maintain a key, The Monitor must provide the key to the County and the United States, when submitting any Compliance Report, unless there is reasonable concern that such provision would subject the individual to retaliation. A copy of the key must be filed under seal with the Court if the Court requires filing of the key with the Compliance Report.

\* \* \*

The parties jointly requested Judge Barbour to appoint Ms. Simpson as the Monitor. *See* Docket No. 9. Since the start of this case, her and her team's services have been invaluable.

Neither party has suggested that monitoring is "prospective relief" subject to the PLRA's "narrowly drawn" and "least intrusive means" requirements. Many courts have instead found that monitoring "'cannot be relief' and to find otherwise 'would conflate relief with the means to guarantee it[] . . . .'" *Braggs v. Dunn*, 383 F. Supp. 3d 1218, 1282-83 (M.D. Ala. 2019) (quoting *Benjamin v. Fraser*, 156 F. Supp. 2d 333, 342-43 (S.D.N.Y. 2001)). On the other hand, the Second Circuit, in

dictum suggested that where the monitoring body had "substantial responsibilities," concluding that it is not prospective relief could be "somewhat problematic." *Id.* (quoting *Benjamin v. Fraser*, 343 F.3d 35 (2d Cir. 2003)).

Notwithstanding amendments to the Consent Decree, the County remains under an enforceable judicial order. *United States v. Chromalloy Am. Corp.*, 158 F.3d 345, 349 (5th Cir. 1998); *see also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004). And the Monitoring Team serves as the "eyes and ears of the court."

> Courts possess the inherent authority to enforce their own injunctive decrees. . . . 'Courts do not sit for the idle ceremony of making orders and pronouncing judgments, the enforcement of which may be flouted, obstructed, and violated with impunity, with no power in the tribunal to punish the offender.'

*Pierce v. Vision Invest., Inc.*, 779 F.2d 302, 309 (5th Cir. 1986) (quoting *Waffenschmidt v. Mackay*, 763 F.2d 711, 716 (5th Cir. 1985)). Accordingly, the provisions regarding monitoring remain intact.

Alternatively, the Court finds that monitoring meets the PLRA's "narrowly drawn" and "least intrusive means" requirements to address detainees' ongoing constitutional violations.

First, monitoring is needed because the County has consistently demonstrated that it is not equipped to monitor compliance itself. *See* Fifteenth Monitoring Report at 137 (explaining that the County is required to file a self-assessment compliance report at least month before every site visit. Yet, "[a] self-

145

assessment was not provided prior to the January, May, or September, 2019 or the January, June or October 2020 or February, 2021, June 2021 or October site visit." As noted *infra* 148, "[s]ince October 2017, [the County] has only provided two self-assessments in compliance with paragraph 159." The County has had nearly six years to prove itself. It is, apparently, simply not up to the task.

One glaring example of the County's failure to self-monitor is its longstanding issues in establishing functional basic systems such as record-keeping, reporting, and investigations. As discussed at length above, deficient basic systems, in combination with other inadequacies,[21] subject detainees to a substantial risk of serious harm and actual harm.

Moreover, as evidenced herein the County has consistently failed to identify and correct problems within the jail system, but particularly RDC. To this, it retorts "the County is trying." It lists off a litany of things that it is "trying" to do. But the County's assertion that it intends to meet the standards set by the Court, does not negate the need for a New Injunction, and accordingly, the need for the monitoring. *See Gates*, 376 F.3d at 337 (explaining that "intending to meet, or attempting to meet the standards" "does not deprive a federal court of its power to determine the legality of the practice. If it did, the

---

[21] *E.g.*, "Staffing is at an all-time low right now. In the past five years, the staffing level has fluctuated for detention between 205 and 256 officers. As of the end of January, that number was 191. That's totally unacceptable." Tr. vol. 1 at 86; "Constant 'churning' of . . . staff[.]" Fifteenth Monitoring Report at 95; "the failure of security staff to follow policies or procedures[.]" *Id.* at 32; "Facility and maintenance problems continue to plague RDC." *Id.* at 54.; "problems because of the failure to implement direct supervision" Tr. vol. 1 at 95.

courts would be compelled to leave "the defendant . . . free to return to his old ways.").

Paragraphs 136-58 are critical to the Court's oversight and otherwise meet the PLRA's "narrowly drawn" and "least intrusive means" requirements to address detainees' ongoing constitutional violations. Accordingly, this section remains intact.

Additionally, this Court also finds that some semblance of administrative (*i.e.*, implementation, timing, and general provisions, and emergent conditions) and operational requirements (*i.e.*, record-keeping such as grievances and incident reports, and investigations) are necessary for this Court to enforce its own Order. Such requirements were discussed in turn above, and due to their dual function as "prospective relief" were otherwise modified to adhere to the PLRA's "narrowly drawn" and "least intrusive means" requirements to address detainees' ongoing constitutional violations. *See* 18 U.S.C. § 3626(b)(2). These functions are necessary to apprise the Court of constitutional violations, and to facilitate effective oversight of the Consent Decree. *See Braggs*, 383 F. Supp. 3d at 1282-83.

### 17.   County Assessment and Compliance Coordinator

The Consent Decree provisions regarding the county assessment and compliance coordinator are reproduced here:

159. The County must file a self-assessment compliance report. The first compliance self-assessment report must be filed with the Court within four months of the Effective Date and at least one month before a Monitor site visit. Each self-assessment compliance report must describe in detail the actions the County has taken during the reporting period to implement

this Agreement and must make specific reference to the Agreement provisions being implemented. The report must include information supporting the County's representations regarding its compliance with the Agreement such as quality assurance information, trends, statistical data, and remedial activities. Supporting information should be based on reports or data routinely collected as part of the audit and quality assurance activities required by this Agreement (e.g., incident, use of force, system, maintenance, and early intervention), rather than generated only to support representations made in the self-assessment.

160. The County must designate a full-time Compliance Coordinator to coordinate compliance activities required by this Agreement. This person will serve as a primary point of contact for the Monitor. Two years after the Effective Date of this Agreement, the Parties may consult with each other and the Monitor to determine whether the Compliance Coordinator's hours may be reduced. The Parties may then stipulate to any agreed reduction in hours.

\* \* \*

Since October 2017, the County has provided only two self-assessments as required by paragraph 159. *See* Fifteenth Monitoring Report at 137 (explaining that the County is required to file a self-assessment compliance report at least a month before every site visit. "A self-assessment was not provided prior to the January, May, or September, 2019 or the January, June or October 2020 or February, 2021, June 2021or October site visit." Yet, to its credit, the County has hired a compliance coordinator who serves as the point person to coordinate compliance activities. Therefore, it is in sustained compliance with paragraph 160.

148

Internal tracking of compliance with the Consent Decree is essential to achieving compliance, but the section is inconsistent with the PLRA's requirements as it goes beyond the minimum standards required by the Constitution.

Accordingly, this entire section is deleted.

### 18. Emergent Conditions

The Consent Decree provision regarding emergent conditions is reproduced here:

161. The County must notify the Monitor and United States of any prisoner death, riot, escape, injury requiring hospitalization, or over-detention of a prisoner (i.e. failure to release a prisoner before 11:59 PM on the day she or he was entitled to be released), within 3 days of learning of the event.

* * *

Paragraph 161 is critical to the Court's ability to adequately oversee the Consent Decree. Accordingly, paragraph 161 remains intact.

### IV. Conclusion

For these reasons, the County's motion to terminate is granted in part and denied in part. A new injunction with only the preserved and modified paragraphs shall issue.

**SO ORDERED**, this the 13th day of April, 2022.

s/ Carlton W. Reeves
*United States District Judge*

149