**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**UNITED STATES OF AMERICA**                                        **PLAINTIFF**

**VS.**                                        **CIVIL ACTION NO. 3:16-CV-489-CWR-RHWR**

**HINDS COUNTY, ET AL.**                                        **DEFENDANTS**

**DEFENDANTS' MEMORANDUM IN
SUPPORT OF MOTION TO STAY PENDING APPEAL**

Defendants Hinds County, Mississippi, and Sheriff Tyree Jones, in his official capacity (collectively, "the County"), respectfully submit this Memorandum in support of their Motion to Stay Pending Appeal (ECF 190).

**INTRODUCTION**

Under the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626, the County moved to terminate (ECF 111) the sixty-four page Consent Decree (ECF 8) because it became readily apparent the Consent Decree  micromanaged nearly every aspect of the County's detention facilities and exceeded constitutional minimums to such an extent that the Consent Decree hindered and impeded the County's efforts to operate its detention facilities, particularly the Raymond Detention Center ("RDC").  Following a hearing, the Court entered its Order Amending Consent Decree (ECF 168), and the New Injunction (ECF 169).  The County has timely appealed those orders (ECF 185).  The New Injunction should be stayed pending resolution of the County's appeal.

To determine whether to grant a stay pending review on appeal, a court must consider the following factors: (1) whether the stay applicant made a strong showing that it is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether

issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Chafin v. Chafin*, 568 U.S. 165, 179 (2013).

For the reasons explained below, a stay of the New Injunction is warranted under this standard because it is not necessary to correct a current and ongoing violation of federal law; rather, the Court should have terminated the Consent Decree outright instead of essentially modifying it by entering the New Injunction. Further militating in favor of a stay, the New Injunction is neither narrowly drawn nor the least intrusive means to correct the alleged violations.

## BACKGROUND

In June 2016, the United States of America sued the County under 42 U.S.C. § 1997, alleging that the County deprived "prisoners of rights, privileges, or immunities secured and protected by the Constitution of the United States."[1]  A Consent Decree was subsequently entered (ECF 8).

On November 23, 2021, the Court *sua sponte* entered an Order to Show Cause, directing the County to show cause as to why it should not be found in contempt and a receiver appointed to operate the RDC (ECF 100).  On January 21, 2022, the County filed its Motion to Terminate the Consent Decree under the PLRA, 18 U.S.C. § 3626 (ECF 111).

The Court held an evidentiary hearing on the Order to Show Cause and the County's Motion to Terminate from February 14 to March 1, 2022.  On April 13, 2022, the Court entered its Order Amending Consent Decree (ECF 168) and The New Injunction (ECF 169).  Both the County and the United States timely appealed those orders (ECF 185, 186).

---

[1] ECF 1, Complaint, ¶ 1.

## ARGUMENT & AUTHORITIES

**I.      The New Injunction Should Be Stayed.**

Courts weigh four factors to determine whether to grant a stay pending appeal: whether the stay applicant has made a strong showing that it is likely to succeed on the merits; whether the applicant will be irreparably injured absent a stay; whether issuance of the stay will substantially injure the other parties interested in the proceeding; and where the public interest lies. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

**A.      The County made a strong showing that it is likely to succeed on the merits.**

"The PLRA strongly disfavors continuing relief though the federal courts; indeed, its fundamental purpose was to extricate them from managing state prisons." *Brown v. Collier*, 929 F.3d 218, 228 (5th Cir. 2019). To terminate the Consent Decree here, the County was required to prove the terminability of the Consent Decree by establishing that two years had passed since the Court granted prospective relief. 18 U.S.C. § 3626(b)(1)(i). As a matter of judicial notice and otherwise, the County established that two years had passed since the Consent Decree was entered on July 19, 2016 (ECF 8). At that point, section 3626(b)(3) shifted the burden to the United States to prove that the Consent Decree:

(i)      remains necessary to correct a current and ongoing violation of a federal right,
(ii)     extends no further than necessary to correct the violation of a federal right, and
(iii)    is narrowly drawn and the least intrusive means to correct the violation.

18 U.S.C. § 3626(b)(2)–(3). The United States did not carry its burden of proving these three essential elements.

Neither the Consent Decree nor The New Injunction is necessary to correct a current and ongoing violation of a federal right. Although the PLRA does not explicitly define "current and ongoing," two rules are settled. First, the "current and ongoing" inquiry is not synonymous with

whether the defendant has complied with the consent decree. *Plyer v. Moore*, 100 F.3d 365, 370 (4th Cir. 1996). Second, and more importantly, current <u>and</u> ongoing violations are not violations that occurred in the past or that may occur in the future. Instead, "a current and ongoing violation is one that exists at the time the district court conducts the § 3626(b)(3) inquiry." *Castillo v. Seckinger*, 238 F.3d 339, 353 (5th Cir. 2001) (collecting cases). Accordingly, "in order to make the required finding of a current and ongoing violation of a Federal right required by § 3626(b)(3) a court must look at the conditions in the jail at the time termination is sought, not at conditions that existed in the past or at conditions that may possibly occur in the future, to determine if there is a violation of a federal right." *Id.*; *see also Castillo v. Cameron County*, 238 F.3d 339, 353 (5th Cir. 2001) (same).

The Court's Order Amending Consent Decree primarily cites assaults at RDC and sexual misconduct as evidence of "continuous and ongoing" violations.[2] The Court credited one monitor's testimony that there is "an excessive number of assaults" at RDC, and another monitor's testimony that there are "about 20 [assaults] per month, one of them being an assault that resulted in the inmate being beaten to death."[3] But a court must look at the conditions in the jail at the time termination is sought, not at conditions that existed in the past or at conditions that may possibly occur in the future, so prior assaults do not constitute a current and ongoing violation of a federal right under § 3626(b)(3). *See Seckinger*, 238 F.3d at 353; *Cameron County*, 238 F.3d at 353. As of the time of the evidentiary hearing, there were no deaths at RDC in 2022.[4]

---

[2] ECF 168, Order Amending Consent Decree at 48-49, 78, and 85-86.
[3] ECF 168, Order Amending Consent Decree at 48-49. This Court relied upon testimony that is entirely inaccurate. PX-032, which is shaky at best (and highly speculative), actually denotes that 38 "assaults" occurred at the RDC between October 2020 to January 2021. PX-032 at 73–78. These figures break down to <u>less than 10 assaults</u> per month.
[4] Tr. at 1196.

In its Order Amending Consent Decree, the Court found that sexual assaults "went essentially unchecked while the PREA coordinator was out for six months," but did not cite any evidence of sexual assaults during that period.[5]  The Court did cite an October 8, 2021 incident where a minor was sexually assaulted at Henley-Young,[6] but that past incident does not constitute a current and ongoing violation of a federal right under § 3626(b)(3), especially since Henley-Young is not subject to the New Injunction (ECF 169).

Because a current and ongoing violation is one that exists at the time the district court conducts the § 3626(b)(3) inquiry, and as shown by the inadequate examples of purported ongoing violations cited in the Court's Order Amending Consent Decree (ECF 168), the United States did not establish that an injunction remains necessary to correct a current and ongoing violation of a federal right.  *See Seckinger*, 238 F.3d at 353.

<u>Both the Consent Decree and the New Injunction extend further than necessary to correct the violation of a federal right</u>.  The constitutional rights of a convicted prisoner in state custody emanate from the Eighth Amendment's guarantee against cruel and unusual punishment," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), but a pretrial detainee's rights arise from the due process guarantees of the Fourteenth Amendment, *Bell v. Wolfish*, 441 U.S. 520, 537-37 (1979).  Because pretrial detainees retain at least those constitutional rights that courts have held are enjoyed by convicted prisoners, *id.* at 545, the Eighth Amendment standard extends to pretrial detainees under the Fourteenth Amendment.  *Aguirre v. City of San Antonio*, 995 F.3d 395, 420 (5th Cir. 2021).  In turn, two subparts govern the Eighth Amendment inquiry – namely, demonstration of a substantial risk of serious harm and deliberate indifference.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

---

[5] ECF 168, Order Amending Consent Decree at 85.
[6] ECF 168, Order Amending Consent Decree at 85-86.

PD.37841088.3

The United States did not establish a substantial risk of serious harm. Substantial risk of serious harm is an objective inquiry, consisting of two components: (1) harm and (2) risk. With respect to the "harm" component, courts must consider whether the alleged harm is "sufficiently serious." *Hudson v. McMillian*, 503 U.S. 1, 21 (1992). "This circuit has worded the test as requiring <u>extreme</u> deprivation of any '<u>minimal</u> civilized measure of life's necessities.'" *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004) (emphasis added). With respect to the "risk" component, courts must consider whether there is a "substantial risk that the alleged harm is likely to occur." *Id.* The majority of federal courts equate "substantial risk" with "pervasive conduct," as opposed to "isolated incidents," which results in a "real and proximate threat." *Lakin v. Barnhart*, 2013 WL 5407213, at *7–8 (D. Me. Sept. 25, 2013), *aff'd*, 758 F.3d 66 (1st Cir. 2014). When combined with the PLRA's "current and ongoing" standard, the "substantial risk of serious harm" inquiry is even more stringent than in ordinary jail cases. In a nutshell, the record evidence must reflect "pervasive conduct," amounting to a "reign of terror," "at the time termination [was] sought." *Castillo*, 238 F.3d at 353–54.

The Order Amending Consent Decree cites the law regarding the "substantial risk of serious harm,"[7] and twice states that certain provisions of the Consent Decree "as modified" are necessary to "address the substantial risk of serious harm to which the [detainees/prisoners] remain exposed."[8] The Order does not, however, specifically identify the "substantial risk of serious harm" to which the Court refers. The record evidence must reflect "pervasive conduct," amounting to a "reign of terror," at the time termination was sought, but it does not. *See Castillo*, 238 F.3d at 353–54.

---

[7] ECF 168, Order Amending Consent Decree at 41-42.
[8] ECF 168, Order Amending Consent Decree at 81 and 98.

PD.37841088.3

Nor did the United States establish deliberate indifference.  Deliberate indifference requires the satisfaction of two components: (1) the defendant's awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists, and (2) the defendant actually drawing the inference.  *Williams v. Hampton*, 797 F.3d 276, 281 (5th Cir. 2015) (en banc).  Critically, these components <u>cannot</u> be met if the defendant "responds reasonably" to substantial risk to inmate health or safety, even if the harm is not ultimately averted.  *Farmer*, 511 U.S. at 844–85.

The County made a strong showing that it is likely to prevail on the merits because, among other reasons, it has responded reasonably to the alleged violations.  The County's former Jail Administrator, Kathryn Bryan, testified that life safety issues are "[a]nything that put people's lives in danger."[9]  Ms. Bryan affirmatively testified that she did not ignore life safety issues at the jail, that she did not turn a blind eye to such issues, and that she was not deliberately indifferent to such issues.[10]  *See Whitley v. Hanna*, 726 F.3d 631, 652 n.2 (5th Cir. 2013) (explaining that deliberate indifference occurs when the defendant is guilty of "turning a blind eye").

Gary Chamblee has worked for Benchmark Construction for the last 25 years.[11]  He managed the construction work at RDC for Benchmark.[12]  Chamblee has personally visited RDC two to three times a week for the past two years.[13]  Chamblee testified that during the past two years Benchmark's work at RDC has been extensive, including the following:  Fixing cell doors,[14] fixing light fixtures, toilets, and HVAC system,[15] replacing, refurbishing, and certifying all fire

---

[9] Tr. at 456.
[10] Tr. at 457.
[11] Tr. vol. 8 at 1456-57
[12] Tr. vol. 8 at 1459.
[13] Tr. vol. 8 at 1465.
[14] Tr. vol. 8 at 1467, 1470–72.
[15] Tr. vol. 8 at 1468–70.

PD.37841088.3

pumps and the fire sprinkler riser,[16] replacing servers for cameras, workstations, and devising plans to upgrade all cameras that are currently misfunctioning,[17] and fixing the facilities' roofing.[18] Indicative of the County's reasonable response to the condition of RDC, Benchmark has billed the County $3.2 million since 2020 for renovations to RDC.[19]

Further indicative of the County's reasonable response to jail conditions is the testimony of jail architect Robert Farr that the County has not ignored the issue of how it will safely and securely house pretrial detainees: "Since our involvement with the County in December of '19 moving forward in to 2020, the County has been moving aggressively to address the needs of the facilities and to bring them into compliance with the stipulated order and to work diligently to get to a point that the consent decree is satisfied."[20] Farr "recommended that the most effective way to meet the requirements of the detention system for Hinds County would be to develop a new facility that could be … developed in stages that would allow for the consolidation to a single facility."[21] The County approved that recommendation,[22] and, as a result, the County is building an entirely new, state-of-the-art detention facility at a total cost of approximately $133 million.[23] When asked whether the County is ignoring the RDC in the meantime, Farr responded as follows:

> No, the ongoing investments in the Raymond Detention Center are intended to keep it functioning through the '26 time frame and to make sure that the facility meets the requirements of both the stipulated order and the consent decree that is possible. It is managing the continuing challenges of keeping that facility operational, but the investment is being made in it to accommodate those, and investments in some of the areas that were identified in the physical analysis that were security driven, you have to address those to be able to maintain and continue a safe facility.[24]

---

[16] Tr. vol. 8 at 1482–83.
[17] Tr. vol. 8 at 1486.
[18] Tr. vol. 8 at 1486.
[19] Tr. vol. 8 at 1497–98.
[20] Tr. vol. 8 at 1560-61.
[21] Tr. vol. 8 at 1541-42.
[22] Tr. vol. 8 at 1552.
[23] Tr. vol. 8 at 1559.
[24] Tr. vol. 7 at 1559–60.

PD.37841088.3

Further indicative of the County's reasonable response to jail conditions is the testimony of the County Administrator, Kenneth Jones, regarding the significant funds the County has expended in responding to the challenges at RDC.  Jones testified that the County's general fund budget is $80.5 million.  34% of the entire general fund budget goes to the Sheriff, and 66% of the Sheriff's budget – *i.e.* approximately $18 million or 22% of the County's entire general fund budget – goes  to detention services.[25]  Further, the County has paid $1.2 million to the monitoring team under the decree.[26]  In addition, the County pays $3 million a year to QCHC to provide medical services to the detainee population,[27] and in 2021 alone, it paid $2 million to Merit Health Hospital for detainee emergency services[28] and $1.8 million for the detainee's public defender program.[29]  Finally, since January 2021, the Hinds County Board of Supervisors has unanimously approved every matter that has come before it for a vote regarding detention services.[30]

Still further indicative of the County's reasonable response to jail conditions is the testimony of Credell Calhoun, the President of the Hinds County Board of Supervisors.[31]  Calhoun testified that "we were trying to do the best we could to make sure that … we get that facility as safe as we could for the … detainees … and the detention officers."[32]  Calhoun also testified that "we are really doing overtime trying to get a new jail that will meet all of the specifications that the consent decree is trying to get to."[33]

---

[25] Tr. vol. 9 at 1599–1600.
[26] Tr. vol. 9 at 1465.
[27] Tr. vol. 9 at 1605.
[28] Tr. vol. 9 at 1605.
[29] Tr. vol. 9 at 1606.
[30] Tr. vol. 9 at 1596, 1608-09.
[31] Tr. vol. 9 at 1696.
[32] Tr. vol. 9 at 1737.
[33] Tr. vol. 9 at 1740.

PD.37841088.3

The Court faulted the County for low levels of staffing,[34] but the evidence demonstrates that the County has not turned a blind eye to that issue because it:

- Expanded the recruitment footprint for detention services.[35]
- Incentivized college degrees in recruitment and pay.[36]
- Offered uniform stipends for detention officers.[37]
- Premium pay for detention officers.[38]
- 5% pay raise for detention center officers.[39]
- Switched staffing pay from monthly to biweekly.[40]
- Monetary incentives for detention officers to continue employment.[41]

The evidence shows that the County has not been deliberately indifferent, as it has responded reasonably to the alleged violations. This factor weighs in favor of a stay.

**B.     The County will be irreparably harmed absent a stay.**

The PLRA requires the district court to enter relief that is "narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C. § 3626(b)(3). The New Injunction (ECF 169) is not narrowly drawn or the least intrusive means to correct the alleged violations. Most glaringly, the New Injunction does not contain any provisions regarding its termination. A perpetual injunction with no mechanism for termination is, facially, not narrowly drawn or the least intrusive means to correct the violation.

The New Injunction has no compliance standards or outcome measures, so it is not narrowly drawn or the least intrusive means to correct the alleged violations. For example, The New Injunction requires the County to "[e]nsure that Jail supervisors review and respond appropriately to incidents,"[42] but says nothing about what constitutes a satisfactory review or an

---

[34] ECF 168, Order Amending Consent Decree at 5, 8, 123 n. 20, and 146 n. 21.
[35] Tr. vol. 9 at 1704.
[36] Tr. vol. 10 at 1804.
[37] Tr. vol. 10 at 1804.
[38] Def. Ex. 51; Tr. vol. 9 at 1608.
[39] Def. Ex. 51; Tr. vol. 9 at 1608.
[40] Tr. vol. 9 at 1607.
[41] Tr. vol. 10 at 1804.
[42] ECF 169, The New Injunction at 4:93-94 (¶ 66).

appropriate response.  Such ambiguous and open-ended provisions – and there are many such provisions in The New Injunction – set the County up to be non-complaint.

In a decision rendered in October 2020 regarding a state geriatric prison in Texas run by the Texas Department of Criminal Justice (TDCJ), the Fifth Circuit cautioned that federal judges are not policymakers.  *Valentine v. Collier*, 978 F.3d 154, 165 (5th Cir. 2020).  "The Constitution charges federal judges with deciding cases and controversies, not with running state prisons."  *Id*. (citation omitted).  Just as the Constitution does not charge federal judges with running state prisons, it does not charge federal judges with running county detention centers.  "Principles of federalism and separation of powers dictate that exclusive responsibility for administering state prisons resides with the State and its officials."  *Id*. at 166 (citation omitted).  Those same principles dictate that exclusive responsibility for administering RDC resides with the County and its officials.  "Institutional reform litigation is a creature poorly suited for the courts, as the role of the workaday trial judge in such litigation is often rather precarious at best and downright ineffectual at worst."  *Connor B. v. Patrick*, 985 F. Supp. 2d 129, 157 (D. Mass. 2013).

The New Injunction nonetheless comprehensively inserts the district court (and the monitors) into the minutia of running the RDC, including all of the following matters:  Protection from harm, use of force standards, use of force training, use of force reporting, incident reporting and review, sexual misconduct, investigations, grievance and prisoner information systems, restrictions on the use of segregation, lawful basis for detention, posting of the Injunction at RDC, policy and procedure review, monitoring, and emergent conditions.[43]  The scope of The New Injunction improperly leaves the Court to micromanage RDC.  "While federal courts can certainly enter injunctions to prevent Eighth Amendment violations, they are not to micromanage state

---

[43] ECF, 169, The New Injunction.

prisons." *Gates v. Cook*, 376 F.3d 323, 338 (5th Cir. 2004) (citing *Bell*, 441 U.S. 520, 562 (1979)). In *Valentine*, this Court observed that "[t]he permanent injunction lays claim to TDCJ's resources, commanding how it must allocate its time, funding, and facilities. In doing so, it necessarily interferes with TDCJ's flexibility to address the facts on the ground, which, as has been repeatedly recognized in this litigation, are ever-changing." *Valentine*, 978 F.3d at 165. The New Injunction does the same things here regarding RDC.

Finally, the cost alone of monitoring The New Injunction is prohibitive. The monitoring team's site visit rate has historically been $1,500 per day.[44] The monitoring team's budget has historically been about $275,000 per year.[45] The County should not have to continue to bear these costs for many reasons, including that the monitoring team's own reports make plain the fact their activities have historically been unhelpful to the County's efforts to improve RDC.

For these reasons, the New Injunction violates federal law. Unless this Court stays the New Injunction pending the parties' ongoing appeal, the County remains subject to an injunction that does not comply with the PLRA, that micromanages the day-to-day operations of RDC, and that is cost prohibitive. This factor weighs in favor of a stay.

### C.    A stay will not substantially injure other parties interested in the proceeding.

To begin with, this case is not a class action, nor are there any individual plaintiffs, so individualized relief is not at issue here, and the United States is the only plaintiff. It cannot credibly be maintained that a stay will somehow injure the United States. In addition, no evidence was adduced at the evidentiary hearing that the Consent Decree was helpful in improving conditions at the RDC.[46] The same holds true for the New Injunction. And, as shown above, the

---

[44] Tr. 1198.
[45] Tr. 1198.
[46] See, for example, Dr. Richard Dudley's testimony that mental health and medical services at the jail did not improve under the Consent Decree. Tr. at 683.

United States did not establish "continuous and ongoing violations" within the meaning of 18 U.S.C. § 3626(b)(3).  This factor weighs in favor of a stay.

> **D.      A stay is in the public interest.**

A stay is in the public interest because it will allow the County to continue its mission to advance public safety and security under its terms, absent the control of the Court or the monitoring team.  In this vein, the Supreme Court has stated that "it is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons."  *Woodford v. Ngo*, 548 U.S. 81, 94 (2006) (citation omitted).   Indeed, institutional reform of the kind the district court engaged in "raise[s] sensitive federal concerns" by treading on "areas of core state responsibility" and "dictating … budget priorities."   *Horne v. Flores*, 557 U.S. 433, 447-49 (2009).   In recognizing these longstanding precepts, this factor weighs in favor of a stay.

## RELIEF REQUESTED

The Court should grant Defendants' Motion to Stay (ECF 190) and stay enforcement of the New Inunction (ECF 169) pending resolution of the parties' appeal.

Dated:  July 5, 2022.

PD.37841088.3

Respectfully submitted,

**PHELPS DUNBAR, LLP**


BY:   */s/ Nicholas F. Morisani*
       Reuben V. Anderson, MB #1587
       W. Thomas Siler, Jr., MB #6791
       James W. Shelson, MB #9693
       Nicholas F. Morisani, MB #104970
       Loden P. Walker, MB#105996
       4270 I-55 North
       Jackson, Mississippi 39211-6391
       Post Office Box 16114
       Jackson, Mississippi  39236-6114
       Telephone: 601-352-2300
       Telecopier: 601-360-9777
       Email: reuben.anderson@phelps.com
              tommy.siler@phelps.com
              jim.shelson@phelps.com
              nick.morisani@phelps.com
              loden.walker@phelps.com

**ATTORNEYS FOR DEFENDANTS**


**<u>CERTIFICATE OF SERVICE</u>**

I certify that on July 5, 2022, I had this Memorandum electronically filed with the Clerk of the Court, using the CM/ECF system, which sent notification of such filing to all counsel of record in this matter.


                                          */s/ Nicholas F. Morisani*
                                          Nicholas F. Morisani