UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA                              Plaintiff

V.                             CASE NO. 3:16-cv-489-CWR-RHWR

THE HINDS COUNTY BOARD OF                            Defendants
SUPERVISORS, ET AL


**TRANSCRIPT OF STATUS CONFERENCE
VIA VIDEOCONFERENCE**

BEFORE HONORABLE CARLTON W. REEVES
UNITED STATES DISTRICT JUDGE

June 21, 2022
Jackson, Mississippi


The proceedings were reported by a stenographic court reporter.
The transcript was produced using computer-aided transcription.


*Margaret Wasmund, RDR, CRR, CRC*
*Court Reporter*
*2851 Shiloh Road*
*Pelahatchie, Mississippi 39145*
*margaretwasmund@gmail.com/601-329-6113*

APPEARANCES:

REPRESENTING THE PLAINTIFF:

Christopher N. Cheng, Esquire
Laura L. Cowall, Esquire
U.S. Department of Justice
150 M. Street NE, 10th Floor
Washington, DC  20530

Helen Vera, Esquire
U.S. Department of Justice
950 Pennsylvania Ave NW
Washington, DC  20530

Mitzi Dease Paige, Esquire
U.S. Attorney's Office
501 East Court Street, Suite 4.430
Jackson, MS  39201

REPRESENTING THE DEFENDANTS:

Tony R. Gaylor, Esquire
Hinds County Board of Supervisors
P.O. Box 686
Jackson, MS  39205-0686

James W. Shelson, Esquire
Nicholas F. Morisani, Esquire
Loden P. Walker, Esquire
Phelps Dunbar, LLP
P.O. Box 16114
Jackson, MS  39236-6114

Rayford G. Chambers, Esquire
Chambers & Gaylor, PLLC
P.O. Box 12393
Jackson, MS  39236-2393

John C. Hall, II, Esquire
The Hall Law Group PLLC
263 East Pearl Street
Jackson, MS  39201

ALSO PRESENT:

Ms. Elizabeth Lisa Simpson
Mr. David Parrish
Sheriff Tyree Jones

1          (June 21, 2022, 9:05 a.m.)

2                THE COURT:  Good morning.  Who do I have on for the

3     government?

4                MR. CHENG:  This is Christopher Cheng.  I also have

5     Helen Vera, Laura Cowall, and I believe from the U.S.

6     Attorney's Office Mitzi Dease Paige is with us as well.

7                THE COURT:  And who is on for Hinds County?

8                MR. GAYLOR:  Your Honor, for Hinds County, board

9     attorney Tony Gaylor.  We also have from Phelps Dunbar, Nick

10    Morisani, Jim Shelson, and Loden Walker.  And obviously, for

11    the sheriff's department, we have John Hall, and the sheriff is

12    on as well.  We also have attorney Ray Chambers on the line on

13    behalf of the county as well.

14                THE COURT:  Okay.  And I have the monitors here,

15    Ms. Simpson and Mr. Parrish.  Any others?

16                MS. SIMPSON:  Myself and Dave Parrish.  And I think

17    Dr. Dudley is planning on joining us, but he's not on yet.

18                THE COURT:  We have the court reporter here as well.

19        Again, thank you for making yourselves available on what

20    appeared to be a pretty short notice.  I realize we just sent

21    out the notice of this meeting I think on Friday, but I

22    understood that the monitors would be doing their follow-up

23    interviews from their last site visit this week.  And I knew

24    that that space would be between Tuesday and Friday of this

25    week, I guess.  And I know that when these interviews have

1    occurred, I guess, most recently the lawyers have been at least

2    present for those interviews.  So I figured that if the

3    monitors had something set for this morning, then somebody for

4    the parties would be available, so I did not reach out and try

5    to find a convenient date or time.  I figured somebody would be

6    here, and I predicted correctly.

7        But I wanted to talk with you.  Now, I know the monitors

8    came in the other week because I discussed with the monitors

9    the progress of their most recent site visit.  As the parties

10   are aware, the court views that its order is still in place,

11   which requires the monitors to do their monitoring duties and

12   report to the court.  And just like we've done in the past, the

13   monitor would have the -- has returned to do the site visits, I

14   guess, and then have the interviews.  And I think typically the

15   interviews would occur before they left, and then we would have

16   a follow-up status conference at or near the time -- well, in

17   the past it's been right on the heels of them wrapping up their

18   interviews.  And I think the monitor was there on-site, I do

19   believe, the week of Memorial Day; is that correct,

20   Ms. Simpson?

21       MS. SIMPSON:  Yes, Your Honor.  Although, as you

22   know, the site visit got terminated because one of our team

23   members tested positive for COVID.  So we didn't complete the

24   site visit that week.  The interviews this week are actually

25   the completion of the site visit.

1          THE COURT:  Okay.  And thank you.  I was informed of

2    that as well.  But my purpose in having this call is that --

3    and I want to hear from the parties on it because I could be

4    mistaken or the monitor could be mistaken.  But I've been

5    informed that several of the record requests that have been

6    requested by the monitor, the requests were not either complied

7    with or they were not fulsome or -- I'm just trying to make

8    sure that the parties are still, again, meeting their

9    obligation under the existing order of the court and the

10   consent decree.

11         I've been told that there's a number of record requests

12   that would aid the monitoring team to do their duties.  Those

13   requests were not complied with.  At least maybe -- and I'm

14   trying to find out have they been complied with yet because

15   obviously it affects the monitoring team's ability to do what

16   the court has asked or what this court has required of the

17   team.  And I'm just trying to find out.  And I'm here to hear

18   from the parties about that.

19         But I'll have Ms. Simpson first explain for the benefit of

20   everyone those records that have been requested and whether or

21   not they'd been received at least as of this morning.

22   Ms. Simpson.

23         MS. SIMPSON:  Your Honor, we have a number of records

24   requests that have not yet been received.  I can list them, so

25   I'll go forward with that.  There is a classification and

1   records summary report for April that we have not received.  We

2   have not received the Criminal Investigation Division reports

3   for April.  We have not received the Criminal Investigation

4   Division summary sheet for April and May.  We have not received

5   the Internal Affairs Division reports January through May.  We

6   have not received the human resources records that have been

7   requested; that's the monthly workforce, the hires, the

8   terminations, current staffing level and background on all

9   hires and promotions; not received the training status report,

10  the shakedown logs for April and May, the initial

11  classification forms for all individuals classified in the

12  first two weeks of May; all court orders requiring the payment

13  of fines and fees for persons booked January through May; a

14  list of all persons released without a court order, sometimes

15  referred to as in and outs; the form completed by Erica

16  Scott -- I'm not sure of the name of that form, but she does a

17  form for everybody going to their first appearance; the

18  grievance spreadsheet, which includes the months of January

19  through May; all program request responses for the first

20  two weeks of May; the post assignment sheets for the month of

21  May; the visitation records for RDC for May.  And I believe

22  that's what we're waiting for at this point.

23          THE COURT:  Okay.  I want to note for the record that

24  Dr. Dudley is now on the call as well.  Now, I guess

25  everybody -- I guess for the defendants, you heard the listing

1    of the records that have been requested and that the monitor

2    says that she's not received.  Any defendant disagrees that

3    those documents have been provided --

4              MR. HALL:  Good morning, Your Honor.  This is John

5    Hall.

6              THE COURT:  -- or disagree with what Ms. Simpson has

7    said that she does not -- that she's not received?

8              MR. HALL:  Good morning, Your Honor.  This is John

9    Hall for the sheriff's department and the county.  The

10   documents that Ms. Simpson has requested, these are the balance

11   of the documents that have been requested.  I guess she's also

12   advised the court that voluminous records have already been

13   turned over.

14        With respect to the classification summary for April, I

15   guess we can turn over May's, so that can be resolved.  The CID

16   reports from January through March -- I'm going back and forth,

17   Your Honor.  To give you the background, Judge, we went over to

18   a new system in how we turn documents over to the government

19   and the monitors.  They were previously being kept in a Google

20   Drive that Mr. Green was the administrator for.  After he

21   resigned -- or I guess during the month that he resigned, we've

22   come up with a way to transfer documents and save documents to

23   the government.  The Phelps Dunbar firm will probably do that.

24   In the interim (videoconference interference) with all the

25   pertinent parties on it and migrated everything that had been

1   sent prior to -- I guess in 2022 anyway to the monitors and the

2   DOJ.  So that's been migrated over to the Dropbox as well as

3   documents that were requested in April and May.

4        This is new to me, Your Honor, being we don't have someone

5   doing this.  So we, along with Belinda Jackson who is over our

6   records, we've been compiling these records, turning them over

7   as quickly as possible.  This is a new role for Ms. Jackson as

8   well.

9        These documents that they've requested, it looks like

10  documents have been supplemented over the weekend.  I can go

11  back and look.  The monthly workforce -- I'm still waiting on

12  that from our HR.  We looked from the top.  The classification

13  summary for April, I believe -- I thought that was turned over.

14  As far as -- I'll go back and check -- the CID reports for

15  April and May, I can get the CID person to send me those, but

16  again I think there is a summary -- the CID summary has been

17  turned over.

18       Lisa, you don't have that one already, with the IAD

19  summary?

20            THE COURT:  I think you're on mute, Ms. Simpson.

21       Go to the next one.

22       Are you speaking, Ms. Simpson, because you're on mute if

23  you are.  I'm sorry.

24            MS. SIMPSON:  Sorry, Your Honor.  I was looking in

25  the Dropbox.  I do have the IAD summary sheets.  They are

1    weekly summary sheets.  I don't have the IAD reports.  With

2    CID, I have the reports for May, but not for April.  And I

3    don't have the summary sheets.

4              THE COURT:  As I appreciate the process, all of these

5    documents are generally made available to the monitoring team

6    prior to coming on-site to do their visits.  So those

7    documents, I would believe, would have been -- should have been

8    made available prior to May 31st or so.  Again, the monitoring

9    team does not need to be impeded or frustrated in any way in

10   performing the duties of what the court has enlisted them to

11   do.

12        I realize Mr. Green left whenever he left.  I don't know

13   the circumstances of his departure.  I don't know how the

14   county or the sheriff's department was maintaining documents or

15   whether they've gone to a new way of maintaining them or

16   through a new server and all of that.  But I think everybody

17   knew way back in April or at some point in time that the team

18   would be on-site to do their work in May.  And so at least some

19   of those documents, maybe all of them, had not been made

20   available back during that time.

21        And I don't know who is responsible for maintaining them,

22   whether it is the sheriff's department or the county or both of

23   you, but I do know the county and the sheriff's department is

24   responsible for making sure that the monitoring team can do its

25   job.

1    So I don't know who the request -- who was responsible for

2   maintaining or responding to any of the requests.  I've heard

3   from Mr. Hall.  Is the county obliged to respond to any of

4   those questions today?

5         MR. GAYLOR:  Your Honor, we obviously communicate

6   with the sheriff's department with regard to responses, but

7   understand that from the county's perspective and the sheriff's

8   department perspective, we have a change in personnel.  And we

9   also stated that we've got a change in our server in terms of

10  how we keep and maintain documents.  So it's not going to be a

11  completely seamless transmission to this new way of

12  transmitting information.

13    Additionally, Your Honor, that's not to say that we agree

14  with everything that's being requested.  So there is some time

15  for us to go back and forth with the monitors a little bit

16  about what they're requesting because what they're requesting

17  now isn't going to exactly be the same as what they were

18  getting before, per the court's new orders.  So we're all

19  adjusting a little bit to this process.

20         THE COURT:  Well, have you raised any objections with

21  the monitor specifically saying that X, Y, or Z of what you're

22  requesting is no longer to be supplied pursuant to the court's

23  most recent order?  And if so, if there's a disagreement, I

24  think the court ought to be the arbiter of that disagreement,

25  if there is a disagreement.  I don't know.  What I'm saying is

1  if the county or if the sheriff is objecting to what the

2  monitor is doing, you need to -- that objection needs to be

3  brought to the court, because if there's a disagreement about

4  what the existing court order says -- I realize everybody has

5  appealed a portion of it and all that.  But if there's a

6  disagreement about what information the monitor is seeking,

7  that the monitor believes -- that the team believes that it

8  needs in order to do what the most recent order says, if

9  there's an objection to it, bring it to the court.

10          MR. HALL:  Your Honor, this is John Hall.  We have

11  objected, Your Honor, but we still turn over the documents.

12  There's nothing that -- we understand the process, Your Honor,

13  but if it's something that we felt is just absolutely outside

14  of the realm of what they're requesting, we would absolutely

15  bring it to the court's attention.  So there's not been an

16  objection, Your Honor, by the county, "No, y'all aren't going

17  to get this because you're not supposed to."

18      We've had the conversation and we've had the dialogue I

19  guess we were supposed to have and, for instance, with the

20  visitation logs, anything that any of these fact finders are

21  looking for, yet we're pulling them anyway.  Just because

22  they're requested, though, Your Honor, I think that we do have

23  a right to question whether or not -- the relevance of the

24  request.

25      It seems that even though this consent decree has been

1    pared down from 59 pages to 10 pages, the amount of documents

2    remains the same.  And that right there doesn't make a lot of

3    sense, but again nothing has been purposely not turned over.

4    If it's a situation where I don't know where to get it, they've

5    given me time to try to find it.  And that's the thing.

6         So last week, Ms. Simpson suggested that she directly

7    contact individuals within the sheriff's department because she

8    feels that she can go to somebody quicker than I can and she

9    knows who has what documents directly and ask them for it.  And

10   I think that works.  Since she made that suggestion, she's

11   reached out to certain people.  The documents have been

12   uploaded.

13        So it's more of a work in progress, Your Honor, as opposed

14   to a stonewalling by the county.  I think the county

15   understands its responsibilities.  But I do appreciate, though,

16   the judge advised me (videoconference interference) --

17             THE COURT REPORTER:  Mr. Hall, you faded out.  I

18   couldn't hear you.

19             THE COURT:  You need to repeat yourself for the

20   record.

21             MR. HALL:  I just thank the court for letting us

22   reiterate the fact that if we had any objections that we should

23   and could bring them to the court's attention.

24             MR. GAYLOR:  This is Attorney Gaylor.  And Attorney

25   Gaylor was saying for the record that we certainly object to

1    any notion or representation that the county or the sheriff's

2    office is any way, shape, or form stonewalling this process.

3    We try and operate in good faith and operate in our

4    communications with the monitors about what they're going to

5    receive and when they're going to receive it.  We also

6    understand that practically speaking there are times where some

7    things take a little bit longer to get than others, but we

8    aren't calling the court unnecessarily to make those --

9            THE COURT:  Hold on.  They have not called the court

10   unnecessarily.  The monitor is doing the bidding of the court.

11   The court has appointed the monitor to do a specific task, and

12   that task includes monitoring at the Hinds County Detention

13   Center.  And in that role, which is what the monitors have done

14   over the years in this case, they've requested documents and

15   information prior to their visits.  They have gone on-site, or

16   done it remotely in the last couple of years, obviously because

17   of COVID.  And then they've had exit interviews.  And I think

18   the monitors' point for the court is that they have requested,

19   maybe even on more than one occasion, certain documents in

20   advance of the most recent visit, and those documents were not

21   provided.

22          Now, they may not have been provided because of a change

23   of leadership, a change of personnel, a new system.  But in

24   this court's mind, none of that is really a real good excuse.

25   Persons need to be able to do the job of the sheriff's

1   department and the county irrespective of the change of

2   personnel, irrespective of a change of lawyer.  They need to be

3   able to do the job.  And if they can't do the job, then let the

4   monitors know or let the court know that everybody would be

5   wasting their time prior to doing what the court has asked them

6   to do.

7       And I understand the parties being defensive and all of

8   this, but the court -- the court has an obligation here.  So if

9   the parties believe that any request is either burdensome,

10   irrelevant, unnecessary, you need to let the court know and the

11   court will deal with that.  And I know the parties have worked

12   together -- the defendants have worked -- well, the parties

13   have worked with the monitors to try to make this process as

14   seamless as possible.  But apparently, it has become quite

15   difficult to move forward.

16       I mean, how does the county, for example, expect -- the

17   county and the sheriff's department expect for the monitor to

18   pick up and begin these interviews today if the documents that

19   have been requested long ago -- I mean, I assume some of these

20   requests are ongoing requests, I assume.  I don't know.  I

21   assume some of these requests are the same requests that have

22   been asked for over the years.  And so having incident reports,

23   for example, I'm pretty sure that that's an ongoing request,

24   because the court has been concerned about incidents that have

25   occurred there at the detention center.

1    So what progress is made on other portions of the consent

2    decree, I'm sure these are ongoing.  So again, the change in

3    personnel should not impact that so detrimentally that the

4    monitors can't have the information prior to the visit or prior

5    to these interviews, because in a typical basis at the end of

6    the interview is when the -- is when the court has typically

7    held the status conference.

8    I won't be able to hold a status conference this Friday,

9    for example, because I'm out of town.  But the way it's been

10   done in the past is that we would have a status conference when

11   the monitors were here just to see what are the preliminary

12   things.  And then they would go back and they would begin

13   preparing their report.  And that report would be made

14   available.  And we would have a more sustained status

15   conference afterward.

16   Now, if the parties -- that is, the government, the

17   county, or the sheriff -- believe that all of that is null and

18   void and unnecessary in light of the court's most recent order,

19   then you need to let the court know.

20   And I'm sorry for cutting across you, Mr. Gaylor, but you

21   can finish whatever statement that was you were making.

22            MR. GAYLOR:  Your Honor, I think what the gist of

23   what we're trying to say is that we are, in fact, trying to be

24   compliant in working with the monitors, and we have submitted a

25   very large amount of information to them.  And so when we

1   submit 70 percent or more of the information that they've

2   requested and then there's more to give, we're still working on

3   that information.

4        And, Your Honor, with all due respect, when there is a

5   change in personnel and a change of systems, we are working

6   through that change.  It's not that we're being unresponsive.

7   We're trying to be very responsive.  But we -- for practical

8   purposes, there have been some things that make us make that --

9   that may cause a delay in our response, but we request that

10  they work with us in the same way that we're working with them

11  in rescheduling everything because of some of the disruptions

12  that have taken place.

13       And so there has to be some understanding across both

14  sides with regard to the county and sheriff's perspective as

15  well as the monitor's perspective and DOJ's perspective in

16  terms of schedules and responses and everything else.  And so

17  we're trying to work with them in that sense, and we hope that

18  they'll have some level of understanding as we work through our

19  new process.

20            THE COURT:  So when is the court supposed to, again,

21  have status conferences and things of that sort, or does the

22  court sit on its hands and do nothing because everybody is

23  challenging the decision of the court?  I mean, I know there

24  have been a multitude of interlocutory appeals filed by

25  everyone, which is fine.  I mean, everybody is entitled to do

1    that.  But what is the court supposed to do in the interim?

2              MR. GAYLOR:  Your Honor --

3              THE COURT:  Yes.

4              MR. GAYLOR:  -- with all respect, Your Honor, there

5    is -- we would have had visits -- full visits just a couple

6    of weeks ago for the court to respond to or monitor or take a

7    look at, and monitors' reports would be in the process of being

8    preparing but for the most recent outbreak.  And so there has

9    to be -- we're hoping that there's some level of understanding

10   that there's going to be a little bit of a delay on this

11   instance, on this setup, monitors' reports on this set of

12   activities, because there was, in fact, a little bit of an

13   outbreak that we're responding to as well.

14       We've still got folks out.  We still have a unit that's

15   being quarantined.  And so we're adjusting a little bit right

16   now.  We don't anticipate that this is going to last long --

17   much longer.  But for practical purposes, there was a bit of a

18   delay this time.  There may not be this delay next time.  We

19   certainly presume not, because we don't anticipate that we'll

20   have the same level of problem to deal with.

21             THE COURT:  You indicated, Mr. Gaylor, that

22   70 percent of the documents have been provided or 70 percent of

23   the requests have been complied with.  Do we have a date by

24   which you believe that the county or the sheriff's department

25   will be able to comply with the other 30 percent?  Having as

1    much information as possible before these interviews obviously,

2    I would think, would be helpful to the parties, the monitor,

3    and the monitoring team.

4              MR. HALL:  With respect to the interviews, Your

5    Honor, the documents Ms. Simpson said have already been turned

6    over, you have IAD summary reports, my understanding from the

7    beginning of the year to the present, from January through May;

8    CID summary reports from the beginning of the year through May,

9    with the exception of the April summary report.  Those

10   summaries have the narratives in them from the actual

11   underlying incident reports.

12        So with respect to the general knowledge that the monitors

13   would need to ask anybody, let's say, for instance, there was

14   the CID investigation in the monitor's possession already.

15   Now --

16             THE COURT:  As a summary or the incident report

17   itself?

18             MR. HALL:  The summary --

19             THE COURT:  You-all are lawyers, Mr. Hall.  You know

20   a summary of a document is okay, but you want to see what the

21   original says --

22             MR. HALL:  Right.

23             THE COURT:  -- a physical record or anything, right?

24             MR. HALL:  Absolutely, Your Honor.

25             MS. SIMPSON:  If I may, I think there's some

1   confusion about what those summary sheets are.  The IAD summary

2   sheet is really just a log.  It shows the nature of the charge

3   or the potential violation and whether it was sustained or

4   exonerated.  It actually does not have the underlying

5   narratives.  So I think that's the narrative spreadsheet which

6   does have the narratives from the incident reports, but the IAD

7   summary sheet does not.  And the CID summary sheet is actually

8   just a log as well.  So the CID and IAD reports are definitely

9   needed.  The logs don't really provide much information at all.

10          THE COURT:  Do you disagree with that, Mr. Hall or

11  Mr. Gaylor?

12          MR. SHELSON:  Your Honor, this is Jim Shelson.

13  That's a separate issue.  No one is saying that she's not

14  entitled to them.  There's been -- I know Your Honor doesn't

15  think it's a good excuse, but the production of these records

16  is not in the routine business of the sheriff's office.  There

17  was a person dedicated to it.  He resigned.  Had to start over.

18      So if you put things in perspective about the 14 or 15

19  categories of documents that Ms. Simpson enumerated, in

20  perspective, yeah, it would be better to have a hundred percent

21  of them produced.  But under the circumstances, it's pretty

22  good.

23      As Mr. Gaylor said, the county expects this to go smoother

24  in the process.  So I think the issue is when can we get a

25  hundred percent to Ms. Simpson.  And I don't think anybody

1   disputes that the county is trying to do that.  And I don't

2   think there's anybody on today's interview with -- that

3   Ms. Simpson needs any of these documents to interview.  I mean,

4   it's like Mr. Gaylor, if Ms. Simpson needs a particular

5   document to interview IA and she appears she can't go forward

6   tomorrow, then she can tell us that and we can get her the

7   documents and she can reschedule that one interview.  But the

8   notion that this is wholesale useless because the county hasn't

9   produced a subset of the hundred precent she has requested I

10  don't think is fair or accurate.

11           THE COURT:  Okay.  I hear you.  Again, I mean, I

12  guess I should be sympathetic to the county because they lost

13  the employee who was primarily in charge of doing this

14  particular task, but I guess I'm sitting on my perch here, and

15  I just can't see how that task in and of itself cannot be

16  picked up by another employee or employees.  And obviously, I

17  know Mr. Green was indispensable, but no one is so

18  indispensable, I don't think, that others can't necessarily do

19  the job.

20      I mean, we have to have Plan Bs in running any

21  organization that we run.  And it's just hard for the court to

22  believe that -- again, I know you changed your service system.

23  You changed your document retention system, I guess.  And you

24  say -- and you've changed the personnel, but the county or the

25  people at the detention center or whatever or the people at the

1    law firms will tell your employees, you're an employee at will.

2    We know that.  And you can come and go when you get ready, and

3    we can get rid of you when we get ready, but the county must be

4    able to do the job that it's required to do irrespective of

5    who's employed there.

6        So I'm sort of sitting back just trying to make sure that

7    the parties understand that if there is some disagreement, and

8    apparently there is not, but I wanted to make sure if there was

9    some disagreement between the parties that the court is here to

10    referee the disagreement.  But again, the monitor needs to be

11    able to report to the court because I need to know how the

12    county is complying with the court's order that I contend is

13    still in place through the last order that the court has

14    issued.

15        MR. SHELSON:  Your Honor, Jim Shelson again.

16    Everything Your Honor just said is understood by the county,

17    and the county is not here trying to tell the court that this

18    order is not in effect.  But just so I don't sound like an

19    excuse machine, just two things very briefly, Your Honor.

20        First, the way Mr. Green set up the Google system he had

21    in place, he's the only one who had access to that.  In

22    hindsight, it should have been set up differently, but it is

23    what it is now.

24        The second thing, Your Honor, is Mr. Green, by virtue of

25    his position, had an institutional knowledge associated with

1    this process, which the short version of it is he knew who to

2    go to when, to get that -- to get the documents the monitors

3    have historically requested.  So, Your Honor, that position

4    isn't like a patrol officer where if a patrol officer calls in

5    sick, there's somebody who is trained to take his place.  That

6    was a unique position.

7         And Your Honor is correct that going forward, somebody

8    else can fill that position.  But, Your Honor, there's going to

9    be a learning curve.  And again, we understand the obligation

10   going forward, and we expect it to be better the next iteration

11   of this.  But this first one, there have been some hiccups.

12   And we will get the documents to Ms. Simpson that she's

13   enumerated on this call.

14              MR. CHENG:  Your Honor, this is Christopher Cheng.

15   If I could say something.  This idea that this is a new problem

16   and it just ties to Mr. Green, it's a quite frankly a grotesque

17   misrepresentation of the record before the court.  We would

18   respectfully remind the court that the defendant affirmatively

19   agreed to terminate the compliance coordinator position, and

20   that was months before this document issue came up.  And they

21   affirmatively argued they did not need Mr. Green.

22         The United States has continually argued that there are a

23   number of provisions, including some that were terminated, that

24   were necessary for them to come into compliance, that were very

25   carefully negotiated, but the defendants represented that they

1    could take care of this on their own.

2         So even on the record, the idea that Mr. Green's departure

3    was a surprise and created all these complications, it's not

4    fair.  This is exactly why those efforts to terminate the

5    provisions were bound to lead to problems for their compliance.

6    And then to now claim as their defense or to mitigate that this

7    was a surprise, it's a ridiculous representation of what

8    actually happened.

9         The other part that isn't even before the court, because

10   the United States has actually been very patient with

11   defendants and have actually been trying to work with them

12   during this transition period, is there have been multiple

13   communications by the Department of Justice to the defendants

14   warning them that Mr. Green was leaving and that they needed to

15   transition to a better process.

16        They've had months to try to come up with a plan.  They've

17   had months to designate someone.  I believe the monitor has

18   continually asked them to designate someone to replace

19   Mr. Green.  They didn't do it.

20        Now, I'm not going to get too much into all the different

21   records.  The idea that there's 70 percent complied with, I

22   really question whether that's true when they're not even

23   producing the incident reports.

24        But leaving that aside, the department has, for example,

25   had one very simple request for months.  We asked for videos of

1    a number of shakedowns that have occurred since October.

2    Videos.  Every single time I talk with Mr. Hall or Mr. Gaylor,

3    I try to bring it up:  "Just get me the videos."

4         We can't even get those videos.  And what's the excuse for

5    that?  That's not Mr. Green.  That's not because you can't

6    figure out what's going on.  The idea this is an accident, I

7    don't think the court should give them that much credit.

8    There's more than enough here suggesting this is actually

9    stonewalling.  And we're not going to -- if Ms. Simpson wants

10   to work with them, that's fine, but we're not going to sit here

11   and just let everyone claim this is -- this is a feature of the

12   defense.

13             MR. HALL:  Your Honor --

14             THE COURT:  Let me follow up.  And, of course, the

15   county will be able to respond in any way.  Has the government

16   asked specifically for -- either verbally or in writing,

17   Mr. Cheng -- those videos you said you've requested since

18   October of 2021?

19             MR. CHENG:  The videos from late 2021, but yes, we've

20   asked for them repeatedly in writing and I believe verbally.  I

21   think Ms. Simpson did too.  She went through her document

22   requests that her team has also asked for those videos.  They

23   go directly to use of force and then the training of staff.  So

24   the defendants can't even claim it's not covered by the

25   injunction.  It's clearly covered by the injunction.  They're

1    just not producing it.

2            MS. SIMPSON:  Yes, Your Honor.  And I have also

3    requested that.  I didn't put it on the list.  I thought that

4    the county had already turned it over to the U.S. Attorney's

5    Office in Jackson, but I am learning now that that's not the

6    case.  So yes, that's another request that has not been --

7            THE COURT:  Okay.  That -- I assume, is that -- to

8    the county -- to the sheriff's department, is that something

9    that Mr. Green was -- is that something that the county has

10   access to and has not produced?  And again, if you're not going

11   to produce something, I think it's -- well, I guess the

12   government or the monitor can raise it with the court.  But

13   again, if the county is going to withhold stuff, if that's the

14   case, it's going to withhold things, let them know and we will

15   take it up with the court.  But I'm just trying to find out

16   does the county --

17           MR. HALL:  Your Honor, this is John Hall.  We do have

18   the videos.  We can turn them over.  The incident reports from

19   those shakedowns have been turned over months ago.  And the

20   government as well as the monitors both know that the Raymond

21   Detention Center staff did not take part in that actual

22   shakedown, that another jurisdiction did.  Any video --

23           THE COURT:  I'm talking about the videos.

24           MR. HALL:  Yes.

25           THE COURT:  Do you have the videos of the shakedowns?

1          MR. HALL:  Yes, Your Honor.

2          THE COURT:  I don't mean to cut across you, but I'm

3    talking about the video evidence of the shakedown, no matter

4    who were the authorities that did it, because if these are

5    people from some other jurisdiction, that is, the state

6    department of public safety or whoever might have been there

7    from other sheriff's departments or federal agencies, whoever,

8    obviously if they are at the detention center, they are there

9    at the invitation of the sheriff, I would guess, because I know

10   the sheriff is not going to allow anybody coming to its

11   facility to do a shakedown and he not know about it or not be a

12   part of it or that they're not invited to do it.

13        So again, the videos that captured that, obviously the

14   incident report helps.  Obviously.  But this court has seen

15   videos that add a -- that add much more context to things based

16   on the written record.  So are there videos in the custody of

17   the sheriff's department that has not been produced as the

18   government has requested and the monitor has requested?

19        MR. HALL:  Judge, they can be hand delivered this

20   morning.  As soon as we get off the call, I'll walk them over

21   myself.

22        THE COURT:  Okay.  Now, of course, that begs the

23   question, Mr. Hall, why weren't they -- why were they not given

24   up last Friday or three weeks ago or two months ago?  That's

25   the thing that frustrates me.  You have them and they can be

1  produced right now based on this call.  Why have they not been

2  produced earlier?

3       MR. HALL:  Just with respect to getting all these

4  other documents, et cetera, together, everything was going on

5  at the same time, so on a daily basis uploading documents

6  online.  We could not download those and send them

7  electronically because they're too voluminous.  So I've had

8  them on -- they've got them burnt on disk.  So with respect to

9  why they weren't -- I don't have a good answer for why they

10  weren't sent yesterday or Friday.

11      The information -- the underlying information pertaining

12  to that has been in the possession of the DOJ as well as the

13  monitors, but the actual videos have not.  They've requested

14  them.  I owe it to them.  I'll get them to them, and I don't

15  have a good reason to give you, Your Honor, for not turning

16  them over earlier.

17      THE COURT:  Yeah, because DOJ says that they've been

18  asking for them since before you got involved in the case,

19  since October of last year.  I don't think you were involved.

20  I don't think you were counsel for the sheriff at that time.

21  You could have been.  I don't know.  Things are moving pretty

22  rapidly in this case.  But even so, I find it very hard to

23  believe that it takes more than six months to download -- to

24  get a copy of a video or videos.

25      MR. HALL:  I think there -- there may be -- the only

1    ones I'm familiar with, there was a March shakedown.  Those are

2    the videos I'm referring to.  And those were requested sometime

3    after -- I want to say April.  So that's on me, Judge.  It was

4    all on me.  I take responsibility for the production of

5    documents.  I don't have a problem with that.  But the

6    October -- I don't know what he was asking for from October.

7               THE COURT:  Okay.

8               MR. HALL:  We're not familiar with that.

9               THE COURT:  Again, this process has required some

10   give and take and some talking.  And I know the monitors are

11   supposed to do interviews this week.  And according -- you

12   know, the way this whole process has been set up is because

13   everybody has certain time frames in which to get things done

14   because the status report has to be submitted.

15       Now, if the parties believe that keeping to the schedule

16   that has been outlined or agreed to long ago cannot be done, I

17   mean, because I would think that the monitors might want to see

18   the videos, for example, of the most recent shakedown, compared

19   to what the incident report says, compared to the summary

20   sheets, compared to what the interviews of the people say.  But

21   if they don't have that, how can they -- how can they do their

22   job and get the information to the court in the time that it

23   says?

24       If DOJ has been requesting certain information, again,

25   for months and there appears to be no attempt to comply with

1   it -- I mean, I think in my last order I mentioned that the

2   contempt finding is still out there.  It is still held in

3   abeyance, I think, or -- I mean, it's out there.

4       And as the court told the parties back at the last status

5   conference, that question remains open.  I think the sheriff's

6   department -- the sheriff specifically asked that question at

7   the last gathering that this court had with the parties because

8   the sheriff wanted to make sure that he spoke appropriately

9   about the status of the case in light of the court's latest

10  order.

11      So hearing that, there's been no attempt to at least do

12  that, of course, and I just don't -- the county gives the court

13  very few options.

14              MR. HALL:  Are you referring to just --

15              THE COURT:  I --

16              MR. HALL:  -- that --

17              THE COURT:  Go ahead, Mr. Hall.  I'm sorry.

18              MR. HALL:  Just for clarification, that one

19  production is what the court is -- of disks, notwithstanding

20  everything else that's been turned over and complied with.

21              THE COURT:  Well, I heard the monitor say at the

22  beginning of this call, a whole list of documents, a whole --

23  regardless of what has been complied with, there's a -- and

24  there is no dispute.  I think the county has told me.

25  Mr. Gaylor, Mr. Shelson has told me that yes, what she listed

1    are things we don't disagree that those are things that we're

2    working on, but these are the reasons why she doesn't have it,

3    but they don't have it.

4        But turning to your specific question, Mr. Hall, again, if

5    video requests -- requests of videos that seem to the court to

6    be fairly easy to gather because you have them, it just boggles

7    the mind that those have not been given up, and there may be

8    other things that are so readily available that the parties

9    might be holding onto to do some massive production.

10       But I guess I'll ask the monitors with respect to the

11   interviews that you have slated for this week, how might the

12   production or nonproduction of what remains outstanding, how

13   might that affect your ability to do your job this week?

14           MS. SIMPSON:  Well, it certainly affects our

15   ability -- for example, the next interview scheduled is with

16   the Internal Affairs Division staff.  And we don't have the IAD

17   reports.  My current plan is to proceed with the interviews and

18   follow up with a second phone call if needed once we get the

19   documents.

20       These interviews have already been delayed.  I don't want

21   to delay them any further even though they are definitely less

22   productive without access to the documents.

23           THE COURT:  Okay.  Again, I'm going to encourage the

24   parties to continue to work with each other.  And again, if

25   there is any specific disagreement about what needs to be

1   produced, how long somebody needs to be -- well, who needs to

2   be made available or whatever type of disagreement that might

3   occur, then -- and it may be no disagreement.  But to the

4   extent that there is, the parties need to bring it to the

5   attention of the court, and I will act on any request as

6   expeditiously as possible, because this court will continue to

7   do what it believes it is obliged to do based on the orders

8   that it's entered and the findings that it's made over

9   the years.

10          So I just wanted to have this status conference with the

11  parties.  Everybody understands that although the court has

12  scaled back what it believes -- scaled back from the -- scaled

13  the consent decree down, I still am very much involved in

14  making sure that the current order is complied with.

15               MR. CHENG:  Your Honor --

16               THE COURT:  I was about to say, anything else from

17  the government, Mr. Cheng?

18               MR. CHENG:  Yes, Your Honor.  I would mention that so

19  far we've been talking about what we consider to be really

20  clear issues of production.  I think Mr. Shelson or someone

21  from Phelps mentioned something about there are some other

22  issues that they have objected to or that they might object to,

23  but that has not really been clear to us what those are.

24          There were a few conversations in the past couple months

25  about the scope of the orders.  Without anyone formally filing

1  objection, I did want to flag that.  I did want to be clear

2  that there have been some discussions about it.  There is

3  apparently a lack of clarity regarding some of the original

4  provisions, the consent decree, the sections that included the

5  definitions and identified the parties, for example.

6      I guess it's not quite clear how those still get applied,

7  if at all, or whether we're basically using new definitions for

8  things like use of force and serious incident or qualified

9  staff.  So I did want to highlight that there is a potential

10  problem there that may eventually get brought to the court's

11  attention if the parties can't resolve it.

12      The other issue had to deal with the stipulated order and

13  whether the monitors still have jurisdiction over the

14  stipulated order.  I think that the (videoconference

15  interference) remains in effect.  And in any case, it might not

16  necessarily be a problem because almost all the major

17  provisions of that order are actually incorporated into the

18  remaining injunction as well.

19      So in theory, whatever the status is of the stipulated

20  order, the monitor should still have jurisdiction over issues

21  that overlap with both the injunction and stipulated order.

22  But because it came up, I did want to flag it with the court

23  that without a clarification from the court or something more

24  formal from the defendants, we could anticipate some sort of

25  dispute about these issues in the future.

```
 1            THE COURT:  Well, I'm here to resolve any dispute.
 2       Ms. Simpson, is there anything further you wish the court
 3   to address?
 4            MS. SIMPSON:  No.  I think if we can get the
 5   documents promptly, that will enable us to do what we can this
 6   week and schedule some follow-up if we need it, so I appreciate
 7   Your Honor addressing that.
 8            THE COURT:  Okay.  Do you anticipate, Ms. Simpson,
 9   staying on track to provide your report as you've done in the
10   past?  You know, the (videoconference interference) --
11            THE COURT REPORTER:  I lost you after "staying on
12   track to provide your report as you've done in the past."
13            THE COURT:  Thank you, Ms. Wasmund.
14       Ms. Simpson, do you think that you're on track to stay on
15   the current schedule of providing to the parties your draft
16   report for their feedback and comebacks and then getting the
17   more formal status report filed and having -- and the court
18   following that with a hearing, as I've done in the past?  Do
19   you think you will be able to stay on your schedule that you
20   would normally do in that regard?
21            MS. SIMPSON:  Yes.  That's our current plan.  And we
22   may even try to expedite it a little bit since the visit got
23   delayed.  But that's the current plan.  And obviously, we do
24   need some of these documents to be able to finalize the report.
25            THE COURT:  Okay.  Thank you.  Is there -- I've heard
```

1  from Mr. Cheng on behalf of the government.  Is there anything

2  further from the sheriff, Mr. Hall?

3           MR. HALL:  No, Your Honor.  We'll keep working with

4  the monitors and the DOJ.

5           THE COURT:  Anything further from the county,

6  Mr. Gaylor, Mr. Shelson?

7           MR. GAYLOR:  No, Your Honor.

8           MR. SHELSON:  Your Honor, Mr. Cheng made reference

9  that I made ridiculous and grotesque misrepresentations to the

10  court.  That wasn't my intention.  If the court construed it

11  that way, I apologize to the court.  But other than that,

12  nothing further from the county.

13           THE COURT:  Okay.  Well, thank you-all for making

14  yourselves available on what might have appeared to have been

15  short notice.  But I hope you-all are productive this week, and

16  I'll look forward to talking to you in the very near future

17  after receiving the status report.

18       Thank you so much.  That concludes the call.  But again, I

19  will leave you-all with this:  If there's any disagreement

20  about anything that you cannot resolve yourself, bring it to

21  the attention of the court.  That concludes the call.  Thank

22  you so much.

23       (Proceedings concluded at 10:10 a.m.)

24

25

CERTIFICATE OF REPORTER


I, Margaret Wasmund, RDR, CRR, CRC, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated this 6th day of July 2022.


*Margaret Wasmund*
MARGARET WASMUND, RDR, CRR, CRC
COURT REPORTER