UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA                          Plaintiff

V.                          CASE NO. 3:16-cv-489-CWR-RHWR

THE HINDS COUNTY BOARD OF                         Defendants
SUPERVISORS, ET AL




**TRANSCRIPT OF EVIDENTIARY HEARING**

BEFORE HONORABLE CARLTON W. REEVES
UNITED STATES DISTRICT JUDGE

July 19, 2022
Jackson, Mississippi




The proceedings were reported by a stenographic court reporter.
The transcript was produced using computer-aided transcription.



*Margaret Wasmund, RDR, CRR, CRC*
*Court Reporter*
*2851 Shiloh Road*
*Pelahatchie, Mississippi 39145*
*margaretwasmund@gmail.com/601-329-6113*

APPEARANCES:


REPRESENTING THE PLAINTIFF:

Christopher N. Cheng, Esquire
U.S. Department of Justice
150 M. Street NE, 10th Floor
Washington, DC  20530

Matthew Donnelly, Esquire
U.S. Department of Justice
950 Pennsylvania Ave NW
Washington, DC  20530

Angela Givens Williams, Esquire
U.S. Attorney's Office
501 East Court Street, Suite 4.430
Jackson, MS  39201


REPRESENTING THE DEFENDANTS:

John C. Hall, II, Esquire
The Hall Law Group PLLC
263 East Pearl Street
Jackson, MS  39201

James W. Shelson, Esquire
Nicholas F. Morisani, Esquire
Phelps Dunbar, LLP
P.O. Box 16114
Jackson, MS  39236-6114


ALSO PRESENT:

Sheriff Tyree Jones
Chief Anthony Simon
Ms. Elizabeth Lisa Simpson
Mr. David Parrish
Dr. Richard Dudley (via videoconference)
Ms. Katherine Rayome

TABLE OF CONTENTS

WITNESSES FOR THE DEFENDANTS:

TYREE JONES

    Direct Examination By Mr. Hall:  .......................12

    Cross-Examination By Mr. Donnelly:  ....................18

    Redirect Examination By Mr. Hall:  .....................28

KENNY WAYNE JONES

    Direct Examination By Mr. Shelson:  ....................30

    Cross-Examination By Mr. Cheng:  .......................32

    Redirect Examination By Mr. Shelson:  .................42

    Redirect Examination (Continuing) By Mr. Shelson:  .....52

    Recross-Examination By Mr. Cheng:  .....................53

WITNESSES FOR THE GOVERNMENT:

ELIZABETH SIMPSON

    Direct Examination By Mr. Cheng:  ......................63

    Cross-Examination By Mr. Hall:  ........................71

    Cross-Examination By Mr. Shelson:  .....................90

    Redirect Examination By Mr. Cheng:  ...................100

DAVID PARRISH

    Direct Examination By Mr. Cheng:  .....................118

      Exhibit P-159  ....................................123

      Exhibits P-160 through P-167 and P-173  ...........138

Cross-Examination By Mr. Morisani:  ...................142

Redirect Examination By Mr. Cheng:  ...................160

  Exhibit D-52    .....................................161

1       (July 19, 2022, 10:40 a.m.)

2           THE COURT:  Good morning.  We're getting started a

3   little bit later than I intended, but obviously the parties can

4   take whatever time that they need for the purposes of this

5   hearing.  This is United States of America v. Hinds County, et

6   al, 3:16-cv-489-CWR-RHWR.

7       Who is here for the government?

8           MR. CHENG:  Christopher Cheng, Your Honor, and

9   Matthew Donnelly --

10          THE COURT:  Make sure your microphone is on.

11          MR. CHENG:  Christopher Cheng, Your Honor, and

12  Matthew Donnelly for the United States.  We also have Angela

13  Williams with the U.S. Attorney's Office.

14          THE COURT:  Okay.  And I do see the receivers are

15  here, Ms. Simpson, Mr. Parrish.  And I think Dr. Dudley is on

16  by Zoom; is that correct?

17          MR. CHENG:  Yes, Your Honor.  Dr. Dudley will be

18  participating by Zoom.

19          THE COURT:  Okay.  Thank you.

20      Who is here for the defendants?

21          MR. HALL:  Good morning, Your Honor.  John Hall for

22  the Hinds County Sheriff's Department.  We have Nick Morisani

23  and Jim Shelson for the county as well.

24          THE COURT:  Okay.

25          MR. HALL:  Your Honor, the designated witnesses will

1  be Sheriff Jones for the sheriff's department and Anthony Simon
2  for the county.
3           THE COURT:  Okay.  I know we're here today on the --
4  I think the county's motion for reconsideration of Docket
5  Number 171, which is part of a response to the court's second
6  contempt order, I think, at 165.  I think I informed the
7  parties that we'll give the county the opportunity to put on
8  any evidence in mitigation and also take up any of the
9  outstanding issues that need to be taken up.
10          Are we prepared to do that today?
11          MR. HALL:  Yes, Your Honor.
12          THE COURT:  All right.  How do we wish to proceed?
13          MR. CHENG:  Your Honor, we are prepared to proceed.
14  I did want to flag that there was some confusion when we met
15  with the -- conferred with the defendants on Friday about the
16  scope of the hearing.
17       Our understanding is they requested the evidentiary
18  hearing to deal with the motion for reconsideration.  We're all
19  prepared to move forward on that.  There was some discussion
20  about the scope of the hearing and whether the court would also
21  be taking other updated information as a normal status
22  conference and whether that would open the evidentiary hearing
23  up for more expansive discussion.
24       I think -- we just want to make sure the court gets
25  whatever information the court thinks it needs to decide the

1    motion today or whatever other information it needs as part of

2    this evidentiary hearing.  We had three concerns we wanted to

3    flag.

4         The first is that our view is that if there is a status

5    conference for a more general update for the court, that

6    doesn't require a full evidentiary hearing each time with the

7    formalities of a trial.  The reasoning is because the court

8    should be getting status conferences routinely from the

9    monitors; and if every single time we have to do a trial, it's

10   going to create a cumbersome process.

11        The second issue is that the PLRA only lets the defendants

12   get one bite at the apple every two years or so, not every

13   two months.  And so if they're basically reopening the hearing

14   to bring in new evidence each time, that would procedurally

15   cause some difficulties and be unfair to the United States.

16        The third is that we do understand why the defendants feel

17   the need to protect their rights to make sure the evidence is

18   before the court, but the procedures in place under the court

19   orders decide how they protect their rights.  It doesn't

20   necessarily require that we do a trial each time.

21        That said, these were just things we brought up with the

22   defendants.  They weren't resolved.  They may not be an issue,

23   but we wanted to flag it with the court before we proceed.

24             THE COURT:  Okay.  Thank you, Mr. Cheng.

25        Let me hear from the defendants.

1        MR. SHELSON:  Good morning, Your Honor.

2        THE COURT:  Good morning.

3        MR. SHELSON:  Jim Shelson for the county.  May I

4   proceed?

5        THE COURT:  You may.

6        MR. SHELSON:  Your Honor, I'm not sure we're all that

7   far apart with the United States.  On motion ECF 171, the

8   motion for reconsideration, the county view is that that should

9   be confined to mitigation efforts regarding A-Pod.  We have two

10  witnesses that are going to be pretty brief, and then that's

11  going to be our presentation on the A-Pod motion for

12  reconsideration issue.

13       Anything else, Your Honor, in our view should be a

14  separate hearing.  We know on the last status conference Your

15  Honor indicated that he wanted to hear from the monitors.  To

16  the extent that they have testimony that relates to mitigation

17  efforts regarding A-Pod, that would obviously come into play

18  regarding motion ECF 171.  But to the extent that Your Honor

19  wants a general update status from the monitors regarding their

20  last site visit, in our view that's a separate matter.

21       We agree that it need not be evidentiary.  We have some

22  concerns that the court would receive the monitors' update

23  before the parties received their written report.  But if the

24  court -- if the court is going to hear from the monitors today

25  on a status update, then we do not disagree that it can be

1    nonevidentiary; and if it's nonevidentiary, and they just give

2    the court an update, then, you know, we might -- counsel might

3    request a brief opportunity to respond.  If the court receives

4    their testimony on the update in an evidentiary manner, then,

5    Your Honor, our view is they would have to be presented on

6    direct; we would have an opportunity to cross and call rebuttal

7    witnesses.

8        So I guess the main issue is as far as, you know, what the

9    court wants from the monitors and, if it's a status update,

10   whether that's evidentiary or nonevidentiary.

11        THE COURT:  Okay.  All right.  Thank you.

12        MR. SHELSON:  Thank you, Your Honor.

13        THE COURT:  All right.  Mr. Cheng.

14        MR. CHENG:  Yes, Your Honor.  I think this is why we

15   may need to see how this proceeds because when we talk about A

16   and mitigation efforts, that could be much broader than I think

17   Mr. Shelson conceives of as the presentation; and so we would

18   want the monitors or other witnesses to address those issues,

19   and they will respond as part of this hearing, and it would be

20   for evidentiary purposes.

21        So again, Your Honor, I think we can proceed.  It's just

22   depending on what the defendants do, the court may be asked at

23   some point whether or not the U.S. is going beyond the scope of

24   the direct and expanding this too much.  We do feel that the

25   motion to reconsider was itself so broad and opened up so many

1    avenues of argument that we should have a little bit of leeway

2    to talk about what the monitors have been able to identify

3    during their last site visit, and it should be evidentiary.

4            THE COURT:  All right.  I'm going to allow the

5    monitors to give me information.  The second contempt order was

6    filed back in March, and the motion for reconsideration was

7    filed back in April.  I advised the parties that the court

8    would be looking to give the county an opportunity to provide

9    some evidence in mitigation in support of either their motion

10   for reconsideration or in support of -- or as their basis for

11   not being found in contempt.  And the court's new injunction

12   became effective in April, but the monitors I don't think were

13   able to visit the site or complete, at least, their site

14   inspection sometime in May.

15       And I think all the parties participated at some level

16   with the monitors.  It was handled as it had routinely been

17   handled.  I do realize that the initial site visit was cut off

18   because we've had at least one status conference over the

19   phone, I think, and got information that one of the site visits

20   had to be interrupted because one of the monitors had COVID.

21       So a lot of the stuff was done remotely from there, but I

22   think the parties have participated in it at every level, and

23   the court would be interested to know what the monitors -- what

24   the monitors -- with their visit, what did they learn from

25   their most recent visit, what did they learn from their most

1  recent site inspection.  And so I'm going to give the

2  parties -- I could have the monitors do it as we've done it in

3  the past as sort of a status update; or if the parties wish to

4  question the monitors, you may do that as well.

5      I do realize the monitor -- the time -- the deadlines by

6  which the parties have typically done things, traded draft

7  reports and all, that deadline has not been met.  I'll have the

8  monitors tell me and the parties can also tell me whether or

9  not -- whether they participated, whether the monitors were --

10  whether the parties were available and -- at the time of the

11  site inspection.  And to the extent they disagreed with stuff

12  that the monitor might say, you need to disagree on the record

13  and let me know because I do need to be moving on.

14      I realize we're at the stage now where we have an appeal,

15  a cross appeal, and at least one or two interlocutory appeals

16  as of now.  So it's a matter of this court trying to proceed

17  with this case as best as it can.  So I'm ready to go forward.

18      I will hear the -- I'll hear whatever argument the county

19  might wish to put on their motion for reconsideration in the

20  way that the county wishes it to go forward.  Do you want to

21  call your two witnesses or have argument or do whatever?  I am

22  fine with it.

23          MR. SHELSON:  Your Honor, we'd just as soon proceed

24  with our witnesses; and to the extent that we have an objection

25  to a question that gets asked by the United States, we'll

T. JONES - DIRECT                                        12

1   object contemporaneously.

2          THE COURT:  Okay.  Thank you.  All right.  You may

3   proceed.

4          MR. HALL:  Your Honor, the county would call Sheriff

5   Tyree Jones to the stand.

6                        **TYREE JONES**

7   was thereupon called as a witness and, having first been

8   duly sworn, testified as follows:

9          THE COURT:  I'll just remind you, Sheriff Jones, to

10  make sure that the lawyers finish their questions before you

11  begin to speak so that the two of you will not be speaking at

12  the same time, and please continue to speak at a pace at which

13  the court reporter can keep up with you.

14         THE WITNESS:  Yes, sir.

15         THE COURT:  All right.

16         MR. HALL:  May it please the court.

17         THE COURT:  You may proceed.

18                    **DIRECT EXAMINATION**

19  BY MR. HALL:

20  Q.  Sheriff Jones, you're here to testify about the county's

21  efforts to mitigate or comply with the court's orders.  You're

22  aware of that.

23  A.  Yes, sir, I am.

24  Q.  And particularly we're here to talk about efforts that

25  have been undertaken with respect to A-Pod.

T. JONES - DIRECT

1    A.  Yes, sir.

2    Q.  And just for background, explain to the court briefly the

3    differences how the RDC is set up.

4    A.  Well, RDC is composed of three different pods.  We have

5    A-Pod.  We have B-Pod.  We have C-Pod.  And, of course, you

6    know, we have the booking area; and we have holding cells in

7    the booking area as well.  Once a detainee makes it through

8    booking and classification, they're then placed into a pod

9    between A-Pod, B-Pod, and C-Pod.

10   Q.  Now, with respect to A-Pod is that -- from a facility

11   standpoint, describe the -- are there any differences between

12   A-Pod, B, and C?

13   A.  Yes.  A-Pod is in a different condition than B and C as it

14   relates to the physical plant itself.  There were some damaged

15   doors in A-Pod that has extended over a period of time.  And

16   there were some other technical issues with A-Pod as well.

17   Q.  At some point was there a decision made by yourself with

18   the county to close A-Pod?

19   A.  Yes, there was.

20   Q.  Why is that?

21   A.  Due to the safety of A-Pod and due to the condition of

22   A-Pod, we rendered it would probably be better to close A-Pod

23   and operate out of the other two pods.

24   Q.  Were there any upgrades to any other pods in preparation

25   for moving detainees from A-Pod?

T. JONES - DIRECT

1    A.  Yes, there was.

2    Q.  And tell us what preparations were made in the other pods.

3    A.  In B-Pod, the doors, the locking mechanisms were upgraded

4    and replaced.  The plumbing issue in B-Pod was addressed, and

5    it was fixed.  We installed new tables and dining equipment in

6    B-Pod, and we also upgraded the camera system in B-Pod as well.

7    Q.  Was there any upgrades to fire alarms in B-Pod?

8    A.  Yes.  The fire alarms were upgraded in B-Pod as well.

9    Q.  Were there any repairs made to the roof in B-Pod in

10   preparation for moving folks from A to B?

11   A.  Yes, there was some repairs done to the roofing.

12   Q.  Now, with respect to the detainees in B-Pod, tell us the

13   plan about moving folks from A to B.  Was B just empty?

14   A.  No, B wasn't empty, but we had two housing units in B-Pod

15   that we were attempting to use to put detainees from A-Pod into

16   B-Pod.  We were going to move the trusties from B-Pod to the

17   work center.

18   Q.  Do you remember about how many individuals that would have

19   been?

20   A.  At that particular time, if I remember correctly, it may

21   have been maybe 15 to 20.

22   Q.  They were going to move to the work center, you said.

23   A.  That's correct.

24   Q.  Now, let's talk about a timeline.  With respect to the

25   repairs, et cetera, when did those repairs begin for B-Pod in

1    preparation for moving people from A-Pod?

2    A.   They began in early spring.  We had a deadline where we

3    wanted to get started somewhere around the beginning of June.

4    Q.   And with respect to the repairs in B, were those repairs

5    ultimately made by that deadline that you imposed?

6    A.   Yes, they were.

7    Q.   With respect to the actual movement of detainees from

8    A-Pod, what dates were you trying to move the A-Pod detainees

9    to B-Pod?

10   A.   We were going to utilize June to do that.  We were going

11   to start moving -- initially we moved the trusties from B-Pod

12   to the work center and then start slowly transitioning

13   detainees from A-Pod to B-Pod.  If I remember correctly, it may

14   have been B-2 and B-3.  Maybe Chief Simon can elaborate a

15   little bit more on that.

16   Q.   That's fine.  We'll call Chief Simon for the particulars.

17   Were detainees ultimately moved from A-Pod to B-Pod as planned?

18   A.   No, they were not.

19   Q.   Tell the court why.

20   A.   In early June we had a COVID outbreak at the facility, and

21   we had to start using the empty space that we had available in

22   B-Pod for quarantine.

23   Q.   With respect to the COVID outbreak, was a contact tracing

24   done within the facility?

25   A.   Yes, it was.

T. JONES - DIRECT

1  Q.  And did you find who initiated that COVID outbreak in the

2  facility?

3  A.  The COVID outbreak occurred around the time that the

4  monitors visited RDC, which was in late May, early June.

5  Q.  Now, you say "around the time."  Were you made aware by

6  one of the monitors that a member of their team, in fact, was

7  COVID positive?

8  A.  Yes, I was.

9  Q.  And do you remember what date that was?

10  A.  Somewhere around May 31st or June 1st, somewhere in that

11  area.

12  Q.  Now, with respect to the COVID outbreak, were there any

13  detention officers who were infected with COVID after that site

14  visit?

15  A.  Yes, there were several detention officers and several

16  detainees tested positive.

17  Q.  Now, let's talk not big, big picture; but with respect to

18  after that COVID outbreak, were any units closed or

19  quarantined?

20  A.  Yes.  We had to close several units in quarantine, to

21  include the work center as well.

22  Q.  Were any units on B-Pod quarantined?

23  A.  Yes.

24  Q.  To this day -- today is July 19th -- are there any pods

25  that are still in quarantine?

T. JONES - DIRECT

1    A.  Yes.  We still have pods, housing units under quarantine

2    as well, yes.

3    Q.  With respect to the work center, is the work center still

4    under quarantine?

5    A.  Yes, it is.

6    Q.  The reason why I ask, we were trying to move people from B

7    to the work center.

8    A.  Correct.

9    Q.  Also, with respect to other hindrances for removal of

10   detainees from A-Pod to elsewhere, has the crime rate in

11   Jackson affected that?

12   A.  Yes, it has.  Our numbers have risen in the detention

13   facilities.  There have been more people arrested, more people

14   have been charged, and more people have been indicted.  So that

15   has caused an increase in numbers over the last three months in

16   our detention facilities.

17        MR. HALL:  Your Honor, can I have a moment to confer

18   with counsel?

19        THE COURT:  All right.

20   (Off-the-record discussion between defense counsel.)

21   BY MR. HALL:

22   Q.  Sheriff, long term, as far as A-Pod is concerned, tell the

23   court what is your ultimate goal with respect to A-Pod.

24   A.  My ultimate goal with A-Pod is to completely empty A-Pod

25   and not use it anymore.

T. JONES - CROSS

18

1    Q.  Once your COVID challenges subside or eradicate, what is

2    your plan?

3    A.  My plan is to start moving detainees out of A-Pod into

4    B-Pod, and we also have other efforts under way as well and

5    other resources that we look forward to that could possibly

6    help us dwindle our numbers in the facility as well.  You know,

7    we have the addition of the state resources that have been made

8    available to Hinds County, and hopefully that will navigate

9    more of the detainees through the criminal justice system to

10   get them out of the facility as well.

11   Q.  All right.

12          MR. HALL:  I don't have any further questions, Your

13   Honor.

14          THE COURT:  All right.  Any cross-examination of this

15   witness?

16          MR. DONNELLY:  Just a few questions, Your Honor.

17          THE COURT:  All right.

18                     **CROSS-EXAMINATION**

19   BY MR. DONNELLY:

20   Q.  Good morning, Sheriff.

21   A.  Good morning, sir.

22   Q.  A-Pod isn't closed right now, correct?

23   A.  No, sir, it's not.

24   Q.  And when is your expected timeline?  Can you give us a

25   month when you expect for it to be actually closed?

1    A.   Well, right now, safety is our number one priority, for

2    the safety of the detainees and the detention officers.  We

3    look forward to at some point the COVID numbers going down in

4    our facility.  Once that happens, we will be able to move

5    detainees from A-Pod and start putting them into B-Pod, but we

6    can't do that -- we can't move detainees around like that until

7    the numbers begin to change.

8    Q.   So you can't give us an estimate that it will be September

9    or December.  You can't give us an estimate like that, right?

10   A.   I can't tell you an exact estimate of when.  Again, as

11   soon as our numbers dwindle as it relates to COVID, and as soon

12   as we have, I guess, better advice from the state regarding our

13   COVID numbers, then we will begin to readdress that particular

14   issue.  But again, we can't do anything right now due to our

15   COVID situation.

16   Q.   And how many detainees are in A-Pod right now,

17   approximately?

18   A.   I would probably say anywhere from 140 to 150.

19   Q.   And if you -- assuming that number holds somewhat steady,

20   you feel you have the room in B-Pod to put all those people

21   from A-Pod?

22   A.   If we -- B-2 and B-3 should be able to hold about

23   120 detainees between those particular housing units in B-Pod.

24   We may have to go back and again readdress moving some

25   detainees to other facilities; but again, we're also looking

1   forward to some of the other resources that have been afforded

2   to Hinds County to help move detainees through the criminal

3   justice system and eventually get them out of our facility as

4   well.

5   Q.  I'm glad you brought that up.  As far as transferring to

6   other facilities, you haven't identified any facilities that

7   will take anybody yet, right?

8   A.  We have been in contact with some.  I do have some

9   detainees right now that are in the Rankin County facility.

10  But due to our COVID situation, it's hard to communicate with

11  other facilities regarding transferring detainees out of our

12  facility into another facility due to our COVID situation.

13  Q.  With the exception of Rankin, do you have an agreement

14  with any other facility, sitting here today, that they will

15  take your detainees?

16  A.  I don't have an agreement, no.  There's just been

17  communication.

18  Q.  As far as closing down A-Pod, I'll just proffer to you

19  we've heard that before.  And so I will ask you:  There

20  originally was a plan that I believe was in the response to the

21  order to show cause, where the plan was to shut down two parts

22  of A-Pod and then renovate two units.  Are you familiar with

23  that plan?

24  A.  I'm not quite familiar with that plan, no.

25  Q.  Okay.  But that's not the plan anymore, right?

1    A.  Not that I'm aware of.  Again, our plan is we began to --

2    let me go back to B-Pod.  We renovated B-Pod.  We upgraded the

3    camera system in B-Pod.  We fixed several physical plant issues

4    in B-Pod to be able to put approximately 120 detainees in the

5    B-Pod.  That's also with transferring the trusties from B-Pod

6    to the work center as well.  Right now, that's our plan.  To do

7    that, we don't have any plans that I can speak of at this

8    particular time to do any type of upgrades to A-Pod.

9             MR. DONNELLY:  Can I confer with counsel, Your Honor?

10            THE COURT:  Yes, you may.

11            MR. DONNELLY:  Thank you.

12       (Off-the-record discussion between government counsel.)

13            MR. DONNELLY:  Nothing further, Your Honor.  Thank

14   you, sir.

15            THE COURT:  Any redirect of this witness?

16            MR. HALL:  No redirect, Your Honor.

17            THE COURT:  I do have some questions before -- and

18   then you may follow up based on the questions I have asked, as

19   will be the government.

20       You indicated, Sheriff Jones, that there are currently

21   some inmates being housed in Rankin County?

22            THE WITNESS:  Yes, sir.

23            THE COURT:  How many?

24            THE WITNESS:  I'm not exactly sure, but we have

25   several over there.  Maybe Chief Simon can elaborate a little

1    bit more about the exact numbers, but we do have some over

2    there.

3            THE COURT:  Okay.  And the county has a written

4    agreement with Rankin County with respect to them housing those

5    particular inmates?

6            THE WITNESS:  No.  It was just kind of an oral

7    communication, will you house these detainees for us, and he

8    said yes.  I spoke directly with the sheriff over there.

9            THE COURT:  And so is that agreement that they would

10   house them until those persons proceed through the criminal

11   justice system or --

12           THE WITNESS:  Yes, sir.

13           THE COURT:  No matter how long that takes.

14           THE WITNESS:  They don't call and ask us to come get

15   them or anything like that.  They're there being held, just

16   like they're being held in Hinds County, awaiting trial or

17   awaiting whatever court appearances they have.

18           THE COURT:  And that agreement, how much is Hinds

19   County paying Rankin County?

20           THE WITNESS:  We're not paying them anything.

21           THE COURT:  With respect to the COVID outbreak prior

22   to June 1st, any correctional officers tested positive for

23   COVID?

24           THE WITNESS:  Your Honor, the last time we had a

25   COVID situation in detention prior to then was probably in

1    early spring -- late winter, early spring.  It had been a
2    couple of months, and we had not had any outbreaks in the
3    facility.
4            THE COURT:  Okay.  No outbreaks, but did any
5    correctional officers test positive?
6            THE WITNESS:  Not that I'm aware of, sir, no.
7            THE COURT:  Since June 1st, how many correctional
8    officers have tested positive?
9            THE WITNESS:  Several.  I don't have the exact
10   number.  I can get it.  We can get it.  But several have tested
11   positive.
12           THE COURT:  With respect to inmates, you indicated
13   that some of them also have tested -- well, detainees, some of
14   them have tested positive.  Do we know what that number is?
15           THE WITNESS:  Yes, sir.  We do have it.  I just don't
16   have it readily available.  But we have a daily updated sheet
17   of exactly how many people, detainees, detention officers that
18   test positive, yes.
19           THE COURT:  And what mitigation efforts are the
20   county instituting to prevent the spread of COVID?
21           THE WITNESS:  We have personal protection equipment.
22   We have masks.  We have sanitizers.  We have ongoing testing
23   efforts in coordination with the state as well as our
24   health-care facility that's at the detention center as well.
25           THE COURT:  Is there a mask mandate at the Hinds

```
1    County Detention Facility right now?

2             MR. SHELSON:  Yes, there is.

3             THE COURT:  So everyone is wearing a mask?

4             THE WITNESS:  They should be, yes.

5             THE COURT:  All inmates?

6             THE WITNESS:  Yes.  The inmates have been provided

7    masks as well.

8             THE COURT:  All correctional officers.

9             THE WITNESS:  Yes, sir.

10            THE COURT:  And how long has that been in place?

11            THE WITNESS:  For the last couple of weeks that I'm

12   aware of.

13            THE COURT:  Was it in place at the time that the

14   monitors were on-site?

15            THE WITNESS:  No, sir, it was not.

16            THE COURT:  Does the county require its correctional

17   officers to be vaccinated?

18            THE WITNESS:  You say the county require --

19            THE COURT:  No, no, no.  I'm sorry.  Does the

20   sheriff's department require its correctional officers to be

21   vaccinated?

22            THE WITNESS:  No, it's not a requirement.  We only

23   encourage it.  But if they don't, then there is something in

24   place that they have to get tested at their own expense and

25   they have to provide those testing results to the county as
```

1    well.

2                THE COURT:  So for the last month how many persons

3    have provided proof to you that they've been -- well, do you --

4    does the sheriff -- do the people test daily at the sheriff's

5    department -- at the detention center?

6                THE WITNESS:  No, sir.  It's not a daily test that

7    they're required to take, but we do have someone there that can

8    provide tests to anyone that needs to take a test.

9                THE COURT:  But for those persons who are not

10   vaccinated -- I may have heard you wrong -- you require them to

11   be tested periodically or daily?

12               THE WITNESS:  No, periodically, not daily.

13               THE COURT:  Oh, just periodically.

14               THE WITNESS:  Yes, sir.

15               THE COURT:  With respect to the detainees who are not

16   vaccinated, do you require them to be tested periodically or

17   daily or at any time?

18               THE WITNESS:  Not that I'm aware of for the

19   detainees.  But if they show symptoms or they have been in

20   close contact with a positive case, we do require them to be

21   tested at that time.

22               THE COURT:  I think Mr. Hall indicated that you did

23   some contact tracing.  And am I correct that you've

24   concluded -- you've concluded that the -- as you call it, the

25   COVID outbreak was initiated by the monitors.

1        THE WITNESS:  Yes, sir.  We have a COVID coordinator,

2   and the numbers were traced back.  We had not had a positive

3   case or that facility had not been introduced or exposed to

4   COVID in a few months prior to the monitors' visit.  Yes.

5        THE COURT:  No correctional officer had tested

6   positive for COVID prior to May 31st or June 1st?  No

7   correctional officer.

8        THE WITNESS:  No, sir.  Not that I'm aware of.

9        THE COURT:  And no inmate.  No detainee, excuse me.

10       THE WITNESS:  Yes, sir, that's correct.

11       THE COURT:  As a result of the introduction of the

12  COVID, has anyone been hospitalized?

13       THE WITNESS:  As far as detention officers and

14  detainees?

15       THE COURT:  Well, let's start with detention

16  officers.

17       THE WITNESS:  I'm not aware of any, but we have had

18  them to be off of work quarantining due to that.  I'm just not

19  aware of anyone having to go to the hospital, no.

20       THE COURT:  What about for detainees?

21       THE WITNESS:  I'm not aware of any detainees as well.

22       THE COURT:  Am I correct, then, in assuming, then,

23  that no detainees are being transported to court proceedings,

24  Hinds County court proceedings because of the -- shall I assume

25  that there are no court proceedings occurring; because of the

1    introduction of COVID among the detainees, that nobody is going

2    to Hinds County Circuit Court either for trials, initial

3    appearances, sentencings, guilty pleas?  Am I correct in

4    assuming that?

5           THE WITNESS:  No, sir.  We are still transporting

6    detainees to court; but we're not transporting, of course,

7    detainees positive for COVID to court.

8           THE COURT:  So you've managed to separate persons, I

9    take it, quarantine -- those who are quarantined are

10   quarantined.

11          THE WITNESS:  Yes, sir.

12          THE COURT:  How many people are in quarantine?  How

13   many detainees are in quarantine?

14          THE WITNESS:  I don't have the exact number right

15   now, but we have several that are still being quarantined.

16          THE COURT:  You mentioned the uptick in crime.  Isn't

17   it true that the City of Jackson had a record number of murders

18   last year?

19          THE WITNESS:  For the last couple of years, yes.

20          THE COURT:  So the increase in crime didn't just

21   start, right?

22          THE WITNESS:  No, I wouldn't say an increase in

23   crime.  There has been an increase in arrests, Your Honor.

24          THE COURT:  There has been an increase in arrests?

25          THE WITNESS:  Yes, sir.

1         THE COURT:  Okay.  Now, outside of Rankin County, you

2    say that there have been communications with others, but the

3    Rankin County agreement is a result of communication as well,

4    right?

5         THE WITNESS:  Yes, sir.

6         THE COURT:  So what other correctional facilities or

7    what other law enforcement entities -- there is no agreement

8    with anyone else?

9         THE WITNESS:  No, sir, not at this time.

10        THE COURT:  Who are the conversations being held

11   with?

12        THE WITNESS:  I have spoken with the sheriff in

13   Madison County.  I've spoken with the sheriff in Holmes County.

14   And I had a brief conversation with the sheriff in Copiah

15   County -- I'm sorry, not Copiah -- Claiborne County as well.

16        THE COURT:  Okay.  I have no further questions at

17   this time.  I'll turn it over to the county.

18      (Off-the-record discussion between defense counsel.)

19        MR. HALL:  Just briefly, Your Honor.

20                      **REDIRECT EXAMINATION**

21   BY MR. HALL:

22    Q.  Sheriff, the judge just asked you about positive COVID

23   findings in corrections officers.  You testified no.  You were

24   talking about -- just for clarification, for the record to be

25   clear, have there been any corrections officers within the

1    past -- let's say the past few months before the monitors came

2    that came up positive, to your knowledge?

3    A.   I'm not aware of any myself.  But I guess the more logical

4    answer to that question would be if it did or if they had, it

5    did not affect the facility itself.  It didn't cause other

6    people in the facility to be tested -- to test positive as

7    well.  I don't know the exact I guess medical persona for each

8    individual in detention, but it did not -- if they did, it

9    didn't cause an outbreak or anything in the facility.

10   Q.   I guess that's a better question to ask.  Let me ask it.

11   If there were some corrections officers who were positive, did

12   those officers impact the COVID numbers at the facility?

13   A.   No, sir, it did not.

14   Q.   I'm talking in the timeline between, let's say, late

15   winter of 2022 through May 31st of this year.

16   A.   That's correct.

17            MR. HALL:  Your Honor, could I have a moment?

18        I don't have any further questions, Your Honor.

19            THE COURT:  All right.  Any follow-up based on the

20   questions that I've asked?  This is to the government.

21            MR. DONNELLY:  One second, Your Honor.

22        (Off-the-record discussion between government counsel.)

23            MR. DONNELLY:  No, Your Honor.

24            THE COURT:  All right.

25            MR. DONNELLY:  Thank you.

1      THE COURT:  Sheriff, you may step down.

2      THE WITNESS:  Thank you.

3      MR. HALL:  Your Honor, at this time the county calls

4  Kenny Wayne Jones to give testimony.

5                    **KENNY WAYNE JONES**

6  was thereupon called as a witness and, having first been

7  duly sworn, testified as follows:

8      THE COURT:  I'll just remind you, Mr. Jones, just

9  allow the lawyers to finish their questions before you begin to

10  speak so that the two of you will not be speaking at the same

11  time.  And please speak at a pace at which the court reporter

12  can keep up with you.

13      THE WITNESS:  Sure.

14      THE COURT:  Mr. Shelson, you may proceed.

15      MR. SHELSON:  Thank you, Your Honor.

16                   **DIRECT EXAMINATION**

17  BY MR. SHELSON:

18  Q.  Will you please state your name for the record?

19  A.  Kenneth Wayne Jones.

20  Q.  Mr. Jones, you recently testified, so I'm not going to

21  belabor your background, but where are you employed?

22  A.  Hinds County.

23  Q.  In what capacity?

24  A.  County administrator.

25  Q.  And how long have you been the county administrator?

K. JONES - DIRECT

1    A.  Two years.

2    Q.  How much, based on estimates the county has received,

3    would it cost to renovate A-Pod?

4    A.  State your question again.  I'm not sure I understand.

5    Q.  How much would it cost to renovate A-Pod?

6    A.  How much would it cost?

7    Q.  Yes, sir.

8    A.  It would cost anywhere between 4 and 5.5 million to

9    renovate that pod.

10   Q.  And does the county have an understanding of how long it

11   would take to renovate A-Pod?

12   A.  Yes, we do.

13   Q.  And what is the time frame?

14   A.  I'm not specific about the time frame; but building a new

15   jail, we kind of looked at it like it would be in the time

16   frame of the new jail being built.

17   Q.  From a financial perspective, can the county proceed with

18   both building a new jail and renovating A-Pod?

19   A.  No.  Not at all.  And it would not be feasible.

20   Q.  Why not?

21   A.  The time frame that we're talking about building a new

22   jail, with the new jail and some of the things we're looking

23   at, the budget just won't withstand renovating that pod for

24   5 million and then going on with building the new jail.

25   Q.  Can you tell the court whether or not the county has the

1  funds to do both?

2   A.  They do not.  They do not.

3          MR. SHELSON:  May I have a moment to confer, Your

4  Honor?

5          THE COURT:  Okay.

6      (Off-the-record discussion between defense counsel.)

7          MR. SHELSON:  I tender the witness, Your Honor.

8          THE COURT:  Okay.

9                       **CROSS-EXAMINATION**

10 BY MR. CHENG:

11  Q.  You talked a little bit about the feasibility of reopening

12 or fixing A-Pod.  Were you aware that there was also some

13 discussion about reorganizing the housing units so that some of

14 them could be holding those with mental issues while others

15 could be holding lower security inmates?

16  A.  No.  That would not fall anywhere within what we do on our

17 side.  That would be the law enforcement side.

18  Q.  Right.

19  A.  So I don't have a lot of knowledge to what you're asking.

20  Q.  So when you talk about what's feasible, were you aware

21 that there were a number of plans to help the county try to use

22 the existing housing more appropriately, with minimizing the

23 cost to the county?

24  A.  Well, we've looked at that all along.  But with setbacks

25 that we were having with mechanical issues, setbacks we were

K. JONES - CROSS

1    having with COVID, we had to move prisoners to this so that we
2    could quarantine and all that, it just -- it just kind of threw
3    the whole thing off.
4      Q.  Except, you know, those setbacks -- I mean, those setbacks
5    are the things that have been discussed before, right?  You
6    were at the trial in February and we talked about setbacks,
7    right?
8      A.  Right.  They can always be talked about, but until you
9    experience them in reality --
10     Q.  Uh-huh.
11     A.  You understand.
12     Q.  So even in February when we were talking about the
13   physical plant of A-Pod --
14     A.  Right.
15     Q.  -- and the expense of fixing it, there was some discussion
16   about, you know, if there was better staffing it could reduce
17   the expenses of trying to run A-Pod, right?
18     A.  I don't remember.  I don't remember exactly what we
19   discussed about A-Pod.
20     Q.  Were you aware, though, that the staffing issue is tied to
21   the maintenance and physical plant issue?
22     A.  I don't remember that either.  Look, I look at money and
23   whether we're going to have the money to do certain things, and
24   that's it.
25     Q.  So you've talked about the feasibility of paying for

1    improvements.  Let me break up some of those improvements, all
2    right?  So was it the board's decision or the sheriff's
3    decision not to put fire sprinklers in Raymond Detention
4    Center?
5    A.  I remember we discussed it; but, now I don't know whose
6    decision it was if they didn't go in.  We discussed the
7    sprinklers.  I remember the discussion because they were not in
8    there originally.  So I don't know whose decision it was
9    directly if they wasn't put in.
10   Q.  Well, the sheriff earlier testified about how they did
11   some upgrades to B-Pod to make it more effective for inmates.
12   A.  Okay.
13   Q.  Did you remember there were some discussions about fixing
14   locks in A-Pod?
15   A.  Yes.
16   Q.  Do you remember that?
17   A.  I do.  I do, because my maintenance superintendent was
18   involved in a whole lot of that.
19   Q.  Your statement about how much it's going to cost to
20   renovate A-Pod --
21   A.  Right.
22   Q.  -- $5 million, that is not just to fix locks, right?
23   A.  Say that again.
24   Q.  When you say it's going to cost millions of dollars to
25   renovate A-Pod --

1  A.  Right.

2  Q.  -- was it going to cost millions of dollars just to fix a

3  few locks in A-Pod?

4  A.  Well, I don't know if you were just talking about a few

5  locks.  You were talking about doing something that had to go

6  into everything because some of the problems were that even in

7  A-Pod with the -- they would lock the cells down, put trash in

8  the cells.  We had to look at all that, and I remember that.

9  You had fixtures being removed so that they could go through.

10  It was a whole lot more in A-Pod than fixing locks.

11  Q.  Just -- what I'm just trying to be clear about, though,

12  is -- you know, have you read the stipulated order?

13  A.  I read the stipulated order about a year and a half ago.

14  Q.  So are you aware that in the stipulated order, when it

15  talks about renovating A-Pod, it had a specific list of things

16  to do for A-Pod?

17  A.  Yeah.

18  Q.  And when you talk about --

19  A.  Along with everything else, but I don't remember

20  specifically A-Pod.

21  Q.  But when you talk about how much it's going to take to fix

22  A-Pod, you're talking about bringing the entire facility up to

23  the same standard as the rest of the jail, right?

24  A.  And I'm talking about what we've discussed, at least what

25  the sheriff has discussed with us, so that we can get some kind

1    of determination on how much it's going to cost to do what's

2    being asked.

3    Q.  And have you been there in the meetings when Mr. Parrish

4    suggested that the master planning committee needs to just

5    prioritize which fixes are really important and which ones are

6    not as important?

7    A.  A few Zooms.  A few Zooms from the initial standpoint.

8    Q.  And you're aware the monitor has never said you have to

9    fix everything.  They have said you need to prioritize the

10   fixes to make A-Pod more manageable; is that right?

11   A.  Now, from my understanding the monitor said, You need to

12   fix all of this, which was a pretty extensive list, because the

13   last meeting I had with the monitors, some of the things that

14   were on the list I had never heard of.  So that wasn't even in

15   the original concept of what we were going to do anyway.

16   Q.  Okay.  So let's say we proceed with whatever your new plan

17   is, right?  You're just going to wait for the new jail?  Is

18   that what you're going to do, wait for the new jail?

19   A.  We're going to do everything we can to maintain the

20   security and the safety of what we have now but at the same

21   time get ready to put out resources in getting the new jail up

22   and running as soon as possible.

23   Q.  But in order to do that, you're going to have to put aside

24   some things that had originally been included in your master

25   planning process, right?

1    A.  Well, yeah, it was some things in the master, but they

2    wasn't included in the budget.

3    Q.  So, for example, you know, fixing the locks and the

4    trashed cells in A-Pod, you're not going to do that anymore?

5    A.  That was the original -- the original concept was to get

6    all the locks fixed and all of that.  So, I mean, that was a

7    given.  There were just some other things that got into play.

8    Q.  But you're not going to do that now, right?  That's no

9    longer on the plans?

10   A.  We're going to do whatever the sheriff make the

11   determination we need to do, the jail administrator.  Whatever

12   we're told to do, we're going to do that.  It's just that we

13   talked about our concerns with the feasibility of spending

14   millions of dollars.

15   Q.  But right now there's no money allocated for those fixes

16   because you haven't talked to the sheriff about it yet, right?

17   A.  I haven't talked to the sheriff about it right now,

18   exactly.

19   Q.  So, for example, other projects that got held up -- the

20   mental health unit, they were going to just use some of the

21   housing for the mental health unit.  Is that held up as well?

22   A.  I don't know.  I'm not sure.

23   Q.  As you're working with the sheriff in order to close

24   A-Pod, you're also working with the City of Jackson to reopen

25   the Jackson Detention Center; is that right?

1    A.  That's the misdemeanor facility.

2    Q.  Right.

3    A.  Okay.

4    Q.  Right.  So, you know, even as you're trying to work on the

5    sheriff's side, you're trying to reopen the Jackson Detention

6    Center; is that right?

7    A.  We are.  We are.

8    Q.  Now, are you aware that if you try -- if Jackson hires

9    people to work at the Jackson Detention Center, it might

10   actually put pressure on the county and its ability to recruit

11   officers for the county jail?  Are you aware that might be a

12   problem?

13   A.  No.  All I know, we allocated 50,000 so we could get

14   started with that building --

15   Q.  Yeah.

16   A.  -- to get some of the drainage problems and some little

17   structural improvements.  But at the same time we haven't -- my

18   office hasn't discussed staffing.

19   Q.  And so is that the board's decision to help support the

20   city in reopening the Jackson Detention Center, or is that the

21   sheriff's decision?

22   A.  That's a board decision because the board wants to get

23   that facility open as soon as possible so that we can get

24   misdemeanors coming in there so that we can do some other

25   things that we're trying to do.

1   Q.  Do you know if the sheriff supports that decision to

2   reopen the Jackson Detention Center?

3   A.  I'm sure he does.

4   Q.  So then you realize money that's spent on the Jackson

5   Detention Center is money that cannot be spent at the county

6   jail, correct?

7   A.  Right.

8   Q.  All right.

9           MR. CHENG:  If I could confer with counsel.

10           THE COURT:  Yes.

11      (Off-the-record discussion between government counsel.)

12   BY MR. CHENG:

13   Q.  I think -- would you agree with the sheriff that there's

14   no immediate timeline for closing A because things keep

15   changing?

16   A.  Now, I would agree with what the sheriff has presented us.

17   But the specifics of the closure and all of that, I'm not, you

18   know, abreast enough to say I agree with anything.

19   Q.  Is it fair to say there's no specific date right now for

20   when A-Pod is going to be closed?

21   A.  I don't know of a date, right.

22   Q.  And when the COVID start breaking out, that was around the

23   holiday in May; is that right?

24   A.  Somewhere around about that time.

25   Q.  So it's been, what, almost a month and a half, two months

1    since then?

2    A.  A couple of months --

3    Q.  Right.

4    A.  -- since then, right.

5    Q.  Okay.  And, you know, while the inmates are still held in

6    A-Pod, would you agree they are still in some danger from the

7    conditions in A-Pod?

8    A.  A-Pod alone?

9    Q.  Yes.

10   A.  No.  I would agree that if they're in B, C, whatever pod

11   they're in, they're in some danger because it's a jail.  So I

12   wouldn't limit it to A-Pod.

13   Q.  So you don't think A-Pod is more dangerous than B or C?

14   A.  Well, it depends on -- you got a prison language down

15   there.  And I can't talk about it, but the sheriff knows the

16   prison language.  Sometimes there's more honor in A-Pod than

17   you got in the rest of it, and that determines how the

18   prisoner -- who down there.  Now, if you don't look at that,

19   then you won't get a legitimate answer in that.  I don't think

20   A-Pod is no more dangerous than any other pod.  You may put

21   more violent offenders in A-Pod, but you're going to -- the

22   situations I see are across the board.

23   Q.  Do they put more violent offenders in A-Pod than B and C?

24   A.  I don't know.

25   Q.  So let me ask you this, then:  If there's violence in the

1   whole jail, A-Pod is the only pod where none of the doors work,

2   correct?

3    A.  All I know, we had to get the locks fixed.  I don't know

4   if the doors close or not.  The only thing I remember about

5   A-Pod was we had to get the locks fixed.  And every time we get

6   the locks fixed, they go back, jam the locks, put trash in the

7   cells and all that.

8    Q.  But right now the locks have not been fixed, correct?

9    A.  I don't know.

10   Q.  Oh, I see.  So when we're assessing whether or not A is

11  more dangerous than B or C --

12   A.  Right.

13   Q.  -- we don't know whether the locks go into the

14  dangerousness of A?

15   A.  Uh-uh, because, see, we --

16          MR. SHELSON:  Object to the form of the question.

17  We're not assessing that, so we object to the form of the

18  question.

19          THE COURT:  Objection overruled.

20   A.  You've got to understand that from a county administrator

21  standpoint, we don't get that type of data.  We get the -- you

22  know, we don't say, per se, locks are this or -- but I haven't

23  heard that locks wasn't working.

24  BY MR. CHENG:

25   Q.  But when you allocate the money, you realize that's going

K. JONES - REDIRECT

1  to have an impact depending on what the conditions are actually

2  like in that unit, correct?

3  A.  Yes.  But we've allocated money to fix locks from the

4  door.

5          MR. CHENG:  Thank you, Your Honor.

6          THE COURT:  All right.  Any redirect of this witness?

7          MR. SHELSON:  Yes, sir.

8                    **REDIRECT EXAMINATION**

9  BY MR. SHELSON:

10  Q.  Mr. Jones, counsel asked you some questions about JDC.  Do

11  you remember that?

12  A.  The Juvenile Detention Center.  JDC?

13  Q.  JDC.

14  A.  Right.

15  Q.  Yeah.  So is the county in the process of giving JDC to

16  the city?

17  A.  Well, we're negotiating.  We're in the process of that

18  now.

19          THE COURT:  Okay.  Hold on.  Is JDC the Juvenile

20  Detention Center or is JDC the Jackson Detention Center --

21          MR. SHELSON:  The Jackson.

22          THE COURT:  -- because that's what he -- I thought

23  that's what -- I just want to make sure we're talking about the

24  same thing.  He said JDC, but I think Mr. Cheng was talking

25  about the upcoming misdemeanor facility with the City of

1    Jackson.

2            MR. SHELSON:  I'll clarify that, Your Honor.

3            THE COURT:  Okay.  All right.

4            MR. SHELSON:  What I thought we were talking about

5    too.

6    BY MR. SHELSON:

7    Q.  When you answered Mr. Cheng's questions about JDC, were

8    you referring to the Jackson Detention Center, the misdemeanor

9    facility?

10   A.  I recall saying are you specifically talking about the

11   misdemeanor facility because that's what I thought he was

12   asking me.

13   Q.  So you're talking about the Jackson Detention Center?

14   A.  The Jackson Detention Center.  We call it the misdemeanor

15   facility.

16   Q.  Why is the county in the process of negotiating with the

17   city over the ownership of JDC?

18   A.  State your question again.

19   Q.  Did you say that the county is in the process of

20   negotiating with the city over the ownership of JDC?

21   A.  Yes.  We're doing that now.

22   Q.  Okay.

23   A.  Right.

24   Q.  Why is the county doing that?

25   A.  Because in all of our meetings on the crime and even from

K. JONES - REDIRECT

1  a legislative standpoint, county and city, we've put together a

2  plan where all of us have to really get in where we fit in.  So

3  one thing they wanted to do, a lot of it was based on the

4  misdemeanor facility being operational on some of the things

5  that we were looking at because we didn't have anywhere to

6  house them.  So with that being the fact, the county had it

7  over there.  So the chiefs got together, had a few

8  conversations, the mayor, us, the board; and one of the

9  determinations made was that we needed to go ahead and try to

10  give that facility to the city.

11  Q.  Last thing.  Remember counsel asked you about the cost to

12  fix locks.  Do you have a recollection that it cost

13  approximately $2 million to fix the locks in C-Pod?

14  A.  All I know, we talked about the money to fix locks.  I

15  don't remember specifically what it was or how much.  I know it

16  was a million-dollar figure, but I don't know exactly how much.

17  Now, I do remember the locks had to be fixed in C-Pod.  There

18  had to be locks fixed in A-Pod.  But then they had to move some

19  things.  So could be.

20  Q.  All right.

21        MR. SHELSON:  Your Honor, no further questions.

22        THE COURT:  Thank you, Mr. Shelson.

23  I have a few follow-ups, and then the county will be able

24  to follow up based on my questions.

25        You indicated, Mr. Jones, I believe, that the county has

1   at least been in discussions with the City of Jackson about the
2   Jackson Detention Center.  If there is an agreement between the
3   two, who would be parties to that agreement, would it be the
4   county and the City of Jackson?
5          THE WITNESS:  Yes.  It would be, right.
6          THE COURT:  Well, let me ask you this:  To the extent
7   that the sheriff has any agreement to house inmates at other
8   facilities, whether that's state facilities or other county --
9   I say inmates.  They're detainees.  To the extent the sheriff
10  has any agreement to house detainees at the Raymond Detention
11  Center, somewhere else, would that agreement come through the
12  county or would that be an agreement that the sheriff would
13  have?
14         THE WITNESS:  Now, Judge, you -- Your Honor, you have
15  me somewhat confused on that one because I don't know what the
16  administrational stipulations would be where the sheriff is
17  going to put people unless we do have a conversation.
18         THE COURT:  The county would be involved in that
19  conversation?
20         THE WITNESS:  If the county is involved in that
21  conversation, then I can get a full understanding of who's
22  making a decision because, from your question, you're asking me
23  something that is interlocal between law enforcement, and I
24  don't necessarily know everything.  When you start talking
25  about other facilities and where they can be locked up at, I'm

1    not privy to a lot of that information in my capacity.

2            THE COURT:  Okay.  So that would just be something

3    between the sheriff's office --

4            THE WITNESS:  Right.

5            THE COURT:  -- and maybe the sheriff's department of

6    somewhere else.

7            THE WITNESS:  Exactly.

8            THE COURT:  The county --

9            THE WITNESS:  It would come to me in passing, Your

10   Honor.

11           THE COURT:  Okay.  The county would not be involved

12   at all.

13           THE WITNESS:  Other than the sheriff giving a report

14   on what he's doing, and we got to make a decision for something

15   financial, that would be on him.

16           THE COURT:  Now, turning back to the Jackson

17   detention facility, I think Mr. Cheng asked a question to --

18   well, he said any money that the county gives to that project,

19   that same money cannot -- that same money cannot be going

20   toward the Raymond Detention Center or anything else; is that

21   correct?

22           THE WITNESS:  That's correct.

23           THE COURT:  Now, this misdemeanor facility, how much

24   money has the county allotted to that project as of today?

25           THE WITNESS:  50,000.

1    THE COURT:  And how much does the county expect to
2 have to give to that project to bring it up?
3    THE WITNESS:  We haven't had the total anticipation.
4 We just allocated the $50,000 so they could get started with
5 the minor things that was -- the facility is in decent shape
6 other than some water issues, pipe issues, things like that.
7 So we allocated 50,000 so they could get started on getting
8 those things corrected, getting them repaired so that they can
9 go in.  Some of the floors, from my understanding sitting in
10 the meeting, are functional now.
11    THE COURT:  When does the county expect that the
12 first detainee would be introduced into the Jackson Detention
13 Center?
14    THE WITNESS:  Once we get through with our agreements
15 on what the city is going to do, because I think the city had
16 some reservations on their side that they were still talking
17 about.  This is going to happen fairly quickly.
18    THE COURT:  When you say "fairly quickly," what's the
19 timeline?
20    THE WITNESS:  I'm anticipating in the next 90 days,
21 no more than six months.
22    THE COURT:  Now, that facility, as I -- and please
23 correct me if I'm wrong -- is going to be a facility that
24 houses persons who have been charged with misdemeanors.
25    THE WITNESS:  Yeah.  That would be a 72-hour maximum.

1          THE COURT:  No, no, I'm -- well, first of all, that's
2    my first question.  Charged with misdemeanors.
3          THE WITNESS:  Yes.
4          THE COURT:  That would include people -- speeding
5    tickets?
6          THE WITNESS:  Anything defined from a law enforcement
7    standpoint as a misdemeanor, they would be housed over there.
8          THE COURT:  Writing a bad check that's less than a
9    hundred dollars or --
10          THE WITNESS:  That's a misdemeanor.
11          THE COURT:  A simple assault.
12          THE WITNESS:  All of those.
13          THE COURT:  Doing doughnuts in the road.
14          THE WITNESS:  That's a misdemeanor.
15          THE COURT:  Simple traffic violations.
16          THE WITNESS:  Right.
17          THE COURT:  And I heard you mention 72 hours.  So
18    that suggests to me -- and please correct me if I'm wrong --
19    that nobody would be there for more than 72 hours is what this
20    misdemeanor jail is about?
21          THE WITNESS:  From my understanding and the
22    conversations that I've been privy to is you get booked in, you
23    hold them there until they go through the process, and
24    whatever the misdemeanor is, it shouldn't take over 72 hours to
25    get that misdemeanor processed.

1        THE COURT:  When you say "processed" -- and maybe

2  somebody else is going to answer this question.  But when you

3  say "processed," I mean, are we talking about people being

4  charged with a misdemeanor?

5        THE WITNESS:  Your Honor, you're talking to the

6  county administrator.  I don't know the legal --

7        THE COURT:  Okay.

8        THE WITNESS:  -- jargon for what constitutes

9  misdemeanor charges and what they take them through.  If I

10  talked about that, I would be speculating at best.

11        THE COURT:  Okay.  But you indicated 72 hours.  I'll

12  ask somebody else that.

13        THE WITNESS:  Now, I've heard in conversations

14  72 hours, and it may have been the City of Jackson that said

15  72-hour holding.  But that has come up in conversation.

16        THE COURT:  Now, holding these misdemeanors -- I'm

17  not going to ask that question.

18      Has the county received a report from the sheriff's

19  department about the number of correctional officers who have

20  contracted COVID in the last 60 days?

21        THE WITNESS:  Yes.  The sheriff has given us a report

22  on officers that were -- that had contracted the virus.  He's

23  given us a report in the meeting on what he's dealing with on

24  that.

25        THE COURT:  Okay.  And what about the number of

1    detainees who have contracted it?

2              THE WITNESS:  He's also given us a report on that.

3              THE COURT:  Has the county assisted the sheriff

4    with -- has the county been advised or told whether or not

5    there's an outbreak at the facility?

6              THE WITNESS:  Yes.  Yes, they have.  And he's

7    basically told us that in order to quarantine, they have to do

8    certain steps and procedures.  So he's giving us a report on

9    all of that.

10             THE COURT:  Has the county assisted the sheriff in

11   dealing with the outbreak of COVID?

12             THE WITNESS:  The county has assisted the sheriff in

13   everything he asked us to do.

14             THE COURT:  And what has the county done in assisting

15   the sheriff in dealing with the outbreak of COVID?

16             THE WITNESS:  Just whatever he said he needed.  And

17   I'm not specific about it; but whatever he said he needed when

18   he talk about outbreak of COVID, whether it's his officers or

19   whether his prisoners, whatever he needed from us and the

20   board, we've given that to the sheriff's office.

21             THE COURT:  And you indicated that it might not be

22   feasible to move forward with doing whatever the county had

23   originally said about dealing with the A-Pod.

24             THE WITNESS:  Right.  The situation you have, Your

25   Honor, is that you made a determination because of the consent

1    decree to build a new jail.  Okay.  You talked about the new

2    jail.  But what you didn't do is include all of the money that

3    it was going to take in your budgeting process.

4         So we've been trying to deal with getting this new jail

5    up, paying the vendors, paying all of the contractors for

6    something that was not budgeted.  We can't do it with funds

7    that were given from the federal government so it was coming

8    out of the general fund.  So now, we're -- even if we did --

9    anticipated revenue loss and those funds, it was only so much.

10   So right now we're not in a position to spend upwards of

11   4 million, $5 million to renovate something that's not going to

12   be there and we're building a new facility.  That money should

13   be allocated for resources for that facility.

14             THE COURT:  We heard testimony back in February about

15   the timeline for the new jail -- new jail to be built.  Has

16   that timeline changed at all in the last five months?

17             THE WITNESS:  I'm not for sure on the specifics of

18   the timeline.  All I know, that they are moving very fast on

19   everything they're doing because I'm looking at what's coming

20   through, even today.  So they are moving very, very fast on

21   putting all this together.

22             THE COURT:  No concrete has been poured, right?

23             THE WITNESS:  No, but they're already about to

24   pour -- right now they are getting all of the soil and all of

25   that straight to get ready to put the facility -- the

1    beginning, the initial down.  So that's where they are.

2              THE COURT:  So they've done the sewer?  Is that

3    finished?  Because there was talk back in February that they

4    would have to do a sewer line.  Has that been finished?

5              THE WITNESS:  Your Honor, if I -- I can't look at the

6    text that I got this morning, but there is paperwork to be done

7    on what we passed at the board that's going to allow them to go

8    in and begin processes on certain things.  But I don't remember

9    exactly what it was.

10             THE COURT:  I have no further questions.  Any

11   follow-up based on the questions that I've asked?

12             MR. SHELSON:  May I proceed, Your Honor?

13             THE COURT:  You may.

14             **REDIRECT EXAMINATION** (Continuing)

15   BY MR. SHELSON:

16   Q.  Mr. Jones, the sheriff testified that he got PPE, hand

17   sanitizer, and masks for RDC.  That's through funds

18   appropriated by the county; is that correct?

19   A.  Yes.

20   Q.  And last question.  Do you know -- and if you don't know

21   that's okay.  But when the judge was asking you those questions

22   about who was going to be housed in JDC, do you know if those

23   are city defendants as opposed to county defendants, or do you

24   not know either way?

25   A.  I'm thinking countywide.  I'm thinking countywide because

1   if the county is involved in the process of giving that to the

2   city, it would only be my assumption that it's countywide for

3   those misdemeanors.

4   Q.  But you don't know one way or the other whether it's just

5   city or not, do you?

6   A.  I don't.

7            MR. SHELSON:  Okay.  Thank you, Your Honor.

8            THE COURT:  All right.  You're welcome.

9        Any follow-up, Mr. Cheng?

10           MR. CHENG:  Just a couple.

11                     **RECROSS-EXAMINATION**

12  BY MR. CHENG:

13  Q.  You talked a little bit about the Jackson Detention Center

14  is in physically good shape, right?  I was wondering:  Have you

15  read the older monitoring reports about the condition of the

16  Jackson Detention Center?

17  A.  I have.

18  Q.  Do you know, for example, if it's a sprinkler system?

19  A.  I don't know.

20  Q.  Do you know if the fire alarms or smoke detectors work?

21  A.  No.

22  Q.  If it turned out that those systems also had to be

23  replaced, that could affect the cost of opening Jackson

24  Detention Center, correct?

25  A.  Right.

1    Q.  Likewise, do you know if those misdemeanors, any of them

2    have serious mental health issues?

3    A.  I do not.

4    Q.  Is it possible that there are some who get in there

5    because of vagrancy that may be related to mental health

6    issues?

7    A.  I would be speculating in my answer.

8    Q.  Do you know, then, if that Jackson Detention Center is

9    going to need medical or mental health staff?

10   A.  Haven't had a conversation about it.

11   Q.  And that could also affect the cost of opening up Jackson,

12   correct?

13   A.  I would assume.

14   Q.  And you talked a little bit about the 72 hours to process.

15   I just want to get a clarification:  Have you ever heard either

16   the chief of police or anyone on the Jackson side talk about

17   the need to be able to punish the misdemeanors in the first

18   72 hours before they have to go to court?

19   A.  Punish?

20   Q.  Yes.

21   A.  What's your definition of "punish"?

22   Q.  Well, you know, basically they need to be able to take

23   them off the streets and give them a sanction for what they

24   did.  Have you ever heard anything like that?

25   A.  No.  I'm simply talking about you doing the doughnut in

1  the street and get arrested, and that's where they going to put

2  you.

3  Q.  Okay.  But if somebody were arrested for misdemeanor, I

4  mean, they could be turned around within 24 hours, couldn't

5  they?

6  A.  They could have, I'm sure.  They have been turned out

7  within 24 hours, depending on the crime.

8  Q.  And once you set it at 72 hours, are you aware of the

9  higher risks that occur when inmates are housed for longer than

10  just a short time in a jail?

11  A.  No, I'm not.

12  Q.  If there were additional risks, for example, from suicide

13  or spreading infectious disease, could that affect the cost of

14  opening up the Jackson Detention Center?

15  A.  I would assume so.

16  Q.  There was also some discussion about the agreement with

17  the other jurisdictions and how you would be involved in that

18  conversation, that the sheriff was working it out with other

19  counties.  Do you remember that?

20  A.  That would be the sheriff's call on law enforcement that

21  he's talked to --

22  Q.  Right.

23  A.  -- from surrounding areas.  All I know is that I've seen

24  him collaborate on that before.

25  Q.  When sheriffs collaborate on housing each others' inmates,

1   do they work out things, like, who pays for it when they

2   transport?

3   A.  I'm not sure.

4   Q.  But if they had to pay for transport, would that be

5   something they need the board's approval on?

6   A.  Transport?  Isn't transport just a regular function of?

7   Q.  Well, let me ask this, then:  So, for example, let's say

8   you moved a hundred inmates to other counties, right?

9   A.  Right.

10  Q.  Do you know who would pay for moving those inmates to the

11  other counties?

12  A.  I don't.  No.

13  Q.  If the sheriff does come up with an agreement and the

14  county has to take on a cost, would you have to -- would the

15  board have to approve paying for transporting those inmates?

16  A.  They would have to approve for what the sheriff asked for

17  because I'm sure whatever agreement that they talked about, it

18  would be an agreement where there would be two entities instead

19  of one.

20  Q.  Do you know if Rankin County has asked Hinds County to

21  hold any of their inmates with serious mental illness or

22  serious medical problems?

23  A.  I have no idea.

24  Q.  If the county took someone like that and had to pay for

25  their medical care, do you know who would pay, the county or

1    Rankin County?  Hinds County or Rankin County?

2    A.  I'm not sure on any of that.  The only thing we've dealt

3    with from Rankin County that's come into Hinds County is stop

4    dropping your people off in our parking lots, and we catching

5    it on camera, so....

6    Q.  Right.  Because once they put them in your parking lot, if

7    you have to take care of the inmate, you have to pay for

8    everything, right?

9    A.  It becomes a -- we -- it becomes our problem then.

10   Q.  So as a county, you're not inclined to just take

11   other-county inmates if it imposes a bigger cost on you, right?

12   A.  No.  No, no.  Not in that form.

13   Q.  So the answer is you would not want to take those inmates,

14   right?

15   A.  We're going to take the inmates that we have to to

16   maintain the law.  Now, you're talking about an agreement

17   between counties, and the agreement between counties is

18   different than we're forced to do something because you -- you

19   know.

20   Q.  So if there is going to be an agreement for other counties

21   to take your inmates, would it be fair to say that a lot of the

22   details have not been worked out yet?

23   A.  Not on my end that I would be privy to because I don't

24   know.

25             MR. CHENG:  Thank you.

1          THE COURT:  Let me just follow up so we make sure
2    we're talking about the same thing.
3        Mr. Jones, when you -- I'm doing this for the record, so I
4    just want to make sure it's clear.  When you're talking about
5    dropping people off, of course, the court has read and has
6    always heard about persons being released from Whitfield, some
7    medical facility maybe; and a person is discharged from there
8    and dropped off in a parking lot in Jackson.  Is that what you
9    were referring to, something like that?
10          THE WITNESS:  Yeah, or that person migrated from
11    Jackson to your area and was brought back.
12          THE COURT:  Okay.  Migrated from Hinds County to
13    another area and then law enforcement in the other area bring
14    them back to Hinds County.
15          THE WITNESS:  Right.
16          THE COURT:  Okay.  A vagrant or someone else, and
17    then Hinds County becomes responsible if that person is
18    arrested?
19          THE WITNESS:  Right.  Right.  Right.
20          THE COURT:  Okay.
21          THE WITNESS:  And most of those instances, Your
22    Honor, have been mental illness.
23          THE COURT:  Right.  And once they come into the
24    custody of Hinds County, then Hinds County is responsible for
25    the medical services that these persons might need.

1              THE WITNESS:  Right.

2              THE COURT:  And going back to the question with

3    respect to the agreement that the sheriff might have with

4    another sheriff's department or another state, local agency,

5    inmates who are housed in the Raymond Detention Center or who

6    could be housed in the Raymond Detention Center, the sheriff

7    could have an agreement with another county that a person from

8    there be housed at your particular facility and not at Raymond.

9              THE WITNESS:  Right.

10             THE COURT:  And if that agreement exists, then that

11   inmate who is -- that detainee who is at the other facility,

12   when they need to come to Hinds County or wherever they might

13   go for court appearances and have to be transported, there's a

14   cost to that, correct?

15             THE WITNESS:  That's true.

16             THE COURT:  And to the extent that there might be

17   multiple or dozens or hundreds of inmates who are a part of

18   that agreement, if there are costs associated with the person's

19   care, transport, that Hinds County might be responsible for

20   paying --

21             THE WITNESS:  Uh-huh.

22             THE COURT:  -- you would expect some sort of written

23   agreement that the County would have to approve.  Is that a

24   fair statement?

25             THE WITNESS:  That's correct.  That's correct.  That

1    written agreement would be predicated on the fact of whatever

2    the reasoning should be for it to have that agreement.

3    Sometimes that agreement could pertain to safety.  If you've

4    got -- we want to put them in your facility until we can calm

5    this down because those are the shot callers, and we need to

6    move them from there to maintain order.  So it's all in that.

7            THE COURT:  Okay.  Is there a written agreement to

8    that effect where you have --

9            THE WITNESS:  I'm not sure.  It would be on the law

10   enforcement side.

11           THE COURT:  Okay.  But to the extent that there would

12   be costs later paid --

13           THE WITNESS:  Yeah.

14           THE COURT:  -- associated with that, would -- do you

15   get an invoice?  Do you get -- does the county get something in

16   writing?

17           THE WITNESS:  Well, now, the sheriff has -- the

18   sheriff has a budget also.  So a lot of the things -- a lot of

19   the things that the sheriff can do, when the sheriff comes to

20   us, it's because he want certain things that may qualify for

21   pockets of money that we have, additional equipment, computers,

22   all of that.  Pockets of money allow us -- and there are things

23   that he got, body cameras, that qualify for that money that may

24   have not been in the original order.

25       So that's what we help with, but he also has his own

1    budget.  So if we're going to incur a cost, he'll let us know

2    what cost we're going to incur and why.

3            THE COURT:  Okay.  All right.

4        Any follow-up based on what I've asked?  I know I went

5    back and asked some separate questions.

6            MR. SHELSON:  No, Your Honor.

7            THE COURT:  Mr. Cheng.

8            MR. CHENG:  No, Your Honor.  Thank you.

9            THE COURT:  All right.  Mr. Jones, you may step down.

10           THE WITNESS:  Thank you.

11           THE COURT:  Let me ask, does the county have any

12   other witnesses?

13           MR. HALL:  No, Your Honor.

14           THE COURT:  Okay.  At this time I think it's

15   appropriate for us to take our lunch break.  And when we

16   return, I guess we'll hear from the United States.

17           MR. CHENG:  Yes, Your Honor.  We anticipate it should

18   be a fairly quick presentation.  We think Ms. Simpson will be

19   called first.

20           THE COURT:  Oh, okay.  All right.  Let's then -- it's

21   12:10.  Let's come back at 1:30, and then we will start back

22   from there.  Is there anything we need to take up before then?

23           MR. DONNELLY:  I apologize, Your Honor.  Based on

24   sort of what's been happening and the length of the defendant's

25   presentation and what we're going to put on this afternoon, the

1    question comes up about the general update that you were

2    looking for from the monitors, and it seems like that is

3    probably not going to happen during the exams, and I'm not sure

4    how you wanted to handle that.

5            THE COURT:  We'll figure it out once we start back

6    up.

7            MR. DONNELLY:  All right.  Thank you, Your Honor.

8            THE COURT:  Thank you.

9        (Recess from 12:11 p.m. to 1:32 p.m.)

10           THE COURT:  Is there anything we need to take up

11   before we begin?

12           MR. CHENG:  No, Your Honor.

13           THE COURT:  All right.

14           MR. HALL:  No, Your Honor.

15           THE COURT:  All right.  Mr. Cheng, are you ready to

16   call your first witness?

17           MR. CHENG:  Yes, Your Honor.  The United States calls

18   Elizabeth Simpson.

19                        **ELIZABETH SIMPSON**

20   was thereupon called as a witness and, having first been

21   duly sworn, testified as follows:

22           THE COURT:  Ms. Simpson, you may remove your mask to

23   testify.  You can do that.  All right.  We know the rules of

24   engagement, if you will, about speaking and stuff.

25       So go ahead, Mr. Cheng.

1          MR. CHENG:  Yes.

2                    **DIRECT EXAMINATION**

3     BY MR. CHENG:

4     Q.  Ms. Simpson, since the second contempt order, what type of

5     compliance monitoring activities have you engaged in?

6     A.  Well, we review the monthly reports as they become

7     available, when they're available.  And then we scheduled a

8     site visit to begin May 31st.  And we typically and did request

9     documents to be available prior to the site visit in order to

10    review those in connection with the site visit.

11    Q.  So that May 31st date around the time -- was that around

12    the time of the holiday?

13    A.  Yes.  I think Memorial Day was the 30th, and we traveled

14    on the 30th and then did one day of monitoring on-site.

15    Q.  And were you aware that there were some trending for COVID

16    at this time?

17    A.  That there were what?

18    Q.  That there were some trending in COVID cases at the time?

19    A.  Trending COVID cases?  Just what I read in the news, that

20    there -- COVID cases were on the rise everywhere, actually.

21    Q.  So did your team take any precautions before it started

22    its jail inspection?

23    A.  Yes.  Mr. Parrish had some symptoms prior to the site

24    visit, so he tested for COVID and tested negative and then he

25    wore a mask the entire time we were on-site.  And Dr. Dudley

SIMPSON - DIRECT

1   and I wore a mask as well, probably not quite as consistently

2   as Mr. Parrish.

3   Q.  Did anyone on the county side?  Were they wearing masks

4   during the inspection?

5   A.  Generally, no.

6   Q.  Was there --

7   A.  But some of the staff did but not the people that

8   accompanied us on the tour.

9   Q.  How about, like, the jail leadership, such as the sheriff?

10  A.  No, I don't believe they were wearing masks.

11  Q.  So you may have heard testimony today about how the COVID

12  situation prevented them from moving inmates from A-Pod to B or

13  C.  Do you have any opinion about that?

14  A.  Yes.  What I understand is that -- well, so the site visit

15  was aborted when Mr. Parrish tested positive, and then we

16  returned home and we finished the site visit remotely.  So on

17  June 22nd, the information I gathered on that day was related

18  to COVID.

19      As of that day, there were 17 detainees that were

20  quarantined for COVID.  Ten of them were in C-Pod, housing

21  units 1, 2, and 4.  Seven of them were quarantined in B-1 iso.

22  So C-Pod and B-1 iso were impacted.  A-Pod and the B-Pod

23  housing units were not impacted.  There was nobody quarantining

24  there because of COVID.  And the quarantine that was in the

25  C-Pod and B-1 iso was scheduled to end I believe on July 1st.

SIMPSON - DIRECT

1    So even prior to July 1st, COVID would not have prevented the

2    movement of inmates from A-Pod to B-Pod -- or the B-Pod housing

3    units.

4        And after July 1, I don't know if there were new cases

5    after that time.  I didn't hear testimony this morning as to

6    how many current cases there are who's quarantined.  But as I

7    said, as of June 22nd, A-Pod and B-Pod housing units were

8    unaffected, so that movement could have taken place.

9    Q.  Did you ever receive a rapid notification indicating that

10   a member of your team had brought COVID into the facility?

11   A.  A rapid notification?  I don't think so.

12   Q.  Did you ever get a copy of a contact tracing report or

13   medical records indicating that they determined that your team

14   brought COVID into the facility?

15   A.  No.

16   Q.  Now, in the past you had a compliance coordinator,

17   Mr. Green, working with you; is that right?

18   A.  Yes.  I mean, he was employed by the county, but he

19   assisted us with compliance activities.

20   Q.  And would a compliance coordinator be responsible for

21   providing you with COVID information if new information came to

22   light?

23   A.  We did receive it through Mr. Green, yes, when new cases

24   occurred.

25   Q.  Since Mr. Green left have you been receiving periodic

SIMPSON - DIRECT

1   reportings about the COVID situation in the jail?

2   A.  No.

3   Q.  And to your knowledge what type of screening or testing

4   program do they actually have for COVID in the jail?

5   A.  I did ask whether the other detainees in the quarantined

6   units were being tested and was told no, that they were not.

7   And I believe that new detainees coming into the facility are

8   offered the opportunity to be tested, but they're not required

9   to be tested.

10  Q.  And prior to the May visit from Mr. Parrish, could they

11  have moved inmates from A to B and C at that time?

12  A.  As far as I know.  Well, COVID would not have prevented

13  it.  The problem is there aren't sufficient beds.

14  Q.  So let's talk about that.  Have you determined what does

15  prevent them from moving inmates from A to other housing units?

16  A.  Well, if they want to move people into actual beds, they

17  don't have enough beds.

18  Q.  So based on your assessment, what was the last count for

19  the jail?

20  A.  The count we were given on May 31st was 711 in the system.

21  Q.  And how does that compare with earlier in this case when

22  you first started monitoring?

23  A.  At one point they were below 500.  I think it went down,

24  from when we started monitoring, to the upper 400s, around 500;

25  and then it started going up.

1  Q.  So, you know, they've made a point of saying how they were

2  going to move people from A-Pod to B or C.  And I guess there's

3  been some discussion about the expense of renovating A-Pod.

4  Did you hear that testimony?

5  A.  I heard it this morning, yes.

6  Q.  So leaving aside the physical plant expenses, were there

7  other things they were supposed to do to mitigate conditions in

8  A-Pod?

9  A.  Well, most of it's physical plant issues.  There's also

10  serious staffing problems in A-Pod.

11  Q.  So what is the current staffing for the jail?

12  A.  So for RDC -- well, the total number is 175.  RDC has 108.

13  Q.  And again, how does that compare with earlier in this case

14  when you first started?

15  A.  This is the lowest we've seen it.

16  Q.  How does it compare to even when the trial occurred in

17  February?

18  A.  At that time I believe the number was 195.  So it's

19  dropped from even February.

20  Q.  And with that drop in staffing, does that affect B and

21  C-Pods or just A-Pod?

22  A.  Oh, it affects all the pods.

23  Q.  So are there supervision issues in any pods outside of A?

24  A.  Yes, yes.

25  Q.  So it would be --

SIMPSON - DIRECT

1  A.  I was just going to say the staffing level at RDC is at

2  about 42 percent.  They need -- according to the staffing

3  analysis, they need 258; and they've got 108 staff.  So they

4  can't staff any of the pods adequately.

5  Q.  So if they move the inmates from A-Pod to B or C, does

6  that resolve the staffing issue?

7  A.  No.  No.  Right now, because of the staffing level, they

8  often have one person in the control room and maybe one person

9  on the floor.  So they would gain some staff by closing A-Pod

10 but not nearly enough to adequately staff the other pods.

11 Q.  And if they had closed A-Pod and moved everyone to B and

12 C, would that have impacted other things they were supposed to

13 do involving mental health care segregation?

14 A.  Well, if they structured it well, they have enough inmates

15 with severe mental illness, with SMI, that they could dedicate

16 one housing unit to that population, even -- even if they're

17 trying to move A-Pod out, because that population is taking a

18 bed somewhere.  If they put them all on one unit, that could be

19 a mental health unit.  It would have to be done purposely and

20 well in order to move all the inmates and still move forward

21 with the mental health unit.

22 Q.  So did they purposely and well plan the movement of those

23 inmates?

24 A.  It doesn't appear that they have planned that yet.

25 Q.  So what happened to the mental health unit?

1    A.   They have decided not to move forward on creating a mental

2    health unit.

3    Q.   So if they move the inmates from A to B or C, do they

4    still have inmates with serious mental illness in the jail?

5    A.   Oh, yes.

6    Q.   What's the caseload like right now?

7    A.   I understand that it is now at about 250 on the mental

8    health caseload.  About 200 of them have SMI.

9    Q.   And how does that compare with when we had the hearing in

10   February?

11   A.   That's gone up as well.

12   Q.   Even back in February was it ever your intention to

13   suggest that A-Pod is the only place where bad things happen in

14   the jail?

15   A.   No.

16   Q.   So are B and C dangerous as well?

17   A.   Yes.  Yes.  I keep a spreadsheet of the assaults,

18   including where they occur; and C-Pod has close to the same

19   number of assaults as A-Pod.

20   Q.   And have they had issues with locks and doors in the B and

21   C as well?

22   A.   The cell doors are certainly much harder for the detainees

23   to pop open.  But there are some incident reports that -- in

24   which they have popped them open, including the cage doors.  So

25   that happens.

SIMPSON - DIRECT

1    The C cell-door windows have not all been replaced yet,

2   and there has been an issue with them being broken out and

3   detainees crawling out the windows.  They're replacing those

4   sort of on an ongoing basis.

5   Q.  How about fire safety?  Do they have fires or fire safety

6   issues outside of A-Pod?

7   A.  Yes.  There are fires that are set outside of A-Pod.  One

8   of the C housing units, I think it's C-3, does not have a --

9         MR. HALL:  Objection, Your Honor.  It's outside the

10  scope of the hearing.  She's testifying about C-Pod.  We're

11  here to talk about A-Pod, Your Honor.

12        THE COURT:  Objection overruled.

13        MR. HALL:  And likewise, a second objection, Your

14  Honor.  I'm not clear on what time Mr. Cheng is asking.  If

15  she's talking about things that happened in 2018 or 2019, that

16  needs to be stated.  So if he could be specific as to when.

17        THE COURT:  Rephrase your question.

18  BY MR. CHENG:

19  Q.  Well, let's focus in on the last couple of months.  Are

20  there still fires and fire safety issues in B and C-Pod?

21  A.  Yeah.  In this time frame, as I said, we reviewed the

22  incident reports.  So there certainly have been fires in C-Pod

23  during this time frame.  Also, at the time of the site visit,

24  like I said, I believe it's C-3 the fire hose had been removed

25  because the cabinet had been damaged, destroyed.

1      There is -- oh, and because there aren't officers in the

2  units, the fire extinguishers have been removed from the units

3  and are kept in the control room.

4  Q.  And so, you know, even outside of the A-Pod, are inmates

5  able to break out of the pods?

6  A.  Yes.  There are incident reports in which they have not

7  only broken out of their housing units but actually gone from

8  there to the great hall.

9  Q.  And that is even in the last couple of months?

10  A.  Yes.  There were, I believe, three incidents in May where

11  inmates managed to access the great hall.

12          MR. CHENG:  If I could confer with my counsel, Your

13  Honor.

14          THE COURT:  Okay.

15     (Off-the-record discussion between government counsel.)

16          MR. CHENG:  No other questions, Ms. Simpson.  Thank

17  you.

18          THE WITNESS:  Thank you.

19          MR. HALL:  May it please the court.

20          THE COURT:  You may proceed.

21                      **CROSS-EXAMINATION**

22  BY MR. HALL:

23  Q.  Ms. Simpson, I just have some preliminary questions for

24  you.  What did you do to prepare for your testimony today?

25  A.  Well, I went back through my notes from the site visit, I

SIMPSON - CROSS

1   mean, this is what I've been doing to prepare to do the report,

2   which is basically the same thing as preparing for the hearing.

3   Q.  All right.

4   A.  So back through the notes, the incident reports, the

5   documents, et cetera.

6   Q.  And before we start there, tell us just for the record:

7   What is your role as a monitor?

8   A.  My role is essentially to be the eyes and ears of the

9   court, to do reviews of the jail conditions and compared to now

10  the new injunction, and report back to the court as to whether

11  I find compliance or not.

12  Q.  And your function is independent in nature, isn't it?

13  A.  Yes.

14  Q.  How do you define "independent"?

15  A.  That I answer to the court.

16  Q.  You're not on our side; you're not on their side, right?

17  A.  That's correct.

18  Q.  All right.  Likewise, before -- have you ever conferred

19  with any plaintiff attorneys, meaning attorneys who have

20  lawsuits against the county?

21  A.  Hinds County?

22  Q.  Yes.

23  A.  There was one attorney who had information about some

24  assaults in the jail, and I talked with him to gather that

25  information.

SIMPSON - CROSS

1    Q.  What's his name?

2    A.  I don't remember.

3    Q.  Chuck Mullins?

4    A.  That sounds right.

5    Q.  When was that?

6    A.  Probably six to ten months ago.

7    Q.  So prior to your last testimony, you conferred with

8    Mr. Mullins, right?

9    A.  I gathered information from him, yes.

10   Q.  How did you get the information?

11   A.  Over the phone.

12   Q.  Do you know how he got your phone number?

13   A.  No.

14   Q.  Did you call him or did he call you?

15   A.  He called me, I believe.

16   Q.  Did you advise the court that you were speaking to

17   Mr. Mullins?

18   A.  No.

19          THE COURT:  For the record, Mr. Mullins is entered as

20   an interested party in one of these cases.

21          MR. HALL:  Well, Your Honor, can I respond?

22          THE COURT:  Pardon me?

23          MR. HALL:  Mr. Mullins filed a motion.  The court has

24   not ruled on it.  And we can object, we will object, but the

25   court has -- he's not been allowed to -- looks like he just

1    filed that motion and got ECF admittance or admission.  So if

2    that's the case, then any plaintiff lawyer that has a case

3    against the county should be able to be here, or none of them

4    should be.

5         So I plan on filing a response to Mr. Mullins' motion as

6    an interested party, but I don't know that there's anything in

7    that motion that allows him to confer with the independent

8    monitors.

9              THE COURT:  Okay.  We'll take it up.

10             MR. CHENG:  I'm sorry, Your Honor.  Can I get a

11   clarification?  Is that Mr. Mullins as the interested party

12   role in this case or in another case?

13             THE COURT:  It's in one of the -- I think he's filed

14   a motion in this case, I think, because I think he's attended

15   some of these proceedings.

16             MR. HALL:  I was about to ask about that, Your Honor.

17   BY MR. HALL:

18   Q.  Did you speak with Mr. Mullins during the February

19   proceedings?

20   A.  No.

21   Q.  So just before that -- my line of questioning was broken.

22   Did you advise anybody from the court -- from the county that

23   you were conferring with a lawyer that was suing them?

24   A.  So I would not agree with the term "confer."  I was

25   gathering information regarding the assaults that he was

1  familiar with.  So I was not providing any information to him.

2  So no, I did not tell anybody from the county that I was

3  gathering information from him.

4  Q.  Why not?

5  A.  Because I gather information from lots of sources.  I

6  don't necessarily tell either group of attorneys what I'm

7  gathering.

8  Q.  So just so we're clear, you investigated certain things at

9  the behest of a plaintiff lawyer.  Is that what happened?

10  A.  No.  He let me know that he was representing the family, I

11  believe, of at least one of the inmates who had died.  And I

12  talked with him about the information that he had regarding

13  that incident.

14  Q.  How long did you talk to him?

15  A.  How long?

16  Q.  How long did that take, yes.

17  A.  I don't know.  20 minutes.

18  Q.  How many conversations have you had with Mr. Mullins?

19  A.  One.  Just that one.

20  Q.  Now, besides Mr. Mullins -- we've got that one -- did you

21  send him information via email?

22  A.  No.

23  Q.  How did you get the information -- or did you -- how did

24  you get any other information from him besides that phone call?

25  A.  Just the phone call.

SIMPSON - CROSS

1  Q.  And likewise, when I say did you talk to anybody from the

2  county about this, did you talk to Mr. Green about this?

3  A.  I don't believe so.

4  Q.  Now, likewise, with respect to your preparation, did you

5  confer with the government prior to your testimony today?

6  A.  Yes.

7  Q.  Let's talk about that.  How often?  When did you first

8  start talking with -- conferring with the government prior to

9  testifying today?

10  A.  I had a conversation in -- I think it would have been late

11  June.

12  Q.  And who did you speak with?

13  A.  Mr. Cheng.

14  Q.  How often do you talk to Mr. Cheng?

15  A.  Prior to this, I had two phone calls with him.

16  Q.  I want to know right now how often you talk to Christopher

17  Cheng.

18  A.  I'm sorry.  What?

19  Q.  How often do you talk to Mr. Cheng?

20  A.  On an ongoing basis?

21  Q.  Within the last month?

22  A.  Within the last month?  I had two phone calls, and then we

23  touched base when I got in last night.

24  Q.  And likewise, during this hearing, you also stepped

25  outside with his cocounsel to discuss things?

SIMPSON - CROSS

```
1    A.  Yes.

2    Q.  What did y'all talk about?

3    A.  I let him know the information that I was familiar with

4    regarding COVID.

5    Q.  And on that same token, how often have you and I spoken?

6    A.  Not frequently.  I think we've had one one-on-one phone

7    call; and then, of course, during the site visits we're on the

8    Zooms together.

9    Q.  We don't have each other's cell phone numbers or anything

10   like that, do we?

11   A.  I don't know if I have your cell phone number.

12   Q.  All right.  Well, I can tell you I don't have yours.

13       Do you have cell phone numbers of any of these other

14   lawyers here, Mr. Morisani or Mr. Shelson?

15   A.  You know, I'd have to look in my phone, but --

16           THE COURT:  Well, let me ask you this:  Have y'all

17   given her your cell number?

18           MR. HALL:  It's never come up, Judge.

19           THE COURT:  Have you given her your cell number?

20           MR. HALL:  No.  It's never come up, Your Honor.

21           THE COURT:  Have you given her your cell number?

22           MR. HALL:  I have not.

23           THE COURT:  Okay.  I mean, the problem -- I mean,

24   you're going down a track that's -- well, go ahead with your

25   examination.
```

1           MR. HALL:  Thank you, Your Honor.

2     BY MR. HALL:

3      Q.  With respect to the conference that you had during this

4     hearing with counsel opposite, you gave him some information

5     about COVID.

6      A.  Yes.

7      Q.  Okay.  What information did you give him?

8      A.  That COVID had not impacted housing units A and B.

9      Q.  That's a good thing, isn't it?

10     A.  Yeah.

11     Q.  Likewise, with respect to exhibits, prior to this hearing

12    have you exchanged exhibits or conferred with Mr. Cheng or his

13    cocounsel about any exhibits pertaining to this hearing?

14     A.  When we touched base last night, we looked at both the

15    plaintiff's and defendants' exhibits.

16     Q.  So did you meet with him in person?

17     A.  Yeah, in the lobby.

18     Q.  Where -- everyone staying at the same hotel?

19     A.  Yeah.

20     Q.  And how long did that visit last?

21     A.  Not very long.  Maybe a half hour.

22     Q.  And who initiated that visit?

23     A.  Mr. Cheng.

24     Q.  Again, did you advise the court that you were meeting with

25    the government prior to today?

SIMPSON - CROSS

1    A.  Not specific to that meeting.

2    Q.  Let me ask you this:  Prior to today's hearing when was

3    the last time you spoke with Mr. Green?

4    A.  It would have been, I think, late April.

5    Q.  Now, let's talk about your last visit.  Okay?

6    A.  Okay.

7    Q.  You were asked earlier about trending numbers.  Do you

8    recall that?

9    A.  Yes.

10   Q.  And as far as I can recall, and correct me if I'm wrong,

11   the issue of trending numbers, COVID trending numbers was never

12   discussed between the monitoring team and the county prior to

13   that May 31st visit, was it?

14   A.  Prior to the visit, no.

15   Q.  And there was no discussion whatsoever about COVID having

16   any impact whatsoever on the upcoming visit, was there?

17   A.  No.

18   Q.  And the first time I heard this, now, you testified that

19   Mr. Parrish actually had symptoms before coming into our

20   facility; is that right?

21   A.  Yes.  He thought he had allergies.

22   Q.  Okay.  Did he tell you that the first time back in

23   February -- or I guess you-all came in January, right?

24   A.  I think January.  Yes.  Yes.  January.

25   Q.  During that visit, now, was there any discussion about him

SIMPSON - CROSS

1   having any type of symptoms before coming into our facility?

2   A.  No.

3   Q.  All right.  So, now, this last one, a member of your team

4   has symptoms.  Did you think to call anybody with the county to

5   advise that Mr. Parrish has had some symptoms?

6   A.  No.  He had tested negative.

7   Q.  Do you know when he tested negative?

8   A.  The day that he traveled.

9   Q.  And that's what he told you.

10  A.  Yes.

11  Q.  And at some point you testified about mask-wearing, right?

12  A.  Yes.

13  Q.  You weren't around Mr. Parrish the whole time, were you?

14  A.  No.

15  Q.  You split up at some point, didn't you?

16  A.  Yes.

17  Q.  Where were you?

18  A.  Well, we were on -- we were together for the first meeting

19  with Mr. Shaw and the command staff.  Then we did the tour

20  together, although we got separated.  And then I believe I

21  talked with Sergeant Tillman, and I'd have to look at my

22  schedule to know who else.

23  Q.  Let me go back.  Did you tell the court that a member of

24  your team had some symptoms prior to coming into our facility?

25  A.  No.

SIMPSON - CROSS

1    Q.  Why not?

2    A.  Because he had tested negative.

3    Q.  So you can't testify one way or the other if Mr. Parrish

4    had his mask on during the entirety of his visit at our

5    facility, can you?

6    A.  When we were separated I would not be able to say.

7    Q.  Now, let's talk about when you found out that he was

8    actually positive.  You sent us an email; is that right?

9    A.  That's right.

10   Q.  Did you call the federal government lawyers and tell them

11   that Mr. Parrish had indeed come up positive?

12   A.  No.  I think you were all on the same email, I think.

13   Q.  That was the email you ended with "what an adventure" or

14   something like that?

15   A.  Something like that.

16   Q.  You know, you said that in jest?

17   A.  Well, yeah and no.  I mean, it certainly wasn't

18   anticipated and kind of threw things off course.

19   Q.  Right.  Now, prior to -- because you keep up with this

20   stuff.  Prior to your visit at the end of May, had you known of

21   any type of COVID outbreak at the Raymond Detention Center?

22   A.  I had not known of any.  We weren't getting COVID

23   information at that point.

24   Q.  Well, if there was an outbreak or some type of issue,

25   would you have expected to be kept out of our facility if we

SIMPSON - CROSS

1    had problems in the facility at the time?

2    A.  No.  I mean, there were problems in the facility in

3    January and we were in the facility.

4    Q.  Okay.  And how many problems were in the facility in

5    January?

6    A.  There were quite a few staff that were out due to COVID

7    and I believe a number of inmates that had tested positive.

8    Q.  And tell me, when was it you visited in January?

9    A.  Mid-January.  I don't know.

10   Q.  Those positive COVID numbers had no impact on your visit,

11   though, did they?

12   A.  Well, we went in anyway.

13   Q.  Well, my question is if -- you were able to do your visit,

14   right?

15   A.  We were able to do the visit.  There were some people out

16   that we would otherwise have talked to.

17   Q.  Okay.  Fast-forward now to this last one in May.  You were

18   unaware of any type of COVID issues at RDC, right?

19   A.  That's right.

20   Q.  And then you advised that Mr. Parrish was, in fact,

21   positive; is that right?

22   A.  Right.

23   Q.  And at some point you stopped the visit, right?

24   A.  Well, we were required to stop the visit.

25   Q.  Who required you to stop it?

SIMPSON - CROSS

1   A.  We arrived at RDC; and we were met there by Mr. Morisani,

2   who told us that the sheriff had shut down the visit.

3   Q.  Let me ask you this.  I should have asked you before.

4   What is the monitoring team's COVID protocols?

5   A.  Well, we've been remote for -- until January.  And then

6   we -- we were on-site in January.  In January there was quite a

7   bit of spike going on with COVID, and we were all wearing

8   masks.  And I think we -- I know I had recently tested.  I

9   think Mr. Parrish had tested.

10  Q.  Answer my question.  Did you have any protocols?

11  A.  We don't have a formal protocol.

12  Q.  Okay.  Even after coming down here in January, you had not

13  developed any further protocols before this May visit, right?

14  A.  Right.

15  Q.  Have you developed any protocols since this May visit?

16  A.  I think we will probably do it for the next visit.

17  Q.  So the answer is "no" today, right?

18  A.  Not right now, no.

19  Q.  And I shouldn't begrudge you for planning to do something

20  in the future, should I?

21  A.  When we have our next visit, yes, we need to have a

22  conversation about protocols for all of us.

23  Q.  Well, my question is I shouldn't hold that against you

24  that you're going to plan on doing something, right?

25  A.  Well, if I don't do it you should, but --

SIMPSON - CROSS

1    Q.  So just the next visit we'll revisit this.

2    A.  I think we all need to revisit it.

3    Q.  All right.  Now, with respect to Mr. Parrish coming down

4    with COVID, did you advise the court?

5    A.  Yes, I did.

6    Q.  When did you do that?

7    A.  I sent an email probably when I got back to Albuquerque,

8    which was, I believe, Wednesday.

9    Q.  Why didn't you tell the court when you told us?

10   A.  Why didn't I tell --

11   Q.  Why didn't you?

12   A.  Because it didn't impact the court at that point.

13   Q.  Okay.  And at some point, though, we rescheduled a virtual

14   visit, right?

15   A.  Right.

16   Q.  And we have a COVID coordinator at the facility, right?

17   A.  There has been one.

18   Q.  Well, you know that Sheena Fields is the COVID coordinator

19   now.  Are you telling the court you don't know that that's what

20   she does also?

21   A.  Well, she -- under the prior jail administrator, somebody

22   else had taken that on; and I didn't know what happened with

23   that.

24   Q.  Have you ever asked us, Who was your COVID coordinator?

25   Let me ask it that way.

SIMPSON - CROSS

1    A.  Not recently.

2    Q.  In fact, when you did your last visit, you stayed away

3    from the issue of COVID, didn't you?

4    A.  No.

5    Q.  Well, you talked to a lot of people --

6    A.  Yes.

7    Q.  -- in -- over two or three days?

8    A.  Right.

9    Q.  And you talked to Lieutenant George I guess --

10   A.  Yes.

11   Q.  -- about COVID.  And what does Lieutenant George do at

12   RDC?

13   A.  She's the inmate services manager.

14   Q.  Didn't talk to Ms. Winfield, who's over the medical.  No

15   one talked to her about COVID during the visit?

16   A.  I don't know.  I believe Dr. Dudley would have, but I

17   don't know.

18   Q.  And we'll talk to Dr. Dudley about that.  But you didn't

19   talk to her, right?

20   A.  I did not talk with her.

21   Q.  Okay.  Same thing with Ms. Fields, who is the COVID

22   coordinator.  You didn't have any questions for her either,

23   right?

24   A.  Not about COVID.

25   Q.  Now, you also testified about movements, and you gave your

1  opinions about when people could have been moved, et cetera,
2  right?
3   A.  With respect to where the COVID quarantines were, yes.
4   Q.  When you showed up on May 31st of this year, B-Pod was
5  ready to have inmates -- or detainees moved into it, was it
6  not?
7   A.  B-3 was a little rough.  It had not -- there were no
8  inmates there at the time, and it seemed like some of the
9  things were not quite complete.
10  Q.  Let's be specific for the court, now.  It's a little
11 rough.  Let's be specific about everything that you saw that
12 wasn't right in B-3.  Go.
13  A.  Well, I would defer to Mr. Parrish on physical plant
14 issues, but the desk for the officer had not been finished out,
15 and I don't know if the cameras were done at that time.
16  Q.  You don't know one way or the other.
17  A.  Right.  Like I said, I would defer to Mr. Parrish on
18 physical plant issues.
19  Q.  All right.  So the desk and the cameras, which, you know,
20 Mr. Parrish will testify about that.  Anything else that was
21 not ready in B-3 for detainees to be moved there?
22  A.  I think they couldn't get the door open initially.
23  Q.  Which door?
24  A.  The cage door from the horseshoe.
25  Q.  All right.  You think that or you know that?

SIMPSON - CROSS

1   A.  I know they had trouble getting it open.  I don't know

2   what the issue was.

3   Q.  And that was in May -- in May.

4   A.  Right.  In B-3.

5   Q.  Okay.  What about B-1?

6   A.  That's kind of when I got behind, and I don't think I went

7   into B-2 or B-1.

8   Q.  And I was about to ask you about B-2.  So you don't know

9   the condition of B-1 or B-2 testifying today, right?

10  A.  I don't think I went in there.  Yeah.

11  Q.  Prior to this May 31st visit, remember Mr. Cheng asked you

12  about detainees being moved into B, right?

13  A.  Right.

14  Q.  And we didn't have any detainees in B, right?

15  A.  Well, you didn't have them in B-3.

16  Q.  And that's because B-3 wasn't ready for detainees; isn't

17  that right?

18  A.  Like I said, it seemed like it wasn't quite finished.

19  Q.  This was before -- I'm talking about way before your May

20  visit.

21  A.  Oh, before our May visit.  I know they started moving

22  inmates into B-Pod in the fall of 2021.  Not all the units.

23  Q.  And likewise, you understand the plan, that you had to

24  move some detainees from B to the work center, right?

25  A.  Well, it wouldn't necessarily be required, but I think

SIMPSON - CROSS

1     that was what was being planned.

2     Q.  Well, where else would you move them if they didn't go to

3     the work center?

4     A.  They don't necessarily have to be moved.

5     Q.  So space didn't need to be made in B to facilitate A?

6     A.  Well, I think they were talking about moving trusties, of

7     which I believe there were 17.  So there's plenty -- there's a

8     lot.  I mean, I think there's a space issue.  There aren't

9     enough beds.  But it wasn't necessary to move those 17 in order

10    to move some inmates from A-Pod to B-Pod.

11    Q.  That's your opinion.

12    A.  Right.  That's my opinion.  And also the inmate services

13    manager said at the time of her interview that she did not have

14    the beds to move A-Pod inmates anywhere, that both facilities

15    were full.

16    Q.  And you talked to her in -- that was June of 2022, right?

17    A.  Right.

18    Q.  After the COVID spike.

19    A.  Well, there were inmates in quarantine for COVID --

20    Q.  Right.

21    A.  -- at that time.

22    Q.  Okay.  So that's -- can you and I agree that the COVID

23    spike has affected Hinds County's ability to move detainees

24    from A-Pod to B-Pod?

25    A.  No.

SIMPSON - CROSS

1    Q.  Had no effect whatsoever on it.

2    A.  Not that I see.

3    Q.  Is it okay, then, to move individuals or detainees in

4    A-Pod who do not have COVID -- you're saying it's okay to move

5    them into a pod where the other detainees do have COVID.  Is

6    that your testimony?

7    A.  No.  There were no inmates in B-Pod that had COVID except

8    for B-1 iso.

9    Q.  Okay.  So -- except for B-1 iso.  So there was a unit in

10   B-Pod that had COVID-positive detainees, right?

11   A.  In iso unit, yes.

12   Q.  All right.  That's a whole unit, though.

13   A.  Well, it's small.  I mean, it's, like, a four-bed.

14   Q.  Is it your testimony that you think it's a good idea to

15   move detainees who are not COVID positive throughout a facility

16   that is undergoing a COVID spike?

17   A.  Well, not throughout the facility, not to the housing

18   units that had COVID.

19   Q.  Now, in June the work center was on quarantine.  Are you

20   aware of that?

21   A.  No.  We didn't ask questions about the work center.

22   Q.  Well, I was on a call the other day you were asking

23   questions about the work center.  Do you remember that?

24   A.  We had a disagreement as to what was encompassed.

25   Q.  All right.  Well, we'll take that up with the court after

1    this hearing.

2         With respect to any other pods, though, it is your

3    understanding, though, that there were other pods at RDC that

4    were under quarantine since your May 31st visit, right?

5    A.   C-Pod, housing unit 1, 2, and 4.

6    Q.   But COVID had nothing to do with moving anybody from

7    A-Pod, according to you?

8    A.   Right.  To B-Pod.

9    Q.   All right.

10            MR. HALL:  One moment, Your Honor.  I may be done.

11            THE COURT:  All right.

12        (Off-the-record discussion between defense counsel.)

13            MR. HALL:  Your Honor, I have no further questions.

14   I tender to the county.

15            THE COURT:  Okay.  Thank you, Mr. Hall.

16            MR. SHELSON:  May I proceed, Your Honor?

17            THE COURT:  You may.

18                         **CROSS-EXAMINATION**

19   BY MR. SHELSON:

20   Q.   Good afternoon, Ms. Simpson.

21   A.   Good afternoon.

22   Q.   You remember you testified on direct that when the

23   monitors were at RDC for the last site visit that no one from

24   the county wore a mask?

25   A.   That's generally my recollection.  I don't know.  There

1    may have been somebody wearing a mask.

2     Q.  Do you recall who was present for the county?

3     A.  Mr. Morisani, and the sheriff was there for part of it,

4    Mr. Shaw, Chief Simon, Captain Caston, I think Captain McBride,

5    and that might have been it.

6     Q.  And what monitors were there in person?

7     A.  Well, Dr. Dudley was there, but he went directly to the

8    medical area.  Mr. Parrish and I were there for that initial

9    meeting with command staff and the tour.

10    Q.  So of all those people you just mentioned, to your

11    knowledge who got COVID within, say, two weeks of the site

12    visit?

13    A.  I'm not aware of anybody that I mentioned having gotten

14    COVID.

15    Q.  Except Dave Parrish?

16    A.  Well, yeah, except Dave Parrish.

17    Q.  You were asked whether any member of the monitoring

18    team -- well, strike that.

19        You were asked whether you received any rapid notification

20    or contact tracing regarding whether a member of the monitoring

21    team brought COVID into the facility.  Do you recall that?

22    A.  I recall being asked that, yes.

23    Q.  And you said you received no such documents?

24    A.  Not that I recall.

25    Q.  Does that mean that a member of the monitoring team did

1    not bring COVID into the facility?

2    A.  No.

3    Q.  Are you contending that not receiving such rapid

4    notification or contact tracing is somehow a violation of the

5    new injunction?

6    A.  Not that I can think of.  I would leave that to the

7    attorneys.

8    Q.  All right.  You said that -- on direct that RDC does not

9    have enough beds to move people out of A-Pod; is that correct?

10   A.  That's correct.

11   Q.  When you said that, do you mean to move -- they don't have

12   enough beds to move everyone out of A-Pod or that they don't

13   have enough beds to move anybody out of A-Pod?

14   A.  I believe they -- I believe they could move some people

15   out of A-Pod.  At least -- B-3 was empty when we did the tour.

16   It apparently has people in it now.  I mean, I'd have to look

17   as of today what the population is and what the empty bed

18   numbers are.

19   Q.  You agree that moving detainees out of A-Pod, even if you

20   can't literally move everyone out of A-Pod, is a good

21   development?

22   A.  I think to the extent they can close a housing unit is a

23   good development.

24   Q.  So if they could -- if RDC could move enough detainees out

25   of A-Pod to close one of the units in A-Pod, that would still

SIMPSON - CROSS

1    be better than the current state of affairs?

2    A.  That would be better, although I would add that the

3    current staffing level is so low that none of the pods are

4    safe.

5    Q.  Did you testify that the number of detainees at RDC is

6    going up?

7    A.  It has been.  The last figure I have is from May, so I

8    don't know what's happened between May and now.

9    Q.  And do you contend that the fact that a number of

10   detainees in RDC is going up is somehow a violation of the new

11   injunction?

12   A.  The conditions that have resulted I believe are a

13   violation of the new injunction.

14   Q.  But that's not what I asked you.  Are you contending that

15   the fact that the number of detainees is going up is a

16   violation by the county of the new injunction?

17   A.  The new injunction does not address a hard number of

18   inmates allowed to be in the facility.

19   Q.  All right.  And the facility does not control who gets

20   arrested for a felony in Hinds County, does it?

21   A.  That's correct.

22   Q.  So bottom line, do you think it's good to try to move as

23   many detainees as you can out of A-Pod or not?

24   A.  I think moving detainees out of A-Pod would be a good

25   thing.

SIMPSON - CROSS

1   Q.  You also mentioned on direct that the number of detainees

2   with SMI has gone up.  Do you recall that?

3   A.  Yes.

4   Q.  You contend that that's a violation of the new injunction?

5   A.  Not the number alone, no.

6   Q.  Okay.  And RDC cannot control whether people with SMI

7   commit a felony and get arrested for that felony, can they?

8   A.  No, they don't.  They do have to provide services, though,

9   if they do come into the jail.

10  Q.  Did you testify in direct that you've -- since the last

11  site visit before the most recent one, you've done an analysis

12  of the number of assaults at the facility?

13  A.  Analysis might be too strong a word.  I keep a spreadsheet

14  that lists the inmate involved, the location, whether the

15  inmate was hospitalized, how the officer came to know of the

16  assault.

17  Q.  Do you have that spreadsheet with you?

18  A.  I think that the government has it as an exhibit, although

19  I guess no exhibits were entered.

20  Q.  In your spreadsheet, how did you define assault?

21  A.  If there was physical contact, then I -- I mean, sort of

22  aggressive physical contact.  If there's an argument but

23  there's no physical contact, I don't define it as an assault.

24  If the argument escalates to where there's physical contact, I

25  do.

1   Q.  So you're actually defining a battery?

2   A.  Yes.

3   Q.  You talked about staffing a little bit.  Do you recall

4   that?

5   A.  Yes.

6   Q.  Did you testify that the last count you had there were 108

7   detention officers at RDC?

8   A.  Yes.

9   Q.  I wasn't clear on how many detention officers you're

10  saying there should be under the staffing plan at RDC.

11  A.  The staffing analysis would call for 258 if two of the

12  housing units in A-Pod were closed.  At the time the staffing

13  analysis was done, that was the plan, was to close two of the

14  housing units.  So it was done on that basis.

15  Q.  So given that A-Pod is occupied, how many detention

16  officers are you saying should be at RDC?

17  A.  That was not done in the staffing analysis.  Like I said,

18  it was done considering that two housing units, when closed in

19  A-Pod, I mean, you would have to add two more unit officers for

20  three shifts and a relief factor and probably an additional rec

21  officer.  So you'd have to do that analysis.  Mr. Parrish might

22  be able to do it in his head, but I can't.

23  Q.  So let's keep it simple.  258 under the staffing plan that

24  exists now, and there's 108 current; is that correct?

25  A.  Correct.  In RDC.

1    Q.  At RDC.  So that's a difference of 150?

2    A.  Thereabouts, yeah.

3    Q.  So do you have any views of what the county would have to

4    do in a relatively short span of time to get 150 more detention

5    officers?

6    A.  It would certainly be difficult in a short period of time;

7    but I think the recruitment and retention plan offers some good

8    suggestions, both short, medium, and long term.  Things that

9    we've discussed in the past:  step plan, career ladder,

10   stipends for uniforms.  At the time of the site visit, the

11   direct deposit and bimonthly -- biweekly pay had not been

12   implemented.  I don't know if it has by now.

13       I think a market analysis would be good and not just

14   looking at nearby correctional facilities or the state

15   correctional system but to look in Jackson and Hinds County as

16   to who's competing for the labor market and what they're

17   offering.

18               MR. SHELSON:  May I approach the witness, Your Honor?

19               THE COURT:  You may.

20               MR. SHELSON:  I'm going to show her Exhibit D-48.

21               THE COURT:  D-48, is that an exhibit that was in

22   the --

23               MR. SHELSON:  Let me clarify that, Your Honor.

24   That's what we've premarked it as for this round.  It's not

25   admitted into evidence at this time.

1           THE COURT:  Okay.  All right.  And has the government

2    seen it?

3           MR. SHELSON:  We've produced all our --

4           THE COURT:  Okay.  That's fine.  As long as y'all --

5           MR. CHENG:  Is this the March 30th memo?

6           MR. SHELSON:  Yeah.

7           MR. CHENG:  Yes, we've seen it.

8           THE COURT:  Okay.  All right.

9    BY MR. SHELSON:

10   Q.  Have you seen the memorandum you've just been handed

11   before today?

12   A.  No, not before today.

13   Q.  Do you know if this is one of the documents that was

14   produced to you in connection with this last site visit?

15   A.  Not that I know of.  I might have missed it.  I know we

16   have not received most of the documents from human resources

17   that we requested, so --

18   Q.  Is this a document from the Hinds County Sheriff's Office?

19   A.  Yes.

20   Q.  Is it date of March 30th, 2022?

21   A.  Yes.

22   Q.  Does it say, Effective April 1st, 2022, direct deposit

23   will be open to all employees of the Hinds County Sheriff's

24   Department?

25   A.  Yes, it does.

SIMPSON - CROSS

1  Q.  Do you have any information that that did not, in fact,

2  occur as of April 1st, 2022?

3  A.  Nothing as solid as this.  I did ask about it during the

4  site visit and was told that it hadn't been quite completed

5  yet.  But this would suggest that it has been.

6  Q.  And I think we can all agree that the salaries for

7  detention officers have been increased?

8  A.  Yes.

9  Q.  So we have -- we've had salary increases, and it's the

10  county's position that direct deposit is in place; is that

11  correct?

12  A.  This memo would suggest that.

13  Q.  And despite that, the staffing numbers have gone down?

14  A.  Yes.

15  Q.  And with respect to the retention side of it, did you

16  receive any documents from the county, in its most recent

17  document production to the monitors, regarding detention

18  officers who were terminated for cause?

19  A.  Yes.  We received the IAD -- the Internal Affairs report,

20  some of which involved detention officers that have been

21  terminated.

22  Q.  So the period of time that encompasses the monitors' most

23  recent site visit, how many detention officers were terminated

24  for cause?

25  A.  I don't know the number.  Now, I'm not going to guess.

SIMPSON - CROSS

1    Q.  That's fine.  But you have seen documents that indicate

2    that some number of detention officers were terminated for

3    cause?

4    A.  Yes.

5    Q.  And you believe that the county should not terminate

6    detention officers when they have cause just to keep the

7    numbers -- the staffing numbers up?

8    A.  I think, if I got the negatives right -- I don't believe

9    that they should hold off termination just to keep staffing

10   numbers up.  I didn't evaluate whether some lesser form of

11   discipline might have been appropriate in those cases.  I did

12   not look at that.

13   Q.  That's fine.  And so without having to make that kind of

14   judgment, if the county is terminating officers for cause, that

15   will impact the retention numbers, correct?

16   A.  That's correct.

17   Q.  And if the county is legitimately terminating officers for

18   cause, that's not good for the retention number, but it's

19   something that the county should be doing, correct?

20   A.  That's correct.

21          MR. SHELSON:  Your Honor, may I have a moment to

22   confer?

23          THE COURT:  You may.

24       (Off-the-record discussion between defense counsel.)

25          MR. SHELSON:  Thank you, Your Honor.  I tender the

1    witness.

2             THE COURT:  All right.

3                    **REDIRECT EXAMINATION**

4    BY MR. CHENG:

5    Q.  Ms. Simpson, have you ever made yourself available to be

6    prepared for these hearings by defense counsel?

7    A.  Yes.

8    Q.  And could you describe how you made yourself available?

9    A.  Well, last -- during the January site visit and the

10   following trial, I sent a number of emails letting counsel know

11   that -- both defense and plaintiff's counsel, that I was

12   available to confer with either side.  And, of course, we do

13   the exit conferences at the end of a site visit to also share

14   whatever information we have.

15   Q.  Did defense counsel take advantage of this opportunity to

16   talk to you before this hearing?

17   A.  No.  I'm not sure I specifically reached out before this

18   hearing.  When I did before the February hearing, I got no

19   response.  I did actually suggest to defense counsel that

20   during the site visit we meet over lunch or something to just

21   talk generally, get to know each other a little bit more since

22   they were new to the case, but --

23            MR. HALL:  Objection, Your Honor.  Again, just for

24   specificity, can she advise -- we have a bunch of lawyers, so

25   who did she ask out to lunch?

SIMPSON - REDIRECT

1          THE WITNESS:  I asked Mr. Morisani.  And I don't know

2      if there were others on the email or not.

3          MR. HALL:  Thank you, Your Honor.

4          THE COURT:  All right.

5      BY MR. CHENG:

6      Q.  And you were saying about the luncheon.  What happened

7      then?

8      A.  Well, the site visit got aborted.  I never heard back

9      anyway, but the site visit got aborted.

10     Q.  And do you ever communicate directly with defense counsel

11     about documents or trying to get cooperation with the

12     inspections?

13     A.  Yes.  Typically via email, but yes, lots of communication.

14     Q.  And you mentioned something about documents from human

15     resources.  What was the situation with those documents?

16     A.  Well, Mr. Parrish usually reviews those; but one of the

17     requests that we make is sort of the current staffing levels,

18     people that have been promoted and their backgrounds, new hires

19     and their backgrounds.  And we got some of the human resources

20     documents but not all.

21     Q.  And when we talk about this March memo --

22     A.  Yes.

23     Q.  -- during your site inspection did you ask specifically

24     about direct deposit after March?

25     A.  We asked about the direct deposit and biweekly pay in our

1    interviews.  I don't think we had a specific document request

2    related to that.

3    Q.  And what did they tell you about the direct deposit?

4    A.  I believe that Mr. Shaw and I think Mr. Gaylor both told

5    me that they hadn't been finalized and -- but that it was

6    expected soon, that they were approved but not fully

7    implemented.  But I think we lumped them together, and so maybe

8    one was implemented and one wasn't.  I don't know.

9    Q.  And did the defense counsel ever provide additional

10   records, including, like, this memo to you before this hearing?

11   A.  Not that I recall seeing.

12   Q.  How would you describe the level of cooperation with your

13   compliance visits since the defendants took office in November?

14           MR. HALL:  Objection, Your Honor.  Outside the scope

15   of our cross-examination.

16           THE COURT:  Objection overruled.

17   A.  We've had a great deal of difficulty getting documents and

18   getting them in time and sort of having the level of open

19   communication that we've had in the past.  But to me the

20   documents have been most trying.

21   BY MR. CHENG:

22   Q.  So let's talk a little bit about the COVID.  There was a

23   discussion about the intro meeting?

24   A.  About what?

25   Q.  The introduction meeting --

1    A.  Oh.  Yes.

2    Q.  -- with everybody at the beginning of the tour.

3    A.  Yes.

4    Q.  Did Mr. Parrish or you talk about Mr. Parrish's COVID

5    symptoms at that time?

6    A.  Mr. Parrish was experiencing some symptoms.  He was hoarse

7    and coughing, and he shared that he was experiencing those

8    symptoms but that he had tested negative for COVID.

9    Q.  And who was present, again, at that meeting?

10   A.  All the people I previously mentioned:  Mr. Morisani,

11   Mr. Shaw, Chief Simon, Captain Caston, I believe Captain

12   McBride, the sheriff.  The sheriff might have joined us on the

13   tour.  I think maybe he wasn't at the meeting.

14   Q.  And did any of them tell you they had any special

15   protocols they wanted to adopt because somebody had symptoms?

16   A.  No.

17   Q.  And after Mr. Parrish developed COVID, was there any

18   discussion with the defense about what the protocol should be

19   about continuing the tour?

20   A.  No -- well, not initially.  We arrived at RDC, and we were

21   told we would not have access to the facility.  And then there

22   was some discussion about whether we would continue that week

23   remotely, actually from here but not in person.  And it was

24   decided not to go that route.

25   Q.  And just to be clear, who canceled the tour, was it you

1    who canceled the tour that day?

2    A.  No.  No.  We arrived to do the tour and were told that we

3    would not have access.

4    Q.  Was there any discussion about security blocking the door?

5    A.  I believe that that was told, that we would not be allowed

6    entrance.

7    Q.  And do you know who it was?  Was it county counsel for the

8    board or the sheriff's counsel or the sheriff?  Do you know who

9    made that decision?

10   A.  I believe we were told it had been made by the sheriff.

11   Q.  And did anyone consult with the court before denying you

12   access?

13   A.  Not that I know of.

14   Q.  There was some discussion about how the county -- whether

15   or not they controlled the arrests.  You heard -- they asked

16   you about that, do you recall?

17   A.  Yes.

18   Q.  At least under the old consent decree, the county had some

19   input into that process through the criminal justice

20   coordinating committee, right?

21   A.  Yes.

22        MR. SHELSON:  Objection, relevance.

23        THE COURT:  Objection sustained.

24   BY MR. CHENG:

25   Q.  So there's also some discussion about what they can do in

SIMPSON - REDIRECT

1    a short time to improve their staffing?

2    A.  Yes.

3    Q.  Some of these things that you talked about, like the

4    retention plan, how long has that actually been under

5    discussion?

6    A.  Well, the -- some of the ideas are in the settlement

7    agreement itself so they've been around from the beginning.

8    And I believe some of them were then incorporated in the

9    stipulated order, which goes back to January 2020; and then the

10   recruitment and retention plan was provided by -- well, the

11   consultant worked with a former jail administrator and produced

12   a final document, I believe in December 2022.

13   Q.  So, for example, like, a career ladder.  Has that been

14   implemented?

15   A.  No.

16   Q.  How about step pay?

17   A.  No.

18   Q.  And were those also in the retention plan?

19   A.  Yes, I believe so.

20   Q.  There was also some discussion about how they've had to

21   terminate employees for cause.

22   A.  Yes.

23   Q.  When they terminate these employees, whose employees are

24   they?

25   A.  The -- well, they're in the sheriff's department.  They're

1    employees of the county, I believe.

2    Q.   So who hires these people?

3    A.   They go through the county or the sheriff's HR, human

4    resources, process.  The sheriff hires them.

5              MR. CHENG:  That's it.  Thank you, Your Honor.

6         Thank you, Ms. Simpson.

7              THE COURT:  The court has a few questions, and I'll

8    give the government the opportunity to follow up in the end,

9    the -- Hinds County and the sheriff afterward.

10        Now, Ms. Simpson, I just want to make sure:  I know in the

11   past when you were undertaking your monitoring activities, I

12   guess prior to the last hearing, as a standard practice you

13   would reach out to the county -- let me ask you if this is

14   true -- if this is part of the way you did -- reach out to the

15   county as you prepare to do your next visit, requesting certain

16   documents?

17             THE WITNESS:  That's correct.

18             THE COURT:  Okay.  And what documents -- I know it

19   was a whole list of them, but what type of documents did you

20   request?  This is back before February of 2022.

21             THE WITNESS:  Oh, before February.  Okay.

22        Well, we would receive some documents on a monthly basis

23   and -- so, for example, the incident report narratives, it's

24   not something we would need to request specific for a site

25   visit because we got it routinely as a monthly report.  And

1    other things came in routinely as monthly reports:  the

2    quality assurance report, the classification and records

3    summary report, the benchmark reports.  So a number of reports

4    we received routinely on a monthly basis.

5         THE COURT:  And then those reports -- again, I'm

6    talking about January, February of '22 -- that would have been

7    information that ultimately the court would receive through

8    the -- by way of the April 16th, I believe, '22, monitoring

9    report?

10        THE WITNESS:  Monitoring report, right.

11        THE COURT:  Okay.

12        THE WITNESS:  And then there are documents we request

13   specifically for the site visit, and I can run through some of

14   those if you want.

15        THE COURT:  Tell me about those documents.

16        THE WITNESS:  So I usually request a month of

17   grievances and their responses, two weeks of program requests

18   and their responses, the classification form for everybody

19   classified usually in a two-week period.  And depending on

20   whether we're doing the site visit in person or remotely, I

21   will request the face sheets that go in the file, the inmate

22   record files.  And then we request the IAD reports.  We'd like

23   to get those on a monthly basis but that's been difficult.

24        We request the human resources documents, the segregation

25   logs, the visitation logs, recreation logs, the -- oh, this

1   time I requested orders related to fines and fees so I could

2   drill down on that issue a little more.  The CID reports,

3   that's -- usually we get those on a monthly basis.  The

4   population reports, the post assignment sheets.

5        Those are the ones that come to mind.

6            THE COURT:  Okay.  Do you recall what, if any,

7   documents you received prior to your visit in May, the visit

8   that was cut off, what documents -- well, first of all, had you

9   reached out to the county for any documents?

10           THE WITNESS:  Yes.  I believe actually my document

11  request went out May 4th, requesting that the documents be

12  provided by May 23rd and reminding them that we were wanting

13  the monthly documents in addition to the ones that we were

14  requesting specifically for the site visit.  So yes, that went

15  out to the county.

16           THE COURT:  Did you receive those documents in

17  advance of your -- in advance of your arriving in May?

18           THE WITNESS:  Most of them we did not.

19           THE COURT:  Okay.  Tell me what is the importance of

20  having those documents with respect to your being able to do

21  what you've been tasked to do?

22           THE WITNESS:  Well, in some instances I can't do a

23  productive interview if I don't have the documents.  So, for

24  example, to be able to talk with classification about the

25  timeliness of classification or the accuracy of the

1    classification forms, I can't do that without having those

2    documents.  Similarly with the grievances, if I don't have the

3    grievances and their response, I can't go through those with

4    the grievance officer.

5         And Mr. Parrish would have a similar difficulty.  He can't

6    evaluate whether recreation is being provided unless he has the

7    rec logs, and similarly the visitation logs, and the

8    post-assignment sheets to know how many officers are present on

9    the units.

10        So both in terms of having the interviews be effective but

11   also to be able to report on these issues in the report, it's

12   very difficult without the documents.

13             THE COURT:  Okay.  So in May when you -- when the

14   visitation was cut off because of Mr. Parrish's COVID

15   finding -- positive finding, was there an attempt to do any --

16   I think there was an attempt to do the rest of it remotely.

17             THE WITNESS:  There was.  I sent a number of emails.

18   Once we knew we couldn't go into the facility on Wednesday, I

19   sent a number of emails asking if I could pick up the documents

20   so that I could at least be reviewing the documents, and then

21   Department of Justice offered to set up a platform so that we

22   could do the interviews as scheduled during that week as

23   opposed to setting them up in a later time.

24             THE COURT:  Did you ever get all the documents you

25   requested?

1           THE WITNESS:  No.  Not at that time, and we still

2     haven't.

3           THE COURT:  On the monthly -- was there a time during

4     the month you had been receiving the documents, the monthly

5     documents, for example?

6           THE WITNESS:  Right.  The monthly documents usually

7     came in the first week of the following month.  So we would

8     normally have had July's documents about two -- I'm sorry,

9     June's documents about two weeks ago.

10          THE COURT:  Okay.  Have you received them?

11          THE WITNESS:  No.

12          THE COURT:  Have you received all the documents from

13    May?

14          THE WITNESS:  May were fairly good on the monthlies.

15    We have not received all of the documents for April, in the

16    April monthly.  And May we're missing some of the monthlies,

17    but we're better for May than April.

18          THE COURT:  Have you asked them -- do you know if

19    there was any conversation with anyone with the county or with

20    the sheriff's department that would be -- and when I say

21    "anyone," I'm talking about those persons with whom you've been

22    dealing with in the past or either counsel, about the specific

23    documents that you needed?

24          THE WITNESS:  During some of the interviews, I asked

25    the staff member whether they had been requested to provide the

1   documents.  In some instances they said no, they hadn't been

2   requested.  And then most recently they said -- this was with

3   respect to the orders on fines and fees -- that they had

4   provided -- well, the records supervisor said she had provided

5   those documents to the lieutenant, but we still have not

6   received those.  And there's been a number of communications

7   with counsel about the documents that we're still missing.

8              THE COURT:  Today is July 19th.  So in about

9   two weeks, if there were monthly documents that had been

10  requested, in two weeks you would expect to have received the

11  July documents, I presume.

12             THE WITNESS:  That's correct.

13             THE COURT:  Counsel asked you about any sort of

14  contact or conversation that you might have had with

15  Mr. Mullins.

16             THE WITNESS:  Yes.

17             THE COURT:  Do you know how many defendants -- how

18  many plaintiffs he's represented based on -- well, do you know

19  if he's represented any current or former inmates in the

20  detention center?

21             THE WITNESS:  I think during the phone call he

22  mentioned that he was representing the family of the detainee

23  that was assaulted and killed, and then I believe he mentioned

24  one other detainee that had been assaulted and severely

25  injured.  But I think those are the only two detainees he

1   mentioned.

2           THE COURT:  Do you know if he filed a lawsuit against

3   the county on behalf of that individual, the individual's

4   family?

5           THE WITNESS:  No, I don't.  He hadn't at the time I

6   spoke with him.

7           THE COURT:  Okay.  And if he did file a lawsuit, it

8   would be a matter of public record, right?

9           THE WITNESS:  Yes.

10          THE COURT:  And, in fact, I do believe the court has

11  even cited to some of those lawsuits in its prior opinions,

12  correct?

13          THE WITNESS:  I think that's correct, yes.

14          THE COURT:  And speaking of staffing, there's been a

15  number of questions -- or been a lot of talk about staffing.

16  In any of your meetings with the county since our last hearing

17  back in -- well, during your visit -- during your May site

18  visit, has the county indicated to you how, if any -- how it

19  might ameliorate the staffing issues that they currently have?

20  I think everybody agrees that there are staffing problems.

21          THE WITNESS:  Yes, I think so.

22      Well, we've talked about the things that have been

23  mentioned today:  you know, the bimonthly -- or biweekly

24  payroll, the direct deposit, the raise, and then things that

25  haven't been done, the step plan, the career plan.  So we talk

1    about those to determine what the status of those initiatives

2    are.

3             THE COURT:  Going back to the reaching out, if any,

4    or contact with Mr. Mullins as a part of -- well, contact with

5    Mr. Mullins, is the monitor limited in any way where you can

6    find or obtain information that you believe might be necessary

7    to do your job in this case?

8             THE WITNESS:  We are not limited in that regard.  And

9    we have in the past reached out to the public defender, to the

10   district attorney, the Southern Poverty Law Center, family

11   members.  We receive unsolicited information at times as well.

12   So we're not limited in our information-gathering tasks.

13            THE COURT:  Do you receive or obtain any information

14   through the press, through the media?

15            THE WITNESS:  Yes.  Mr. Parrish and I both subscribe

16   to the *Clarion-Ledger*, and we receive information that way.

17            THE COURT:  And as a part of -- as a part of what you

18   do in keeping the court informed, sometimes the court will

19   direct you to certain information.  Is that a fair statement?

20            THE WITNESS:  Yes.  That's correct.

21            THE COURT:  I have no further questions.  The county

22   and the -- the sheriff and the county may follow up based on

23   what I've asked.  I'm sorry.  The United States may follow up

24   based on what I've asked, and then the other two.

25            MR. CHENG:  No follow up, Your Honor.

```
1            THE COURT:  All right.
2            MR. HALL:  Nothing from the sheriff's department.
3    May I approach Ms. Summers with the --
4            THE COURT:  Is that D-48?
5        (Off-the-record discussion between defense counsel.)
6            MR. HALL:  No further questions from the sheriff's
7    department.
8            THE COURT:  Okay.  You may step down, Ms. Simpson.
9            THE WITNESS:  Thank you.
10           THE COURT:  Is there a next witness for the
11   government?
12           MR. DONNELLY:  There is, Your Honor.  And I believe
13   Mr. Cheng is going to handle that witness.
14       We have a request, and it's my fault for not objecting
15   sooner.  When Mr. Shelson walked up, I thought it was going to
16   be brief, so it wasn't worth it.
17       But defendants are operating in a joint capacity and have
18   submitted a joint witness list and a joint exhibit list, 61
19   exhibits.  They're sitting at the same table.  They're
20   obviously invoking a sort of joint defense privilege.  And so
21   we'd request that they have a single defense counsel question
22   the witness.
23           THE COURT:  I'll hear from you, Mr. Shelson.
24           MR. SHELSON:  May I proceed, Your Honor?
25           THE COURT:  You may.
```

1          MR. SHELSON:  May I have the Elmo, please.

2      Your Honor, this is the complaint in this action.  There's

3   actually three defendants:  Hinds County, Hinds County Board of

4   Supervisors, and the sheriff.  We agree that the Hinds County

5   and board are one.  The sheriff, in his official capacity, is a

6   separate entity.  That's reflected in the parties as well,

7   paragraph 7, three parties.  I could show the court every time

8   defendants is in this complaint, it's plural.  It's never

9   singular.  There are three defendants here.  Two, we agree,

10  should be treated as one.  The third is separate.

11     It doesn't matter what, frankly, the United States thinks

12  is a joint capacity or not.  They, in fact, sued three

13  entities.  And Hinds County/Hinds County Board of Supervisors

14  should be treated as one.  The sheriff in his official capacity

15  should be treated as a second defendant.  Both defendants

16  should have an opportunity to examine witnesses.

17     Your Honor, legally this matter is controlled by Federal

18  Rule of Evidence 611.  Granted, the court has considerable

19  discretion under Rule of Evidence 611 to control the mode and

20  order of examination.  But the factors are, one, make those

21  procedures effective for determining the truth; two, avoid

22  wasting time; and, three, protect witnesses from harassment or

23  undue embarrassment.

24     I'll submit, Your Honor, that for determining the truth,

25  it's advantageous to allow both defendants to question the

1    witnesses, avoid wasting time -- I think the record would

2    reflect that I was not repetitive of what Mr. Hall asked

3    Ms. Simpson -- and protect the witnesses from harassment or

4    undue embarrassment.  I don't think I asked any harassing

5    questions or any that caused undue embarrassment to

6    Ms. Simpson.

7         For all those reasons, Your Honor, and particularly since

8    the United States sued three separate defendants, we think that

9    the county/board of supervisors on the one hand, the sheriff in

10   his official capacity on the other, should each be permitted to

11   examine witnesses.

12            THE COURT:  If there's any finding against the

13   sheriff in his individual capacity -- excuse me, in his

14   official capacity, I guess if there's a judgment, then -- a

15   monetary judgment, if there were, the county would be

16   responsible for paying that for the sheriff, correct?

17            MR. SHELSON:  I haven't considered that, Your Honor,

18   but that's possible.  But it's still -- it's still -- I think

19   that's a separate issue from the mode of examination of

20   witnesses.  And if there were such a finding, that reinforces

21   the point because, again, that's a separate entity; and it

22   shows the entity distinction that we're talking about.

23            THE COURT:  Yeah.  The county would be responsible,

24   though, right?  The county.  If there's any judgment against

25   the sheriff, the county's -- yeah.  I mean, I guess in its

1    injunctive capacity sort of thing, being yeah, you can enjoin

2    the sheriff.  But there is no physical -- no entity called the

3    Hinds County Jail or the Hinds County Sheriff's Department,

4    right?

5             MR. SHELSON:  It --

6             THE COURT:  I tell you what.  Let's not go down that

7    path.

8             MR. SHELSON:  Yes, sir.  It is --

9             THE COURT:  Let's not go down that path.  We're going

10   to allow you to do your --

11            MR. SHELSON:  Thank you, Your Honor.

12            THE COURT:  -- examination, but I will -- I don't

13   want anybody to be repetitive and to get two bites out of one

14   issue.

15            MR. SHELSON:  Yes, sir.

16            THE COURT:  All right.  You may call your next

17   witness.

18            MR. CHENG:  Your Honor, we call -- the United States

19   calls David Parrish.

20                        **DAVID PARRISH**

21   was thereupon called as a witness and, having first been

22   duly sworn, testified as follows:

23            THE COURT:  Mr. Parrish, you've been in the courtroom

24   all this time and before, so you know how this is done.

25        Mr. Cheng, you may begin whenever.

**DIRECT EXAMINATION**

1

BY MR. CHENG:

2

3   Q.  Mr. Parrish, there's been some discussion today about the

4   defendants' efforts to mitigate the conditions in A-Pod.

5   Besides the physical plant conditions in A-Pod, have they

6   mitigated the staffing problems in A-Pod?

7   A.  The staffing problems in A-Pod are much the same as

8   they've been for a long time.  They're not -- the staffing

9   level is not getting better.  It's getting worse.

10  Q.  And you've heard Ms. Simpson testify earlier about the

11  staffing numbers.  Do you agree with her about the staffing

12  figures?

13  A.  Yes, sir.

14  Q.  And across the jail, is there a staffing supervision

15  problem across the other housing units as well?

16  A.  Yes, sir.  It's not unique to Alpha.  If one -- well,

17  based on my firsthand observation back on May 31st and also a

18  review of a few post-assignment sheets that were attached to

19  IAD reports, it's apparent that it's very consistent throughout

20  that there's generally one officer in the control room and one

21  officer taking care of the four housing units and the iso units

22  in each of the three pods.

23  Q.  So two officers per pod?

24  A.  Correct.

25  Q.  In terms of, like, a concrete impact, what does that

1    impact in terms of the officers' ability to supervise inmates?

2     A.  Well, if we go back to October of 2020 when Charlie

3    reopened after being renovated for the second time, the

4    commitment from the county -- from the sheriff's office was

5    that it would operate under the principles of direct

6    supervision, that there would be one officer inside each of the

7    four or each of the three direct supervision housing units and

8    that there would be two officers assigned to the fourth one,

9    which is a confinement area, lockdown, in addition to the

10   control room and having somebody as an escort officer on the

11   floor.

12        Unfortunately, it's never been possible to staff Charlie

13   at that level.  It was done intermittently, and then over time

14   it's dropped off.  And we have the same issue in Bravo, now

15   that it's reopened; and we've always had the same issue in

16   Alpha.  So there's no officer there to observe things

17   firsthand, prevent problems from escalating.  It means that

18   officers are basically responsive to things, responding to

19   fights that break out or assaults or that sort of thing.

20    Q.  So have there been escapes or assaults in the jail?

21    A.  The Raymond Detention Center is kind of unique in my

22   experience.  I've never seen a jail where inmates break out but

23   not to escape to freedom.  They break out to bring contraband

24   back in.  That still happens in Alpha Pod where the inmates

25   have the most ready access to the roof and the ceiling.  There

1    are -- so that still goes on and that adds to the contraband

2    problem.  Then as far as assaults and things within the

3    facilities, they routinely happen in each of the three pods.

4    Q.  And I know we've probably heard this before; but even if

5    they don't want to spend money in the physical plant to fix the

6    physical plant at A-Pod, does that justify not dealing with

7    staffing and supervision as a separate remedy?

8    A.  Well, when I first came here back in 2014, I was told from

9    the then-sheriff that what we needed was a new jail and that

10   would take care of things.  And I've heard that routinely

11   through each administration over the years.

12        That's not the solution.  You have to be able to manage

13   what you have, and that means it has to be adequately staffed.

14   Otherwise, the county is going to spend a lot of money building

15   a brand new facility that's not going to be adequately staffed,

16   that's going to be torn apart just like Alpha and face the same

17   kinds of problems that Bravo and Charlie face right now.

18   Q.  So has the lack of supervision affected their ability to

19   do things like welfare checks?

20   A.  Yes.  They're not done.  I get documents that say that

21   they are; but they also get notes on the bottom written by the

22   officer, Unable to conduct timely because I was standing two

23   posts, or I was called off to booking, or something like that.

24   And then my firsthand observation on May 31st was looking at

25   suicide watch areas, where there had been no records kept for

PARRISH - DIRECT

1   hours or where there was nobody present.  Those are inmates who

2   are supposed to be under constant supervision, just like us

3   looking at each other, but making a 15-minute notation.

4              MR. MORISANI:  Your Honor, I object.  It's not clear

5   whether he's talking about A-Pod or other pods throughout the

6   facility.

7              THE COURT:  Clarify if you will, Mr. Parrish.

8   BY MR. CHENG:

9   Q.  Yes, Mr. Parrish, when you talk about the lack of welfare

10  checks, are we just talking about A-Pod or are we talking about

11  the whole jail?

12  A.  No, that's true of the entire jail.  Alpha Pod doesn't

13  have a lockdown area like Bravo and Charlie, but they're still

14  required to do hourly well-being checks.  I don't know whether

15  they're being done because we haven't gotten any of those

16  records for this one.

17  Q.  Because Mr. Morisani did bring it up, let me introduce an

18  exhibit.  If we could turn to U.S. Exhibit 159, if you could

19  take a look at it, Mr. Parrish.  Do you recognize Plaintiff's

20  Exhibit 159?

21  A.  Yes, sir.  It's a segregation well-being check form.

22  Q.  And you actually collect a number of these observation

23  check logs when you're doing your review?

24  A.  Well, when I go on-site and can see them firsthand, I look

25  at some there; but these are also documents that we request

1    that are sent to us electronically.

2    Q.  And these logs that you get, do they show short staffing

3    only in A-Pod or do they show it elsewhere too?

4            THE COURT:  Hold on.  Is there an objection?

5            MR. MORISANI:  Your Honor, I'm going to object.  This

6    document is objectionable for several reasons, one of which is

7    that it's not limited to A-Pod.

8            THE COURT:  Objection overruled.

9    A.  I'm sorry.  Could you restate it for me?

10   BY MR. CHENG:

11   Q.  Yes.  So when you look at these observation logs, are the

12   short staffing issues only in A-Pod or are you seeing them in

13   other logs as well for other pods?

14   A.  No, they reflect the problem throughout.

15           MR. CHENG:  Your Honor, we move for the admission of

16   Plaintiff's Exhibit 159.

17           THE COURT:  Any objection?

18           MR. MORISANI:  Yes, sir, Your Honor.  The document is

19   not what it purports to be in the sense that it purports to be

20   a document for a certain date range.  I think it's May 18th to

21   the 30th.  And it goes well beyond that, after the site visit

22   in early June, in addition to the fact that it's not limited to

23   A-Pod.

24           THE COURT:  Are these documents that are received

25   from the county?

PARRISH - DIRECT

1        MR. MORISANI:  Yes, sir, I believe so.  But again,

2   it's not what it purports to be.  The exhibits list it as a

3   document from the date range of May 18th to the 30th, I

4   believe; but it goes way past May 30th into June, the document

5   does.  And it's not limited to A-Pod, Your Honor.

6        THE COURT:  I'm going to overrule the objection.

7   P-159 will be received into evidence.

8        (Exhibit P-159 admitted.)

9        THE COURT:  One of your objections was it goes into

10  June.  I'm only scanning through it.  It looks like all the

11  dates are May.

12       MR. MORISANI:  I'm incorrect about that.  It goes

13  prior to May 18th.  It has, like, May 6th, May 5th, dates like

14  that.  And then it does go to May 31st, which is outside the

15  range as well.  I apologize.

16       THE COURT:  All right.  Again, objection overruled.

17       THE WITNESS:  Your Honor, excuse me.  There's a

18  document that I think somebody left behind here.  I don't know

19  whether it's something --

20       THE COURT:  Yes.  That's D-48, I think.

21  BY MR. CHENG:

22  Q.  So we've talked a little bit about direct supervision and

23  staffing as a way to mitigate conditions in A-Pod.  Do you

24  recall the sheriff talking about turning things around through

25  his leadership or improving staff morale sometime in February?

1    A.   I can remember him addressing that here but also during

2    our site visit, which we did one day on-site but then remotely.

3    And he spoke during the exit briefing; and he made that

4    comment, that morale has improved since -- under his

5    administration.

6    Q.   And so how is that process working in terms of mitigating

7    the conditions in A-Pod?

8    A.   That's not a measurable -- I'm not quite sure how to

9    answer that one.

10   Q.   Well, do you see any indications that morale or

11   supervision have improved in terms of the staff?

12   A.   I can't get a measurement for that from conversations with

13   people who are walking around.  I can just look at what is done

14   or not done or look at the records.  I saw a case of an officer

15   who walked off the job from master control and left all the

16   doors standing open, with vehicles waiting in line.  That's not

17   an indication of good morale.  That's somebody that I'm glad to

18   see the sheriff's office parted ways with.

19           MR. HALL:  Your Honor --

20   A.   That was the right decision.

21           MR. HALL:  -- again just for specificity, what time

22   period is Mr. Parrish testifying about?

23           THE COURT:  Would you clarify, Mr. Parrish?

24           THE WITNESS:  When did that occur?  I think it was in

25   April.

1   BY MR. CHENG:

2   Q.   And this was the officer in master control?

3   A.   Yes, sir.

4   Q.   What is the difference between master control and the

5   other control rooms?

6   A.   Well, master control is the main control room for the

7   entire jail at the RDC, and it's located right in the booking

8   area.  And then each of the three housing pods has its own

9   control room, but the pod control rooms only take care of that

10  particular pod.  Master control has cameras that allow it to

11  look at everywhere throughout the jail and to allow access and

12  egress from the facility.

13  Q.   How many officers are supposed to be in master control?

14  A.   Two.

15  Q.   Were there two officers in master control?

16  A.   From that record it appeared that there was only one.

17  Q.   And so when the officer walks off of master control, does

18  that impact the security of just A-Pod or does it affect other

19  parts of the jail too?

20  A.   That affected the entire jail.

21  Q.   And when they walked off, can you describe a little bit

22  about exactly how that panned out in terms of, like, from the

23  beginning to when the person walked away?  What happened?

24  A.   The report that I looked at was very brief.  It didn't

25  provide much access -- much information except for the fact

1    that when questioned the officer said that that officer was

2    tired of having to worry about opening and closing doors.

3    Q.  And so when they walked off, what happened to the doors?

4    Who's controlling doors?

5    A.  Well, I can't say.  I wasn't there.  But if there was no

6    control, they needed to -- they had to assign another officer

7    immediately to take charge of master control.

8    Q.  That master control room, is there, like, a security

9    vestibule leading to the master control room?

10   A.  No.  There's a single door.

11   Q.  So when we've talked about, like, mitigating the dangers

12   in A-Pod, are security vestibules for control rooms an issue

13   that has come up in the past as well?

14   A.  Oh, yes.

15   Q.  Again, why does having security vestibules affect the

16   security in the housing units?

17          MR. MORISANI:  Objection, Your Honor.  Again, this is

18   not specific to A-Pod.

19          THE COURT:  Objection overruled.

20   A.  In a jail the normal standard is to have a safety

21   vestibule going into any control room and into any housing

22   area.  That's two doors.  You open the first door and go inside

23   the safety vestibule.  The door shuts, then the next door

24   opens, and you can go through.  And then that door closes.

25   That way the inmates can't rush and charge out.  That's where

1    the term "safety vestibule" comes from.

2         For some reason or another, they were not installed, when

3    the Raymond Detention Center was built, in any of the control

4    rooms, whether it be master control or the pod controls.  And

5    so certainly that was one of the things that jumped out right

6    from the very beginning, and it's been a matter that's been

7    under consideration and has been included in such things as the

8    master planning list of issues to be addressed.

9    BY MR. CHENG:

10   Q.  So I think there's some suggestion that the rest of the

11   jail, B and C, are more secure compared to A and that they're

12   ready to go.  Do you agree with that assessment that the rest

13   of the jail is secure enough to move the inmates from A to the

14   rest of the jail?

15   A.  Well, they're in better shape than Alpha, absolutely.

16   They've had the doors, locks retrofitted.  They're in far

17   better shape than when we started this process.  But even with

18   that, we still have instances of inmates getting out of their

19   housing units out through the corridor and out to the great

20   hall.  That should be --

21   Q.  To clarify, are we talking about outside of A-Pod they're

22   getting out of their housing units into the great hall?

23   A.  It would be Alpha, Bravo, Charlie.  I've seen it occur at

24   all three.  But the other issue is that even after things are

25   repaired, it's necessary that they be utilized properly, which

1    means that doors need to be secured.  And all too often I find

2    doors that are standing ajar leading in and out of housing

3    units.

4    Q.  And is that outside of A-Pod as well?

5    A.  That's correct.

6    Q.  And if they don't have enough staff in the three housing

7    units and they move the inmates to B and C, have they been able

8    to breach -- have inmates been able to breach the security

9    vestibules or doors in B and C?

10   A.  Yes.

11   Q.  There was also some discussion about using Rankin in order

12   to mitigate, having inmates move to Rankin County?

13   A.  Yes, sir.

14   Q.  Do you remember that?  Has the sheriff also used Rankin

15   officers to help deal with staffing issues at the jail here?

16   A.  Not necessarily for staffing issues, but they've been

17   called upon on two occasions within the past year to conduct

18   shakedowns at the Raymond Detention Center.

19   Q.  Was there any delay in getting the records for the

20   shakedown information when Rankin was brought into the jail?

21   A.  Any delay in getting that information?

22   Q.  Yes.

23   A.  The more detailed information finally came through with

24   the IAD reports, so I didn't see that as -- I mean, it came

25   with the rest of them.  I didn't see that as separate.

1  Q.  So did you have a chance to review the shakedown

2  information when Rankin officers were used to deal with Hinds

3  County inmates?

4  A.  Yes.

5  Q.  And did you form any opinion about the conduct of the

6  Rankin officers when dealing with Hinds County inmates?

7        MR. HALL:  Objection, Your Honor.  Outside the scope

8  of this hearing.

9        THE COURT:  Objection overruled.

10  A.  They did not follow Hinds County use of force policy.

11  They deployed bean bag shotguns when they went into Alpha and

12  Charlie pods and hit approximately seven inmates because they

13  didn't respond to their verbal commands to do certain things.

14  BY MR. CHENG:

15  Q.  So then did the sheriff's department in Hinds County

16  investigate the use of force?

17  A.  No.  They indicated that no Hinds County officers were

18  involved and that the information from the incident would be

19  passed to Rankin County for them to dispose of as they saw fit.

20  Q.  If we could go through -- let's see.  It might be

21  Plaintiff's 160 through 167.  And we're going to have to go

22  through them a little more slowly.  Do you recognize, first,

23  Plaintiff's Exhibit 160?

24  A.  It jumped from the first page, which looked like a report

25  on the shakedown, rapid notification, and then went over to --

PARRISH - DIRECT

1    okay -- a list of contraband items.

2    Q.  The book next to you has it in paper form, if you want to

3    look at it a little more slowly.

4    A.  Yes, sir.  I'm familiar with this.

5    Q.  So do you recognize Plaintiff's Exhibit 160?

6    A.  Yes.

7    Q.  And what is that?

8    A.  Well, it's a rapid notification report on the shakedown.

9    Q.  Do you recognize Plaintiff's Exhibit 161?

10   A.  Yes, sir.  These are the reports that were generated by

11   Rankin County.

12   Q.  What type of reports are they?

13   A.  A use of force report.

14   Q.  And do you recognize Plaintiff's Exhibit 162?

15   A.  Yes, sir.  The same thing.

16   Q.  And 163?

17   A.  Yes, sir, the same.

18   Q.  And 164?

19   A.  Yes, sir, more.

20   Q.  And 165?

21   A.  Yes, sir, more of the same.

22   Q.  And 166?

23   A.  This is an incident report that was generated to explain

24   about the shakedown and making reference to the number of

25   people that were struck and then the contraband items that were

PARRISH - DIRECT

1    found.

2      Q.  And do you recognize 167?

3      A.  Yes, sir.  A picture of a table full of contraband.

4      Q.  So have you had a chance to review these materials as well

5    when forming your opinion?

6      A.  Yes.

7      Q.  And having reviewed it, do you think there is actually a

8    contraband problem that remains at the jail?

9      A.  Oh, yes.  There has been for many years.

10     Q.  And has that been reduced, as far as you can tell, by the

11   current sheriff's policies?

12     A.  Well, I can't measure numbers one against the other, but

13   finding that level of contraband at one setting is kind of

14   frustrating from a jail administrator's point of view.

15     Q.  Does finding contraband through a shakedown eliminate the

16   need to have enough supervision to keep the contraband out of

17   the facility?

18     A.  No.  Whether there's contraband there or not, the inmates,

19   the detainees need to be properly supervised.  The contraband

20   issue just makes it more dangerous for everybody involved.

21     Q.  And having reviewed these materials, did you have any

22   concerns about the way the sheriff's department handled the use

23   of force by Rankin County officers against their own inmates?

24     A.  I'm sorry.  You need to repeat that question for me.

25     Q.  Yeah.  Did you have any concerns about how the Hinds

1   County Sheriff's Department handled the use of force by Rankin

2   County officers against Hinds County inmates?

3   A.  Well, I think the issue was, from our discussions with CID

4   and staff, that there were Hinds County supervisors present,

5   including an investigator from CID when this occurred, but they

6   were -- the Rankin County deputies were -- or officers were not

7   under the control of Hinds County staff.  They kind of

8   free-steamed and did what they wanted to.  They were not

9   directed by Hinds County, and that resulted -- what happened

10  was because of apparently a conflict between what may be

11  acceptable in their policy over in Rankin versus what's in

12  Hinds County's policy.

13  Q.  So were Rankin County officers allowed to do anything that

14  would violate Hinds County's use of force policies?

15  A.  Well, they used bean bag shotguns without going through

16  any intermediary steps, with lots of officers present, so it

17  wasn't a lack of staff.  And they jumped directly from do what

18  I say, you know, put your hands out or move or come out of the

19  cell or what have you, to using a bean bag shotgun on them,

20  which is contrary to what Hinds County use of force policy

21  says.

22  Q.  So would you say that the Rankin County officers used

23  inappropriate levels of force against the Hinds County inmates?

24  A.  Inappropriate, yes.

25  Q.  You mentioned something about the sheriff's department.

PARRISH - DIRECT

1    The sheriff's department does not investigate because the

2    Rankin County officers are held responsible by Rankin sheriff's

3    department?  How does that work?

4    A.  Well, I've never seen anything like this ever.

5    Q.  Okay.

6    A.  But on the IA information sheet regarding the case, that's

7    the notation, that there was no Hinds County officer involved

8    so -- but the information would be turned over -- on what

9    happened would be turned over to Rankin County for them to

10   dispose of as they saw fit.

11   Q.  So if the sheriff's department were to move a bunch of

12   inmates to Rankin County, would you have any concerns about

13   whether the Hinds County people would take responsibility for

14   what happens to their own inmates?

15   A.  If they move inmates to another jail, they're going to be

16   under the administration of the other jail.  They're not going

17   to have any day-to-day control.  I'm not sure if I'm answering

18   your question.

19   Q.  Let me ask you this:  If something bad happens to the

20   Hinds County inmates when they're at other facilities, does

21   Hinds County have a mechanism for them to deal with those sorts

22   of complaints or deal with those abuses?

23   A.  I haven't seen anything like that.

24            MR. CHENG:  If we could run just those clips on

25   Plaintiff's Exhibit 173.

PARRISH - DIRECT

1    BY MR. CHENG:

2    Q.   And these are also from the -- straight down.

3         Do you see this video from that event.  Do you know what

4    this video is?

5    A.   This is one of -- it's a very poor-grade video which is

6    regarding the Rankin County shakedown.

7    Q.   So when the defendants have said that they fix cameras,

8    for example, in housing units, do you consider this type of

9    quality video to be adequate?

10   A.   I don't know for a fact; but I've got to assume that this

11   is Alpha Pod, where lighting conditions are not very good.

12   Q.   And when you are reviewing other use of forces or other

13   investigations, were there other problems with the camera

14   quality?

15   A.   Well, that's been a long-standing problem.  We've heard

16   testimony in here previously of upwards of 60 cameras that were

17   under review and needed to be replaced.  And they have taken

18   action on that with regard to Bravo.  So Bravo now has higher

19   quality camera coverage.  They're working on Charlie on a

20   case-by-case basis and the exterior cameras around the

21   facility.  But to the best of my knowledge, there's no plan to

22   do anything of a retrofit with regard to cameras in Alpha

23   because the plan is to close it.

24   Q.   And even if they don't fix everything in Alpha, would

25   improving the cameras in Alpha help mitigate some of the

PARRISH - DIRECT

1    dangers in Alpha?

2    A.  Well, it would help staff be able to see what's going on

3    and respond accordingly.

4    Q.  Would it also help them provide better oversight of staff

5    to see whether staff had done anything abusive to inmates?

6    A.  Certainly.

7            MR. CHENG:  If we could go to the next clip.

8    BY MR. CHENG:

9    Q.  So can you describe what is going on in this video clip,

10   and do you recognize this clip?

11   A.  Yes, I do.  It appears approximately a dozen Rankin County

12   officers entering the housing unit, which once again appears to

13   be Alpha; but in this one there's better lighting.  It's a

14   different housing unit, apparently.  And there's no audio, but

15   apparently he yelled for the -- or directed the inmates to lie

16   down, and so you can see them dropping to the ground.  When

17   you're looking right now at that inmate, who looks like he's

18   taking his first step on the stairs, an officer came up shortly

19   thereafter; and an inmate at the top of the stairs laid down on

20   the ground, and it appears that the officer fired up at him

21   from down at the bottom of the stairs.

22   Q.  So you reviewed the use of force reports for this

23   shakedown, correct?

24   A.  Yes.

25   Q.  And were there justifications given by the Rankin officers

1    for why they used force?

2    A.  Yes.

3    Q.  Did those justifications match what you saw on this video?

4    A.  Well, maybe from their perspective the inmates didn't

5    respond fast enough or do what they had directed.  But like I

6    said, that's contrary to Hinds County policy.

7    Q.  Why is it contrary to policy to shoot an inmate who

8    doesn't do as directed?

9    A.  Well, the policy is based on good correctional practice,

10   that you have a continuum of care, if you will, or a continuum

11   of force that starts out with verbal directions and ultimately

12   ends up in something much more serious.  But the idea is that

13   you do things incrementally, only responding with the highest

14   level of force when it's necessary to skip what you would

15   normally find in the continuum.  In this case, I don't know, it

16   didn't appear to me that it --

17   Q.  You mentioned somebody got shot.  Can we roll to that

18   section?  Can you try to just point that out to where that

19   happens?  And are we talking about an inmate who's, like, on

20   top of the stairs to the left?

21   A.  That's correct.  Yeah, the inmate that just went up the

22   stairs is now lying down on the floor.  There's an officer who

23   comes to the bottom of the stairs and right there appears to

24   shoot.

25   Q.  That flash, was that somebody shooting?  Is that your

1    view?

2    A.  Yes.

3    Q.  Let's see the next clip.  What's going on here?  Do you

4    recognize this video?

5    A.  I recognize it.  I'm not sure what's going on.  They

6    apparently are telling the inmates to come down from up on the

7    mezzanine level by crawling down head first down the stairs.

8    Over on the other side they're having them walk.  You can't

9    really tell what's being directed because we don't have audio.

10   Q.  Uh-huh.  So this inmate who's on the stairs, does he look

11   like he's standing up a bit?

12   A.  On the right-hand side, the right stairwell?

13   Q.  Yes.  What happened there?

14   A.  I'm not sure.  They've got everybody piling up down at the

15   bottom of the stairs.

16   Q.  If we could run that again.  So are you aware of any

17   justification for the inmates being asked to crawl down the

18   stairs this way?

19   A.  I've been in literally hundreds of jails, and I ran a huge

20   jail system for 27 years.  I've never seen anything like this.

21   Q.  So having reviewed these videos and looked at the use of

22   force reports, were you satisfied with the quality of the use

23   of force review in this case?

24   A.  Well, I don't know what kind of relationship there is

25   between Hinds County and Rankin County with regard to the use

PARRISH - DIRECT

1    of each other's officers.  I think there should be some

2    accountability for the officers who were brought in.  They

3    should be under the direction and control of Hinds County

4    staff, regardless of where they come from.  And there should be

5    some accountability for what these people did.

6            MR. CHENG:  Your Honor, at this time I'd like to move

7    in Plaintiff's Exhibit 160 through 167 and 173.

8            THE COURT:  Any objection?

9            MR. MORISANI:  There is an objection to 161, Your

10   Honor.  It does not involve A-Pod.  It's C-Pod.

11           MR. CHENG:  Can we pull up 161?

12           MR. MORISANI:  The objection would be relevance, Your

13   Honor.

14           MR. CHENG:  Well, the shakedown, Mr. Parrish

15   previously testified it was at A and C, I believe, Your Honor,

16   so it's the same event.  The fact is it's still the same

17   officers; it's the same event.

18           THE COURT:  Objection overruled.  That was the only

19   objection, to 161?

20           MR. MORISANI:  Yes, sir.

21           THE COURT:  Those exhibits will be received into

22   evidence.  I believe it was 160 through 167 and 173.

23        (Exhibits P-160 through P-167 and P-173 admitted.)

24   BY MR. CHENG:

25    Q.  And, Mr. Parrish, let me go back to one preliminary

1   matter.  During the most recent site visit in May, were you at

2   the introductory meeting?

3   A.  Yes.

4   Q.  And at that time did you say anything about your symptoms

5   to the defendants?

6   A.  Yes, I did.

7   Q.  And what did you tell them?

8   A.  Well, I -- I've had all four Pfizer shots.  I had the

9   first two and then the two boosters.  I wear a mask.  I tested

10  before I left, and that's negative.  But by the time I got here

11  on Monday night, I was starting to get scratchy in the throat.

12  And so I told them that, that -- you know, but I've had

13  everything, and so I thought that I just had a -- like a sore

14  throat or something coming on.  Passed that along.

15  Unfortunately it got me.

16  Q.  So the defendants have talked about their mitigation; but

17  despite their reported efforts to mitigate, do you believe

18  there continues to be a grave and immediate threat of harm to

19  detainees in the jail?

20  A.  The lack of supervision by staff has gotten progressively

21  worse over time, and the situation is severe.

22  Q.  And based on what they've said that they've done to

23  mitigate, do you think they can be reliably trusted to comply

24  with the court's orders?

25  A.  Well, they've made some good faith efforts to do things.

PARRISH - DIRECT

1    The staffing situation has just gotten progressively worse.

2    And the current conditions, it's -- unless something happens

3    there, it's going to continue.  The problems are going to

4    continue.

5    Q.  And even back in December or February, did these

6    particular defendants, these elected officials, indicate that

7    they thought they could start turning things around and could

8    start making conditions better in the jail?

9              MR. MORISANI:  Your Honor, I would just object to the

10   time period in the question.

11             THE COURT:  Rephrase the question, Mr. Cheng.

12   BY MR. CHENG:

13   Q.  Well, let me ask:  After the election, these officials

14   came in as a new board and a new sheriff, correct?

15   A.  Yes.

16   Q.  And when they came into office, earlier this year at the

17   trial did they indicate that they would be able to turn things

18   around?

19             MR. MORISANI:  Same objection, Your Honor.

20             THE COURT:  Objection overruled.

21   A.  Yes.  The answer is that they were doing things that would

22   be progressive.  I'm going to give the sheriff credit for

23   something that he did do here.  The plan for -- the step plan

24   for merit increases, for salary increases and so forth, was a

25   good one.  He put that together and we heard it here.  We're

1  going to do something.  The problem is that it was never

2  submitted to the board of supervisors as an action plan, vote

3  this up, yes, or down, or modify it.  And so it's still a

4  matter that's just under consideration.

5      So we have some things that have been done:  higher

6  salary, biweekly pay plan, direct deposit.  But some of the

7  other really excellent suggestions that he put into that

8  document are still in limbo, and that's what we would encourage

9  the sheriff and the county to work on jointly to address the

10 problem.

11         MR. CHENG:  Thank you, Mr. Parrish.

12         THE COURT:  All right.  At this time, for the court

13 reporter's benefit, we're going to take a 15-minute recess.

14 And then when we return we'll figure out where we're going from

15 that point.  But we're going to take a 15-minute recess.

16     You may step down, Mr. Parrish.  I'll ask you not to

17 discuss with anybody your testimony, though.

18         THE WITNESS:  Yes, sir.

19     (Recess from 3:45 p.m. to 4:07 p.m.)

20         THE COURT:  Mr. Parrish, you may return to the stand.

21 Do you have any cross-examination of this witness?

22         MR. MORISANI:  Yes, sir.

23         THE COURT:  All right.

24         MR. MORISANA:  May I proceed, Your Honor?

25         THE COURT:  You may.

1                        **CROSS-EXAMINATION**

2    BY MR. MORISANI:

3    Q.  Good afternoon, Mr. Parrish.

4    A.  Good afternoon.

5    Q.  The last time you were at Raymond Detention Center was May

6    31st of 2022, correct?

7    A.  That's correct.

8    Q.  And I walked around with you that day; isn't that right?

9    A.  Yes.

10   Q.  I pretty much spent the whole day with you, didn't I?

11   A.  A great deal of it, yes.

12   Q.  And you'd agree with me that throughout that day, you took

13   your mask on and off throughout the day, correct?

14   A.  I did.

15   Q.  And do you recall being in B-Pod control with me and we

16   discussed the low staffing that you observed at the facility?

17   A.  Vaguely, yes.

18   Q.  Well, you certainly -- from your testimony, you certainly

19   understand that the staff are doing what they have to do,

20   correct?

21   A.  Staff are living with the situation, yes.

22   Q.  They're doing everything they can with what they've got,

23   correct?

24   A.  I have nothing bad to say about the efforts of staff.

25   Q.  There's certainly no bad faith by the staff, correct?

PARRISH - CROSS

1   A.  Certainly no.

2   Q.  The staff are certainly operating in good faith, aren't

3   they?

4   A.  Yes.

5   Q.  And do you recall when we were interviewing Captain

6   McBride, you made a comment that when staff do something that's

7   practical and that can benefit everybody, how can you be

8   opposed to that.  Do you recall that?

9   A.  When staff is doing something that's practical, how can

10  you be opposed to it?

11  Q.  Your comment was that when staff do something that is

12  practical and that can benefit everybody, how can you be

13  opposed to it.  Do you recall telling us that when you

14  interviewed Captain McBride?

15  A.  I don't recall it exactly, but it sounds like me.

16  Q.  Now, you talked a little bit about the staffing problems.

17  I think you said it was the same as it's been for a long time.

18  Do you recall that?

19  A.  What I was pointing out was that it has not improved over

20  time, yes.

21  Q.  And I think you said -- your words were, It's the same as

22  it's been for a long time.  Do you recall saying that just less

23  than an hour ago?

24  A.  Probably did.

25  Q.  And I want to talk to you about staffing.  You don't

1    dispute that throughout the time that Major Bryan was jail

2    administrator, through to this very day, the county continues

3    to recruit for detention officers, right?

4    A.   Oh, they have, yes.

5    Q.   And the county has also increased detention officers'

6    starting salary to $31,000, correct?

7    A.   That's correct.

8    Q.   And the county has started biweekly pay now, right?

9    A.   Correct.

10   Q.   It's also started direct deposit pay, correct?

11   A.   Yes.

12   Q.   And more recently, the county has implemented a detention

13   officer award program at Raymond Detention Center, hasn't it?

14   A.   I'm not really familiar with that.  I heard something

15   about it, but I can't explain to you what it is.

16   Q.   Frank Shaw told you about it, didn't he?

17   A.   He said that he had some kind of -- like, they had an

18   officer of the month type thing, yes.

19   Q.   Do you have any reason to dispute that they have that?

20   A.   No.

21   Q.   And Sheriff Jones, he personally goes to RDC frequently to

22   interact with staff, doesn't he?

23   A.   That's what he explained to us, yes.

24   Q.   And he listens to their concerns too, doesn't he?

25   A.   Apparently.

1    Q.  So it's not fair to say the county is not dealing with

2    staffing, is it?

3    A.  I didn't say that the county is not dealing with it.  I'm

4    saying that it's not going in the right direction.

5    Q.  But it's not fair to say the county is not dealing with

6    staffing, is it?

7    A.  I have not said that.

8    Q.  Is it fair to say that?

9    A.  It's fair to say that they're working on the problem.

10   Q.  Now, you don't dispute -- well, let me ask you this:

11   There was some talk earlier about well-being checks.  And the

12   staff at the facility are performing the 15-minute well-being

13   checks, aren't they?

14   A.  They're trying to.  They don't have enough people to do

15   it.  When I was there on Saturday after- -- or on the afternoon

16   of the 31st, we were in Charlie 4.  I walked in there, and

17   there was a sergeant standing the post.  That's how short they

18   were, that a sergeant was having to stand the post for

19   Charlie 4 and for Charlie 4 iso, the suicide watch.  Physically

20   impossible for one person to do all that, but he was giving it

21   his best.  I'm not taking anything away from the officers.

22   Q.  So when you told us during the exit conference on

23   June 24th that the staff were doing the 15-minute well-being

24   checks, were you just making that up?

25   A.  No, I was talking about booking when I said that.  I said

PARRISH - CROSS

1   the last few times that I've been there, the 15-minute

2   well-being checks in booking were current.

3   Q.  And that's a good thing, isn't it?

4   A.  Oh, absolutely.

5   Q.  And you also talked about the workload for booking

6   personnel has been more equitably distributed, didn't you?

7   A.  That's correct.

8   Q.  That's another good thing, isn't it?

9   A.  Yes.

10  Q.  And you also talked about staff in the units -- in the

11  pods, excuse me -- in the pods were no longer maintaining more

12  than one logbook.  Do you recall that?

13  A.  Yes.

14  Q.  Now they're using one logbook for the entire unit,

15  correct -- the entire pod, excuse me.

16  A.  Yes.

17  Q.  And that's a positive change, isn't it?

18  A.  Actually it's a good thing because it takes -- it

19  eliminates redundant and unnecessary documentation.  That makes

20  the job of the officers easier.

21  Q.  Now, you don't disagree that the county has had to take

22  disciplinary actions against several detention officers since

23  the last monitoring report, the 16th report.  You don't

24  disagree with that, do you?

25  A.  No.

PARRISH - CROSS

1    Q.  And that officer that walked out of central control, would

2    you have kept that officer at your facility at Hillsborough

3    County?

4    A.  Absolutely not.

5    Q.  The county didn't keep the officer here, did they?

6    A.  No.

7    Q.  I think you said at least three times on June 21st,

8    Mr. Parrish, that operating the Raymond Detention Center

9    through direct supervision is not possible, given the number of

10   staff versus the number of detainees at the Raymond Detention

11   Center right now, didn't you?

12   A.  I think it's versus the number of posts.  They don't have

13   enough officers to stand all the posts that are necessary for

14   direct supervision.

15   Q.  It's not possible to do it right now, is it?

16   A.  They can't do it with the number of people that they have

17   there, so they're not doing it.

18   Q.  And it's not possible to do it with the number of people,

19   is it?

20   A.  That's what I just said, yes.

21   Q.  Now, Mr. Parrish, you talked a little bit about the

22   March 2022 shakedown.  I'm going to call your attention to that

23   briefly.  Sheriff Jones decided to have a shakedown after

24   receiving intelligence; isn't that right?

25   A.  He explained that they got intelligence that there may be

PARRISH - CROSS

1    some staff bringing in contraband, and that's why he decided to

2    bring in officers from another jurisdiction.

3    Q.  Exactly.  He asked the officers from Rankin County, but he

4    had tactical reasons for asking those officers to come assist,

5    didn't he?

6    A.  He had what reasons?  Tactical or technical?

7    Q.  He had tactical reasons for asking Rankin County to bring

8    in deputies to help, didn't he?

9    A.  He had information that maybe some of his staff were

10   bringing in contraband, and that's why he was asking to bring

11   in people from another jurisdiction.  That's what he explained

12   to us.

13   Q.  And bringing in more deputies would what?  It would

14   increase the manpower to conduct the shakedown, wouldn't it?

15   A.  Yes.

16   Q.  But there were still RDC command staff present during the

17   shakedown; isn't that right?

18   A.  That's what we were told.

19   Q.  And I think you've testified that there were lots of

20   officers present, but you'd agree with me there were more

21   detainees in those living units than there were officers,

22   weren't there?

23   A.  Certainly.

24   Q.  And you don't dispute that none of the detainees were

25   seriously injured during that shakedown, do you?

PARRISH - CROSS

1    A.  I don't think I discussed that.

2    Q.  Well, do you dispute that?  You don't disagree -- none of

3    the detainees were seriously injured during that shakedown,

4    were they?

5    A.  Well, based on the pictures that I saw, some of them had

6    bruises and wounds from that but nothing that required

7    hospitalization.

8    Q.  And no one was killed during the shakedown, were they?

9    A.  No.

10   Q.  And that shakedown, it resulted in the recovery of some

11   pretty serious contraband, didn't it?

12   A.  Absolutely.

13   Q.  Drugs were found, correct?

14   A.  Yes.

15   Q.  Cell phones were found, correct?

16   A.  Yes.

17   Q.  And, of course, shanks were found, right?

18   A.  Yes.

19   Q.  And I think there were 67 shanks found.  Do you agree with

20   that?

21   A.  I don't remember the exact number, but there were a lot.

22   Q.  Do you have any reason to dispute that it was 67?

23   A.  I do not.

24          MR. MORISANI:  If I may borrow the Elmo.

25   BY MR. MORISANI:

PARRISH - CROSS

1    Q.  Now, this is PX-167.  I believe it's already been admitted

2    into evidence.  But I'll represent to you that it's a picture

3    of the contraband that was located during that shakedown,

4    Mr. Parrish.  And those shanks in this picture, they could have

5    been used to seriously injure detention staff or detainees

6    alike, couldn't they?

7    A.  Yes.

8    Q.  They could be used to kill detention staff or detainees

9    alike, couldn't they?

10   A.  Certainly.

11   Q.  But this shakedown got a lot of those, 67 of them, out of

12   the detainees' hands, didn't it?

13   A.  Yes, it did.

14   Q.  And you'd agree the units from which this contraband was

15   taken are safer today without those items, aren't they?

16   A.  Certainly.

17   Q.  And those units are safer without the drugs that were

18   located and confiscated, right?

19   A.  Certainly.

20   Q.  And they're safer, of course, without the cell phones as

21   well, aren't they?

22   A.  Yes.

23   Q.  Now, you're not here to say or testify that shakedowns are

24   supposed to be negotiations, are you?

25   A.  No, I'm not.  I didn't say that.

PARRISH - CROSS

1   Q.  And I want to talk a little bit now about that shakedown,

2   how it was carried out.  What's the use of force policy number,

3   Mr. Parrish?

4   A.  I'm sorry.  I can't remember it off the top of my head.

5   Q.  Policy 5.500 sound about right?

6   A.  Could be.

7   Q.  And you know what the date of the use of force policy is?

8   A.  It's about two to two and a half years ago.

9   Q.  February 1st, 2020, sound about right?

10  A.  That sounds about right.

11  Q.  And does this -- does the use of force policy say anywhere

12  in that policy, Don't use force to compel compliance?

13  A.  It says that force is not to be used as the -- to --

14  when -- I can't remember the exact wording, but the -- in one

15  of the explanations, it says that it's not to be used to force

16  inmates to follow verbal directions.

17  Q.  Does it say anywhere in the policy not to use force to

18  compel compliance?

19  A.  I don't have it in front of me.

20  Q.  Does it authorize the use of mechanical measures?

21  A.  Oh, yes.

22  Q.  Are tasers mechanical measures?

23  A.  Yes.

24  Q.  Does it allow the use of electronic control devices?

25  A.  I think that's the terminology that's used as opposed to

1    "tasers" in the policy.

2    Q.  Are tasers electronic control devices?

3    A.  Yes.

4    Q.  Does the use of force policy allow the deadly use of

5    force?

6    A.  Does it allow the deadly use of force?

7    Q.  Yes.

8    A.  It goes all the way through the whole range.

9    Q.  Is that a yes --

10   A.  Yes.

11   Q.  -- to my question?

12   A.  Yeah.

13   Q.  I want to show you a copy of this policy.

14          MR. MORISANI:  Borrow the Elmo one more time.

15   BY MR. MORISANI:

16   Q.  Mr. Parrish, we're looking at the use of force policy,

17   it's policy 5.500 dated February 1st of 2020.  You see that?

18   A.  Yes.

19   Q.  Let me know if you have any trouble.  I'm going to try to

20   slide it down now.

21       I want to direct your attention to the yellow highlights

22   on paragraph 3.  We're looking at generally procedures, use of

23   force generally.  5-501 is the section of the policy,

24   paragraph 3.  If you will just read this first title of this

25   column.

PARRISH - CROSS

1    A.   It's talking about authorized use of force.

2    Q.   And I'm going to read subparagraph B and C, and you tell

3    me if I read these correctly.  Under authorized use of force,

4    "prevent an act which could result in death or serious bodily

5    injury to self or another person."  Did I read that correctly?

6    A.   Yes.

7    Q.   Subparagraph C, authorized use of force, "to defend

8    oneself or another against a physical assault."  Did I read

9    that correctly?

10   A.   Yes.

11   Q.   Flip to the next page.  We're staying in that same chart,

12   authorized use of force.  I'm going to read subparagraph F; and

13   if you will, just tell me if I read it correctly.  Authorized

14   use of force, "to overcome active physical resistance to a

15   lawful command."  Did I read that correctly?

16   A.   Yes.

17   Q.   I'm going to scoot on down to paragraph 6.  I'm going to

18   read this portion here beginning with "use of force."  If

19   you'll just let me know if I read this correctly.  "Use of

20   force levels in no way suggests that each step must be

21   implemented and in order; rather, that the staff response must

22   be commensurate with the level of force presented."  Did I read

23   that correctly?

24   A.   Certainly.

25   Q.   Let's talk about now the use of force levels that are

1    available under this policy.  And this is the Hinds County

2    policy, correct, Mr. Parrish?

3    A.  Yes.

4    Q.  The use of force levels available.  I'm going to start

5    here under "level of force presented."  Tell me if I read this

6    correctly.  "Active resistance.  Examples:  Assaultive and

7    threatens bodily harm, evasive movements that are a threat to

8    safety, overt hostile attacking movements."  And the

9    commensurate staff response is "chemical devices, electronic

10   device --" I'm sorry "-- use of electronic control device,

11   other less lethal weapons, i.e., foam rubber launchers with

12   approval of the shift supervisor."  Did I read all that

13   correctly?

14   A.  Yes.

15   Q.  And again, looking to page 3 of this policy, we're reading

16   from the table that begins on page 2 under "use of force

17   levels."  It goes on to page 3.  "The level of force presented:

18   Imminent threat to inflict serious bodily harm or death on

19   another person."  Commensurate staff response:  "Lesser

20   response, e.g., as outlined in passive and active resistance,

21   or deadly force."  Did I read that correctly?

22   A.  Yes.

23   Q.  Now, I want to direct your attention to Section 5-502 of

24   this policy, the use of force policy.  And again I'm going to

25   read from the policy, and just let me know if I read this

PARRISH - CROSS

1    correctly.  This is paragraph 1 of Section 5-502.  "Security,

2    less lethal equipment.  Such force may not be used as a means

3    to force an inmate to comply with verbal orders unless such

4    noncompliance presents an imminent threat."  Did I read that

5    correctly?

6    A.  Yes.

7             THE COURT:  No.  Immediate threat.

8             THE WITNESS:  Immediate.

9    BY MR. MORISANI:

10   Q.  "An immediate threat."  Excuse me.

11            MR. MORISANI:  Thank you, Your Honor.

12   BY MR. MORISANI:

13   Q.  Did I read that correctly now?

14   A.  Yes.

15   Q.  Now, Mr. Parrish, we've gone through the county's use of

16   force policy, and I want to sort of look at some of these use

17   of force reports.  Dealing with the March 2022 shakedown, the

18   first report I want to look at --

19            (Off-the-record discussion between defense counsel.)

20   BY MR. MORISANI:

21   Q.  Mr. Parrish, I'm going to follow up with you on one part

22   of this use of force policy.  It's paragraph 5-502, and I'm

23   going to direct your attention to that sentence that I read out

24   loud beginning with "such force may not."  That sentence does

25   not prohibit the use of force to compel compliance, correct?

PARRISH - CROSS

1    A.  It makes an exception if there's an immediate threat.

2    Q.  So you can use force to compel compliance under this

3    policy, based on that sentence, can't you?

4    A.  If there's an immediate threat.  It's not the same.

5    Q.  Is that a yes answering my question?

6    A.  No.  Not just saying do something and you don't do it,

7    then you can use force?  No.

8    Q.  But this sentence allows the officers --

9              MR. CHENG:  Objection.  Asked and answered.

10             THE COURT:  You may ask the question again.

11   Objection overruled.

12   BY MR. MORISANI:

13   Q.  This sentence allows force to be used to compel compliance

14   under those circumstances in that sentence, doesn't it?

15   A.  If there is an immediate threat.  I'm standing by that

16   because that's what it says.

17   Q.  And that's what the sentence says, doesn't it?

18   A.  That's what it says.

19   Q.  Those are the circumstances in the sentence, aren't they?

20   A.  That's what it says.

21   Q.  So under the circumstances in this sentence, the Hinds

22   County use of force policy allows the use of force to compel

23   compliance, doesn't it?

24   A.  If there is an immediate threat, not just use of force to

25   follow a written or a verbal direction.

1    Q.  Let's look at PX-161.  I'm going to turn to page 2, for

2    the record.  If you will -- Mr. Parrish, I'm going to let you

3    do the reading this time.  If you'll read that highlighted

4    sentence.

5    A.  I'm sorry.  I was looking in here.

6    Q.  It's PX-161.  I can hand you this copy if you'd like.

7    A.  No, no.  I can see it here.

8    Q.  The highlighted sentence, if you will.

9    A.  "I began yelling for Duke to crawl out, being I could see

10   a shank near his hand...refused to obey and was struck on the

11   bottom side of his body to the best of my knowledge with a less

12   than lethal bing bag round."

13   Q.  Said he could see a shank near the individual's hand,

14   couldn't he?

15   A.  That's what he said, yes.

16          THE COURT:  Make sure you're speaking into the

17   microphone when you talk, Mr. Parrish.

18   BY MR. MORISANI:

19   Q.  Direct your attention to PX-163.  I'm going to turn to

20   page 2.  And if you'll read the sentence beginning "as the team

21   departed."  If you'll read that entire sentence for the record,

22   Mr. Parrish.

23   A.  "As the team departed, though, out the pod, I came in

24   contact with...whom possessed a shank and would not comply with

25   my commands...was struck with a less than lethal bing round and

1    began to follow commands as he was ordered to by me."

2    Q.  So this individual in PX-163 not only possessed a shank

3    but also failed to comply with commands and he was struck,

4    correct?

5    A.  That's correct.

6    Q.  I turn your attention to PX-164, page 2 for the record.

7    I'm going to let you read this sentence that's highlighted,

8    Mr. Parrish.  It begins, "I began yelling."

9    A.  "I began yelling for so-and-so to get facedown and place

10   his hands behind his head at which time he responded, 'Fuck

11   you.  I have something for you.'  I then deployed a less than

12   lethal bing bang round, striking...in the left leg.  He became

13   compliant and began following commands...was then evaluated by

14   Hinds County Jail staff."

15   Q.  So again, here we have an officer commanding a detainee to

16   do something; the detainee makes a threat, I have something for

17   you; and then deploys the less than lethal bean bag, correct?

18   A.  That's correct.

19   Q.  I'll also show you PX-165, page 2 for the record.  Again,

20   I'm going to let you read the highlighted sentence beginning

21   "while taken."

22   A.  "While taken...he began swatting at me with his hands and

23   refusing to place them behind his back.  I then deployed my

24   taser using a drive stun to gain control of...was placed in

25   hand restraints and was placed in a different part of the Hinds

PARRISH - CROSS

1    County Jail --" pardon me "-- by the Hinds County Jail staff."

2    Q.  All right.  So here, in PX-165 we have an officer getting

3    swatted at by an inmate, refuses to obey the command to put his

4    hands behind his back, then he's deploying the taser, correct?

5    A.  That's right.

6    Q.  Now, do you know how long that shakedown took on

7    March 18th of 2022?

8    A.  I can't tell you.

9         MR. MORISANI:  Your Honor, if I may briefly confer, I

10   may be finished.

11        THE COURT:  Okay.

12     (Off-the-record discussion between defense counsel.)

13        MR. MORISANI:  Just a couple brief questions, Your

14   Honor.

15   BY MR. MORISANI:

16   Q.  Mr. Parrish, I think you testified earlier that this

17   sheriff, Sheriff Jones, had begun to turn things around a

18   little bit.  Do you recall that?

19   A.  Yes.

20   Q.  And to that end, there's been no suicides since Sheriff

21   Jones has been in office.  There's been no suicides at RDC has

22   there?

23   A.  No.

24   Q.  Since Sheriff Jones has been in office, there hasn't been

25   any deaths at Raymond Detention Center, have there?

PARRISH - REDIRECT

1 A. That's correct.

2 Q. And since Sheriff Jones has been in office, there haven't

3 been any drug overdoses at Raymond Detention Center, have

4 there?

5 A. That's correct.

6    MR. MORISANI:  I don't have any further questions,

7 Your Honor.  I tender the witness.

8    THE COURT:  The government ready for redirect?

9    MR. CHENG:  Yes, Your Honor.

10         **REDIRECT EXAMINATION**

11 BY MR. CHENG:

12 Q. If we can look at the Defense Exhibit 52.

13 A. I'm sorry.  Could you say that number again, please.

14 Q. Defense Exhibit 52.

15    THE COURT:  Has that been received in evidence yet?

16 I don't think so.

17    MR. CHENG:  Just because defendants mentioned it.

18 Well, we can ask him generally.

19    THE COURT:  No, no.  It's not in evidence yet because

20 I haven't -- did you intend to place that in evidence?

21    MR. MORISANI:  I will, yes, Your Honor.  I apologize.

22 I think it may be in already from the March -- in the February

23 hearing, but I'll go ahead and put it in now just to be safe.

24    THE COURT:  All right.  Thank you.  D-52 is received

25 into evidence.

1           (Exhibit D-52 admitted.)

2      BY MR. CHENG:

3       Q.  So Mr. Morisani asked you some questions about this use of

4      force policy, and I want to talk to you a little about the

5      context of the provisions.  So when you talked about how verbal

6      instructions are not -- refusing verbal instructions is not a

7      basis for use of force unless there's an imminent threat,

8      right?

9       A.  That's correct.

10      Q.  Okay.  And when we talk about imminent threat, what is an

11     imminent threat or immediate threat?

12      A.  Well, it's designed for the protection of the officer.  If

13     something physical is going to happen to him or her, that would

14     be considered an imminent threat, not just imagining something

15     but physically something is coming the officer's way.  Or the

16     officer can also use that in trying to break up, for instance,

17     a fight between inmates and orders it to be stopped and they

18     don't do it, and then he finally intervenes.

19           The officer doesn't need to be hurt first.

20      Q.  And even if there is a use of force, doesn't Provision 8

21     stay "strikes or similar offensive force measures are only used

22     as a defensive response"?

23      A.  I'm sorry, which --

24                THE COURT:  Provision what?

25                MR. CHENG:  Provision 8 on Exhibit 52-003.

1          THE COURT:  Well, you need to make sure he sees it.

2          MR. CHENG:  Sure.

3          THE COURT:  I mean, you need to point it out.  I

4    don't think that he sees it.

5          MR. CHENG:  Sure.

6          THE COURT:  I'm just trying to figure out who's doing

7    it.

8          MS. RAYOME:  (Indicating.)

9          THE COURT:  All right.  Thank you.  Paragraph 8?

10         MR. CHENG:  Yes.

11   BY MR. CHENG:

12   Q.  And we'll be going through paragraph 8, 9 and 10, so let's

13   start with 8.

14   A.  Yes, sir.

15   Q.  So the idea is offensive force is still supposed to only

16   be used as a defensive response?

17   A.  That's correct.

18   Q.  Would a planned use of force include the March 2022

19   contraband cell checks?

20   A.  Yes.  That's what it was.

21   Q.  And under this policy under Section 9, there are some

22   additional requirements for planned uses of force, correct?

23   A.  Yes, sir.

24   Q.  Does that include video and audio taping by the officers

25   going in?

1    A.   Yes.

2    Q.   And were they doing that type of video or audio taping?

3    A.   Not to the best of my knowledge.

4    Q.   And you saw the video earlier when the team first went

5    into that housing unit.  Did it look to you like there was an

6    immediate threat when they opened fire on the officer -- on the

7    inmate on the second tier?

8    A.   That first inmate that laid down on the mezzanine level

9    and then it appeared that the officer fired at him from the

10   bottom of the stairs, maybe there was something else going on,

11   but I sure couldn't see it from the video.

12   Q.   And if they actually had body cameras would that have

13   helped provide a better investigation of that use of force?

14   A.   Yes.

15   Q.   Did you ask for body camera footage of the March incident?

16   A.   They didn't have body cameras.  They had the GoPro, which

17   has not been functional for many months at Raymond.

18   Q.   And that GoPro, that's something that was originally

19   talked about some years ago, right?

20   A.   That's right.

21   Q.   And when one of the video clips showed the inmates

22   crawling down the stairs and one of the officers sort of took

23   an inmate and sort of moved him or pushed him down the stairs,

24   did you see an immediate threat then?

25   A.   No.

PARRISH - REDIRECT

1   Q.  Mr. Morisani also took you through some questions about

2   how the staff have done what they could with what they have.

3   You remember that?

4   A.  Yes.

5   Q.  Now, are you suggesting that because the staff themselves

6   do what they can with what they have, the county is excused

7   from doing anything more?

8   A.  No.  It's -- they're doing the best they can with their

9   existing resources, but they're so short of staff that we have

10  supervisors having to stand officers' posts, multiple posts

11  with one person like that.  That's how bad the situation has

12  gotten.

13  Q.  And you've also talked a little bit about the sheriff has

14  done some things to try to turn things around.  But when it

15  comes to staffing and supervision, is he better off now or

16  before the sheriff was in charge?

17  A.  The numbers have dropped significantly through each site

18  visit and report that we have done.  So the numbers are worse

19  now than they were before the beginning of this administration.

20       MR. CHENG:  No other questions.  Thank you, Your

21  Honor.

22       Thank you, Mr. Parrish.

23       THE COURT:  All right.  Prior to the shakedown that

24  we've seen a videotape of, I think that -- and what we've been

25  talking about with this contraband and then -- and again, the

1    government may follow up as well as the county and sheriff's

2    officials may follow up based on what I've asked.  But with

3    respect to the shakedown in March, that's what we see

4    represented in these exhibits; is that correct?

5            THE WITNESS:  That's correct.

6            THE COURT:  And in Exhibit 167 it shows a table full,

7    basically, the contraband that was seized on that occasion, I

8    presume.

9            THE WITNESS:  That's correct.

10           THE COURT:  And prior to that March shakedown, what

11   evidence, if any, is there that the county -- the most recent

12   shakedown prior to that?

13           THE WITNESS:  I can't give you a specific date.  I

14   can say that under the previous jail administrator, she tried

15   to implement more routine shakedowns because as was reported

16   back at that point, they had gone for a period of three to

17   five months at the Charlie Pod that had not been shaken down;

18   and she was determined to try and make that a more routine

19   process.  So they -- there's no specific schedule, and I can't

20   give you a date, Your Honor.

21           THE COURT:  I think from the hearing in February --

22   from the hearing, I do recall that at least Sheriff Crisler

23   had -- Interim Sheriff Crisler had done a shakedown; is that

24   correct?

25           THE WITNESS:  Yes.

1          THE COURT:  But please correct me if I'm wrong.

2          THE WITNESS:  No, you're correct.

3          THE COURT:  So at least there was one.  And in

4   March of '22 Sheriff Jones was in office, correct?

5          THE WITNESS:  Yes.

6          THE COURT:  And this is the amount of contraband that

7   was seized in March.

8          THE WITNESS:  That's right.

9          THE COURT:  And this contraband looks like shanks.

10  As they said, 67 shanks?

11         THE WITNESS:  I think that was the figure that was

12  quoted.

13         THE COURT:  Well, I'm just trying to find out has the

14  county or the sheriff's department, in your meeting with them

15  in May, have they told you how they thought that the shanks got

16  in there other than staff might have brought it?

17         THE WITNESS:  No.

18         THE COURT:  Did they say where the shanks were found?

19         THE WITNESS:  I haven't seen anything on that, no.

20         THE COURT:  Okay.  I know at one time during the

21  hearing back here in February, and consistently through several

22  monitors' reports in the past, you've indicated that at times

23  inmates -- detainees have escaped to return with contraband.

24  Do we know if any of this contraband was brought in by any

25  detainees?

1          THE WITNESS:  We don't know, and certainly the shanks

2     would not be something brought in from outside.  They're

3     homemade within the facility by tearing things apart and

4     fabricating knives, shanks.  Telephones, generally, and drugs

5     are what we see coming in from the outside.  That's the kind of

6     contraband that gets thrown over the fence or up on the roof

7     that the inmates bring back in.  Generally it's split like

8     that.

9          THE COURT:  Let's talk about, then, the shanks that

10    persons have made, torn apart things and made from, I presume,

11    property there at the detention center.  In your experience as

12    a correctional officer or jail administrator or whatever your

13    title was at the time, I mean, how does one reduce the risk of

14    the inmates being able to either have the time to concoct or

15    make one of these things or to reduce that possibility?

16         THE WITNESS:  From my experience -- I took over a

17    jail system in 1981.  Some of the jails went back as far as

18    1926.  They were old, old facilities; and they were all remote

19    surveillance.  That means that the inmates had nine-tenths of

20    the building.  They had all the living area.  The staff had the

21    hallways and the control rooms.  I never had a table covered

22    with this much contraband, but we found all kinds of contraband

23    like this in our jails back then because the inmates, as you

24    say, had all the time in the world to tear things apart and

25    fabricate weapons.

1   　　　When we went to direct supervision and put an officer

2   inside each housing unit, just like -- this is a housing unit

3   with 64 inmates; and one officer, just like the teacher in the

4   classroom, runs this place, contraband just fell off the

5   charts.  We don't have contraband like that in our jail system

6   anymore because of direct supervision.

7   　　　That's what was advocated for here.  That's the total

8   solution.  Otherwise, this kind of thing is going to continue.

9   Maybe not on this scale, but contraband is going to keep being

10  manufactured inside.  Even if inmates getting out to the

11  outside to bring things in is stopped, they can still tear

12  things apart inside because they've got all the time in the

13  world and no supervision.

14  　　　And so that's the advantage of direct supervision.

15  That's -- it solves this kind of a problem.  And until that can

16  finally happen here, I'm afraid we're going to continue to see

17  this kind of a thing.  One, two -- three jail administrators

18  back, he took me around for a tour one time; and we stopped off

19  in the armory.  And there were about three milk crates -- big

20  plastic milk crates full of cell phones that had been

21  confiscated.  The numbers just overwhelmed me.

22  　　　So it's not something new.  It's been going on for some

23  time.

24  　　　　　THE COURT:  And Mr. Morisani asked you about -- he

25  mentioned that there have been no suicides, I guess this year

1    or going back to the time that Sheriff Jones has been sheriff;

2    is that correct?

3             THE WITNESS:  That's correct.

4             THE COURT:  And he said no evidence of drug

5    overdoses -- or deaths --

6             THE WITNESS:  Deaths.

7             THE COURT:  -- deaths due to drug overdoses, correct?

8             THE WITNESS:  That's correct.

9             THE COURT:  Any evidence of any assaults?

10            THE WITNESS:  Lots of assaults.

11            THE COURT:  Lots of assaults?

12            THE WITNESS:  Oh, yes.

13            THE COURT:  The assaults, did they require -- any of

14   the detainees had to go -- to seek medical attention there at

15   the facility?

16            THE WITNESS:  At the facility and at a hospital.

17            THE COURT:  Okay.  That was going to be my next

18   question.  Did they have to seek medical attention outside of

19   the facility?

20            THE WITNESS:  Yes.

21            THE COURT:  Now, with respect to the use of force, I

22   don't have the policy here before me, but it's that exhibit --

23   that's fine.  The exhibit concerning Hinds County's use of

24   force.  I think Mr. Morisani focused in on those areas where

25   use of force can be used.  There was a chart there.

```
 1                THE WITNESS:  Yes, sir.
 2                THE COURT:  I think.  On that chart, there's also the
 3     section that says prohibited use of force.
 4                THE WITNESS:  Yes, sir.
 5                THE COURT:  Prohibited use of force, and it details
 6     instances where use of force should not be used or is
 7     prohibited from being used, for example, right?
 8                THE WITNESS:  Yes, sir.
 9                THE COURT:  For example, one cannot tase -- although
10     one can tase an individual who is in -- I think they describe
11     it as electronic use of force.  One can tase an individual who
12     is in prison, who's a detainee.  You can, right?
13                THE WITNESS:  Yes, sir.
14                THE COURT:  But you cannot tase that individual if
15     that individual is simply not complying with a verbal request?
16                THE WITNESS:  That's correct.
17                THE COURT:  Has there been -- based on your
18     conversations at your last visit with the county -- well, with
19     the sheriff's department in May, between March and May, at that
20     time had there been any other sort of shakedown?
21                THE WITNESS:  Your Honor, there very well may be.
22     I'm sorry.  I'm just drawing a blank off the top of my head on
23     dates.  They do do shakedowns.
24                THE COURT:  They do.
25                THE WITNESS:  And we had records of them being done
```

1    at the work center.  I mean, it wasn't just isolated to that

2    facility.  But I can't quote a date.  I'm sorry.

3           THE COURT:  Was there any evidence that any official

4    from the Hinds County Sheriff's Department took a part -- had a

5    role or took a part in the shakedown that occurred in March of

6    2022?

7           THE WITNESS:  No.  They were apparently just

8    observers.

9           THE COURT:  And did any of those observers file any

10   incident reports?  Have you seen any incident reports that were

11   submitted by Hinds County Sheriff's Department?

12          THE WITNESS:  I think there was one incident report

13   that's reflected in here towards the back of this segment.

14   There is a brief incident report that talked about the

15   shakedown.

16          THE COURT:  Okay.  And that was prepared by Hinds

17   County persons?

18          THE WITNESS:  Yes.

19          THE COURT:  The ones that we've been talking about

20   here mostly, 163, 164, 5, 6, and -- well, don't let me

21   misspeak.

22          MR. MORISANI:  Your Honor, if I may, it's 166, Your

23   Honor.

24          THE COURT:  166?

25          MR. MORISANI:  Yes, sir.

1          THE WITNESS:  Yeah.

2          THE COURT:  I see there were 22 lighters confiscated

3     or found.  Obviously, that would at least aid an individual to

4     burn stuff in one of the cells, correct?

5          THE WITNESS:  Yes.

6          THE COURT:  I have no further questions.  Mr. Cheng,

7     does the government have any follow-up based on what I've

8     asked?

9          MR. CHENG:  No, Your Honor.

10         THE COURT:  All right.  Does the county or the

11    sheriff have any follow-up?

12         MR. MORISANI:  No, sir, Your Honor.

13         THE COURT:  All right.  Mr. Parrish, you may step

14    down.

15         MR. CHENG:  Your Honor, the United States has no more

16    witnesses, so -- at least in regards to the motion to

17    reconsider.  If, however, the court wants to proceed with the

18    general status conference, my understanding is Dr. Dudley has

19    limited scheduling availability after today.  It wouldn't be

20    part of this formal proceeding; but if the court wants to hear

21    from Dr. Dudley, it might be good to do it today or reschedule

22    it.

23         THE COURT:  You said he has limited availability

24    after today?

25         MR. CHENG:  Yes.

1        THE COURT:  After today he has limited availability?

2        MR. CHENG:  Yes.  Ms. Simpson may be better able to

3    discuss his schedule, but our understanding was he had some

4    other commitment after today.

5        MS. SIMPSON:  Your Honor, my understanding is that he

6    is in Fulton County, Georgia --

7        THE COURT:  Make sure you speak into the microphone

8    for the record.  I can hear you fine, but the court reporter

9    probably --

10       MS. SIMPSON:  My understanding is that he is in

11   Fulton County, Georgia, for the week and could be available

12   tomorrow.  In my conversations with him, tomorrow was no less

13   likely than today.  So I think he's available tomorrow, unless

14   DOJ had a separate conversation with him.

15       MR. CHENG:  Yeah.  Perhaps that's a misunderstanding,

16   but we originally were anticipating calling him today because

17   of his scheduling instead of tomorrow, so he was listening in

18   for today.  But if he's testifying today, he might not be

19   available tomorrow.

20       THE COURT:  Is Mr. Dudley on the line still?  I

21   realize it's 6:00 out in Georgia.

22       MS. SIMPSON:  I don't think he is.  I think that my

23   conversation with him was more that having a specific time --

24   knowing a specific time ahead of time would help him structure

25   his schedule there.  So it wasn't so much that today was better

1    than tomorrow.

2             MR. CHENG:  Then perhaps we need to follow up with

3    Dr. Dudley, then.

4             THE COURT:  Okay.  Did you need to call him in this

5    portion of your case or simply for the status conference?

6             MR. CHENG:  We do not need to call him for our

7    portion of the case, so we're done with our portion of the case

8    regarding the motion to reconsider.  But as for the general

9    status conference, that would depend, Your Honor, if you wish

10   to proceed.  If so we probably need to at least give him a call

11   if you do want to hear from him today.

12            THE COURT:  Okay.  We're at the 5:00 hour.

13        (Pause.)

14            THE COURT:  I'm just trying to figure out where we

15   are.  With respect to the status conference, ladies and

16   gentlemen -- I should say, counsel, with respect to the status

17   conference, I know the monitor has been on-site back in May.

18   And typically what has happened in the past is that a draft

19   report, I believe, is submitted to the parties for their

20   comments; and after that a final report is filed, and then the

21   court would typically have a full status conference about the

22   particular report that would then be final.  And in this case,

23   that would be the -- what I assume to be the 17th monitors'

24   report, since I see the 16th one was April 5th, 2022.  So for

25   purposes of that, could we not treat it just like we've done in

1    the past?

2         But for purposes of the motion for reconsideration and

3    later on, I guess, the motion to stay -- but for purposes of

4    the motion for reconsideration, I've heard the testimony today.

5    Are there any closing arguments anybody wishes to make with --

6    I say closing arguments -- any arguments on the motion for

7    reconsideration because I'm trying to see whether or not we

8    need to come back tomorrow.  My schedule is free tomorrow.  But

9    I know some of you might have other things to do, including my

10   court reporter.

11        MR. HALL:  Your Honor, we think that we're done.  We

12   don't have any summation or anything like that.  And we also

13   agree with the court that any type of status conference can be

14   dispatched of like it has been in the last couple of years.  If

15   there's no need for us to do that here, let them -- let the

16   monitors write the report up, we'll look at it, they finalize

17   it, and then we go from there.  So from our vantage point, Your

18   Honor, we have nothing further for the court today.

19        THE COURT:  All right.  What says the government?  I

20   mean, any -- like I say, I give either one of you the

21   opportunity to put your motion -- your response, your motion

22   for reconsideration in a bow if you wish, and any response.

23        But with respect to the status conference part, should we

24   treat that -- as I've suggested, treat that like we've

25   treated -- I don't know which first one I got involved with,

1    but all the status conferences since I've been involved, all

2    the monitors' reports since I've been involved, including up

3    through the 16th monitoring report.

4                MR. CHENG:  Yes, Your Honor.  I think that is

5    actually a perfectly fine approach.  It's what we've been doing

6    all along.  There's no reason to change that.

7         The only thing we ask is that however the status

8    conference works, it should not hold up a decision on the

9    motion for reconsideration of the contempt relief.  So we do

10   think we're pretty much done with the evidence for the motion

11   for reconsideration, and we're happy to provide some summation

12   or closing argument if the court needs it.  But if the

13   defendants don't need it and we don't need it, then the court

14   can decide the motion.  What we don't want to see is we wait

15   for the status conference --

16               THE COURT:  No, we won't be waiting.  We won't be

17   waiting.

18        Well, I mean, so I don't -- well, I've heard you-all.

19   There's no need for any summation of any kind.  That's number

20   one.  There's no need for us to even work around Dr. Dudley's

21   schedule to try to figure out what we need to do from this

22   point forward with respect to any additional evidence or

23   hearing of any sorts.

24        What we will do is give the monitor the opportunity to

25   complete her report or to do it like she's done in the past, I

1    think, prepare a draft that is submitted to the parties.  The

2    parties -- I don't think that has changed with respect to the

3    protocols and things that I've required in the new injunction

4    or anything else, the ten days or whatever -- however many days

5    the parties have to get back to the monitor for their input --

6    or for your input and then for the monitor to submit the final

7    report.

8          So I think that's all that I have except for I do want to

9    apologize to you, Mr. Hall, for cutting across you earlier.  I

10    did it in a public way; I should apologize in a public way.  So

11    I do apologize.

12          Is there anything -- and that was for the comment about

13    the cell phone exchange numbers and all that, just in case you

14    forgot.  Is there anything else we need to take care of?

15                MR. HALL:  Nothing from the defendant, Your Honor.

16                THE COURT:  All right.

17                MR. HALL:  For this defendant.

18                THE COURT:  Nothing from defendant the sheriff.

19                MR. HALL:  Right.

20                THE COURT:  Defendant county?

21                MR. MORISANI:  Nothing from the county, Your Honor.

22    Thank you.

23                THE COURT:  Anything from the United States?

24                MR. CHENG:  Nothing from the United States, Your

25    Honor.

1              THE COURT:  All right, then.  Thank you all so much.

2    This concludes all that we have today.  Court is adjourned.

3    Y'all have a great week.

4         (Proceedings concluded at 5:13 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER


I, Margaret Wasmund, RDR, CRR, CRC, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated this 31st day of July 2022.


*Margaret Wasmund*
MARGARET WASMUND, RDR, CRR, CRC
COURT REPORTER