IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF MISSISSIPPI

NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.: 3:16-cv-00489-CWR-RHWR |
| | ) | |
| | ) | |
| HINDS COUNTY, ET AL., | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| _____ | ) | |

Court-Appointed Monitor's Seventeenth Monitoring Report

Elizabeth E. Simpson
Court-Appointed Monitor

David M. Parrish                    Dr. Richard Dudley
Corrections Operations              Corrections Mental Health

## INTRODUCTION

In February, 2022, the Court held an extensive hearing in response to the County's request to be relieved from federal oversight.  Subsequently, the Court issued a New Injunction that relieved the Sheriff and County from many of the provisions of the original Settlement Agreement. Among other deleted provisions was the requirement for a Compliance Coordinator. The Compliance Coordinator resigned and no one has been assigned the full breadth of his duties. As a result, the ability to prepare for the May/June site visit and complete this report has been compromised. The April monthly reports were not provided until well into June and some have still not been provided; the documents requested in preparation for the site visit were not provided before the site visit began; some were provided during the site visit and had to be reviewed to the extent possible between interviews; and, many documents have still not been provided. These include:

1. The Classification and Records Summary Report for April
2. The CID reports for April
3. The CID summary sheet for May
4. The HR records-monthly work force, hires, terminations, current staffing level and background on all hires and promotions
5. The training status report
6. Shakedown logs for April and May
7. All court orders requiring the payment of fines and fees for persons booked January through May
8. A list of all persons released without a court order (in and outs)
9. The post assignment sheets for the month of May
10. Visitation records
11. Recreation logs
12. Policies adopted since April 13th
13. The job posting for the Jail Administrator position
14. Benchmark meeting minutes from May to the present

In addition, communications with staff were restricted with a requirement that all communications be made through the attorneys. Emails to the attorneys requesting such phone calls often went without a response. Basic information that is readily available could not be obtained.

The site visit began on May 31, 2022. However, that evening one of the members of the monitoring team tested positive for COVID. As a result, the site visit was shut down and continued remotely two weeks later. Unlike the difficulty in obtaining documents, The County arranged the

interviews both on site and remote without any problems. Individuals were available and the technology functioned well.

As a result of the move to the New Injunction, several changes have been made to the Monitoring Report. The Compliance Overview continues to include the compliance history but starting with this Monitoring Report, only the paragraphs in the New Injunction are included. Because of the difficulties in completing the monitoring, the monitoring provisions of the New Injunction are included in the Report with compliance status. Although it is unclear to the Monitoring Team whether all or some of the provisions of the Stipulated Order are still in effect, this report does not include the status of the Stipulated Order provisions.


## EXECUTIVE SUMMARY

**Corrections Operations**

Previous Monitoring Reports have pointed out the critical shortage of staff that makes compliance with the Settlement Agreement/New Injunction impossible.  The most recent Staffing Analysis (October 2021) specified the need for 351 officers to operate the RDC and WC (assuming that A-Pod utilized only two housing units and 329 if A-Pod were closed).  Over the past five years the number of filled positions peaked at 256, but for the past three years that number has dropped significantly.  In January 2022, it fell to a new low of 195.  In May of this year the number of filled positions bottomed out at 175.  The RDC cannot be operated effectively when the staffing level is so low.  Direct supervision of C and B Pods was promised prior to the reopening of C-Pod in October 2020.  That has not happened.  Today there is little difference in the staffing of B and C-Pods, as compared to A-Pod where Direct Supervision has never been in place since the officers were pulled out of the housing units in 2012.   This has already resulted in some destruction of the renovated C-Pod because the detainees are not supervised.

Longstanding problems at the RDC continue to go uncorrected.  For the full term of the monitoring process, the HCSO has been cited for improperly housing inmates in Booking holding cells. Those cells have no windows, no access to outdoor recreation yards and no day room space.  Inmates should not be held in holding cells for more than eight hours, yet the HCSO has routinely kept inmates there for days, weeks, months and even years.  On May 31, 2022, the Interim Jail Administrator told the Monitoring Team that he had ended that practice.  Yet, two weeks later, the Inmate Services Manager stated that inmates were being housed in holding cells again.

Over the past year and a half, the average daily population (ADP) has increased by approximately 150.  Considering the fact that the ADP now exceeds 700, the Interim Jail

Administrator's plan to close A-Pod and move all of those inmates to B-Pod is impractical. The ADP now exceeds the Jail System's Operating Capacity, by approximately 100 inmates. There is no plan in place to deal with the excess population.

The Hinds County Sheriff's Office and County have had five years to deal with critical problems that were pointed out graphically and specifically in the Settlement Agreement. Some of those issues have been addressed, but some have never been tackled. Today, the RDC is no better off than it was in 2016, in spite of significant renovation expenditures. The never-ending problem of renovation followed by inmate destruction has not been resolved.

**Medical and Mental Health**

The medical and mental health staff are skilled and extremely dedicated to providing the best possible medical and mental health care to detainees at the facility, and they make every effort to address self-identified problems with the delivery of services and/or those identified by the monitor. In addition, the reenergized, weekly Interdisciplinary Team Meetings have allowed for much improved cooperation between medical/mental health staff and jail administration and detention staff, and in turn, improvements in jail safety and security. However, there are two issues that severely compromise the ability of medical and mental health staff to provide the services they are contracted to provide. The first is staff shortages, both with regard to detention staff and mental health staff. Then, while there is an infirmary/a medical observation unit for acutely, severely physically ill detainees, there is still no comparable unit for acutely, severely mentally ill detainees, where they can be kept safe while receiving the therapeutic interventions they require (with the exception of the suicide resistant cells for actively suicidal detainees). Furthermore, following a year of planning and steps to renovate space for a mental health unit at RDC, plans to open such a unit at RDC have now been scrapped by the County.

### MONITORING ACTIVITIES

| Date and Time (CT) | Lisa Simpson | Dave Parrish | Dr. Rick Dudley |
|---|---|---|---|
| Tuesday, May 31 | | | |
| 9:00 | Frank Shaw, Chief Simon, Captains Caston and Conner | Frank Shaw, Chief Simon, Captains Caston and Conner | HSA Taylor |
| 10:30 | Tour RDC | Tour RDC | |

4

| | | | |
|---|---|---|---|
| 11:00 | | | Head Nurse |
| 1:00 | Sgt Tillman | Tour RDC | MH Coordinator Ms. Martin |
| 3:00 | Officer Dotson | Lt. McBride | Medical Nurse Practitioner |
| 4:00 | Gary Chamblee and Sgt. Winter | Gary Chamblee and Sgt. Winter | Psychiatric Nurse Practitioner |
| Tuesday, June 21st | | | |
| 9:00 | Zoom conference with Court | | |
| 1:00 | IAD, Childs and investigator | | |
| 2:00 | Board Attorney Tony Gaylor | | |
| 3:30 | Sheriff Jones | | |
| | | | |
| Wednesday, June 22nd | | | |
| 9:00 | Jimikia Scott | | |
| 10:30 | Lt. George | | |
| 1:00 | Lt. George (classification) | | |
| 3:00 | Melody Clayton | | |
| 4:00 | Sheena Fields | | |
| | | | |
| Thursday, June 23rd | | | |
| 9:00 | | Lt. Knox | MH Staff and QCHC staff |
| 1:00 | | Sgt. Booking | EMR Review |
| 2:30 | | CID, Homes, Elkins and Edwards | |
| | | | |
| Friday, June 24th | | | |
| 9:00 | Berlinda Jackson | | |
| 10:30 | Detainee Interviews | Doris Coleman | |

5

| 1:00 | Erika Scott | | |
|------|-------------|---|---|
| 3:00 | Exit Interview | | |
| July 11th 1:00 | Sgt. Tillman | | |

## COMPLIANCE OVERVIEW

| Site Visit Date | Sustained Compliance | Substantial Compliance | Partial Compliance | NA at this time | Non-Compliant | Total |
|-----------------|----------------------|------------------------|--------------------|-----------------|---------------|-------|
| 2/7-10/17 | 0 | 1 | 4 | 2 | 85 | 92 |
| 6/13-16/17 | 0 | 1 | 18 | 2 | 71 | 92 |
| 10/16-20/17 | 0 | 1 | 26 | 1 | 64 | 92 |
| 1/26-2/2/18 | 0 | 1 | 29 | 0 | 62 | 92 |
| 5/22-25/18 | 0 | 1 | 30 | 0 | 61 | 92 |
| 9/18-21/18 | 1 | 0 | 37 | 0 | 54 | 92 |
| 1/15-18/19 | 1 | 1 | 44 | 0 | 46 | 92 |
| 5/7-10/19 | 1 | 6 | 42 | 0 | 43 | 92 |
| 9/24-29/19 | 1 | 6 | 47 | 0 | 38 | 92 |
| 1/21-24/20 | 1 | 6 | 49 | 0 | 36 | 92 |
| 6/8-12/20 | 1 | 6 | 51 | 0 | 34 | 92 |
| 10/5-21/20 (corrected) | 1 | 6 | 54 | 0 | 31 | 92 |
| 2/8-11/21 | 2 | 6 | 53 | 1 | 30 | 92 |
| 6/7-11/21 | 2 | 2 | 59 | 1 | 28 | 92 |
| 10/4-8/21 | 3 | 0 | 59 | 1 | 29 | 92 |
| 1/24-28/22 & 1/31 to 2/3/22 | 3 | 0 | 59 | 1 | 29 | 92 |
| NEW INJUNCTION | | | | | | |
| 5/31-6/24 | | | 32 | | 6 | 38 |

## SUBSTANTIVE PROVISIONS

1.  **Protection from Harm**

6

38. Ensure that the Jail is overseen by a qualified Jail Administrator and a leadership team with substantial education, training and experience in the management of a large jail.

**Non-Compliant**

While the previous Jail Administrator met the criteria of this paragraph, when she was terminated by the current Sheriff, her replacement, the Interim Jail Administrator (Frank Shaw) does not meet the requirements for the position because his background is in prison (not jail) operations. His temporary employment was scheduled to terminate on August 1, 2022 (although the Monitoring Team has been informed that it has been extended one month).  During the May/June site visit the question of his replacement was raised.  The Sheriff indicated that he has interviewed one candidate, but to date the Monitoring Team has not been provided with a copy of the advertisement for the position by either County or Sheriff's Office staff.

39. Ensure that all Jail supervisors have the education, experience, training, credentialing, and licensing needed to effectively supervise both prisoners and other staff members.

**Partial Compliance**

As was noted in the 16th Monitoring Report, the command staff of the Jail System do not meet the educational requirements of this paragraph, although their experience is supportive of their positions; however, the resumes and background information on the individuals who have been promoted between March and June, 2022, have not yet been received from the Sheriff's legal counsel.  Consequently, it is not possible to determine whether or not those individuals are qualified.  Those promotions include one Captain, one Lieutenant, two Sergeants and the Compliance Officer. Although some of the supervisors have completed on line training for Jail Administrators, the American Jail Association training requested by the prior Jail Administrator is still waiting on approval from Budget.

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail housing units.

**Partial Compliance**

While policies and procedures that have been developed during the monitoring process reflect the principles and dynamics of "Direct Supervision", the implementation of that practice has been a total failure at the RDC.  Direct Supervision is not in place in any of the three housing pods of that facility, primarily due to the lack of staff.  Direct Supervision was supposed to have been implemented in C-Pod when it was re-opened in October 2020, after it was restored for the

second time since the riot of 2012. The plan that the Sheriff's Office intended to follow was to then implement Direct Supervision in B-Pod once it was renovated. In fact, that never happened; instead, the situation has gotten worse over time.

Today, Direct Supervision is not in place at the RDC. As a result, damage to the recently renovated B and C Pods continues to occur because the inmates in those areas are unsupervised continuously by an officer inside each housing unit. As an example, it was noted in the last Monitoring Report (#16), that the officer's bathroom door in HU C-2 had been ripped off its hinges and that the interior of the bathroom was destroyed. In addition, the adjacent fire hose box could no longer be closed or locked and the fire hose was missing. This occurred because the HU was left unattended for extensive periods of time. During the May/June site visit, the Corrections Operations Member of the Monitoring Team noted that the damage had still not been corrected. Both incident reports and Post Assignment Sheets reflect that officers are not present in the Housing Units. Further, the current level of staffing makes Direct Supervision operation a practical impossibility. This fact was confirmed by the Interim Jail Administrator on May 31st, when he acknowledged that Direct Supervision was not possible at this time due to the shortage of staff.

The failure to implement and maintain Direct Supervision has implications affecting fire safety as well. Since some fire hose boxes in the housing units have been damaged, those units no longer have fire hoses in them. This even occurs in the "horseshoe" corridor that goes around each pod control room. The hose box in that area adjacent to B-1 and B-2, which was damaged prior to the January site visit, has yet to be repaired. Consequently, there is no fire hose at that location in spite of the fact that this corridor is supposedly an area under the control of staff. In addition, because there are no officers working continuously inside the housing units, the fire extinguishers have been removed from them and are now held inside the respective control rooms.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Injunction, and allow for the safe operation of the Jail.

**Non-Compliant**

The RDC is significantly understaffed. The situation is so critical, that during the May/June site visit each of the three housing pods were observed to have only one officer in the control room and one officer (generally a supervisor) on the floor responsible for four housing units and two isolation units. The level of staffing has never been this low during the previous five years of monitoring. When questioned as to the number of personnel on board, the Jail Administrator and County representatives were unable to say what the number was. However, the HR Director subsequently confirmed that the number of filled positions had dropped to a new low of 175 in May. During the past five years of the monitoring process, the highest number of filled positions ever

reported was 256.  It should be noted that the most recent Staffing Analysis (October 2021) calls for 329 positions to operate the WC and RDC (B and C Pods), assuming that A Pod is closed; 351 positions with two housing units in A-Pod open.  That means that only 53% of the positions required to operate the Jail System are filled even if A Pod is closed. With respect to RDC, the staffing analysis requires 258 positions with two A-Pod units open (currently all four units are open). There are currently 108 positions at RDC filled, a staffing level of 42%.

During the May/June site visit, the Corrections Operations Member of the Monitoring Team found that staffing was so short that a Sergeant was the only officer on duty to monitor the entire C-Pod and that he had not made any log entries for C-4 (segregation) or C-4 ISO (suicide watch) for the duration of his shift.  Similar conditions were found in B-Pod which is also supposed to be operated as a Direct Supervision housing area.  In A-Pod, which has never been staffed for Direct Supervision, the situation was much the same. Although the HCSO has not yet produced the requested Post Assignment Sheets which were supposed to be available to the Monitoring Team prior to May 31st, some of those Post Assignment Sheets were included with IAD investigative reports which were made available.  A review of those documents revealed that Pods A, B and C are routinely staffed with only a control room officer and one floor officer.  In many cases, only a control room officer is assigned, with no one scheduled to work the floor (all four housing units and two ISO units).

Incident Report 22-1398 is reflective of the critical nature of this problem.  On June 19, 2022, the C-Pod control room officer heard noises coming from the ceiling above the control room.  Subsequently, it was determined that two inmates, who were supposed to be under constant observation while on suicide watch in C-4 ISO, had ripped the light fixture out of the ceiling and escaped from the ISO Unit.  Obviously, there was no officer present providing "constant supervision" and making 15-minute log notations, or else this could not have happened.  Such a breach of security is inexcusable.

The lack of adequate supervision is reflected in the numerous assaults that continue to occur at RDC. From February through May there were 39 assaults resulting in 11 hospital transports. The extent of the injuries is seldom listed in the reports. However, one inmate suffered 5 puncture wounds in the torso. There continue to be concerns that the number of assaults is underreported. Three assaults were discovered from the hospital transport list. For one, there was no corresponding incident report in the narrative spreadsheet. However, the Rapid Notification on this incident included the incident report. It is concerning that the report did not appear in the narrative spreadsheet. Two additional assaults were discovered from the hospital transport list noting the detainees to be transports as a result of assaults. The incident reports did not identify the incidents in the narrative as assaults (IR #'s 220208 and 220295). In addition, in interviews of

9

detainees, one detainee stated that he was assaulted when other inmates slammed and pinned his arm in the cell room door. Other inmates came to his rescue. There was no officer on the unit and he did not report the assault.

The amount of contraband is also reflective of the lack of supervision. In the shakedown of A and C-Pods on March 18, 2022, 67 shanks, 23 cell phones and 22 lighters were recovered. Numerous incident reports report inmates going through the roof to retrieve contraband. In IR #220357, an inmate in a red jumpsuit is observed on the roof. While observing him, an inmate in a green jumpsuit is seen walking along the back perimeter. Inmates also move about within the facility. In IR#220439, the A-4 rec yard door had been stopped open and two A-4 inmates were in the rec yard with A-3 inmates. In IR #220440, an inmate popped open the cage door of C-4 and went to C-3 and from there into the Great Hall.

Based on a review of suicide logs it now appears that both B-4 ISO and C-4 ISO are being used to hold inmates under suicide watch.  In addition, some inmates are locked inside single cells within those ISO units, which makes it impossible for the assigned watch officer to continuously observe them.  Suicide watch practice and Jail policy calls for those inmates to be held in the dayroom area of the ISO unit.  This problem was seen first hand by the Corrections Operations Member of the Monitoring team during the May/June site visit in C-4 ISO.

During this monitoring period, there were two disturbing incident reports indicating that suicidal inmates are not promptly referred to Medical or put on suicide watch. In IR#220463 the officer reported to the Sergeant that an inmate was suicidal. The Sergeant reportedly said to leave him in the cell and leave him alone. The report states that the inmate was later put in a suicide smock in his cell. Even more troubling, in IR #220385 the officer reported to the Sergeant that an inmate was suicidal. The Sergeant reportedly responded "We don't have the staff to be dealing with this stuff tonight." The officer then told a different Sergeant who sent a nurse and the inmate was put on suicide watch.

Some suicide watch officers explain their failure to make 15-minute notations on the Suicide Observation Logs by adding notations in the Comments section, such as: "Due to Shortness of Staff And going to Medical"; "Due to Shortness of Staff Checks will be irregular"; "…0300 Hrs I (name) 10-8 to Front Desk"; and "Due to short staff, the recommended observation times will be delayed periodically."  There continue to be concerns about the reliability of the suicide watch logs. During the site visit, the team visited B-Pod. There was an inmate in a suicide smock in B-4 ISO. There was no officer providing constant supervision. When questioned why there was no officer outside the ISO unit, it was reported that the only officer on the Pod was assisting the movement of inmates in B-1. When exiting B-3, an officer had come to sit outside of the ISO

unit. However, upon the Monitor circling the horseshoe, that officer was observed to enter the control room and enter multiple times on the suicide observation log.

Adequate supervision of detainees in Segregation is also not documented. The Segregation Logs provided by the HCSO reflect inconsistent compliance with expected procedure.  Segregation Log sheets are supposed to be maintained for each inmate held in a confinement/segregation status.  The inmates are housed in C-4 and B-4, yet the sheets were maintained for inmates in various housing units in A-Pod.  Intermixed with them were Suicide Watch logs as well as Booking holding cell logs.  Based on observation of actual practice while on site, it is apparent that all of these logs, with the exception of Booking, are still being maintained inside the control rooms, not on the floor or inside the housing units.  That fact brings into question the validity of such documentation because it cannot be physically accomplished at the actual times indicated on the logs; rather, it can only be done through periodic entries covering an hour or two, or more, at a time.

Ideally, the 30-minute Segregation Log sheets should be posted by each cell where an inmate is locked down.  However, since there are no officers present inside segregation housing units, the sheets would be torn down and destroyed by the inmates.  The procedure put in place called for a log book to contain a separate sheet for each inmate that would be maintained by the assigned officer(s).  In practice that has not occurred.  Instead, log sheets have been kept inside the control rooms which means that floor officers routinely go into the control room, even though it is supposed to be a restricted area.

In order to address the lack of staff, early in his term in office, the Sheriff prepared a new pay plan for Detention Services that included bi-weekly pay, a higher salary schedule and a step plan based on longevity and performance.  This proposal was provided to the Board of Supervisors, but not as a formal request.  Instead, it is seen by both the County and Sheriff as a proposal for future consideration. The bi-weekly pay plan and direct deposit have been implemented. However, the other components of the plan have not been adopted. The adoption of these components should be given high priority so that Hinds County can remain competitive in the marketplace.

At present, there are enough medical staff to fulfill the terms of this Injunction and allow for the safe operation of the Jail.  Although it has continued to be difficult to hire permanent nurses, the use of per-diem nurses has addressed what would otherwise be a shortage of nurses.

On the other hand, there is an extreme shortage of mental health staff required to fulfill the terms of this Injunction and allow for the safe operation of the jail.  At present, the mental health staff consist of one QMHP/Mental Health Coordinator, two additional QMHPs (one of those positions

is currently vacant, but there is an active effort to fill that position), one psychiatric nurse clinician, and one very part-time psychologist (who currently works less than one day/week).

In early 2022, the monitor and the Mental Health Coordinator performed a mental health staffing analysis for QMHPs.  At that time, there were 200 detainees on the mental health caseload (all actively in treatment), 150 of whom were considered seriously mentally ill (SMI); there were on average 25 new mental health assessments performed each week; emergency and urgent mental health interventions (including suicide assessments and the monitoring of detainees on suicide watch) consumed about 23 hours/week; and then in addition, there was the time required to develop initial treatment plans and periodically review treatment plans, monitor all detainees being held in segregation, and perform various administrative tasks.  That analysis revealed that in order to perform all tasks, consistent with existing policies and procedures, 179 hours of QMHP time would be required (about 4.5 FTEs/about 1.5 more FTEs than is currently budgeted and 2.5 more than is currently on site).

Since the time of the above noted staffing analysis, the mental health caseload has continued to grow (it is now about 260 detainees, about 200 of whom are SMI), as has the number of hours required to perform most of the above noted tasks.  Given the significant shortage of QMHPs, staff is forced to prioritize the most urgent tasks (such as performing initial mental health assessments, managing suicidal detainees, and the monitoring of detainees being held in segregation), while other important tasks (such as rapidly following-up on detainees who were unable or unwilling to participate in an initial mental health assessment, treatment planning, and providing individual and group therapy sessions) are not consistently performed in a manner outlined in existing policies and procedures.

It is important to note that the current shortage of detention staff also impacts on the ability of medical and mental health staff to fulfill the terms of this Injunction, and allow for the safe operation of the Jail.  More specifically, as a result of the shortage of detention staff, there are times (especially during evening and weekend hours) when there is no detention staff in the medical department, including in medical observation; there are times when there are not enough detention staff to adequately supervise special placements, such as suicide watch; there are times when detention staff are not available to bring detainees down to the medical department for evaluation and treatment of medical and/or mental health difficulties; and there are times when there are not enough detention staff on some of the units to support the provision of medical and/or mental health services on the units, including medication pass and medical and/or mental health evaluations and treatment.

44. Develop and implement policies and procedures to ensure that detention officers are conducting rounds as appropriate.

**Partial Compliance**

While policies and procedures have been developed to ensure that Detention Officers are conducting rounds as appropriate, actual practice is not in compliance.  The incident reports with the multiple fires, assaults, inmate movement, etc. indicate that rounds are not being conducted as needed. The inability to make adequate rounds is undisputed. The Jail Administrator stated in his interview that the Jail does not have enough staff to make rounds (when asked about the electronic rounds system the purchase of which was recommended by the prior Jail Administrator). When there is only one officer on a Pod it is not possible for that officer to provide constant supervision for suicidal inmates and make the required rounds. There is sometimes a Sergeant on the Pod as well although not always. Staffing levels are so low that supervisors have to perform the duties of Detention Officers.  That means that supervisors are unable to accomplish their jobs.  See paragraphs 41 and 42, above.

45. Ensure that all correctional officers receive adequate pre- and post-service training to provide for reasonably safe conditions in the Jail.
> c.    "Direct supervision" training. Detention officers must receive specific pre- and post service training on "direct supervision." Such training must include instruction on how to supervise prisoners in a "direct supervision" facility, including instruction in effective communication skills and verbal de-escalation. Supervisors must receive training on how to monitor and ensure that staff are providing effective "direct supervision."

**Partial Compliance**

While new correctional officers (Detention Officers) go through a basic recruit academy, a Field Training Officer Program, and annual in-service training, the Direct Supervision training that was initiated through the National Institute of Corrections (NIC) Train the Trainers Program has not been implemented as was planned.  Based on questioning of staff regarding the principles of Direct Supervision, it was apparent that officers are not familiar with the principles and dynamics of Direct Supervision.  Application of the Direct Supervision concept has not been accomplished.

The Lieutenant in charge of Detention training generally provides a memo outlining what training has been provided to new and current staff during the previous four months, but that document was requested but not provided.  However, during a Zoom conference call with him on June 23, 2022, he provided a verbal update which reflected that new recruits still receive basic academy training and that in-service training is still being provided to existing personnel in spite

of the critical staff shortage.  This is accomplished by paying overtime in half day increments so that off duty officers can attend in-service classes without impacting jail operations.

On-line training for command level staff is available through organizations such as the American Correctional Association, American Jail Association and National Institute of Corrections, but time off to attend remote site training is not practical at this time.  Which facility and Detention commanders have taken advantage of on-line training has not been made available to the Monitoring team.

46. Develop and implement policies and procedures for adequate supervisory oversight for the Jail.

**Partial Compliance**

Supervisors are expected to monitor day to day activities within the Jail, manage compliance with approved policies, ensure that written documentation of incidents is consistent with those policies and also make sure that the physical plant is maintained appropriately and that discrepancies are recorded and corrected within reasonable time frames.

Existing policies require supervisors to review all day to day activities within the Jail System. They must sign off on well-being checks on a shift to shift basis.  While they routinely do so, they virtually never make notations or recommend corrective measures when they find that such documentation is not being kept within standards.  An example of this is when well-being checks are not current or have been missed.  The supervisor's signature appears at the bottom of the page, but he/she does not make amplifying notations.  On numerous occasions, the recording Detention Officer makes comments on the form that it was not possible to comply with the frequency of required well-being checks due to a shortage of staff or because the officer was required to handle multiple posts simultaneously, but the supervisory signature virtually always stands alone—without any comments or recommendations.

Physical plant discrepancies are supposed to be noted and recorded by supervisors, but there is little point in them doing so, since their documentation has no impact on corrective action.  To the County's credit, Benchmark Construction was brought on board several years ago to address and follow up on maintenance issues.  On the part of the Sheriff's Office, the Chief Safety and Security Officer was created at about the same time to coordinate HCSO requests for service with the County.  Prior to that there was no record of what problems were identified and the status of any actions taken to correct them.  Today, the monthly Benchmark report on outstanding maintenance issues is one of the most valuable tools for monitoring the status of corrective action.  (Although, as noted above, the May and June Benchmark report has been requested but not

received).  Unfortunately, longstanding matters, such as the need to create a safety vestibule for the Master Control Center (MCC) in Booking are still in limbo because (as the monthly Benchmark reports note) Benchmark is "awaiting directive" or "awaiting proposal".

Progress is being made in such areas as the kitchen where new food carts and trays have been put on line.  In addition, two eight-person picnic style tables are being installed in each standard Housing Unit (exclusive of B-4 and C-4, segregation).  This upgrade has taken more than two years to be initiated, but action is finally making it possible for some of the 64 inmates in those housing units to have a place to sit in the dayroom and to eat their meals.  Other issues which require prompt action include the two chillers which provide air conditioning for the facility.  In the March 31, 2022, Benchmark report both chillers were listed as inoperable.  In the April 27, 2022, Benchmark report only the Trane chiller was noted as operational while the York chiller was still "awaiting repair".  Washers and dryers have similarly been out of service for a period of approximately six months.  As of May 31st, two washers and two dryers at the RDC were still inoperable.  The most recent Benchmark report provided to the Monitors stated: "proposals submitted for 2 washers and 2 dryers". The Monitoring Team has not received the May and June Benchmark reports to provide up to date information.

The issue of inoperable cameras is recorded in Benchmark reports going back to at least June 2020.  Since that time little was done until recently, but all cameras in B Pod are now functional and similar repairs for C Pod and external areas of the RDC are planned.  Go Pro cameras, which are used during shakedowns, have not been available at the RDC for a similar time frame.  To date the Monitoring Team has not been provided documentation regarding their repair or replacement.

Over two years ago the key operated locking mechanism malfunctioned on the entry door to the Booking office directly across from the one person holding cells.  Since then, it has not been repaired.  Instead, Booking staff had to retrofit a sliding deadbolt that requires an officer to leave his/her post to open and then secure the door every time someone wants to enter or leave the office.  According to the Booking Sergeant who was interviewed on June 23, 2022, this relatively simple mechanical problem has still not been corrected.

While work has been undertaken to repair malfunctioning security doors, they still exist, even in the renovated B and C-Pods.  During the walk through of the RDC on May 31st, the outer security door to C-3 was found to be inoperable.  Even when doors do function properly the staff do not routinely operate them according to procedure.  The Corrections Operations Member of the Monitoring Team was able to walk into C-4 (Segregation) without assistance from the control room officer because both safety vestibule doors were standing ajar.  All safety vestibule doors are

15

supposed to be opened and closed one at a time so that security to a particular area is not breached. There was one IAD report on April 14, 2022 in which an officer was investigated for leaving the doors open (and abandoning her post in Master Control). She stated that she left the doors open because "she does not feel like turning around to keep opening the doors." It is good that this was investigated, however, subsequent incident reports make clear that this practice continues. In May, there were no less than 3 incident reports (IR#s 220440 (C-4), 220448 (B-1), and 220464(C-4 ISO)) in which an inmate was able to leave his housing unit and reach the great hall.

Inmates continue to break out of the RDC, but not to escape to freedom; rather they break out in order to pick up contraband items and take them back into the jail. Incident Report 220417 is representative of this sort of activity. On May 4, 2022, inmates were discovered on the roof "…receiving several packs that was being thrown over the fence." They had broken out of their cells in A-Pod and escaped through the roof, but they were not trying to flee the facility; they were "escaping" only so that they could recover contraband.

There has been progress with regard to the implementation of policies and procedures focused on improving the supervisory oversight and management of SMI detainees. A representative from Classification has been meeting with mental health staff on a regular/often daily basis to discuss the classification and placement of some of the more difficult SMI detainees. The reconstituted and re-energized Interdisciplinary Team meetings, now involving supervisory staff at the highest levels, focus on and attempt to collectively address a range of problems involving SMI detainees. However, there are two issues that compromise the effectiveness of these important efforts. The first is that in the absence of a mental health/special housing unit, there continues to be no alternative placement, other than segregation, for the most acutely ill SMIs, where they would be safe and able to receive the more intensive course of treatment they require (see paragraph 77). Placed in segregation, they remain inadequately treated and unstable. The second issue is that there continues to be a need to incorporate mental health assessments into the disciplinary review process, so that the best interdisciplinary interventions can be designed for SMI detainees charged with disciplinary infractions at that point, instead of after they have spent some time simply being held in segregation (see paragraph 77).

## 2.    Use of Force Standards

50. Develop and implement policies and procedures to regulate the use of force, including policies and procedures to ensure timely notification, documentation, and communication with supervisors and medical staff (including mental health staff) prior to and after any use of force.

**Partial Compliance**

While the Use of Force Policy has been in place for over two years, supervisors rarely, if ever, make comments or findings regarding the actions of officers involved in UOF situations. The HCSO does, however, follow up routinely on UOF cases with an IAD investigation.

To date there is no record of medical and mental health staff ever being notified in advance of a UOF incident; but inmates who have been involved in UOF cases are generally taken to Medical for examination. A glaring exception to this was the use of a taser in Booking on May 19th. See, below.

Because tasers are now carried by Lieutenants and most Sergeants, the use of tasers, instead of OC, has increased dramatically. The increase is also driven by the fact that supervisors are frequently called upon to do the jobs of Detention Officers because of the shortage of staff. According to IAD investigative reports of UOF cases, tasers are now used more frequently than OC (see paragraph 68). In April, OC was used four times and tasers once according to incident reports. In May, Tasers were used 6 times and OC used twice.

The following UOF cases are reflective of the fact that UOF involving both tasers and OC spray continue to be used contrary to policy when an inmate refuses to comply with an officer's verbal directive. In each case a taser or OC spray was deployed when the inmate failed to comply. In some instances, the report states that the inmate became "aggressive" but did not threaten physical injury to the officer or other inmates; in others aggression is not noted. In IAD 2022-009, IR 220157 a Jail Investigator deployed his taser when an inmate refused to step away from him as he was conducting a search of the detainee's cell. In IAD 2022-012, IR 220190, an inmate indicated that he was suicidal while being seen by a nurse in Booking. He became irate and began destroying County property. An officer sprayed him with OC after he had ceased acting out. This was confirmed by a review of surveillance tape. In IR #220473, OC spray was deployed when an inmate would not go into his cell. No aggressive behavior was noted. In IAD 2022-023, IR# 220159, an inmate in Booking refused to complete the intake process. He became aggressive, used profanity and attempted to spit on officers. Rather than place him in a holding cell until he calmed down, a Detention Officer sprayed him with OC.

On March 18, 2022, officers from Rankin County conducted a shakedown of the RDC. According to the Sheriff, outside assistance was requested because of confidential information that some HCSO staff were possibly involved in the introduction of contraband to the facility. While there were supervisory and investigative HCSO personnel present during the shakedown, they did not command the scene. Consequently, nothing was done when the Rankin County officers deployed bean bag shotguns on approximately seven inmates who did not comply with their verbal directives even though, a number of the Rankin County reports indicate that the UOF was in direct violation

of the HCSO UOF policy. See, e.g., UOF reports on L.H., D.H., B.M. The only discernable UOF on the videos provided show a shot fired on inmate laying on the floor. IAD did not review or act on the UOF stating that Rankin County would be responsible for reviewing the UOF. See, IAD Weekly DOJ Compliance Report for March 14-20, 2022. If outside agencies are going to continue to be used for shakedowns, it is imperative that the HCSO adopt policies and procedures to supervise those agencies such that excessive force is not used in the facility contrary to HCSO's policies.

Several uses of force incidences appeared to be mental health related…for example, on 5/19/22 a taser was used "to prevent suicide", 5/19/22 a taser was used for "uncontrolled behavior", and on 5/20/22 a taser was used when a detainee "said he wanted to kill himself" but then "refused to change into a suicide smock."

Consultation with medical and mental health staff following use of force incidences remains inconsistent.  An example of why this is so important can be found in the case of DM, a 64 year old male, who was admitted to the facility on the evening of 19 May 2022, tased that evening, but not taken to medical after he was tased (IR# 220472).  DM had a history of paranoid schizophrenia, was crying and cursing and was likely combative.  Several days later he was hospitalized in status epilepticus and ended up on a ventilator; it was also reported that he had an underlying cardiac condition; and then in addition, there was the acute episode of schizophrenia. Given his age and these medical and mental health findings, the use of the taser on him could have been a life-threatening event and/or a further disorienting event, which is why post use of force medical and mental health assessments are so important. It is critical that officers understand the importance of medical treatment following the use of force. Tasers are potentially lethal and life threatening.  It is also essential that they understand the importance of using de-escalation and less intense force before using Tasers which is not evident from the incident reports.

### 3.      Use of Force Training

52. The County must develop and implement a use of force training program.

**Partial Compliance**

There has been no change in the status of this paragraph since the last reporting period. UOF training is provided to all new recruits during basic academy orientation.  In-service training continues for existing staff. The requested training status report has not been provided. This paragraph continues in partial compliance because the records provided to date and the interview of the training supervisor do not indicate that all staff have been trained on UOF.

53. Topics covered by use of force training must include:

      a.      Instruction on what constitutes excessive force;

18

b.      De-escalation tactics;

c.      Methods of managing prisoners with mental illness to avoid the use of force;

d.      Defensive tactics;

e.      All Jail use of force policies and procedures, including those related to documentation and review of use of force.

**Partial Compliance**

There has been no change in the status of this paragraph.  The UOF training includes a continuum of appropriate force responses to escalating situations, de-escalation tactics and defensive tactics, but it does not yet include specific measures for managing inmates with mental illness, nor does it include scenario-based training. As noted above, it does not appear from the incident reports that de-escalation techniques or lower-level use of force is being used before OC spray or tasers. This would appear to call for additional training in this area.

55. The County must update any use of force training after any revision to a use of force policy or procedure.

**Partial Compliance**

Since the UOF Policy was approved and implemented in February 2020, UOF training has been provided to both supervisors and officers through the in-service training program.  Since that time Lieutenants and some Sergeants have been issued tasers in addition to OC.  Accordingly, the use of tasers has increased significantly, primarily because Sergeants and Lieutenants have had to become more involved in day to day activities as substitutes for officers in the pods due to the critical shortage of staff.  That shortage of staff has also led to OC and tasers being deployed when an inmate fails to comply with a verbal order and appears to be "aggressive".  Whereas, in the past "hands on" would have been the intermediary step, today OC and tasers are used. This may be because of inadequate training regarding the use of de-escalation and intermediate levels of force or because there are no, or an insufficient number of, officers available to take that action to assist in addressing challenging situations. Either way, because of the introduction of tasers in the facility, the UOF policy should be revised to more specifically address the use of tasers and/or training should be provided on the use of tasers.

#### 4.      Use of Force Reporting

56. Develop and implement use of force reporting policies and procedures that ensure that Jail supervisors have sufficient information to analyze and respond appropriately to use of force.

**Partial Compliance**

19

There has been no change in the status of this paragraph.  Although the UOF policy was adopted over two years ago and training has continued since that time, supervisors still do not seem to be aware that they are to do more than merely "sign and send" UOF reports up through the chain of command.  UOF reports continue to be deficient, see, paragraph 58 below, but they are noted to be approved. This matter has been discussed in each recent Monitoring Report, but the results are still the same.  It may be time for command staff to implement a policy that requires comments/recommendations/findings on the part of supervisors, and that without those notations, the reports must be rejected until appropriate documentation is incorporated into them.

The ability of supervisors or IAD to sufficiently evaluate the UOF continues to be compromised by non-functional cameras. It is fairly common now for the incident report to state that the inmate acted aggressively. The IAD reports do not typically indicate any review of video footage. In one report, video footage was requested but not received. Without the ability to review video footage the appropriateness of the UOF can't be confirmed. See, e.g., IAD #2022-034.

57. Require each staff member who used or observed a use of force to complete a Use of Force Report as promptly as possible. Staff members must accurately complete all fields on a Use of Force Report.

**Partial Compliance**

There has been no change with regard to this paragraph.  The IR spreadsheet provides information regarding UOF incidents, but they are sometimes mis-identified/titled even when UOF was involved.  A review of the incident narrative spreadsheet indicates that the UOF field is more consistently checked, however not uniformly, see, e.g. IR#220440, IR#220157, IR#220190, IR# 220473 (in this case, UOF was checked "No" when the narrative states the inmate was sprayed). The Monitoring Team has not received the additional reporting required when the field is checked but will require this documentation in the future. Generally, supplemental reports are provided by other officers involved in a UOF incident, however, this is not consistently the case. See, e.g., IR #220471 and IR #220473.

58. Ensure that Jail use of force reports include an accurate and detailed account of the events.

**Partial Compliance**

There has been no change in the status of this paragraph.  UOF reports routinely lack witness statements and they never specify the classification of the housing area where the incident occurred.  As was recommended in the 16th Monitoring Report, all staff need to recognize the importance of making their reports be able to stand alone.  That means that the uninformed reader should be able to determine what transpired simply by reading the report, without interpretation or

supplemental information from the author.  In IR 220159, the involved officer never identified witnesses who could substantiate what he did to bring a disruptive inmate under control.  There is no reference to video coverage of the incident and there was no supervisory supplement included.  Even a review of the IAD investigation (IAD 2022-023) did not include that information.  IAD 22-050/IR 22-0392 is another example of deficient reporting.  OC was used to force an inmate to give up his underwear.  He was on suicide watch at the time in HU B-1 ISO.  The responding Sergeant simply stated that the inmate was "…being non complaint (sic) and had to be sprayed." He never addressed the question of how an inmate on suicide watch obtained unauthorized clothing, whether or not the assigned suicide watch officer was actually on post or where the officer who used OC was assigned.  That officer indicated that he was notified by "…floor officers in B-pod…".

IAD 22-055/IR 22-0440 is another example.  An officer working in C-Pod reported that an inmate "…popped C-4 cage and went to C-3 cage…", he then ran out to the Great Hall.  The UOF occurred there when a Lieutenant used his Taser on the inmate.  Nowhere is there any mention of how an inmate could pop the C-4 cage door.  C-Pod has been completely renovated two times since the riot of 2012, and it is now supposedly secure.  Neither is there information on how the inmate could have gotten out to the Great Hall.  If the primary security door leading from C-Pod to the Great Hall had been closed and locked, that would have been impossible.

In IR# 220257, the Rankin County officers involved in the shakedown were never informed by HCSO investigative and command staff (who were present) that they were acting in violation of the HCSO UOF Policy by deploying bean bag shotguns on inmates who failed to comply with their verbal orders.  See, paragraph 50, above. Further there were no witness statements included in the report package.

59. The County must ensure that Jail supervisors review, analyze, and respond appropriately to use of force.

**Partial Compliance**

Reference is made to the 14th, 15th and 16th Monitoring Reports.  It is redundant to repeat the comments regarding this paragraph again, but nothing has changed.  Supervisors are so busy filling in for Detention Officers (due to the shortage of staff) that they have no time to properly fulfill their expected duties.  While they do notify the appropriate chain of command and investigative authorities, they do not evaluate incidents, reach conclusions and make recommendations as required. See, e.g. IR# 220157, #220190, IR#220473 all of which are shown as approved with no indication of evaluation of the conduct. None of the IAD investigative reports reflect review by supervisors not involved in the original incidents.  If, this in fact being done, it should be included in the IAD report that determines whether or not an officer's use of force was exonerated or was in violation of the UOF policy.

21

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift. All level 1 uses of force must also be reviewed by a supervisor who was neither involved in nor approved the use of force. The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

**Partial Compliance**

Policies have been put in place which require supervisory review of all UOF incidents.  The quality of UOF incident reports has improved over time (although still deficient, see paragraph 58 above) and, while supervisors routinely do not make comments or recommendations regarding the appropriateness of the force used, they do document what transpired when they were participants in the incident.  The Incident Narrative Spreadsheet had included a spot for supervisory comments by a supervisor who was not directly involved although it was not being used.  However, that column has been removed from the spreadsheet. There is no documentation or other indication that supervisors are completing the review required by this paragraph. See, paragraph 50, above.

## 5.  Incident Reporting and Review

63. Develop and implement incident reporting policies and procedures that ensure that Jail supervisors have sufficient information to respond appropriately to reportable incidents.

**Partial Compliance**

The status of this paragraph remains unchanged.  Even though Policy 1-500, Incident Reports, was approved and adopted over two years ago, and training continues, compliance is dependent upon an improvement in the quality of reports.  They need to reflect all aspects of the incident with enough detail, and verification from witness statements or supplements from other involved officers, to simply, completely and accurately summarize what occurred so that supervisors can follow up with appropriate findings and comments. See examples described in paragraph 64 below.

64. Ensure that Incident Reports include an accurate and detailed account of the events.

**Partial Compliance**

Although it is no longer possible to make reference to the Quality Assurance Reports to support the noted problems with accuracy/completeness of incident reports (because with the transfer of

the Quality Assurance Officer, no one is preparing such reports), the following examples are re-flective of the continuing problem.  In IR 220578, Medical Report-Injury on June 13, 2022, an inmate was found "unresponsive" in his cell in HU B-1.  There was no explanation as to how he was found or by whom.  What did other inmates have to say about the situation?  There are no witness statements. On April 30, 2022, a shakedown was conducted in HU A-4 at the RDC. Ex-tensive contraband items were referenced by category but there was no list of items confiscated or pictures of them. (IR#220399). There was no mention made of Go Pro camera use.

As mentioned above in paragraph 46, there is no indication in the incident reports regarding the three separate incidents of inmates gaining access to the great hall, how they were able to exit their housing units and access the great hall or any corrective action that was taken. Similarly, as refer-enced in paragraph 42, there is no indication of how an inmate was found to be walking along the back perimeter and whether any corrective action was taken. Two inmate assaults were discovered by reviewing the list of medical transports both of which were identified in that list as being a result of inmate assaults. Matching the dates and names to incident reports, the incident reports could be located. In IR #220208, the incident report does not list the type of incident as an assault and the narrative does not mention that the reason for taking the inmate to medical was as a result of an assault or any information on the assault or the nature of the injuries. Similarly, in IR #220295 the incident type is listed as an assault but there is no information in the narrative regarding the fact that it involved an assault or any information on the assault or the nature of the injuries.

IR 220417, titled, Security Breach (May 4, 2022) explained how inmates were found on the Roof of A-Pod while retrieving contraband.  What items were confiscated was not noted. As with UOF reports, there appears to be less compliance with the requirement that all officers involved in an incident prepare supplemental reports. See, e.g. IR# 220463 (the narrative report indicates that a Sergeant and two other officers were involved in the incident but no supplemental reports appear in the narrative spreadsheet).

66. Ensure that Jail supervisors review and respond appropriately to incidents.

**Partial Compliance**

There has been no change in the status of these paragraphs since the 16th Monitoring Report was published.  Policy 1-500, Incident Reports, was approved and adopted on April 14, 2021.  Since then, most officers and supervisors have received orientation training on it, but the quality of in-cident reports and lack of follow up by supervisors indicates that additional training is required. Unfortunately, the Quality Assurance Reports, which had proved to be an invaluable resource, are no longer available for the benefit of staff and the Monitoring Team alike.  Command staff

should consider having a quality assurance process, even if that action is no longer specifically required by the New Injunction.

### 6.      Sexual Misconduct

67. To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement policies and procedures to address sexual abuse and misconduct. Such policies and procedures must include all of the following:

a.      Zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations;

b.      Staff training on the zero tolerance policy, including how to fulfill their duties and responsibilities to prevent, detect, report and respond to sexual abuse and sexual harassment under the policy;

c.      Screening prisoners to identify those who may be sexually abusive or at risk of sexual victimization;

d.      Multiple internal ways to allow both confidential and anonymous reporting of sexual abuse and sexual harassment and any related retaliation, including a mechanism for prisoners to directly report allegations to an outside entity;

e.      Both emergency and ongoing medical and mental health care for victims of sexual assault and sexual harassment, including rape kits as appropriate and counseling;

f.      A complete ban on cross-gender strip searches or cross-gender visual body cavity searches except in exigent circumstances or when performed by a medical examiner;

g.      A complete ban on cross-gender pat searches of women prisoners, absent exigent circumstances;

h.      Regular supervisory review to ensure compliance with the sexual abuse and sexual harassment policies; and

i.      Specialized investigative procedures and training for investigators handling sexual abuse and sexual harassment allegations.

**Partial Compliance**

This paragraph was listed as non-compliant in the 15th and 16th Monitoring Reports. The PREA Coordinator had been on leave during those reporting periods and her duties had not been adequately assumed by other individuals. The PREA Coordinator returned to her duties in January and the PREA program is getting back on track.

There are few PREA incidents reported. During this reporting period there was one staff-on-inmate report in January; no incidents reported in February; two reported in March, one inmate-on-

staff and one inmate-on-inmate; the April report was not provided but it does not appear that there were any incidents reported in April; and there was one inmate-on-inmate incident reported in May. The incidents appear to have been adequately investigated. However, the finding reached in one of the investigations is not consistent with the zero tolerance policy of PREA. In the March incident, the result of the investigation was that no physical sexual activity had occurred but that the alleged perpetrator (initially the alleged victim) had asked the victim to engage in sexual activity. The original report found that the victim had been sexually victimized. This paragraph was removed reportedly because there had been no physical activity. However, the request to engage in sexual activity constitutes sexual harassment under PREA and there should have been such a finding.

The PREA Coordinator provides training to on-boarding officers in the training academy. In April, the PREA Coordinator presented at the Academy for on-boarding officers. At the time of the site visit an in-service training was scheduled for the following week. The last in-service training in May 2021 was attended by 128 employees which was less than the approximate 230 employees at that time.

As previously reported, incident reports indicate the need for additional in-service training. In April, IR #220320 stated that an inmate in B-4 set a fire in order to get an officer's attention because other inmates were trying to rape him. B-4 is supposed to be a lock down unit. The inmate was moved to another cell in B-4. This incident was not referred for a PREA investigation and it is questionable whether appropriate protective action was taken. This indicates the need for continued in-service training of officers.

Screening for potential victimization or abusive issues is done by the Booking and Classification staff. The original report in the March PREA case noted that the victim had been sexually victimized previously in a different Hinds County facility and appears to question whether the victim had been adequately screened for possible victimization and housed accordingly. This should be investigated further.

The MOU with the Mississippi Coalition Against Sexual Assault (MS CASA) is in effect and was being utilized at the time of the 13th Monitoring Report. An outside line has been implemented such that inmates can call the Coalition directly from the kiosk in the unit without charge. DOJ has highlighted a problem with reporting through the Coalition in that if the Coalition receives certain federal funds, it cannot pass on any PREA reports without a written release from the inmate. Third party reporting is still available through friends and family. PREA complaints can also be reported through the kiosk directly to the PREA Coordinator or through submitting a grievance at the kiosk.

Both medical and mental health staff continue to provide any clinically indicated emergency and ongoing medical and mental health care for victims of sexual assault and/or sexual harassment. It should be noted that if a detainee alleges having just been raped, the detainee is immediately sent to the hospital emergency room for a full, forensic medical assessment, which includes the use of a rape kit. If there is an actual PREA defined incident, medical staff will perform or facilitate the performance of any indicated assessment and provide any medically indicated treatment; mental health staff will perform an assessment and provide any indicated mental health treatment; and medical and mental health staff will confirm that the PREA officer is aware of the incident.

The MOU with MS CASA also provides for counseling services for persons involved in sexual activity and it appears that individuals have been appropriately referred for counseling.

The PREA Coordinator has put up posters in the housing units with PREA information. She has also prepared pamphlets that are provided to new bookings. In addition, she reports that a TV has been is now being used in the ID room of Booking with a 16-minute video informing the inmates about PREA and the reporting process. This is a good step forward. In the past, the PREA Coordinator had completed education sessions with inmates by coordinating with a group being conducted by the discharge planning nurse. This may or may not have been the appropriate group of inmates if they were, in fact, close to discharge. Even so, these groups have not been continued. Some format for education sessions with inmates should be considered. The education process needs to continue to be expanded. The PREA Coordinator also reported that she does walk-throughs of the housing units during which she talks with inmates about PREA.

One ongoing concern related to the ability to provide for sexual safety and adequately investigate allegations is that in February, the prior Detention Administrator reported that at RDC, 56 cameras were not working, 14 were missing and 10 needed adjusting. Investigative procedures should not only include a review of medical and mental health records, but also include interviews with identified medical and mental health staff.  Medical and mental health staff often have a fuller understanding of the case than is reflected in the records.

Medical and mental health staff provide both emergency and ongoing medical and mental health care for victims of sexual assault and sexual harassment, whether such cases are referred to staff by the PREA Coordinator or first identified by medical and/or mental health staff (in which case they would then also be referred to the PREA Coordinator).  When there is an alleged rape, the victim is immediately sent to the hospital for a full forensic medical assessment, which includes the rape kit.

### 7.    Investigations

68. The County shall ensure that it identifies, investigates, and corrects misconduct that has or may lead to a violation of the Constitution.

    a.    Develop and implement comprehensive policies, procedures, and practices for the thorough and timely investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury.

    f.    Provide the Monitor and United States a periodic report of investigations conducted at the Jail every four months. The report will include the following information:

        i.    a brief summary of all completed investigations, by type and date;

        ii.    a listing of investigations referred for administrative investigation;

        iii.    a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

        iv.    a listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures. This list must also contain the specific misconduct and/or violation.

        v.    a description of any corrective actions or changes in policies, procedures, or practices made as a result of investigations over the reporting period.

**Partial Compliance**

Investigations are handled by two separate units within the HCSO.  Criminal Investigations (CID) handles incidents that occur within the jail facilities much as they would for offenses that occur on the street.  The advantage of having dedicated investigators handle all Detention cases is that they are familiar with the operations within the facilities.  Internal Affairs (IAD) handles cases that involve the actions of officers, such as UOF incidents, to determine the appropriateness of their actions.

From January through April CID conducted 75 investigations.  The information for May has not yet been provided.  Of those cases, 29 were Assaults, eight were Aggravated Assaults, 23 dealt with Contraband, four were classified as Information, one was Investigation of Staff, one was Property Damage, one was a Shakedown, one was classified as an Escape and seven were Arsons.  CID referred five cases to IAD, four Internally, five to an Outside Agency and 29 to the Grand Jury.   A breakdown of those investigations as to location within the RDC revealed that 21 occurred in A-Pod, 11 in B-Pod, 16 in C-Pod, seven in Booking and one in Medical.  The remainder occurred at the WC or Henley Young.

From January through May, IAD initiated 61 investigations.  They were classified as follows: three, Conduct Unbecoming; two, Job Abandonment; eight, Fact Finding; 15, Violation of General Orders; and 33, Use of Force.  Of the UOF cases, 15 involved the use of a taser, OC was deployed in 11 cases and Hands On action was used in six cases.  In one instance shotgun fired bean bags were used by officers from Rankin County who were brought in to conduct a shakedown at the RDC.

In all of the investigations provided during this reporting period, the officers using force were exonerated even though there were a number of incident reports that did not support the level of force used. See, paragraph 50. The following UOF cases are reflective of the fact that UOF is now routinely exonerated by IAD when an inmate refuses to comply with an officer's verbal directive.  In each case a taser was deployed when the inmate failed to comply and became "aggressive" but did not physically attack the officer or other inmates.  In IAD 2022-009, IR 220157 a Jail Investigator deployed his taser when an inmate refused to step away from him as he was conducting a search of the detainee's cell.  In IAD 2022-023, IR# 220159 an inmate in Booking refused to complete the intake process.  He became aggressive, used profanity and attempted to spit on officers.  Rather than place him in a holding cell until he calmed down, a Detention Officer sprayed him with OC. The most questionable IAD investigation noted during the past four months was #2022-012, in which the involved officer was "exonerated" even though she deployed OC on an inmate after he had been brought under control.  The IAD report states that "A review of surveillance tape showed that he (the inmate) was no longer destroying any property at the time he was sprayed."

CID investigations continue to fall below this requirement. CID investigations tend to be brief and lacking detail.  They list the inmate(s) involved but seldom, if ever, include witness statements, whether or not video recording of the event was available or examined, infrequently indicate whether or not a referral was made to IAD or to another appropriate area/agency.  In most instances the case is listed as resolved with no further action required because the victim failed to identify who caused him harm.

## 8.      Grievance and Prisoner Information Systems

69. The grievance system must permit prisoners to confidentially report grievances without requiring the intervention of a detention officer.

**Partial Compliance**
There has been no change in the status of this requirement. The County has installed a kiosk system that allows detainees to file grievances without the intervention of a detention officer.

However, there are some gaps in access to the kiosks. There are no kiosks in Booking where people are inappropriately housed as well as no kiosks in the ISO units.

The grievance policy provides that an inmate may submit a written grievance and will be provided a form and an envelope that can be sealed. This can be given to the housing officer or the area supervisor when he or she is doing their rounds. This would allow an additional avenue to submit a grievance confidentially although not without some involvement of a Detention Officer. However, detainees are not informed that they may request a written grievance form so this avenue has not been made available to them. Paragraph 72 below requires that the grievance system accommodate individuals with cognitive, literacy or language barriers. The failure to do so impacts compliance with this paragraph in that detainees with those barriers cannot confidentially report grievances. The grievance policy requires that if there are cognitive or communication barriers, the Detention Officer refers the issue to the Area Supervisor for communication assistance or problem resolution. It does not appear that this provision of the policy has been implemented or that the inmates have been informed of it. In addition, without an officer regularly in the units, an inmate would not have easy and confidential access to a Detention Officer.  It is reported that the kiosks now have a Spanish speaking format. This will be confirmed during the next site visit. Persons with disabilities still require the intervention of another inmate or officer.

71. All grievances must receive appropriate follow-up.

**Partial Compliance**
As previously reported, the Grievance Coordinator maintains a spread sheet to track the grievances and grievance responses. Many of the fields are pulled electronically from the Securus system. However, she has to manually add the type of grievance, the date of response, and the date of an appeal. The Grievance Coordinator previously reported that some officers do not respond to grievances through the Securus system and, as a result, there is no documentation of a response to some grievances. This appears to be a significant problem. The timeliness of responses is also an issue. Standard grievances are supposed to receive a response within 7 days. Emergency and medical grievances are supposed to receive a response in 24 hours.

Only the May spreadsheet was provided for this site visit. A new "glitch" was observed in the May spreadsheet. A number of grievances had the words "Auto System Update" in the column where the date for the response should have been. The Grievance Coordinator explained that when this appears, it is not possible to enter a response. These are tallied separately. IT needs to address this issue. In May, 6 Emergency Grievances had no response with 3 additional Emergency Grievances having no response due to the "Auto System Update." Fifteen Emergency Grievances had a late response. As noted in prior reports, it appears that many of the emergency

grievances are not emergencies, but that is not known until the grievance is reviewed. Also as stated before, the Grievance Coordinator has also suggested that a timely response to emergency grievances could be better ensured if the system had an alert signal for emergency grievances. The Grievance Coordinator works regular business hours and will not see an emergency grievance submitted in the evening or on the weekend until the next business day.

With respect to regular grievances, in May, 15 regular grievances had no response with an additional 5 having no response due to "Auto System Update."  Twelve grievances had late responses. Two Medical grievances had a late response. In total approximately 25% of grievances had a late or no response.

One response to a Medical Grievance was problematic. The detainee submitted the grievance on May 10th. A timely response on May 11th stated that he would be seen that day. He submitted an appeal of the grievance stating that no one came to get him for Medical on May 11th. The response to the appeal was submitted on May 30th saying that he had been seen on May 29th. The medical records indicate a different course of events in which the inmate was seen repeatedly during this time frame. As has been noted previously the records of the Grievance Officer are often inconsistent with the records of Medical with respect to responses to grievances. This should be resolved.

A previously stated concern has been addressed. When an inmate submits a grievance regarding a medical issue on a regular grievance form, the Grievance Coordinator cannot assign it to Medical. Although this is helpful in tracking grievances by category, it means that the inmate is told he has to resubmit on the proper form. This could delay needed medical attention, e.g., one grievance in May complained of chest pain. The Grievance Coordinator now responds that the grievance needs to be submitted on the Medical Grievance form but she also prints out the grievance and gives it directly to Medical.

There appears to be some improvement in reducing the number of grievances that are denied as not a grievance when they should actually be considered grievances. There were a few including eye glasses being taken, alleged over detention, and life being in danger. There are still some grievances where the adequacy of the response needs improvement but this appears to be improving. There were still a number of responses stating that the officer "will look into it" or will come talk to the detainee. There is no way of knowing whether the promised action was completed. When possible, it would be better to address the grievance and then report what was done. Another problematic response was on a grievance stating that the detainee was not receiving his diabetic meals. The officer responding stated that the grievance needed to go to the kitchen staff. The new grievance policy requires that the Quality Assurance Officer do a monthly

30

audit of grievances and responses to determine the timeliness and appropriateness of the responses. This has not been implemented yet and now there is no Quality Assurance Officer but if implemented should provide some oversight in this area.

The Inmate Requests and responses are not considered grievances for purposes of this paragraph. However, they are requested and reviewed because the requests and response can provide information related to other provisions of this injunction. There is an issue with requests not having a response. Of the 87 requests reviewed, 13 had no response.

72. The grievance system must accommodate prisoners who have physical or cognitive disabilities, are illiterate, or have LEP, so that these prisoners have meaningful access to the grievance system.

**Non-Compliant**

The grievance policy requires that if there are cognitive or communication barriers, the Detention Officer refers the issue to the Area Supervisor for communication assistance or problem resolution. It has been reported that the kiosks now have a Spanish language format. Thise will be confirmed during the next site visit. However, persons with disabilities would still require the intervention of an officer which is not ideal but at least there is a specified means to address this issue. There is no indication that this provision of the policy is being implemented or that inmates have been informed of this option. One of the detainees interviewed stated that he did not know how to use the kiosk system and did not know how to submit a grievance. Another stated that he tried to use the kiosk to submit a grievance but it wouldn't work. He asked for assistance but received none. Prisoners are assisting one another but that carries the risk of them accessing and using another prisoner's PIN number in addition to the potential of having to disclose private information. This may inhibit the use of the grievance system and also allows access to the prisoner's funds.

## 9.    Restrictions on the Use of Segregation

74. Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term housing where staff will provide access to exercise, meals, and other services.

**Non-Compliant**

There are three areas addressed by this provision: Classification; appropriate long-term housing; and access to exercise, meals and other services.

Classification maintains a log showing the date of booking and the date of classification. The log indicates that not all inmates are classified within 8 hours of booking. In February, the log indicates that 18 out of 84 or 22% were not classified one day or more after the date of booking. The log does not show the time of either booking or classification. It is possible that an 8 hour period could result in a booking the following day. Assuming that is the case with all of the classifications showing completion the next day, there would be 13 out of 84 or 15% classified two days of more after booking. In March, the log shows that 16 or 19% were classified one day or more after booking. Again, assuming those that are classified the next day were still within the 8 hour time frame, there would be 11 or 13% classified 2 days or more after booking. The April log was not provided. In May, the log shows that 37 or 44% were classified one day or more after booking. Again, assuming those that are classified the next day were still within the 8 hour time frame, there would be 25 or 30% classified 2 days or more after booking. These included individuals classified up to 4 weeks after booking.

However, it should be noted that there appear to be a number of inaccuracies in the classification log. In reviewing the apparent late classifications for March during the interviews, the computer system showed timely classification for 4 of the apparent late classifications and an even later classification date for one individual. Because of these inaccuracies, the log cannot be relied upon to accurately quantify the number of late classifications, but it appears to be a significant number.

This is no doubt, in part due to the understaffing in the Classification office. The office is supposed to have 8 officers and one supervisor. They have three officers and one who fills in (he is also the Sanitation officer, the Disciplinary officer and works in the units). The supervisor was on maternity leave at the time of the site visit. Even counting the officer who fills in, the office is down by more than half. At that staffing level despite their best efforts, Classification cannot be covered 24/7.

The Monitor requested the initial classification form for all detainees booked in the first two weeks of April. It appears that only the first week was provided, a smaller sample than requested. There were three forms that were incomplete, one in which the criminal history was scored incorrectly, and, as previously noted, there were many in which the Special Management section was not completed. It should be noted that there continue to be frequent problems with access to the NCIC system for Classification staff (and Booking staff). The officers have compensated by contacting the Radio Room which uses a different system to get the NCIC report. This inefficiency should be investigated and addressed by IT.  As noted in previous reports, the staff are using an objective classification instrument, are not routinely overriding the result, and the accuracy of the scoring is much improved.

Although improvements have been made in the area of Classification, it is still not the case that an objective risk instrument is governing the long term housing placement of inmates. There continue to be gang pods. The Inmate Services Manager reported that the operation of inmate committees who reject housing placements has calmed down but still exists as evidenced by several incident reports. See below. Security continues to move inmates without Classification involvement and, although Classification staff review these moves, without 24/7 Classification coverage, this is often after the fact. See, e.g. IR #220514. The current lack of bed space, limitations on the use of some housing units and COVID also impacts the ability of Classifications to house detainees based on classification.

The second aspect of this provision is that after classification, detainees should be housed in appropriate long-term housing. This continues to be a problem area. Booking cells continue to be used to house, rather than just hold for eight hours, inmates.  The holding cells in Booking have been consistently misused to house some inmates for days, weeks, months and even longer.  The rationale for this continuing practice has varied from doors and locks that cannot be secured in the pods to overcrowding, to the need to separate problematic inmates from the general population.  Most recently, the impact of COVID as an additional classification criterion has been blamed for non-compliance with the standard.

During the Monitoring Team's interview with the Interim Jail Administrator on May 31, 2022, he stated that the practice of housing inmates in Booking holding cells had been recently stopped and that it was no longer permitted.  The inspection of Booking later that day confirmed what he said, but in an incident report only two weeks later (IR 22 0592, 6-15-22) the originating officer stated that an inmate was to be moved from C-4 to Booking "for housing".  Further, the HCSO Active Inmate Listing (RDC) dated 6-20-22, indicated that four inmates were housed in Booking holding cells.  Finally, during the Zoom interview with a Booking Sergeant on June 23, 2022, she indicated that there were two inmates housing in holding cells as of that date. The Inmate Services Manager stated that one was there for setting fires and the other for close observation. Nothing has changed.  Inmates are still being housed in Booking. The Monitoring Team has repeatedly stated that Booking is not appropriate housing. Now that the cell door windows in C-Pod are being replaced, these individuals should be housed in C-4 if segregation is needed. C-4 is supposed to have two officers in the unit. The segregation unit is intended to be operated and staffed for management problem inmates.

It also must be questioned whether any of the housing units constitute appropriate long-term housing without adequate staffing to supervise. However, this is particularly true of A-Pod. The County has stated an intention to close A-Pod. At the current count (711 as of May) there are not nearly enough beds at RDC and the WC to move all the detainees out of A-Pod. The Inmates

Services Manager also stated that the jail system is full and she does not have the beds to move the detainees out of A-Pod. No agreements have been made to house detainees in other jurisdictions. A-Pod continues to have the problems previously reported: cell doors do not lock; the lighting in the cells and frequently in the day room do not work; there are no tables; detainees are sleeping on the floor-some because of the heat and some because they have no assigned cell; detainees frequently ask to be moved because they fear for their safety (See, e.g. IR #220475, 220480, 220489, 220491) and other detainees insist on the removal of some inmates at risk of assaulting them (See, e.g. IR #220368, 220478, 220484). In the current season, the heat is a major issue. All four detainees interviewed from A-Pod described the heat as excessive. Most notably, in the supplemental report to IR #220418 it states that in Medical "it was determined that detainee had passed out from being over heated in A2 Zone due to only one fan in unit for 58 detainees being housed in that unit at the time and no available cold ice or water to drink." The detainee was returned to A-2 for housing.

Access to services could not be fully evaluated because of the failure to provide the relevant documents. During the site visit on May 31st, the Food Service Director indicated that he is planning to return to the previous practice of serving three hot meals per day instead of two hot, and one cold, meals.  This change will certainly be well received by the inmates who currently face the prospect of two cold (sandwich) meals on days when they go to court. In the interview of inmates, one inmate stated that the meals were distributed by other inmates. This proved to be a problem as reported in the 16th Monitoring Report. However, another inmate, from a different unit, stated that an officer was present during the distribution of meals. This inconsistency was not resolved.

It is not possible to comment on the frequency of inmate visitation with family and friends since the HCSO has not provided any records or documentation regarding visitation since January 2022. Recreation is provided to inmates at the RDC, but it is not possible to comment on this practice either since no records have been provided to the Monitoring Team.  In particular, it would be beneficial to review documentation regarding inmates held in B-4, C-4 and the ISO units (Segregation). Inmates continue to be provided only one jumpsuit contrary to policy. As a result, they must wear only undergarments when they send their jumpsuits to the laundry.

Providing access to medical and mental health services involves several issues.  First of all, there must be an adequate number of and the right mix of medical and mental health staff to provide medical and mental health services to the detainee population.  In this regard, see paragraph 42. Then, there must also be an adequate number of detention staff to support medical and mental health staff efforts to provide medical and mental health services.  In this regard, see paragraph 42.

A third and somewhat more complicated issue is the extent to which the place where a detainee is housed supports or impedes access to the medical and mental health services that the detainee requires.  Obvious examples of this include the medical observation unit and suicide resistant cells, both of which allow for access to the more intensive treatment and supervision that a detainee might require, while keeping the detainee safe until such time that he/she is more stable. However, as has been previously described the lack of sufficient detention staff compromises the ability of medical staff to provide services even in these locations. The proposed mental health unit is yet another example, focusing on providing access to more intensive mental health treatment for the most acutely ill and unstable SMIs, along with the type of supervision that will minimize the risk of harm to themselves or others. With regard to the proposed mental health unit, see paragraph 77.

A troubling incident report raises the issue of access to medical care. In IR #220369 an inmate was hurt while on recreation. He asked the officer to be taken to Medical but was ignored. He later asked the Lieutenant and was taken to Medical and then sent to the hospital.

75. The County must document the placement and removal of all prisoners to and from segregation.

**Partial Compliance**

RDC maintains two separate logs with respect to documenting the placement and removal of detainees in segregation. One is called the Segregation Monthly Report and one is the Detainee/Inmate Disciplinary Report. The Segregation Report lists all detainees in segregation because of special needs, protective custody, medical observation and occasionally administrative segregation. This does now include the date of the move into segregation and has a column for segregation end date, however, the logs reflect that these detainees rarely exit segregation unless they are released. They continue in segregation in some cases for years. Also, the Segregation log does not include individuals housed in Booking or the ISO units. The Segregation Report does not include individuals who are in segregation for disciplinary reasons. Those individuals are listed in the separate Disciplinary Report. The Disciplinary Report includes a list of all disciplinary cases and the sanction imposed. In some cases, this is a loss of canteen or other privileges and in some cases this is a sentence to segregation. This log does not include the date of placement or removal from segregation.

76. Qualified Mental Health Professionals must conduct mental health rounds at least once a week (in a private setting if necessary, to elicit accurate information), to assess the mental health status of all prisoners in segregation and the effect of segregation on each prisoner's mental health, in

order to determine whether continued placement in segregation is appropriate. These mental health rounds must not be a substitute for treatment.

**Partial Compliance**

QMHPs perform weekly rounds of all detainees being held in segregation, with the goal of assessing their mental health status, the effects of segregation on their mental health, any need to initiate or adjust mental health treatment, and whether or not continued placement in segregation is appropriate.  The findings of these assessments, along with any other relevant information about a detainee, are discussed during the weekly IDT meetings, and the team then takes any action that might be required and available. As stated in this paragraph, the goal of these rounds is to determine whether continued placement in segregation is appropriate in order to move individuals out of segregation. As discussed in paragraph 77 below, this cannot be achieved because of the lack of appropriate alternatives and sufficient therapeutic services.

It is understood that these weekly assessments are not a substitute for treatment, and so therapeutic sessions are also provided to detainees being held in segregation as indicated.  It should be noted however that due to detention staff shortages, it is often difficult to have detainees removed from their cells so that they can be interviewed in a more private setting, even when this is clearly indicated (i.e., although it is always preferable to perform mental health assessments in a private setting, there are times when it is obvious/clear that the lack of privacy has impeded the assessment process).  And due to mental health staff shortages as well, see, paragraph 42, the treatment needed is not able to be provided. This is even more of a problem for the most acutely ill SMI detainees who actually require more frequent and more intensive involvement with mental health staff in order to develop the type of engagement/working relationship with staff that will allow for the gathering of accurate information and in turn, the development of the most appropriate interventions.

77. The County must develop and implement restrictions on the segregation of prisoners with serious mental illness.

**Non-compliant**

Restricting the placement of SMI detainees in segregation involves several issues.  These include:

- The provision of mental health services to SMI detainees housed in general population units, so that they can remain stable enough to function on a general population unit
- The incorporation of information obtained via mental health assessments into the disciplinary review process, so that SMI detainees are not inappropriately placed in segregation

36

- A segregation review process whereby the mental health status of SMI detainees held in segregation is reviewed and efforts are made to identify the most appropriate placement and design the most appropriate intervention(s)
- An alternative appropriate housing placement (an alternative to segregation) for SMI detainees who are unable to function on a general population unit

The mental health staff make every effort to provide mental health services to SMI detainees housed in general population units, so that they can remain stable enough to function on a general population unit.  However, as noted in paragraph 42, there are not enough mental health staff to provide the range of services that are required.  As staff members have said, 'we do the best we can with what staff we have', while recognizing that given the shortage of staff, they are unable to provide indicated interventions (for example, sufficiently frequent individual sessions, psychoeducational and therapeutic group therapy, and more intensive efforts to engage the most acutely ill and regressed detainees).

As noted in paragraph 46, policies and procedures have yet to be developed to allow for the incorporation of information obtained via mental health assessments into the disciplinary review process.  Such policies and procedure would help identify, for example, SMI detainees who's charged behavior was really a product of their mental illness and therefore need treatment instead of placement in segregation; SMI detainees who would clearly be harmed by being placed in segregation; and SMI detainees who are so seriously ill that placement in segregation is unlikely to be a benefit (i.e., recognized by them as a punishment for their behavior and/or aid in the correction of their behavior).

As noted in paragraph 46, a segregation review process has been incorporated into the weekly Interdisciplinary Team meetings.  The mental health status of SMI detainees held in segregation is reviewed and efforts are made to design a more appropriate intervention(s) for each detainee.  However, as also noted in paragraph 46, the alternative intervention options available to the team are limited, and so there are SMI detainees who remain in segregation despite the fact that it is an inappropriate placement for them.

The absence of an alternative placement (an alternative to segregation) for SMI detainees who are unable to function on a general population unit is a major issue here.  The detainee population focused on in this regard are those SMI detainees who are so acutely ill (because they have not yet been engaged in treatment or treatment efforts have not yet resulted in stabilization) that they are either at high risk of harming other detainees or staff, at high risk of being harmed by others, and/or otherwise unable to function and care for themselves on a general population unit.  A mental health unit, specifically designed and programed for this population, would provide an

adequately supervised and safe alternative to placement in segregation, and provide a housing setting and the combination of mental health interventions required to stabilize them.

During the last year, the mental health staff have worked to develop a program plan for a mental health unit, and worked with classification and detention staff with regard to issues such as admission and discharge criteria, detention supervision and the training of detention staff to work on that unit, and the full incorporation of detention staff into the therapeutic programming on the unit. The mental health staff also consulted with administration on the renovation of the unit that had been selected to be made into a mental health unit.

However apparently, it has now been decided that there will not be a mental health unit until the new jail is built. Therefore, during this most recent site visit, the mental health expert of the Monitoring Team and QCHC staff attempted to identify other doable alternatives for the provision of mental health services to the target population that would restrict their placement in segregation. As in the past, no doable alternatives were identified. As a result, this provision of the New Injunction remains unaddressed.

In addition to detainees with SMI being routinely held in segregation, they also are placed in segregation as a result of the disciplinary process. The Disciplinary Officer reported that he confers with mental health staff when he is addressing discipline of a detainee with SMI. Mental health staff confirm this. This practice is good but the consultation should be expanded to cover the topics recommended above and in previous Monitoring Reports. Providing required due process in the disciplinary procedure is also a safeguard on placing detainees with mental illness in segregation. The Disciplinary Officer should be provided guidance on due process requirements and a disciplinary policy incorporating those requirements should be developed and implemented. The Disciplinary Officer reported that he considers his conversation with the detainee to be the hearing and a request to be heard by the Disciplinary Committee to be an appeal. The detainee is not offered an initial hearing with the Disciplinary Committee as he should be. Compounding this problem is the practice documented in the case of detainee M.T. After his initial conversation with the Disciplinary Officer, he was given 21 days canteen restriction. The report then states "Please be advised your 21 days canteen restriction will be taken and lockdown enforced if you appeal this decision." The detainee did "appeal" and was given lockdown. The Disciplinary Officer has made significant progress in establishing a disciplinary procedure which did not previously exist. However, additional guidance is needed.

### 10.    Youthful Prisoners

## 11.    Lawful Basis for Detention

85. The County will not accept or continue to house prisoners in the Jail without appropriate, completed paperwork such as an affidavit, arrest warrant, detention hold, or judge's written detention order.

**Partial Compliance**

There has been significant improvement in this area since the beginning of the monitoring process. Detainees are generally not booked in without appropriate paperwork with only occasional exceptions identified. There are more occasions when detainees continue to be housed in the jail after they should have been released. The 16th Monitoring Report identified 7 such individuals. Several more are noted in paragraph 92 below. The Records Supervisor and the Inmate Services Manager report that the practice of booking "in and outs" continues. This is when an officer brings an individual in for booking with an arrest report that states to release the individual after X hours. The Monitor has requested any lawful authority for this practice such as a statute or court order but none has been provided. This is not a lawful hold or detainer and the person should not be booked in on this paperwork. Alternatively, this could be seen as a lawful arrest report for purposes of booking but not a lawful release without a court order. This practice should be investigated and, if not supported by lawful authority, discontinued. The Monitor requested a listing of all individuals booked according to this practice to determine the frequency of these bookings but such a listing was not received.

86. No person shall be incarcerated in the Jail for failure to pay fines or fees in contravention of the protections of the United States Constitution as set forth and discussed in *Bearden v. Georgia*, 461 U.S. 660 (1983) and *Cassibry v. State*, 453 So. 2d 1298 (Miss. 1984).

**Partial Compliance**

The Records Supervisor reported that individuals are not held when the only order is for the payment of fines and fees. However, the staff have not followed the procedure set out in the former Settlement Agreement to have those orders corrected. This can result, as it did in the case described in the 15th Monitoring Report, in an individual being held on an unlawful order for fines and fees when the other pending charges were resolved. In order to evaluate whether this is an ongoing concern, the Monitor requested the Mittimuses ordering fines and fees received during this monitoring period. These were not received so this paragraph is listed as in partial compliance until such a review can take place.

92. The County must ensure that the Jail timely releases from custody all individuals entitled to release. At minimum:

a.      Prisoners are entitled to release if there is no legal basis for their continued deten-
tion. Such release must occur no later than 11:59 PM on the day that a prisoner is entitled
to be released.

b.      Prisoners must be presumed entitled to release from detention if there is a court
order that specifies an applicable release date, or Jail records document no reasonable legal
basis for the continued detention of a prisoner.

c.      Examples of prisoners presumptively entitled to release include:

i.      Individuals who have completed their sentences;

ii.      Individuals who have been acquitted of all charges after trial;

iii.      Individuals whose charges have been dismissed;

iv.      Individuals who are ordered released by a court order; and

v.      Individuals detained by a law enforcement agency that then fails to
promptly provide constitutionally adequate, documented justification for an indi-
vidual's continued detention.

**Partial Compliance**

This provision was particularly difficult to monitor because of the delay in receiving documents
and the irregular uploading of the documents. This required a second interview of the Records
Supervisor who had some difficulty recounting events because of the passage of time. There
were several apparent instances of over detention. For example, M.K was not released on time
because his name was spelled differently in the JMS system than the court order. A. S. was not
released on time because the court order was either not received or received but not entered.
Some problems appear related to communications with MDOC and/or Probation and Parole.
R.G. had an unsecured bond ordered on 3/29/22. He had either a probation or parole hold. This
was not specified in the system. The detainee submitted a program request regarding his contin-
ued detention on 5/8/22. The hold was released on 6/3/22. The Records Supervisor did not know
why there was a delay. Similarly, T. C. posted bond on 4/12/22 but there was a detainer from
MDOC. On 5/3/22, he submitted a grievance stating that he had signed his parole discharge pa-
pers in the prior month. MDOC should have been contacted on 4/12/22 when he was otherwise
entitled to release. The Records Supervisor did not know who or when MDOC was contacted,
but the inmate was released on 5/3/22 after he filed the grievance. Similarly, N.H. completed his
sentence but then had a parole hold. This should have been resolved when he was otherwise enti-
tled to release but was not until a week later. In June, there was another over detention of an indi-
vidual who was sentenced on 6/8/22 and should have been registered as a sex offender at the jail
and then released. He was not released until 6/16/22. Lastly, J.S. should have gone to MDOC
months earlier than his eventual release. However, the probation violation was entered as a new
charge instead of a hold and so he was not entered on the manual probation and parole list that
tracks individuals on PV holds.

       12.      **Continuous Improvement and Quality Assurance**

.

       13.      **Criminal Justice Coordinating Committee**

       14.      **Implementation, Timing, and General Provisions**

121. Within 30 days of the Effective Date of this Injunction, the County must distribute copies of the Injunction to all prisoners and Jail staff, including all medical and security staff, with appropriate explanation as to the staff members' obligations under the Injunction. At minimum:

     a.      A copy of the Injunction must be posted in each unit (including booking/intake and medical areas), and program rooms (e.g., classrooms and any library).

     b.      Individual copies of the Injunction must be provided to prisoners upon reasonable request.

**Partial Compliance**

While a hard printed copy of the New Injunction is not provided to each inmate, an electronic copy is available for review on the inmate kiosk system.  Copies of the Injunction are not posted in each housing unit (including booking/intake and medical areas).  The Sheriff's legal counsel did attend roll calls and gave a printed copy of the Injunction to those officers and supervisors who were in attendance.

       15.      **Policy and Procedure Review**

130. The County must review all existing policies and procedures to ensure their compliance with the constitutional violations addressed in this Injunction. Where RDC does not have a policy or procedure in place that complies with this Injunction, the County must revise or draft such a policy or procedure.

**Partial Compliance**

As of April 13, 2022, 38 policies had been approved and adopted. Jail staff reported that two additional policies have been approved since that time. These have been requested but not received. Numerous polices remain to be adopted and implemented relevant to the New Injunction. These include among others, Discipline, Releasing, Visitation, Food Service, Training, and many others.

       16.      **Monitoring**

This Injunction must be monitored by an individual approved by the Court. Accordingly, paragraphs 136 through 158 of the Order Amending Consent Decree, and their subparagraphs, are hereby incorporated and remain in force.

141. The Monitor may contract or consult with other individuals or entities to assist in the evaluation of compliance. The Monitor will pay for the services out of his/her budget. These individuals and entities must be governed and bound by the terms of this Agreement as the Monitor is governed and bound by those terms. The Monitor may engage in ex parte communications with the County and the United States regarding this Agreement.

**Partial Compliance**

The Monitoring Team has been able to engage in ex parte communications with counsel for the County although with limited response and the United States. With respect to staff of the County and the Sheriff's office, see, paragraph 145 below.

142. The Monitor and United States will have full and complete access to the Jail, Jail documents and records, prisoner medical and mental health records, staff members, and prisoners.

**Partial Compliance**

For the past five years the Sheriff's Office and County have made a good faith effort to provide access to the Jail, Jail documents and records, prisoner medical and mental health records, staff members and prisoners.  The Compliance Coordinator served as the primary point of contact and he assured complete and timely access as required.  However, that level of cooperation, open access and assistance changed once the County moved to be relieved from the provisions of the Settlement Agreement.  Since that time records are not readily available, when they are delivered it is not within the previously accepted time frames and access to HCSO/County personnel is tightly restricted.

The County and Sheriff claim that the delay in the delivery of previously accessible documents is due to changes in personnel and procedures.  The Google Docs system that had been in place for years was recently replaced with Dropbox.  Since the Compliance Coordinator resigned after no longer being required by the New Injunction, the Sheriff's legal counsel has taken over the management and control of all documents.  That means that everything has to go through him before it can be provided to the Monitoring Team.  Consequently, items that should have been provided prior to May 31, 2022, are still held in limbo.  Basic information, such as the number of filled positions, which is readily available on a month to month basis through the Human Resources Director, has still not been provided via Dropbox or e-mail.  If it were not for the conference call with her on June 24, 2022, that number would still be unknown.

42

In years past it was always possible to have direct contact with the Jail Administrator and subordinate commanders and supervisors in order to stay current with conditions since the previous site visit.  In anticipation of the next site visit phone calls were frequently made with the appropriate personnel.  After the February hearing in federal court, access and cooperation ceased.  By means of example, on March 31, 2022, the Corrections Operations Member of the Monitoring Team sent an e-mail to the Assistant Jail Administrator asking to schedule a phone call regarding operational issues.  He responded promptly with a promise to set a conference call shortly, but nothing happened for the next month.  At that point the Sheriff's legal counsel intervened and all subsequent communication was with him.  A meeting scheduled for May 6th was subsequently rescheduled for Friday morning, May 13th, but the Sheriff's legal counsel never followed through or communicated further.  Consequently, no conference call was ever held prior to the May/June site visit.

144. The County must maintain sufficient records to document that the requirements of this Agreement are being properly implemented and must make such records available to the United States or Monitor at all reasonable times for inspection and copying. The County must maintain, and submit upon request, records or other documents to verify that the County has taken such actions as described in any self-assessment compliance reports (e.g., census summaries, policies, procedures, protocols, training materials and incident re-ports).

**Partial Compliance**

As noted in the introduction and throughout the report, access to documents has been particularly problematic since the entry of the New Injunction and the resignation without replacement of the Compliance Coordinator. Documents that were provided on a monthly basis were not provided for April, 2022 and many have still not been provided. The June monthly reports have not been provided. Documents requested in connection with the site visit were requested to be provided by May 23rd. They were not provided in that time frame. As a result, the site visit commenced on May 31st without the necessary documents. That visit was aborted because of COVID and remote interviews were scheduled for the week of June 20th. The documents had still not been provided. The Court set a hearing to address this issue on the morning of June 20th and the requested documents began to be provided on that and subsequent days. This, however, required that the documents be reviewed "on the fly" as interviews relevant to the documents were being conducted. As noted in the Introduction, a number of documents have still not been produced and the June monthly documents have not been uploaded now well into July.

145. The County will direct all employees, contractors, and agents to cooperate fully with the Monitor and United States.

**Non-Compliant**

Communication with the County and its attorneys and HCSO staff has been problematic. In addition to the difficulties described above, communication with County attorneys has been difficult. Emails requesting interviews with HCSO staff, site visit arrangements, updates on document production, etc have often been unanswered. This not only results in significant Monitoring Team time to follow up on these issues but an inability to effectively engage in the monitoring process.

### 17.    County Assessment and Compliance Coordinator

### 18.    Emergent Conditions

161. The County must notify the Monitor and United States of any prisoner death, riot, escape, injury requiring hospitalization, or over-detention of a prisoner (i.e. failure to release a prisoner before 11:59 PM on the day she or he was entitled to be released), within 3 days of learning of the event.

**Partial Compliance**

The County has generally complied with this requirement in the past although the immediate notifications were delayed in April presumably with the resignation of the Compliance Coordinator and the transfer of this duty. Rapid notifications were uploaded for June but there have not been any uploaded for July. Compliance is also dependent on the incident reports being complete, however. In IR#220208 described above where there was no mention of an assault, but a medical transport for an assault, a rapid notification was not provided. The County has generally not provided immediate notification of over detention. The Monitors received the first such notification during this monitoring period. However, there were several additional instances of over detention during the monitoring period that did not result in immediate notification. The Inmate Services Manager stated that incident reports for over detention are not prepared because there is no incident type in the JMS system for over detention. One recommendation would be to create that category in JMS so that these can be more easily tracked and immediate notifications provided.