

_____

No. 3:16-CV-489-CWR-RHWR

UNITED STATES OF AMERICA,

*Plaintiff,*

*v.*

HINDS COUNTY, ET AL.

*Defendants.*

_____

ORDER

_____

Before CARLTON W. REEVES, *District Judge*.

Before the Court is Hinds County, Mississippi, and Sheriff Tyree Jones' (collectively, "the County's") Motion to Stay the New Injunction Pending Appeal. Docket No. 191.

## I.   Introduction

The United States Department of Justice began investigating Hinds County's jail system in 2014. The investigation centered on whether pre-trial detainees were "reasonably

protected from harm that may result from prisoner-on-prisoner violence or use of force." Docket No. 3-1 at 1.

Recognizing the crisis at hand, Hinds County Senior Circuit Judge Tomie Green empaneled a Hinds County Grand Jury. It found "that there were not enough officers to secure the Jail. Those officers that were on duty [] were frightened of the inmates. The inmates seemed to be in control of the Jail as a result of the shortage of guards." Docket No. 3-4 at 1. The Grand Jury recommended that the Circuit Court "remove the jail from the sheriff's control" and remove any "power [that the] Sheriff [] has to supervise pre-trial detainees or inmates." *Id.* at 2.

In 2016, the United States brought this lawsuit. It alleged that the County was engaged in a "pattern or practice" of Eighth and Fourteenth Amendment violations related to detainee-on-detainee violence, use of excessive force by jail staff, dangerously low staffing levels, jail policies and procedures, housing and classification systems, the physical plant, internal investigations, detention of persons who should have been released, and the treatment of juvenile and suicidal detainees. Docket No. 1 at 3-5. Through a Consent Decree, the County agreed. Docket No. 2-1.

The deficiencies found in 2014 and 2016 are largely the same today. *See* Docket Nos. 100, 126, 165, 168, and 204. Thus, on August 29, 2022, the undersigned ordered a receivership to oversee operations at the Raymond Detention Center (RDC)—and only RDC—starting no later than November 1, 2022.

The decision was not made hastily. *See* n.1, *infra*. The County has consistently failed to improve the conditions at RDC—

2

first under the Consent Decree, Docket No. 2-1, then under a Stipulated Order, Docket No. 60-1, and now under the New Injunction, Docket No. 169.

A brief summation of the County's history of non-compliance illustrates the Court's dilemma.

In 2016, the County agreed to bring its detention centers up to constitutional standards by agreeing to the Consent Decree. The terms of the Consent Decree were negotiated and agreed upon by the parties, as was the Monitor, Elizabeth Simpson. The Monitor and her team began to provide technical assistance, conduct regular site visits, and serve as the eyes and ears of the Court. [1]

By 2020, the County had "reached sustained compliance (meaning compliance for at least 18 months) in only one of the 92 requirements of the Consent Decree." Docket No. 60 at 7. As the Court stressed then, "*Only one*." *Id.* (emphasis in

---

[1] The Consent Decree and Monitoring Team were approved by U.S. District Judge William H. Barbour, Jr. The case was transferred to the undersigned in December 2018 upon Judge Barbour taking senior status. Within days of the case being transferred to the undersigned, the Court scheduled and held its first status conference with the parties. *See* Minute Entries of December 28, 2018 and January 15, 2019. Upon the submission of each subsequent Monitor's Report the undersigned presided over each Status Conference to hear from the Monitor, her team, and the parties about the County's compliance. Unlike Judge Barbour, the undersigned presided over each Status Conference and did not delegate those hearings to the Magistrate Judge. Since the submission of the Seventh Monitoring Report, the undersigned has received the testimony from the Monitor and the parties. The Seventeenth Monitoring report has now been submitted, and as explained in this and many of its prior orders, the testimony at the status conference overwhelmingly has been about the County's *lack of* compliance.

original). The County had reached substantial compliance in just six areas and partial compliance in 47.

Nevertheless, under the threat of contempt, the County again promised to bring the facilities' conditions up to constitutional standards. This time it agreed to the Stipulated Order, which was meant to be a step-by-step remedial plan for the County to get on a path to compliance.

As the Sheriff's Office explained at the time,

> [The Stipulated Order] is, is more specific relief to get us going in the right direction, because as Your Honor knows, we've said this for the past two years, I think. We've been doing the best we can with the resources that we have. This is a huge, huge undertaking. And whenever we have limited resources and we're trying to pour all those resources into all 92 sections of the consent decree, we're getting nowhere. So this is what this stipulated order does is help get us in the right direction, help us get some traction[.]

Docket No. 55 at 9-10.

The Court begrudgingly approved the Stipulated Order in lieu of finding the County in contempt, and in hopes of finally making headway on the goal—constitutional jail conditions.

This remedial plan, too, was ultimately unsuccessful. Despite the Stipulated Order, the County continued its pattern of constitutional violations and widespread non-compliance. The Monitor's fifteenth compliance report of November 24, 2021 concluded that defendants were in substantial compliance with only three of the Decree's 92 substantive provisions. *See* Docket No. 101 at 22-23.

4

On December 14, 2021, again facing the threat of contempt, *see* Docket No. 100 ("Order to Show Cause"), the County responded with more promises. It vowed to correct the deficiencies at RDC if only the Court would extend the compliance deadline to July 1, 2022. *See* Docket No. 105 at 5 ("The County thus respectfully requests this Court give them until July 1, 2022 to prove they can make even more significant, positive change at RDC before the Court decides whether to take the drastic, extraordinary steps it is considering taking."). Quoting the poet Robert Frost, the County declared "we 'have promises to keep and miles to go before we sleep.'" *Id.* at 4.

Rather than make "positive change," though, the County moved to "terminate or, alternatively, modify" the Consent Decree under the Prison Litigation Reform Act (PLRA). Docket No. 111.

On February 4, 2022, disturbed by the record number of assaults, fires, and deaths, including murders, suicides, and overdoses, the Court issued its First Order of Contempt. Docket No. 126. The Order identified "more than two dozen provisions [of the Consent Decree] where the County is simply non-compliant with a Court Order." *Id.* at 20.

On February 14, 2022, the parties commenced a two-week hearing regarding the appropriate remedy for the finding of contempt against the County, and to address the County's PLRA motion. The United States urged for appointment of a receiver. Docket No. 138 at 89. Taking the opposite position, the County contended that the Consent Decree should be "terminated and dissolved in its entirety." Docket No. 140 at 29. The United States, the County submitted, "failed to prove either that the County failed to reasonably respond to any substantial risk of serious harm or that the prospective relief in

5

the Consent Decree meets the PLRA's . . . requirements." *Id.* at 28-29. There was no need for further oversight or supervision, the County insisted.

After the February 2022 proceedings, the Court again found the County in contempt. Docket No. 165. The Second Order of Contempt centered on the County's decision to house detainees in A-Pod, in violation of the Stipulated Order. This, despite Sheriff Tyree Jones admitting that the unit was unsafe. *See id.* at 5. The Order emphasized that "[i]mposition of 'an appropriate sanction for that contempt' is again reserved pending the PLRA termination motion.'" *Id.* at 18 (citing *Petroleos Mexicanos v. Crawford Enters.*, 826 F.2d 392, 398 (5th Cir. 1987) (collecting cases)).

In April, the County's motion to modify or terminate was substantially granted. The Order revised the Consent Decree, excising those provisions that the Court determined exceeded the constitutional minimum. *See* Docket No. 169 ("The New Injunction"). The New Injunction removed the Work Center and Henley Young from the scope of remedial relief and dramatically scaled back the provisions applicable to RDC.[2]

The present motion to stay the New Injunction pending appeal followed.

In its memorandum, the County argues that the New Injunction "does not comply with the PLRA, [] micromanages the day-to-day operations of RDC, and [] is cost prohibitive." Docket No. 192 at 12. Despite the Court granting the relief the County requested and substantially reducing the demands of

---

[2] Both parties have expressed their disagreement with aspects of the New Injunction by appealing the order.

the Consent Decree, the County now insists that anything less than termination is insufficient.

The United States opposes the motion, noting that this Court has just found that RDC has "unconscionably high levels of violence," and that the "pervasiveness and severity of such incidents distinguish RDC as a place where 'terror reigns.'" Docket No. 198 at 8 (quoting Docket No. 168).

At a routine Status Conference held August 29, 2022, to discuss the Monitor's Seventeenth Report, the United States suggested that the County is not and does not intend to comply with the New Injunction and Stipulated Order. For example, the Monitor represented that the County has failed if not refused to provide the Monitoring Team with records, and denied the Monitoring Team access to the jail for an October site visit.

But the Status Conference also revealed that the County has reneged on other promises made to the Court.  Specifically, it has delayed plans to stop housing detainees in A-Pod, which the Sheriff admits is an unsafe housing unit. The County has shelved plans to build a mental health unit, this time until completion of the new Jail—several years from now. And despite claiming at trial that it was engaged in a "national search" for a qualified Jail Administrator, it is now focusing on an internal candidate. Docket No. 162 at 1706.[3]

---

[3] Furthermore, it is not lost on the Court that neither the Sheriff nor his designee attended this Status Conference. His counsel was present, but the *party* in this litigation was not. The County, on the other hand, was represented by the President of the Board of Supervisors and the County Administrator.

As the United States aptly put it, the Court is being "gas-lighted."

No more. The Court agrees that "[c]ontinuing remedial efforts short of receivership will only lead to further confrontation, delay, and serious harm to the people confined to the Jail." Docket No. 138 at 89.

For the following reasons, then, the County's Motion to Stay is DENIED.

## II.    Law

"A stay is an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (internal quotation marks and citations omitted); *accord Texas Democratic Party v. Abbott*, 961 F.3d 389, 397 (5th Cir. 2020). Whether to grant a stay is "left to the court's discretion," and "is dependent upon the circumstances of the particular case." *Nken*, 556 U.S. at 433. "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433-34.

When exercising this discretion, courts look to four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id.* (citation omitted); *accord E.T. v. Paxton*, 19 F.4th 760, 764 (5th Cir. 2021) (citing *Nken* in noting that the "the factors we consider in determining whether to grant a stay are by now axiomatic.").

"There is substantial overlap between [the stay factors] and the factors governing preliminary injunctions," but the two inquiries are not "one and the same." *Nken*, 556 U.S. at 418, 433-34. "A stay simply suspends judicial alteration of the status quo, while injunctive relief grants judicial intervention . . ." *Id.* at 429 (internal quotations omitted). Accordingly, a preliminary injunction "'demands a significantly higher justification' than a request for a stay.'" *Respect Maine PAC v. McKee*, 562 U.S. at 996 (quoting *Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312, 1313 (1986)).

### III.   Discussion

### A.   Success on the Merits

Under the traditional four-factor test for a stay, the movant must first demonstrate a likelihood of success on the merits on appeal. Whether the Consent Decree exceeds the mandates of the PLRA has already been analyzed extensively. After an in-person visit to the facilities and a two-week hearing, the Court substantially granted the County's motion in a 149-page ruling and issued the New Injunction. The Court stands by its analysis. And at least then, so did the County.

Upon the New Injunction's release, Sheriff Tyree Jones held a press conference calling the New Injunction "a step forward" and "a step in the right direction." DeAnna Tisdale Johnson, *Sheriff calls terminated consent decree 'a step in the right direction,'* Jackson Advocate, Apr. 26, 2022, https://jacksonadvocateonline.com/sheriff-calls-terminated-consent-decree-a-

step-in-the-right-direction/. The New Injunction was also described as "a major victory for Hinds County." Anthony Warren, *Judge scales back consent decree; Sheriff says Hinds Co. avoids jail takeover*, WLBT, Apr. 13, 2022.

The County now insists that although it requested modification or termination of the Consent Decree, and successfully obtained the former, it is entitled to nothing shy of the latter. For 149 pages of reasons, the Court respectfully disagrees. Given the record before the Court, termination of the New Injunction is nothing more than "a mere possibility," and that is not enough at this juncture. *See Vine*, 2019 U.S. Dist. LEXIS 153328, 2019 WL 4257108, at *4 (quoting *Nken*, 556 U.S. at 418 ("[A] sufficient demonstration of a likelihood of success on the merits 'requires more than a mere possibility that relief will be granted.'"). Accordingly, this factor does not weigh in favor of a stay.

### B.   Irreparable Injury to the County

The New Injunction—a 10-page document delineating the constitutional standards for housing pre-trial detainees—does not impose any new requirements on the County. The Court derived at the New Injunction by eliminating many of the Consent Decree provisions it found exceeded the constitutional minimum. Notably, the New Injunction reduced the requirements imposed on the County from 64 pages, and removed the Work Center and Henley-Young facilities from the Court's oversight.

Because the New Injunction is substantially less onerous than its predecessor, adhering to the New Injunction cannot irreparably injure the County. Under the New Injunction, the County exercises greater control of the prison than it did

previously. The New Injunction merely requires the County to meet the absolute minimum constitutional standards and sets forth the least intrusive means to correct the violations.

Even so, the County argues that the New Injunction is "ambiguous," "open-ended," "set[s] the County up to be non-compliant," but also, somehow, "micromanages the day-to-day operations."

Unfortunately, the County's arguments are not new and are demonstrative of the County's *modus operandi*—bait-and-switch.

First, the County negotiated the Consent Decree and stipulated that in accordance with the PLRA, it was "narrowly drawn, extend[ed] no further than necessary to correct the violations of federal rights . . . [and] is the least intrusive means necessary to correct the[] violations[.]" Docket No. 2-1 at 61. Then, after four years of admittedly "getting nowhere," the County petitioned for *more* compliance guidance in the form of the Stipulated Order. Docket No. 55 at 9-10. Thus, though noting that "contempt is warranted," the Court begrudgingly approved the parties' Stipulated Agreement, designed to outline compliance priorities, and operate in full effect alongside the Consent Decree. Just this past December, meanwhile, the County pressed for more time, until July 1, 2022, to prove its "demonstrated commitment to righting the ship at the RDC." Docket No. 105 at 23.

At the two-week evidentiary hearing in February 2022, the Court invited the parties to submit proposed drafts of the New Injunction. The County's attorney stated, "Your Honor asked me whether the County would be willing to draft what it thought was a suitable consent decree. After conferring

with my colleagues, the answer to that question is yes." Docket No. 164 at 2205. The Court responded, "[a]s I said, the case is in the parties' hands, so I suggest draft away." *Id.*

The County submitted no proposal.

Therefore, this Court, after a careful provision-by-provision review, issued the New Injunction, which substantially pared back the Consent Decree and identified the least intrusive means to meet the bare constitutional minimum for detainees to be safe.

For the first time since this litigation started, the County will be under its least stringent injunction. Thus, the Court finds that the County will not be irreparably harmed absent a stay.

### C.    Irreparable Injury to Interested Parties

The Court now turns to the third and fourth factors of the traditional stay inquiry, assessing the harm to interested parties and weighing the public interest. Because here the United States is the party opposing the stay, these factors are merged. *Nken*, 556 U.S. at 435.

A "stay," according to the County, "simply returns the parties to the point at which the Court had disposed of the consent decree yet not entered the [169] New Injunction." Docket No. 205 at 7. In other words, a stay pending appeal would return the County to pre-2016 jail standards (or lack thereof). Whereas the United States argues that a stay would revert the County to again operating under the Consent Decree, "the status quo" for the last six years, and that based on the relief the County seeks, it appears to be requesting an injunction.

If the County were not subjected to federal oversight, irreparable injury would result to detainees, the United States, and the public interest.

The County's failure to remedy its jail conditions has caused "needless suffering and death," *Brown v. Plata*, 563 U.S. 493, 501 (2011), including seven deaths last year, and a litany of constitutional violations. "[T]he loss of constitutional freedoms 'for even minimal periods of time . . . unquestionably constitutes irreparable injury.'" *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Because this Court has already found that the County's constitutional violations are "current and ongoing," and that RDC is a facility where "terror reigns," the County's arguments to the contrary are not well-taken. *See generally* Docket No. 168.

The County has shown a clear lack of urgency and competency since this action was initiated over six years ago, and there is no indication that if left to its own devices, the situation will change anytime soon. Detainees, who once again are persons presumed to be innocent, will continue to suffer substantial harm unless the County is held accountable. Pre-trial detainees should not face these deplorable and dangerous conditions, including assaults and death as they await the disposition of their cases. This factor, like the other, does not weigh in favor of issuing a stay.

Because the County cannot make the lesser showing for a stay, it cannot satisfy the "significantly higher" demands for an injunction." *Respect Maine PAC v. McKee*, 562 U.S. at 996 (quoting *Ohio Citizens for Responsible Energy, Inc.*, 479 U.S. at 1313); *see also Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) ("A

preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right.").

### IV.    Conclusion

For the foregoing reasons, the County's Motion to Stay is DENIED.

**SO ORDERED**, this the 2nd day of September, 2022.

s/ CARLTON W. REEVES
*United States District Judge*

14