```
 1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
 2                           NORTHERN DIVISION

 3

 4   UNITED STATES OF AMERICA                          PLAINTIFF

 5   VERSUS                    CIVIL ACTION NO. 3:16-CV-00489-CWR-RHWR

 6   THE HINDS COUNTY BOARD OF SUPERVISORS,
     HINDS COUNTY SHERIFF, ET AL.                      DEFENDANTS
 7

 8

 9                     VIDEOCONFERENCE PROCEEDINGS
                  BEFORE THE HONORABLE CARLTON W. REEVES,
10                  UNITED STATES DISTRICT COURT JUDGE,
                             AUGUST 29, 2022,
11                         JACKSON, MISSISSIPPI

12

13                    (Appearances noted herein.)

14

15

16

17

18

19

20

21

22   REPORTED BY:

23       CANDICE S. CRANE, RPR, RCR
         OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4187
25       E-mail:  Candice_Crane@mssd.uscourts.gov
```

1    **APPEARANCES VIA VIDEOCONFERENCE:**

2        FOR THE PLAINTIFF:

3            CHRISTOPHER N. CHENG, ESQ.
             LAURA L. COWALL, ESQ.
4            HELEN VERA, ESQ.
             MITZI DEASE-PAIGE, ESQ.
5
         FOR THE DEFENDANTS:
6
             JAMES W. SHELSON, ESQ.
7            TONY R. GAYLOR, ESQ.
             RAYFORD G. CHAMBERS, ESQ.
8            JOHN C. HALL, II, ESQ.

9        ALSO PRESENT:

10           ELIZABETH SIMPSON
             DAVID PARRISH
11           RICHARD DUDLEY
             CREDELL CALHOUN
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**TABLE OF CONTENTS**

2    Style and appearances.....................................1-2

3    By Mr. Parrish............................................  7

4    By Ms. Simpson............................................ 19

5    By Mr. Dudley............................................. 24

6    By Ms. Simpson............................................ 27

7    Court Reporter's Certificate..............................101

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **PROCEEDINGS VIA VIDEOCONFERENCE, AUGUST 29, 2022**

2

3          THE COURT:  Good morning.  Who do I have on for the

4     United States?

5          MR. CHENG:  Good morning, Your Honor, Christopher

6     Cheng.  We also have Laura Cowall and Helen Vera with the

7     United States Department of Justice.

8          THE COURT:  All right.  Hinds County?

9          MR. GAYLOR:  Good morning, Your Honor.  You have board

10    attorney Tony Gaylor as well as special counsel, Attorney Ray

11    Chambers; Jim Shelson from Phelps Dunbar; and I believe other

12    attorneys are joining him as well.

13         THE COURT:  The sheriff's department?

14         MR. GAYLOR:  Your Honor, right now we are serving in

15    that capacity as well.  Attorney Hall will be on shortly after

16    another previously scheduled hearing that he's in the middle

17    of right now.

18         THE COURT:  Okay.  All right.  Is there a

19    representative from the County on?  I know there's a lot going

20    on in the city and county right now.  Is there a

21    representative from the County on?

22         MR. GAYLOR:  Your Honor, the board president, Credell

23    Calhoun, is in with me as well.

24         THE COURT:  Okay.  Any representative from the City

25    of -- from -- any representative from the sheriff's

1   department?

2        MR. GAYLOR:  No, Your Honor.

3        THE COURT:  Who's on for the monitors?

4        MS. SIMPSON:  Your Honor, Lisa Simpson, and with me is

5   Dave Parrish and Dr. Richard Dudley.

6        THE COURT:  Okay.  I think I've gotten the roll call

7   done.  We do have a court reporter present here in the

8   courtroom with me.

9        The purpose of this -- the primary purpose of this

10  hearing is to do what we've always done at the point where the

11  monitors have submitted or issued or filed their monitoring

12  report.  This is the 17th monitoring report that was filed on

13  August 11, 2022, and we're going to go through that like we've

14  done others in the past.

15        In addition, I am aware that the -- well, that the

16  Court -- in anticipation or with this notice that it has

17  decided to appoint a receiver, the Court asked the parties to

18  submit their versions of what the order appointing the

19  receiver should look like.  I'll give you an opportunity to

20  elaborate or speak to those if you wish, and I do know that

21  the parties have raised -- or at least the County has raised

22  certain objections to the receivers under consideration by the

23  Court, and if the County wanted to elaborate on those

24  objections, today will be your opportunity to do that as well.

25        But I'll start off with Ms. Simpson again as we've done

1    in the past.  Please tell us those matters, and you can defer

2    to the members of your team with respect to their portions of

3    the report and their findings to which they might be able to

4    speak best.  But if you will, give us, Ms. Simpson, your

5    overall assessment, you know, as you've done in the past of

6    what you-all were able to find based on the most recent

7    monitoring report.

8            MS. SIMPSON:  Thank you, Your Honor.

9            I think I will start by having Mr. Parrish cover the

10   correction operations issues, as I think those are perhaps

11   more important and concerning of the various issues that we

12   cover.

13           So, Dave, do you want to put your video on as well?

14           MR. PARRISH:  Thank you.

15           THE COURT:  For those who -- so that we can reduce any

16   feedback, in case there is some, because there has not been

17   any right now, if you will, mute your microphones.  And I'll

18   do the same for mine unless I'm speaking, so that there will

19   only be one person who can be heard at any given time.  Just

20   unmute if you'd like to chime in or ask a question or do

21   something of the sort.

22           I will say that this most recent monitoring report, the

23   report itself follows the Court's order narrowing, if you

24   will, the -- well, the Court's ruling on the -- from the

25   hearing that we had back either last winter or earlier this

1    summer -- or spring or summer with respect to the County's

2    motion to terminate the consent decree, and in response to

3    that, the Court has narrowed the settlement

4    agreement/stipulated order and issued its own new injunction.

5    But I just say that for the record.

6         So if you will, Mr. Parrish, you may proceed.

7         MR. PARRISH:  Good morning, Your Honor.

8         I don't want to be repetitious as to what's in the

9    report that everybody's had an opportunity to read, but I need

10   to reemphasize the fact that staffing, of course, is the

11   biggest consideration.  Over the past six years, the highest

12   number of filled positions was 256.  It dropped to an all-time

13   low of 175 on May the 31st when we were there for that day.

14   Don't know what it is since then, and that's part of the

15   ongoing problem is that we are not receiving information as we

16   used to.

17        I used to get immediate notifications, and that sort of

18   thing just does not come through at all anymore.  Getting

19   records that we used to receive routinely are just not

20   available.  I haven't seen anything since -- an update of

21   anything since last June.

22        THE COURT:  Let me ask you this:  Have you been

23   provided a reason why the information has -- is not coming, or

24   are your requests not being received?  Are you being told that

25   you won't get the information?  And if you're told that, have

1    you been told why you won't get the information?

2        MR. PARRISH:  I'm going to have to defer back to

3    Ms. Simpson for some of that.  Basically she submitted a

4    number of requests time and again asking for updated

5    information that's not available.  The original explanation

6    was that when Synarus Green left, that the sheriff's attorney

7    was converting over to a different system of providing us the

8    information via Dropbox.  I can't begin to explain what the

9    problem is there, but I've had Zoom call meetings and

10   conference calls going back into June where we asked for

11   specific documents where all the parties involved were there.

12   And, you know, for instance, the HR director said I'll provide

13   you with this, and I have yet to see it.  So I don't know

14   where the breakdown is there, but it has fallen apart ever

15   since Mr. Green left.

16       MS. SIMPSON:  Yes.  I would just echo what Mr. Parrish

17   said.  We haven't received any explanation for the difficulty

18   other than the transition from Mr. Green to a new person in

19   charge of providing the documents who apparently is in

20   training, and Mr. Hall was filling in during the transition.

21       But as Mr. Parrish said, we have not received the

22   monthly reportings for June or July, and of course now August

23   will be due in a week or so.  So that's the only explanation

24   that I have been given.

25       THE COURT:  Mr. Green was the compliance coordinator?

1          MS. SIMPSON:  Yes, Your Honor.

2          THE COURT:  And do you know on or about the time that

3    he no longer was the compliance coordinator?

4          MS. SIMPSON:  He submitted his resignation in mid

5    April, I believe, or late April effective late May; but after

6    his resignation was submitted, he was not provided with the

7    documentation to pass on to us.  So effectively he stopped

8    being the compliance coordinator somewhere around late April.

9          THE COURT:  And to whom have you been directed -- you

10   indicated that at some point in time Mr. Hall stepped forward

11   and I guess a transition period and was -- you know, he was

12   the person, I guess, who you communicated with with respect to

13   getting and receiving documents.  Did the sheriff direct you

14   to any others in the office as to where you should -- who you

15   should contact to get information that Mr. Green had been

16   supplying?

17         MS. SIMPSON:  No.  It's my understanding that a person

18   has been assigned some of the duties that Mr. Green had.  She

19   is sort of the repository for documents, but I have not been

20   directed to her for requesting documents.  To date I've only

21   been directed to Mr. Hall, and typically I copy the other

22   county attorneys on any request for documents.

23         THE COURT:  Okay.  Thank you, Ms. Simpson.

24         Mr. Parrish, you may continue.

25         MR. PARRISH:  Okay.  Your Honor, briefly, direct

1  supervision at the Raymond Detention Center is still

2  nonexistent.  The lack of staff makes it impossible for them

3  to put an officer inside each housing unit as required.  When

4  we were on-site, we found as few as just one person in the

5  control room, nobody on the floor; or one person in the

6  control room and one person handling the floor for all four

7  housing units plus the two iso units; on occasion a supervisor

8  filling in at that level because there was no officer.  So

9  supervisors were unable to provide their normal supervisory

10  duties because they're filling in as detention officers.

11  That's the kind of thing that we found.

12        I have no idea what has transpired since then since we

13  have not gotten any additional information.  At that time,

14  even though the interim jail administrator assured us that

15  nobody would be housed in booking anymore for housing as

16  opposed to just being processed through the holding cells,

17  within two weeks inmates were being housed there again.  I've

18  got to assume that's probably continuing, but, once again,

19  can't confirm one way or the other.

20        Basically what we have in the report is the best

21  information that's available.  It's all several months out of

22  date at this point, and so at this point, I can't provide any

23  additional information other than what we have there.  I don't

24  know.  I'll be happy to answer any additional questions if you

25  have specifics, Your Honor, but I'm really kind of at a loss

 1    to provide additional information to you.

 2         Pardon me, Your Honor.  There's one thing I neglected

 3    to mention.  Excuse me.  The proposal was that the sheriff's

 4    office was going to close Alpha Pod.  There were various

 5    number of reasons why that did not happen, but, once again, we

 6    don't know the status of that at this point.  So we'll have to

 7    defer to the sheriff's office and the County to provide us

 8    with the status of that housing pod and what has happened.

 9         THE COURT:  I'm looking at the report, Mr. Parrish, and

10    the executive summary and then afterward.  Just have a couple

11    of questions.  At page 9 of the report, for example, there's

12    an indication that from February through May, there were 39

13    assaults resulting in 11 hospital transports, and one inmate

14    having suffered five puncture wounds in the torso.  Now, that

15    takes us through May.

16         What information do you have or that you've been

17    provided that would allow an assessment of what has occurred

18    since May?

19         MR. PARRISH:  We don't have what's necessary to be able

20    to answer your questions.  That's probably one of the biggest

21    issues right now is the lack of information that's been

22    provided by the sheriff's office and the County since our last

23    hearing.  They've basically taken the position that things are

24    on hold.  I don't know how better to explain it than that.

25         THE COURT:  And I guess the information that you were

1    provided that you would glean is this information, like at

2    page 9, would come from -- might come from conversations with

3    people but also come from incident reports that have been

4    filed or prepared?

5         MR. PARRISH:  Yes, Your Honor.  We had information that

6    took us up to about June, but things have stopped since then.

7         THE COURT:  And I know on page 10 you describe the

8    shakedown that occurred back in March that we had much

9    testimony on during the course of the trial where they

10   discovered 67 shanks, 23 cellphones, 22 lighters, *et cetera*.

11   Do we know -- again, I guess since that hearing or even

12   subsequent to that, do we know if there have been anymore

13   shakedowns that -- again, that you've been provided

14   information on?

15        MR. PARRISH:  No, sir, we don't have any additional

16   information.

17        THE COURT:  Turning to a separate portion of the report

18   that I believe you're responsible for taking up the data on or

19   reviewing the data and information, the use of force

20   standards, I think that starts at page 16 of what has been

21   filed.  You indicated at page 17 that now Tasers are provided

22   to lieutenants and most sergeants.  Do we know if those are

23   the only people in the institution who have Tasers?  That's

24   number one.  Or do the correctional -- well, that's the first

25   question.

1      Do the correctional officers, people other than

2  lieutenants and sergeants, do you know if others are provided

3  Tasers?

4      MR. PARRISH:  I don't know for a fact, Your Honor.  I

5  did not personally observe detention officers carrying Tasers,

6  but my understanding from talking to command staff when we

7  were there earlier was that they would only be provided to

8  people who had gone through the requisite training.  I don't

9  know what their status is with regard to that.

10      THE COURT:  Okay.  At page 22 and 23 of the report, you

11  talk about incident reporting and review.  At the top of

12  page 23, you looked at an incident report 220578, a medical

13  report injury on June 13, 2022, an inmate having been found

14  unresponsive.  What information or what did you find out about

15  that un- -- what does "unresponsive" mean, I guess?

16      MR. PARRISH:  Basically, Your Honor, that refers to the

17  fact that an inmate's either passed out or just unable to

18  respond to an officer.  The problem is the same thing that

19  we've had from the very beginning with the quality of the

20  reports as to not being adequately documented as to how an

21  inmate was found, who found him, in what condition, what

22  brought it about, the details that -- as I've reflected over

23  time, a report should be able to stand alone.  You should not

24  have to have somebody there to explain what actually

25  transpired.  You should be able to pick up a report, read

1  through it, and understand completely what transpired, and

2  unfortunately, that's still not the case.

3        So we get a report that somebody is unresponsive.

4  Well, who found him?  When?  How did that come about?  What

5  were the conditions?  Was anybody else interviewed?  What did

6  the inmates have to say?  They have nothing.  And that's

7  the -- I guess that's the problem with the quality of the

8  reports that we've dealt with over the years.

9        So I can't answer more specifically than what we have

10  reported right here in the report.

11        THE COURT:  Okay.  Would an incident report -- I guess

12  an incident report could have a firsthand account of what an

13  officer actually observed at the time.  Would that report

14  necessarily or could it or should it necessarily include what

15  other type of investigation might have been done?

16        For example, if an officer witnessed it, it would have

17  a firsthand account of what he was involved in or what he or

18  she saw.  I assume that would be contained in that incident

19  report.  But if there was another inmate -- an incident report

20  being about an altercation between a correctional officer and

21  a detainee but there's another detainee in the same cell where

22  this all occurred, would you expect the incident report or

23  some other incident report to at least indicate whether or not

24  the eyewitness, the other inmate, was interviewed?  Would that

25  be in that particular incident report, or would that be a

1  separate incident report?

2      MR. PARRISH:  Your Honor, it would be either in the

3  preliminary incident report or in the supplements that are

4  attached to it, not a new incident report.  That's where when

5  a supervisor steps in and follows up on what was done, the

6  supervisor should make sure that somebody has interviewed

7  witnesses, has checked to see whether there's video of what

8  occurred, has just done more than I walked in the door, and I

9  found this.  Well, then what else did you find and were there

10  other officers involved?  Did you interview inmates and do

11  that sort of thing?  That's what's routinely lacking from

12  reports in Hinds County.

13      THE COURT:  Okay.  And, again, we're doing -- I guess,

14  you know, I'm proceeding like we proceeded in the past.  And,

15  of course, maybe I'm not going into all the detail that I have

16  done in the past, because there's some things I do want to

17  cover.

18      But at page 27 where you talk about investigations,

19  Mr. Parrish, the -- how the criminal investigation division,

20  CID, is doing whatever it does, and you indicate in that last

21  paragraph at page 27:  From January through April, CID

22  conducted 75 investigations.  The information for May has not

23  been provided.  Of those cases, so from January to April, I

24  guess, there were 29 assaults and eight aggravated assaults

25  and 23 investigations that dealt with contraband.

1     Do we know what were the nature?  Obviously in state

2  law there is a difference between assault and aggravated

3  assault, so do we know what were -- do we have information

4  about the assaults?  Have you been provided information about

5  those assaults that occurred from January to April?

6     MR. PARRISH:  Yes, Your Honor.  The CID provides an

7  update on the status of their investigations, and they look

8  into was it a simple assault, somebody threw a blow; was

9  somebody seriously injured; do we have an aggravated assault;

10  was contraband involved or whatever?  All of those things, and

11  as indicated here, that information is only current through

12  May.  But CID does do that.

13     Once again, in my review, and this is strictly my

14  opinion from having looked at many of these over the years, is

15  that there is little attempt to go back and solicit

16  information from potential witnesses and oftentimes, well,

17  somebody did something to somebody else and that person

18  doesn't want to proceed with anything, so therefore it's

19  resolved.  The CID reports are rather perfunctory.  But they

20  are doing them, and they are breaking them down according to

21  classification.

22     THE COURT:  You indicated that they're current through

23  May, but this report suggests they're only current through

24  April.  Maybe you have seen some May stuff, I don't know, but

25  this report says from January to --

1          MR. PARRISH:  I apologize.  I misstated.  I misstated.

2     Excuse me.

3          THE COURT:  Okay.  So in theory, we don't know the

4     outcomes or input of May, June, or July?

5          MR. PARRISH:  That's correct.

6          THE COURT:  Up through today.  So the aggravated

7     assaults that occurred -- simply by state law, an aggravated

8     assault typically is one that would require some medical

9     attention, I mean, because it is more of a serious injury in

10    most instances.  Do we know if these aggravated assaults or if

11    any of these assaults led to medical attention or

12    hospitalizations of any sort?

13         MR. PARRISH:  Yes, sir.  And I can go through them

14    individually, but the reports are generally complete in

15    referencing the fact that medical attention was required or

16    the individual had to be sent to the hospital or something

17    like that.  That is routinely covered.

18         THE COURT:  And I'm going backwards now, and I

19    apologize.  But back on page 9, you mentioned an escape that

20    occurred in June of 2022.  Is that the last known escape of

21    some type that you've been made aware of?

22         MR. PARRISH:  Your Honor, you're referring to the one

23    in Charlie Pod?

24         THE COURT:  Yes, sir.

25         MR. PARRISH:  Yes.  They never got out of the building.

 1   But this was pretty incredible, because we've got inmates in

 2   an iso unit who are supposed to be under constant supervision;

 3   that is, with an officer observing them constantly.  Not just

 4   coming back every 15 minutes and checking on them, but

 5   constantly, making 15-minute notations, but constantly

 6   supervising them.

 7       THE COURT:  They're constantly supervising them,

 8   because the person's on suicide watch?  Is that what iso is?

 9       MR. PARRISH:  Yes, sir.  So you've got people who are

10   suicidal under constant supervision, and, incredibly, they are

11   able to tear their cell apart, go up through the ceiling, tear

12   out a light fixture, and climb over the control room in

13   Charlie Pod.  And the officer in the control room heard noise

14   above his or her post, and that's how they were discovered.

15   Now, that's pretty incomprehensible.  I mean, it's obvious

16   that nobody is supervising them; that there's nobody sitting

17   there watching them all the time as they're supposed to be.

18   Fortunately, nobody got out of the building, but that was

19   beyond unusual.

20       THE COURT:  Are there any other points you wish to

21   highlight or speak to with respect to the portion that -- of

22   the report that you've done I guess since our last status

23   hearing, Mr. Parrish?

24       MR. PARRISH:  No, Your Honor.  Just would be good to

25   know what's going on in booking at this point as to whether or

1    not people are being housed there or whether that's finally

2    been corrected.  That's all I have, sir.

3          THE COURT:  Thank you, Mr. Parrish.

4          Ms. Simpson, I turn it back over to you.

5          MS. SIMPSON:  Thank you.

6          THE COURT:  And please, if there's anything that you

7    think needs to be highlighted or underscored in any way, you

8    certainly may do so, Ms. Simpson.

9          MS. SIMPSON:  Yes, Your Honor.  I do think that some of

10   the issues that Mr. Parrish mentioned do need to be

11   highlighted, and, again, I don't want to be too repetitive of

12   what's in the report.

13         But as Mr. Parrish mentioned, the staffing level is of

14   great concern.  The numbers are given in the report, but

15   basically RDC is operating at about 42 percent of its staffing

16   needs based on the staffing analysis, and that is not

17   sustainable in order to provide adequate supervision of the

18   detainees.  That's an extremely low number, and as has been

19   mentioned in the past, the County has hired quite a few

20   people.  It really appears that their difficulty is retaining

21   them, particularly at RDC.  So I know there is a national

22   shortage of correction officers.  That's being experienced in

23   many parts of the country.  However, they don't seem to be

24   having the problem at Hinds County of hiring people.  It's

25   retaining them that has been the problem.

1          And the lack of supervision has been apparent in the

2     incident reports.  I think more than ever in the past, there

3     is a sense from the incident reports that the detainees are,

4     for the most part, on their own unsupervised.  They are

5     routinely going -- and, again, our information is dated now as

6     we have not received reports since May.

7          We may have received some rapid notifications.  I'd

8     have to see.  I think we got rapid notifications for June but

9     not the incident spreadsheet, and we haven't received rapid

10    notifications since June.

11         But based on the April and May incident narratives,

12    there are sort of ongoing assaults.  There are inmates

13    routinely going through the roof to get contraband; inmates

14    getting out of the housing units and to the great hall; fires,

15    of course; and just sort of ongoing incidents that appear to

16    be, in large part, due to the inmates not being supervised as

17    a result of the lack of staffing.  So I think that is the most

18    troubling.

19         And I think you mentioned the use of force.  There has

20    been increased use of Tasers.  And, again, we don't have

21    current information, but as of May, there was significant

22    increase in use of Tasers.  And it may be because more

23    supervisors are responding to incidents as a result of a lack

24    of staffing, but based on the review of the reports, both the

25    incident reports and the IAD reports, a number of those appear

1    not to have been a reasonable use of force.  And there is one

2    particularly troubling incident where a Taser was used and an

3    inmate was not taken to medical.  He had to be transported to

4    the hospital the next morning when he was seen by medical.

5           Again, a couple of the incident reports that show the

6    stress, I guess you would say, of the lack of staffing.  The

7    two where the inmate told the officer that he was suicidal,

8    and the officer told the supervisor.  And the supervisor in

9    one of them, essentially, according to the report, said we

10   don't have the staff to deal with that stuff tonight.  So I

11   think the stress of the lack of sufficient staffing is

12   impacting the welfare of the inmates significantly.

13          And those were, I believe, the areas I wanted to

14   highlight from the -- Mr. Parrish's segment, and I will turn

15   it over to Dr. Dudley now to discuss the mental health issues.

16          THE COURT:  Thank you.  Before you turn it over to

17   Mr. Dudley, let me ask you these couple of questions.  I asked

18   who was on this call, and I don't think there's a -- other

19   than an attorney representative for the sheriff, the jail

20   administrator is not on this call; is that correct?

21          Nobody told me the jail administrator is on this call.

22   So do we -- I know at one time Mr. Frank Shaw was, I guess,

23   the jail administrator.  I think his term was to expire, but I

24   think I read in the documents here that it was going to be

25   extended by a month.  Do you know, Ms. Simpson -- do you and

 1   your team know if Mr. Shaw is still on the job or the

 2   contracted jail administrator, under contract?

 3        MS. SIMPSON:  It looks like Mr. Hall is now on the

 4   call.  He probably would be better able to answer that

 5   question.  We were just told that Mr. Shaw's contract was

 6   extended to the end of August, but I have not talked with

 7   Mr. Shaw to confirm that.  And, of course, now we're at the

 8   end of August, so I don't know if there's a further plan.

 9        THE COURT:  Mr. Hall, now that you've appeared -- and I

10   did get from your colleagues as to why you would be delayed,

11   and that's fine.  But with respect to Mr. Frank Shaw, is he

12   still the jail administrator for the jail, Mr. Hall?  You're

13   on mute, sir.  Can you unmute your mike, if possible?

14        MR. HALL:  Good morning, Your Honor.  I apologize.  I

15   had another hearing I just got off of.

16        THE COURT:  Right.  Right.  We understand.  Is

17   Mr. Frank Shaw still the jail administrator?

18        MR. HALL:  Yes, he's still the interim jail

19   administrator.

20        THE COURT:  And for how much longer is he to be the

21   jail administrator?

22        MR. HALL:  We're going month to month, Your Honor, but

23   we think that within the next -- we have a good candidate that

24   we're crossing some -- crossing the Ts and dotting the I's to

25   start very shortly, so Mr. Shaw's contract was extended to the

1  end of this month, and then if it needs to be extended another

2  month, he's agreed to do that.  The Board will do that as

3  well.  I don't think that will be necessary, though.

4       THE COURT:  I'm sorry.  I mean, because this month ends

5  Wednesday.

6       MR. HALL:  Right.

7       THE COURT:  So do you expect Mr. Shaw to be on board

8  past Wednesday?

9       MR. HALL:  To play it conservatively, Your Honor, yes,

10 Your Honor.  We're probably going to keep him on for another

11 month, but, again, we're in discussions with someone else to

12 take over to be the permanent administrator.  The receivership

13 issue has changed the pitch, if you will, to any potential

14 suited for this job, so saying that and given that, it's not

15 as attractive of a position as it was prior to the Court's

16 ruling.  Either way, we still need someone to run the work

17 center.  We still need someone to run other aspects of our

18 jail system, so Frank will be on as long as we need him for

19 the most part.  Like I said, we just extend his contract at

20 our board meetings.

21      THE COURT:  Did the County ever advertise that position

22 in any way?  No, no.  Maybe that's the wrong question.  How

23 did the County advertise that position?

24      MR. HALL:  It was listed on the Hinds County Sheriff's

25 Office -- on our social media as well as we had feelers

1    reaching out to administrators throughout the state and

2    nationally.  It was also listed on the Mississippi Sheriffs'

3    Association website.  I think our -- the candidate we're

4    looking for is internal, and that's probably who we'll go

5    with.  We're in the process of finalizing that, so we should

6    have someone in permanently very shortly.

7          THE COURT:  Did -- I'm not sure if it's clear from the

8    report, but was the job announcement or whatever it was, the

9    listing that was placed inside as well as the Mississippi

10   Sheriffs' Department Association or however it was

11   disseminated, Facebook or otherwise, was that information ever

12   provided to the monitors in this case?

13         MR. HALL:  The actual listing?

14         THE COURT:  Yes.

15         MR. HALL:  I can't recall, Your Honor.

16         THE COURT:  Okay.  All right.  I will -- we're going to

17   come back to compliance and other type of information, but,

18   Ms. Simpson, you've now turned it over to Dr. Parrish and --

19   excuse me, Dudley.

20         And, Dr. Dudley, you may proceed.

21         MR. DUDLEY:  Good morning, your Honor.

22         THE COURT:  Good morning.

23         MR. DUDLEY:  I'll be very brief.  With one exception,

24   the status of medical and mental health remains the same.  The

25   exception is that a decision has been made to postpone the

1  opening of the mental health unit until movement into the new

2  jail facility.  I'm unaware of any alternative plan for

3  addressing the concerns that the mental health unit was

4  designed to address, and after talking with staff about it and

5  other issues that you're aware of, I'm not -- I don't know

6  what such an alternative plan could be.

7       THE COURT:  When you say the "new jail facility," are

8  you talking about the real new jail facility, the one that is

9  not slated to open until, I think we heard some testimony,

10  probably no sooner than 2025, 2026?  I mean, when you say the

11  "new jail facility," you're talking about the one where -- and

12  I'll ask the County and the sheriff as to where we are on the

13  construction, but are we talking about the one that was a part

14  of all the testimony about what the County was going to do in

15  the future?

16       MR. DUDLEY:  Yes, Your Honor.

17       THE COURT:  Okay.  So there is no plan, to your

18  knowledge -- well, first of all, the County is still detaining

19  many people who suffer from mental illness and also suffer

20  from what you-all would determine to be; that is, people in

21  the scientific community, Mr. Dudley, people who suffer from

22  severe mental illness?

23       MR. DUDLEY:  That's correct, Your Honor.

24       THE COURT:  There is a difference; right?  I'm just

25  asking.  I think you-all labeled some people maybe have mental

1   illness and conditions and then there are some who do have

2   SMI.  I believe I've seen the reports and stuff, and I think

3   even in this report the number is somewhere around -- I think

4   I've seen it -- 200 persons who suffer from SMI; is that

5   right?

6         MR. DUDLEY:  That's correct, Your Honor.

7         THE COURT:  And you say the County has no plan with

8   respect to, I mean, how these people will be -- and this may

9   be the wrong word, how these people will be handled or treated

10  or provided for?

11        MR. DUDLEY:  Well, just to be clear, Your Honor, the

12  number that we're talking -- that you were just talking about

13  are the number of detainees who are suffering from a disorder

14  that we would consider to be a serious mental illness.

15  There's a subset, a much smaller subset, of that population

16  who are currently acutely ill and highly symptomatic as

17  opposed to those with serious mental illnesses who have been

18  stabilized on medication and are somewhat better able to

19  function and may be in general population units, although

20  receiving treatment and on medication.  So the mental health

21  unit was designed for those who are more acutely ill and

22  highly symptomatic, so much so that they're unable to function

23  in the general population.

24        THE COURT:  Okay.

25        MR. DUDLEY:  So that's a subset of that larger

1    population.

2         THE COURT:  Right.  Do you have any of the information

3    with respect to the work that you needed to be done,

4    Mr. Dudley, that -- any information through -- after May or

5    June of 2022?  I mean, do you have any more information with

6    respect to the reporting and stuff that you are tasked with

7    reviewing that is beyond April or May of 2022?  Mr. Parrish

8    said his information basically stopped in April or May of

9    2022.  Is that the same for you?

10         MR. DUDLEY:  Yes.

11         THE COURT:  Okay.  Thank you.  I appreciate it,

12    Dr. Dudley.

13         I turn it back to you, Ms. Simpson.

14         MS. SIMPSON:  I think the areas that I usually

15    investigate and cover are grievances, PREA records, and more

16    administrative type of issues, and I think those are covered

17    in the report.  I don't know that they need to be highlighted

18    here.

19         In addition to the issues that Mr. Parrish and

20    Dr. Dudley spoke to, I think of great concern is the lack of

21    access to information and documents that we have had access to

22    in the past.  That's been referenced here several times today,

23    but that's definitely a serious problem for us to do the

24    monitoring that we're required to do.

25         And with that, I will close other than answering any

1  questions you may have.

2      THE COURT:  Okay.  Thank you.  And as I typically do,

3  I'll give the parties an opportunity to ask any question or

4  raise any points.  But before that, I simply, you know, have

5  the County and the sheriff here -- and maybe you-all have

6  divided up the role of who is responsible for providing

7  information on requests that -- to be done.  Maybe the County

8  and/or sheriff now -- with the Court's order having scaled

9  back not only the -- well, the consent decree and the

10  stipulated order down to its injunction, it may be that the

11  County has taken -- the County and/or the sheriff is taking

12  the position that there may not be any need to have any

13  contact with the monitors and provide any reporting, and that

14  may be one of the reasons why they're -- according to the

15  monitors -- I mean, I'm hearing that they've not been given

16  the information that they need, so how -- I guess I'm asking

17  the County and the sheriff, why is it that the monitors have

18  not received the information that they need to do -- to

19  prepare this 17th monitoring report and/or do what is -- what

20  they've been tasked to do?

21      Because it may be that the parties believe that, you

22  know, there's no more role for the monitors in light of the

23  last injunction, and if that's the case, I mean, you're free

24  to tell me that.

25      MR. HALL:  May it please the Court?

1          THE COURT:  Yes.

2          MR. HALL:  Your Honor, this is John Hall for the

3     record.

4          That's not the County's position at all, Your Honor.

5     We would not flout this court or any court's orders with

6     respect to turning over documents, *et cetera*.  There's been a

7     transition.  We told the Court there's been a transition.  The

8     monitoring team knows there's been a transition.  The most

9     recent documents -- and for background, the documents are sent

10    a month -- there's a month lapse.  So, for instance, they

11    wouldn't have August records because we're still in August, so

12    at this point, they would have June and July.  We're working

13    on getting them June and July.  In June -- I want to say the

14    last time they got records was late June, which would have

15    covered May -- or April -- March, April, and May.  So there's

16    a lag as far as how documents are sent.

17         Now, Mr. Shelson and Ms. Simpson spoke last week with

18    respect to specific documents that are requested; right?  We

19    can't turn over documents on demand.  If somebody says, hey, I

20    need quarterly this or IAD from that, that's one thing.  Now,

21    there is a bit of a disconnect, Your Honor, with what is to be

22    turned over.  For instance, in the last -- the most recent

23    injunction, it advises that the investigative reports are

24    supposed to be turned over every four months.  The monitors

25    and I guess the Government feels that, no, we want them on a

1    monthly basis.

2         At the end of that, the most recent injunction says

3    that they're supposed to be told if there's an escape, an

4    injury to a detainee that requires hospitalization, a riot,

5    something else within three days of that happening.  The

6    monitoring team through Ms. Simpson's position is that any

7    rapids -- that's -- and a rapid is just a report that they've

8    come up with to give rapid notification to people that need to

9    know what's going on.  That any rapid whatsoever is supposed

10   to be downloaded as soon as we get it.  That's not what the

11   injunction says.

12        The investigation records are not supposed to be sent

13   over as soon as an investigation is done, and that's supposed

14   to be uploaded.  That's not what the injunction says.  It says

15   every four months.  The -- June and July, they're on the way.

16   I got a batch, and I know the monitoring team and the

17   Department of Justice would not have appreciated me sending

18   over a batch of documents the way I received it from RDC.

19   We're still working some kinks out with respect to how we're

20   getting documents from the facility.  It's changed in the last

21   month, to be honest with you.  I don't know if we have

22   somebody different getting me the documents, but there was

23   just a batch of 100 documents here, a batch of 42 documents

24   there.  So I had to go through and cull out each document to

25   upload, and that's what I'm doing now.

1          So with respect to the production of documents, if

2     there's an October site visit planned, then if we can get them

3     June, July, August would be done I want to say probably in the

4     middle of September just to make sure everybody has their

5     things in.  They'll have all their records in ample time to

6     investigate what they need to investigate prior to showing up

7     in October, Your Honor.  But it's not the County's position --

8     or the sheriff's department position that the consent decree

9     was shaved down and everything else was done.  The stipulated

10    order would shave down that we don't have that obligation.

11         The production has stayed the same.  Even though --

12    that's ironic in my mind that even though the consent decree

13    was shaved down, the stipulated order was shaved down, now

14    we're working on a document that's 10 pages as opposed to 59

15    pages, the amount of documents remain the same to be

16    prepared -- or propounded to the Government.  So in keeping

17    with that, we're trying to keep up with what we owe them.

18         THE COURT:  Well, what I've seen in this report is that

19    the monitors contend that they -- obviously in advance of the

20    most recent site visit and what we heard previously is that

21    they requested certain information and that information did

22    not come to them at some point in time.  They were able to get

23    it after they began the visit, but they still did not receive

24    all the information necessary to go into this current report

25    that we're discussing.  So I'm trying to figure out where the

1    breakdown -- one of the questions that was asked before you

2    came on was Mr. Synarus Green was the dedicated person as a

3    compliance officer and was doing all that was necessary from

4    the perspective, I guess, of the monitors, but since he's no

5    longer there, those duties may have been divided or reassigned

6    to someone or to somebody.  It may be more than one person.

7         But, again, getting the information necessary to

8    compile the report has been, I guess, at best, haphazard.  So,

9    you know, it may be that the new jail administrator -- I don't

10   know who assigns the duty within the sheriff's department.

11   Since it involves the jail, maybe the new jail administrator

12   has decided, you know, that those tasks would be performed by

13   someone else.

14        You know, I'm just trying to make sure that the

15   monitors can do their job so long as the monitors are required

16   to do their job.  Yes, this court has announced that it will

17   be appointing a receiver, but, of course, it's my expectation

18   that the monitors will provide some sort of briefing to the

19   receiver just like the monitors would provide it to anybody

20   else who's assigned to the task of overseeing the facility.

21        So I'm just trying to figure out what is the hang-up or

22   the holdup or what.  I do know that we did talk about a

23   Dropbox thing at some point in time, but, again, that only

24   will help us on a going-forward basis.  But there's a gap

25   here.  This report here goes through about April or May.

1    There's some touching on June, but even in preparing for

2    October's report, which is about 60 days away, the receiver

3    tells me -- excuse me, the monitors -- Mr. Dudley just said

4    it, Ms. Simpson, Mr. Parrish just said, you know, that they

5    have not received any information since May or June, and

6    obviously they have work to do and work that they could be

7    doing.  So I'm just trying to figure out why is the

8    information not getting to the monitors.

9        MR. HALL:  Two things to speak to that, Your Honor.

10   You're right; Mr. Green was dedicated.  That was his job to

11   get documents from where they needed to be, send them to where

12   they need to go.  We have a compliance person, call it what

13   you will.  She's new to this job, so pulling specific

14   documents and then knowing how to -- who to get them to, who

15   to get them from, there has been a learning curve with that

16   and we're, unfortunately, still going through that learning

17   curve.  I'm new to this job, Your Honor.  I've only been the

18   sheriff's lawyer for, what, six months, so there's a learning

19   curve for all of us.

20       But as far as the -- that's not true that they've not

21   gotten anything since May.  The Dropbox shows that they

22   received documents as recently as late June that would have

23   covered that prior quarter.  Again, it's a work in process,

24   Your Honor.  We're working as fast as we can to turn over to

25   them -- to turn over responsive documents to them.  We're not

1    just turning over any document that's drafted down there at

2    RDC and just turning them over to them.  I don't know how they

3    were getting it before, but it doesn't work like that now.

4          And it's also my understanding that the monitoring team

5    was communicating with specific people when they needed

6    documents.  So before I got on the call, I don't know if

7    anybody spoke to that.  I know that with classifications --

8    well, she's been out for bereavement, but I know that in the

9    past Ms. Simpson has talked to certain people if something was

10   lacking.  I don't know if that's happened recently, but if it

11   was said on the call, I missed it.

12         But, Your Honor, I'm pushing as much documents out as

13   we can as quickly as we can to comply with the Court's order.

14   There's no stonewalling or anything like that.  The County is

15   in a bad enough predicament than to raise the ire of this

16   judge over something like turning over documents.

17         MR. GAYLOR:  May it please the Court?

18         THE COURT:  Well, hold on.  Let me make this point.

19   This most recent monitoring report has been done just like all

20   the others, except this one here is pared down, because it's

21   only tied to the things that the Court says are more important

22   in the new injunction.

23         But as I appreciate it, a draft of this report went to

24   the parties a week, ten days, two weeks, sometimes before the

25   report was finalized.  I think the parties had an opportunity

```
 1   to comment on the draft report.  And then after those comments
 2   were received and maybe the parties discussed those, then came
 3   the filing of the report.  So I guess, then, since it appears
 4   to be some disagreement, I'll allow the County and the sheriff
 5   to tell me what they -- the extent -- what it may be or what
 6   are the disagreements to what the monitor has filed.
 7           MR. GAYLOR:  Your Honor, may I please the Court?
 8           THE COURT:  Yes.
 9           MR. GAYLOR:  With regard to, again, document
10   production, I want to reiterate for the record from the
11   County's perspective the injunction requires production of
12   investigative reports every four months.  Now, the compliance
13   coordinator position was eliminated within the most recent
14   injunction as well, and so we do have people, as Mr. Hall has
15   stated, trying to produce reports, trying to get things in
16   order properly in accordance with the Court's injunction.  But
17   perhaps there is some bit of a disconnect, as Mr. Hall has
18   stated or alluded to, with regard to the reasonableness of
19   production.  And, Your Honor, again, we haven't gone beyond
20   the four months with regard to producing documents, so we
21   certainly don't want there to be any kind of a presentation
22   from us stating that we believe to be -- believe ourselves to
23   be in a violation of the Court's order.
24           THE COURT:  Okay.
25           MR. HALL:  With respect to the objections to the
```

1    monitor's report, Mr. Shelson can speak to that.  I'll just

2    pitch it to him about the specifics of the objections.  I can

3    pull them up.

4         THE COURT:  Right.  Because all the Court has before it

5    is the monitoring report that was filed.  I don't have the

6    drafts, but I do know that there are -- I know that the

7    monitor provides the parties a preliminary draft, and I guess

8    there's some negotiation with respect to the language used or

9    findings made prior to the filing of the final report.  I

10   think that's what has been done in the past, and I take it

11   nothing was done differently in this case.

12        So, Mr. Shelson, the Government -- the United States

13   Government would also have an opportunity to chime in where

14   necessary.

15        MR. SHELSON:  So, Your Honor, this is Jim Shelson.

16        So I don't think I can adequately summarize the

17   objections that the County and the sheriff made to the

18   monitor's draft 17th monitoring report.  I think the best

19   thing to do in that regard is probably just to file them in

20   the record, so your court can have the detailed nature of the

21   objections we made.

22        I'll just highlight some of them, Your Honor.  There's

23   clearly a disconnect between the County and the monitors

24   regarding the application of the use-of-force policy.  We're

25   frankly at a loss to see a use of force that would be

1    acceptable to the monitors.

2         If I can just give the Court one example from the 17th

3    monitoring report.  It references one detainee who became

4    aggressive, used profanity, and attempted to spit on officers,

5    although I think the incident reports show that he did spit on

6    the officers.  But, anyway, the monitors then said rather than

7    placing him in a holding cell until he calmed down, a

8    detention officer sprayed him with OC.

9         Our reading of the use-of-force policy is that was a

10   completely permissible use of force when the detainee is

11   aggressive, spits on an officer.  Our view, and we think it's

12   a reasonable reading, authorizes -- the use-of-force policy

13   authorizes OC -- the application or the use of OC in those

14   circumstances.  The monitors felt otherwise, and we, frankly,

15   took issue in our written objections with the monitor's

16   conclusions regarding use of force in the 17th monitoring

17   report.

18        Alpha Pod, Mr. Parrish seems to view it as an

19   all-or-nothing proposition.  You clearly cannot move everybody

20   out of A-Pod all at once.  There's just not enough capacity to

21   do that.  But any reduction in A-Pod over time is a good

22   development, and that's what the County's trying to do.  It

23   got sidetracked on that for a variety of reasons Your Honor

24   heard about at the last hearing.

25        Next thing, Your Honor, Mr. Parrish talked about the

1    detainee who was unresponsive.  Mr. Parrish is looking at

2    that, it seems to me, as a lack of sufficient written

3    reporting.  He would want, as he just put it, to have

4    stand-alone reports that give him all the information he feels

5    he needs.

6          We'll point out, though, that Mr. Parrish obviously had

7    the information about the unresponsive detainee in connection

8    with the last site visit.  If there wasn't enough information

9    in the written report he had to make it a stand-alone report,

10   he had every opportunity to ask whoever he wanted to ask about

11   it.  He interviewed a number of people.

12         Okay.  He can fault us that the report didn't have

13   everything he thinks it should have, but he seemed to have the

14   information to follow up on it as he saw fit.  And if he

15   didn't have information based on -- if he wanted more

16   information based on the information we did give him, he

17   should have followed up.

18         Increased use of --

19         THE COURT:  Hold on for a second, Mr. Shelson.  So that

20   information shouldn't be readily available to people in

21   supervision over the -- I mean, it seems to me, and I might be

22   wrong, but if a detainee is unresponsive, that it generates

23   some reports.  The reports themselves would help the sheriff

24   or the County or whomever, and it should not take the monitor

25   coming in to ask these follow-up questions.  It seems to me

1   that the follow-up questions should be asked by those within

2   the sheriff's department.

3        I'm thinking that, yes, Mr. Parrish was able to come in

4   and ask follow-up questions, but why would it be necessary for

5   him to do that?  Because I would assume others have asked

6   these follow-up questions, and those answers to the follow-up

7   questions are somehow documented already.

8        MR. SHELSON:  Well, Your Honor, the person -- whoever

9   wrote that report that has the unresponsive information in it

10  did not have all the details in there that a monitor wanted

11  when the monitor subsequently reviews it.  People aren't going

12  to write -- I don't mean to be flippant when I say this, Your

13  Honor, but people aren't going to write perfect reports in the

14  real world, and this report didn't have all the detail that

15  Mr. Parrish wanted.

16       At that point, we couldn't go back and add details to

17  the report.  It was what it was.  He wanted it to be a

18  stand-alone report.  It wasn't.  And so that's -- that's an

19  adequacy of the written report issue.  It's not that we didn't

20  tell him the information that we had.

21       THE COURT:  Was the initial report sufficient in the

22  sheriff's view is the question, I guess.  That detainee so and

23  so was unresponsive and whatever information was in that

24  report at that time, that incident report, I guess the sheriff

25  finds that that information is -- whatever's in that incident

1    report was sufficient for the sheriff?

2           MR. SHELSON:  Given the realities at the facility,

3    that's going to happen from time to time.

4           THE COURT:  Okay.

5           MR. SHELSON:  The increased use of Tasers, increase

6    relative to what?  You know, there was -- at the longer

7    hearing two hearings ago, there was a lot of testimony about

8    the introduction of Tasers to the facility.  So obviously

9    introducing Tasers to the facility is going to increase the

10   use of Tasers.  It just is, because you introduce these Tasers

11   to the facility and they're going to be employed from time to

12   time, so, yeah, there's going to be an increased use of

13   Tasers.  So the question isn't so much is there an increased

14   use of Tasers; it's is the use of Tasers consistent with the

15   use-of-force policy?  And we maintain that it is.

16          The report that Mr. Parrish -- it was Ms. Simpson, I

17   think, mentioned where a detainee was suicidal and a sergeant

18   said they didn't have the staff to deal with it, that did

19   happen.  But my recollection is there's another -- there's a

20   further report that was provided to the monitors, because I

21   saw it in reviewing the materials from the last site visit,

22   and that sergeant was almost immediately overruled.  So, yeah,

23   the sergeant said -- had a poor reaction to that incident, but

24   the sergeant's shortcoming was dealt with and addressed

25   timely.  And so, you know, that's the kind of thing we have a

1    problem with and one of the things we raised in the

2    objections, to my recollection, is the full story doesn't

3    always come out in these monitoring reports, which is an

4    underlying problem we have with them.

5         But with that said, Your Honor, based on what was said

6    by the monitors previously, those are the things I can address

7    here.  The rest, like I said, we'd like to address by filing

8    our objections with the Court.

9         THE COURT:  Okay.  Does the United States wish to

10   respond in any way, Mr. Cheng?

11        MR. CHENG:  Yes, Your Honor.  I hesitate to go into too

12   much detail because in many ways, it feels like we're

13   rehashing the last two evidentiary hearings and just arguing

14   about what is excessive use of force and what's really

15   required by the Court's orders.  I think those have largely

16   been resolved in our favor, and I don't really want to give

17   credence to the defendants' position.  But I do want to flag a

18   couple of points.

19        The first is this idea of a four-month timetable for

20   turning over records.  That doesn't make any sense.  It's not

21   required by your order.  There is a right of access to records

22   that is not tied to the site inspections.  The site

23   inspections are every four months.

24        Additionally, under your newest order under paragraph

25   161 for immediate notifications, whatever they call them,

1   whether immediate notifications or emergency notifications or

2   rapid notifications, those are supposed to be done

3   immediately, and if they're not doing it until they feel like

4   it, that is problem right there.

5       I would also mention, Your Honor, that, frankly, it

6   feels a little bit like there's a bit of gaslighting here

7   about what's going on.  We have an e-mail from counsel for the

8   board, Mr. Morisani, to the monitor dated August 21st where

9   counsel for defendant says, "Because of the uncertainty over

10  the monitor's continued existence, we cannot agree or commit

11  to a site visit at the end of October."  So this idea that

12  they're preparing documents for an October site visit and

13  they're willing to cooperate and this is all about transition,

14  what they're telling you in court does not match at all what

15  is going on behind the scenes here.

16      On top of that, what doesn't make sense is that a lot

17  of these records are presumably already assembled.  As

18  Mr. Parrish indicated, some of the HR records, the staffing

19  figures, these do not require a trained new compliance

20  coordinator.  They don't require anything other than counsel

21  to do their job and provide the records when they've been

22  requested, and they didn't do so.

23      So, you know, I mean, if you really look at what's

24  being said versus what's being done, what's been said months

25  ago versus what's being represented today, what it really

1    looks like is defendants are in contempt of the latest court

2    orders as well and this is not good faith.  This is just

3    plain, old-fashioned ignoring the Court's orders and hoping

4    they can just outlast the monitors.

5          This ties a little bit to the substance, too, Your

6    Honor, because it feels a little bit like they're working to

7    create obstructions in order to limit the records to say that

8    there are no current and ongoing violations.  If there are no

9    documents and they don't cooperate with discovery, then they

10   position themselves differently for appeal.  That's a

11   problematic approach, because under the standard for

12   deliberate indifference, when the defendant goes out of their

13   way not to gather information or not to know something, that

14   is itself evidence that they're deliberately indifferent to

15   the problems that are happening in the facility.

16         So in a way, what they're doing to monitor shows a

17   breakdown in their system for internal controls, quality

18   assurance, managing the facility.  It shows that we have a

19   defendant who doesn't want to have systems alerting them of

20   their problems, who doesn't care if the people providing

21   oversight think there's an issue, because they're just not

22   going to cooperate.  That is itself an indication of a very

23   deliberate effort to avoid dealing with their problems.

24         As Your Honor mentioned, the use-of-force policies,

25   they've known for some time that you really can't just use

1    force to punish people after the fact, and yet we have

2    esteemed defense counsel here arguing that everything they're

3    doing complies with their own policy.  Well, under the

4    contempt orders, at least for now, they should not be doing

5    that, and to continue to defend it and to continue to allow a

6    client to do that, to continue to allow them to not do

7    investigations in a timely way, do incomplete reports, and

8    excuse it, that's highly irresponsible.

9         The jail is barely holding on with the staff it's got.

10   You know, we don't have a receiver.  We have an administrator

11   who is sort of transitioning out.  We've got rampant, you

12   know, problems in the jail.  Right now is not a good time for

13   us to be playing these types of games, Your Honor.

14        You know, if we have contempt again of these orders,

15   what can we do about it?  I think I'll address that more, Your

16   Honor, if you're ready to talk about the receivership, but

17   suffice it to say their response makes no sense to us.

18        THE COURT:  Before we talk about the receivership,

19   Mr. Cheng, I do want to ask these questions of the sheriff

20   and/or the County.

21        Is there a policy yet in place -- I guess have all the

22   detainees been vaccinated?  That's number one.  Have all the

23   correctional officers been vaccinated?  Not that they're

24   required to.  I'm just asking.  Have they -- what's the

25   testing policy, if you will, for COVID in the institution?  Is

1  there a testing policy?  Is there a vaccination policy?

2       MR. HALL:  Yeah, I can get all that to the Court.  I

3  can't speak on whether or not each and every detainee has been

4  vaccinated, because as the Court knows, it's a fluid situation

5  with who comes in and who leaves.  I can get a census number

6  from our COVID coordinator and get back to the Court hopefully

7  while we're on this call.

8       With respect to the officers, it's my understanding all

9  of our detention officers are vaccinated.

10       With respect to the actual policy, I can get that to

11  the Court also.

12       THE COURT:  And you did mention the fluid situation of

13  people coming in and going out.  You know, are people who come

14  in, are they tested and quarantined, or how is that handled?

15  And I only raise this question because the sheriff and the

16  County tied, I believe, a COVID -- a COVID outbreak, I think,

17  to Mr. Parrish.  Basically --

18       MR. HALL:  That's correct, Your Honor.

19       THE COURT:  -- accused him of spreading COVID

20  throughout the facility, and that he was the one that did it.

21  And I'm trying to figure out how does the County know that

22  Mr. Parrish was the original source of all the COVID that ran

23  through the detention facility at that time when he came?

24       MR. HALL:  For me, Your Honor?

25       THE COURT:  Yeah.  From whoever -- whoever had stood up

1  and said that that is the case, that Mr. Parrish is the

2  original source of the outbreak of COVID.

3        MR. HALL:  Right.  So as far as the detainees that come

4  in and out of the facility, they are tested and quarantined

5  when they come through the facility.  So they go through

6  booking, they're held, their tests are either -- if they're

7  negative, they're placed into the facility.  If they're

8  positive, they're quarantined.

9        The testimony, I think, was clear that we had not had

10  any type of outbreak in that facility, Your Honor, since the

11  beginning of the year.  Then you have Mr. Parrish who comes

12  down to the facility, advises that he had some symptoms, goes

13  through the facility, by his own admission spoke to several

14  individuals throughout the facility without his mask on.  That

15  night --

16        THE COURT:  There was also testimony that he did have

17  his mask on; right?  I mean, there's a conflict in that with

18  respect to some of the testimony; right?

19        MR. HALL:  There's not a conflict, Your Honor.  The

20  only conflict was Ms. Simpson said his mask was on the whole

21  time, but Mr. Parrish himself denied that and he agreed that,

22  yes, my mask was off during my visit to the facility.  So if

23  there was any conflict, it was on the monitor's part, not on

24  the proof from the County.  It's clear he was down there

25  talking to folks with his mask off.  That's in the record,

1   Your Honor.  It's also clear that we didn't have any outbreak

2   before this.

3          THE COURT:  Were the county employees or the

4   correctional officers who also go in and about the place

5   throughout the facility, are they tested on a daily basis?

6          MR. HALL:  No, Your Honor.

7          THE COURT:  Did any of the correctional officers

8   have -- did they have COVID in between the time of the

9   beginning of the year and this latest outbreak?

10          MR. HALL:  There is no record of any correction officer

11   having COVID prior to this break -- prior to this outbreak

12   that could be attributed to that -- a detention officer

13   spreading COVID in this facility.

14          THE COURT:  Has all the COVID subsided now?

15          MR. HALL:  It has.

16          THE COURT:  Okay.  So no more -- anybody with COVID

17   there in the facility?

18          MR. HALL:  I'd have to look to see.  We have -- our

19   COVID coordinator sends a report to all of our county

20   officials:  to Judge Green, who I see is on the call; the

21   circuit court clerk; the public defender; the DA.  So there's

22   a daily note to say what the COVID numbers are.

23          THE COURT:  And there have been occasions where people

24   with COVID have actually been transported to the Hinds County

25   Court; right?

1        MR. HALL:  There were occasions where people that were

2   under quarantine were transferred to the court.  Whether or

3   not they are COVID or not, I can't speak to that.

4        THE COURT:  Okay.

5        MR. HALL:  There were people that were under quarantine

6   that have been sent to the court.  Again, it's also my

7   understanding, had that been the case, I'm not aware of a

8   spike in COVID at the Hinds County Courthouse.  If that was

9   the case, then it came from us.  Again, this guy brought it --

10  he was positive, went down to talk without his mask on, had

11  symptoms, and we had this outbreak.  Now --

12       THE COURT:  I think the testimony was he had symptoms

13  and he tested negative; right?  COVID symptoms are runny nose

14  or whatever, but he tested negative before coming on to the

15  facility was part of the testimony; right?

16       MR. HALL:  That's what he said, right.

17       THE COURT:  I understand that's what he said.

18       MR. HALL:  Right.

19       THE COURT:  Mr. Gaylor, did you want to add anything?

20       MR. GAYLOR:  Yes, Your Honor.  Mr. Hall has stated our

21  position that, yes, the Monitor David Parrish did bring COVID

22  into the facility.  But beyond that, I wanted to reiterate our

23  position that our delay in closing Pod A was related to that

24  outbreak, because, again, we had to put -- we basically had to

25  shut down Pods B and C while they were under quarantine, and

1    several detainees were infected at that point.  So, Your

2    Honor, it is related to that.  That is our position for the

3    record.

4         THE COURT:  Okay.  Now, turning to the receiver issue

5    because the Court asked -- and I know it's going to be

6    appealed and all of that, and I know we have one appeal

7    already pending on motion to stay pending.  But turning to the

8    issue of the receiver, the parties have put forth separate

9    plans on -- the parties have put forth separate plans on how

10   to -- what will be the role, I guess the -- the duties of the

11   receiver, the compensation of the receiver, and things of that

12   sort, and the parties know who -- what receivers the Court

13   will be looking to, and I'm ready to hear comments about them.

14        I do -- I think my order was pretty clear that the

15   parties had a right to submit up to three persons, and the

16   United States actually submitted the names of three persons,

17   but the County elected to only put forth the name of one

18   person, so the chances -- if there were equal chances of me

19   appointing one of the four, then those on the -- you know,

20   there's a 75 percent chance that I would appoint one that was

21   submitted by the United States, because I had no alternatives

22   other than the sole one submitted by the County, and the

23   County obviously made that choice.

24        So we'll talk about the receiver, but before we get

25   into that issue, we're going to take a 15-minute break for the

1    court reporter.  I don't expect the rest of the hearing will

2    last very long.  I do want to give you-all the opportunity to

3    put on the record and expound upon what you've put --

4    submitted in writing if there's anything you want to focus in

5    on for the purpose of this record, but we're going to take a

6    15-minute break for the court reporter.

7            We'll be in recess.  You don't have to turn off

8    anything other than your microphone and/or your camera if you

9    wish, and we'll just come back in about 15 minutes.

10                    (A brief recess was taken.)

11           THE COURT:  Counsel, we can go back on the record.

12           There's -- I see pictures popping up.  Okay.  I see

13   just about everybody who I saw earlier.  I got representatives

14   from every side.

15           So, Mr. Cheng, we're going to talk briefly, if you

16   will, about the proposals that the parties have suggested to

17   the Court or recommended to the Court with respect to the

18   receivers, and this is the opportunity for the parties to make

19   comments for or against any person who is under consideration

20   or any other details, rate of pay, whatever you might want to

21   provide to the Court.

22           I'll start with the United States.

23           MR. CHENG:  Thank you, Your Honor.

24           I think one thing we should recognize up front is that

25   there are going to be some uncertainties here.  This is a

1    substantial remedy that, you know, has to be taken, but it is

2    one that, you know, we cannot always predict what's going to

3    happen in the future, so we have to be careful how we set up

4    the receivership.  The things we do in the original order

5    appointing the receiver could have consequences for years to

6    come, and so keeping in mind that word of caution that in many

7    ways guided the Department's drafting of the order that we

8    submitted to the Court, there are couple things that we'd like

9    to talk about regarding the proposed order.

10         The first is we want to discuss sort of why we included

11   certain provisions in the receivership order.  The second is

12   we would like to talk a little bit about the candidates for

13   receiver and what we think the Court should look for in a

14   candidate.

15         Let me first talk about the draft order that the United

16   States submitted, and I'll try to keep it short.  The first is

17   that the receiver needs to have day-to-day authority to run

18   the Raymond Detention Center, and so that type of language is

19   built throughout the order.  In comparison, we think the

20   defendants' proposed order basically treats the receiver

21   almost like a jail administrator, who ultimately still has to

22   report to the sheriff.  That is not an appropriate way to set

23   up a receiver.

24         If you look at some of the oldest cases about

25   receivership, such as, for example, *Ex parte Tyler*, a

1   receiver -- it's almost like you've created an organization

2   outside of the jurisdiction of the state.  It's a completely

3   different sovereignty.  It's a position that reports to the

4   Court.  So the jail is no longer really the sheriffs, and you

5   cannot have two masters for the receiver.

6        The other thing is that while we agree that the

7   receiver should be coordinating and communicating with the

8   sheriff or the defendants, we don't think that the

9   communication is the same thing as approval or going through

10  their chain of command.

11       Another item we think we should flag is that in our

12  proposal, the receiver sets up a baseline budget.  We

13  categorically reject the idea that there should be some

14  arbitrary cap on how much the budget can increase each year,

15  but at the same time, we recognize, you know, this is one of

16  those things where there's some degree of uncertainty.  I

17  think Ms. Simpson and her team would confirm that for years

18  it's been very difficult to determine the full budget for the

19  sheriff's department.  There are pieces of it all over the

20  place.  Staffing is controlled in some ways by the county

21  board, there are some operational pieces that are run by the

22  sheriff, there are things hidden away across the system, and,

23  you know, it's therefore important for the receiver to set up

24  a baseline for the budget before everyone goes to the court

25  about what the costs should be or what the costs are that are

1  excessive.

2       As an analogy, you know, it's a little bit like the

3  receivership for a bankruptcy or a financial institution,

4  which I think, you know, the federal courts have a lot more

5  experience with outside of this context.  You don't go in and

6  say, you know, here's the accounts and this is the only thing

7  you can do.  With a receivership, you actually go in and one

8  of the first things you do is make sure there's an accounting

9  of what's actually in the funding for the organization, what

10  are the resources and assets that need to be used by the

11  receiver.

12       The fourth thing I'd like to mention is that the

13  receiver is going to have some challenges because of the way

14  the new injunction is created.  We do have some concerns about

15  the operational problems that the receiver is going to

16  encounter.  For example, it's a little unclear what happens

17  with work center detainees.  The receiver has no jurisdiction

18  over the work center, but, you know, who's running the jail

19  system as a whole?  Who controls admissions?  Who controls

20  discharge?

21       If the receiver had complete control over the jail

22  system, that would be one thing, but because of the nature of

23  the order, at present there are some potential operational

24  issues.  So without waiving any rights of appeal, our proposed

25  order addresses these problems through several mechanisms,

1    including a provision that says the receiver controls

2    admissions and discharge to RDC --

3         THE COURT:  Hold on for one second.  Slow down just a

4    little bit, Mr. Cheng.

5         Is that what you needed?

6         I'm sorry.  Slow down for the court reporter, sir.

7         MR. CHENG:  Sure.  So, you know, if the sheriff wishes

8    to admit prisoners into the system, the sheriff has that

9    continued authority to do so.  The sheriff continues to

10   function as an officer of the State.  However, RDC is under

11   the receiver's control, and so there needs to be some

12   protection so that the receiver actually can control what's

13   going on inside the receiver's facility.

14        The receiver also has to have access to records

15   relevant to RDC operations regardless of where they are

16   actually held at present.

17        The receiver, again, while able to coordinate and

18   communicate with the sheriff and other county agencies, at

19   some point there may be something that requires the receiver

20   to carry out the responsibilities that is still technically

21   under the control of the sheriff or that the sheriff or the

22   County assert that they retain control over.  So there have to

23   be some mechanisms to resolve those types of disputes.

24        Another category we'd like to flag is that with the

25   receiver -- we had a chance to come up with something less

1  than a receiver.  The idea of a compliance director was

2  floated with defendants.  Your Honor is aware that the

3  compliance director idea was used in New Orleans, for example,

4  and in a more amicable relationship with defendants, you can

5  have somebody who is sort of a step less than a receiver, more

6  like a joint actor, a joint manager for the facility, where

7  there's more coordination and deference to the defendants.

8      But at this point, after all this litigation, the

9  contempt, the noncooperation, that type of model isn't really

10  appropriate.  The defendants' draft order looks a lot like

11  that kind of compliance director model where there's a lot

12  more deference to the defendants, but we're now talking about

13  a receiver, and so that model is not really appropriate in

14  this context.

15      I also note that it's especially not appropriate given

16  the problems with, you know, even over the last few months,

17  trying to get the defendants to come into compliance with the

18  new court orders, to get them to cooperate with the monitor,

19  to get them to just do the things that are needed even under

20  the status quo.

21      And that sort of takes me to the last sort of big

22  substantive issue under our draft order.  We are aware, Your

23  Honor, that the Court thinks it may be possible to phase out

24  the monitorship.  We are actually a lot more pessimistic about

25  that.  As I said at the beginning, there's a lot we don't

1    know, and the receiver is going to come on board brand-new

2    without a lot of information about the history of this

3    facility, without much information about what's going on in

4    the facility.

5         At a minimum, having a transition process and having a

6    monitor there to provide that type of information and work

7    with the receiver will help the receiver, you know, get a jump

8    start on their job.

9         But there's a broader issue institutionally for having

10   a monitorship that is separate from the receivership.

11   Receivers are a -- you know, they are a strong remedy being

12   taken by the Court.  It may be a necessary remedy, but like

13   any other remedy, there are potential pitfalls and there are

14   potential abuses, and even though we really have great

15   confidence in our receiver candidates, you know, it would be

16   irresponsible for us as a government agency to recommend a

17   receivership that has no checks and balances.  A monitorship

18   is one of those checks and balances.  Now, there are things

19   you can do with the monitorship that can be, you know,

20   modified while the receiver is in place so that there isn't,

21   you know, a lot of conflict between the two, but there needs

22   to be a way to audit the receiver as well.

23        Again, going back to sort of the financial model, if

24   you have a receiver that takes over a corporation, nobody

25   would ever get rid of the auditors or say that there's no

1    longer a need for an accounting firm to make sure the books

2    are appropriate.  You need to have some type of safeguard.

3         Now, that's another area where, you know, we disagree

4    strongly with the defendants.  There are a lot of ways we can

5    approach this, but there needs to be some type of independent

6    review process.

7         This is especially important because there are going to

8    be some gaps in the timeline.  So, for example, there's no

9    receiver now, but there is the monitorship.  Defendants,

10   however, have indicated they don't really see the need to

11   produce records and some other things even now during the

12   interim stage.  There are things this court needs to know

13   about what's going on in the case that are going to continue

14   regardless of whether or not a receiver is on-site, and so

15   having this process of the monitorship that's already in

16   place, having it stay in place until there's something, you

17   know, that works for everybody, that would just be something

18   we strongly recommend.  And quite frankly, we think the

19   monitorship works, and so it should be retained.

20        I know the defendants feel like the monitors are biased

21   or they have their concerns about the monitorship.  The bottom

22   line is the monitors were jointly selected.  It's going to be

23   a problem trying to come up with an alternative process that

24   the parties will agree to anyway, and this so-called bias, the

25   reality is the monitors have been accurate.  They have

1  repeatedly testified and been supported by the record.

2  Whereas the defendants have not really been able to disprove

3  many of the basic facts that have been presented by the

4  monitors.  That is not bias.  It is just an uncomfortable

5  truth for the defendants.

6       Let me talk to my second category, which is just the

7  receiver candidates, and I'll just address briefly sort of the

8  concerns here that the defendants have raised.  We do think

9  that the candidates we propose are fine candidates.  They all

10 have substantive jail or systems reform experience.  They also

11 have experience dealing with courts and other political

12 entities, which in some ways, you know, is something they're

13 going to be able to do and need to do if they're working for

14 the sheriff, the Board, and the Court.

15      There were a few concerns raised by Ms. McCampbell

16 about her work in other cases.  We would just note that she is

17 a monitor in those other cases, not a receiver.  A monitor is

18 different from a receiver because, you know, they don't really

19 control what defendants do.  So however long it takes the

20 defendant to comply with an agreement may not have much to do

21 with the monitor at all.  It's quite different from a

22 receivership.

23      As for partiality, Ms. McCampbell is private

24 contractor, like many others.  She has worked with DOJ.  But

25 lots of people have as well.  You know, Hinds County gets

1    federal relief funds.  The undersheriff received federal

2    training.  There are other government agencies providing funds

3    to other parts of the government.  When it comes to government

4    contracting and government entities, whatever Ms. McCampbell

5    has done in the past is not a legal conflict, and all it

6    really is is actual experience, and it shouldn't be held

7    against her.

8          I think something similar could be said about

9    Mr. France, Wendell "Pete" France.  His work in particular

10   with DOJ I believe was almost 12 years ago, so to complain

11   that that shows partiality is particularly, you know,

12   untenable here.  And the fact is he was basically a state

13   official who ran a large jail in Baltimore and has had an

14   array of consulting jobs, which gives him good perspective on

15   a lot of criminal justice issues; on county, state, local

16   government issues.  So he also has a nice balance of skills.

17         I think Ms. McDonald contacted us, and I understand she

18   may have withdrawn her candidacy and may have notified the

19   Court, so I won't go much into her.  I do understand she might

20   be willing to serve in an interim basis, but, again, to keep

21   it short, Your Honor, that's the basics in the Department's

22   view.

23         THE COURT:  Thank you, Mr. Cheng.  Ms. McDonald has

24   withdrawn her name for consideration.  We were prepared to

25   interview her last week, as we've interviewed McCampbell and

1    France, to do our due diligence after having received the

2    resume/vita experience or whatever.  I have interviewed those

3    two candidates.

4        I'll take up any comments from the County with respect

5    to these candidates or whatever the County wishes to say.

6        MR. SHELSON:  Your Honor, this is Jim Shelson.

7        With respect to the candidates, I'll start there.  So

8    all the County has is the CVs that the Department submitted

9    directly to the Court back in February and our own internet

10   research.  We'd like the opportunity to do due diligence.  We

11   didn't feel comfortable without consulting with the Court of

12   just trying to contact the candidates the Department put up,

13   but we'd like the Court's permission to do so.  We should have

14   more information than just their CVs.  The -- that's just not

15   enough to go on, Your Honor, and this is the first we've

16   heard, for instance, that Ms. McDonald has withdrawn.

17       The Court talked about --

18       THE COURT:  I heard that -- I found that out on

19   Thursday of last week or Thursday that she had withdrawn.

20       MR. SHELSON:  Yes, Your Honor.

21       THE COURT:  She contacted the Court on Thursday.

22       MR. SHELSON:  Yes, Your Honor.  But my point is that

23   that's new to the County.

24       And the court spoke about its due diligence with the

25   candidates.  The County should have the same opportunity.  We

1    also think, Your Honor, that the people being considered for

2    the receiver, that that information should be filed in the

3    public record, in the court's public record, as should the

4    Department's proposed order appointing receiver.  We think not

5    to do it is inconsistent with Local Rule 79 because not having

6    that information in the public record takes -- it's not in

7    there for, one, appellate purposes, and it's effectively

8    submitting that information under seal.

9         But, Your Honor, we think that fundamentally if a

10   candidate worked for DOJ in any capacity, whether it was

11   12 years ago or 12 days ago, that that's disqualifying on its

12   face.  There's enough people presumably who can do this job

13   who have not worked for the Department.  Your Honor, a

14   person -- this person is going to be running the Raymond

15   Detention Center day to day.  The person running the Raymond

16   Detention Center should not have worked for the party that

17   sued the County and the sheriff.  That's a facially

18   disqualifying issue and from the beginning, Your Honor, it

19   would -- it causes -- it would cause an objectively reasonable

20   person to question that person's neutrality, and for that

21   reason, Your Honor, it's disqualifying.

22        THE COURT:  Well, let me ask you about that particular

23   point.  Again, I gave the parties the option to give me three

24   names.  The United States gave me three names of people I

25   believe that they were familiar with.  Hinds County gave me

1   one name of a person who is under current contract with the

2   County.  You gave me the name of Mr. Frank Shaw as the only

3   name, and that person is under current contract with the

4   County.  And not only that, that -- the -- at one point in

5   time, there might have been an attorney-client relationship

6   between Mr. Shaw and the current set of lawyers for the County

7   when the County -- when lawyers were representing EMCF and he

8   was at least the warden at EMCF.  He may not have been the

9   client of the County, but he was certainly the representative

10  of that entity.

11          So why would that not be an inherent conflict,

12  particularly just looking at the facts as they exist right now

13  when Mr. Shaw is under a current contract that's due -- that

14  will not -- well, that's due to expire Wednesday but is under

15  consideration to be extended at least for another month or on

16  a day-to-day basis?  But certainly at the time that the name

17  was submitted, the County had equal right to submit a name of

18  someone other than a person who it was under a current

19  contract with.

20          So how can the County now say that a reasonable person

21  might assume that a person like Mr. France, who might have

22  been under a contract with DOJ, not necessarily these lawyers,

23  but with the DOJ 12 years ago, and Ms. McCampbell being --

24  having been affiliated or having some relationship with DOJ

25  based on being a -- I don't know if that's -- if what these

1   people are are anymore than experts or contract hires, I mean,

2   what's -- am I missing something here?  What's the difference?

3   Why is it so -- inherently such a -- why is it so obvious that

4   reasonable minds might determine that there's a conflict or

5   just because these people had prior contracts with DOJ?

6        MR. SHELSON:  Because, Your Honor, if you asked me now

7   based on what's transpired, I'd say that Frank Shaw's

8   disqualified.

9        THE COURT:  I'm sorry?

10       MR. SHELSON:  If you asked me based on what has

11  transpired since we first gave you Mr. Shaw's name as a

12  potential receiver, I'd say that he's disqualified for the

13  same reason that I just made the argument for that DOJ's two

14  remaining candidates are disqualified.

15       THE COURT:  But the County submitted Mr. Shaw's name

16  knowing that Mr. Shaw was under current contract with the

17  County and did not give me any other name, none other name.  I

18  asked for three names.  I gave the parties an opportunity to

19  send me three names.  The County gave me one, a name of

20  someone who it is under obligation to pay to run the facility

21  right now.

22       MR. SHELSON:  But, Your Honor -- all that's true, but

23  here's where we are.  The Court has already announced it's not

24  going to consider Mr. Shaw as the receiver, and there's not

25  one time since the Court has announced that that we've asked

1    the Court to do otherwise.  So the fact that Mr. Shaw is not

2    going to be the receiver doesn't mean that the two remaining

3    candidates are -- in their stand-alone capacities should be

4    the receiver.  If they are disqualified because of their past

5    relationship with the Department that's a stand-alone issue.

6    It may be that none of the remaining two candidates should be

7    the receiver, and if that's the case, I mean, they need to

8    stand -- they need to be stand-alone candidates, and if they

9    have a conflict, then they have a conflict.

10        THE COURT:  Okay.  Anything else that the County wishes

11   to say about these or any other matters?

12        MR. SHELSON:  Your Honor pointed out that Your Honor's

13   last order, ECF 204, about the qualifications of the receiver,

14   we would just point out that those -- the Court's expectation

15   regarding the qualification for the receiver have not been

16   enumerated.  And the reason why we mentioned that is if you

17   just take the certified jail manager point that we've heard a

18   lot about -- and I'm only going by their CVs because that's

19   all I have -- only one of the candidates put up by the

20   Department is a certified jail manager.  Beyond that, there's

21   a number of things that we just don't know about, which is why

22   I started with due diligence.

23        You know, Ms. McCampbell resigned from a prior

24   monitoringship.  We don't know anything about that.  It may be

25   nothing to be considered about, but we just don't know.  And

 1    we should have more information than just their -- than just

 2    their CV.  And so we renew our request to interview them.

 3          And there's some fundamental information, Your Honor,

 4    that all these candidates, whoever's being considered, should

 5    have to apply beforehand, like hourly rate or how they

 6    contemplate being compensated.

 7          Turning, Your Honor, to the specific -- to DOJ's

 8    proposed order of appointment, the receiver is a broad remedy

 9    and the Department's proposal essentially has no limitations

10    or caps, and that's a problem.  And it has in many instances

11    incredibly loose language which, combined with a broad remedy,

12    is not good.

13          And just to one of Mr. Cheng's point, we'd like to

14    point out that the County defending itself is not a lack of

15    cooperation.  Mr. Cheng said that the County's proposed order

16    has a receiver reporting to the sheriff.  It does not, Your

17    Honor.  We'd be curious to know which paragraph he thinks says

18    that, but we would submit that that's not in the order.  It

19    talks about that the receiver shall seek input from the

20    sheriff unless doing so would cause unreasonable delay, but

21    there's no language in the County's proposed order that the

22    receiver is reporting to the sheriff.  They both contemplate

23    day-to-day control of the facility being with the receiver.

24          We think the Court should be very careful about

25    separating the patrol side of the sheriff from the detention

1   side of the sheriff.  That's a bright line, and it should be

2   maintained.  The order submitted by the County attempts to do

3   that, the Department's does not, and if I understood the

4   Department argument that it just made, it doesn't think such a

5   line should exist.  So fundamentally, to give you an example,

6   Your Honor, the receiver should have no authority to, for

7   example, convert patrol officers to detention officers.

8   The -- it's critical that the receiver's broad power -- and no

9   matter how the Court does it, this receiver is going to have

10  broad power -- be confined to RDC personnel specifically and

11  no further.

12       Mr. Cheng said that there should be no arbitrary cap

13  on, for example, a budget.  An arbitrary cap on a budget is

14  better than arbitrary unlimited authority, which is what the

15  Department's proposed order gives the receiver.  Unlimited

16  authority, Your Honor, is never good, and it's not good here,

17  and there's a way to cap and limit the authority of the

18  receiver to nonetheless let the receiver run the jail on a

19  day-to-day basis.

20       To the monitors --

21       THE COURT:  Well, have you thought about how that cap

22  would work, Mr. Shelson?  If there should be a cap, how should

23  that cap work?  Should it be capped at what the County -- I

24  guess that -- I don't know how the sheriff does his budget

25  right now, but obviously some portion of his budget is

1    dedicated to things affiliated with RDC and its tentacles.

2    Should the receiver be capped at whatever level that now

3    exists or that level plus 1, 2, 3, 4, 5 percent or something

4    like that?  How would the County propose such a cap?

5         MR. SHELSON:  Your Honor, in the County's proposed

6    order, it proposes that it can -- a million dollars year to

7    year.  So in year one, the monitor could spend up to

8    $1 million more than the prior year; year two, 1 million more

9    than that, and so on.  So, I mean, if you just assumed a

10   three-year receivership, over three years that would in theory

11   allow the monitor, for example, to increase RDC budget

12   $3 million over that three-year period from the current

13   budget --

14        THE COURT:  And the current --

15        MR. SHELSON:  -- according to the County's proposed

16   order.

17        THE COURT:  And the current budget would start at what

18   RDC -- the amount of funds going to RDC right now?

19        MR. SHELSON:  Yes, Your Honor, in this current fiscal

20   year, which is --

21        THE COURT:  The County's fiscal year ends in July, I

22   think.

23        MR. SHELSON:  No.  It's October.

24        THE COURT:  October.  I'm sorry.

25        MR. SHELSON:  I believe so.  So that's what the County

1    proposed in its order.

2          THE COURT:  Okay.

3          MR. SHELSON:  The monitor -- the point, Your Honor,

4    that the Department raised about its view that the monitorship

5    should continue and their underlying pessimism in that regard,

6    counsel mentioned that the monitors, I'm assuming from their

7    historical knowledge, working with the receiver and being a

8    source of information, Your Honor, that's one thing.  That's

9    not -- that's being a resource.  That's not continued

10   monitoring.  So I'm not entirely clear what the Department is

11   proposing in that regard.

12         But, Your Honor, we want to be clear:  This

13   receivership order is going to turn over the jail management

14   to the receiver.  The receiver is going to be running the

15   show.  And so if -- this is what we don't get, Your Honor:

16   The monitor at that point is really not going to be monitoring

17   the County.  The monitor at that point will be monitoring the

18   receiver, because the receiver is running the show.  So even

19   under DOJ's proposed order, the ways the County could be in

20   contempt, it's hard to figure out why.

21         I mean, one example would be, you know, funding the

22   jail at X amount of money and the County doesn't do it.  But

23   absent that, the receiver is running the jail.  If the jail's

24   not in compliance once the receiver's in place, with possibly

25   very limited exceptions, like not funding something they were

1    ordered to fund, the compliance is not the County's

2    noncompliance at that point.  It's the receiver's

3    noncompliance.  So why -- the Department may disagree with

4    that, but that's, frankly, disagreeing with reality.  And so

5    why we'd be having a monitor going forward to monitor the

6    receiver, frankly, Your Honor, the County does not get that.

7         Your Honor, a few specific points.  And we'll be happy

8    to submit a red line of our comments if the Court thinks that

9    would be helpful, but -- I'm not going to address every

10   comment we have, Your Honor, but in the Department's

11   introductory paragraph to their proposed order, they talk

12   about the fact that a receiver is likely to provide a

13   relatively quick and efficient remedy.  We don't think that's

14   an established fact in the record.  Then their boilerplate

15   language about receivership being a narrowly drawn remedy, we

16   certainly don't agree with that.

17        The -- in Section 1 of the Department's proposed order,

18   it's -- the language is:  The receiver's authorized to hire

19   subject matter or technical assistance consultants as the

20   receiver deems necessary to perform the receiver's functions.

21   That's just a classic example, Your Honor, of overbreadth and

22   excessively broad language.  That's the thing that begs for a

23   cap.  I mean, within reason the receiver shouldn't be able to

24   hire as many consultants as he or she wants.  There should be

25   a limit on stuff like that, on how many consultants the

1    receiver can appoint, because money is finite, Your Honor.

2    There's no way around that.

3         And on that point, for example, Your Honor, the -- in

4    the County's proposed order, the proposed number of

5    consultants the County proposed is two.  Your Honor, I don't

6    know why they do it, but several points throughout the

7    Department's proposed order, sometimes they refer to RDC;

8    sometimes they refer to the jail.  Whatever the Department is

9    referring to in their proposed order as the jail is not

10   defined, and that gives us pause.  Either the Department

11   means -- when the Department means "jail," they either mean

12   RDC or they mean something in addition to RDC, and that at a

13   minimum needs to be clarified as to what the term "jail" means

14   in the Department's proposed order, because it could have

15   significant ramifications.

16        Again, Your Honor, we don't think that the receiver

17   should have open-ended budgetary authority.  We think it

18   should be capped.  We think subsumed in that cap should be the

19   authority to make capital improvements.

20        As we read the Department's proposal, it gives the

21   receiver authority with respect to the new jail facility.  We

22   think that the receiver should have no authority with respect

23   to the new jail.

24        THE COURT:  May I interrupt?  Let me ask a question

25   about the new jail.  Where are we?  Has any dirt been

1    overturned?  Are they still doing studies, soil studies, or

2    what stage of the process are we in, and is the County still

3    on track to open the jail when it announced that it was

4    seeking to build a new jail?

5         MR. GAYLOR:  Your Honor, may it please the Court?  The

6    County is still on track.  In terms of site preparation, all

7    the plans are being made for that.  Obviously we've got

8    architects, construction folks who have been hired for that

9    purpose and who have been being paid for that purpose.  We're

10   in the process of doing a significant amount of infrastructure

11   in cooperation with the City as well as the school district.

12   So that process has been ongoing for the last couple of years

13   and is going forward as planned, as possibly feasible.

14        THE COURT:  So has ground been broken?

15        MR. GAYLOR:  There hasn't been a ground-breaking

16   ceremony, but dirt has certainly been disturbed, Your Honor.

17        THE COURT:  Okay.  And remind the Court again, when is

18   the target opening month or year or --

19        MR. GAYLOR:  I don't have the specific information in

20   front of me, Your Honor, but I would state that we're talking

21   about within 24 months, I believe, for the first phase.

22        THE COURT:  For it to be built and open and running?

23        MR. GAYLOR:  For the first phase.  Your Honor, I'm not

24   positive because I don't have my construction folks on this

25   call, so I don't want to say -- speak out of turn.  If

1   Mr. Hall has a better recollection, he can speak on it as

2   well.

3        THE COURT:  I mean, is the plan that sometime possibly

4   in 2024 or 2025 phase one would be completed?  Is that the

5   plan?

6        MR. HALL:  That is my understanding, Your Honor.

7        THE COURT:  Okay.

8        MR. HALL:  And I think that was the testimony before

9   the Court as well.

10       THE COURT:  Yeah.  We can go back and check.  Okay.  I

11  just wanted to know if we were still on-site to -- still on

12  target to hit that.

13       Go ahead, Mr. Shelson.

14       MR. SHELSON:  Your Honor, I think it may be '25-26 as

15  opposed to '24-25, but the record will speak for itself.  But,

16  Your Honor, just to get through this, the next thing I want to

17  highlight, this is Section 3, powers and authority of the

18  receiver, subsection B, personnel, in the Department's

19  proposed order.  It says, the receiver shall have the power to

20  hire, fire, suspend, supervise, promote, transfer, discipline,

21  and take all other personnel actions regarding employees or

22  contract employees who perform services related to the

23  operation of the RDC.  Your Honor, that's impossibly

24  overbroad.

25       For example, the sheriff provides services related to

1  the operation of RDC.  Certainly the receiver should not have

2  authority to fire the sheriff.  It should go without saying

3  that the receiver cannot fire a duly elected public official.

4  The Board of Supervisors performs service related to RDC.  The

5  receiver can't fire them.

6       THE COURT:  Would the County agree to making that list

7  to exclude the sheriff, the elected county officials, and -- I

8  mean if you remove the sheriff, if you remove the elected

9  county officials, and maybe the officials who report directly

10  to the Board of Supervisors, that would be the county

11  administrator, because that person too would have some

12  responsibility, I take it.  If you look at it broadly, I think

13  the County would conclude that the way it's written now, it

14  might include the county administrator, so if you remove those

15  persons plus anyone who reports directly to the Board of

16  Supervisors -- I don't know who that might be other than I

17  guess -- I think all the other employees report to the county

18  administrator, like the budget person, the inventory person,

19  people like that in the county system, or at least the way it

20  used to be set up, the deputy county administrator, to the

21  extent there is one, the person who's over maintenance maybe.

22       Is there a list that we can agree with that would fall

23  under the rubric of the receiver that -- a list of persons we

24  can agree with?  You know, obviously the sheriff would not be

25  one, nor would the members of the Board of Supervisors, and in

 1    my view the receiver would have no right to fire, for example,

 2    or to even hire a county administrator.

 3         MR. SHELSON:  Well, we agree with that, Your Honor, but

 4    to answer Your Honor's question directly, we don't think

 5    that's narrow enough.  The way the County proposed dealing

 6    with this is that the receiver's authority to hire and fire

 7    would be directly limited to people who work directly at RDC.

 8    And if Your Honor -- you know, the other way to handle that is

 9    if -- if the receiver, for example, wants to fire somebody who

10    doesn't work directly at RDC, at a minimum he should have to

11    come to Your Honor.

12         THE COURT:  Okay.

13         MR. SHELSON:  You know, there needs to be a direct

14    connection at the facility and that -- you know, the receiver

15    would be running RDC.  He wouldn't be running the sheriff's

16    department, and that's kind of where I started with, for

17    example, maintaining the critical distinction between patrol

18    and detention.

19         The next sentence in that same paragraph, Your Honor --

20    I won't read the whole thing in the interest of time, but it

21    concerns the receiver's powers with respect to establishing

22    personnel policies.  Essentially the same issue, Your Honor:

23    Personnel policies for the RDC as opposed to, for example, the

24    sheriff's office as a whole or anything broader than RDC.

25         The point about negotiating contracts, Your Honor, I

1    think we all need to be careful there.  Certainly the receiver

2    should have no ability to put the County in breach of an

3    existing contract, and before the receiver -- if the receiver

4    thinks that an existing contract needs to be breached, you

5    know, that subjects the County to a breach of contract claim,

6    but the way that the County's proposed order dealt with that

7    is if the receiver is going to take an action that puts the

8    County in breach of an existing contract, the receiver needs

9    to come to the Court first.  We think that's a reasonable

10   limitation.

11       Requisition.  Our point there, Your Honor, is that

12   state law is state law, and the receiver needs to comply with

13   state law.

14       Your Honor, there's layers of expenses in the DOJ's

15   proposal.  There's a receiver, they want the monitoring to

16   continue, they talk about consultants, they talk about legal

17   staff, they talk about staffing the office of the receiver,

18   and they talk about various accounting obligations.  That all

19   adds up, Your Honor, and we think those layers of cost that

20   are built into the Department's proposal only reinforces why

21   there should be caps.

22       Records maintained by the receiver or the office of the

23   receiver in the Department's proposal are not public records.

24   We don't understand why that's the case.  There should be

25   transparency except for to the extent, you know, that the

1    receiver has otherwise protected information, such as HIPAA

2    information.  Absent something like that, the receiver's

3    records should be public records.

4        The term Your Honor proposed by the Department is that

5    the receivership shall remain in place no longer than

6    necessary to remedy the unconstitutional conditions justifying

7    the appointment.  Your Honor, we think that's inconsistent

8    with the Court's order at ECF 204, which we read to tie the

9    duration of the receivership to the opening of the new jail.

10       We think that the Department's proposal for a

11   transition plan is unworkable.  If the receiver is in charge

12   of the jail, the receiver's in charge of the jail, and there's

13   not a way to -- to transition it back in the sense that the

14   County's responsible for some things, the receiver's

15   responsible for others, so we just don't think that will work.

16       Indemnification, Your Honor, that certainly should be

17   tied to the receiver's performance of the duties under the

18   order in his official capacity.  If the receiver does

19   something outside of that, certainly there should be no

20   indemnity obligation.

21       Preexisting rights of access and discovery rights.

22   That provision of the Department's proposal, Your Honor, we

23   think is unduly broad.  The receiver's going to be running the

24   show.  Again, if the Department, once the receiver's in place,

25   wants information regarding the jail, they should have to go

1  through the receiver, because it's the receiver's show once

2  he's appointed.

3        Your Honor, one or two other things very briefly.

4  Mr. Cheng referenced the proposed October visit by the

5  monitors.  I'd just like to let the Court know the County's

6  position on that.  The Court's order at ECF 204 says two

7  things in that regard.  First, it says within 30 days of

8  appointment of the receiver, the monitor and her team shall

9  submit a final report to the County.  And then on the last

10  page it says the receiver shall begin to work as soon as

11  possible but no later than November 1st.

12        Your Honor, we presume that the Court will appoint a

13  receiver sometime before November 1st, and so our point about

14  October is, for example, I don't know if the Court appointed a

15  receiver this week, then October is inconsistent with the

16  Court's order because it wouldn't be within 30 days of the

17  appointment of the receiver.  Your Honor, we're not being

18  obstructionist.  That's what the Court's order says.

19        And we also don't think it's unreasonable, Your Honor,

20  to ask -- you know, the court order at 204 says submit a final

21  report.  If the Court means by that another full-blown

22  monitoring site visit and then the 18th monitoring report

23  would constitute the final report, then so be it, that's the

24  order of the Court.  But in fairness, Your Honor, when the

25  court wrote "final report," the Court may have meant something

1    differently, and so that's the other point we wanted

2    clarification on is whether by "final report" the Court means

3    another full-blown site visit.

4         And, Your Honor, the final thing I'll say is -- and I

5    don't want to argue these points.  I just want the Court to

6    know where the County is coming from.  On the four months for

7    investigation report, Your Honor, we're basing that on the new

8    injunction, Section 7(f), paragraph 68(f), and on our point

9    about the rapid notifications, we're basing that on the new

10   injunction, Section 18, paragraph 161, and we think the

11   language used and that we just cited supports the arguments

12   that Mr. Hall and I previously made on those points.

13        THE COURT:  Okay.  Thank you, Mr. Shelson.  Let me just

14   ask a couple of follow-up questions with respect to the sort

15   of objections that have been raised to the persons who the

16   Court is currently considering.  You know, other than the

17   Court releasing another order asking persons to apply to be

18   the receiver, what is it that the Court could or should do

19   after having given the parties again to give me three names,

20   and then how might that impact the timeline?

21        I don't think it's necessary, for example, for all the

22   receivers who apply to have that information publicly filed.

23   Otherwise, I would tell you that I've two or three people to

24   contact the Court and say, I am an appropriate receiver;

25   please consider me.  One of whom says that he has much

 1   experience in the state prison system as well as the federal

 2   prison system, so I know how they each ought to run; you can

 3   contact me at, and he gave me his phone number.

 4        I mean, so rather than go through that process of doing

 5   that, the Court thought it was best for the parties to put

 6   their best foot forward on trying to get names and/or

 7   information, and now it is practically September 1, and if the

 8   Court wanted to stay on its timeline, I'm not sure if it would

 9   be possible to open up a process where we would receive

10   applications and then not only that but, of course, I'd give

11   the parties an opportunity to do their vetting or their due

12   diligence and then mount affirmative responses or objections

13   to any future candidate.  I think, you know, the County has

14   had the opportunity to put people in place without the Court

15   necessarily vetoing it, so I'm not sure if the Court ought to

16   put a receiver up who either one of these parties vetoes, but

17   I'll let you respond in kind.

18        MR. SHELSON:  Your Honor, I certainly didn't mean to

19   suggest there had to be a formal application process.  That's

20   not our view.  The Court, for example, could order

21   additional -- order the parties to submit additional

22   candidates, hopefully without -- candidates without a prior

23   relationship of some kind with the party.  If the Court is of

24   the view that the County forfeited that chance, then that's

25   the Court's view.  But, you know, where we are now is of the

1  three candidates the Department submitted, I believe, if I

2  have them straight, the one who did not previously have a

3  relationship with the Department is the one who has withdrawn,

4  and that's a concern.  I won't go back into it, but that

5  concerns the County for the reasons that have already been

6  stated.

7        So, Your Honor, I mean, another way to look at this is

8  that the Court's absolutely right that the County submitted

9  one name.  DOJ submitted three.  Two of them have a prior

10  relationship with DOJ, and the one that didn't has withdrawn.

11  So it's certainly not on the Court where we find ourselves

12  today, but, again, the Court could give the parties a very

13  limited number of time to submit other candidates without

14  prior relationships that would cause issues.

15        THE COURT:  Well, one thing that has been mentioned and

16  all is the -- was the rate of compensation, and that's, of

17  course, not anything that's in any prior order of the Court or

18  anything.  It doesn't matter whether it's an hourly rate,

19  daily rate, monthly rate, annual rate of compensation,

20  whatever.  I mean, I think the parties -- I think the Court's

21  fairly clear that the receiver should stay on no longer than

22  necessary to make sure that the County's in full compliance,

23  which technically, I guess, it could take literally months, it

24  could be years, or it could even exceed the time where the new

25  facility is open.

1          Just because the new facility is open does not mean

2    that the County has fully complied with -- because I take it

3    when the new facility is open at phase one, there will still

4    be some people at RDC.  I presume they will be somewhere

5    unless there's a plan where there will be people somewhere

6    else.  But so long as persons are being detained and under the

7    jurisdiction of Hinds County, Hinds County is obligated to

8    make sure that they abide by the constitution.  So it doesn't

9    matter that you have one facility or two facilities.

10         I mean, just right now I think the Court has found

11   everything works pretty much well at the work center, so

12   therefore the work center has not been part of the new

13   injunction, I don't think.  Or Henley-Young, not part of the

14   new injunction.  It's RDC.  And just because the County does

15   go about in opening up phase one but leave some people over

16   there at RDC, well, the Court might find or, you know, someone

17   may contend that the constitutional rights of those who remain

18   at RDC, you know, are still being violated, in which case

19   presumably the receiver could still be in place.  But the

20   receiver could have remedied everything much prior to that and

21   there may not be a need for a receiver.

22         So in that regard, I think in the County's proposal --

23   I don't have it before me, but I think the rate of pay that

24   the County suggested ought to be devoted to a receiver, if I'm

25   not mistaken, and I don't have it before me, was somewhere 50

1  and $75,000 a year.  Is that right?

2       MR. SHELSON:  Yes, Your Honor.

3       THE COURT:  Okay.  Now, I guess in defense of that

4  figure, I guess my question is:  The current jail

5  administrator with whom you have a contract with is paid,

6  according to public filings of the County -- I don't think the

7  County's ever -- maybe the County has said it, but public

8  filings on your board minutes, I believe, show that Mr. Shaw's

9  contracted at the rate of $14,500 per month plus some amount

10  of money for housing allowance, I think.  So roughly 14,500,

11  $15,000 a month, or even more.  I think there was a payment of

12  3,000 something dollars to the Westin.  I don't know if that's

13  where he's staying.  But assuming it's $15,000 a month, that

14  equates to about $180,000 a year.  So why would the receiver

15  be paid substantially less than the County -- than the jail

16  administrator who the County has contracted with at this

17  point?

18       MR. SHELSON:  I'm sorry, Your Honor.  What was --

19       THE COURT:  I'm just --

20       MR. GAYLOR:  I'll say this, Your Honor.

21       THE COURT:  For the County -- for the current jail

22  administrator, the contract is something like $14,500 a month,

23  if I'm right.  I may be wrong.  And if I'm wrong, please

24  correct me.  But annualized, that's almost $180,000 a year, I

25  think.

1          MR. GAYLOR:  For the record -- may it please the Court?

2          THE COURT:  Yes.

3          MR. GAYLOR:  For the record, we did want to make clear

4    that the contract is $14,500 per month.  That is not -- we are

5    not paying expenses associated with his housing, *et cetera*.

6    So the contract is $14,500 per month, which was supposed to be

7    for a temporary period of time as the interim jail

8    administrator.  That is not the proposal for the permanent --

9    a permanent jail administrator.

10          THE COURT:  What is the proposal for the permanent jail

11    administrator that the County's in negotiation with to serve

12    at this point?  I mean, because I heard Mr. Hall say that

13    they're working -- you've identified -- the sheriff has

14    identified a person who would be the jail administrator.  What

15    is the salary that is being negotiated around that particular

16    person?

17          MR. HALL:  It has to fall in line -- Your Honor, this

18    is John.  It has to fall in line obviously lower than what the

19    sheriff is making by statute and fall in line somewhere with

20    his other department heads, chief deputy, somewhere along that

21    line.  So I can pull that number.  But the amount that we were

22    paying Ms. Bryan was way outside of what we had previously

23    paid any jail administrator.  Same thing with Mr. Shaw.

24          THE COURT:  What was being paid to Ms. Bryan?

25          MR. HALL:  She was making, like, a thousand dollars

1   less than the sheriff is my understanding.

2        MR. GAYLOR:  Uh, she have made roughly -- annually she

3   would have made roughly about 113, $114,000 a year.

4        THE COURT:  Okay.

5        MR. SHELSON:  But, Your Honor -- this is Jim Shelson --

6   the number for the receiver in the County's proposal is

7   $75,000, and if I could tell the Court where we got that.  The

8   Department's receiver candidates are from Florida, California,

9   and Maryland.  The California one has withdrawn, but we

10  assumed that if one of these individuals were appointed as

11  receiver, they weren't going to move permanently to

12  Mississippi, and so that's why it was less, for example, than

13  Mr. Shaw.  Now, if one of these --

14       THE COURT:  Mr. Shaw didn't move to Mississippi, did

15  he?  Did Mr. Shaw move to Mississippi, or did he move to

16  Mississippi for six months?

17       MR. SHELSON:  He moved to Mississippi for six months.

18       THE COURT:  He moved here?

19       MR. SHELSON:  He kept his Florida residence, but he --

20  the point is Mr. Shaw was a full-time administrator.  We don't

21  expect the receiver's full-time duty to be a receiver.  I

22  mean, if you just like at the resumes, they're all doing other

23  things now.  I suspect they're not going to quit those.  And

24  so if, as we suspect, this isn't going to be the receiver's

25  only job, they shouldn't be contemplated otherwise -- they

1    shouldn't be compensated otherwise.

2         MR. GAYLOR:  Your Honor, the presumption is that the

3    jail administrator -- that we will have a jail administrator,

4    Your Honor, and so that expense was not going away.

5         THE COURT:  Was Mr. Shaw a full-time employee for the

6    County, or did he not do work with anyone else, is my

7    question.  I mean, you say he moved here now.  His residence

8    was still in Florida.  But he moved here, and I assume then he

9    was reporting to or worked out of the detention center or

10   wherever he was set up on a daily basis in Mississippi.

11        MR. GAYLOR:  May it please the Court?  Mr. Shaw was

12   acting as our interim jail administrator.  The number that is

13   being associated with the potential receiver presumes that a

14   full-time jail administrator is still going to be there.  So

15   we did not presume that that receiver would be acting as the

16   jail administrator *per se*, and so numbers associated with that

17   receiver's amount was going to be based on the fact that a

18   full-time jail administrator was being paid and still in

19   place.  We understand that that receiver could hire or fire

20   the jail administrator, which adds to our issues in making

21   sure that we have one in place.  But nevertheless, that

22   position would still be there.  So the amount of compensation

23   associated with the receiver presumes that the full-time

24   administrator is still there, Your Honor.

25        MR. SHELSON:  That, Your Honor, and there's consultants

1    for the receiver.  We've proposed capping it at two.  The

2    Department proposes no cap, but what you have potentially

3    under the Department's proposal is the receiver, you have a

4    receiver with the right to bring in his or her own jail

5    administrator, you have some number of consultants, and you

6    possibly have the continuation of monitoring.  And so it

7    raised in our mind serious questions of whether this receiver

8    is really quote/unquote a "full-time job."  We can parse what

9    Mr. Shaw did, but the intent of Mr. Shaw was for the jail

10   administrator to be his full-time job.

11          THE COURT:  Okay.

12          MR. CHENG:  Your Honor, if I may?

13          THE COURT:  Yes, Mr. Cheng.

14          MR. CHENG:  I think, you know, a lot of this stuff

15   we're getting really into the weeds in a way that may not be

16   making this clearer.  It's actually a lot simpler than I think

17   defendants want to make it sound.

18          Ultimately the receiver is your officer, Your Honor,

19   far more so than the monitor.  It's basically a remedy, and

20   just as you put all the limits that you need to on the

21   receiver, the orders that already exist, the constitutional

22   standards that apply are the limits of the receiver.  But

23   beyond that, it's all pure speculation about what the receiver

24   might do with their consultants and everything else.

25          Intellectually one has to understand -- you know, I

1   said earlier once you put a receiver in place, the jail is now

2   moved into a different sovereignty, into a different entity.

3   It's almost like you have a completely different agency.  And

4   I think defendants haven't quite understood that yet, which is

5   why they're bringing up all these things like, well, what

6   about the jail administrator and what about the consultants?

7        There is now a separate jail, and it's run by the

8   receiver, which is under the direct control of the Court and

9   controlled by the orders of the Court, and those are its

10  limits, and beyond that it really isn't any of the defendants'

11  business.  They are -- they are going to be responsible for

12  certain things, because no matter how much we try, there's

13  always going to be some type of a relationship between the

14  County and this jail, the Raymond Detention Center.

15       So, for example, you know, this idea that the receiver

16  could fire the sheriff, it's kind of a -- it's a straw man

17  argument because the sheriff shouldn't be operating in the

18  jail, period.  It's not as though the sheriff is providing

19  direct supervision of inmates.  And they can certainly try to

20  misinterpret our order and suggest it's too broad, but, again,

21  getting back to first principles, the sheriff is a separate

22  constitutional officer working for the County.  He doesn't

23  operate in the jail at all.  And to the extent he does, there

24  is a mechanism for dealing with the coordination.  If he were

25  for some reason actually directly interfering in operations in

1  the jail, yes, the receiver could kick him out.  But he'll

2  still keep his position with the State or the County because

3  that is a separate sovereignty.  And so when you keep that

4  principle in mind, a lot of this stuff -- it's very clearly a

5  straw man argument.

6       Likewise, with the cost issue, once you recognize that

7  it is a separate entity and the receiver is a separate entity,

8  they do have to have a separate budget, because who's

9  defending the receiver, you know, if there's a dispute?  It's

10 not the County, because the receiver works for the Court.  So

11 the receiver needs to have separate protections in the event

12 there is some type of dispute.  It could be something as

13 simple as an employee complaining that the receivership

14 exceeds its authority.  It could be the sheriff complaining

15 about the receiver.  The Department of Justice does not

16 represent the receiver.  The receiver is a part of the

17 judiciary.

18      It would be just like if somebody complained about a

19 magistrate judge or complained about a member of your staff;

20 it's a separate organization.

21      I will say that there is one thing I agree with

22 Mr. Shelson about, that there are some findings the Court

23 should probably make before appointing a receiver.  The PLRA

24 does apply.  We have included language in our order that we

25 think follows your contempt orders about how this is a

1    necessary remedy.  We think we've already demonstrated why

2    it's more efficient than the years and years of noncompliance

3    by the defendants.  But it is important that the Court

4    actually state the language of the PLRA and make those

5    findings when appointing the receiver.

6         I feel like the County has more to say, so I don't -- I

7    just wanted to interrupt a little bit because I felt we were

8    getting a little bit sidetracked here, but we do have a few

9    more comments as well afterwards.

10        THE COURT:  Okay.  No, no, you can finish up with your

11   comments, Mr. Cheng.

12        MR. CHENG:  Okay.  So the other thing, let's talk a

13   little bit about, like, the budget.  We recognize that the

14   receiver, you know, needs to get a salary, but, again, the

15   receiver is your entity, you know.  Your Honor, when the

16   receiver is interviewed by you, you decide what is reasonable.

17   And at a minimum, we think that's going to depend on the

18   receiver.  That's something that's going to have to be worked

19   out by you and the court.

20        Now, if the defendants think it's too much money or

21   something like that, they can complain about it later, object

22   about it later, but a lot of those details have to basically

23   be resolved by the judiciary.  It's not something that

24   necessarily gets raised right now.  Or to the extent it should

25   have been raised, the defendants have been a little bit tardy

1    about raising it.  A lot of these issues should have been

2    brought up -- actually, frankly, were brought up some time ago

3    about the expense of receivership and the problems with

4    receivership, and defendants lost.  So, you know, we're past

5    that point.  We're just calculating damages, so to speak, and

6    those damages are whatever is necessary to bring the facility

7    into constitutional compliance.  That is the ultimate check

8    there.

9         And then the other thing I'd mention is, you know,

10   Mr. Shelson indicated that they don't try to control the

11   receiver, and, you know, how many times did the defendants say

12   they would let jail administrators run the jail independently

13   and would not interfere?  The record is replete with examples

14   of how that never worked out, so we do think it's absolutely

15   important to make that really clear.

16        In their order, for example, on page -- I think it's

17   page 7, the sheriff gets to approve the plan of action.  The

18   sheriff makes decisions on personnel.  The County can overrule

19   certain things if it impacts the County.

20        We're not saying the County or sheriff have no

21   authority.  They continue to retain some authority over the

22   powers that they exercise independently as county officials.

23   But if it gets in the way of the receiver complying with the

24   Court's orders in implementing constitutional requirements,

25   they lose out.  And I think that's all we're doing with our

 1   order.  And so I think this idea that they're not going to

 2   interfere, not try to get in the way, almost everything the

 3   receiver [sic] has said sounds like the nickeling-and-diming

 4   that they did with jail administrators.  They got into the

 5   weeds and made it impossible for the jail administrators to

 6   get their jobs done.  We're past that point, Your Honor.

 7        We need to give the receiver the power they need to

 8   carry out the Court's orders.  We need to have clear

 9   partitions between the receiver and jurisdiction at RDC versus

10   the rest of county government, so that the receiver doesn't

11   get too much undue influence or doesn't get too much

12   interference from the County.

13        And so all I can say, Your Honor, is I think our order

14   does a better job of that than the defendants' does, and while

15   it's tempting to treat it like an adversarial thing where each

16   side gets to talk about what they want, ultimately, Your

17   Honor, it's your receiver.  You've got to make sure the

18   receiver can do what you need the receiver to do, and some of

19   that is going to have to be determined more as a rolling

20   process.  It shouldn't delay the appointment of a receiver.

21        The last thing I should probably mention is the

22   conflict issue.  You know, the defendants don't actually cite

23   any case law or legal standard for why there is a conflict.

24   Traditionally there is no conflict if someone works for

25   someone in a completely different legal matter.  You know, if

1    you can create a conflict just because someone had some

2    relationship, does that mean that no expert can ever work in

3    any case if they've ever worked for defense counsel or worked

4    for a defense firm or worked for the State of Mississippi?

5    That -- that has never been recognized as the standard for

6    conflicts.

7           But then ultimately, Your Honor, again, it's up to the

8    Court.  You know, if the Court wants to let the defendants

9    interview these receiver candidates, you know, we wouldn't

10   object to that.  I mean, we do hope that the process is fairly

11   quick, but technically defendants have had a chance to object.

12   They actually filed objections.  They've raised their

13   concerns.  They have received all the process they're due.

14   Meanwhile, the jail is still terrible, the inmates aren't

15   getting relief, so what are we going to do about them?

16          THE COURT:  Thank you, Mr. Cheng.

17          Is there anything else the County would like to mention

18   or say?

19          Mr. Shelson, if the County wanted to submit a red-line

20   version -- I think you've offered to do that -- you know, you

21   have that right to do so.  Or if there are any simple little

22   things you'd like to file, you have the right to do so.

23          That's the same to the Government, to the United

24   States.  You know, if there's something that you wish to say

25   that has not been said, if there's -- I think Mr. Cheng

1    alluded to the fact the County is still in contempt.  You

2    know, the Court is here to address whatever motions or

3    submissions that the parties file.  I've not closed the door

4    to any submissions in this case.

5         But for the time being, I'm still communicating with

6    the monitors on an as-needed basis because I still think -- I

7    have not relieved the monitors from their duties, although my

8    last order said that a receiver would be in place by November

9    the 1st.  Obviously I hope to meet that deadline, but until

10   the monitors are relieved of their duties, the monitors are

11   still working and gathering information from the Court.  And I

12   would suspect that any of the information it gathers -- that

13   they gather will be information that they would use to inform

14   the installed receiver.  Now, whether that is through a final

15   18th monitoring report or some report that is determined to be

16   filed, however they best see to provide that information.

17        And, again, I think my order is pretty clear -- I think

18   it is -- that the receiver will have the sole ability to

19   determine whether or not it continues to use the monitors in

20   some capacity, maybe not as monitors like they're being used

21   now but for consultants.  I did not want to tie the hands of

22   the receiver and say that you must disband the monitors you --

23   the receiver will have a right to hire anybody he or she

24   chooses for whatever purposes subject to the Court agreeing.

25   And I know the County is saying, well, maybe two consultants,

1  but, again, the receiver is going to have to have the

2  flexibility and the capacity to do what's needed to right this

3  ship, as the County said that they wanted to do.  But this

4  court has found that it's necessary for a receiver -- at least

5  to attempt to do so.

6       So I say that so if there are any subsequent

7  submissions, again, I've not closed that off to either party,

8  submissions regarding anything.

9       So with all that said, is there anything else we need

10 to take up at this point?

11      MS. SIMPSON:  Your Honor, if I may?

12      THE COURT:  Yes.

13      MS. SIMPSON:  I'm a little unclear on whether we can

14 move forward with the scheduled site visit.  We were proposing

15 the week of October 17th, and I understand Mr. Shelson's

16 position that if you were to appoint a receiver tomorrow, it

17 would be beyond the 30 days, but that seems unlikely, and we

18 can't really anticipate with the work that has yet to be done

19 when the receiver will be appointed for purposes of scheduling

20 the site visit.  So I guess I'd just like us all to get some

21 clarification and be on the same page that we can move forward

22 with scheduling a site visit for the week of October 17th.

23      THE COURT:  I think it's reasonable for you to proceed

24 as if you need to submit a final report, I guess within

25 31 days -- or 30 days of appointing the receiver.  And right

1   now this court's order simply says that we hope that a

2   receiver should be appointed no later than or by November 1st.

3   I have not appointed a receiver yet, so, again, having a final

4   report submitted within that 30 days, it could be one day

5   before that receiver starts, for example, in my view, the way

6   that I -- you're still on the job for the Court, Ms. Simpson.

7   You and -- the monitoring team is still in place.  There are

8   things that I think it's going to help the Court and the

9   receiver.  The monitoring team still needs its job to do.

10  Until they have been relieved by the Court or the receiver

11  they still have work to do.

12          MS. SIMPSON:  Okay.  Thank you, Your Honor.  And the

13  last thing I wanted to mention, it's kind of in the weeds, but

14  the County was talking about a limitation on our right to get

15  the investigation reports, and paragraph 68(f) is actually

16  talking about having the County prepare and provide a summary

17  report on a four-month basis that includes the five things

18  that are listed in paragraph 68(f).  It's a report that

19  they've actually never done, and it would be great if they

20  did.  I think they do have a bit of a spreadsheet that

21  includes some of the information, but either way, it doesn't

22  restrict our access to documents that's covered by paragraph

23  142.  It's talking about a completely different document that

24  actually doesn't exist.  So I think that our request on

25  investigations is permitted by the new injunction.

```
 1              THE COURT:  Yeah.  I'm not suggesting that the parties
 2    bombard the Court with a bunch of filings with respect to
 3    generating motions and all that stuff, but I think the -- on
 4    the front end, I think the consent decree was fairly clear, I
 5    thought the stipulated order was fairly clear, and I don't
 6    think there's much confusion about what the injunction
 7    actually says as far as how it's written and what remedies are
 8    tied to which paragraphs or what is required.  You know, I
 9    hope the parties can find a way -- a path forward in agreeing
10    to those things.  Otherwise I do -- you know, if the County is
11    refusing to produce something that the Government believes
12    should be or that the receivers should be bringing to the
13    Court's attention, and vice versa if the County believes there
14    is stuff they are requesting; that is, that the Government
15    and/or the receivers are requesting that they have no right to
16    request, bring it to the Court's attention and we'll tee it
17    up.
18              MR. HALL:  That's the question, Your Honor, I think is
19    before the Court.  I was unclear with what provision
20    Ms. Simpson said she was entitled.  Was it 68 or 60(a)?
21              MS. SIMPSON:  The document that they're talking about
22    is in 68(f), but our entitlement to any investigations as well
23    as other documents is paragraph 142.
24              MR. HALL:  Of the new injunction?
25              MS. SIMPSON:  Right.  Paragraph 68(f) is talking about
```

1  a summary report that the sheriff's office should be creating

2  but isn't, and that summary report is supposed to be done on a

3  four-month basis.  But 142 is what gives us the ability to

4  request documents that we need to determine compliance with

5  the various provisions.

6      MR. HALL:  And the weekly -- because we may as well get

7  it straight right now with the Court on the call.  Are you

8  saying that the weekly and monthly IAD and CID records do not

9  address 142(f)?

10      MS. SIMPSON:  They don't include all of the information

11  that is required by 68(f).

12      MR. HALL:  Even though you get the underlying reports?

13      MS. SIMPSON:  We have found the County to be in partial

14  compliance because we can get the information between the

15  underlying reports and the weekly spreadsheet.  We can get the

16  information.

17      MR. HALL:  Your Honor, that's the issue right there.

18  They want a summary as well as the underlying reports.  If all

19  we gave them was the summaries, they'd jump up and down and

20  say we want the underlying reports.  They get the underlying

21  reports but then say, well, we still want it summarized.  Or

22  did I miss that?

23      MS. SIMPSON:  I'm just looking at paragraph 68(f), and

24  it says that a periodic report of investigations conducted at

25  the jail every four months should be provided and it should

1  include the five items there.  That's what's in the new

2  injunction and what's in the old settlement agreement.

3       MR. CHENG:  Ms. Simpson, if you don't mind my asking,

4  are they actually providing all the underlying reports too?

5       MS. SIMPSON:  Well, I think this topic came up because

6  we are trying to get the reports on a monthly basis and have

7  not received them for June or July.

8       MR. HALL:  We're talking prior to those.  You did get

9  all the underlying reports from the last batch I sent you;

10  right?  For March, April, and May?

11       I'm not going to waste the Court's time, Judge.

12  They're there.  I mean, she knows she got them, but she can

13  work it out with us lawyers, Judge.

14       MS. SIMPSON:  Yes, we did get them.  I just had to

15  check my list of what we had not received.

16       MR. HALL:  Right.  Your Honor, we'll work it out as

17  lawyers and not waste the Court's time on this.

18       THE COURT:  All right.  Okay.  Is there anything else

19  we need to take up?

20       MR. CHENG:  Yes, Your Honor.  If we may?  Your Honor

21  indicated that the parties might be able to submit red lines

22  or file other things with the Court.  If this does go to the

23  receivership, may we suggest that perhaps there should be a

24  schedule for it?  So the parties know, you know, if they're

25  going to submit red lines, when they're due, whether the other

1    side gets a chance to respond to it, so it gets a little more

2    certainty about, you know, is there going to be a receiver

3    appointed or when?

4         Alternatively, you know, if the Court has other

5    thoughts on how to approach that, we'll hear whatever the

6    Court has to suggest.  It just feels like it's a little

7    ambiguous to us what we're responding to.

8         THE COURT:  Okay.  No, no, no, no.  I think Mr. Shelson

9    offered or suggested that maybe they can offer some red lines

10   to the duties of the receiver, I thought.  I could have been

11   mistaken.  Because right now I've received both proposals, and

12   then I can go from those proposals, and I could actually go in

13   and figure out from the two proposals what it is I might want

14   to keep, what it is I want to delete.  So if there are red

15   lines to be submitted as to one or the other's, I welcome --

16   you know, I invite you to do that.  But I don't think that

17   that takes, you know, a significant period of time, because

18   you-all have been in the possession of each other's proposal.

19        So if there are things that the County contends that is

20   okay, for example, in what the United States has submitted,

21   you know, I'll just give y'all the opportunity to do a

22   red-line thing.  I mean, I can go from here and -- as I'm

23   already doing in deciding that which I'm keeping or taking

24   out, but it might be enhanced by giving you an opportunity to

25   redline one another's particular proposal that you have now.

1           And, again, I don't think that that takes many days to

2     do.  In fact, I don't think it takes the rest of this week,

3     actually.  So if someone wants to submit a red line -- and

4     that's the red line I was talking about, the duties of the

5     receiver.  I don't think there's anything else on the table to

6     be redlined, but I can give you-all till close of business

7     Wednesday to do that.

8           MR. CHENG:  Your Honor, I'm not sure the United States

9     would need to send a red line of the defendants' document, but

10    let me check with my office about it.  And this deadline

11    Mr. Shelson said (AUDIO GAP) you know, that sounds at least

12    pretty reasonable to get it done quickly.

13          THE COURT:  Yeah.  Because I'm moving toward trying to

14    get us on a schedule to deal with a lot of things.  So -- but

15    Wednesday -- by close of Wednesday is a good timeline for me

16    to receive anything else that you-all might want to have as

17    far as input on the duties and responsibilities of the

18    receiver.

19          Is there anything else we need to take care of?

20          MR. CHENG:  No, Your Honor, not from our side.

21          THE COURT:  Anything from Hinds County or the sheriff?

22          All right.  Thank you all for your attendance, and I

23    appreciate your patience.  And if you don't have anything else

24    before the Court, the Court is now adjourned.

25    ****************************************************************

1                    **COURT REPORTER'S CERTIFICATE**

2

3          I, Candice S. Crane, Certified Court Reporter, in and

4     for the State of Mississippi, Official Court Reporter for the

5     United States District Court, Southern District of

6     Mississippi, do hereby certify that the above and foregoing

7     pages contain a full, true, and correct transcript of the

8     proceedings had in the aforesaid case at the time and place

9     indicated, which proceedings were stenographically recorded by

10    me to the best of my skill and ability.

11         I further certify that the transcript fees and format

12    comply with those prescribed by the Court and Judicial

13    Conference of the United States.

14         THIS, the 29th day of September, 2022.

15

16                    /s/ Candice S. Crane, RPR RCR

17                    Candice S. Crane, CCR #1781
                      Official Court Reporter
18                    United States District Court
                      Candice_Crane@mssd.uscourts.gov
19

20

21

22

23

24

25