

No. 3:16-CV-489-CWR-BWR

UNITED STATES OF AMERICA,

*Plaintiff,*

v.

HINDS COUNTY, ET AL.

*Defendants.*

ORDER DENYING STAY

Before CARLTON W. REEVES, *District Judge*.

Hinds County, Mississippi and Sheriff Tyree Jones (collectively, "the County") have filed a Motion to Stay Receiver Orders Pending Appeal. Docket No. 227. The United States opposes relief. Docket No. 231. On review, the motion will be denied.

## I.     Introduction

It's been a long year of litigation. And after nearly 10 years of investigation into the conditions at Hinds County's Raymond

Detention Center (RDC), one might say it's been a long decade, too.[1]

The Court saga started on June 23, 2016, when the United States filed this lawsuit to end unconstitutional conditions of confinement at RDC and two other facilities that comprise the Hinds County jail system. The parties immediately entered into a freely negotiated Consent Decree – and later, a Stipulated Order – to correct the problems.

The County's efforts to transform one of the facilities (the Work Center) into a functional jail for the citizens of Hinds County was eventually realized. But the story was not the same at RDC.

Despite promises to comply with the Consent Decree, the County continually failed to follow its provisions. Conditions at RDC remained fundamentally unchanged. So, in November 2021, after a record seven in-custody deaths in that year, with the most recent death having occurred October 18, the Court issued an Order to Show Cause directing the County to "explain why it should not be held in civil contempt and why a receivership should not be created to operate RDC." Docket No. 100.

The County responded with more promises. This time, it vowed to correct the unconstitutional conditions of confinement at RDC if only the Court would extend the compliance deadline to July 1, 2022. *See* Docket No. 105 at 5. Quoting Robert Frost, the County declared "we 'have promises to keep and miles to go before we sleep.'" *Id*. at 4.

---

[1] If this has been a long year for the lawyers involved in this case, imagine how difficult a year it has been for the detainees living in RDC's A-Pod.

The County recorded zero miles on its journey. Rather than work to remedy the situation at RDC, the County moved to terminate or modify the Consent Decree under the Prison Litigation Reform Act (PLRA). And while it slept, RDC continued to register assaults, fires, and other imminent risks of physical danger to the innocent detainees housed there. Consequently, the Court issued its First Order of Contempt and identified "more than two dozen provisions [of the Consent Decree] where the County was non-compliant with a Court Order." Docket No. 126.

On February 14, 2022, the parties commenced a two-week trial regarding the appropriate remedy for the finding of contempt against the County, and to address the County's PLRA motion. The United States urged for appointment of a Receiver, arguing that "[c]ontinuing remedial efforts short of a receivership will only lead to further confrontation, delay, and serious harm to the people confined to the Jail." Docket No. 138 at 89. Taking the opposite position, the County contended that the Consent Decree should be "terminated and dissolved in its entirety." Docket No. 140 at 29.

After the February 2022 proceedings, the Court again found the County in contempt. Docket No. 165. The Second Order of Contempt centered on the County's decision to house detainees in A-Pod, in violation of the Stipulated Order. *See* Docket No. 165. The Order emphasized that "[i]mposition of 'an appropriate sanction for that contempt' is again reserved pending the PLRA termination motion.'" *Id*. at 18 (citing *Petroleos Mexicanos v. Crawford Enters.*, 826 F.2d 392, 398 (5th Cir. 1987) (collecting cases)).

Next came the Court's Order on the PLRA motion. In April, the County's motion to modify or terminate was substantially

granted. Docket No. 168. This Order revised the Consent Decree, excising those provisions that exceeded the constitutional minimum, and collecting the necessary remainder into a New Injunction. *See* Docket No. 169. The New Injunction removed the Work Center from the scope of remedial relief and dramatically scaled back the provisions applicable to RDC.

The County asked the Court to reconsider that Order. Docket No. 171. The United States opposed reconsideration. Docket No. 176.

Having given the County until July 1, 2022 to purge itself of contempt, per the County's request, the Court held a final mitigation hearing on July 19, 2022. The Court invited the County to argue its motion for reconsideration and welcomed any evidence that would ameliorate its record of non-compliance. After the better half of a day, the parties rested.

On July 29, 2022, the Court determined that a Receiver was warranted to operate RDC and remedy its ongoing unconstitutional conditions. Docket No. 204. The parties then submitted to the Court names of potential Receivers.

On October 31, 2022, after weighing the candidates' professional experience, the Court appointed Wendell M. France, Sr., a member of the National Institute of Corrections and American Correctional Association, to be Receiver. Docket No. 215. In a separate Order issued that same day, after weighing the parties submissions, Docket Nos. 209 and 210, the Court outlined the scope of the Receiver's Duties and Responsibilities. Docket No. 216. The Court noted that Mr. France would begin his transition into the receivership on November 1, 2022 by cultivating relationships with County

officials and developing a draft Plan of Action to achieve constitutional conditions of compliance with the Court's Orders. To effectuate a smooth transition, the Receiver's operational control over RDC would not take effect until January 1, 2023.

The present Motion to Stay followed.

## II.   Law

"A stay is an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (internal quotation marks and citations omitted); *accord Texas Democratic Party v. Abbott*, 961 F.3d 389, 397 (5th Cir. 2020). Whether to grant a stay is "left to the court's discretion," and "is dependent upon the circumstances of the particular case." *Nken*, 556 U.S. at 433. "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433-34.

When exercising this discretion, courts look to four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id.* (citation omitted); *accord E.T. v. Paxton*, 19 F.4th 760, 764 (5th Cir. 2021) (citing *Nken* in noting that the "the factors we consider in determining whether to grant a stay are by now axiomatic.").

### III. Discussion

#### A. Success on the Merits

Under the traditional four-factor test, the movant must first demonstrate a strong showing of likelihood of success on the merits. The County advances several arguments in this portion of its stay application.

First, the County contends that the Receiver Orders exceed the PLRA's need-narrowness-intrusiveness standard because they are remedies for the violation of a now-inoperative Consent Decree.

To determine whether a remedy is appropriate under the PLRA's need-narrowness-intrusiveness standard, the question is not which governing Order appears most recently on the docket. *See* 18 U.S.C. § 3626(a)(1)(A). Rather, the question is whether the remedy is "necessary, narrowly drawn, and extend[s] no further than necessary to correct ongoing constitutional violations." *See* Docket No. 168.

The County implies that unconstitutional conditions of confinement at RDC ceased once the Court replaced the Consent Decree with the New Injunction. And because the New Injunction became the operative order, the County contends, any violation of the Consent Decree is now moot.

The County further argues that the Court's analysis of the *Plata* factors was deficient. The County's reasoning assumes two premises. First, that the Consent Decree and New Injunction are two entirely distinct Orders outlining uniquely drawn provisions to ensure constitutional compliance at RDC. And second, that the erasure of the Consent Decree marks a new beginning and thus absolves the County of any alleged violations concerning either Order.

Both premises are flawed.

Though different in name, the New Injunction is a substantially pared down version of the Consent Decree. The Consent Decree contained 167 provisions; the New Injunction contains just 33 – all of which can be directly traced back to their original place in the Consent Decree itself. With congruence in mind, the Court arrived at the New Injunction by eliminating many of the Consent Decree provisions it found exceeded the constitutional minimum. For example, the New Injunction reduced the requirements imposed on the County from 64 pages to 10 pages and removed the Work Center and Henley-Young facilities from judicial oversight. Docket No. 169.

There is an obvious through-line between the County's failure to comply with the constitutional minimums in the Consent Decree and its failure to comply with the constitutional minimums in the New Injunction. Consider, as an example, the problem of inadequate staffing at RDC.

Paragraph 42 of the Consent Decree required the County to "[e]nsure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Agreement, and allow for the safe operation of the Jail." Docket No. 126 at 20. The County was non-compliant with this critical requirement. *Id.*

The New Injunction contains the exact same requirement. *See* Docket No. 169 at 2. Yet, as the Court has emphasized, the County continues to be non-compliant with this provision. *See* Docket No. 204 at 9-10 ("[S]ince the release of the Thirteenth Monitoring Report, the number of staff members has steadily decreased. In fact, the current staffing levels are the lowest

they have ever been. . . . The staffing crisis affects nearly every facet of operations at RDC."). The below chart illustrates the declining trajectory – a trajectory, it is worth mentioning, that has occurred under the present County leadership:



This is not a situation where the Court imposed new conditions on the County, only to then measure its efforts to comply using an entirely different metric. Rather, the Court's decision to impose a receivership stems from a long timeline of worsening Constitutional violations. *See Depriest v. Walnut Grove Corr. Auth.*, No. 3:10-CV-663-CWR-FKB, 2015 WL 3795020, at *12 (S.D. Miss. June 10, 2015) (highlighting that the inquiry into whether violations are "current and ongoing" for remedial purposes under the PLRA do not exist in a temporal vacuum). That timeline only codifies the County's failure to comply with the 2016 Consent Decree, including with provisions retained in the New Injunction, and the 2020 Stipulated Order. It also paints a familiar picture: that the County is not determined to correct the ongoing constitutional harms at RDC.

8

The record in its entirety, coupled with the current and ongoing constitutional violations at RDC, render it less than likely that the County will prevail on the merits. This factor does not weigh in favor of issuing a stay.

### B.     Irreparable Injury to the County

The County next contends that it will suffer irreparable harm because the Receiver will remove "all of the County's authority and fiscal control over RDC and vests it in the Receiver." Docket No. 228. Invoking George Orwell's *1984*, the County hypothesizes that the Receivership could impose financial burdens on "limited County funds," "bankrupt the County," "force the County to defund" other legitimate programs, "or raise taxes." Docket Nos. 228 and 234.

The County cleverly glosses over several "checks and balances" designed to ensure a reciprocal working relationship between the Receiver, the County, and the Court. These checks include but are not limited to: 1) "the Receiver's budget, staff compensation, staff terms of service, and other significant financial agreements subject to approval by the Court before they may take effect"; 2) the Receiver shall send the draft and final Plan of Action designed to achieve constitutional conditions of confinement "to the parties for comment"; and 3) the Court's recognition that because the Receiver position is "significant in its scope and dimension," the Receiver's Duties and Responsibilities "may be modified" as necessary from time to time in accordance with federal law, "including by motion of the parties or at the Receiver's written request." Docket No. 216.

Each of the above provisions was deliberately crafted by the Court with the twin goals of 1) ensuring that the County's

voice, as representatives of the people, was not lost and 2) ensuring meaningful opportunities for the County to contest the Receiver's decisions when it disagrees. The appointment of a Receiver, bestowed with tailored powers to remedy the ongoing unconstitutional harms at RDC, does not cast the County a phantom in its ability to exercise its own powers and meaningfully voice its concerns. The County is and will remain an active player, whose involvement and commitment to remedying the unconstitutional conditions at RDC is necessary to compliance.

Furthermore, the County's doomsday prediction that the receivership will impose extreme financial burdens on the County is premature. The Receiver is developing a draft Plan of Action to achieve Constitutional conditions of compliance. That draft has not yet been circulated to the parties. Consequently, the parties have not yet had the opportunity to provide any comment or feedback on Mr. France's draft plan. With no information related to the Receiver's projected initial operating fund, no information related to RDC's projected annual budget, and no information related to any proposed interim measure to improve the conditions of confinement at RDC, the County's fears are mere theoretical assertions not supported by any evidence in the record. That the County may incur financial burdens because the Court has appointed a Receiver to oversee the operations at RDC fails to satisfy the second factor.

### C. Injury to Interested Parties and the Public Interest

What remains are the third and fourth factors of the traditional stay inquiry: assessing the harm to interested parties and weighing the public interest. Because the United

States is the party opposing the stay, these factors are merged. *See Nken*, 556 U.S. at 435.

Focusing on injury to others, the County contends that because the United States is the only plaintiff, and "individual relief is not at issue," a stay will not injure the United States. But the County fails to understand that the United States, acting in its official capacity, represents both the public interest and the ongoing harm endured by incarcerated persons that would flow from the delay of the Receivership. *See* 42 U.S.C. § 1997 *et seq.*; Docket No. 231. Detainees at RDC are persons presumed to be innocent. Unless the County is held accountable, those persons will only continue to suffer substantial harm. Pretrial detainees should not be left to endure such dangerous conditions at RDC, including serious bodily harm, assault, and even death as they await the disposition of their charges.

Next, the County argues that the Receiver's "carte blanche" authority over RDC is contrary to the public interest because the Receiver is not accountable to the people of Hinds County. The County fails to recognize its own lack of accountability to the people of Hinds County. In June 2016, detainees Malcolm Landfair and Gerome Moore escaped using a hole they made in the wall of a jail cell at RDC. In March 2019, detainees Marcell Martin and John William Gray escaped from RDC through a crawl space. And just this past month, detainee Preston Hart escaped from a RDC courtroom after being given access to an unsecured area at the facility. To the County, these escapes are merely the result of inadequate staffing. But to the people of Hinds County, every escape poses a real and substantial threat to public safety.

11

There is another element to the public interest that the County has not considered. In this case, a Receiver will provide *more* stability and accountability for the people of Hinds County, rather than less. In recent memory alone, the County has cycled through County Administrators Carmen Davis, Jennifer Riley-Collins, Scherrie Prince, and now Kenny Wayne Jones. Docket No. 168 at 16. The Jail Administrator position has passed from Mary Rushing, to Ric Fielder, to Kat Bryan, to Anthony Simon, to Frank Shaw, and now back to Anthony Simon. It should not be overlooked that the problems have been systemic and have not been cured by any sheriff, whether elected or appointed. The Board of Supervisors, meanwhile, cannot even decide who its own President is.

The County plainly has a strong interest in the administration of jails. But the County has shown a clear lack of urgency and competency since this action was initiated in 2016. And there is no indication that the County, if left to its own devices, will remedy the ongoing constitutional harms at RDC anytime soon.

## IV. Conclusion

Again, "[a] stay is an intrusion into the ordinary processes of administration and judicial review, and accordingly is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken*, 556 U.S. at 427 (internal quotation marks and citations omitted). Hinds County has not met the high standard necessary to secure such extraordinary relief.

For the foregoing reasons, the County's Motion to Stay is denied.

**SO ORDERED**, this the 2nd day of December, 2022.

s/ CARLTON W. REEVES
*United States District Judge*
