**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**UNITED STATES OF AMERICA**                                                        **PLAINTIFF**

**VS.**                                        **CIVIL ACTION NO. 3:16-CV-489-CWR-RHWR**

**HINDS COUNTY, ET AL.**                                                        **DEFENDANTS**

**DEFENDANTS' COMMENTS AND OBJECTIONS
TO THE 18TH MONITORING REPORT**

Defendants provide the following comments and objections to the 18th Monitoring Report.  The comments and objections set out below address the draft of the 18th Monitoring Report provided to the County on Sunday, November 20, 2022.

---

**Global Objection**

Defendants Hinds County, Mississippi, and Tyree Jones, in his official capacity as Sheriff of Hinds County, Mississippi (collectively, "Defendants" or "the County"), globally object to the proposed Eighteenth Monitoring Report.  Defendants and/or their counsel participated in the Monitors' October 2022 site visit.  Counsel was able to observe the Monitors' conduct, methods of investigation, and actions during the site visit.  Defendants do not believe the Monitors are neutral observers of the facts.  They make every effort to view the considerable efforts and substantial money being poured into the Raymond Detention Center ("RDC") in the worst possible light and to give Hinds County and Sheriff Jones little-to-no credit for their efforts.

A beginning caveat.  Some of the following objections are similar to the objections the County made to the 17th Monitors' Report.  But, there are new objections of a substantive nature as well.  It would be a mistake to assume these objections are identical to the previous objections.

It remains clear the Monitors have no experience operating a detention facility under the conditions impacting Hinds County over the past two (2) years and, frankly, have virtually no "hands on" experience operating a detention facility at all.

The Monitors make broad conclusions based on limited information, much of which is hearsay and interpretation of undefined New Injunction language that is vague and ambiguous and gives rise to broad conclusions that are not helpful to the Court or Defendants who dispute the Monitors' interpretations.  Examples include the definition of "Jail Administrator" and the

---

PD.40549851.1

Attachment "A"

definition of "assault."  Making broad conclusions that detention officers are undisciplined and violating policies based on a few incident reports is simply wrong.  Defendants (and Mr. Parrish) acknowledge that officers may occasionally violate policies.  Defendants will discipline those officers when discipline is warranted, such as the three officers who were terminated (by Sheriff Jones) following his review of the circumstances surrounding a detainee's death on October 18, 2021 or the one officer terminated after simply walking off post in central control and complaining of being tired of opening and closing doors.

The County objects to every finding of "partial compliance" in the 18th Monitoring Report. The New Injunction does not contain a coherent or objectively applicable distinction between partial compliance and "substantial compliance," and the Monitors failed to articulate one at the hearing in February 2022. The Monitors' hair-splitting to avoid finding even one instance of substantial compliance is not credible and is biased on its face. As explained below, many of the partial compliance findings in the 18th Monitoring Report should be changed to compliance or substantial compliance.

Just as with their interpretation of the Consent Decree, the Monitors routinely attempt to expand or fill gaps within the New Injunction with their views of how things should be done. The Monitors should quit doing so and should remove all of their expansion or gap-filling from the 18th Monitoring Report. Worse, the Monitors continue to treat their recommendations and technical assistance as binding terms of the New Injunction. All references in the 18th Monitoring Report to the Monitors' recommendations or technical assistance should be removed.  We will point out below where the Monitors are criticizing the County for things not required by the New Injunction.  This is a significant issue.  Consent decrees and injunctions often "grow" over time because monitors add matters not required by the decrees or injunctions.  This is usually done by imposing their opinions on how things could be done better rather than what the New Injunction requires.

The past two (2) years brought the RDC incredible operational challenges, none of which Defendants could control.  COVID-19 wreaked havoc on the RDC's operations in numerous respects. After going COVID-free for several months, one of the Monitors went to the RDC while infected with COVID-19.  Immediately thereafter and with that Monitor (David Parrish) admitting he walked throughout the facility, sometimes without a mask, another round of COVID-19 infections began again in June 2022.  This new COVID-19 cycle further complicated housing in the facility and delayed the plans to begin emptying A-Pod.  All the while, the County's employees could not opt out of coming to the facility.  The RDC operates 24-7, 365 days per year, and it has to be staffed (to the extent possible) every minute of every day.  Yet, COVID-19 made staff recruitment nearly impossible.  Similarly, obtaining supplies for day-to-day operations—not to mention construction supplies and construction workers— was exceedingly difficult.  Layered on top of these operational issues, Jackson, Mississippi has become the number one murder capital of the United States, per capita.  Further complicating matters, the Jackson and Hinds County courts slowed to a crawl (if they were conducting business at all), thus arrestees were spending longer jail times waiting for the Court system to handle an increasing number of arrestees.  And, these issues do not begin to touch on the many other serious issues Hinds County faces, including law enforcement, education funding, street

repair and maintenance, court funding, financial management and technology management, just to name a few.  Of course, the Monitors have only to worry about the terms of the New Injunction and their own fees.  The Monitors have no accountability to the taxpayers and citizens of Hinds County.  Nor do they have to concern themselves with how decisions are made regarding detention officer pay impacts other County employees.  Their sole concern is to obey the New Injunction regardless of any other consideration.

In the meantime, Hinds County is left to try to comply with the New Injunction.  A lot of positive things have occurred and are occurring at the RDC.  The Monitors minimize virtually every positive development occurring at the RDC and characterize almost everything they can in its most negative light.  The County has lost faith in the Monitors and their ability or willingness to be credible in their reporting and quite frankly, in their qualifications to accurately report on the complex operational issues the County faces at RDC.

A good example of the Monitors' bias is demonstrated by their unfathomable criticism of the Interim Jail Administrator, Frank Shaw, and their over-the-top praise for the new Jail Administrator, Anthony Simon.  The 18th Monitors' Report begins with heavy praise for "new" policies allegedly put in place by Mr. Simon, and implied criticism for the fact the allegedly "unqualified" Mr. Shaw had not put these policies in place sooner.  On pages 2-3 of the 18th Monitors' Report, the Monitors effusively praise Mr. Simon for "announcing" there had been no inmates "housed" in Booking holding cells since July and that this policy "change" represented "a monumental redirection of Hinds County Sheriff's Office (HCSO) practice."  Although the County has confidence in Mr. Simon in his new role and believes he will do a great job in the future, this "new practice" that Mr. Simon allegedly put in place was in place months before Mr. Simon took over as the new Jail Administrator.  The Monitors even acknowledge this fact when they indicate this "new" policy has been in place since July, which was three (3) months before Mr. Shaw ended his time as Interim Jail Administrator.  In fact, Mr. Shaw put this "policy" in effect almost immediately after he became the Interim Jail Administrator.  Unfortunately, events beyond Mr. Shaw's control prevented jail staff from complying with the "policy" due to their judgment that housing a particular prisoner in the Booking cells trumped their "policy" of not housing inmates there.  Jail Administrators have to make situational judgments about safety of inmates and staff that sometimes supersede policies.  In this case, one particular inmate who continuously set fires throughout the facility could not be housed safely anywhere other than the Booking cells.  The individual was a State of Mississippi prisoner who was due to be transferred out of the RDC as quickly as possible.  Given the limitations of the facility and staff, the decision was made to house the individual in Booking until the State could move him.  Sometimes unforeseen circumstances cause management to make situational exceptions to otherwise sound policies and practices.  There may have been a few other short-term exceptions from time-to-time, but the Booking area has not housed any inmates since the prisoner described above left the facility.  The County sincerely hopes it does not ever again have to house inmates in the Booking area; but we also know an unforeseen situation could arise that leaves us no realistic choice but to do so.  Operational flexibility is a necessary evil from time to time.

The Monitors' Report also praises Mr. Simon for the preparation and of an undated and

revised Inmate Handbook.  In fact, this document was actively being prepared under Mr. Shaw's watch.  To his credit, Mr. Simon finalized and presented the finished product soon after he was named the new Jail Administrator, but much of the work to prepare the new Handbook was done by Mr. Shaw and his staff.

## Introduction

The Monitors refer to the 17th Monitoring Report's discussion of difficulties obtaining documents to suggest those same difficulties still existed prior to the October 2022 site visit.  Defendants will address the Monitors' commentary regarding documents below.  It suffices to say at this point, that the Monitors received hundreds of documents, conducted numerous interviews, and we are not aware of anyone the Monitors wanted to interview not being made available to interview.  *Compare* 18th Monitoring Report at 4-6 (identifying ***more than 35 interviews conducted*** to assess the County's compliance with the 38 paragraphs of the New Injunction).

With regard to the Monitors' criticism of the periodic turnover of Sheriffs, Jail Administrators, County Administrators, and Chairmen of the Board of Supervisors (we assume they mean Presidents of the Board of Supervisors), we agree things would be run more efficiently with less turnover.  Unfortunately, the pesky presence of state law, the democratic process and, in one instance, the unexpected death of a Sheriff sometimes got in the way.  We are required to conduct elections every four (4) years.  The voters have a habit of changing elected officials such as Sheriffs and the Board of Supervisors members when they are not happy with their performance.  Democratic governments are not designed to be efficient.  Procurement laws are a good example of governmental inefficiency, but are, again, necessary evils to safeguard the taxpayers' money.  The Monitors can ignore state laws and regulations, but the County does not enjoy the option of being quite so cavalier, even if it is an "archaic arrangement."

Finally, in the Introduction section, sub-headed "Medical and Mental Health," the Monitors point out that the RDC has an infirmary, a medical observation unit for acutely, severely, physically ill although detainees, it has "no comparable unit for acutely, severely mentally ill detainees, where they can be kept safe while receiving the therapeutic interventions they require . . . ."  While the County would like to have such a unit if it had the money to do so, nothing in the New Injunction requires the County to operate such a unit.  This is one example of the Monitors imposing a wish list on the County that goes beyond what the New Injunction requires.

## Executive Summary

**Corrections Operations**

The Monitors' discussion of corrections operations further reveals the Monitors' bias and overall unwillingness to recognize that the County has made steady improvements at RDC.  The Monitors' statement that "[t]oday there is little difference between B and C-Pods, as

Case 3:16-cv-00489-CWR-BWR   Document 239-1   Filed 12/05/22   Page 5 of 25

compared to A-Pod" is, put simply, absurd.  In the same vein, the Monitors' prediction that "the expensive repairs in B and C-Pods will soon be destroyed by inmates (again) in those areas because they are not supervised" is based on nothing more than the Monitors' own speculative bias against the County.  Supervision simply cannot eliminate all possibility of future destruction; and the fact remains that as we sit here today, neither B or C-Pod are on a path toward destruction.

The Monitors' statement that "[l]ongstanding problems at the RDC continue to go uncorrected" is equally troubling.  The Monitors know full-well that staffing issues are the most important issues facing RDC.  If the County had a magic wand, it would use it to be fully staffed immediately.  But, the County cannot conscript people off the street and force them to work at RDC.  Mississippi is at historical lows for unemployment – 3.8% as of October 2022.  Hinds County's unemployment rate is 3.5% as of October 2022.  Anecdotally, almost all Mississippi employers are struggling to find employees, including the Mississippi Department of Corrections ("MDOC") and virtually all private employers.   Hinds County has increased detention officer salaries twice in the past year.  The MDOC increased salaries again effective July 1, 2022, and Defendants intend to do likewise.  In addition, the County began making direct deposits of paychecks into employee accounts beginning April 1, 2022.  We would love to find more employees, but locating, recruiting and hiring employees remains a challenge and will likely remain so for the foreseeable future.[1]

Nevertheless, it is undeniable that the County has made improvements at RDC.  It is difficult to see how the Monitors can make such a claim about longstanding problems going uncorrected when numerous changes for the good have been accomplished, including but not limited to bad staff members now actually being disciplined and even having their employment terminated, doors throughout the facility now being opened and closed as designed and intended, and numerous areas within the kitchen having been repaired or upgraded.  Granted, the Monitors observed a few door-security issues.  We do not pretend to be perfect, but, overall, door-security has drastically improved and we are working daily to perfect our door-security.

In addition, the County is trying to implement direct supervision but does not have the manpower to do so.  Neither the Monitors nor a Receiver will be able to hire sufficient number of staff under current conditions.  There is no evidence of which the County is aware that additional money, in and of itself, will attract more employees in sufficient numbers to significantly affect the RDC's staffing needs.

Put simply, the County manages the RDC the best it can with the manpower it currently has to operate the facility.  The County would appreciate some credit for its efforts, particularly given the circumstances under which it has operated since 2020.

---

[1] The County incorrectly reported in its Objections to the 17th Monitors' Report that it began making bi-monthly payroll payments in April 2022.  While preparing the instant Objections, counsel learned the bi-monthly payments had not yet begun.  The direct deposits are being made.  We apologize for this error.

PD.40549851.1

**Medical and Mental Health**

While it is unclear what the Monitors mean by referring to the plans for a mental health unit in RDC's B-pod being "scrapped," the Monitors were informed of the reasons why the mental health unit was not completed and opened as a mental health unit: the County is placing primary emphasis on getting detainees out of A-pod and needed the planned mental health unit space on B-pod to do so.  The County's plans to begin moving detainees out of A-pod were disrupted after one of the Monitors introduced COVID-19 into the RDC on May 31, 2022.

**Compliance Overview**

The Compliance Overview continues to refer to "Sustained Compliance," although there is no such category of compliance in the New Injunction.

**Objections Regarding Documents Commentary**

The 18th Monitoring Report states in pertinent part that "there is an ongoing struggle in obtaining the needed documents.  In the event that the monitoring continues, the process for providing documents should be improved."[2]  The County agrees there have been challenges related to document production since the New Injunction was issued and the process should be improved, but improvement is needed from the monitoring side.

The County attempted in good faith to make the process as accessible as reasonably possible for the monitoring team.  The documents the County produced were bates numbered and placed in electronic folders that matched the documents with the specific requests.[3]  Nonetheless, the Monitor continues to claim that documents that were produced have not been produced.[4]

In August 2022, the Monitor provided the County a list of the Monthly Documents.  That list contained 16 items.  In connection with the October site visits, the Monitor submitted a Monthly Document list with 15 items.  The County used the list that contains 16 items in producing Monthly Documents for the October site visit.

In addition to the Monthly Document list, the Monitor requested 5 items of Medical/Mental Health Documents, plus remote access to electronic medical records.  Remote access was

---

[2] Draft 18th Monitoring Report at 2.

[3] In the Draft 18th Report, the Monitor failed to reference or otherwise make use of the Bates stamp numbers provided by the County, despite the fact doing so would allow for more accurate references to documents on which the Monitor relies.  As part of the improvements the Monitor should make if the Monitor is to remain in place, the County urges the Monitor to reconsider the decision not to make good use of the Bates numbers.

[4] For example, page 45 of the draft 18th Monitoring Report states the following:  "At the time of the October site visit, Jail staff reported that five additional policies have been approved and are awaiting signature. These have not been reviewed by the Monitors for purposes of determining whether they comply with the New Injunction as they have not yet been provided."  Notwithstanding the fact that nothing in the New Injunction requires that newly approved policies to be submitted to the Monitor, these documents were provided.

PD.40549851.1

provided, but it was not utilized.

In addition to the Monthly Document list and the Medical/Mental Health Documents, the Monitor submitted a list of 44 Site Visit Requests.  In total, the Monitor made 60 separate document requests for the October site visit (16 Monthly, 5 Medical/Mental Health, and 39 Site Visit Requests).  The County respectfully submits that 60 separate document requests for a site visit is excessive and should be curtailed if monitoring continues, especially given the wide variation in the time parameters of the requests as discussed below.

The Monitor should specify the period the Monthly Document Requests should cover to address the Monitor's complaint that outdated information was provided.  Beyond that, there is no uniformity in the periods that the 39 Site Visit Requests cover as summarized in the Table below:

| Item | Time Period |
|:---:|:---|
| 1. | As of October 1, 2022, plus new hires from January 1, 2022 through October 1, 2022. |
| 2. | Since 2020. |
| 3. | For 2021 through the present. |
| 4. | January through September. |
| 5. | Since January 1, 2022. |
| 6. | Since January 2022. |
| 7. | October 1, 2022. |
| 8. | January through September 30, 2022. |
| 9. | September 1-15, 2022. |
| 10. | September 1-15, 2022. |
| 11. | July 1, 2002 through September 30, 2022. |
| 12. | January 1 through September 30, 2022. |
| 13. | June through September, 2022. |
| 14. | September 1-15, 2022. |
| 15. | January 1 through September 30, 2022. |
| 16. | For September 2022. |
| 17. | June through September, 2022. |
| 18. | June through September, 2022. |
| 19. | Month of September 2022. |
| 20. | June 1, 2022 through September 30, 2022. |
| 21. | August and September. |
| 22. | September 1 through September 15, 2022. |
| 23. | No time period stated. |
| 24. | Month of September. |
| 25. | Month of September. |
| 26. | June through September 2022. |
| 27. | February 1, 2022 through September 30, 2022. |
| 28. | January 1, 2022 through September 30, 2022. |
| 29. | June 1 through September 30, 2022. |
| 30. | Month of September, 2022. |

| | |
|---|---|
| 31. | Since January 2022. |
| 32. | No time period stated. |
| 33. | No time period stated. |
| 34. | January through September, 2022. |
| 35. | January through September, 2022. |
| 36. | No time period stated. |
| 37. | June 1 through September 30, 2022. |
| 38. | No time period stated. |
| 39. | No time period stated. |

If monitoring continues, the number of requests should be reduced and the period that the requests cover should be <u>after</u> the immediately prior site visit.  Site Visit Requests covering a period of years and "forever" requests (no time period stated) are unreasonable and should be discontinued.

**Substantive Provisions**

All of the objections stated above are incorporated by reference into this "Substantive Provisions" section.

| PARAGRAPH | COMMENTS |
|---|---|
| | **Protection from Harm** |
| ¶38 | |
| ¶39 | |
| ¶41 | The County objects to the Monitors' conclusion that the County is Non-Compliant with ¶41.  ¶41 requires the County to "ensure that Jail policies and procedures provide for the 'direct supervision' of all Jail housing units."  The Report then goes on to note the County has in fact done that.   Then the Monitors state the County failed to implement the practice.   ¶41 <u>does</u> <u>not</u> require implementation, it merely requires the County to ensure that policies and practices "<u>provide</u> for the direct supervision of all Jail housing units."  The Monitors may believe ¶41 requires implementation. It does not.  The Monitors' narrative goes on to discuss their belief that a lack of direction supervision may result in destruction of the cells.   In addition, the narrative also discusses fire safety issues and the location of fire hoses.  These items may be part of the Monitors' wish list and they may believe these practices are better for the facility.  But, they are not required by ¶41.  The Monitors even find ways to criticize the Fire Marshall's inspection report, even though it is not at all relevant to ¶41's requirements. The County is compliant with ¶41 and we |

| | object to conclusion that we are Non-Compliant. |
|---|---|
| ¶42 | The County objects to the finding of "Non-Compliant." It has not been reasonably possible to hire sufficient staff to implement direct supervision, which is a reality the Monitor has consistently elected to ignore.

Other things are worth mentioning in terms of the basis for our objections.  Obviously, there are many things we cannot do because of the lack of staff.  And, we have to make decisions as to what should be done and what shouldn't be attempted giving the realities of the situation.  The fact there were no deaths in the facility for the 10 year period preceding 2021 and there were no RDC deaths thus far in 2022 is a testament to the monumental work of RDC management and staff under extremely difficult circumstances.

The Monitors criticize the RDC due to the "numerous assaults that continue to occur at RDC.  See Eighteenth Monitors' Report at p. 10. Of course, the Monitors do not define what constitutes an "assault" and do not differentiate between a minor incident and an assault resulting in real injury.  According to the Report, there were a total of 52 reported assaults in the four (4) month period from June through September.  If one does the math, that means, on average, there were 13 assaults per month.  The Monitors also tell us there were 28 assaults during the same period that required hospital transports, or 7 per month.  The Monitors mention one assault included stab wounds and a beating, but we have no detail of the seriousness of the other hospital transports.  The Monitors opine without any point of reference that this number of assaults or hospital transports is out of line with what normally happens in any similar-sized detention facility.  Frankly, 13 assaults per month for 500 men locked in close proximity 24-7 for months at a time does not sound out of the ordinary.  But, with nothing to compare it to, the Monitors are wrong to impose their purely personal opinions as to whether the number of assaults at the RDC are unusually high or low or about what one would expect.[5]

The Monitors' complaints about contraband are likewise devoid of any comparative information.[6]   Every detention facility, whether |

---

[5] Compare the RDC's numbers with the 2 deaths at Parchman this summer as well as the assaults from the City Jail in Houston, TX.  See *MS Dept. of Corrections Reports Two Murders In A Two-Week Span At Parchman*, WLBT Report (Brendan Hall) (Nov. 9, 2022) (Exhibit "A"); New York Times, *Jail Is A Death Sentence for a Growing Number of Americans* (Sheila Dewan) (Nov. 22, 2022) (Exhibit "B")

[6] See The Yazoo Herald, *Suspect Smuggling Contraband With A Drone Arrested* (James Patterson) (Aug. 8, 2022) (Exhibit "C")

PD.40549851.1

| | |
|---|---|
| | operated by local, state or federal authorities, has contraband. Yet, the Monitors compare what it observes to no other facility to demonstrate the RDC has more contraband than any other facility or whether it has, proportionately, similar amounts or fewer items of contraband. The same can be said about their comments regarding the "opportunity" for extortion. The RDC is a prison. Bad things happen in prisons. Surely something more than a Monitors' observation that there is an "opportunity" for extortion doesn't equate with a finding that the RDC is any different than any other detention facility.<br><br>The Monitors criticize the County for not implementing a bi-weekly pay plan or a step-plan based on longevity. See Report at p. 12. The Monitors indicated it was "reported one reason for the delay is to consider fairness across County departments." Id. This is a pointed example of one reason Monitors and Receivers should not be managing the RDC. They are accountable only to the words of the injunction. It does not matter to them that the County has to operate a Sheriff's Department with law enforcement officers or a Public Works Department or schools. How does the County explain to the employees in those departments why their pay is different from the RDC employees? Neither the Monitors nor the Receiver cares about the County's other employees. This is what happens when you do not allow the County to run itself. Just because the Monitors or the Court believe they can run it better is not justification for them to do so. |
| ¶44 | The County objects to the non-compliant finding attributed to this paragraph. The paragraph requires the County to both develop and implement policies to "ensure" that rounds are conduced "as appropriate." The Monitor admits the County has developed the policies required by this paragraph. Yet, somehow, the Monitor finds the County to be "non-compliant" with this paragraph's requirements. This sort of irrational finding that defies the plain language of the relevant paragraph—even in a draft report—is precisely why the County has no reason to place any confidence or trust in this Monitor.<br><br>In addition, this paragraph of the New Injunction does not include any requirements related to detainee property, the detainee property room, or securing the door to the detainee property room, and thus the last two sentences of the Monitor's analysis of this paragraph should be deleted. |
| ¶45 | The County objects to the finding of "Partial Compliance." The Monitor again concedes that training has occurred, but faults the County because the training "has not been put into practice . . . ." Aside from the fact the Monitor's subject matter consultant David Parrish testified that direct supervision was impossible with the staffing levels at RDC, the Monitor's finding here is even more |

| | |
|---|---|
| | inexplicable when one realizes Paragraph 45 does not mention or otherwise require ***implementation*** of direct supervision. |
| ¶46 | |
| **Use of Force Standards** | |
| ¶50 | |
| **Use of Force Training** | |
| ¶52 | |
| ¶53 | |
| ¶55 | The County objects to the Monitor's partial compliance finding related to this paragraph.  This finding is yet another iteration of the Monitor's war against the County's use of tasers at RDC, despite the fact the Monitor signed-off on the very use of force policy that allows the County to use those tasers.  Further, the Monitor's claim that "the increased use of tasers" warrants the partial compliance finding because the use of force policy that should be reviewed misses the point of the requirement of this paragraph: ***training***, *see* Draft 18th Monitoring Report at 22 ("55. The County must update any use of force ***training*** after any revision to a use of force policy of procedure."). |
| **Use of Force Reporting** | |
| ¶56 | The County objects to the partial compliance finding in this Paragraph.  The Monitor does not contend the County has not adopted and is not implementing policies and procedures related to the reporting of the use of force.  Instead, the Monitor does not like the way the County is implementing these policies, with the Monitor claiming that the County should apply a bright-line, blanket rule that all reports will be simply rejected "unless there was appropriate documentation (findings/recommendations) incorporated in them" by reviewing personnel.  Of course, the Monitor makes no exception for those reports that do not warrant findings or recommendations. This type of one-size-fits-all "technical advice" is as detached from operational reality as it is unhelpful to officers and supervisors, and it should have no place in determining whether the County is in substantial compliance with the requirements of Paragraph 56. |
| ¶57 | |

| ¶58 | |
|---|---|
| ¶59 | |
| ¶61 | |
| **Incident Reporting and Review** | |
| ¶63 | |
| ¶64 | |
| ¶66 | |
| **Sexual Misconduct** | |
| ¶67 | The County objects to the Monitor's finding of partial compliance. The Monitor continues to give no credit to the County for the low numbers of PREA incidents reported at RDC. The Monitor also ignores information provided to her, claiming only 13 employees were trained in June 2022 when the documentation provided to the Monitor showed that 26 employees had been trained in June 2022. The Monitor's assumption that the damages or otherwise out-of-service kiosk machines hinders reporting of incidents completely overlooks the fact that numerous staff, including the PREA Coordinator repeatedly make rounds throughout the living areas and take reports of incidents while doing so. |
| **Investigations** | |
| ¶68 | |
| **Grievance and Prisoner Information Systems** | |
| ¶69 | |
| ¶71 | |
| ¶72 | The County objects to the non-compliant finding related to this paragraph. After finally acknowledging the kiosks allow for Spanish-speaking detainees to submit grievances, the Monitor nevertheless refuses to raise the non-complaint finding from the 17th Report to even partial compliance. In addition to being counter-intuitive, the Monitor's irrational judgment of the County's compliance with this paragraph's requirements is another demonstration of the unfair standard to which they are holding the County. As predicted by the County in its objections to the Monitor's Draft 17th Report, the |

PD.40549851.1

|  | Monitor downplays the option for Spanish-speaking detainees to submit grievances by now claiming that persons with disabilities (cognitive impairments) do not have meaningful access to the grievance system because two detainees she interviewed said they do not know how to use the facility's kiosks or submit a grievance. Thus, despite acknowledging that the relevant "policy requires that if there are *cognitive or communication* barriers," there must be assistance provided *and* that the County *is* providing assistance to detainees with communication barriers (i.e. Spanish-speaking detainees) to submit grievances via the Spanish option on the kiosks, the Monitor nevertheless keeps her "non-compliant" rating in place. |
|---|---|
| **Restrictions on the Use of Segregation** | |
| ¶74 | The County objects to the "Non-compliant" finding in this paragraph because it is based on the Monitor's own expansion of the requirement laid down by this paragraph, found in a section dealing with *restrictions on using segregation*.  Throwing context out the window and moving far away from limiting her compliance assessment to whether inmates are classified and housed in "more appropriate" long-term housing where they will be provided with "access to exercise, meals, and other services" within 8 hours of intake, the Monitor uses this provision to flag the County for alleged flaws in staffing, the County's food services budget, the meal menu, visitation at RDC, supply shortages, and the lack of a mental health unit.  All the while, the Monitor observes positive changes in the areas that actually matter for this requirement, *see* Draft 18th Monitoring at 35 (noting "improvements have been made in the area of Classification" and stating that Major Simon's "contention" that detainees have not been housed in Booking since the beginning of July 2022 was confirmed and that this "represents a quantum leap in the right direction").  The fact that "quantum leaps in the right direction" are not enough to show partial compliance to this Monitor only reinforces the unfair, subjective, and self-sustaining standard to which this Monitor has been holding the County for more than six years. |
| ¶75 | |
| ¶76 | The County objects to the finding of "Partial Compliance." As with the 17th Monitoring Report, the County is in "substantial compliance" with this paragraph. This is because the Monitor once again finds the County is doing what Paragraph 76 requires, *see* Draft 18th Monitoring Report at 38 ("QMHPs perform weekly rounds of all detainees held in segregation . . . . It is understood that these weekly assessments are not a substitute for treatment, and so therapeutic |

| | |
|---|---|
| | sessions are also provided to detainees being held in segregation as indicated."). Nevertheless, the Monitor once again concludes the County is in "partial compliance" with Paragraph 76 because of items the County is allegedly not or may not be doing, but these items are not part of Paragraph 76's requirements, *see* Draft 18th Monitoring Report at 38-39 ("[I]ndicated interventions are not always available, such as an alternative housing placement that would allow for enhanced treatment. . . . [D]ue to detention staff shortages, it is often difficult to have detainees removed from their cells so that they can be interviewed in a more private setting . . . ."). |
| ¶77 | |
| **Lawful Basis for Detention** | |
| ¶85 | |
| ¶86 | |
| ¶92 | |
| **Implementation, Timing, and General Provisions** | |
| ¶121 | |
| **Policy and Procedure Review** | |
| ¶130 | The County objects to the "Partial Compliance" finding related to this Paragraph. The Monitor acknowledges that 38 policies have been approved and adopted by the County to date and five additional policies have been approved but are awaiting signature. While it is unclear why the Monitor considers the County to be only in "Partial Compliance" with this paragraph, it appears the Monitor's finding is based in part on the fact that the Monitor has not "reviewed" the policies to determine if they comply with the New Injunction, but this is improper because there is no requirement in the New Injunction that the Monitor review the policies for compliance. |
| **Monitoring** | |
| ¶141 | |
| ¶142 | |
| ¶144 | |

14

| ¶145 | Once again, the County must object to the unreasonable, irrational "Non-Complaint" finding related to this paragraph.  Aside from completely ignoring the obvious period of transition related to monitoring at RDC that has been described numerous times and witnessed firsthand by the Monitor, the Monitor remains steadfast in ignoring other realities surrounding her site visit and interviews related to the 18th Report.  For example, despite basing this finding in part on "unanswered" emails "requesting interviews with HSCO staff[,]" the Monitor praises the County's efforts related to staff interviews, *see* Draft 18th Report at 2 ("Unlike the difficulty in obtaining documents, The County [*sic*] arranged the interviews both on site and remote without any problems.").  In reality (and as with the previous site visit related to the 17th Monitoring Report), the Monitor and her team conducted numerous interviews and she does not contend there is anyone who she wanted to interview but was not made available to interview.  The Monitor also tacitly acknowledges that no one from the County has prevented employees, contractors, or agents from cooperating with the Monitor, *see* Draft 18th Report at 47 ("It should be noted that during site visits, Jail staff has been cooperative and communicative."), yet the Monitor quite irrationally finds the County is non-compliance with the very paragraph requiring such cooperation.  As with the 17th Monitoring Report, the County should be found—at a minimum—in partial compliance with Paragraph 145, and ***the Monitor's obstinate refusal to do so should make clear to the Receiver that this Monitor and this County are no longer good for one another***. |
| --- | --- |
| **County Assessment and Compliance Coordinator** ||
| **Emergent Conditions** ||
| ¶161 | |

72°
Jackson, MS

ADVERTISEMENT

# MS Dept. of Corrections reports two murders in two-week span at Parchman

By Brendan Hall
*Published: Nov. 9, 2022 at 10:13 PM CST*

🅕 ✉ 🅨 🅟 🅛

JACKSON, Miss. (WLBT) - Officials with the Mississippi Department of Corrections say there were two homicides in a two-week span at one of the state's prisons.

On September 26th, Fate Santee Jr. killed Richard Weems. Then, on October 10th, Michael Powell killed Markeith Williams.

Both murders happened inside the Mississippi State Penitentiary at Parchman. It's the very same prison that was under fire just months ago after federal investigators said conditions were in violation of the constitution.

It's also where a woman we're calling "Marie" finds her cousin.

ADVERTISEMENT

Prospect Smarter, Not Harder
Say goodbye to quota chaos.          See How          S

ⓧ

EXHIBIT "A"

She said she worries about him each and every day - not only because of the violence but also the conditions he's forced to live in.

"The roof leaks when it rains, there's no electricity in some of the areas that they're in, and the meals that come in - when they do get them - are either raw chicken or they look like something a pig wouldn't eat," she said.

ADVERTISEMENT

Ad removed. Details

Marie's cousin has even reported rodents walking around inside the cells.

We asked MDOC Commissioner Burl Cain about these claims.

"There are no rats running around in our prison I don't believe, and we have exterminating companies on board," Cain said. "We look forward to when [the media] tours the prison. It's clean, it looks good, and it's actually pretty peaceful."

Cain said MDOC spent almost eighty million dollars in ARPA funds to improve conditions within its prisons, including Parchman.

ADVERTISEMENT



The commissioner blamed the recent homicides on gang violence, and he said the men involved were moved to Walnut Grove, which is part of a continued strategy to split up inmates involved with gangs.

Even still, the commissioner said killings in prison are inevitable.

"It did happen, and it will happen again. We've got it suppressed considerably, but it's prison. We have 19,000 or so people now, so there you have it."

An MDOC official said the state crime lab has not completed its reports on either of the two inmates killed, meaning their cause of death has yet to be determined.

*Want more WLBT news in your inbox? Click here to subscribe to our newsletter.*

*Copyright 2022 WLBT. All rights reserved.*

**You May Like**

## If You Are 45 Years Old, this Strategic Game is a Must-Have (no install)

**Forge Of Empires**

Sponsored Links by Taboola

**Amazon Has Millions of Prime Subscribers — But Few Know About This Savings Trick**

**Capital One Shopping** | Sponsored

**Gwen Stefani, 53, Takes Off Makeup, Leaves Us With No Words**

**Finance Wealth Post** | Sponsored

**You May Like**

## If You Need To Kill Time On Your Computer, You Have to Play this Vintage Game. No Install.

**Forge Of Empires**

12/5/22, 3:16 PM
Jail Is a Death Sentence for a Growing Number of Americans - The New York Times
Case 3:16-cv-00489-CWR-BWR Document 239-1 Filed 12/05/22 Page 18 of 25

The New York Times | https://www.nytimes.com/2022/11/22/us/jails-deaths.html

# Jail Is a Death Sentence for a Growing Number of Americans

In Houston's jail, where the population is at its highest in a decade, 24 people have died this year. More than half had a history of mental problems.

 **By Shaila Dewan**

Nov. 22, 2022

Matthew Shelton was contending with diabetes and periodic substance abuse when he moved in with his sister outside Houston in order to get his life together.

Three months later, facing an old criminal charge of driving while intoxicated, he turned himself in to the Harris County Jail one day in March with a supply of the insulin he relied on to stay alive.

After two days, he told his family that no one was allowing him access to the insulin: He was trying to manage his illness by discarding the bread from the sandwiches he was served. He was alone, frightened and cold, he said.

His mother, frantic, tried repeatedly to phone the jail but could not reach anyone. "We sent money for him to buy socks and ChapStick, and he never bought them," she said.

Three days later, Mr. Shelton, 28, was found dead in his cell, after having slipped into a diabetic coma.

He was one of 24 people who have died this year in the jail, located in Houston, a far higher death rate than what is reflected in the most recent statistics for jails around the country.

Houston, whose jail has reached its highest population count in over a decade, is far from the only city where jails have become more fatal. Deaths have spiked in cities across the country, including New York, Oklahoma City, Seattle, Pittsburgh and Louisville, Ky. California, Texas and Georgia have also recorded statewide increases in deaths. Covid-19 accounts for only part of the rising toll — suicides and fatal overdoses have also increased in some places.

Jail officials blame a host of factors, including crowding, staff shortages, mental health issues exacerbated by the pandemic and the repurposing of beds in solitary confinement, once available to isolate violent detainees, that now must be used for quarantining the ill.

EXHIBIT "B"

Case 3:16-cv-00489-CWR-BWR   Document 239-1   Filed 12/05/22   Page 19 of 25



Prison activists gathered for a rally outside the New York Gov. Kathy Hochul's office in March.  Michael M. Santiago/Getty Images

But jails have also in many cases violated minimum safety standards or failed to provide adequate medical and mental health care for their inmates, about two-thirds of whom are awaiting trial and presumed innocent.

The Houston facility was cited by the state in September for holding new arrestees in its crowded Joint Processing Center for as long as 99 hours before moving them to a permanent cell. The limit is 48 hours.

In Los Angeles, a federal judge granted an emergency order in September after the American Civil Liberties Union provided evidence that people with mental illness were being chained to furniture for days or left to sleep on concrete floors without access to toilets.

In Louisville, a woman killed herself in jail after being held for 18 hours in an attorney interview booth with no mattress, toilet or running water.

Much of the recent attention on jails has been focused on Rikers Island in New York, which is under threat of a federal takeover after suicides and frequent reports of uncontrolled violence.

But there are indications of a much wider crisis whose dimensions are not yet fully understood. The Justice Department has failed to fulfill a 2013 congressional mandate to conduct a comprehensive count of all deaths in custody, at one point acknowledging that its new system had recorded only 39 percent of deaths in local jails.

The most recent national figures available, from 2019, show that jail deaths were rising even before the pandemic. From 2000 to 2019, jail deaths per capita increased by 11 percent, to 167 per 100,000. In 2019, suicide was the leading cause of death. The number of drug- and alcohol-related deaths was the highest ever recorded.

The nation's jails have little broad oversight but instead are local facilities, most commonly controlled by elected sheriffs. They held about 650,000 people last year, according to Jacob Kang-Brown of the Vera Institute for Justice, a group promoting prison reform. The jail population declined substantially at the beginning of the Covid-19 pandemic but has since begun to rebound, he said.

In Houston, there was another death Tuesday morning, when a 45-year-old man succumbed to injuries sustained in an assault by other jail inmates. That followed the death of a 27-year-old man who was found hanging in his cell last week. Two of the other deaths this year were suicides, including a man who was moved to a padded cell after a suicide attempt, then rammed his head repeatedly against the walls, the

door and a metal grate, causing fatal injuries.

Jason Spencer, the chief of staff for Sheriff Ed Gonzalez, whose department runs the jail, said that the death rate, currently at more than 200 per 100,000 inmates, can vary widely from year to year.

At least a dozen of those who died this year were in their 20s, 30s or 40s. More than half had a history of mental illness or had been declared incompetent, according to Sarah V. Wood, the general counsel for the public defender's office.

While an autopsy attributed Mr. Shelton's death to a natural cause, diabetic ketoacidosis, his family insists that it was entirely preventable, a result of the jail's failure to provide him with insulin.

"This is something that didn't need to happen," his mother, Marianna Thomson, said. "This is just carelessness. They didn't care."





Marianna Thomson holding a locket containing the ashes of her late son, Matthew Shelton.    Brandon Thibodeaux for The New York Times

Mr. Spencer said the death occurred not long after the county's public health care provider, Harris Health, took over the responsibility of providing medical care at the jail and referred questions there.

Bryan McLeod, a spokesman for Harris Health, declined to comment because Mr. Shelton's family plans to sue. He also declined to discuss whether the jail's medical providers were adequately staffed.

The deaths this year in Houston come amid a host of complaints about dangerous conditions in the jail. In a lawsuit, several dozen detention officers describe staffing shortages so severe that drug use and assaults were rampant, nurses were unable to administer medicine and officers, often denied meals and bathroom breaks, sometimes urinated into plastic bags.

"The jail is in disastrous shape right now," said David Batton, the legal counsel for the union that represents jail employees. He faulted the county for failing to adequately fund jail operations. The lawsuit was dismissed last week.

Mr. Spencer said the county had approved a staffing increase of 100 detention officers, but that more than 100 positions remained unfilled. He said the problem was much larger than Houston; the jail's death rate, he said, was in line with that of the state's other large jails.

Many jails have seen overcrowding in part because of court backlogs stemming from the pandemic, which slowed or halted hearings and trials. But Houston's backlog dates back to Hurricane Harvey in 2017, when the courthouse was damaged. The local courts now have more than 41,000 pending felony cases.

Even if no new cases came in, it would take more than a year to clear the old ones, according to a 2020 analysis by the Justice Management Institute, a research and training group. The institute recommended dismissing all nonviolent felony cases more than nine months old, pointing out that most of the accused would not have been sentenced to time behind bars.

But Kim Ogg, the Harris County district attorney, has declined to dismiss cases in bulk, saying that each should be considered individually. "We can't neglect our prosecutorial duty, and we're not going to tell victims that their crime doesn't count," said Dane Schiller, a spokesman for Ms. Ogg.

Advocates for better jail conditions also blame the overcrowding on a pandemic-era executive order from Gov. Greg Abbott, which later became state law, aimed at blocking the release of detainees on cashless bail.

The law, S.B. 6, prevents the release of any inmate with a previous conviction for violence or threatening violence, no matter how old, without requiring them to pay some bail money.

It has worked against a parallel effort to funnel people with serious mental illness into treatment instead of jail, without requiring them to pay for release, said Krish Gundu, co-founder and executive director of the Texas Jail Project, a watchdog group. She said that S.B. 6 undermines the Sandra Bland Act, named for a woman who could not afford the $500 needed to post bond after a traffic stop and hanged herself in a Texas jail.



Twenty inmates have died this year in Harris County Jail in Houston. Brandon Thibodeaux for The New York Times

Because many acts associated with mental illness, such as spitting on a police officer, are categorized as violent, hundreds of poor defendants who need treatment must now remain in jail while they are on the long waiting list for a community psychiatric bed, Ms. Gundu said.

In Harris County, four out of five detainees have a mental health indicator such as a diagnosis of major mental illness or previous treatment with psychiatric drugs, according to the jail's dashboard, putting an intense strain on the system.

One woman who had no prior convictions was arrested in January 2020 on charges of possessing less than a gram of meth, almost certainly not enough to earn a prison sentence.

The woman was repeatedly referred to the jail's mental health unit when guards witnessed her doing things like walking naked, drinking out of toilets and assaulting or being assaulted by others. But each time, she was swiftly returned to the general population. She spent more than two years moving in and out of jail, diversion programs and mental health treatment.

At some point, jail officials became aware that she was pregnant. In May, she gave birth in her cell without medical assistance. How that happened is unclear: Mr. Spencer said she had been checked on once every hour, as required.

When the newborn was discovered, baby and mother were taken to the hospital, where the mother remained under the supervision of two jail guards. A judge at that time declared her incompetent to stand trial and "suffering severe and abnormal mental health, emotional or physical distress."

Despite her condition, she was permitted at the hospital to interact with her infant daughter and is now charged with stomping, kicking and striking her, though the baby survived.

Advocates for better jail conditions said the jail had failed to treat her severe mental illness, failed to adequately monitor her pregnancy and failed to protect the baby.

The woman's lawyer, Staci Biggar, did not respond to requests for comment.

This year's death toll comes on the heels of several notorious cases last year. In one, Jaquaree Simmons, 23, was beaten to death by guards who then failed to document their use of force, according to a subsequent investigation. The jail fired 10 guards, and the case will soon be presented to a grand jury.



Fred Harris after his high school graduation in Stafford, Texas, in 2020.





Mr. Harris in the hospital after being beaten and stabbed in Harris County Jail, which ultimately led to his death in 2021.

In another, Fred Harris, a 19-year-old, cognitively disabled inmate who weighed only 98 pounds, was placed in a holding tank with a 240-pound detainee who was known to be violent and was required to have an escort when outside his cell, according to a lawsuit filed by Mr. Harris's family. Mr. Harris was stabbed and beaten to death, and his cellmate has been charged with murder.

Asked if the jail bore any responsibility, Mr. Spencer said, "That's hard to say. I mean, those kinds of things, you know, sadly, have always happened in jails and prisons."

But Mr. Harris's mother, Dallas Garcia, said jail officials had failed to provide basic protections for her son. "I don't want anyone else to experience that," she said. "I don't want there to be a lack of human decency in these places."

12/5/22, 3:23 PM
Case 3:16-cv-00489-CWR-BWR   Document 239-1   Filed 12/05/22   Page 25 of 25
Suspect smuggling contraband with drone arrested | The Yazoo Herald



# SUSPECT SMUGGLING CONTRABAND WITH DRONE ARRESTED

By JAMIE PATTERSON

Sun,08/14/22-8:00AM, **1,553 Reads**

A drone carrying contraband intended to be dropped at the local federal prison complex took a wrong turn over the weekend and headed towards the local county jail. Its wrong turn landed the operator behind those same bars after a deputy noticed the drone overhead the complex.

Kevin Upchurch, 24, was charged with smuggling contraband into a correctional facility and trafficking.

Terry Gann, chief deputy with the Yazoo County Sheriff's Department, said Upchurch was arrested last Sunday after a deputy noticed his drone flying over the Yazoo County Regional Correctional Facility.

"We believe he intended to drop the contraband at the federal prison, but he got confused and went to our county jail," Gann said. "There was a package of contraband hooked to the drone, and he was about to drop the package inside the fence line. But there was a deputy who noticed it before the drop could be made."

Gann said the contraband included several bags of marijuana, tobacco products and other items.

Gann said it is actually quite common for drones to be used to smuggle contraband into correctional facilities.

"They attempt to use drones by covering the lights with tape," Gann said. "But the noise from these drones can't be hidden."

Copyright 2022 Emmerich Newspapers, Inc. All rights reserved. This material may not be published, broadcast, rewritten or redistributed without permission.

EXHIBIT "C"