IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF MISSISSIPPI

NORTHERN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.: 3:16-cv-00489-CWR-RHWR |
| | ) | |
| | ) | |
| HINDS COUNTY, ET AL., | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| _____ | ) | |


Court-Appointed Monitor's Eighteenth Monitoring Report


Elizabeth E. Simpson
Court-Appointed Monitor


David M. Parrish                         Dr. Richard Dudley
Corrections Operations                   Corrections Mental Health

# INTRODUCTION

In the 17th Monitoring Report, the difficulties in obtaining the necessary documents and information were described.  The process was slightly improved with the October, 2022 site visit. The documents were provided late, with some documents being provided the day before the site visit, while the monitoring team was in transit. Some documents were not provided until after the site visit necessitating the scheduling of follow up interviews. The Compliance Officer who assumed some of the duties of the Compliance Coordinator has not taken on the full breadth of the former Compliance Coordinator's duties. As a result, there is an ongoing struggle in obtaining the needed documents. In the event that the monitoring continues, the process for providing documents should be improved.

Unlike the difficulty in obtaining documents, the County arranged the interviews both on site and remote without any problems. Individuals were available and the technology functioned well.

Prior to the filing of this final 18th Monitoring Report, defendants filed with the Court Defendants' Objections and Comments to the 18th Monitoring Report. Paragraph 149 of the Settlement Agreement, incorporated into the New Injunction provides that the parties may submit comments to the Monitor for consideration prior to the filing of the final report. The Monitor does make revisions based on the comments received. It would be more appropriate to file any objections after review of the final report. Because defendants have already filed objections and comments with the Court, the Monitor will address some of those here.

Global Objections
1. The Monitors have no hands-on experience operating a jail. This comment is inexplicable as Dave Parrish ran the Hillsborough County Jail (Tampa Bay area) for 27 years.
2. The application of partial compliance. The defendants' statement that the Monitors found no areas of substantial compliance is incorrect. The Monitor found two areas of substantial compliance. (The chart has always used the term substantial compliance; the individual paragraphs have been changed from Compliant to Substantial Compliance). The Settlement Agreement identified the categories of compliance. The New Injunction does not. Because the finding of Partial Compliance allows the Monitors to recognize some degree of progress, the Monitor has continued these categories. The Monitor suggests that the defendants request the Judge to determine how he wants compliance measured if they object to this approach. The category of Sustained Compliance has been eliminated at Defendants' request.
3. The ongoing statements that one of the Monitors was responsible for the surge of COVID in the facility. Jail records indicate that two Sheriff's Office employees and one RDC employee tested positive at the time of or shortly before the May/June site visit.

2

4.  Crediting Major Simon with the new policy on housing detainees in booking and the completion of the Inmate Handbook. The report does not state that Major Simon implemented the new policy on housing in booking but that he announced it and it states that the policy began in July. The report is revised to state that Major Simon oversaw the *completion* of the Handbook consistent with defendants' comments.

Objections Regarding Document Commentary (addressed here as it appears to relate to comments in the Introduction)

1.  The objection that the document request is too onerous. Similar document requests have been made since April, 2020 when the site visits became remote due to COVID. There were no difficulties in receiving the documents requested when the Compliance Coordinator was responsible for fulfilling those requests. Defendants chose not to replace him upon his resignation with someone with a similar breadth of duties.
2.  Documents Commentary footnote 4a; The new policies waiting for signature are: 8-300 Restrictive Housing, 10-100 Housekeeping and Inspections, 14-100 Food Service Management, 15-200 Visiting, 16-400 Commissary, 19-100 Transportation. These are not the policies provided by defendants.
3.  The policies don't have to be approved by the Monitoring Team but it is appropriate as part of monitoring to determine that they are consistent with the requirements of the New Injunction where applicable. Paragraph 130 is explicit on that point.

## EXECUTIVE SUMMARY

**Corrections Operations**

Since the last Monitoring Report there have been significant changes in the operation of the Hinds County Jail System.  The Interim Jail Administrator' employment ended on October 1, 2022.  During the October site visit the Sheriff designated the Assistant Jail Administrator as the new Jail Administrator, holding the rank of Major.  Prior to becoming the Assistant Jail Administrator he served as the Captain in charge of the Work Center (WC), a Direct Supervision facility which now houses both male inmates and the female inmates.  The WC is no longer governed by the terms of the New Injunction which replaced the Settlement Agreement.  The JDC no longer houses inmates, but the Transfer Waiting area on the ground floor is still operational.  It holds inmates on their way to and from court since there are no holding cells in the courthouse.

The new Jail Administrator reported two significant operational and administrative improvements.  First, he announced that there have been no inmates "housed" in Booking holding cells since July.  That change in policy represents a significant redirection of Hinds County Sheriff's Office (HCSO) practice. Over the past six years, every promise to end the housing of inmates in

Booking has failed to materialize within weeks.  The second action taken by the new Jail Administrator was the completion of an updated and revised Inmate Handbook.  While it still requires some revisions before it can be published, this accomplishment represents another effort that has gone on for the full six years of the monitoring process without success—until now.

Although the WC was operating under the principles and dynamics of Direct Supervision at the time of the last tour of that facility, the Raymond Detention Center (RDC) has never been able to meet that standard, and the failure to do so has resulted in ongoing management, maintenance and (lack of) inmate supervision issues that put both inmates and staff at risk.  The primary factor that results in these problems is the critical shortage of staff.  Without enough officers to fill essential posts, Direct Supervision operation is impossible, as is compliance with the conditions of the New Injunction.

The most recent Revised Staffing Analysis (October 2021) calls for 258.5 positions to operate the RDC (assuming that two of A-Pod's Housing Units are kept open).  In fact, all of A-Pod must stay open because the Average Daily Population (ADP) has increased to approximately 750.  That means that to operate the RDC, 280.6 staff employees are required; however, only 101 are currently on board at that facility.  Consequently, only 36% of the required positions are filled.

The shortage of staff is such that supervisors are unable to perform their usual duties because they must fill in for correctional officers and stand posts for them.  It also means that well-being checks are not performed as required by policy.  Both conditions became painfully apparent during the October site visit.  Based on first hand observation, coupled with confirmation from officers and supervisors, those checks are not being done or are being recorded without proper verification.  To make matters worse, the supervisors in charge of validating 15 minute watches required for inmates in holding cells in Booking and Transfer Waiting at the JDC, are not familiar with the policy-mandated 15 minute standard required for those watches.

Maintenance issues continue to go uncorrected for unreasonably lengthy time frames.  This problem has been addressed in multiple prior Monitoring Reports, but little has been done to correct it.  The high turnover of Sheriffs, Jail Administrators, County Administrators and Chairmen of the Board of Supervisors has added to the problem.  The Sheriff's Office and County need to develop a cooperative maintenance and procurement system that provides for prompt attention to those issues.  The current arrangement that has been in place for the duration of the monitoring process needs to be replaced with a functional system whereby parties responsible for the operation of facilities are given the authority and financial control to be able to handle matters without having to depend upon uninterested parties.

4

Defendants Objections and Comments to Executive Summary, Corrections Operations
1. Statements attributed to the Corrections Operations summary regarding the comparative condition of Pods A, B, and C do not appear in the draft 18th Monitoring Report.
2. The example given by defendants of improvements is the operation of security doors. During the October site visit, this did not appear to be an area of improvement as is described in paragraph 46 below.

## Medical and Mental Health

The medical and mental health staff is skilled and extremely dedicated to providing the best possible medical and mental health care to detainees at the facility, and they make every effort to address self-identified problems with the delivery of services and/or those identified by the monitor.  In addition, the reenergized, weekly Interdisciplinary Team Meetings have allowed for much improved cooperation between medical/mental health staff and jail administration and detention staff, and in turn, improvements in jail safety and security.  However, there are two issues that severely compromise the ability of medical and mental health staff to provide the services they are contracted to provide.  The first is staff shortages, both with regard to detention staff and mental health staff.  Then, while there is an infirmary/a medical observation unit for acutely, severely physically ill detainees, there is still no comparable unit for acutely, severely mentally ill detainees, where they can be kept safe while receiving the therapeutic interventions they require (with the exception of the suicide resistant cells for actively suicidal detainees).  Furthermore, following a year of planning and steps to renovate space for a mental health unit at RDC, plans to open such a unit at RDC have now been scrapped by the County.

Defendants Objections and Comments to Medical and Mental Health Summary (included under Introduction in Defendants' document but addressing the Executive Summary)
1. Executive Summary Mental Health: As has been discussed, the mental health unit is necessary for providing the mental health services required by paragraph 74 and for limiting the use of segregation for SMI detainees required by paragraph 77. The Injunction does not require a mental health unit but it does require appropriate mental health services and the implementation of restrictions on the placement of SMI detainees in segregation. Defendants can accomplish this how they choose; however, the Mental Health member of the Monitoring Team has brainstormed with QCHC staff and they have not come up with a way of accomplishing these requirements without a mental health unit.

**COMPLIANCE ACTIVITIES**
October 17-21,2022 (and follow-up)

| Date and Time (CT) | Lisa Simpson | Dave Parrish | Dr. Richard Dudley |
|---|---|---|---|
| Tuesday, October 18 | | | |
| 9:00 | Chief Simon (now Major), Captains Caston and McBride | Chief Simon (now Major), Captains Caston and McBride | HSA Taylor |
| 10:00 | | | 10:00 Head Nurse |
| 10:30 | Tour RDC | Tour RDC | |
| 11:00 | | | MH Coordinator |
| 1:00 | Lt. George | Tour RDC | Medical Nurse Practitioner |
| 3:00 | | | All Mental health staff |
| 3:30 | Gary Chamblee and Sgt. Winter | Gary Chamblee, Benchmark Construction | |
| Wednesday, October 19 | | | |
| 9:00 | Inmate Interviews | Tour RDC | Segregation Rounds with MH Coordinator |
| 10:30 | Jimikia Scott (include HSA and Head Nurse for 15 minutes-1/2 hour) | | |
| 11:00 | | Doris Coleman, HR Director | 11:30 Join Jimikia Scott interview |
| 1:00 | Lt. Childs (and IAD investigator) | Lt. Childs and IAD investigators Rholon Tucker and Mike McGee | Discharge Nurse |

| | | | |
|---|---|---|---|
| 2:00 | Tony Gaylor and County Administrator Jones | Captain Sims and CID Investigator Eric Smith | All Mental Health Staff |
| 3:30 | Credell Calhoun | Tour JDC transfer area | |
| 4:00 | Sheriff Jones | Sheriff Jones | HSA |
| Thursday, October 20 | | | |
| 9:00 | Jimikia Scott | Officer Ester, IT | |
| 10:30 | Melody Clayton | Mioka Laster | |
| 1:00 | Sgt. Dotson | Rochay Johnson, Food Service Director | |
| 3:00 | Sgt. Tillman | Sgt Henderson, Booking | |
| 4:00 | | Sgt Scott RDC Housing | |
| Friday, October 21 | | | |
| 9:00 | Exit interview | Exit interview | Exit interview |
| 11:00 | Erika Scott | Captain Burnley, Training | |
| 12:00 | Balinda Jackson, Compliance Officer | Balinda Jackson, Compliance Officer | EMR review-remote |
| Monday, November 7 | | | |
| 11:00 | Sheena Fields, PREA | | |
| 1:00 | Sgt. Dotson | | |
| 2:00 | Sgt. Tillman | | |

## COMPLIANCE OVERVIEW

| Site Visit Date | Sustained Compliance | Substantial Compliance | Partial Compliance | NA at this time | Non-Compliant | Total |
|---|---|---|---|---|---|---|
| 2/7-10/17 | 0 | 1 | 4 | 2 | 85 | 92 |
| 6/13-16/17 | 0 | 1 | 18 | 2 | 71 | 92 |
| 10/16-20/17 | 0 | 1 | 26 | 1 | 64 | 92 |
| 1/26-2/2/18 | 0 | 1 | 29 | 0 | 62 | 92 |
| 5/22-25/18 | 0 | 1 | 30 | 0 | 61 | 92 |
| 9/18-21/18 | 1 | 0 | 37 | 0 | 54 | 92 |
| 1/15-18/19 | 1 | 1 | 44 | 0 | 46 | 92 |
| 5/7-10/19 | 1 | 6 | 42 | 0 | 43 | 92 |
| 9/24-29/19 | 1 | 6 | 47 | 0 | 38 | 92 |
| 1/21-24/20 | 1 | 6 | 49 | 0 | 36 | 92 |
| 6/8-12/20 | 1 | 6 | 51 | 0 | 34 | 92 |
| 10/5-21/20 (corrected) | 1 | 6 | 54 | 0 | 31 | 92 |
| 2/8-11/21 | 2 | 6 | 53 | 1 | 30 | 92 |
| 6/7-11/21 | 2 | 2 | 59 | 1 | 28 | 92 |
| 10/4-8/21 | 3 | 0 | 59 | 1 | 29 | 92 |
| 1/24-28/22 & 1/31 to 2/3/22 | 3 | 0 | 59 | 1 | 29 | 92 |

## NEW INJUNCTION

| | Substantial Compliance | Partial Compliance | NA at this time | Non-compliant | Total |
|---|---|---|---|---|---|
| 5/31-6/24 | | 32 | | 6 | 38 |
| 10/18-21/22 | 2 | 27 | 1 | 8 | 38 |

## SUBSTANTIVE PROVISIONS

### 1.     Protection from Harm

38. Ensure that the Jail is overseen by a qualified Jail Administrator and a leadership team with substantial education, training and experience in the management of a large jail.

**Substantial Compliance**

In determining compliance with this paragraph, the Monitoring Team looked at the qualifications of the Jail Administrator and the two Captains at RDC. The sergeant and lieutenant supervisors are addressed in paragraph 39 below. On October 1, 2022, the Interim Jail Administrator's employment with the HCSO ceased.  On the next to last day of the October site visit, the Sheriff announced that he was promoting the Assistant Jail Administrator (Chief Simon) to become the Jail Administrator, holding the rank of Major.  Although he does not have a four-year college degree (he does have an associate degree), that requirement was not included in the New Injunction.  He does have an impressive record of time as a supervisor at increasing levels with the Hinds County Sheriff's Office, and he has taken numerous on-line management courses through the National Institute of Corrections (NIC).

Since the position of Assistant Jail Administrator is now vacant, there are no other members of the Jail System's management team to vet.  The facility captains and other supervisors meet the education, training and experience in management of a large jail as outlined in paragraph 39 below.

39. Ensure that all Jail supervisors have the education, experience, training, credentialing, and licensing needed to effectively supervise both prisoners and other staff members.

**Partial Compliance**

Since the education requirements are no longer specified in the New Injunction, those officers who have been promoted during the last four months meet the education, credentialing, and licensing required by this paragraph. They include one lieutenant and four sergeants.
New supervisors do not receive training specific to their new duties upon promotion.  That is something that should be provided.  The need for it is apparent in some incident reports and in the lack of knowledge regarding standards displayed by some supervisors when questioned.  The primary case on point during the October site visit was the Booking sergeant at JDC who told me that well-being checks where required hourly, instead of every 15 minutes, on inmates in the Booking holding cells.

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail housing units.

**Non-Compliant**

While policies and procedures have been developed during the monitoring process, that reflect the principles and dynamics of "Direct Supervision", as has been previously noted in each Monitoring Report since October 2020, the implementation of that practice has been a failure at the RDC. Since Direct Supervision was not implemented when C-Pod and B-Pod were reopened (after being renovated), the fact that policies have been developed has little value, hence the finding of Non-Compliant.

The irony of the situation is that the RDC was originally designed to be, and operate as, a Direct Supervision jail. In fact, it did so, from the time that it opened in the mid 1990's until the (then) Sheriff pulled the officers out of the housing units in 2012, and left the inmates unsupervised. They, in turn, rioted and literally destroyed a full third of the facility. Since then, C-Pod has been rebuilt twice and B-Pod once due to damage caused by the unsupervised inmates. A-Pod has never been renovated; consequently, it is in the worst shape of all three housing pods.

When C-Pod re-opened in October 2020, the County/HCSO committed to having it operate as a Direct Supervision housing area. Not only did that not happen, but the lack of staff has resulted in the current condition where the entire facility is left in the hands of the inmates and the progress that had been made toward implementing Direct Supervision has been overturned.

The lack of supervision has impacted many areas including fire safety. It should be noted that all of the fire safety issues relative to fire extinguishers and fire hose boxes that were listed in the 17th Monitoring Report remain uncorrected. This includes fire hose boxes in the "horseshoe" corridors that go around the control rooms in A and B-Pods. These are areas that are supposedly under staff control, yet the damage was done by unsupervised inmates over a period of years and it has still not been repaired.

Defendants Objections and Comments: The reference to the Fire Marshall's report in the draft report has been eliminated.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Injunction, and allow for the safe operation of the Jail.

**Non-Compliant**

The critical lack of staff to operate the RDC was covered in detail in the 17th Monitoring Report. Since then, nothing has changed.  The HR Director reported that there were only 175 positions filled in June 2022.  In October she confirmed that there were just 176 positions filled.  That figure covers the RDC, WC and JDC.  Even though the JDC has not housed inmates for some time, it still serves as the transfer waiting/holding area for the courts, so some officers continue to work there.

The most recent revision of the Staffing Analysis was conducted in October 2021.  It called for the following:

JDC          9.9 positions
WC           72.7 positions
RDC          236.4 positions (assuming that only B and C-Pods are operational)
             258.5 positions (assuming that two of A-Pod's Housing Units are kept open)

In reality, however, all of A-Pod has been kept open because the average daily population (ADP) is now approximately 750 inmates.  That means that the actual number of positions required to operate the RDC is 280.6.  Yet, according to the HR Director, only 101 staff members are actually assigned to, and working at, the RDC.  Consequently, the facility is short 179.6 personnel, fully 64% below the required number of staff.  In the obverse, only 36% of the required positions are filled at the RDC.

During the October site visit, the Corrections Operations Member of the Monitoring Team personally observed the impact that this shortage of staff has on the day to day operations of the RDC.  On multiple inspections throughout the week, he found that the pods were routinely staffed with only one officer in each control room and just one officer on the floor, responsible for all four housing units and the two ISO units.  The one exception was C-Pod, where there were generally two trainees assigned as part of the FTO program.

Post Assignment Sheets reflect that this condition was not an anomaly during the site visit.  In fact, frequently, the condition is actually worse.  During the first shift on October 4, 5, 8, 10, 11, 17, 18, and 25, 2022, there were no floor officers assigned in all three pods.  The only officers present were the three pod control officers.  In Booking, there was frequently no escort officer available to conduct well-being checks on inmates in the holding cells and often there was no officer assigned to do the same for inmates in Medical.  Further, there were numerous other non-housing posts throughout the RDC that went unattended.

11

Of particular concern is the fact that required well-being checks are no longer being conducted due to the shortage of staff.  In the past, 30-minute checks were made on inmates held in Segregation (C-4 and B-4).  While the individual log sheets for each inmate were never posted by the respective cells, they were at least kept in a folder or binder so that real time entries could be recorded as the inspecting officer made rounds.  Unfortunately, that system morphed into a non-system whereby any log sheets that were maintained were of no value because they were completed after the fact in the pod control rooms.  During the October site visit, two control room officers independently told the Corrections Operations Member of the Monitoring Team that 30-minute well-being checks are no longer conducted; that sometimes, hourly check information is called in for inclusion in the control room officer's logbook.

Of equal concern is the fact that suicide watches are no longer conducted according to previously implemented practice.  Instead of having an officer sit inside a designated suicide watch ISO unit (C-4 ISO and B-4 ISO) to provide constant supervision of the inmates held in the respective dayrooms, the officer was moved outside of the ISO unit so that he/she could look into it through a window.  Worse yet, now suicide watch inmates are no longer required to be in the ISO unit dayroom where they can be seen through a window; instead, they are housed in the individual ISO unit cells where it is impossible for an officer to have constant supervision.  Control room officers stated that they were conducting the well-being checks by leaving their posts to enter the ISO unit and check on the welfare of the respective suicidal inmate(s) by looking into their cells. This practice is completely contrary to policy, but beyond that, it means that the control rooms are left unattended, which represents a gross breach of security.

When questioned as to who authorized the above referenced changes regarding well-being checks, both supervisors and officers stated that nothing came from "above", that they simply modified procedures because the shortage of staff made compliance with expected procedure impossible.

The lack of adequate supervision is reflected in the numerous assaults that continue to occur at RDC. From June through September there were 52 reported assaults resulting in 28 hospital transports. These assaults occurred in all three pods, in each of the housing units and two of the ISO units. The extent of the injuries is seldom listed in the reports. However, one inmate was admitted to the Intensive Care Unit as a result of his injuries. (IR# 221005) At the time of the site visit he was reported to be breathing on his own but with the expected level of recovery still unclear. Another had multiple stab wounds to the head, shoulder and back (IR# 220740); another was described as "beat pretty bad" (IR #220899). There continue to be concerns that the number of assaults is underreported. The hospital transport list included a detainee being transported as the result of an assault. An incident report regarding that detainee on that date states that while

doing wellness checks, the officer was told by several detainees that the injured detainee had a seizure and hit his head on the floor. Medical apparently determined that he had been assaulted. In addition, in interviews of detainees, one detainee stated that in September he was assaulted. There was no officer on the unit at the time. Later, he was taken to Medical. There does not appear to be an incident report regarding this alleged assault. In addition to detainees actually being assaulted, many detainees request to be moved because they "fear for their life." There were 25 such incident reports from June through September. See, e.g., 220626, 220706, 220818, 220891, 220978.

The amount of contraband is also reflective of the lack of supervision. In the shakedown of C-2 after an assault occurred on July 13, 2022, 25 shanks were recovered. Two detainees stated that there were lots of shanks in the jail; one stated that everyone has a shank. The detainee also stated that there was an "ungodly" amount of drugs in the jail.  Numerous incident reports documented the scope of the contraband problem (see IR's 220767, 220775, 220777, 220786 and 220791). Inmates also move about within the facility. In IR# 220686 a detainee was in the horseshoe approaching B-3 with a roll of tissue. When asked why he was off his unit, he stated he was going to give the tissue to a detainee in B-3. The officer determined that the tissue had a small amount of "weed." In another incident, IR#220656, a detainee was being moved to the contact room when he ran out the back door and into the great hall.  See, also, IR# 220756 and 220983.

Lack of consistent supervision also allows opportunity for extortion.  The 16th Monitoring Report reported that detainees who did not have an assigned cell were required by other inmates to pay for the use of toilets in the cells. At the time of the May/June visit, Jail staff reported that this practice had been addressed by keeping one cell open and, in addition, at the time of the October site visit all detainees now have an assigned cell. However, not all cells have a functioning toilet. One of the detainees interviewed stated that some detainees require payment for the use of the toilet with food, canteen or commissary. Similarly, the Monitor spoke to a detainee on the tour of the facility who also confirmed that this practice exists. In CID investigation #22-1461, a detainee who had been assaulted stated that he was assaulted because he urinated in the shower which he did because he wouldn't pay to use a toilet. Another example of extortion is found in IR #220826 where a detainee's mother called to say her son was in danger and that other inmates wanted him to pay to stay on the unit.

As in the last monitoring period, there are indications that suicidal inmates are not promptly referred to Medical or put on suicide watch. In IR#220964 the sergeant helping with count was approached by a detainee who stated that he was suicidal. The Sergeant appropriately took the detainee to Medical but reported that the detainee stated that he had told the previous shift but they had done nothing.

In order to address the lack of staff, early in his term in office, the Sheriff prepared a new pay plan for Detention Services that included bi-weekly pay, a higher salary schedule and a step plan based on longevity and performance.  This proposal was provided to the Board of Supervisors, but not as a formal request. It was reported that one reason for the delay is to consider fairness across County departments. The direct deposit has been implemented but the bi weekly pay plan has not. The other components of the plan have not been adopted. The adoption of these components should be given high priority so that Hinds County can remain competitive in the marketplace. The Sheriff's office should also assess whether other non-monetary factors are impacting retention.

At present, there is enough medical staff to fulfill the terms of this Injunction and allow for the safe operation of the Jail.  Although it has continued to be difficult to hire and retain permanent nurses, seemingly at least in part related to the perception of the jail as a dangerous place to work, the use of per-diem nurses has addressed what would otherwise be a shortage of nurses.  It should be noted however that many of the per-diem nurses have been at the facility for some time; so that has been a very positive thing (they have a knowledge of the population and offer a continuity of care similar to that of the regular staff nurses); but it should be noted (and further explored/reviewed) that they are reluctant to become regular staff nurses because being per-diem nurses provides them with a better salary/benefits package.

There is also a new medical nurse practitioner since the last site visit, who by all accounts is working out quite well.  When the Medical/Mental Health member of the Monitoring Team met with her, it was clear that her knowledge base and her compassion for the population are impressive.

On the other hand, despite having filled the vacant QMHP position as of the beginning of October 2022, there is still a shortage of mental health staff required to fulfill the terms of this Injunction and allow for the safe operation of the Jail.  At present, the mental health staff consists of one QMHP/Mental Health Coordinator, two additional QMHPs, one psychiatric nurse clinician, and one very part-time psychologist (who currently works less than one day/week).

As has been previously noted, an early 2022 mental health staffing analysis, based on what was then a caseload of 200 detainees and taking into consideration all the other tasks performed by QMHPs, revealed that in order to perform all tasks, consistent with existing policies and procedures, 179 hours of QMHP time would be required (about 4.5 FTEs/about 1.5 more FTEs than is currently budgeted).  Since the time of that mental health staffing analysis, the mental health caseload has continued to grow (it is now about 266 detainees); the percentage of the mental health caseload that is SMI has also continued to grow (it is now about 196 of the 266 detainees

14

on the caseload who are SMI); and in addition, the number of hours required to perform all of the other tasks performed by QMHPs has continued to grow (for example, the number of previously homeless and otherwise unsupported SMI detainees has continued to grow, which has meant that a lot more time has to be spent on discharge planning).  Given the shortage of QMHPs, staff is forced to prioritize the most urgent tasks (such as performing initial mental health assessments, managing suicidal detainees, and the monitoring of detainees being held in segregation), while other important tasks (such as rapidly following-up on detainees who were unable or unwilling to participate in an initial mental health assessment, treatment planning, and providing individual and group therapy sessions) are not consistently performed in a manner outlined in existing policies and procedures.

Just to be clear, in light of the current injunction under which monitoring is being performed, 216 of the current mental health caseload of 266 detainees are housed at RDC.  However, since the same mental health staff members are responsible for all 266 detainees, the staffing needs requires consideration of the entire caseload.  It should also be noted that the staffing shortage has a much bigger impact on RDC (vs. the WC), given that most of the SMI detainees, those on suicide watch and those on mental health observation are housed at RDC.

It is important to note that the current shortage of detention staff also impacts on the ability of medical and mental health staff to fulfill the terms of this Injunction, and allow for the safe operation of the Jail.  Although Administration has made considerable effort to prioritize providing detention staff support to medical and mental health staff, medication pass is still delayed at times, especially in the evenings; there is still only one officer in the medical area (instead of two), and there are some weekends when there is no officer in the medical area; and there are still times when medical or mental health staff have to call for detention staff support, and the only available staff may be a lieutenant or a captain.

A review of specific cases identified via a review of incident reports has raised two additional issues that should be noted here, because they impact on the use of valuable staff time (including medical, mental health and detention staff time) and the quality of the medical and mental health services provided.

The first is that there were five cases reviewed where the detainee's known SMI (in some cases including an intellectual disability) had impacted on the ability of medical staff to diagnose and/or treat a serious physical health problem.  These are the types of cases where medical and mental health staff should meet and jointly staff the case, in order to develop the best joint approach to the assessment and management of each detainee's medical and mental health

15

difficulties.  Such joint staffing would not only improve medical and mental health care for this group of detainees, but would also save time for and lower the frustration level of the clinical staff.

The second is that a review of several detainees who are placed on suicide watch on a monthly basis revealed that all of those detainees suffered from intellectual disabilities.  As a result, they were constantly in some type of conflict with others on their units; at such times, they were feeling the need to get off the unit as quickly as possible; and the only way they knew to quickly escape their difficult situations was to say they were suicidal.  In fact, once placed on suicide watch (with all of the detention, medical and mental health staff time required to do that), they would admit to mental health staff that they were not suicidal but they knew that if they said they were they would be quickly removed from the unit.  Therefore, during this site visit, the Mental Health/Medical member of the Monitoring Team and the mental health staff explored various alternatives for working with this group of inmates in an effort to decrease their use/abuse of suicide watch and the associated time demand that this use/abuse of suicide watch placed on medical, mental health and detention staff.

Defendants' Objections and Comments
1. Contrary to Defendants statement that there were no deaths in the facility for 10 years prior to 2021, there was a death of an inmate by assault in 2018. The Monitor was not monitoring prior too 2016 and cannot speak to whether there were others in this time frame.
2. The concern for fairness across County departments was included because the Monitor believes this is a legitimate concern for why the pay proposal was not acting upon yet. It is unclear to the Monitor why the Defendants object to this.

44. Develop and implement policies and procedures to ensure that detention officers are conducting rounds as appropriate.

**Non-Compliant**
This paragraph is carried as Non-Compliant even though policies and procedures have been developed; but, as is the case with the requirement to develop procedures regarding Direct Supervision, the failure to implement them in practice does not meet the requirements of this paragraph. Paragraphs 41 and 42, above provide detailed justification for this finding.

The lack of staff to fill required posts throughout the RDC, but particularly in housing areas, makes it impossible for officers to adequately monitor and record the status of inmates in the housing units, ISO units, Medical, Booking and Transfer Waiting at the JDC.   Supervisors frequently stand posts instead of acting as supervisors because there are so few officers available.

16

During an inspection of the JDC Transfer Waiting area, the Corrections Operations Member of the Monitoring Team found that the 15-minute well-being check forms for each inmate detained in the two holding cells were actually kept in an office in the administrative wing of the facility, not posted next to each cell, or even in the Transfer Waiting area.  An examination of the forms revealed that none were current.  Four had a last entry of 1300 hours when examined at 1450. Three showed that the inmates went to court from 1315 to 1345, but they were actually back in the JDC (though not logged in) when the forms were examined at 1455.  When questioned about the discrepancies, the assigned officer stated that a lieutenant at the WC had told her that 30-minute entries were satisfactory.  In fact, 15-minute entries are required.   At the RDC the sergeant in charge of Booking also provided the Corrections Operations Member with erroneous information.  She said that suicide watch and SMI (serious mental illness) inmates required 15-minute log notations, but that other inmates in the Booking holding cells had to be monitored only once per hour (15 minutes is the standard).  When supervisors don't have the right answers it is little wonder that the officers do not comply with published policy.

45. Ensure that all correctional officers receive adequate pre- and post-service training to provide for reasonably safe conditions in the Jail.

> c.    "Direct supervision" training. Detention officers must receive specific pre- and post service training on "direct supervision." Such training must include instruction on how to supervise prisoners in a "direct supervision" facility, including instruction in effective communication skills and verbal de-escalation. Supervisors must receive training on how to monitor and ensure that staff are providing effective "direct supervision."

**Partial Compliance**

Approximately two years ago the National Institute of Corrections (NIC) provided on site Direct Supervision "Train the Trainers" orientation for command staff, supervisors and correctional officers.  Unfortunately, that training was not put into practice when first C-Pod, then B-Pod, were re-opened.  Although there is a Direct Supervision component in the basic recruit academy, it has no practical application at the RDC.

The most positive thing that has occurred with regard to new officer orientation is the Field Training Officer (FTO) program that was initiated by the last qualified Jail Administrator, Major Bryan.  Although it was not sanctioned through the Training Bureau, it serves its purpose well. New officers work under the supervision of designated officers in C-Pod until they are able to complete their basic training.

Information regarding training was not available either prior to or during the October site visit. The lieutenant who coordinates training for Detention Services was not available due to illness,

17

nor was his usual report on the status of training activities accessible.  The captain responsible for all HCSO training was able to confirm that in-service training is still ongoing, though at a reduced rate, by paying off duty officers for a half day of training.  In addition, basic recruit training is ongoing.  While information regarding individual facility commanders was not available, the newly designated Jail Administrator/Major has compiled an extensive and impressive list of on-line training courses through the NIC.  Further, the Sheriff has indicated that he will support the Major's attendance at the May 2023, Annual Training Conference of the American Jail Association.

46. Develop and implement policies and procedures for adequate supervisory oversight for the Jail.

**Partial Compliance**

As has been previously reported, supervisors are expected to monitor day to day activities within the Jail, manage compliance with approved policies, ensure that written documentation of incidents is consistent with those policies and make sure that the physical plant is maintained appropriately.  In addition, they are tasked with ensuring that discrepancies are recorded and corrected within reasonable time frames.

In fact, due to the shortage of staff, supervisors also have to stand posts that should be filled by correctional officers.  That means that supervisors are unable to fulfill some of their primary duties because they are working as de-facto correctional officers.

Existing policies require supervisors to review all day-to-day activities within the Jail System.  They must sign off on well-being checks on a shift to shift basis and they must do the same on all incident reports.  In actual practice, they do sign those documents, but they virtually never note discrepancies or recommend corrective action when well-being checks are not conducted within specified time frames or when incident reports do not provide required information.  The unofficial practice of "sign and send" that has been previously noted for years in Monitoring Reports has never been corrected.  Even when the officer responsible for a well-being check notes that it was not completed within the prescribed time frame due to "lack of staff", supervisors never make any amplifying comments.

Physical plant discrepancies, which are supposed to be noted and recorded by supervisors, are literally never documented.  That is understandable, since their efforts have historically had no impact on the County's maintenance work.  The fact that the HCSO now has a sergeant assigned to coordinate all maintenance issues with the County, via Benchmark Construction, has helped,

but the decision making process required to move ahead with such matters still leaves the Jail System operating with equipment that does not work for outrageously lengthy periods of time. The most recent Benchmark Status Report reflects the seriousness of this long-standing problem. Although not dated, it appears to be from either May or October 2022.  Further, the information contained in this report is supplemented by an interview with the on-site Benchmark representative during the site visit as well as first hand observations by the Corrections Operations Member of the Monitoring Team.  In addition, the Jail Administrator said that he is not provided with copies of the periodic Benchmark Status Reports.  In his new capacity, he should be responsible for authorizing and prioritizing all maintenance projects, so his involvement in the Benchmark maintenance process is critical.

Go Pro cameras were ordered by the HCSO through the County in January 2020.  To date they have not been received.  No one working for the HCSO or County could explain why, more than two years later, the cameras are not available and in use.  This is a classic example of ineptitude that has been pointed out to the parties on numerous occasions in previous Monitoring Reports. These cameras could have easily been purchased on-line in just a matter of days.

New security cameras have been installed in B-Pod, and problem cameras in C-Pod, A-Pod, Medical and other support areas have been identified for future correction.  While this is a step in the right direction, it is something that should have been expeditiously addressed long ago.  In addition, the 32 cameras which have been identified as being in need of repair, replacement or relocation, should be fixed, moved or replaced immediately.

Inoperable cell door locks in the Medical area were identified more than five years ago.  They are currently secured with padlocks.  To date, no one in authority has provided Benchmark with guidance or direction as to what should be done to correct the problem.  The constant change of Sheriffs, Jail Administrators, County Administrators and Chairmen of the Board Supervisors has allowed all individuals involved to point to someone else as the responsible party.

The Booking sergeant also stated there was no key available to lock the Inmate Property Room door, which was found standing ajar and unsecured on three separate occasions during the site visit.  The door does not sit squarely in its frame, so it cannot even be pulled shut.

The fact that the primary access doors from the loading dock to the kitchen, do not have a working locks, has never been mentioned in the Benchmark Reports.  Instead of jail quality security locks on those double doors, a jury rigged hasp and padlock has been in place for the duration of the monitoring process (six years).

19

Fire hose cabinets in the housing units as well as the horseshoe corridors surrounding the pod control rooms have been identified as being inoperable in many previous Monitoring Reports. They still are.

The primary security door to HU C-3 has been inoperable for many months.  In addition, the entry door to B-1 ISO is secured with a hand operated deadbolt instead of a standard key controlled security lock.  This unsatisfactory solution to the problem was not corrected when B-Pod was renovated.

While other primary security doors have been repaired, the Jail staff has become so accustomed to doors that do not function properly that they do not bother to secure those doors that are operable.  During the October site visit, the Corrections Member of the Monitoring Team found the doors to B-1 and B-2 propped open and, worse yet, the Great Hall door to B-Pod propped open with no officer present while an unsupervised inmate moved food carts after the luncheon meal was served.  While in A-Pod he observed both key operated control room doors left open simultaneously.

At the time of the October site visit the following kiosks and inmate phones were inoperable at the RDC (this information was provided by the County subsequent to the site visit):

A-1—one phone and the kiosk
A-2—four phones
A-3—one phone and the kiosk—one phone has been removed
A-4—all operational

B-1—all operational
B-2—one phone and the kiosk
B-3—five phones
B-4—one phone and the kiosk—one phone has been removed

C-1—all operational
C-2—all operational
C-3—two phones
C-4—one phone and the kiosk—three phones have been removed (this means that there are **no** operational phones or kiosk(s) in C-4)

Under such circumstances, inmate communication with family and friends as well as submitting grievances, PREA reports and ordering commissary is unreasonably hampered via both telephone and the video visitation system.

Some good news is that all malfunctioning laundry equipment has either been replaced or repaired. That has allowed for the resumption of the standard laundry exchange schedule which had been suspended for more than four months.

Approximately three years ago it was noted in the Monitoring Report that there was no lock on the door leading to the Booking Office. Since the County maintenance staff took no corrective action, Booking personnel installed a hand operated deadbolt. While that secured the door, it meant that they had to open and close the door whenever someone needed to enter or leave the office. After bringing this to the attention of the Benchmark manager, he went to Home Depot and bought a key operated locking mechanism, something that the County maintenance staff should have done years before. Unfortunately, Jail staff is so accustomed to the old system that keys have not been issued to supervisors and Booking staff, so they still must get up from their posts to open and close the door whenever someone wishes to enter or leave.

The HVAC system in A-Pod is non-functional because, over the years, the inmates have destroyed the air duct system in each housing unit. Currently, there are no plans to correct this problem, leaving the inmates housed there to sweat in the summer and freeze in the winter for at least two or more years while a new jail is built in downtown Jackson.

Numerous showers do not function, primarily in A-Pod, but also in B and C-Pod which were recently renovated. In each instance, the plumbing has been ripped out of the wall leaving an unsightly hole.

The above entries are listed to show how the maintenance problems in the Jail System have become so ingrained that staff continues to follow outdated procedures, even when some problems have been corrected.

Shakedowns of the housing units are conducted at unspecified times as called for by the supervisors. While those actions are appropriate, the prevalence of contraband in the RDC has not been reduced. During the past reporting period there were two instances where staff was notified of inmates who had illegal cell phones in their possession by upset citizens who called the jail to complain that they were receiving harassing phone calls from within the facility (see IR's 220764 and 220768). As noted above, numerous other incident reports documented the scope of the contraband problem (see IR's 220767, 220775, 220777, 220786 and 220791).

21

While conducting an inspection of each housing pod, the Corrections Operations Member of the Monitoring Team counted 30 cells in A-Pod that are still welded shut. This amounts to the equivalent of an entire Housing Unit. This long-standing problem was first addressed at least a year and a half ago, but rather than correct the problem, the County has simply continued to weld cells shut. The County's approach to maintenance issues (cells that cannot be occupied because of plumbing, electrical or structural deficiencies) is to seal them up instead of fixing them.

During 2022, there has been significant progress with regard to the implementation of policies and procedures focused on improving the supervisory oversight and management of SMI detainees. A representative from Classification has been meeting with mental health staff on a regular/often daily basis to discuss the classification and placement of some of the more difficult SMI detainees. The reconstituted and re-energized Interdisciplinary Team meetings, now involving supervisory staff at the highest levels, focus on and attempt to collectively address a range of problems involving SMI detainees. However, there are two issues that compromise the effectiveness of these important efforts. The first is that in the absence of a mental health/special housing unit, there continues to be no alternative placement, other than segregation, for the most acutely ill SMIs, where they would be safe and able to receive the more intensive course of treatment they require (see paragraph 77). Placed in segregation, they remain inadequately treated and unstable. The second issue is that there continues to be a need to incorporate mental health assessments into the disciplinary review process, so that the best interdisciplinary interventions can be designed for SMI detainees charged with disciplinary infractions at that point, instead of after they have spent some time simply being held in segregation (see paragraph 77).

## 2.  Use of Force Standards

50. Develop and implement policies and procedures to regulate the use of force, including policies and procedures to ensure timely notification, documentation, and communication with supervisors and medical staff (including mental health staff) prior to and after any use of force.

**Partial Compliance**
The Use of Force Policy was put in place well over two years ago, but compliance with its standards has fluctuated over time. Initially, IAD found no violation of the policy when officers used force, to include OC, in direct conflict with policy. After this was pointed out by the Monitoring Team, there was some but inconsistent improvement. The two new IAD investigators appear to be addressing the UOF appropriately.

As described below, IAD is to be commended for several excellent reports regarding the use of force. If investigations such as these can be continued, they will go far in reducing the use of excessive force. Unfortunately, they disclose that currently, there is excessive use of force and that the incident reports cannot be relied upon to accurately disclose when detainee behavior warrants the use of force and what level of force. In IR #220656 the detainee was described as showing uncontrolled behavior and clenching his fist when he was tased. The IAD review of video footage showed that he was disobeying a direct order to stop walking, but he was not showing the aggressive behavior described. In addition, four additional officers were approaching the detainee from the other direction. In IR# 220673, the detainee was described as making threats and advancing when he was tased. The IAD review of the video showed a brief moment of behavior as described but was complying with orders, hands on head and facing the wall at the time he was tased. In IR# 220550, the detainee was described as aggressive in refusing to enter a holding cell in Booking and OC spray was used. IAD found that the initial use of OC spray was justified. However, video footage showed that after the detainee was sprayed and turned to enter the cell, one officer kicked him into the cell and the supervisor sprayed OC spray into the cell after him and the door was closed. Five officers were present at that point. Another incident report of concern in this area is IR #220808. An inmate was threatening another inmate in Medical and was tased. The Lt.'s report states that the Sgt was going to tase the inmate again but the Lt. stopped him because the inmate was in handcuffs already. The Monitoring Team has questioned the UOF when the incident reports appear to have a recitation of aggressive behavior that does not seem credible. The reports described here indicate that the skepticism is warranted. IAD was commended for these reports and the Team recommended that similar still photos from the video be printed and included with the report when the officer is exonerated.

Additional concerns as has been previously expressed involve the use of OC spray or tasers to gain compliance as opposed to as a defensive measure. IR # 220763 and IR 220878 are as a coercive tool rather than a defensive measure. Disposition of the investigation in that case is still pending.

On a positive note, Rankin County officers have not been called upon to conduct shakedowns in the RDC since March 2022.  The new Jail Administrator resolved problems in-house when he was the Captain at the WC and that philosophy appears to have been carried forward in his new position. Also, on a positive note is an incident that occurred during the October site visit.  While waiting in A-Pod to interview the on duty sergeant, the Corrections Operations Member of the Monitoring Team observed that supervisor effectively manage a potentially violent situation with an inmate who was loud, belligerent and violent.  Rather than resort to UOF with OC or taser, the sergeant managed things tactfully and controlled the inmate appropriately.  His actions were exemplary.

### 3.      Use of Force Training

52. The County must develop and implement a use of force training program.

**Partial Compliance**

There has been no change in the status of this paragraph.  UOF training continues to be provided to new recruits, but it has not been covered in follow up in-service training.  That training is typically limited to roll call training and has been limited to newly approved policies, inmate rights and PREA.

53. Topics covered by use of force training must include:

      a.      Instruction on what constitutes excessive force;

      b.      De-escalation tactics;

      c.      Methods of managing prisoners with mental illness to avoid the use of force;

      d.      Defensive tactics;

      e.      All Jail use of force policies and procedures, including those related to documentation and review of use of force.

**Partial Compliance**

There has been little change in the status of this paragraph since the last reporting period.  While UOF training includes a continuum of appropriate force responses to escalating situations, it does not yet include specific measures for managing inmates with mental illness, nor does it include scenario-based training.

55. The County must update any use of force training after any revision to a use of force policy or procedure.

**Not Applicable**

As was explained in the 17th Monitoring Report, the UOF Policy has not been revised since it was approved and implemented in 2020, but the increased use of tasers, since they were issued to sergeants and lieutenants, warrants a re-examination of their use.  Incident Reports 220643, 220656, 220673, 220724, 220808 and 220836 reflect instances were tasers were deployed.  The frequency of their use is cause for the recommended review. However, this paragraph refers to updated training after any such revision and no revision having occurred, it is not applicable at this time.

Defendants Objections and Comments

The finding on this paragraph was changed to Not Applicable based on defendants' comments.

### 4.    Use of Force Reporting

56. Develop and implement use of force reporting policies and procedures that ensure that Jail supervisors have sufficient information to analyze and respond appropriately to use of force.

**Partial Compliance**

There has been no change in the status of this paragraph for more than two years since the UOF Policy was adopted.  The initial training on its requirements has not been supplemented over time as multiple officers were promoted to supervisory positions.  The long standing problem of supervisors who merely "sign and send" up through the chain of command has not been addressed or corrected.  As mentioned throughout this report, numerous incident reports disclose actions inconsistent with policy with no findings or recommendations by supervisors. As described above, the inaccurate accounting of events needs to be addressed promptly and seriously. Without an accurate description of events, the supervisors do not have the information they need.

Although cameras in B-Pod have been upgraded and repaired, there are still 32 in C-Pod, A-Pod and throughout the RDC that need to be replaced or repaired.  The lack of a functioning video capability makes the job of the supervisors and investigators more difficult when they try to determine what actually transpired while reviewing an incident.

Defendants' Objections and Comments
The language in paragraph 56 was revised to indicate that findings and recommendations are not being provided when they should have been; not that they are always required.

57. Require each staff member who used or observed a use of force to complete a Use of Force Report as promptly as possible. Staff members must accurately complete all fields on a Use of Force Report.

**Partial Compliance**

There has been no significant change with regard to the status of this paragraph.  The quality of UOF reports has improved over time.  Supplements are often, although not always attached. See, e.g. IR# 220772, 220656, and 220616. Although the clarity of the documents is better than was the case in years past, the accuracy of the reports must be questioned given the reports described in paragraph 50 above.

58. Ensure that Jail use of force reports include an accurate and detailed account of the events.

**Partial Compliance**

Paragraph 50, above describes the incomplete or false information included in some use of force reports as discovered by IAD's review of video footage. That is of great concern.

As was noted above (see paragraph 57) the quality of UOF reports has improved over time, yet they still routinely lack witness statements and they never specify the classification of the housing area where the incident occurred.  The previously recommended standard—"Can your report stand alone?"—has never been met. This same recommendation was made in the 16th and 17th Monitoring Reports.

59. The County must ensure that Jail supervisors review, analyze, and respond appropriately to use of force.

**Partial Compliance**

As has been highlighted in previous paragraphs, supervisors are busy doing the jobs of correctional officers, instead of supervising, because of the extreme shortage of staff.  Therefore, they are unable to fulfill the requirements of this paragraph. Major Simon reported that his command staff does an in house review of use of force and assaults. However, there is no documentation of this review. It has been previously been recommended that staff members conduct a "critical incidence" or "after action" review. This review should be documented with conclusions and recommendations.

Although IAD appropriately investigated the excessive use of force described in paragraph 50 above, it is questionable whether the Jail supervisors appropriately responded to the use of force. In the two investigations in which it was found that use of tasers on a non-aggressive inmate was excessive use of force both by the same lieutenant combined with false reporting to justify the force, the first investigation resulted in remedial training and the second resulted in a 5 day suspension. And the lieutenant was subsequently put in charge of the FTO training program. The use of force described as occurring in booking which also included, at best, incomplete reporting, resulted in verbal counseling. This response by supervisors is less than appropriate given the seriousness of the infraction and false reporting.

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift. All level 1 uses of force must also be reviewed by a supervisor who was neither involved in nor approved the use of force. The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

**Partial Compliance**

As has been highlighted in previous paragraphs, supervisors are busy doing the jobs of correctional officers, instead of supervising, because of the extreme shortage of staff. Therefore, they are unable to fulfill the requirements of this paragraph.

## 5.      Incident Reporting and Review

63. Develop and implement incident reporting policies and procedures that ensure that Jail supervisors have sufficient information to respond appropriately to reportable incidents.

**Partial Compliance**

The status of this paragraph remains unchanged. The policy governing the preparation of Incident Reports (1-500) was approved and adopted over two years ago. Training was then initiated, and it continues in the basic academy, but there has been no follow up for existing staff due to the lack of personnel, which makes in-service training problematic. Paragraph 64 below provides examples of deficient incident reports which show that supervisors do not have sufficient information to evaluate reportable incidents.

64. Ensure that Incident Reports include an accurate and detailed account of the events.

**Partial Compliance**

As been stated in the previous paragraphs, an Incident Report should be able to stand alone; that is, it should not require verbal amplification or explanation. Today that is not the case. Some reports are clear and concise, but others fail to address the cause of the situation or what transpired after the fact (see IR 220811, Arson). There is no indication that any attempt was made to identify what the inmate (in C-4 Segregation) used to start the fire. In IR 220818, Suicide Observation, the report says that an inmate was placed in C-4 for suicide observation. This conflicts with established policy which directs such inmates to be housed in C-4 ISO. The inability of Medical staff to either initiate or supplement Incident Reports has also been pointed out previously as a significant weakness in the Detention Incident Reporting system which results in confusion, lack of clarity and lost information.

There appears to be an increased problem of officers not completing an initial report even though a subsequently responding officer has written a report. There are also numerous examples of responding officers not writing supplement reports. For example in IR #220578 10 detainees exited the A-4 cage. There appear to be a number of responding officers but only one report by a lieutenant that saw the incident on master control cameras. Perhaps because without supplements from

27

other responders, the gaps in information cannot be filled in. However, the lack of information is profound: why were the detainees in the cage, who was supervising them, how did they get out, who responded, how were they returned to the unit, where were the two detainees that refused to return to the unit, was force used, etc. Another example is IR# 220586, the reporting officer opened C-4 suicide and a detainee ran out. The officer called for assistance. That is the totality of the report which is listed as type "Clothing." There are no supplements and no indication whether assistance arrived, how the detainee was returned to the unit, whether force was used, etc. Again, IR #220980 an inmate was banging on the window after being assaulted for stealing. The reporting officer took him to Medical. There is no information on how the officer knew the detainee was assaulted for stealing, who assaulted him, what is injuries were, what other inmates had to say, etc. Other examples include IR# 220578, 220982, 220955, 220962,220700, 220730.

66. Ensure that Jail supervisors review and respond appropriately to incidents.

**Partial Compliance**

As has been the case with a number of the paragraphs in this section, there has been no change in status.  Although Policy 1-500, Incident Reports, was approved and adopted in April 2021, little has changed.  Most officers and supervisors received orientation training on it, but the quality of many incident reports, and the lack of follow up by supervisors, indicates that additional training is required.

## 6.      Sexual Misconduct

67. To prevent and remedy violations of prisoners' constitutional rights, the County must develop and implement policies and procedures to address sexual abuse and misconduct. Such policies and procedures must include all of the following:

  a.        Zero tolerance policy towards any sexual abuse and sexual harassment as defined by the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601, et seq., and its implementing regulations;

  b.        Staff training on the zero tolerance policy, including how to fulfill their duties and responsibilities to prevent, detect, report and respond to sexual abuse and sexual harassment under the policy;

  c.        Screening prisoners to identify those who may be sexually abusive or at risk of sexual victimization;

  d.        Multiple internal ways to allow both confidential and anonymous reporting of sexual abuse and sexual harassment and any related retaliation, including a mechanism for prisoners to directly report allegations to an outside entity;

e.      Both emergency and ongoing medical and mental health care for victims of sexual assault and sexual harassment, including rape kits as appropriate and counseling;

f.      A complete ban on cross-gender strip searches or cross-gender visual body cavity searches except in exigent circumstances or when performed by a medical examiner;

g.      A complete ban on cross-gender pat searches of women prisoners, absent exigent circumstances;

h.      Regular supervisory review to ensure compliance with the sexual abuse and sexual harassment policies; and

i.      Specialized investigative procedures and training for investigators handling sexual abuse and sexual harassment allegations.

**Partial Compliance**

This paragraph was listed as non-compliant in the 15th and 16th Monitoring Reports. The PREA Coordinator had been on leave during those reporting periods and her duties had not been adequately assumed by other individuals. The PREA Coordinator returned to her duties in January 2022 and the PREA program is getting back on track.

There are few PREA incidents reported. During this reporting period there was one inmate on staff incident that was reportedly investigated even though it is not a PREA violation. There was an inmate on inmate PREA incident in September that was investigated. The same perpetrator was involved in an incident in October. Both incidents were serious. They appear to have been properly investigated. One area of concern is that the PREA Coordinator recommended that the perpetrator not be housed with other detainees after the first incident. This recommendation was apparently not implemented and he was housed with another detainee who was the victim in the second incident. Another area of concern is that the spreadsheet provided to the Monitor did not contain the September incident and the report was not provided until its existence became known through the interview of the PREA Coordinator (no documents have been provided for October or November). It is also of concern that the spreadsheets provided to the Monitor do not match the information from the PREA Coordinator.

The PREA Coordinator provides training to on-boarding officers in the training academy. On June 28, 2022, the PREA Coordinator presented at the Academy for on-boarding officers. In June, the PREA Coordinator provided in-service training. The sign in sheets indicate that 27 officers received the training.

Not all PREA incidents are referred to the PREA Coordinator. There was a grievance in July by an inmate requesting to be moved because another inmate was "hitting on" him. This should have been referred. This indicates the need for continued in-service training of officers.

The MOU with the Mississippi Coalition Against Sexual Assault (MS CASA) is in effect and was being utilized at the time of the 13th Monitoring Report. An outside line has been implemented such that inmates can call the Coalition directly from the kiosk in the unit without charge. DOJ has highlighted a problem with reporting through the Coalition in that if the Coalition receives certain federal funds, it cannot pass on any PREA reports without a written release from the inmate. Third party reporting is still available through friends and family. PREA complaints can also be reported through the kiosk directly to the PREA Coordinator, through submitting a grievance at the kiosk or through the phone. As noted above, however, many of the kiosks and phones are not functioning and detainees on lock down have limited ability to access the kiosks and phones. An area of concern with respect to reporting is that the victim in the October incident did not report the incident for apparently two weeks. When asked why he did not report the incident earlier, he stated because the staff was very busy. The report indicates that the victim was mentally ill, but it is unclear from the report whether he did not understand that he could report via the kiosk or phone, did not know how to use those options, and/or did not have sufficient access to staff to make a report earlier.

Medical and mental health staff provides both emergency and ongoing medical and mental health care for victims of sexual assault and sexual harassment, whether such cases are referred to staff by the PREA Coordinator or first identified by medical and/or mental health staff (in which case they would then also be referred to the PREA Coordinator). When there is an alleged rape, the victim is immediately sent to the hospital for a full forensic medical assessment, which includes the rape kit.

The MOU with MS CASA also provides for counseling services for persons involved in sexual activity and it appears that individuals have been appropriately referred for counseling.

The PREA Coordinator has put up posters in the housing units with PREA information. She has also prepared pamphlets that are provided to new bookings. In addition, she reports that a TV has been is now being used in the ID room of Booking with a 16-minute video informing the inmates about PREA and the reporting process. This is a good step forward. In the past, the PREA Coordinator had completed education sessions with inmates by coordinating with a group being conducted by the discharge planning nurse. This may or may not have been the appropriate group of inmates if they were, in fact, close to discharge. Even so, these groups have not been continued. The PREA Coordinator reported that she goes back over the PREA information within 90 days. It appeared that this was an informal process and she stated that it did not happen very often. A more systematic format for education sessions with inmates should be considered. The education process needs to continue to be expanded.

One ongoing concern related to the ability to provide for sexual safety and adequately investigate allegations is that many cameras are still not functioning.  Investigative procedures should not only include a review of medical and mental health records, but also include interviews with identified medical and mental health staff.  Medical and mental health staff members often have a fuller understanding of the case than is reflected in the records.

Defendants Objections and Comments

The documents provided at the time of the site visit showed only 13 officers receiving PREA in-service training. The PREA Coordinator stated that there should be additional sign in sheets. After repeated requests for these sheets, they were provided on December 7, 2022. The paragraph has been revised to reflect the additional 14 officers receiving in-service training.

## 7.    Investigations

68. The County shall ensure that it identifies, investigates, and corrects misconduct that has or may lead to a violation of the Constitution.

     a.    Develop and implement comprehensive policies, procedures, and practices for the thorough and timely investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury.

     f.    Provide the Monitor and United States a periodic report of investigations conducted at the Jail every four months. The report will include the following information:

          i.    a brief summary of all completed investigations, by type and date;

          ii.    a listing of investigations referred for administrative investigation;

          iii.    a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

          iv.    a listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures. This list must also contain the specific misconduct and/or violation.

          v.    a description of any corrective actions or changes in policies, procedures, or practices made as a result of investigations over the reporting period.

**Partial Compliance**

Investigations are handled by two separate units within the HCSO.  Criminal Investigations (CID) handles incidents that occur within the jail facilities much as they would for offenses that happen on the street.  The advantage of having dedicated investigators handle all Detention cases is that they are familiar with the operation of the facilities.  Internal Affairs (IAD) handles cases

that involve the actions of officers, such as UOF incidents, to determine the appropriateness of their actions.

Since the June site visit, two new investigators have been assigned to IAD.  Previously, there was only one investigator.  In CID both investigators resigned and have been replaced by one new officer, but, according to the CID captain, a second one is going to be added.

During interviews with both IAD and CID personnel it came to light that the investigators did not have equal access to the camera/video system that is critical to their work.  This apparently resulted from the turnover of investigators.  When the discrepancy was reported to the IT representative, he immediately took action to allow all CID and IAD investigators equal and direct access to recorded videos without having to make a special request to IT in each case.

From June through July CID conducted 79 investigations.  Of those cases, 16 were Assaults, six were Aggravated Assaults, 26 dealt with Contraband, one was classified as Information, one was an Attempted Rape, one was an Assault on a Law Enforcement Officer, one was Malicious Mischief, and 13 were Arsons.  CID referred two cases to IAD, three internally and 25 to the Grand Jury.  A breakdown of those investigations as to location within the RDC revealed that 28 occurred in A-Pod, 22 in B-Pod, 27 in C-Pod, one in Booking and one in the Transfer Waiting area of the JDC.  These statistics indicate that there is inadequate inmate supervision throughout the entire jail, not just A-Pod. There were a number of very good investigations by the new investigator. However, not all assaults appeared to be referred to investigation. In August, only 8 of the 16 assaults were investigated.

From June through October 15th, IAD initiated 28 cases.  They were classified as follows:  15 Use of Force, six Fact Finding, six Conduct Unbecoming and one Vehicle Accident.  Of the UOF cases, six involved the use of a taser, OC was deployed in seven cases and Hands On action was used two times.  Four of the UOF investigations resulted in a finding of Sustained, 10 resulted in the officer being exonerated and one is still under investigation.

Of special note is the fact that a lieutenant, who had a long history of taser use that was exonerated in the past, was held accountable by IAD for two incidents of improper taser use resulting in his suspension coupled with remedial training.  The new CID investigator appears to be producing more detailed reports than were prepared by his predecessors.  They involve witness interviews which reflect whether or not inmates were even willing to answer questions and/or provide information.

### 8.　　Grievance and Prisoner Information Systems

69. The grievance system must permit prisoners to confidentially report grievances without requiring the intervention of a detention officer.

**Partial Compliance**

There has been no change in the status of this requirement. The County has installed a kiosk system that allows detainees to file grievances without the intervention of a detention officer. However, there are gaps in access to the kiosks. There are no kiosks in the ISO units. In addition, there are five housing units where the kiosks are not functioning at least one of them has been out of service reportedly for months. In addition, on the lock down units, the lack of staff has limited the detainees' out of cell time to short periods every few days. This limits the access of those detainees to the kiosk system. An instruction sheet for filing grievances is provided during the booking/classification process. However, the instruction sheet predates the kiosk system and so does not contain instructions for filing grievances through the kiosk system. It was reported that instructions for using the kiosk system were posted in the intake unit, however, upon inspection, there were no instructions posted. The instruction sheet on grievances also does not include information on what is a grievance as opposed to a request, what is an emergency, and what should be submitted as a medical grievance. Given that this is a frequent cause for grievances being rejected, this should be included in an updated grievance instruction sheet.

The grievance policy provides that an inmate may submit a written grievance and will be provided a form and an envelope that can be sealed. This can be given to the housing officer or the area supervisor when he or she is doing their rounds. This would allow an additional avenue to submit a grievance confidentially although not without some involvement of a Detention Officer. The Grievance Coordinator stated that, in addition, she goes to the housing units.  At the time of the site visit, each of the three control rooms had paper grievance forms. None of them had envelopes and two of the three officers working the control rooms had difficulty locating the forms. With the staff shortage the officers are not in the housing units for long periods of time making it difficult to request and return grievance forms particularly for those in lock down. At least one detainee stated that he would be reluctant to give a paper grievance to an officer for fear of retaliation. Two detainees stated that when they requested a paper form, they were told they didn't have them. Another detainee stated that he was told he could do a written grievance but did not know he could request a form and pen-he thought he would have to write it on the back of one of his court documents. The Grievance Coordinator did have a file of paper grievances showing that some detainees knew how to file one and they did get to the Coordinator. It was approximately 2 or 3 a month.

 The control room staff did not have a clear and consistent explanation for how the paper grievances got to the Grievance Coordinator from there. Paragraph 72 below requires that the grievance system accommodate individuals with cognitive, literacy or language barriers. The failure to do so impacts compliance with this paragraph in that detainees with those barriers cannot confidentially report grievances. The grievance policy requires that if there are cognitive or communication barriers, the Detention Officer refers the issue to the Area Supervisor for communication assistance or problem resolution. It does not appear that this provision of the policy has been implemented or that the inmates have been informed of it.

71. All grievances must receive appropriate follow-up.

**Partial Compliance**
As previously reported, the Grievance Coordinator maintains a spread sheet to track the grievances and grievance responses. Many of the fields are pulled electronically from the Securus system. However, she has to manually add the type of grievance, the date of response, and the date of an appeal. The Grievance Coordinator previously reported that some officers do not respond to grievances through the Securus system and, as a result, there is no documentation of a response to some grievances. This appears to be a significant problem. The timeliness of responses is also an issue. Standard grievances are supposed to receive a response within 7 days. Emergency and medical grievances are supposed to receive a response in 24 hours.

There continues to be a problem with grievances receiving no response or late responses. The following chart shows those numbers.

| Month | Number of Grievances | No Response-Regular | Late Response Regular | No Response Medical | Late Response Medical | No Response-Emergency | Late Response-Emergency |
|---|---|---|---|---|---|---|---|
| July | 136 | 7 | 9 | 0 | 3 | 3 | 15 |
| August | 165 | 0 | 6 | 0 | 3 | 0 | 12 |
| September | 189 | 13 | 16 | 0 | 14 | 0 | 14 |

An area of improvement to be noted is that Medical has not had any grievances that have not been responded to. There are still late responses. However, the Mental Health member of the Monitoring Team has reviewed Medical's paper files on grievances and found the responses to be timely. In order to deal with this discrepancy, the Monitoring Team had a joint meeting with

34

the Grievance Coordinator and the HSA and a plan was put in place to have the electronic system accurately match Medical's responses. A problem for both Medical and the Grievance Coordinator is the weekend response time.  The Grievance Coordinator and the HSA work regular business hours and will not see a medical or emergency grievance submitted in the evening or on the weekend until the next business day.

A previously stated concern has been addressed. When an inmate submits a grievance regarding a medical issue on a regular grievance form, the Grievance Coordinator cannot assign it to Medical. Although this is helpful in tracking grievances by category, it means that the inmate is told he has to resubmit on the proper form. The Grievance Coordinator now responds that the grievance needs to be submitted on the Medical Grievance form but she also prints out the grievance and gives it directly to Medical. Five of these were responded to beyond the 24 hours for medical grievances but this may be due to the discrepancy described above.

There appears to be some improvement in reducing the number of grievances that are denied as not a grievance when they should actually be considered grievances. There was one regarding the denial of rec time. However, a number of legitimate grievances had no response so it was difficult to tell what the outcome was. There are still some grievances where the adequacy of the response needs improvement but this appears to be improving. There were still a number of responses, about 10 in a two week period, stating that the officer "will look into it" or will come talk to the detainee. There is no way of knowing whether the promised action was completed. When possible, it would be better to address the grievance and then report what was done. The new grievance policy requires that the Quality Assurance Officer do a monthly audit of grievances and responses to determine the timeliness and appropriateness of the responses. This has not been implemented yet and now there is no Quality Assurance Officer but if implemented should provide some oversight in this area.

72. The grievance system must accommodate prisoners who have physical or cognitive disabilities, are illiterate, or have LEP, so that these prisoners have meaningful access to the grievance system.

**Non-Compliant**
The grievance policy requires that if there are cognitive or communication barriers, the Detention Officer refer the issue to the Area Supervisor for communication assistance or problem resolution.  The kiosks now have a Spanish language format. However, persons with disabilities do not have meaningful access to the grievance system. Two detainees interviewed appeared to have significant cognitive impairments. They reported that they do not know how to use the kiosk system and do not know how to submit a grievance separate from the kiosk system.  There is no indication that the provision of the policy addressing those with cognitive impairments is being

implemented or that inmates have been informed of this option. Neither the information sheet on grievances nor the inmate handbook currently given at booking includes this information.

### 9.     Restrictions on the Use of Segregation

74. Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term housing where staff will provide access to exercise, meals, and other services.

**Non-Compliant**

There are three areas addressed by this provision: Classification; appropriate long-term housing; and access to exercise, meals and other services.

The Classification supervisor was relatively new to the position at the time of the site visit having been promoted to the position in mid-August. However, he had worked in Classification as an officer before being promoted. It is concerning that he had not seen the policies on Classification and did not know there were any. This is not the first time an administrative supervisor was unaware of the existence of a policy(ies) regarding their area of responsibility. (The current Grievance Coordinator was similarly not trained on the Grievance policy when she started). Attention should be given to the training of supervisors and staff in the administrative areas.

The lack of familiarity with the policies may explain why some practices have developed. The Classification staff was provided access to the NCIC so that they could score the objective classification tool accurately on criminal history. They had previously been using only the JMS system so that if a detainee had a charge/conviction outside of Hinds County they would not know about it unless a hold was indicated in the JMS system. As a result, a number of forms at that time indicated that the detainee reported a serious, sometimes violent, charge that was not scored. However, at the time of the site visit, Classification staff had reverted to using the JMS system for scoring criminal history. In a subsequent interview with the Classification supervisor about two weeks later, he stated that Classification staff has returned to using the NCIC for scoring criminal history.

Another practice that reappeared was the practice of sending individuals to the Work Center based on charge rather than the objective scoring instrument. One individual was not classified but was sent to the Work Center based on charge. When this was caught in the reporting process, he was classified and was found not to be eligible for the Work Center.

Classification maintains a log showing the date of booking and the date of classification. The log indicates that not all inmates are classified within 8 hours of booking. In July, the log indicates that 27 out of 106 or 25% were classified one day or more after the date of booking. The log does not show the time of either booking or classification. It is possible that an 8 hour period could result in a booking the following day. Assuming that is the case with all of the classifications showing completion the next day, there would be 20 out of 106 or 19% classified two days of more after booking. In August, the log shows that 19 out of 83 or 23% were classified one day or more after booking. Again, assuming those that are classified the next day were still within the 8 hour time frame, there would be 13 or 16% classified 2 days or more after booking. In September, the log shows that 22 or 22% were classified one day or more after booking. Again, assuming those that are classified the next day were still within the 8 hour time frame, there would be 15 or 15% classified 2 days or more after booking. These included individuals classified up to 2 weeks after booking.

At the time of the last site visit, a check of a sample of log entries against the computer entries indicated that the log was inaccurate in a number of cases. During the October site visit, a similar check of the September log indicated that the log was mostly accurate with a few exceptions.

Classification is extremely short-staffed currently which no doubt contributes to the inability to classify detainees in the 8 hour time frame. The office is supposed to have 8 officers and one supervisor. They have three officers and one supervisor. At that staffing level despite their best efforts, Classification cannot be covered 24/7. As a result, officers move detainees to other units at times without being able to refer them to Classification. See, e.g. IR # 220758, 220891, 220897, and 220902. This can be days later as in the case of IR #220897. The Classification supervisor stated that in those cases the officers will normally move the detainee to B-1, the intake unit or B-3. However, this is not always the case. See, e.g., IR # 220982.

The Monitor requested the initial classification form for all detainees booked in the first two weeks of September. A check on some of these forms was completed. There were four forms in which the criminal history or current charge was incorrectly scored. There were a number of forms in which the Special Management section was not completed particularly when mental illness was disclosed but not checked. The Classification Supervisor stated that he thought Medical should decide whether there is a mental health issue. However, the purpose of this part of the classification process is to flag potential issues and it should be checked if there is such an indication.  It should be noted that there continue to be frequent problems with access to the NCIC system for Classification staff (and Booking staff). The officers have compensated by contacting the Radio Room which uses a different system to get the NCIC report. This inefficiency should be investigated and

addressed by IT.  As noted in previous reports, the staff is using an objective classification instrument, are not routinely overriding the result, and the accuracy of the scoring is much improved.

Although improvements have been made in the area of Classification, it is still not the case that an objective risk instrument is governing the long term housing placement of inmates. There continue to be gang pods. The Inmate Services Manager reported that the operation of inmate committees who reject housing placements has calmed down but still exists as evidenced by several incident reports. The Classification supervisor also reported that the committees continue to function. One of the detainees interviewed also described the function of the committee or "houseman." A number of incident reports describe incidents where the other detainees on the unit decided that a detainee had to be moved. See, e.g. IR # 220546, 220582, 220643, 220712, 220765, 220817, 220826, 220866, and 220870. In addition, one grievance reviewed complained that inmates should not be permitted to give orders. As mentioned above, security continues to move inmates without Classification involvement and, although Classification staff review these moves, without 24/7 Classification coverage, this is often after the fact. The current lack of bed space also impacts the ability of Classifications to house detainees based on classification.

The second aspect of this provision is that, after classification, detainees should be housed in appropriate long-term housing.  During the Monitoring Team's initial interview with the Assistant Jail Administrator (now Major/Jail Administrator) on October 18th, he indicated inmates have not been "housed" in Booking since the beginning of July 2022.  That statement was confirmed by a review of records and multiple inspections of the Booking area during the site visit.  If this change in practice can continue, it represents a quantum leap in the right direction.  For six years there have been efforts to stop the housing of inmates in Booking, but they always failed after a short period of time.  What makes the change in practice even more noteworthy is that the ADP is at a recent high of approximately 750 inmates.  Coupled with the fact that many cells are not usable (30 in A-Pod alone) and that the JDC is closed, except for the Transfer Waiting area for holding inmates going to and from court, the RDC and WC do not have sufficient capacity to hold the current population.

However, it must be questioned whether any of the housing units constitute appropriate long-term housing without adequate staffing to supervise. This is particularly true of A-Pod. The County has stated an intention to close A-Pod. At the current count (750) there are not nearly enough beds at RDC and the WC to move all the detainees out of A-Pod. The Sheriff reported that two counties had indicated a willingness to take some Hinds County detainees. However, no details have been discussed such as cost or eligible detainees and no agreements have been made to house detainees in other jurisdictions. A-Pod continues to have the problems previously reported: cell doors do not lock; the lighting in the cells and frequently in the day room do not

work; there are no tables; the HVAC system does not work and during hot weather detainees are sleeping on the floor; detainees frequently ask to be moved because they fear for their safety and other inmates insist on the removal of some inmates at risk of assaulting them. In the summer months, the heat is a major issue (See, e.g. IR#220649, 220676. 220575). Toilets don't work and detainees without a functioning toilet are required to pay for the use of another's toilet. CID report 22-1461.

On July 29, 2022, the previous Food Service Director resigned his position because of a conflict with the Sheriff over the adequacy of the Food Service budget.  His replacement, who was hired in September, faces the same budget shortfall because the inmate population has increased significantly and inflation has driven up the cost of purchasing food.  In addition, he has lost three personnel, which makes staffing problematic.  At the RDC, only five of the seven authorized positions are filled.  Consequently, the plan to return to serving three hot meals a day was sidelined and the hot breakfast, hot lunch and cold supper meal rotation is still in place.

Policy 14-200, Food Service Management, was approved and adopted on March 24, 2022.  It calls for the master menu to be approved by an independent dietitian.  While that is an appropriate standard, it has never been met.  To date the Food Service Director has not been able to find a qualified independent dietitian to review and approve the master (quarterly) menu.

Inmate visitation with family and friends is held by video through the kiosk system.  Based on records provided by the HCSO, which group all RDC and WC visits together without reflecting where the inmates are housed, 51 visits were scheduled during the month of September.  Of those, 22 were actually completed.  The remainder were not because they were unpaid, refused, cancelled by the inmate, missed by the inmate or cancelled by administration.  When that number is projected out for a year, it means that only 264 inmates are able to complete a video visitation annually.  With approximately 750 inmates incarcerated at the RDC and WC, it will take 2.58 years for each of them to have one visit.  It would seem that something is very wrong with a system that results in such a low visitation rate.

Opportunities for outdoor recreation are supposed to be provided to inmates at the RDC in the yards that separate Housing Units 1 & 2 and 3 & 4 in each of the three pods, A, B and C.  The most recent Revised Staffing Analysis (October 2021) calls for one officer to be on duty on both sides of each pod on a daily basis, on the day and evening shifts to oversee recreation.  In fact, there have never been any officers specifically assigned to perform that duty for years.  Instead, the floor or control room officer merely opens the door leading from one housing unit to the recreation yard for a certain amount of time, and then records that recreation was provided.  In A-Pod, there are not even any secure, electronically controlled locks on the recreation yard doors.

They are simply secured with padlocks and hasps.  The records provided by the HCSO, which purport to document recreation, are highly suspect.  Some simply list start and stop times and shows "Rec Yard-Unit" in the section for the number of inmates.  Others indicate that adjacent housing units have access to the recreation yard simultaneously instead of alternately, and some say that inmates in segregation (C-4) are let out individually.  That is impossible when there is no one assigned to work in C-4 as reflected by the Post Assignment Sheets.

The laundry situation has improved since the 17th Monitoring Report.  At that time, half of the laundry equipment at the RDC was inoperable and the twice weekly laundry service for each pod had been reduced to only once a week.  Since then, all of the washers and dryers have been replaced or repaired and, according to the Laundry Officer, the twice weekly service has been reinstituted. However, responses to grievances indicate that the Jail continues to be short of needed items such as sheets. In addition, prior grievances complained of missing laundry. Although those grievances were mostly denied, a sign of the laundry room door indicated that because of missing items, the laundry room would be closed and locked at night.

Providing access to medical and mental health services involves several issues.  First of all, there must be an adequate number of and the right mix of medical and mental health staff to provide medical and mental health services to the detainee population.  In this regard, see paragraph 42.  Then, there must also be an adequate number of detention staff to support medical and mental health staff efforts to provide medical and mental health services.  In this regard, see paragraph 42.

A third and somewhat more complicated issue is the extent to which the place where a detainee is housed supports or impedes access to the medical and mental health services that the detainee requires.  Obvious examples of this include the medical observation unit and suicide resistant cells, both of which allow for access to the more intensive treatment and supervision that a detainee might require, while keeping the detainee safe until such time that he/she is more stable. It should be noted that although both a medical observation unit and suicide resistant cells do exist at the jail, consistently insuring adequate detention supervision of these units has been a challenge.  A mental health unit is yet another example, focusing on providing access to more intensive mental health treatment for the most acutely ill and unstable SMIs, along with the type of supervision that will minimize the risk of harm to themselves or others. With regard to the proposed mental health unit, see paragraph 77.

75. The County must document the placement and removal of all prisoners to and from segregation.

**Partial Compliance**

RDC maintains two separate logs with respect to documenting the placement and removal of detainees in segregation. One is called the Segregation Monthly Report and one is the Detainee/Inmate Disciplinary Report. The Segregation Report lists all detainees in segregation because of special needs, protective custody, medical observation and occasionally administrative segregation. This does now include the date of the move into segregation and has a column for segregation end date, however, the logs reflect that these detainees rarely exit segregation unless they are released. They continue in segregation in some cases for years. One detainee listed in the log has been in segregation for over five years. Also, the Segregation log does not include individuals housed in the ISO units. The Segregation Report does not include individuals who are in segregation for disciplinary reasons. Those individuals are listed in the separate Disciplinary Report. The Disciplinary Report includes a list of all disciplinary cases and the sanction imposed. In some cases, this is a loss of canteen or other privileges and in some cases this is a sentence to segregation. This log does not include the date of placement or removal from segregation.

76. Qualified Mental Health Professionals must conduct mental health rounds at least once a week (in a private setting if necessary, to elicit accurate information), to assess the mental health status of all prisoners in segregation and the effect of segregation on each prisoner's mental health, in order to determine whether continued placement in segregation is appropriate. These mental health rounds must not be a substitute for treatment.

**Partial Compliance**

QMHPs perform weekly rounds of all detainees being held in segregation, with the goal of assessing their mental health status, the effects of segregation on their mental health, any need to initiate or adjust mental health treatment, and whether or not continued placement in segregation is appropriate. The findings of these assessments, along with any other relevant information about a detainee, are discussed during the weekly IDT meetings; the goal is that the IDT will take any appropriate action that might be required; but indicated interventions are not always available, such as an alternative housing placement that would allow for enhanced treatment.

It is understood that these weekly assessments are not a substitute for treatment, and so therapeutic sessions are also provided to detainees being held in segregation as indicated. It should be noted however that due to detention staff shortages, it is often difficult to have detainees removed from their cells so that they can be interviewed in a more private setting, even when this is clearly indicated (i.e., although it is always preferably to perform mental health assessments in a private setting, there are times when it is obvious/clear that the lack of privacy has impeded the assessment process). This is even more of a problem for the most acutely ill SMI detainees who actually require more frequent and more intensive involvement with mental health staff in order

to develop the type of engagement/working relationship with staff that will allow for the gathering of accurate information and in turn, the development of and the provision of the most appropriate interventions.

77. The County must develop and implement restrictions on the segregation of prisoners with serious mental illness.

**Non-compliant**

Restricting the placement of SMI detainees in segregation involves several issues. These include:

- The provision of mental health services to SMI detainees housed in general population units, so that they can remain stable enough to function on a general population unit
- The incorporation of information obtained via mental health assessments into the disciplinary review process, so that SMI detainees are not inappropriately placed in segregation
- A segregation review process whereby the mental health status of SMI detainees held in segregation is reviewed and efforts are made to identify the most appropriate placement and design the most appropriate intervention(s)
- An alternative placement (an alternative to segregation) for SMI detainees who are unable to function on a general population unit

The mental health staff members make every effort to provide mental health services to SMI detainees housed in general population units, so that they can remain stable enough to function on a general population unit. However, as noted in paragraph 42, there is not enough mental health staff to provide the range of services that are required. As staff members have said, 'we do the best we can with what staff we have', while recognizing that given the shortage of staff, they are unable to provide indicated interventions (for example, sufficiently frequent individual sessions, psychoeducational and therapeutic group therapy, and more intensive efforts to engage the most acutely ill and regressed detainees).

As noted in paragraph 46, policies and procedures have yet to be developed to allow for the incorporation of information obtained via mental health assessments into the disciplinary review process. Such policies and procedure would help identify, for example, SMI detainees who's charged behavior was really a product of their mental illness and therefore need treatment instead of placement in segregation; SMI detainees who would clearly be harmed by being placed in segregation; and SMI detainees who are so seriously ill that placement in segregation is unlikely to be a benefit (i.e., recognized by them as a punishment for their behavior and/or aid in the correction of their behavior).

As noted in paragraph 46, a segregation review process has been incorporated into the weekly Interdisciplinary Team meetings.  The mental health status of SMI detainees held in segregation is reviewed and efforts are made to design a more appropriate intervention(s) for each detainee. However, as also noted in paragraph 46, the alternative intervention options available to the team are limited, and so there are SMI detainees who remain in segregation despite the fact that it is an inappropriate placement for them.

The absence of an alternative placement (an alternative to segregation) for SMI detainees who are unable to function on a general population unit is a major issue here.  The detainee population focused on in this regard are those SMI detainees who are so acutely ill (because they have not yet been engaged in treatment, or treatment efforts have not yet resulted in stabilization, or they continue to evidence clinically significant symptoms despite their compliance with the best available treatment)  that they are either at high risk of harming other detainees or staff, at high risk of being harmed by others, and/or otherwise unable to function and care for themselves on a general population unit.  A mental health unit, specifically designed and programed for this population, would provide an adequately supervised and safe alternative to placement in segregation, and provide a housing setting and the combination of mental health interventions required to stabilize them or at least maximize their ability to function.

During the last year, the mental health staff have worked to develop a program plan for a mental health unit, and worked with classification and detention staff with regard to issues such as admission and discharge criteria, detention supervision and the training of detention staff to work on that unit, and the full incorporation of detention staff into the therapeutic programming on the unit.  The mental health staff also consulted with administration on the renovation of the unit that had been selected to be made into a mental health unit, and the renovations were started.  At the time of the May/June site visit, it was clearly communicated to the Monitoring Team by the Jail Administrator that the plans for a Mental Health Unit would not be moving forward. As in the past, no doable alternatives for providing enhanced mental health services to this target population have been identified. A discussion about this decision and its impact on the County's compliance with the New Injunction was held at the end of the October site visit. No further commitment by the County was made. The Monitoring Team considers the implementation of a Mental Health Unit to be essential to compliance with the requirement to provide adequate mental health services.

During this site visit, each of the 17 SMI detainees being held in segregation were seen by this monitor and their cases were discussed with the mental health staff.  Although at present, none of them could be safely housed on a general population unit, all but 2 of them would be more

appropriately held on a mental health unit, where they could benefit from a more intensive treatment program.  More specifically, although mental health staff have made considerable efforts to engage these detainees and increase their compliance with the medication prescribed for them (in many cases, by employing long-acting injectable medication instead of oral medication), other therapeutic interventions will be required to fully stabilize them or at least maximize their ability to function (interventions that are impossible to provide while they are being held in segregation).

The detainee noted above to have been in segregation for five years does have SMI. Another SMI detainee in segregation is noted in the log to have been in segregation for four years. When an acutely ill SMI detainee is being held in segregation at Hinds County Jail, it is impossible for a mental health professional to have extensive enough, appropriate interactions with the detainee to even engage the detainee, which is the first step in rendering treatment.  As a result, a detainee who might respond to treatment, remains acutely ill, locked in a cell without anything to do but engage in psychotic delusions and hallucinations, and unable to function in a less restrictive setting. Even the minimal requirements for out of cell time for detainees in segregation, which would not be sufficient to address the isolation, lack of treatment and resulting decompensation, is not provided due to lack of staffing.

In addition to detainees with SMI being routinely held in segregation, they also are placed in segregation as a result of the disciplinary process. The Disciplinary Officer reported that he confers with mental health staff when he is addressing discipline of a detainee with SMI. Mental health staff members confirm this. This practice is good but the consultation should be expanded to cover the topics recommended above and in previous Monitoring Reports. Providing required due process in the disciplinary procedure is also a safeguard on placing detainees with mental illness in segregation. The Disciplinary Officer should be provided guidance on due process requirements and a disciplinary policy incorporating those requirements should be developed and implemented. The Disciplinary Officer reported that he considers his conversation with the detainee to be the hearing. However, this does not include all of the procedural rights the detainee is entitled to. It is permissible to offer a plea before a hearing is held, but it is unclear whether the detainees are informed that they have a right to a hearing and what such a hearing would entail. The draft Inmate Handbook provides information on this process but is still in need of revision to conform to constitutional requirements. The Disciplinary Officer has made significant progress in establishing a disciplinary procedure which did not previously exist. However, additional guidance is needed.

### 10.   Youthful Prisoners

## 11.    Lawful Basis for Detention

85. The County will not accept or continue to house prisoners in the Jail without appropriate, completed paperwork such as an affidavit, arrest warrant, detention hold, or judge's written detention order.

**Partial Compliance**

There has been significant improvement in this area since the beginning of the monitoring process. Detainees are generally not booked in without appropriate paperwork with only occasional exceptions identified. There are more occasions when detainees continue to be housed in the jail after they should have been released. Several are noted in paragraph 92 below. In the 16th and 17th Monitoring Reports, the practice of booking "in and outs" was identified. This is when an officer brings an individual in for booking with an arrest report that states to release the individual after X hours. At the time of the earlier site visits, it appeared that this was done on a range of cases and without legal authority. In fact, these reports were earlier called "law enforcement holds." However, at the time of the October site visit, Jail staff stated that this was only done for misdemeanor DUI charges and an ROR is completed. The Monitor did not find any cases during this site visit for which there was not an ROR.

The Monitor identified a process to review the paperwork on incoming bookings more thoroughly. In Hinds County, a Jail employee prepares the docket for initial appearances for certain arresting agencies including the Hinds County Sheriff's office. The initial appearance according to Mississippi law is to take place within 48 hours of booking/arrest. The Monitor reviewed the bookings for a 2 week period in September (with some dates missing) with the Court Liaison to determine whether the person received an initial appearance in 48 hours and whether any delay was due to a lack of paperwork. Two individuals were released reportedly because of a lack of needed paperwork, however, this was after 5 and 6 days not 48 hours. An additional 8 people were held beyond 48 hours without an initial appearance although it is not possible to tell from the records whether this was due to a lack of paperwork or the lack of an available judge. It should be noted that the Court Liaison reports being in close communication with the judge regarding these cases and is reportedly following his direction. It is also unusual in this Monitor's experience for jail staff to be responsible for overseeing a court docket. This would be a good issue for criminal justice partners to address and bring the practice into compliance with state law.

86. No person shall be incarcerated in the Jail for failure to pay fines or fees in contravention of the protections of the United States Constitution as set forth and discussed in *Bearden v. Georgia*, 461 U.S. 660 (1983) and *Cassiby v. State*, 453 So. 2d 1298 (Miss. 1984).

**Substantial Compliance**

The Records Supervisor reported that individuals are not held when the only order is for the payment of fines and fees. The Monitor requested that the Records staff provide the mittimuses that came in during the monitoring period. This was done. The mittimuses that were provided were all from municipal courts and appeared to be compliant with this paragraph. However, the mittimuses that were found with other records from Justice Court have language inconsistent with this paragraph. They order a sentence and/ or fines and fees and require the defendant to be held until completion of the sentence or payment of the fines and fees. Jail staff has interpreted this to mean that the individual can be released when the sentence is completed even if fines and fees have not been paid. This is not the only possible interpretation and it would be preferable to have the orders corrected or work with Justice Court to develop a new form. Even with this interpretation, there is the potential for an individual to be held solely on fines and fees as described in the 15th Monitoring Report, when the other pending charges were resolved. Nevertheless, this paragraph has been changed to Substantial Compliance, but will continue to be monitored (if monitoring is continued) as the forms inconsistent with this paragraph are still being used and therefore there is a potential for incarceration contrary to this paragraph.

92. The County must ensure that the Jail timely releases from custody all individuals entitled to release. At minimum:

    a.    Prisoners are entitled to release if there is no legal basis for their continued detention. Such release must occur no later than 11:59 PM on the day that a prisoner is entitled to be released.

    b.    Prisoners must be presumed entitled to release from detention if there is a court order that specifies an applicable release date, or Jail records document no reasonable legal basis for the continued detention of a prisoner.

    c.    Examples of prisoners presumptively entitled to release include:

        i.    Individuals who have completed their sentences;

        ii.    Individuals who have been acquitted of all charges after trial;

        iii.    Individuals whose charges have been dismissed;

        iv.    Individuals who are ordered released by a court order; and

        v.    Individuals detained by a law enforcement agency that then fails to promptly provide constitutionally adequate, documented justification for an individual's continued detention.

**Partial Compliance**

The Monitor reviews the record audits, grievances and program requests, and a random selection of the two face sheets in the inmate files. From this review, a number of inmate records are reviewed with the Records Supervisor where the Monitor has questions arising from the documents. The review is therefore not entirely at random but is not based on disclosure of over

detention. There were several apparent instances of over detention. The most troubling was the case of L. W. The report on this over detention has not yet been completed/provided. However, it appears that the detainee was entitled to release on February 1, 2022 when a bench warrant was recalled and the only remaining charge had an ROR release order. Reportedly, the court administrator told the jail to continue to hold him until a new release order was sent. No release order came in and the only court order in the system was an ROR.  An email from the court on July 28th instructed the jail to release the detainee, which was already long overdue, but the detainee was still not released until October 5th. This was 264 days of over detention. A recurring problem appears to involve warrants from other jurisdictions which are not addressed until some time after the detainee is otherwise entitled to release. This was the case with M.S. who should have been release on July 11th but was not released until October 20th after he filed a grievance and T.W. held five additional days after he was otherwise entitled to release. Another recurring issue is the release of individuals charged with probation violations who do not have a warrant after 21 days. This was the case for L.G. and R.M. Then there are two cases where the 8 day delay in both cases was for no explained reason. This was M.S. and M.E.

The Monitor has recommended that technology solutions be explored for some of these errors such as the 21 day time period for probation violations. The Monitor also recommends that there be more in-depth review of releases to identify possible corrective action. The Administrative Lieutenant creates an Erroneous Release Log but these over detentions are rarely identified. It is unclear why that is. This process should be reviewed to determine how these issues of over detention can be identified and corrected by jail staff.

### 12.      Continuous Improvement and Quality Assurance

.

### 13.      Criminal Justice Coordinating Committee

### 14.      Implementation, Timing, and General Provisions

121. Within 30 days of the Effective Date of this Injunction, the County must distribute copies of the Injunction to all prisoners and Jail staff, including all medical and security staff, with appropriate explanation as to the staff members' obligations under the Injunction. At minimum:

    a.      A copy of the Injunction must be posted in each unit (including booking/intake and medical areas), and program rooms (e.g., classrooms and any library).

    b.       Individual copies of the Injunction must be provided to prisoners upon reasonable request.

**Partial Compliance**

While a hard printed copy of the New Injunction is not provided to each inmate, an electronic copy is available for review on the inmate kiosk system. Copies of the Injunction are not posted in each housing unit (including booking/intake and medical areas). The Sheriff's legal counsel did attend roll calls and gave a printed copy of the Injunction to those officers and supervisors who were in attendance. Some staff, however, still seem to be unaware of how to access the new injunction (like the prior Settlement Agreement) or provide access to detainees. One inmate request asked for a copy of the new injunction. The staff response was that she would try to find it. She seemingly did not know how to access it herself or know that the detainee could access it on the kiosk. (However, as noted above, 5 of the 12 housing units do not have a functioning kiosk which would preclude their access).

### 15.  Policy and Procedure Review

130. The County must review all existing policies and procedures to ensure their compliance with the constitutional violations addressed in this Injunction. Where RDC does not have a policy or procedure in place that complies with this Injunction, the County must revise or draft such a policy or procedure.

**Partial Compliance**

As of April 13, 2022, 38 policies had been approved and adopted. At the time of the October site visit, Jail staff reported that five additional policies have been approved and are awaiting signature. These have not been reviewed by the Monitors for purposes of determining whether they comply with the New Injunction as they have not yet been provided. Some or all of these were in the review process before DOJ and Monitor's approval of policies was deleted from the monitoring process and those policies appeared to be on the right track at that time. Numerous polices remain to be adopted and implemented relevant to the New Injunction. These include among others, Discipline, Releasing, Training, and many others.

### 16.  Monitoring

This Injunction must be monitored by an individual approved by the Court. Accordingly, paragraphs 136 through 158 of the Order Amending Consent Decree, and their subparagraphs, are hereby incorporated and remain in force.

141. The Monitor may contract or consult with other individuals or entities to assist in the evaluation of compliance. The Monitor will pay for the services out of his/her budget. These individuals and entities must be governed and bound by the terms of this Agreement as the Monitor is governed

and bound by those terms. The Monitor may engage in ex parte communications with the County and the United States regarding this Agreement.

**Partial Compliance**

The Monitoring Team has been able to engage in ex parte communications with counsel for the County although with limited response and with the United States. With respect to staff of the County and the Sheriff's office, see, paragraph 145 below.

142. The Monitor and United States will have full and complete access to the Jail, Jail documents and records, prisoner medical and mental health records, staff members, and prisoners.

**Partial Compliance**

As reported in the 17th Monitoring Report, for the past five years the Sheriff's Office and County have made a good faith effort to provide access to the Jail, Jail documents and records, prisoner medical and mental health records, staff members and prisoners.  The Compliance Coordinator served as the primary point of contact and he assured complete and timely access as required. However, that level of access changed once the County moved to be relieved from the provisions of the Settlement Agreement and the Compliance Coordinator resigned.  Access to requested documents was very problematic at the time of the May/June site visit. There was some improvement at the time of the October site visit although monthly reports were delayed, requested documents for the site visit were delayed with some documents being provided the day before the site visit was scheduled to begin when the monitoring team was traveling and some not being provided until after the site visit. There seemed to be a greater intention to provide requested documents but if monitoring continues, this process needs to be much improved.

In years past it was always possible to have direct contact with the Jail Administrator and subordinate commanders and supervisors in order to stay current with conditions since the previous site visit.  In anticipation of the next site visit phone calls were frequently made with the appropriate personnel.  After the February hearing in federal court, access and cooperation ceased. This continues to be the case. During the site visit, staff is cooperative and communicative. However, between site visits it appears that all communications must go through attorneys who are often unresponsive and as a result communication with staff is virtually non-existent.

144. The County must maintain sufficient records to document that the requirements of this Agreement are being properly implemented and must make such records available to the United States or Monitor at all reasonable times for inspection and copying. The County must maintain, and submit upon request, records or other documents to verify that the County has taken such actions as described in any self-assessment compliance reports (e.g., census summaries, policies,

procedures, protocols, training materials and incident re-ports).

**Partial Compliance**

As noted in the introduction and throughout the report, access to documents although improved has continued to be problematic since the entry of the New Injunction and the resignation without full replacement of the Compliance Coordinator. Documents that were provided on a monthly basis continued to be delayed in some instances significantly. Documents requested specifically for the site visit were in some instances not provided until the day before the site visit when the monitoring team was traveling and in some instances were not provided until after the site visit and follow up interviews were necessary to schedule. If monitoring continues, the County appears to understand that this process needs to improve and hopefully will work towards that goal.

As was noted in the 17th Monitoring Report, and continues to be the case today, access to documents has been particularly problematic since the issuance of the New Injunction and resignation, without replacement, of the Compliance Coordinator.  Initially, the HCSO and County attempted to shift the delivery of required documents from Google Docs to Dropbox.  When that change resulted in unreasonable delays and the inability of the Monitoring Team to readily access records, the County's legal team began to post documents on their private firm's data base.  The end result has been that documents required for the site visit were not provided in advance and tracking down specific records has become a cumbersome and time-consuming process.

145. The County will direct all employees, contractors, and agents to cooperate fully with the Monitor and United States.

**Non-Compliant**

Communication with the County and its attorneys and HCSO staff has been problematic. In addition to the difficulties described above, communication with County attorneys has been difficult. Emails requesting interviews with HCSO staff, site visit arrangements, updates on document production, etc have often been unanswered. This not only results in significant Monitoring Team time to follow up on these issues but an inability to effectively engage in the monitoring process. Contrary to the requirements of this paragraph, it appears that Jail staff has been instructed not to communicate with the monitors without going through the attorneys. Although this might be workable if there was prompt or any response from the attorneys, this has not typically been the case. Requests to communicate with staff have gone unanswered and the previous lines of communication have been shut down. It should be noted that during site visits, Jail staff has been cooperative and communicative.

Defendants' Objections and Comments

Access to employees during the site visit has not been a problem. As described in this paragraph, the difficulties have arisen when attempting to communicate with employees or obtain information between site visits. Paragraph 142 and this paragraph require full and complete access. Even with complying with defendants' request that this be arranged through defense counsel the Monitoring Team has been unable to communicate with staff in between site visits.

### 17.    County Assessment and Compliance Coordinator

### 18.    Emergent Conditions

161. The County must notify the Monitor and United States of any prisoner death, riot, escape, injury requiring hospitalization, or over-detention of a prisoner (i.e. failure to release a prisoner before 11:59 PM on the day she or he was entitled to be released), within 3 days of learning of the event.

**Non-Compliant**

The County has generally complied with this requirement in the past. Once again with the resignation of the Compliance Coordinator and the transfer of this duty the process appears to have been lost. Rapid notifications appear to be uploaded at the end of the month at best but not in compliance with the time frame of this paragraph. That being said, immediate notifications have not been uploaded for October or November. The County has generally not provided immediate notification of over detention. The Monitors received the first such notification during the last monitoring period but several over-detentions have occurred during this monitoring period without immediate notification. The Inmate Services Manager previously stated that incident reports for over detention are not prepared because there is no incident type in the JMS system for over-detention. One recommendation would be to create that category in JMS so that these can be more easily tracked and immediate notifications provided.