1    IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                 NORTHERN DIVISION

3

4    UNITED STATES OF AMERICA                        PLAINTIFF

5    VERSUS              CIVIL ACTION NO. 3:16-CV-00489-CWR-BWR

6    THE HINDS COUNTY BOARD OF SUPERVISORS,
     HINDS COUNTY SHERIFF, ET AL.                     DEFENDANTS
7

8

9                      MOTIONS PROCEEDINGS
          BEFORE THE HONORABLE CARLTON W. REEVES,
10           UNITED STATES DISTRICT COURT JUDGE,
                      NOVEMBER 28, 2022,
11                  JACKSON, MISSISSIPPI

12

13               (Appearances noted herein.)

14

15

16

17

18

19

20

21
     REPORTED BY:
22
         CANDICE S. CRANE, RPR, RCR
23       OFFICIAL COURT REPORTER
         501 E. Court Street, Suite 2.500
24       Jackson, Mississippi  39201
         Telephone:  (601)608-4187
25       E-mail:  Candice_Crane@mssd.uscourts.gov

1    **APPEARANCES VIA VIDEOCONFERENCE:**

2       FOR THE PLAINTIFF:

3           CHRISTOPHER N. CHENG, ESQ.
            LAURA L. COWALL, ESQ.
4           HELEN VERA, ESQ.
            MITZI DEASE-PAIGE, ESQ.
5           ANGELA GIVENS WILLIAMS, ESQ.

6       FOR THE DEFENDANTS:

7           JAMES W. SHELSON, ESQ.
            NICHOLAS F. MORISANI, ESQ.
8           TONY R. GAYLOR, ESQ.
            RAYFORD G. CHAMBERS, ESQ.
9           JOHN C. HALL, II, ESQ.

10      ALSO PRESENT:

11          CREDELL CALHOUN
            SHERIFF TYREE JONES
12          ANTHONY NJOKU
            DAVE PARRISH

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**TABLE OF CONTENTS**

2    Style and appearances.....................................1-2

3    Court Reporter's Certificate.............................. 66

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      **PROCEEDINGS VIA VIDEOCONFERENCE, NOVEMBER 28, 2022**

2

3          THE COURT:  Good afternoon.

4          Can everyone hear me, first of all?  Okay.  I see you

5      nodding your heads.  Let me take a roll call.

6          Who do I have for the United States?

7          MS. VERA:  Good afternoon, Your Honor.  This is Helen

8      Vera for the United States, and with me from the civil rights

9      division are Laura Cowall; Christopher Cheng; and our

10     paralegal, Anthony Njoku; and from the U.S. Attorney's Office

11     Angela Givens Williams and Mitzi Dease-Paige.

12         THE COURT:  All right.  Thank you.

13         And who do I have for Hinds County?

14         MR. MORISANI:  Good afternoon, Your Honor.  You have

15     Nick Morisani and Jim Shelson from Phelps Dunbar, and with us

16     are Tony Gaylor and board president Credell Calhoun.  And

17     Attorney Ray Chambers as well, sir.

18         THE COURT:  Okay.

19         MR. MORISANI:  And Sheriff Tyree Jones is on as well.

20         MR. JONES:  Sheriff Tyree Jones.  I'm on here as well.

21     Thank you.

22         THE COURT:  All right.

23         MR. HALL:  Good afternoon, Your Honor.  John Hall for

24     the sheriff's department.  I'm traveling, Your Honor, so my

25     reception is kind of spotty.

1          THE COURT:  Okay.  I'll just -- would it be possible --

2     I typically require people to be in a stationary position, so

3     if you're going to speak on anything, you probably should be

4     in a stationary position or -- well, if you drop off, just,

5     you know, call back in, I guess.

6          Do we have any other participants?

7          All right.  Well, thank you all for making yourselves

8     available.  Obviously we do have the court reporter here.

9          Now, I do not believe either the receiver or the

10    monitors are on this call.  If you are, please make sure you

11    let the parties and the Court know.

12         All right.  Again, thank you --

13         MR. PARRISH:  Your Honor?

14         THE COURT:  I'm sorry?

15         MR. PARRISH:  Your Honor, this is David Parrish with

16    the monitoring team.  I may have misunderstood and I was not

17    supposed to be here.  I'll drop off if that's appropriate.

18         THE COURT:  It's not required for you to be here.

19    That's all.  It's not required.  We're not going to take any

20    testimony or anything today.

21         MR. PARRISH:  Okay.

22         THE COURT:  All right.

23         MR. PARRISH:  Thank you, sir.

24         THE COURT:  Thank you, Mr. Parrish.

25         Is there anyone else?  All right.

1          Thank you all for making yourselves available.  We do

2     have the court reporter who is present.

3          As the parties know and should understand, the Court is

4     going to take up the various motions that have been filed.

5     This was prompted initially by the County's urgent and

6     necessitous motion.  I realize it's been a few days since that

7     motion was initially filed.  Its the Court's practice to have

8     it heard as expeditiously as possible, but I think it was

9     filed at or near the time that the Court was out and during

10    the -- was out of the office, and then of course we had the

11    Thanksgiving break.  So I put the parties on a track to have

12    all briefing and stuff filed before today.

13         So the first thing I want to start with, though,

14    because I think the parties received an e-mail or some type of

15    correspondence or communication from this office that the

16    parties should be prepared to address all the pending motions

17    that have been filed.  So I want to start first with the

18    motion for clarification that the United States filed, and

19    then I'll move to the United States' motion for

20    reconsideration at Docket No. 220.  I do believe that the bulk

21    of our time, though, will be spent on the urgent and

22    necessitous motion filed by the County.

23         So are we ready to proceed with the motion for

24    clarification?

25         MS. VERA:  Yes, Your Honor.

1          THE COURT:  All right.  And who will be arguing on

2     behalf of the United States?

3          MS. VERA:  I will, Your Honor.

4          THE COURT:  Okay.  I'll just ask all others to put your

5     mikes on mute while this person is speaking; and when the

6     County responds, everybody will reciprocate for the person

7     who's speaking.

8          You may proceed, whoever that -- whoever will argue

9     this for the United States.  I thought it was Ms. Vera; right?

10         MS. VERA:  Yeah, this is Ms. Vera.

11         THE COURT:  All right.  You may proceed.

12         MS. VERA:  Thank you, Your Honor.  May it please the

13     Court?  Helen Vera for the United States.

14         The United States has asked the Court to clarify that

15     in issuing the receiver orders, the Court found that

16     receivership was necessary to remedy contempt and ongoing

17     constitutional violations and that the relief in the receiver

18     orders is narrowly drawn, extends no further than necessary to

19     correct the violation of the federal right, and is the least

20     intrusive means necessary to correct the violation of the

21     federal right and will not have an adverse impact on public

22     safety or the operation of the criminal justice system.

23     That's the language, Your Honor, from the PLRA.  Criminal --

24         THE COURT:  Is it the United States' position that that

25     specific language must be in the order to make it a valid

1    order?  Because I believe, I think, in reading the particular

2    order, I imagine we touch on some portion of all those words

3    in the order itself.  They may not be stringed together in one

4    sentence, but is this magic language that has to be used?

5         MS. VERA:  That's right, Your Honor.  It's our

6    understanding that it's a requirement to include that

7    quotation from the statute, and that's, you know, the United

8    States' understanding, similar to how Your Honor just

9    characterized the reasoning and the record that support the

10   Court's decision and order -- orders.  But we're seeking

11   clarification that that magic language, as Your Honor put it,

12   is part of those orders.

13        THE COURT:  So the County says, well, that might be

14   okay in some circumstances where the County contends that the

15   Court has no jurisdiction; since they've appealed it --

16   immediately appealed it, then this court can't touch its order

17   in any way at this point in time.  Could you go ahead and

18   address that particular issue?

19        MS. VERA:  Yes, Your Honor.  Our rebuttal brief

20   addressed that.  The motion itself was filed before the appeal

21   was docketed by the Court of Appeals, so it was proper to move

22   for clarification as we did, but we recognize, of course, that

23   that then -- the Court of Appeals docketed the appeal, and so

24   now the way that the Court would make the 60(b) correction

25   would be through an indicative ruling under Rule 62.1, which

1   allows the district court to issue an indicative ruling that,

2   upon remand for this purpose, the Court would add that

3   language to the order, and that's the procedurally how that

4   would work given that the appeal has now been docketed.

5        THE COURT:  Okay.  And assuming the Court agrees with

6   the County and says that it does not jurisdiction to do

7   anything, I assume you all will take the appeal up on that --

8   I mean with that being one of the many issues, but assuming

9   the Fifth Circuit agrees -- well, I guess agrees with the

10  County, I guess the Fifth Circuit can remand it to the Court

11  to make that specific finding first and then allow the appeal

12  to run or what?

13       MS. VERA:  Well, what the United States thinks would be

14  the cleanest approach, Your Honor, would be for the Court to

15  take the Rule 62.1 indicative ruling route, explaining that --

16  you know, and issuing a ruling indicating that the Court would

17  take -- would address this issue and add that language to the

18  order upon remand for that purpose and then the appeal could

19  go back up to the Fifth Circuit.

20       THE COURT:  Okay.  All right.  Is there anything else

21  you'd like to say with respect to this motion Ms. Vera?

22       MS. VERA:  Thank you, Your Honor.  Just that the United

23  States recognizes that the record supported the fact that the

24  Court did make those findings and therefore, you know, we

25  believe that Rule 60(b) via the indicative ruling procedure

1  provides an appropriate and efficient solution to that issue.

2      Thank you, Your Honor.

3      THE COURT:  Okay.  Thank you, Ms. Vera.

4      Who is arguing on behalf of the County and/or the

5  sheriff?

6      MR. MORISANI:  Good afternoon, Your Honor.  Nick

7  Morisani.  I'll argue on behalf of the County and the sheriff

8  for this motion.

9      THE COURT:  Okay.

10      MR. MORISANI:  And may it please the Court?

11      The -- Your Honor, the motion essentially attempts to

12  tell the Court what it was thinking when it issued the

13  receiver orders 215 and 216 on the docket.  It then seeks to

14  have the Court go back now that an appeal has been filed and

15  make a conclusory statement which in their incorrect view, I

16  think, will make the receiver order comply with the PLRA, and

17  that's just not how the PLRA analysis works based on precedent

18  that we cited in our response to their motion.

19      Now, we argued in our response -- I won't rehash it in

20  detail, but we offered two primary grounds on which the Court

21  could base denial of this motion.  The first Your Honor

22  pointed out earlier was we contend the Court does not have

23  jurisdiction to grant the Rule 60(a) request at this point.

24  It's noto only a matter of jurisdiction once an appeal is

25  filed, but it's also a matter of the plain terms of that rule,

1    which says once the appeal is docketed, that there's no

2    question an order can't be entered; and then secondly, just on

3    the merits, I think this was no mere technical error that we

4    contend, and that's all that Rule 60(a) is intended to remedy

5    are essentially scriveners' errors, and that's not what

6    happened here, and so -- it's not what we contend happened

7    here, I should say --

8          THE COURT:  Mr. Morisani, you don't believe that this

9    court intended through its order appointing receivership,

10   appointing a receiver, setting forth the duties and

11   responsibilities of the receiver and all of those things that

12   were said that -- you know, that the -- both parties have

13   disagreed with in some way because each has filed a notice of

14   appeal, you don't believe the Court sought to appropriately

15   find that a receivership was appropriate?

16         MR. MORISANI:  Well, Your Honor, I think -- I trace it

17   back to the order.  It's order No. 204 on the docket where

18   Your Honor found that there would be -- the Court found there

19   would be a receiver appointed as the final sanction for

20   contempt, and that order does not spell out the duties of the

21   receivership, but it says the Court is going to appoint a

22   receiver.

23         When you look forward to those orders pointing out the

24   duties, that's prospective relief in the County's position.

25   That's forward-looking relief, nonmonetary forward-looking

1   relief, and I think the PLRA provides that analysis for the

2   County -- or any defendant's protection in that scenario, and

3   it's not just, you know, a that this statement that matches

4   the language of the statute.  It's an analysis.  Before we do

5   this, are these provisions the least intrusive means?  Are

6   they narrowly provided just to remedy the actual violation,

7   and then of course are they necessary to alleviate the

8   violation?  And so I think it's more than just a statement,

9   Your Honor.

10       Now, whether or not the Court intended that, I don't

11   know if that's really the position that we're taking.  We're

12   taking that the analysis had -- the legal analysis had to take

13   place and it did not and therefore -- it's certainly not a

14   mere clerical error.  Under Rule --

15       THE COURT:  What happens if the Fifth Circuit agrees

16   with you, Mr. Morisani?  Does the Fifth Circuit -- could the

17   Fifth Circuit simply remand it to the Court for the Court to

18   make that specific finding?  I mean to write in the language

19   that the County contends is specifically required by the

20   statute?

21       MR. MORISANI:  I guess two responses, Your Honor.  One,

22   I think it's ultimately up to the Fifth Circuit how they would

23   handle a remand.  That could be one way they do it.  They

24   could remand it for further findings.  And I think the

25   operative word there is "findings."  Again, I don't think it's

1  just a mere statement that the Court would have to put in the

2  order.  I think it's findings that have to be made based on

3  the record.  So -- but I think at the end of the day,

4  ultimately the Fifth Circuit would decide how they would

5  remand it if they agreed.

6          THE COURT:  Okay.  I didn't mean to interrupt your

7  train of thought.  You can continue if you wish.

8          MR. MORISANI:  The last thing I would add, Your Honor,

9  is just there was talk of Rule 62.1, and the plaintiff

10  certainly understands Rule 62.1 and knows about the rule.

11  They filed another motion citing the rule.  There was no Rule

12  62.1 request in the motion to clarify, and that was raised for

13  the first time in their rebuttal, Your Honor, and so we would

14  think that would be completely inappropriate to take that

15  route at this point with respect to the motion to clarify.

16          THE COURT:  But anything on the motion to clarify, I

17  believe it's the County's position that there is nothing to

18  clarify because the Court has no jurisdiction.  Whether you

19  cite Rule 62.1, 60(b), 60(a), no rule allows this court to

20  touch this case at this juncture.

21          MR. MORISANI:  I think if the motion had been made

22  under 62.1, perhaps I would look at it differently.  I don't

23  know.  It wasn't made under that rule.  But certainly under

24  Rule 60(a), that would be our position, Your Honor.

25          THE COURT:  Okay.  All right.  Thank you.

1        Ms. Vera, you do have the -- I'm sorry.

2        Are you through Mr. Morisani?

3        MR. MORISANI:  Yes, sir.

4        THE COURT:  Ms. Vera, you have the right to reply if

5 you wish.

6        MS. VERA:  Thank you, Your Honor.

7        Yes.  Just to reiterate, you know, our response to the

8 County's argument that seemed to suggest that it -- that the

9 Court's reasoning supporting the receiver orders and doing the

10 required analysis by going through the *Plata* factors and

11 addressing the need-narrowness-intrusiveness standard through

12 that analysis, you know, it's clear from the record that the

13 Court did that in its prior orders.  And so we're not

14 presuming to say what the Court was thinking or make any

15 conclusory statements.  It's clear from the record that that

16 was the Court's intention, so we believe that the vehicle of

17 Rule 60(b) is appropriate here.

18        And in terms of whether it was appropriate for the

19 United States to offer Rule 62.1 and the indicative ruling

20 route given that when our motion was filed the appeal hadn't

21 been docketed and then at the time that we filed our rebuttal

22 it had been docketed, we believe that that's appropriate.  I

23 think the text of Rule 62.1, you know, permits the Court to,

24 you know, issue an indicative ruling based on the request for

25 relief itself.

1          Thank you.

2          THE COURT:  Okay.  Thank you, Ms. Vera.

3          Now I'd like to move to the motion for reconsideration

4     filed by the United States.  Is that you again, Ms. Vera, or

5     is that someone else?

6          MS. VERA:  Yes, Your Honor, I'll be addressing that.

7          THE COURT:  Okay.  You may proceed.

8          MS. VERA:  Thank you, Your Honor.

9          The United States has asked the Court to reconsider its

10    termination of the provisions governing conditions for youth

11    charged as adults in light of changed circumstances.  The

12    Court terminated those provisions, apparently based on the

13    existence of the JH decree.  The Court did not make PLRA

14    findings as to the youthful detainees' provisions, instead

15    hinging its analysis and its decision on those provisions on

16    the existence of another decree.  So the United States has

17    asked the Court to reconsider its termination of those

18    provisions and conduct the PLRA need-narrowness-intrusiveness

19    analysis.

20         It would do so in an indicative ruling as permitted by

21    Rule 62.1.  And if the Court finds that's the JCA provisions

22    should be retained, as the United States argues it should,

23    then it would issue an indicative ruling that, if remanded for

24    that limited purpose, the Court would grant our motion and

25    conduct the analysis and find that the remedies for JCA

1   conditions remain necessary to correct constitutional

2   violations and PLRA compliance.  The appropriate --

3       THE COURT:  Let me ask -- oh, go ahead.  I'm sorry.  Go

4   ahead.

5       MS. VERA:  Okay.  Thank you, Your Honor.

6       It is appropriate for the Court to reconsider its

7   termination of the JCA provisions.  Rule 60(b)(5) addresses

8   this precise situation where there has been a change in facts.

9   The Court's order expressed an intention that conditions for

10  youth be governed by the JH decree, but that decree was

11  abruptly terminated.  And JH was terminated in a way that did

12  not address the merits of the case.  There was no decision of

13  any issue or claim.  And in any event, the United States is

14  not barred by any decision in JH, even if there were one on

15  the merits, because we're not a party to that case.  We chose

16  to pursue our own case rather than intervene in that case,

17  which is permitted by CRIPA but not required by it.

18      Neither the JH court nor this one did the PLRA analysis

19  in terminating the oversight of the youth in detention.

20  However, there is a substantial record from which the Court

21  could make that determination as well as the determination

22  that the youth remedies are still necessary and permitted by

23  the PLRA.  And the record before the Court is sufficient to

24  make those findings.  The requirement under *Castillo* is that

25  the determination has to be made based on the record at the

1   time that the motion for termination was filed.

2          Thank you, Your Honor.

3          THE COURT:  Well, let me ask you this.  Obviously

4   everybody knew that the JH case was proceeding along with

5   ours.  We reference the case quite a bit throughout every

6   monitor's report that we had in this case.  The parties for

7   the plaintiffs in JH moved to intervene in this one here or at

8   least to have access to the hearings and the filings and even

9   participated to some degree by at least being present in the

10  courtroom.

11         What, if anything, stopped the United States from

12  seeking to intervene in the JH case once the United States

13  learned that that case might be going in a direction where the

14  judge was asked to discontinue the consent decree?  I mean,

15  couldn't the United States have brought this intention to

16  Judge Jordan in the JH case that, you know, the things

17  occurring in JH -- well, I guess that the Court ought to be

18  mindful that there are those who are in the custody of the

19  County housed at Henley-Young, you know, that there may be

20  some other court proceeding or something that you ought to

21  consider, Judge, before you dissolve the consent decree or

22  allow the consent decree to be terminated?  So why did the

23  United States not move to intervene?

24         MS. VERA:  Well, Your Honor, just to back up a little

25  bit.  The defendants have very strongly argued that, you know,

1    the United States, given that we have filed this motion now,

2    should have intervened then, and there is simply no obligation

3    to intervene in another case.  The JH case has always been

4    different from the youthful detainees' provisions in this case

5    in terms of the origin of that case focusing on the youth

6    court youth housed at Henley-Young at that time versus in our

7    case on the JCAs.  There simply is no obligation to intervene

8    in another case.

9         It also -- various strategic factors would go into a

10   determination to intervene, including whether intervention

11   would have been timely.  Under CRIPA, the United States is

12   pursuing enforcement of the civil rights of detainees in the

13   sheriff's custody in Hinds County, including JCAs.  It's just

14   a separate case, and there was never any obligation to

15   intervene there.

16        And the reason that the United States filed the pending

17   motion for reconsideration was because the changed

18   circumstances in that case, which is that the consent decree

19   there was terminated, was the impetus for that motion.

20        THE COURT:  I realize you -- it sounds like the United

21   States, I guess, could have or at least did weigh its option

22   and said, well, you know, if we file this motion, we know it

23   may be denied because that case is several years old and

24   it's -- and, you know, intervention as a right or at the

25   discretion of the Court might be too late.  But there was no

1   attempt by the United States to at least put that court on

2   notice of the impact, if you will, of this termination over

3   persons who the United States say need judicial supervision.

4   Because there are persons at Henley-Young who would otherwise

5   be under the auspices, if you will, of the receivership we

6   have here; right?

7        MS. VERA:  Your Honor, just to clarify, I did not mean

8   to suggest that the United States actively considered

9   intervening in the JH case.  The United States has always

10  viewed the youthful detainees' provisions in this case as

11  somewhat separate from the issues and the questions and the

12  sort of purview of the JH case, which concerns Henley-Young

13  itself, the juvenile justice facility.  And as Your Honor

14  knows, the youth that are within the auspices or that were

15  within the auspices of this case have always been, you know, a

16  separate group of juvenile detainees who have been charged as

17  adults and who only have been held at Henley-Young for part of

18  the pendency of this case.  So, Your Honor, if I suggested

19  that -- I did not mean to suggest that intervention was

20  something that the United States actively considered in the JH

21  case.

22        THE COURT:  Okay.  Thank you.  No, no, I did not take

23  it that the United States actively considered that.  And --

24  okay.  Is that all, Ms. Vera?

25        MS. VERA:  Almost, Your Honor.

1          THE COURT:  Okay.  No problem.

2          MS. VERA:  On a related note, I would just note for the

3    Court's information that the United States was somewhat

4    surprised that the plaintiffs ultimately agreed to the

5    termination in that case, and so it all transpired fairly

6    rapidly from our perspective.

7          THE COURT:  Okay.  Thank you.

8          Who will respond on behalf of the County and/or the

9    sheriff?

10          MR. MORISANI:  Good afternoon again, Your Honor.  Nick

11    Morisani.  I'll respond again on behalf of the defendants.

12          THE COURT:  You may proceed.

13          MR. MORISANI:  Your Honor -- thank you, Your Honor.

14          On April 13th this court -- you know, obviously I'm

15    sort of saying things the Court already knows, but on

16    April 13th the Court terminated the consent decree provisions

17    in this case related to youthful offenders.  Under the rules,

18    the plaintiff had until May 11th of 2022 to file a motion to

19    reconsider -- a motion to reconsider under Rule 59(e).

20          Meanwhile, in the JH case, the County had moved to

21    terminate the consent decree prior to that date, about roughly

22    a month prior, on March 18th of 2022.  On April 17th, of

23    course, the JH consent decree was stayed by operation of the

24    PLRA.  The JH plaintiffs, they sought retroactive

25    postponement, but that was denied April 26th.

1              And, again, I'm reciting these dates, Your Honor,

2       because this all happened -- it was all within the 28 days for

3       seeking reconsideration under Rule 59(e).  Your Honor, this is

4       the United States Department of Justice.  There's no way that

5       they didn't know that the JH case and these proceedings were

6       happening.  There's no way.  I think if there could be any

7       doubt, the JH plaintiffs obviously removed it when they put

8       themselves on everyone's radar when they became interested

9       parties in this case back in December of 2017, but that's not

10      even to mention what the Court wrote in the Court's order.

11      The Court terminated the youthful offender provisions and

12      expressly directed the parties to submit any concerns related

13      to the JCA to Chief Judge Jordan in the JH case.

14              So I just -- I say all this just to say, Your Honor,

15      they had more than enough information on which to base a

16      timely, properly filed Rule 59(e) motion.  They, of course,

17      didn't do that.  They waited for the JH consent decree to be

18      terminated, and within 20 days sought to have the terminated

19      provisions here resurrected and just dropped into the new

20      injunction.  You know, far from being a properly filed,

21      well-supported motion for reconsideration, Your Honor, this is

22      judge-shopping, and it should be rejected, Your Honor.

23              THE COURT:  Why does the County suggest that it's

24      judge-shopping when there are youth who are being held as

25      adults and the receivership order itself, the receivership

```
1   order that's in place now that the County seeks to have this
2   court reconsider, the receivership order gives the receiver
3   the right to, you know, inspect and do things wherever anyone
4   is housed, I think, up under the receivership.  So children
5   who are being held as adults are not being held at RDC
6   anymore.  They're being held somewhere, so who would be
7   responsible for managing them?  Since Judge Jordan has --
8        MR. MORISANI:  The County --
9        THE COURT:  Since Judge Jordan has said that there's no
10  need anymore to have a consent decree in the case of the JH
11  case, then who should be there to help protect those children?
12       MR. MORISANI:  Your Honor, I think if this were as
13  important an issue to the United States Department of Justice
14  as making sure that someone is there to protect them, they
15  would have moved very quickly with their resources to either
16  have this court reconsider its order or intervene in front of
17  Judge Jordan.
18       THE COURT:  I think the United States argued at some
19  point that, you know -- again, thinking back at what the Court
20  heard and what is in the Court's order throughout the
21  monitoring and throughout the hearings and ultimate resolution
22  on this thing, the County pointed to the fact that there was
23  a -- there is a consent decree.  At one time the County was
24  arguing that there is a consent decree in place in the JH case
25  that governs and controls those children being housed there.
```

1          But now that that consent decree is no longer there,

2     again, who is supposed to watch over those children and make

3     sure that their constitutional protection -- their

4     constitutional rights are being protected if the receiver

5     cannot do it at this point?

6          MR. MORISANI:  Your Honor, they're in the County's

7     custody, and the County has -- has a responsibility to house

8     those juveniles charged as adults.  And I think just to add on

9     briefly, the County made clear its intentions as early as

10    January 2022 that it was going to at a minimum seek to modify

11    that consent decree.  That was a part of the public record,

12    the same public record that was available to us that was also

13    available to the Department of Justice.

14         THE COURT:  Okay.  You wish to offer anything else,

15    Mr. Morisani?

16         MR. MORISANI:  Yes, sir.  Just briefly.  Your Honor

17    posed the question of why the plaintiffs did not seek to

18    intervene, and the only -- it looks to me the only thing I

19    heard was that we just didn't have an obligation, Your Honor,

20    which, again, I think only reinforces the idea that there was

21    more going on here than meets the eye, because -- well, one

22    other thing, too, Your Honor.

23         There were some statements made about there's more than

24    enough evidence in the record to make a determination and

25    there's more than enough evidence in the record to make a

1   finding, and I think if you look at the basis for this motion,

2   it was a Rule 60(b)(5) motion.  I think -- there were two

3   bases:  60(b)(5) and 60(b)(6).  And I just want -- just want

4   to put on the record that 60(b)(5) is clear that you can't use

5   60(b)(5) to relitigate issues.  Statements like that at this

6   hearing, that there's enough evidence to make a determination,

7   to make findings, that is plainly asking this court to

8   relitigate those issues, Your Honor, related to youthful

9   offenders, which the case law says is not the purpose of Rule

10  60(b)(5).

11          I think, again, just for the record, Your Honor, I just

12  want to point out -- we raised this issue in a footnote, but I

13  just want to make the argument in this hearing that Rule

14  60(b)(6) is not applicable here because they're basing their

15  60(b)(6) request on the exact same facts and circumstances

16  that they base the 60(b)(5) request, and again, there's

17  authority from a position that you can't -- Rule 60(b)(6) is

18  exclusive of the other five provisions in 60(b).  You can't

19  take a set of facts and say they meet 60(b)(4), 60(b)(5), but

20  they also meet 60(b)(6), Your Honor.  That's contrary to Fifth

21  Circuit case law, and I can give you a case citation if that

22  would help, but I just wanted to make sure that was in the

23  record as well.

24          And also, Your Honor, 60(b)(5) is not intended to

25  address changes in facts.  I think if it were, we would have

1    60(b)(5) motions filed after every single judgment where there

2    was the slightest change in facts no matter how long in the

3    future.

4           THE COURT:  60(b)(6), is it -- is 60(b)(6) viewed as a

5    catchall?

6           MR. MORISANI:  It is, Your Honor, but in the *Hesling v.*

7    *CSX Transportation* case -- it's 396 F.3d 632; it's at page 643

8    and 644 -- the Fifth Circuit said Rule 60(b)(6), the relief

9    under that provision is "mutually exclusive from relief

10   available under sections (1) through (5)."

11          Similar case is *Hess v. Cockrell*, 281 F.3d 212 at page

12   215.  Those are both Fifth Circuit cases, Your Honor.

13          THE COURT:  Okay.  Well, let me ask.  I know the County

14   spent part of its brief arguing collateral estoppel and res

15   judicata.  I know the Government has responded to that in

16   their rebuttal claiming that those particular doctrines would

17   not apply to them in this particular case.  What does the

18   County say about that?

19          MR. MORISANI:  Your Honor, we would take the position

20   that collateral estoppel does in fact apply.  These are --

21   well, I'll start with the privity question, Your Honor.  I

22   think it's -- just frankly, I'm surprised that the DOJ -- that

23   the plaintiffs would argue that they were not in privity with

24   plaintiffs advocating for the rights of the very same

25   detainees that they're advocating the rights of in this case.

1    I'm a little surprised --

2         THE COURT:  They never represented the JH people;

3    right?

4         MR. MORISANI:  They don't represent the plaintiffs at

5    RDC -- the individuals at RDC either.  Your Honor, I agree

6    with that.

7         THE COURT:  But you're saying that -- you're saying

8    that they were in privity with the JH plaintiffs?

9         MR. MORISANI:  That's our position -- that's our

10   argument, Your Honor, that they are in privity with the JH

11   plaintiffs, who are the very same detainees that they're

12   advocating the rights of in this case.

13        THE COURT:  Was it -- were the JH parties bringing the

14   same claims as the United States?

15        MR. MORISANI:  Their claims involved -- well, they

16   involved the conditions of confinement at Henley-Young, Your

17   Honor.  They -- you know, I think this sort of trickles into

18   other elements in the analysis, so I'll just -- I'll continue,

19   but, you know, CRIPA gives the plaintiff an opportunity to

20   come in and say, okay, the minimum constitutional standards

21   are not being met here; we have authority to file a lawsuit on

22   behalf of the detainees here -- or not on their behalf but a

23   lawsuit to compel compliance with the minimal standards.  The

24   JH plaintiffs weren't constrained by that limitation.  In a

25   lot of ways, the JH plaintiffs were going above and beyond

 1   that, so I don't see how there's any question they couldn't be

 2   in privity.  The JH plaintiffs were asking for more than the

 3   constitutional remedies.  All CRIPA allows the Government to

 4   do here is just, okay, you're not complying with the

 5   constitution; you've got to get things to the minimal levels.

 6          THE COURT:  If the Court accepts that argument,

 7   Mr. Morisani, what about a detainee who wanted to bring his or

 8   her -- his own claim, as in a violation of my constitutional

 9   rights, as has been done, I think, where individuals have sued

10   the County under the federal constitution and the MTCA, I

11   guess, but, again, they're claiming that my rights have been

12   violated under the Fourth Amendment, under the due process

13   clause or whatever.  Those claims have been allowed to

14   proceed.  Wouldn't they be in privity with the United States

15   if the Court accepts your argument?

16          MR. MORISANI:  I don't think they would, Your Honor,

17   and the reason why is that those are single plaintiff claims

18   about individual circumstances.  This is systemwide reform

19   that's being sought both by the JH plaintiffs as a class and

20   by the DOJ as the federal government.  These are systemic

21   claims, that means they're across the board for everyone that

22   comes into that facility, both of these claims.  It's parallel

23   in that sense.  It's not parallel to an individual plaintiff

24   who's got -- whose argument is going to be measured by a

25   different standard, his use-of-force claim is going to be

1   measured by a different standard.  But I guess my point, Your

2   Honor, is that those are single plaintiffs, single sets of

3   facts, whereas this is systemic-wide relief.

4           THE COURT:  So if a group of plaintiffs hired one

5   lawyer to represent their interest against Hinds County, would

6   that change your analysis at all?  If a group of plaintiffs --

7           MR. MORISANI:  I think that's a --

8           THE COURT:  -- not necessarily a -- because the group

9   of plaintiffs in JH were the groups of plaintiffs in

10  Henley-Young, if I'm not mistaken.  It was all youth.  But if

11  a group of the plaintiffs are detainees at RDC, 15, 20, 100 of

12  them got one attorney to file an action on their behalf, which

13  includes these same claims, are you saying that they could not

14  because those claims would be barred by this -- by this action

15  by the United States?

16          MR. MORISANI:  Well, Your Honor, I guess just in

17  thinking through that, just here in the hearing, I think

18  that's a different situation.  First, I think that's a

19  different situation than what you have here because you had

20  every plaintiff in Henley-Young, all the detainees.  There was

21  no carve-out.  It was every detainee in Henley-Young.  And

22  that's what the DOJ lawsuit in this case is for.  Every

23  detainee in that facility.  It's a smaller part of this

24  lawsuit, but it's the same -- it's the same claim.

25          Now, to answer your question more directly under the

1  carve-out, if you said I had 100 plaintiffs in this case, I

2  believe it would depend on the relief they seek.  If they're

3  seeking systemic relief throughout the entire facility, I

4  think, yes, that would be subsumed in this existing lawsuit.

5      THE COURT:  What if they were seeking systemic relief

6  and monetary damages?  That makes it different?

7      MR. MORISANI:  That's an interesting wrinkle, Your

8  Honor, but I don't see how -- go ahead.

9      THE COURT:  Because there are detainees there who have

10  actually sued the County for the constitutional violations

11  that they suffered, and those matters have gone through

12  discovery and trial dates have been set, and ultimately the

13  County has at least settled some of them; right?

14      MR. MORISANI:  I believe so, Your Honor, yes, sir.

15      THE COURT:  Okay.  I'm just trying to figure out if I

16  accept your privity argument, then how does that apply to

17  other plaintiffs?  And that privity argument of yours, is that

18  the same for the collateral estoppel that you've argued as

19  well as your res judicata?

20      MR. MORISANI:  Yes, Your Honor.

21      THE COURT:  All right.  Anything else, Mr. Morisani?

22      MR. MORISANI:  No, sir.  Thank you, Your Honor.

23      THE COURT:  All right.  Any rebuttal by the United

24  States?

25      MS. VERA:  Yes, Your Honor.  This case insofar as it

1    addressed the conditions of juveniles charged as adults,

2    youth, has always concerned youth charged as adults who, when

3    this case was initiated, were housed at Raymond.  They were

4    housed in the adult jail.  This case always was meant to

5    follow those JCAs wherever the County was housing them and

6    govern the conditions and ensure that the conditions that the

7    JCAs were housed in would be constitutional and appropriate

8    for their needs.

9         The JH case only concerned Henley-Young, which at the

10   time that that case was initiated concerned housed youth --

11   court-adjudicated youth.  So the very -- the crux of the issue

12   here is that the United States and the JH plaintiffs are

13   different parties, they brought different legal claims based

14   on different facts and different causes of action, and the

15   targets of these cases have always been distinct.

16        The defendants' arguments about privity are not enough

17   to overcome the bedrock principle that a litigant cannot be

18   bound by something that happens in a case involving different

19   parties, and the United States discussed this in its rebuttal

20   brief to some extent, but the defendants' arguments that

21   privity exists are unavailing, and sort of somewhat similar

22   interests don't establish privity and cannot bind a nonparty

23   to a case.

24        CRIPA contemplates that there may be separate

25   systemwide cases and that the United States won't be bound by

1    those cases.  And, you know, therefore the arguments of

2    defendants about res judicata and collateral estoppel are

3    unavailing and violate basic principles of due process and the

4    ability of litigants to have their day in court.

5         And so going back to the notion that the United States

6    should have intervened in JH and failed to do so, there was

7    never any obligation to do so, and the motion to reconsider

8    that the United States filed was appropriately filed as a

9    result of the termination of the JH case that occurred shortly

10   before we filed this motion.

11        THE COURT:  So -- I'm sorry.  So you're suggesting that

12   the County sets the timeline going back to April and basically

13   those dates ought to be the tip-off dates for the Government.

14   I believe I'm hearing you say, Ms. Vera, that, well, even if

15   the United States would want to do something, they should not

16   do anything until after the JH decree had been terminated?  I

17   mean that the timeline should start there?

18        MS. VERA:  I'm not sure, Your Honor, that there's a

19   timeline that should start except for the fact that the motion

20   on the table today is one that was precipitated by the

21   termination order that the JH court issued and it was not

22   something -- the United States could have -- could have tried

23   to intervene at certain points but didn't and was not

24   obligated to do so.  And so, you know, the change in

25   circumstances that caused the Court's reasoning for the JCA

1    provisions to no longer apply to the current facts, that
2    happened when the order was actually terminated, which
3    occurred shortly after the plaintiffs in JH consented to the
4    termination motion.  So it was when all of that transpired
5    that the United States filed this motion.
6          THE COURT:  In relying on Rule 60(b) or -- 60(b), I
7    think, the County points out that you -- you know, look at all
8    those other factors that preceded it, but you have to find, I
9    guess, some extraordinary circumstance.  How does the United
10   States contend it meets -- if the standard is for 60(b)(6)
11   motions that, you know, one travels through the window of
12   extraordinary circumstances, what about the facts that are
13   before this court would be extraordinary and would allow this
14   court to exercise relief under 60(b)?
15         MS. VERA:  Well, Your Honor, Rule 60(b)(5) -- contrary
16   to the defendants' assertion that it does not cover changes in
17   circumstances or facts, the case law interpreting 60(b)(5)
18   does establish that changes in fact are the type of
19   circumstances that do justify granting a Rule 60(b)(5) motion.
20   You know, the actual wording is that the -- the clause from
21   (b)(5) that the changed facts falls under is that applying a
22   judgment prospectively is no longer equitable, and the cases
23   do interpret that language to include changes in fact that
24   make the judgment no longer equitable.
25         But then as to the catchall 60(b)(6), yes, Your Honor.

1   If the Court found that was the only route for granting the

2   motion for reconsideration, we do think that the circumstances

3   here are of enough import that it would be justified.

4       THE COURT:  Well, I guess I just want to ask this

5   simple question, because the case of United States versus

6   Hinds County was a case about persons who were housed at the

7   Raymond Detention Center or the Jackson Work Center -- the

8   workers center or the Jackson Detention Center.  That's how

9   the case started out.  And part of the remedy that the parties

10  agreed to at some point in time that the Court signed off on

11  is that juveniles will no longer be held at the Raymond

12  Detention Center.

13      The parties satisfied that requirement by putting them

14  at Henley-Young, and the Court had -- a part of the monitoring

15  team would evaluate, would report back to the Court on how

16  those youth being held at Henley-Young, how they were doing

17  and what was going on with them:  Were they getting the

18  educational resources that they needed; you know, were they

19  getting the psychological resources that they needed and all

20  of that.  But in this court's ruling appointing -- of

21  narrowing the consent decree and ultimately appointing the

22  receiver, I think that order acknowledged that -- well, there

23  is some supervision over there for the children being housed

24  at Henley-Young, those children who are charged as adults,

25  there is some supervision going over there because there is a

1    consent decree in place.  There is some monitoring in place by

2    a court of -- by a fellow judge here.  But now that that judge

3    has decided to terminate the consent decree, I guess isn't

4    that extraordinary -- would that be an extraordinary

5    circumstance knowing that those youth who are charged as

6    adults are still being housed at that facility and would fall

7    under any consent decree or any receivership order by this

8    court?  I mean, would that justify the extraordinary and

9    compelling reasons?

10          MS. VERA:  Yes, Your Honor, I believe it would.  It is

11   an extraordinary turn of events insofar as it certainly seemed

12   from Your Honor's order that the Court in this case was

13   contemplating that the other case would continue to protect

14   the rights of the youth housed at Henley-Young.  And since

15   that protection evaporated, I believe it would justify that,

16   Your Honor.

17          THE COURT:  Thank you.  And I'm going to give the

18   County an opportunity to respond because that was a specific

19   question asked of the Government that the County may not -- I

20   think you ought to have an opportunity to respond to it if you

21   wish.

22          MR. MORISANI:  Your Honor, I would like to respond.  I

23   appreciate the opportunity to respond.  I think, you know,

24   there's an assumption underlying this entire argument by the

25   plaintiff, and that's that somehow there was some guarantee

1    that the County was going to prevail on its motion to

2    terminate in the JH case.  There was no such guarantee.  That

3    was a hotly litigated motion that the JH plaintiffs on the

4    record said, look, they don't have a right to discovery.

5    We're going to conduct all sorts of invasive discovery.  And

6    then overnight -- literally overnight, they call off the dogs,

7    so to speak, and the DOJ files a motion in this case to try to

8    bring the provisions back.  It just -- the timing is odd.  But

9    that's neither here nor there.

10        The point, Your Honor, is that there was no guarantee

11   of success on the County's motion.  They're treating that as a

12   foregone conclusion, and I think that's unfair to do that.

13   That consent decree very well could have stayed in place.

14        But I think in addition to that, Your Honor, Your Honor

15   asked the question, and I think that there was -- 60(b)(6)

16   requires extraordinary circumstances, and I think the reasons

17   we laid out earlier in the timeline shows there was nothing

18   extraordinary about what happened here.  This was all

19   happening in real time on the public record, and the plaintiff

20   did not seek intervention in that case.

21        I think in addition to that, the -- you know, there's

22   an argument from the plaintiffs also about how these were

23   somehow distinct categor- -- distinct groups of plaintiffs or

24   distinct issues being litigated here.  There's nothing new

25   about that fact, Your Honor.  That's something that could have

1    been raised in a Rule 59(e) motion after Your Honor issued the

2    order terminating those consent decree provisions.  So that

3    can't be called -- that can't be used to justify some sort of

4    extraordinary circumstance or change in circumstances, the

5    fact that these may have been different or distinct groups.

6         Beyond that, though, Your Honor, I don't have anything

7    else.  I appreciate the opportunity to respond to that, Your

8    Honor.

9         THE COURT:  Thank you, Mr. Morisani.

10        Now we'll move on.  Now the County has the right to go

11   first and last, I guess, with respect to its motion -- well,

12   hold on for one second.

13        Let's take a ten-minute break before we get to that

14   point for the court reporter, and then we'll proceed then.

15   You all can stay on the line if you wish.  Continue muting.

16   You can turn off your camera if you wish.  We'll be back in

17   about ten minutes.

18             (A brief recess was taken.)

19        THE COURT:  I'll hear from the County and/or the

20   sheriff on the urgent and necessitous motion.

21        MR. SHELSON:  Good afternoon, Your Honor.  This is Jim

22   Shelson for the County and the sheriff.  May I proceed, Your

23   Honor?

24        THE COURT:  You may, Mr. Shelson.

25        MR. SHELSON:  Your Honor, this is the motion to stay,

1   ECF 227.  I think everybody agrees on the four factors the

2   Court is to consider on a motion to stay.  I don't know, Your

3   Honor, that we have a lot to add that's not already in our

4   papers, so I'm going to go through the factors, but I'm going

5   to be brief.

6        Your Honor, the first factor is whether the applicant

7   has made a strong showing that it is likely to succeed on the

8   merits.  The merits question with respect to the motion to

9   stay is whether the receiver orders exceed the permissible

10  scope of prospective relief under the PLRA.  Your Honor, I

11  don't think based on the papers that anybody disputes that the

12  receiver orders are prospective relief under the PLRA.  So the

13  County, Your Honor, is likely to succeed on the merits of the

14  issue that the motion to stay presents for the following

15  reasons.

16       First, Your Honor, the receiver orders exceed the

17  need-narrowness-intrusiveness standard of the PLRA because

18  they are a remedy for the violation of the consent decree.

19  The consent decree, as the Court found, exceeded

20  constitutional minimums.  It was superseded by the new

21  injunction, and the consent decree is no longer the operative

22  order.

23       Your Honor, we went through this in our rebuttal, but

24  just briefly, with respect to the first order of contempt, the

25  Court found that the County was not in compliance with 30

1    paragraphs of the consent decree.  Twenty of those 30, or

2    67 percent of those paragraphs, are not in the new injunction.

3    There are a total of 34 paragraphs in the new injunction

4    exclusive of the monitoring provisions.  At the time the new

5    injunction was issued, the County was complying to some degree

6    with 28 of the 34 paragraphs that are in the new injunction,

7    or 82 percent of them.

8         In a nutshell, Your Honor, entering the receiver orders

9    to remedy what the Court found to be violations of the consent

10   decree is not narrowly drawn prospective relief because the

11   consent decree is no longer even the operative order.

12        Your Honor, the second factor is whether the County

13   will be irreparably harmed absent a stay.  Your Honor, again

14   our position on this is succinct.  The County will be

15   irreparably harmed absent a stay because the receiver orders

16   completely divest the County of all powers, authorities,

17   rights, and privileges it now possesses relating to RDC and

18   gives it all to the receiver.

19        Your Honor, the harm in that regard is not speculative.

20   The receiver has complete authority over RDC, and the County's

21   authority is nil.  That is harmful to the County, we submit,

22   Your Honor, for obvious reasons.  The *Plata* case which the

23   Court has cited itself notes that the imposition of a receiver

24   is a "debilitation of the democratic process."  Those concerns

25   are, in our view, sufficient to outweigh the remedy of the

1    receiver orders that the Court put into place.

2         The third factor, Your Honor, is whether a stay would

3    substantially injure other parties interested in the

4    proceeding.  The United States points out that it is suing in

5    an enforcement capacity, but that does not mean, Your Honor,

6    that it essentially becomes the attorney for every detainee at

7    RDC.  This is not a class action.  There are no individual

8    plaintiffs.  No individualized relief is at issue here nor was

9    granted, and the United States is the only plaintiff.

10        There was no evidence adduced at the evidentiary

11   hearing that the consent decree was helpful in improving

12   conditions at RDC.  The receiver orders are a remedy for the

13   Court's finding that the County violated a now inoperative

14   consent decree, and there was no evidence that -- there is no

15   evidence that a receiver will more effectively address any

16   issues with RDC.

17        And finally, Your Honor, the fourth factor is whether a

18   stay is in the public interest.  Your Honor, it is in the

19   County's view because the receiver is not accountable to the

20   voters and taxpayers of Hinds County.  As we noted in our

21   briefing, the receivership has been described as a nuclear

22   option.  We think that is accurate.  A stay of that nuclear

23   option is in the public interest because the receiver has

24   complete authority over RDC but is not accountable in any way

25   to the people of Hinds County.

1     And for those reasons, Your Honor, the County

2 respectfully submits that the Court should grant the motion to

3 stay.

4     THE COURT:  Let me just ask these couple of questions,

5 Mr. Shelson.  So if the Court makes a finding that the County

6 has not done what it needs to do systemically over a number of

7 months, years, or whatever, are you saying that the Court,

8 because of concerns with allow- -- you know, taking it out of

9 the hands of the persons who were elected by the people,

10 taking it out of their hands is wrong?

11     If the Court makes a finding that they have either not

12 done -- done things -- that they continuously violate the

13 constitutional rights of these detainees, that they have not

14 sought to -- if the Court finds that they have not done that

15 which is required and nothing else has worked, then the Court

16 has no tools at its disposal?

17     MR. SHELSON:  Well, Your Honor, the County is

18 definitely not saying that the Court has no tools at its

19 disposal.  But the question Your Honor asked before that point

20 is -- about taking it out of the hands of the County, that is

21 part of what we're saying, Your Honor, but it's not all of it.

22 And the part that that issue really applies to, Your Honor,

23 are the two factors that go to injury, and so what we're

24 specifically saying with regard to taking it out of the hands

25 of the people is that -- with respect to the two injury

 1    factors, that the fact that it's being taken out of the hands

 2    of the people militates in favor of a stay.

 3         THE COURT:  Okay.  Now, I know the County I think at

 4    some point in its brief talks, I think, and I may be mistaken,

 5    but the unreviewable decisions I think might be some language

 6    that was used with respect to the receiver, but the order

 7    appointing the receiver and setting forth his duties, there

 8    are checks and balances there with respect to what the

 9    receiver can do, and it gives the parties the right to contest

10    certain decisions, certain obligations, certain choices,

11    certain things that the receiver might do; right?  Like the

12    budget.

13         If the parties don't agree -- I guess the first part of

14    the budgeting thing is that the receiver must send his budget

15    to the parties first, get feedback from the parties, and if

16    the parties disagree with the budget, then the parties have a

17    right to do what they've done in this instance, come to the

18    Court to have the Court take another look, I guess.  I mean, I

19    think the receiver's budget, for example, staff terms of

20    service and other significant financial agreements are subject

21    to approval of the Court before they may take effect.  That's

22    page 10, paragraph 10 of the duties appointing the receiver.

23    So, I mean, the receiver will not be operating in a sense

24    where his decisions are unfettered; right?

25         MR. SHELSON:  Well, Your Honor, if I could, I think

1    three things in response to that.

2          The first is that the County-elected officials and its

3    unelected employees are completely divested of authority.

4    That is clear.

5          The second thing I'd say, Your Honor, is there is the

6    process for the example the Court used for the budget, but

7    ultimately -- well, not ultimately.  The County has lost

8    control of its budget for RDC under the order.  Now, you're

9    right, it could convince the Court that the receiver's budget

10   could -- could be modified in some way from what he asked,

11   Your Honor, but the County's still not in control of its

12   budget.

13         And the final point, Your Honor, is it unfettered?

14   It's not unfettered in the sense that for certain things

15   specified in the order, there are mechanisms for coming to the

16   Court for the Court to decide.  But it is unfettered in the

17   sense that the County no longer has any control over RDC.

18         THE COURT:  Let me ask you this on another subject.  I

19   think the County mentions the indemnity language or said that

20   the County might be indemnified, I believe -- I think I read

21   in the County's argument that even the Court's granting the

22   receiver indemnity, I think the County suggests that that

23   could possibly indemnify anything that the receiver does.  I

24   think -- I don't believe the County is suggesting that if the

25   receiver does something illegally, it might be -- the County

1    may be responsible for indemnifying the receiver.  Is that the
2    County's position, that the indemnity language that the Court
3    has suggested through its order is much too broad?

4         MR. SHELSON:  Respectfully, Your Honor, that is the
5    County's position.

6         THE COURT:  Okay.  At page 7 of the order at paragraph
7    6, so this would be under the access, immunity, interference
8    with receiver:  Defendants shall completely indemnify the
9    receiver and their personnel in any litigation brought against
10   the receiver or their personnel regarding activities conducted
11   in the course of the receiver's official duties.

12        I take it that -- I guess I should change that to in
13   the course and scope?  I mean, it seems to me that this court
14   will not be granting indemnity for -- his official duties
15   would not be to do things illegally; right?  Does the County
16   read that as saying that the receiver will be blessed with
17   doing things illegally and then if he's sued by somebody, that
18   the County would have to indemnify him?

19        MR. SHELSON:  Your Honor, the County's concern is that
20   it says in any litigation, and so -- in any litigation
21   regarding activities conducted in the course of the receiver's
22   official duties, so we hope we're wrong, but if -- the Court
23   asked a minute ago is -- if the receiver committed an illegal
24   act, we think that that sentence could be alleged to require
25   the County to indemnify the receiver.

```
1          THE COURT:  Even though the receiver might be acting

2    illegally?

3          MR. SHELSON:  Well, correct, Your Honor, because it

4    says any litigation.  And the only limiting thing in that is

5    "in the course of."

6          THE COURT:  Right.  Wouldn't that be sufficient

7    limitation of it?  I'm just asking.  I know lawyers quibble

8    about insurance language all the time on duties to defend and

9    indemnify and all of that.

10         MR. SHELSON:  I think a credible argument could be made

11   that he was -- that -- without further limiting language, that

12   if the receiver committed an illegal act in the context of his

13   official duties, that it's subsumed on paragraph 6 on page 7

14   of the order.

15         THE COURT:  Now, I guess to the extent that any party

16   finds that the order should be modified -- I'm looking at the

17   very last paragraph of the order at page 13.  It says -- the

18   heading Roman numeral V, Modification.  The Court acknowledges

19   that the receiver -- that this is significant in scope and

20   dimension, as the Court said.  Accordingly this order may be

21   modified as necessary from time to time in accordance with

22   federal law, including by motion of the parties or at the

23   receiver's request, to ensure the success of the receiver and

24   the eventual return of RDC to the operation and control of the

25   defendants.
```

1          If the County believes that there are matters that need

2     to be crystallized in some way, does that paragraph allow the

3     County to come to court through a motion requesting any

4     particular modification it believes that it needs?

5          MR. SHELSON:  It does, Your Honor, but I don't know

6     that the County could do that given that the appeal has been

7     docketed.

8          THE COURT:  Okay.  All right.  Is there anything else

9     on your order that you wish to argue at this point,

10    Mr. Shelson?

11         MR. SHELSON:  No, Your Honor.

12         THE COURT:  All right.  Thank you.

13         Who will argue for the United States?

14         MS. VERA:  I will argue on this one as well, Your

15    Honor.  Helen Vera.

16         THE COURT:  You drew the short straw, huh, Ms. Vera?

17    Happy Thanksgiving to you, too.  Go ahead.  I'm sorry.

18         MS. VERA:  Thank you, Your Honor.

19         The Court should not grant a stay of the receiver

20    orders as the defendants argue.  The constitutional violations

21    have gone on too long, and the harm and the risk of harm at

22    RDC is too great.  The sooner the receiver begins work, the

23    better.  It's time for conditions at RDC to meet

24    constitutional standards, which defendants do not even attempt

25    to claim is the case.  And as the Court already found, the

1   receivership will actually help the County minimize waste,

2   spend resources more wisely, and develop a plan for long-term

3   functional management of the facility.

4        It's certainly the case that we agree the four

5   traditional stay factors govern here, and the defendants have

6   not made the requisite showing on any of them.  I'll start

7   with likelihood of success on the merits.

8        The defendants have not made a strong showing that

9   they're likely to succeed on the merits of their appeal.  They

10  suggest that the Court needed to find them in contempt of the

11  new injunction in order to impose a receivership, and this is

12  the crux of their argument on the merits, Your Honor.  There's

13  simply no legal authority requiring that a remedy for

14  constitutional violations at a jail needs to be tailored to a

15  particular order issued by the Court, and the PLRA doesn't

16  focus on the number of court-ordered provisions not yet in

17  compliance or whether there's partial compliance on any of

18  them.

19       The remedy needs to be narrowly tailored to

20  constitutional violations, and it is.  The record in this case

21  is clear.  The Court already conducted the required legal

22  analysis when it applied the *Plata* receivership factors and

23  concluded that a receiver is necessary to correct ongoing

24  constitutional violations at RDC.  And that's, of course --

25  that analysis was in the order that's at ECF No. 204, and the

receiver orders themselves are tailored to the problems here
and how the receiver will remedy them and bring RDC into
constitutional compliance, as the defendants have failed to do
despite many years of court oversight and various attempts at
compliance that do not rise to the level of a receivership.

The procedural history of this case demonstrates that
the Court imposed the receivership to remedy unconstitutional
conditions at RDC.  The Court found the defendants in contempt
of the consent decree and stipulated order and found that
noncompliance contributed to the County's failure to meet
constitutional standards.  The new injunction requires the
defendants to remedy unconstitutional conditions by addressing
their failure to come into substantial compliance with the
decree provisions that the Court retained.  Defendants also
seem to acknowledge that RDC is not in constitutional
compliance.  It has never been a priority to get it there
despite the consent decree, the assistance of the monitoring
team, and many chances from the Court to get on the right
track.

As the Court has found based on the entire record,
including an evidentiary hearing as recently as July, the 17th
monitoring report, and other recent evidence from the past
several months, the same old story persists at RDC warranting
receivership to remedy the constitutional violations.  There's
still dire custody staffing issues.  Supervision is inadequate

1    to protect the population from risk of harm from violence and

2    gang activity in the pods.  The physical plant is in

3    disrepair.  Things get broken and destroyed because there's no

4    sufficient -- there's not sufficient supervision.  Mental

5    health care is inadequate.  It continues to be an issue that

6    has just not been addressed as the County has promised over

7    and over again.  Individuals with serious mental health needs

8    are at risk of harm due to inadequate care and failure to

9    properly conduct wellness checks.

10          Based on the record, the Court found that a receiver is

11   in the best position to right the ship at RDC, and the Court

12   properly found the receiver is necessary to bring RDC up to

13   constitutional standards and protect detainees.

14          There's the defendants' argument that these findings

15   and conclusions were based on the 2016 consent decree are not

16   supported by the law or the facts.  There's no requirement

17   that a receiver be imposed as a sanction for the most recent

18   operative order on the docket.  The legal requirement is tied

19   to constitutional compliance and what remedy is going to be

20   appropriate to get the defendants there.  So the Court's

21   analysis of the factors from *Plata*, which is the seminal case

22   on correctional receiverships, was appropriate.

23          A word about the defendants' argument that a

24   receivership is a serious remedy.  Yes, the Court recognized

25   that.  The United States recognizes that.  But the Court found

1   that receivership was necessary here because the record shows

2   that other lesser -- less intrusive means did not remedy the

3   constitutional violations.  And given the scope of the

4   receiver orders and the pared-down injunction, the Court found

5   that the remedy that was imposed would allow for a focus on

6   the most egregious harms and help the County reach compliance

7   finally and then return RDC to the County's management with

8   improvements in place.

9       You know, defendants seem to argue that receiverships

10  are simply never appropriate, that they cannot be imposed.

11  They haven't exactly said that, but reading their briefs and

12  listening to their arguments, that's what you would think they

13  were saying, and the Court asked a question along those lines.

14  The Court's order includes an explanation of why a

15  receivership is necessary here, why less intrusive means of

16  addressing violations have failed, and cites authority

17  explaining that a receivership can be appropriate, and it's

18  warranted here.

19      Regarding irreparable harm, the second factor for a

20  stay, the defendants have not established that they will be

21  irreparably harmed if the receiver begins work.  First, money

22  spent on the receivership will not be wasted.  There's no

23  plausible argument that conditions at RDC are constitutional.

24  It's almost certain that without the receiver, those

25  unconstitutional conditions will persist.  The record shows

1   and the Court found County is not making adequate progress

2   addressing them, and so a receiver is necessary.  And the

3   Court therefore appointed a qualified candidate who has a

4   track record and experience and expertise to bring the County

5   into compliance; and the receiver, operating under the scope

6   of the receivership order, will be able to make those

7   improvements in ways the County has failed to do on its own.

8          The Court already explained in its analysis of the

9   wasted resources factor that the cost that the receiver incurs

10  will be money well spent and not wasted resources, that,

11  rather, allowing the County to continue to flounder and fail

12  to correct constitutional violations will continue to waste

13  more resources.

14         And as -- the Court asked the defendants about this a

15  little bit, but the defendants also exaggerate the financial

16  harm and the -- you know, the harm that they argue will be

17  caused simply by giving the receiver the authority.  But the

18  receiver orders have built-in safeguards permitting County

19  input on budgets and other aspects of jail management.  The

20  order narrowly applies to RDC.  It's a pared-down version of

21  the older order.  The new injunction is focused on the most

22  egregious harms, and the order recognizes that there are

23  aspects of County government that the receiver will still be

24  subject to.

25         Regarding the third and fourth factors, injury to the

1   United States and the public interest.  The defendants

2   continue to argue that the United States can't be harmed by

3   harm to detainees, but in fact the United States is enforcing

4   a statute that is meant to protect the constitutional rights

5   of detainees.  So harms to the individuals who are detained at

6   the jail are harm to the United States.  And similarly, the

7   receiver is in the public interest because of the serious

8   ongoing harm at RDC, and that harm will be much worse if the

9   receiver orders are stayed.  The same dysfunction, wasted

10  resources, and unconstitutional conditions will persist.

11        Additionally, Your Honor, the new injunction and the

12  constitution are still in place regardless of whether the

13  Court grants a stay of the receiver orders.  The legal

14  standard and the County's obligation to live up to it remains

15  unchanged.  The receiver orders simply allow the receiver to

16  start work, which, as the Court has already found, will hasten

17  progress in a way that it simply has been stymied up to this

18  point.

19        I also want to point out that the defendants have been

20  failing to provide the monitor the access that she requires

21  and inhibiting her ability to evaluate conditions at the jail

22  over the past several months.  There have been a lot of

23  challenges in her ability to obtain information.  For example,

24  it's our understanding that the defendants haven't provided

25  any incident reports to the monitor for October of this year

1  and haven't provided all of the Prison Rape Elimination Act

2  reports that she needs to make her assessments.  And this

3  continued failure to comport with the Court's orders harms the

4  public interest and supports the need for a receiver to start

5  work right away, because defendants have failed to keep up

6  with reasonable access requirements.  And the receiver is

7  needed to reinstate that access.

8       The monitor is the Court's eyes and ears on current

9  conditions, and so by hindering her ability to monitor

10  compliance, the defendants have been impeding not only the

11  United States' access but also the Court's access and public

12  transparency.

13       One final point on receivership.  You know, defendants

14  argue that receivership is undemocratic and accuse the United

15  States of supporting a remedy that's not democratic in nature,

16  but while we recognize that receivership is a serious remedy,

17  it's appropriate and lawful when warranted, as it is here.  No

18  lesser remedy appears capable of addressing the long-standing

19  constitutional violations and harm.

20       The consent decree dates back to 2016.  The stipulated

21  order, which the defendants agreed to to resolve contempt

22  proceedings, dates back to early 2020.  The Court gave the

23  defendants more time this year to come into constitutional

24  compliance, and the Court has heard evidence throughout the

25  year regarding the way that constitutional violations persist

1    at the jail and how very dangerous it is and the risk of harm

2    that detainees face there every day.

3          The Court also considered a more drastic remedy than

4    receivership, such as a prisoner release order or monetary

5    sanctions, and rejected them in favor of the receivership that

6    we are talking about today.

7          So for these reasons, Your Honor, a stay is not

8    warranted here.  We would argue that the receiver should be

9    allowed to start work as soon as possible.

10          THE COURT:  Okay.  Let me ask the Government this

11    question, and I may be recasting differently and -- I may be

12    recasting the County's argument.  And this may not be one of

13    their arguments, so if it's not, they will correct me on

14    the -- when they respond.

15          But basically there was -- on the motion to terminate

16    the consent decree, the Court found, I believe, that the

17    consent decree itself was broader than what the constitution

18    required, and the Court pared that down and entered a new sort

19    of -- new parameters, if you will, modified the -- reduced it

20    by several paragraphs, took out a lot of things as the County

21    argued.

22          So even if -- and this may be where I'm recasting the

23    County's argument.  Even if they were out of compliance with

24    what the Court looked at then, it was this whole injunction

25    that the Court has now since modified, and basically the

1    County says, well, we should be given an opportunity, if you

2    will, to breach our obligations under the existing injunction

3    before this court takes any additional relief.  If that's not

4    the County's argument, that's fine.  That's my question.

5    Should the Court sort of separate or compartmentalize and say,

6    well, the consent decree that was entered and the stipulated

7    order, we had all that was before us on that day.  We found

8    some things, the Court made findings that certain situations

9    were current and ongoing, and now we have something in place

10   to track that.  And there is something in place.  There is an

11   injunction that is currently in place.

12          And to the extent that the -- I don't know what the

13   next monitor's report is going to show or going to say about

14   whether the County is in partial compliance, substantial

15   compliance, not in compliance at all.  I don't know what

16   number of assaults we've had in the last several months

17   because we've had no updates.  I don't know what number of

18   escapes we've had, and certainly we've had some because as a

19   matter of public record and judicial notice, we know that

20   there was -- we know there were press conferences and stuff in

21   the local media about at least one escape.

22          So if there are any deficiencies existing now,

23   shouldn't this whole process begin anew and we sort of, I

24   guess, litigate or figure out how any -- if there are any

25   failures of the County that justify, I guess, contempt

1    citations and then the appointment of a receiver?  Should the

2    Court be looking at it in that way if the County is arguing

3    that, Ms. Vera?

4         MS. VERA:  No, Your Honor.  The County has demonstrated

5    repeatedly that giving them additional chances to come into

6    constitutional compliance doesn't work.  You know, one of

7    defendants' arguments is that the consent decree -- that the

8    County never managed to comply with the consent decree and

9    that's somehow an argument against installing a receiver.  But

10   the problem here is that the County has never been able to

11   come into compliance.  It wasn't able to come into compliance

12   with the consent decree.  It wasn't able to come into

13   compliance with the stipulated order.  Defendants asked the

14   Court for more time about a year ago.  The Court gave them

15   more time.  They didn't come into compliance then.

16        The Court held an evidentiary hearing early this year.

17   The Court continued to evaluate the record over the course of

18   the past year, and giving the County more time to remedy the

19   constitutional violations at Raymond does not work.  The

20   violations have persisted, and the detainees continue to be at

21   unreasonable risk of harm.

22        And the main issue is that failure to comply with

23   constitutional standards, the failure to get RDC into

24   constitutional compliance, and that's why the Court decided a

25   receiver was necessary to remedy those conditions.  And so,

1  you know, giving the County a chance to come into compliance

2  with the new injunction would just be continuing that pattern

3  and leaving the detainees at the jail in a continued risk of

4  serious harm.

5          You know, the defendants' main argument that the new

6  injunction is the operative order now is somewhat -- it's a

7  point that's sort of to the side of the main issue, which is

8  whether the remedy is tailored to address constitutional

9  violations, which it is, but it's also the case that the new

10 injunction is -- it includes the provisions of the previous

11 consent decree that they were already found in contempt of.

12 So we're not really talking about anything new here, Your

13 Honor.

14         THE COURT:  Okay.  Thank you, Ms. Vera.  Anything

15 additional?  Well, let me ask you this, Ms. Vera:  What does

16 the United States say with respect to the order setting forth

17 the duties and responsibilities and obligations of the

18 receiver?  Are there any -- well, I think the County said if

19 there are any modifications, probably can't be done now

20 because there is an appeal.  But any concerns that the United

21 States has with the duties and responsibilities that the Court

22 outlined for the receiver?

23         MS. VERA:  No, Your Honor.

24         THE COURT:  Okay.  All right.

25         MS. VERA:  The Court heard our motion for

1    clarification, but nothing on the substantive provisions, Your

2    Honor.

3            THE COURT:  Okay.  All right.  Thank you.

4            Mr. Shelson?

5            MR. SHELSON:  Yes, Your Honor.  Thank you.  May I

6    proceed?

7            THE COURT:  You may.

8            MR. SHELSON:  Thank you, Your Honor.  To be clear, Your

9    Honor, the motion to stay we're here about today is the

10   County's second motion to stay.  The County's first motion to

11   stay, which the Court denied, was regarding -- the issue there

12   was whether the County was likely to prevail on the underlying

13   merits.

14           What the United States is doing here in its argument is

15   confusing the underlying merits, which it keeps referring to

16   as the underlying constitutional violations, with the merits

17   of the remedy.  What the Court's focus should be on with

18   respect to the motion to stay before the Court today is the

19   merits of the remedy, and so to the extent that the United

20   States, which is near total, is arguing about the underlying

21   merits, they're arguing the wrong merits issue.

22           Clearly, Your Honor, not everything in the consent

23   decree even came close to arising to a constitutional

24   violation, and that's not the County talking, Your Honor.

25   That was a finding that this court made.  The United States

argued that the receiver remedy is narrowly tailored to the constitutional violations.  What constitutional violations?  Your Honor, that's the problem in a nutshell.

The United States is dismissive of the fact that the consent decree is no longer the operative order, and for whatever reason the United States just can't seem to say that the consent decree is no longer the controlling order.  It's gone, and that is a reality.  The County doesn't know what else to say about that.

United States also said that the receivership orders, in addition to addressing the constitutional violations, addresses the violation of the consent decree that the Court found the County in contempt of.  Well, Your Honor, that's what the Court said it did.  It said it is imposing a receivership as the final sanction for the two contempt orders.  Contempt of what?  Not contempt of the new injunction.  Contempt of the consent decree.  That is absolutely clear.

The United States' next point is that it stated as a conclusion that the receivership will work.  To this day, no evidence has been presented by the United States that that will happen.

United States said that the County seems to concede constitutional violations.  The County has never conceded that.  Your Honor, there's not -- let's bring it to just this

1     motion.  There's nothing in the County's motion, its opening

2     brief, or its rebuttal brief that concedes constitutional

3     violations.

4          United States suggested that RDC has never been a

5     priority to the County.  We addressed this somewhat in our

6     opening brief regarding the motion to stay and previously,

7     frankly.  I guess we just have an honest difference of opinion

8     on that with the United States, because in a nutshell, Your

9     Honor, as the Court knows, any matter regarding RDC that came

10    to this board received unanimous approval, and the County's

11    position is that absolutely has been a priority.

12         United States identified *Plata* as the seminal case.  We

13    think that's an overcharacterization of *Plata*.  It's a Ninth

14    Circuit case.  The Fifth Circuit certainly never adopted

15    *Plata*.  The reason -- the truth is, Your Honor, *Plata* is one

16    of the only cases that discuss receivership orders because

17    it's such a rare and extreme remedy.

18         United States mentioned that the new injunction is a

19    pared-down order so the County could focus on the essentials.

20    That's part of our point, Your Honor, that the United States

21    dismisses.  Between the entry of the new injunction and when

22    the Court decided or announced it was going to appoint a

23    receiver, only 107 days lapsed.  The new injunction had never

24    really been tried, Your Honor.

25         United States recognizes -- or said that the County

1   didn't exactly say it but the County seemed nevertheless to

2   say that a receivership is never appropriate.  The County said

3   no such thing, Your Honor.

4        United States said the County did not establish

5   irreparable harm.  Ms. Vera said that money spent on a

6   receiver would be well spent.  That's just argument of

7   counsel, Your Honor.  There's no evidence in the record that

8   supports that.

9        Ms. Vera said that defendants exaggerate the financial

10   harm.  The truth is she doesn't know that.  She doesn't know

11   that.  We haven't seen the receiver's budget.  There's just no

12   basis in the record for that conclusion.  The budget given the

13   other -- the County's other legitimate obligations could be

14   ruinous.  We haven't seen it yet, so I admit I don't know

15   either, but certainly neither does the United States.

16        One thing Ms. Vera said that we agree with is that the

17   order narrowly applies to RDC.  To relate back to a point

18   earlier in the discussion today, Your Honor, the RDC certainly

19   does not -- excuse me, the receiver order certainly does not

20   mention Henley-Young by name.

21        Your Honor, the point -- *Plata* 's point that

22   receivership orders are debilitation of democracy is not

23   something the County is making up.  They are.  In this case

24   the elected officials, the board of supervisors and the

25   sheriff, have no say.  They have no substantive say going

1   forward regarding the operation of a local jail.  Your Honor,

2   this is ECF 232, the United States' memorandum in support of

3   its opposition of the motion to stay.  It's page 16, note 11

4   talking about the receiver orders.  The United States wrote,

5   This is a temporary transfer of powers, not the permanent

6   replacement of local officials.

7        Again, Your Honor, that's debilitation of democracy in

8   a nutshell with respect to this order.  A temporary transfer

9   of powers.  The United States doesn't define temporary, and

10  they don't know the duration of this transfer of power, which

11  is complete, and the United States said it's not the permanent

12  replacement of local officials.  Your Honor, it's the

13  permanent replacement of local officials till the Court does

14  away with the order.  It's the permanent replacement of local

15  officials until the Court says otherwise.  That's irreparable

16  the harm from the County's perspective and, we think,

17  objectively.

18       I don't want to belabor this point, Your Honor, because

19  I really don't think it has to do with why we're here, but it

20  was mentioned and we, frankly, think it was somewhat

21  gratuitous.  Failing to grant the monitor access.  We have a

22  serious dispute about that if what the United States is

23  referring to is this most recent monitoring visit, Your Honor,

24  and to the extent they're talking about documents, which they

25  seem to be, the shortest version of it, Your Honor, is this:

1   For the last site visit, the monitors submitted 60 separate

2   document requests, and they all virtually had different time

3   parameters on them.

4        The County disputes that it did not make a good faith

5   effort to honor those requests.  Lawyers in this room were

6   personally involved in that, and frankly, Your Honor, the

7   County's production we think was state of the art.  They were

8   Bates numbered.  And those 60 separate requests, Your Honor,

9   the documents were placed in folders that matched the request.

10  So there were separate folders for each request.  I don't know

11  how we could have made it easier, and I don't know why it was

12  perceived as not working, but I'll move on.

13       To the point where -- that Ms. Vera finished with that

14  the defendants allege that receiverships are undemocratic,

15  I've spoken to that already, Your Honor, so I won't belabor

16  it.  It's not a mere allegation.  It's a fact.  They're

17  undemocratic.  When you kick out the board of supervisors and

18  the sheriff from any substantive involvement with the local

19  jail, from the actual operation, Your Honor, that is

20  undemocratic, the County respectfully submits.

21       So subject to any questions Your Honor has, that

22  concludes the County's argument, Your Honor.

23       THE COURT:  All right.  I realize that the Court has

24  not been informed because, again, we've not had any status

25  updates in a while, but I think the Court's -- I think it is

1  obvious to the parties that the Court entered -- and I know

2  the notice for citation of contempt, the first one that the

3  Court -- the show cause order that the Court issued a year

4  ago -- a year ago tomorrow, I think.  It was the night of the

5  runoff election.  It was at the hour that the polls closed,

6  and the parties can look at stamped, filed, docket of that.

7       And for the record, if it has not been said, the Court

8  did not want to interfere with the election, so the Court

9  waited until the polls closed.  7:01 p.m. it entered its

10 notice.

11      Now, whether it was prepared prior to 7:00, it may have

12 been.  But this court did not want to be accused of filing a

13 citation of contempt in the middle of a runoff election where

14 the detention center and the jail was a hotly contested part

15 of the whole political thing, because that was part of the

16 hearing.  That has been part of the Court's finding.

17      But at the moment that the Court issued its show cause

18 here -- and I realize I don't think there have been any more

19 deaths, but one of the opening things that the Court mentioned

20 was the number of deaths that had occurred at the facility.

21 Thankfully, I don't believe there have been any more deaths.

22 I don't think there have been.  Again, I've not been -- we've

23 not had any status updates.

24      But just because there have not been any deaths does

25 not mean -- I mean, you know, if the Court waited for five

1   deaths or four deaths to have occurred before entering the

2   show cause -- or the show cause order, I guess shame on the

3   Court, and the Court could have or maybe even should have done

4   something to protect the detainees from the action or inaction

5   of those persons who were democratically elected to provide

6   for them.

7            And I hear you now.  I hear the County now saying that

8   it disrupts federalism, it disrupts the political process,

9   it's invasive, it's evasive, it's whatever.  But the rules

10  allow for the appointment of a receiver, and whether we've met

11  the need of it now -- I mean, the rules itself allow for the

12  appointment of a receiver.  The law itself allows for the

13  appointment of a receiver.  And whether the Court -- whether

14  there are circumstances in this case that justify it, the

15  appointment, the Court has found that there was a need to do

16  it.

17           So now the question before the Court is whether it

18  should stay that particular finding.  And I hear the County,

19  and I hear the United States.  I have -- I think I have all

20  the issues before me.  And I do note that footnote that the

21  County pointed me to, footnote 11, but I'm also cognizant of

22  footnote 7 in the United States' Docket 232 on the motion to

23  stay where there's a mention of whether or not, you know, is

24  the floor the fact that a death has not occurred?

25           So I have all the issues before me now.  I will work

1    diligently to rule on these motions.  I do acknowledge that

2    the County has brought it to the Court as an urgent and

3    necessitous matter, so we will attempt to rule without any

4    undue delay.

5          And so I appreciate -- we set this matter for this

6    afternoon because the Court was supposed to start a trial this

7    morning.  We were able to move it up an hour earlier because

8    of circumstances in the other case.  The trial won't begin

9    until tomorrow.  But we will work diligently to get you the

10   orders on these pending motions.

11         Is there anything else that the Court needs to take up?

12         All right.  Thank you all -- again, thank you for

13   making yourselves available, and sorry you had to work maybe

14   over the holiday like we did.  But that's what we do.  Thank

15   you so much.

16         MR. SHELSON:  Thank you, Your Honor.

17         THE COURT:  The Court will enter an order in due

18   course.

19         MS. VERA:  Thank you, Your Honor.

20         MR. SHELSON:  Thank you, Your Honor.

21         THE COURT:  All right.  We're now adjourned.

22   ****************************************************************

23

24

25

**COURT REPORTER'S CERTIFICATE**

I, Candice S. Crane, Official Court Reporter for the United States District Court for the Southern District of Mississippi, do hereby certify that the above and foregoing pages contain a full, true, and correct transcript of the proceedings had in the forenamed case at the time and place indicated, which proceedings were stenographically recorded by me to the best of my skill and ability.

I further certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

THIS, the 19th day of December, 2022.


*/s/ Candice S. Crane, RPR, RCR*

Candice S. Crane, RPR, RCR, CCR #1781
Official Court Reporter
United States District Court
Candice_Crane@mssd.uscourts.gov