# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# NORTHERN DIVISION

**UNITED STATES OF AMERICA,**

*Plaintiff,*

v.

**HINDS COUNTY, et al.,**

*Defendants.*

CAUSE NO. 3:16-CV-489-CWR-BWR

## ORDER

Before the Court are the United States' *Motion for Reconsideration*, Docket No. 219, the Defendants' response in opposition, Docket No. 229, and the United States' reply, Docket No. 235. The Fifth Circuit remanded this case after the Court issued an indicative ruling pursuant to Federal Rule of Civil Procedure 62.1. Docket Nos. 241 and 246. Following the remand, the motion will be granted.

**I.     Factual and Procedural History**

In July 2016, the Court entered a Consent Decree resolving the United States' allegations that Defendants Hinds County, Mississippi and the Hinds County Sheriff (together, "the County") were responsible for unconstitutional conditions of confinement at the Hinds County Jail ("the Jail"). Docket No. 8-1. The Consent Decree addressed both the rights of adult detainees at the Jail as well as the rights of youthful detainees charged as adults. *Id.* The Consent Decree required the County to ensure that 1) youth "charged as adults are separated by sight and sound from adult prisoners" and 2) youth "with serious mental

illness and disabilities, including developmental disabilities, receive appropriate programs, supports, education, and services." *Id.* at 37. To keep the youthful detainees from the adults, the County chose to house them at its Henley-Young Juvenile Justice Center. ("Henley-Young"). Docket No. 19 at 4.

The County failed to comply with the Consent Decree, and the United States moved the Court to hold the County in contempt. Docket No. 30.

In January 2020, however, the parties entered into a Stipulated Order to resolve the United States' contempt motion. Docket No. 60. The Stipulated Order imposed additional requirements on the County to ameliorate ongoing constitutional harms affecting youth charged as adults who were now housed at Henley-Young. Docket No. 60-1.

That Stipulated Order remained in effect, when on January 21, 2022, the County moved to terminate or modify the Consent Decree. Docket No. 111. The Court held a lengthy evidentiary hearing and substantially granted the County's motion to modify. Docket No. 168. That decision revised the Consent Decree, excising those provisions that exceeded the constitutional minimum, and collected the necessary remainder into a New Injunction. Docket No. 169. Among the terminated provisions was Section K, which governed and outlined constitutional conditions for youthful detainees at Henley-Young. Docket No. 168.

The Court noted that the County's failure to comply with the Consent Decree exposed youth charged as adults to unconstitutional risks of harm. *Id.* at 65. Citing an incident where a Henley-Young officer used inappropriate force on a youth, the Court described the County's violation of the Consent Decree's requirements for staff training as "insufficient to safeguard youth detainees' constitutional right to protection from harm." *Id.* The Court cited additional examples of dangerous incidents and ongoing constitutional violations at Henley-

2

Young. *Id.* at 85 (citing a report of sexual assault at Henley-Young as an example of the County's non-compliance with sexual safety provisions of the Consent Decree, and of the ongoing risk of harm due to inadequate staffing and supervision).

Ultimately, though, the Court terminated Section K in its entirety because a separate Consent Decree (which was entered in March 2012 and extended several times over the last decade), overseen by a separate Federal Judge, governed the specific conditions of confinement at Henley-Young. Because it "wishe[d] to avoid interference with that Consent Decree," this Court held that future concerns about Henley-Young would be "best submitted to the discretion and sound judgment of the Presiding Judge in that case." *Id.* at 110 (referencing *J.H. v. Hinds County*, No. 3:11-CV-327-DPJ-FKB (S.D. Miss. filed June 1, 2011)). The United States was never a party in that case.

On October 13, 2022, the separate Consent Decree governing Henley-Young was terminated by that Presiding Judge,[1] and with it, any federal oversight of the conditions of the Henley-Young facility. The United States filed the present motion immediately thereafter.

In its *Motion for Reconsideration*, the United States requests that the Court exercise its discretion under Rule 60(b) to modify its Order Amending Consent Decree and reinstate all provisions that remain necessary to address ongoing violations of youthful detainees' rights. In other words, the United States wants Section K, or some variation of Section K, inserted into the New Injunction. The County responds that 1) the request to reinstitute provisions

---

[1] The parties had competing motions before Judge Jordan. The plaintiffs asked the court to require Hinds County to show cause why it should not be held in contempt for failure to comply with the Consent Decree and the County asked the court to terminate or, alternatively, to modify the Consent Decree. "Following several months of additional briefing and conferences, Plaintiffs[] consent[ed] to termination of the Consent Decree." *J.H. v. Hinds County*, Docket No. 196, at 1 (S.D. Miss. filed October 13, 2022). To add context, the County moved to terminate the Consent Decree in the *J.H.* case 17 days after the bench trial in this matter had concluded. *Id.* at Docket No. 173.

3

related to Henley-Young is impermissible judge-shopping; 2) the *J.H.* Court terminated the *J.H.* Consent Decree with prejudice; and 3) the PLRA precludes the United States' request for prospective relief.

In its first indicative ruling on the motion, this Court recognized that a notice of appeal divested it of jurisdiction to modify its Order Amending Consent Decree. Acknowledging that the United States' *Motion for Reconsideration* raised a substantial issue, though, the Court indicated that, if the Fifth Circuit remanded this case pursuant to Rule 62.1, the Court would examine the facts and law to determine whether tailored youthful-offender provisions should be added into the New Injunction.

On December 28, 2022, the Fifth Circuit remanded this case for the limited purpose of ruling on the *Motion for Reconsideration*, allowing the undersigned to conduct additional proceedings and make any necessary modifications to the injunction concerning Section K. Docket No. 246.

**II.     Legal Standard**

Rule 60(b)(5) provides for relief from final judgment "if the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application." Fed. R. Civ. P. 60(b)(5). Because injunctions in institutional reform cases "remain in force for many years" and "the passage of time frequently brings about changed circumstances," federal courts must embrace a "flexible approach" to Rule 60(5) motions. *Horne v. Flores*, 557 U.S. 433, 448-50 (2009).

## III.     Discussion

Circumstances have radically changed in the short time since the Court terminated Section K of the Consent Decree. Indeed, the Court did elect to terminate Section K in its entirety when paring down the Consent Decree. But the basis for that decision was not the correction of all unconstitutional harms at Henley-Young, but rather the Court's preference to not interfere with a colleague's governance of the matter. Arguing that the Court should not inject itself into the *J.H.* case, the County emphasized that Henley-Young "is currently governed by an existing, court enforced consent decree specific to that facility." Docket No. 116 at 18, n.9. Oversight by one federal judge was sufficient.

But now, the *J.H.* decree has been eliminated. There has been no finding that the County has complied with its constitutional obligations as it relates to the youthful detainees charged as adults. There is no oversight. The Court finds that deferring to the *J.H.* judgment — a judgment which terminated the consent decree — runs counter to public interest. *See id.* at 447 (holding that relief from a judgment is appropriate if "a significant change either in factual conditions or in law renders continued enforcement detrimental to the public interest"). The record illustrates that youth charged as adults in Hinds County continue to be held in unconstitutional conditions of confinement. Docket No. 220. The United States and the Court-appointed Monitoring team reported serious violations at Henley-Young. Those serious violations consisted of inadequate staffing and supervision, staff training, mental health and behavioral services, classification, and educational programs. Docket No. 101 at 90-108.

To this, the County contends that the United States' motion is impermissible judge-shopping. The Court is not persuaded. *J.H.* was brought by private citizens, and the United

5

States has "an interest in enforcing federal law that is independent of any claims of private citizens." *United States v. East Baton Rouge Parish Sch. Bd.*, 594 F.2d 56, 58 (5th Cir. 1979). Here, the United States has elected to exercise its authority to proceed separately from the *J.H.* case. The United States has not sought any opportunity to litigate its youthful detainee claims before "any judge other than the one to whom it was assigned." Docket No. 235 at 3, n.1. Intervening in a separate class action, as the County suggests, would seem more likely to draw allegations of judge-shopping than its current course of action. *Id*.

Second, the County asserts that res judicata and collateral estoppel principles preclude the United States from requesting Section K be reinstated. Res judicata and collateral estoppel, however, generally do not apply to non-parties. The United States was never a party in the *J.H.* case. In addition, the United States' claims in this case and the claims in the *J.H.* case involve different statutes and different plaintiffs. The United States' case focuses specifically on youth charged as adults with unique needs for treatment, education, and protection from harm.

In an effort to circumvent the general rule against applying claim and issue preclusion to non-parties, the County further argues that res judicata applies because the United States and the *J.H.* plaintiffs were in privity. Again, the Court is not persuaded. The United States, acting in its sovereign capacity, does not have a special relationship with the *J.H.* plaintiffs. Shared interests alone are insufficient to constitute "privity" and no other exception to the rule applies here. Consequently, the United States is not bound by the *J.H.* dismissal under principles of res judicata or collateral estoppel.

Third, the County contends that the PLRA precludes the United States' request for prospective relief. That may be so. In its earlier ruling amending the Consent Decree, the

6

Court never made express findings about whether the County met the PLRA standard for termination of youthful detainee relief. *See* Docket No. 168 at 110 (noting that the County was only partially compliant with six paragraphs of the Consent Decree). The interests of justice and the public interest, therefore, now weigh in favor of determining, on a paragraph-by-paragraph basis, whether Section K or some variation thereof comply with the PLRA standard.

**IV.    The PLRA Analysis**

The Consent Decree's provisions regarding Youthful Prisoners are reproduced here:

As long as the County houses youthful prisoners, it must develop and implement policies and procedures for their supervision, management, education, and treatment consistent with federal law, including the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482. Within six months of the Effective Date of this Agreement, the County will determine where it will house youthful prisoners. During those six months, the County will consult with the United States, the monitor of the Henley Young Juvenile Detention Center consent decree, and any other individuals or entities whose input is relevant. The United States will support the County's efforts to secure appropriate housing for youthful prisoners, including supervised release. Within 18 months after the Effective Date of this Agreement, the County will have completed transitioning to any new or replacement youthful prisoner housing facility. For any youthful prisoners in its custody, the County must:

78.    Develop and implement a screening, assessment, and treatment program to ensure that youth with serious mental illness and disabilities, including developmental disabilities, receive appropriate programs, supports, education, and services.

79.    Ensure that youth receive adequate free appropriate education, including special education.

80.    Ensure that youth are properly separated by sight and sound from adult prisoners.

81.    Ensure that the Jail's classification and housing assignment system does not merely place all youth in the same housing unit, without adequate separation based on classification standards. Instead, the system must take into account classification factors that differ even within the youth sub-class of prisoners. These factors include differences in age, dangerousness, likelihood of victimization, and sex/gender.

7

82. Train staff members assigned to supervise youth on the Jail's youth-specific policies and procedures, as well as on age-appropriate supervision and treatment strategies. The County must ensure that such specialized training includes training on the supervision and treatment of youth, child and adolescent development, behavioral management, crisis intervention, conflict management, child abuse, juvenile rights, the juvenile justice system, youth suicide prevention and mental health, behavioral observation and reporting, gang intervention, and de-escalation.

83. Specifically prohibit the use of segregation as a disciplinary sanction for youth. Segregation may be used on a youth only when the individual's behavior threatens imminent harm to the youth or others. This provision is in addition to, and not a substitute, for the provisions of this Agreement that apply to the use of segregation in general. In addition:

    a. Prior to using segregation, staff members must utilize less restrictive techniques such as verbal de-escalation and individual counseling, by qualified mental health or other staff trained on the management of youth.

    b. Prior to placing a youth in segregation, or immediately thereafter, a staff member must explain to the youth the reasons for the segregation, and the fact that the youth will be released upon regaining self-control.

    c. Youth may be placed in segregation only for the amount of time necessary for the individual to regain self-control and no longer pose an immediate threat. As soon as the youth's behavior no longer threatens imminent harm to the youth or others, the County must release the individual back to their regular detention location, school, or other programming.

    d. If a youth is placed in segregation, the County must immediately provide one-on-one crisis intervention and observation.

    e. The County must specifically document and record the use of segregation on youth as part of its incident reporting and quality assurance systems.

    f. A qualified Medical Professional, or staff member who has completed all training required for supervising youth, must directly monitor any youth in segregation at least every fifteen (15) minutes. Such observation must be documented immediately after each check.

    g. Youth may not be held in segregation for a continuous period longer than one (1) hour during waking hours. If staff members conclude that

8

        a youth is not sufficiently calm to allow a break in segregation after one hour, they must contact a Qualified Mental Health Professional. The Qualified Mental Health Professional must assess the youth and determine whether the youth requires treatment or services not available in the Jail. If the youth requires mental health services that are not provided by the Jail, the Qualified Mental Health Provider must immediately notify the Jail Administrator and promptly arrange for hospitalization or other treatment services.

    h.    If a youth is held in segregation for a continuous period longer than two (2) hours, Staff Members must notify the Jail Administrator.

    i.    Any notifications or assessments required by this paragraph must be documents in the youth's individual record.

84.    Develop and implement a behavioral treatment program appropriate for youth. This program must be developed with the assistance of a qualified consultant who has at least five years of experience developing behavioral programs for institutionalized youth. The Jail's behavioral program must include all of the following elements:

    a.    The behavioral program must include positive incentives for changing youth behavior, outline prohibited behaviors, and describe the consequences for prohibited behaviors.

    b.    An individualized program must be developed by a youth's interdisciplinary treatment team, and properly documented in each youth's personal file. Documentation requirements must include the collection of data required for proper assessment and treatment of youth with behavioral issues. For instance, the County must track the frequency and duration of positive incentives, segregation, and targeted behaviors.

    c.    The program must include safeguards and prohibitions on the inappropriate use of restraints, segregation, and corporal punishment.

***

It is well-established that the "Eighth and Fourteenth Amendments protect prisoners from a substantial risk of harm, including harm from other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). The Eighth Amendment further imposes duties on [prison officials],

"who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take 'reasonable measures to guarantee the safety of the inmates.'" *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). However, under the Due Process Clause of the Fourteenth Amendment, the constitutional standard, commonly used for children and pretrial detainees, is whether the detainees are subject to conditions that "amount to punishment."[2] *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *see also Gary H. v. Hegstrom*, 831 F.2d 1430, 1431-32 (9th Cir. 1987); *Santana v. Collazo*, 714 F.2d 1172, 1179 (1st Cir. 1983) (highlighting that juveniles incarcerated in detention centers "have not been convicted of a crime" and thus possess "a due process interest in freedom from unnecessary bodily restraint which entitles them to closer scrutiny of their conditions of confinement than accorded convicted criminals.").

Like pretrial adult detainees, pretrial juvenile detainees "[are] entitled to minimally adequate training"—that "training required by the Constitution"—because it "may be reasonable in light of [the detainee's] liberty interests in safety and freedom from unreasonable restraints." *Youngberg v. Romero*, 457 U.S. 307, 322 (1982) (discussing the constitutional training requirements in the analogous context of civil commitment). Failure to train detention staff can violate the Constitution if such failure constitutes "deliberate indifference" to the harm imposed by excessive use of force. *See Poole v. City of Shreveport*, 691 F.3d 625, 634 (5th Cir. 2012) (underscoring that the deliberate indifference standard applies to failure to train claims in the analogous context of police use-of-force). Appropriate training is also essential to ensure that correctional staff do not subject pretrial detainees to excessive

---

[2] Circuits are split as to whether the Eight Amendment's cruel and unusual punishment clause or Fourteenth Amendment's Due Process Clause applies to juvenile institutions.

force, as "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" *Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2014) (quoting *Ingraham v. Wright*, 430 U.S. 651, 671-72 n.40 (1977)).

At Henley-Young, the risk of ongoing and recurring harm is well-known. The record contains ample evidence of continued and serious violations of youthful detainees' rights as of January 21, 2022 — the date the County sought termination.

One incident illustrates how officers' lack of proper training subject detained youth-tried-as-adults to unconstitutional force.

The Court heard testimony about an incident involving a staff member escorting two minor girls at Henley-Young from the visitation area back to the living unit. *See* Tr. vol. 6 at 905. The girls were being loud and boisterous, trying to yell or make contact through doors of the boys' unit. *Id*. The staff member continued to try to get the girls back to the living unit before things began to escalate. *Id*. One youth then threatened the staff member before physically approaching her in a "threatening way." *Id*. The staff member responded by removing her belt and swinging it around as a weapon. *Id*. One of the youth was struck with the belt, and a wrestling match with the staff member ensued. The girl was "pinned to the floor" and later received medical care for cuts, bleeding, injuries to her lip, and a cut on the side of her face. *Id*.

Another incident illustrates how officers' failure to respond to incidents have inevitably led to youthful detainees' harm.

The Court heard testimony about a minor's assault at Henley-Young *See* Tr. vol. 6 at 956-57, 962; *see* also PX-47. While playing cards, he got up to grab water when several other residents grabbed him by his feet and dragged him into an empty room. *Id*. Once inside the

11

room, they sexually assaulted him. *Id*. Other residents eventually broke up the assault. *Id*. The minor reported that an officer witnessed the event but did not intervene. *Id*. After reviewing the camera footage, the Court appointed-Monitoring team verified the attack and that an Officer "was on the unit sitting at a table and did nothing." *Id*.

Henley-Young has long been unable to provide basic supervision to prevent and respond to incidents. The record reflects insufficient staffing and an overarching failure to provide the necessary school, behavioral, and mental health programming that comply with federal law.

Proper training, intervention, and accountability are integral to the prevention and remediation of constitutional violations. After a review of the complete record, the Court finds that paragraphs 78, 81, 82, and 83 as modified below are necessary to ensure a safe facility and address the substantial risk of serious harm to which youthful detainees remain exposed. Paragraphs 79, 80[3], and 84, however, are deleted.

> 78. Develop and implement a screening, assessment and treatment program to ensure that youth with serious mental illness and disabilities, including developmental disabilities, receive appropriate programs, supports, education, and services.

> 81. Ensure that the Jail's classification and housing assignment system does not merely place all youth in the same housing unit, without adequate separation based on classification standards. Instead, the system must take into account classification factors that differ even within the youth sub-class of prisoners. These factors include differences in age, dangerousness, likelihood of victimization, and sex/gender.

> 82. Train staff members assigned to supervise youth on the Jail's youth-specific policies and procedures, as well as on age-appropriate supervision and treatment strategies.

---

[3] Based on the Sixteenth Monitoring Report, the County achieved sustained (substantial) compliance in ensuring that youth are properly separated by sight and sound from adult prisoners (Provision #80). For this reason, the Court has excised the provision from the New Injunction.

   83. Specifically prohibit the use of segregation as a disciplinary sanction for youth. Segregation may be used on a youth only when the individual's behavior threatens imminent harm to the youth or others.

These remaining provisions of Section K are "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and the least intrusive means necessary to correct the violation of the Federal right" and will not have an "adverse impact on public safety or the operation of a criminal justice system." 18 U.S.C. § 3626(a). Therefore, the Court will incorporate them into the New Injunction.

**V. Conclusion**

For the foregoing reasons, the United States' *Motion for Reconsideration* is granted.

**SO ORDERED**, this the 30th day of January, 2023.

                s/ Carlton W. Reeves
                *United States District Judge*