# United States Court of Appeals
# for the Fifth Circuit

_____

No. 22-60203
CONSOLIDATED WITH
No. 22-60301, 22-60332, 22-60527, 22-60597

_____

United States Court of Appeals
Fifth Circuit

**FILED**

October 31, 2024

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

THE HINDS COUNTY BOARD OF SUPERVISORS; HINDS COUNTY
SHERIFF TYREE JONES, *In his official capacity*,

*Defendants—Appellants*.

_____

Appeal from the United States District Court
for the Southern District of Mississippi
USDC Nos. 3:16-CV-489, 3:16-CV-489,
3:16-CV-489, 3:16-CV-489, 3:16-CV-489

_____

Before CLEMENT and SOUTHWICK, *Circuit Judges*.[1]

EDITH BROWN CLEMENT, *Circuit Judge*:

Hinds County, Mississippi, operates several detention facilities, including the Raymond Detention Center (RDC or the Jail), whose conditions of confinement are at the center of this appeal. In 2016, the United

_____

[1] This case is being decided by a quorum. 28 U.S.C. § 46(d).

22-60203
c/w Nos. 22-60301, 22-60332, 22-60527, 22-60597

States Department of Justice (DOJ) sued the County under the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997a (CRIPA), alleging a pattern or practice of unconstitutional conditions of confinement in four of the County's detention facilities. The DOJ and County entered into a consent decree that stipulated numerous changes to conditions of confinement in the County's jail system.

But the decree did not resolve the dispute; to the contrary, a years-long battle ensued in the district court as to whether and to what extent the County was complying with the consent decree. The DOJ—citing record numbers of inmate violence and injury, among other evidence of apparently worsening conditions of confinement—argued that the County had mostly failed to comply with the consent decree and was thus in contempt of court. The County denied the contempt allegations and moved to terminate the consent decree in full. The district court twice held the County in contempt for its failure to comply with the consent decree but waited to impose a corresponding sanction until after it had resolved the termination motion. Finding that the County had only partially complied with the decree, the court declined to terminate the consent decree and instead removed some of the decree's provisions, issuing in its place a new, shorter injunction, which focused on conditions at one specific facility: RDC. As the sanction for the County's noncompliance, the court appointed a receiver with wide-ranging responsibility to oversee the County's compliance with the consent decree. The County appealed both the new injunction and the related contempt sanction of a receivership.

Because we find that some constitutional violations remain current and ongoing at RDC, we conclude that the district court did not err by declining to completely terminate the consent decree. The new injunction remains overly broad in one respect, however. *See infra* Part III.A.4. We further hold that the district court did not abuse its discretion by appointing

2

a receiver or in crafting the scope of the receivership as it did, except with respect to the district court allowing the receiver to "determine the annual RDC budget, including for staff salaries and benefits, medical and mental health services (including the medical provider contract), physical plant improvements, fire safety, and any other remedies needed to address the constitutional deficiencies documented in this case." The district court also failed to make sufficient need-narrowness-intrusiveness findings for each of the receiver's duties as required under the Prison Litigation Reform Act, Pub. L. No. 104–134, §§ 801–10, 110 Stat. 1321, 1321–66 to –77 (codified as amended in scattered sections in 11 U.S.C., 18 U.S.C., 28 U.S.C., and 42 U.S.C.) (PLRA). We therefore affirm the district court in all respects except for those articulated in Sections III.A.4 and III.B.2 of this opinion.

# I.

In 2016, the DOJ sued Hinds County, Mississippi, under the CRIPA. The DOJ alleged unconstitutional conditions of confinement in the County's jail system, including at RDC, which is the primary adult jail facility; the so-called "Work Center," which houses lower-security and female detainees; the Jackson Detention Center, which did not regularly house detainees when the orders on appeal were issued; and the Henley-Young-Patton Juvenile Justice Center, where the County has held youths charged as adults since 2019. RDC—the facility at the center of this case, for reasons explained below—houses over 800 individuals, including pretrial detainees, convicted prisoners, and youths accused of adult crimes.[2]

_____

[2] Although RDC houses a mix of pretrial detainees and convicted prisoners, for ease of reference, the terms "detainees," "inmates," and "prisoners" will be used interchangeably. Although pretrial detainees enjoy more rights in certain respects than convicted prisoners, for reasons further explained below, our analysis in this opinion does not turn on that distinction.

22-60203
c/w Nos. 22-60301, 22-60332, 22-60527, 22-60597

In its complaint, the DOJ alleged, *inter alia*, that the jails exhibited rampant inter-prisoner violence, inadequate staffing, the unjustified use of force by officials, dangerously deficient facilities, and over-detention. The DOJ conducted an investigation and issued formal findings that identified the following issues, among others, in Hinds County's correctional facilities: unsafe jail conditions; severe understaffing, including both inadequate numbers and qualifications of staff; lack of housing options to separate different categories of inmates; defective locks, cameras, and alarms at RDC, along with structural facility problems that allow inmates to attack each other and to leave secure areas to obtain contraband; over-detention problems; the placement of inmates with behavioral and mental health issues in booking cells, which were supposedly filthy and not designed to serve as long-term inmate housing; and a series of defective hardware, including broken smoke detectors and cameras, trash buildup, missing fire-safety equipment, poor lighting, leaks in the roof, and damaged vents, lights, and observation windows.

In July 2016, Hinds County and the DOJ agreed to a sixty-four-page consent decree, which required many changes to conditions of confinement in the County's jail system. The district court appointed a monitor to ensure compliance with the consent decree. In June 2019, however, the DOJ moved for contempt, alleging that the County had failed to adequately comply with the consent decree. In its motion, the DOJ argued that the County had achieved substantial compliance with only one of the consent decree's numerous provisions. The County avoided contempt at this point by entering into a January 2020 stipulated order, approved by the district court, that was designed to achieve compliance with the consent decree.

But conditions at RDC nonetheless worsened in several respects, with a July 2021 monitoring report reflecting record numbers of fights and assaults at the Jail, continued fires set by inmates, overdoses, and three deaths so far

that year. In the next three months, three more RDC inmates died, prompting an emergency report from the monitoring team.[3] And the casualties did not stop there. Between October 2021 and January 2022, seventy-seven assaults were reported at RDC, a figure that likely "severely understated" the "full scale of violence at RDC" given the deficiencies in reporting instances of violence. The monitoring team's emergency report characterized the pattern of deaths as "especially alarming." Consequently, the district court yet again ordered Hinds County to show cause as to why it should not be held in contempt and why a receivership should not be instituted. Yet, despite this wave of deaths and injuries in 2021 and early 2022, in January 2022, the County moved to terminate or modify the consent decree, relief that it was entitled to seek at that juncture under the PLRA.

In February 2022, the district court held the County in contempt for failing to comply with over two dozen provisions in the original consent decree, including provisions concerning the protection of inmates from harm, use-of-force training and supervisor reviews, incident reporting and review, sexual misconduct, grievance and prisoner-information systems, use of segregation, over-detention, and more. And, shortly thereafter, in March 2022, the district court yet again held Hinds County in contempt, this time identifying RDC's failure to comply with the consent decree and stipulated order with respect to "A-Pod," an especially unsafe portion of RDC. Specifically, Hinds County had previously promised to move inmates out of A-Pod, but the evidentiary hearing demonstrated that A-Pod still housed inmates and would apparently continue to do so indefinitely. The district court further found that gang-affiliated groups in effect run A-Pod, attack

---

[3] The district court, in a subsequent order, explained in detail the circumstances surrounding each of the six deaths that occurred at RDC between January and October 2021 and each death's relationship to RDC's housing, staffing, supervising, reporting, and investigating practices.

unliked detainees, direct where detainees are housed, and decide who does or does not eat. It also found that the majority of A-Pod's cell-door locks do not work, nor do many of the lights, and that A-Pod has approximately thirty "trash dumpster cells" that have been welded shut but into which inmates deposit trash through broken windows. Finally, the court found that A-Pod inmates also regularly escape through the roof and return with contraband.

The district court waited to determine the contempt sanction pending resolution of the County's PLRA termination motion, for which the district court had held a two-week evidentiary hearing in late February 2022. In April 2022, the district court declined to completely terminate the consent decree, finding a number of ongoing constitutional violations that merited keeping some of the consent decree's provisions in place. Specifically, although the County had made a few improvements in the six years since the consent decree—such as fixing some door locks and approving a pay raise for guards—most of the problems remained unfixed. As of early 2022, staffing levels were at an "all-time low," which, the district court found, was taking its toll: In the same month the County moved to terminate the consent decree, for instance, staff "discovered two inmates, covered in feces and sores, who had suffered 'considerable weight loss' since their last well-being check" as a result of mistreatment by the gangs controlling living units.

But although the district court declined to entirely terminate the consent decree, it did remove many of the decree's more detailed provisions, concluding that many of those provisions exceeded constitutional minimums. The district court then issued a new, much shorter injunction containing only the provisions that it determined were necessary to meet constitutional minimums. Among other things, the new injunction

(i) removed the "Youthful Prisoners" provisions, which pertained only to Henley-Young—the youth facility—and (ii) concerned only the RDC.[4]

In July 2022, after a final mitigation hearing, the district court held that the appropriate sanction for the County's contempt was to appoint a receiver to oversee the RDC. The district court did so in October 2022, therein defining the scope of the receiver's duties. The district court neglected to expressly make the PLRA's required findings regarding the receivership, however. The DOJ therefore moved to confirm that the district court had made the necessary findings, namely that the receivership order was "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right" and would not have an "adverse impact on public safety or the operation of a criminal justice system" (so-called "need-narrowness-intrusiveness" findings). 18 U.S.C. § 3626(a). Later, on remand from this court, the district court amended its receivership orders to incorporate its need-narrowness-intrusiveness findings. The district court also amended the new injunction to reinsert certain provisions related to juvenile detainees.

The County appealed the district court's (A) denial of the termination motion and imposition of the new injunction and (B) appointment of a

_____

[4] On November 2, 2022, however, the DOJ filed a motion for reconsideration that asked the district court to restore the provisions of the consent decree concerning Henley-Young that the district court had previously terminated. The case reached us on appeal, and we remanded for the limited purpose of the district court resolving that motion for reconsideration. The district court granted the Government's request and entered a new, new injunction that reinstituted the "Youthful Prisoners" provisions concerning Henley-Young. Although the "Youthful Prisoners" provisions of the new, new injunction concern Henley-Young (the juvenile facility), for ease of reference, unless this opinion indicates otherwise, references to conditions of confinement herein are presumptively to RDC. The two injunctions are identical with one another with the exception of the "Youthful Prisoners" provisions, which the County does not challenge on appeal.

receivership as a sanction for contempt of court. This court stayed the new injunction and the receivership pending appeal.

## II.

The CRIPA empowers the United States Attorney General to sue states and localities engaged in a "pattern or practice" of creating jail conditions that violate inmates' constitutional rights. 42 U.S.C. §§ 1997a(a), c(a)(1). Under CRIPA, the Attorney General may seek "such equitable relief as may be appropriate to insure the minimum corrective measures necessary to insure the full enjoyment of [inmates' constitutional] rights." *Id.* § 1997a(a).

The PLRA, however, imposes strict limits on federal courts' ability to fashion civil prospective relief to redress constitutional violations proven in a CRIPA action. 18 U.S.C. § 3626(a)(1). Under the PLRA, federal courts may neither grant nor approve prospective relief "unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.*; *see also Brown v. Plata*, 563 U.S. 493, 531 (2011); *Miller v. French*, 530 U.S. 327, 347 (2000). Courts are thus cautioned against "assum[ing] the superintendence of jail administration" "under the guise of enforcing constitutional standards." *Alberti v. Klevenhagen*, 790 F.2d 1220, 1223 (5th Cir. 1986). In making its findings, moreover, a court must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C. § 3626(a)(1)(A).

One method by which a federal court may grant civil prospective relief is via consent decree. Consent decrees concerning conditions of confinement are "terminable upon the motion of any party or intervener . . . 2 years after the date the court granted or approved the prospective relief." *Id.* § 3626(b)(1)(A)(i). Even where two years have passed, however, the district

court may not terminate the consent decree "if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." *Id.* § 3626(b)(3). A "current and ongoing" constitutional violation is "one that exists at the time the district court conducts the § 3626(b)(3) inquiry"—*i.e.*, "at the time termination is sought." *Castillo v. Cameron Cnty.*, 238 F.3d 339, 353 (5th Cir. 2001) (internal quotations omitted).

"[A] district court's decision to terminate or continue prospective relief is to be reviewed for an abuse of discretion," but, if the court's decision "turns on the application of § 3626(b) of the PLRA, that interpretation is reviewed de novo." *Ruiz v. United States*, 243 F.3d 941, 950 (5th Cir. 2001) (internal quotations omitted). Any factual findings that the district court made in support of its § 3626 determination are reviewed for clear error. *Brown*, 563 U.S. at 512–13. The court's "need-narrowness-intrusiveness" findings under § 3626(b)(3) must be particularized "on a provision-by-provision basis." *Ruiz*, 243 F.3d at 950 (internal quotations omitted). The district court should "consider each provision of the consent decree in light of the current and ongoing constitutional violations, if there are any, and determine which aspects of the decree remain necessary to correct those violations." *Id.* at 950–51. In so analyzing, a court may rely on illustrative incidents rather than an "exhaustive[] catalog" of the evidence to establish unconstitutional conditions. *Alberti*, 790 F.2d at 1225.

Below, we review the district court's determinations as to whether each provision of the new injunction remains necessary to correct any current and ongoing constitutional violations at RDC.

22-60203
c/w Nos. 22-60301, 22-60332, 22-60527, 22-60597

## III.

### A.

The DOJ argues that certain conditions of confinement at RDC are cruel and unusual in violation of the Eighth Amendment and that these conditions were current and ongoing at the time the County sought termination, thus justifying continued prospective relief. Because pretrial detainees retain at least those constitutional rights that courts have held are enjoyed by convicted prisoners, the Eighth Amendment standard extends to pretrial detainees, such as those at issue here, under the Fourteenth Amendment. *Aguirre v. City of San Antonio*, 995 F.3d 395, 420 (5th Cir. 2021); *Alberti*, 790 F.2d at 1223 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1984)); *accord Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *Hare v. City of Corinth*, 74 F.3d 633, 649 (5th Cir. 1996) (en banc).

To determine whether an Eighth Amendment violation exists, we must ask two questions. The first is whether the deprivation is "sufficiently serious" as an objective matter to constitute cruel and unusual punishment. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotations omitted). For example, prison officials may not use "excessive physical force against prisoners." *Id.* at 832. Similarly, jail officials must "provide humane conditions of confinement," including by "tak[ing] reasonable measures to guarantee the safety of the inmates"—such as protecting inmates from fellow prisoners. *Id.* (internal quotations omitted); *id.* at 833. "For a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* at 834.

The second element—the subjective component—is whether prison officials, in operating a prison whose conditions are objectively sufficiently serious to support an Eighth Amendment claim, acted with "deliberate indifference to inmate health or safety." *Id.* (internal quotations omitted).

Under the subjective component, a plaintiff must show that prison officials were both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and did actually "draw the inference." *Id.* at 837. "[E]ven where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices." *Hare*, 74 F.3d at 644.

Likewise, where a plaintiff "presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," and circumstances suggest that the official "had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Farmer*, 511 U.S. at 842–43 (internal quotation omitted). There is no Eighth Amendment violation, by contrast, where prison officials "respond[] reasonably" to risks to "inmate health or safety." *Id.* at 844.

Here, on appeal, the County contends that the district court erred by declining to terminate the consent decree. The County principally argues that the evidence cited by the district court was not sufficiently "current" to show "current and ongoing" constitutional violations[5] and that the DOJ

---

[5] The County claims that, "[a]t the longest, 'current and ongoing' should extend no further back than 6 months before the last evidentiary hearing in this case, which was held on July 19, 2022." But that position has two defects.

*First*, even assuming that courts are empowered to consider only the six months preceding the § 3626 hearing, that hearing occurred in February 2022—not July 2022 (the July 2022 hearing concerned the contempt proceedings). In any event, "at the time the district court conducts the § 3626(b)(3) inquiry" means "at the time termination is sought," *Castillo*, 238 F.3d at 353 (internal quotations omitted), and here, the County filed its motion to terminate in January 2022, and the motion was heard in February 2022 and

22-60203
c/w Nos. 22-60301, 22-60332, 22-60527, 22-60597

failed to show that the County is acting with deliberate indifference.[6] Below, we analyze whether the district court erred in holding that Eighth Amendment violations justifying each of the provisions of the new injunction were current and ongoing as of January 2022—the time period during which Hinds County sought termination of the consent decree. *Castillo*, 238 F.3d at 353.

---

decided in April 2022. So, however long courts must look back to determine "current and ongoing," the timeline would run from January 2022—not July.

    *Second*, it is unclear exactly how far back we can, or must, look to determine "current and ongoing" constitutional violations. As mentioned above, the County argues that the answer is six months before the relevant evidentiary hearing. But it is unclear where that figure comes from or that there is any hard-and-fast numerical rule. Courts have taken wide latitude in determining how far back to look for "current and ongoing" constitutional violations in the context of a § 3626 inquiry. *See, e.g.*, *Depriest v. Walnut Grove Corr. Auth.*, No. 3:10–cv–663, 2015 WL 3795020, at *8–9 (S.D. Miss. June 10, 2015) (collecting cases), *appeal dismissed as moot*, 669 F. App'x 209 (5th Cir. 2016). And in order to determine whether a "pattern or practice" of constitutional violations exists, a snapshot of a prison in a moment in time would be inadequate; rather, a court must look back some period of time. *See Alberti*, 790 F.2d at 1224 (collecting cases). Deliberate indifference, for example, can be established via evidence showing notice of a problem from many years ago. *See Gates v. Cook*, 376 F.3d 323, 341 (5th Cir. 2004) (holding that a failure to address a problem known to be "urgent for more than a decade" supports the finding of deliberate indifference). For purposes of our analysis, we will consider the twelve months prior to the January 2022 motion to terminate the relevant time period (hereinafter so described).

    [6] The County appears to suggest that the district court's order and opinion establishes *ongoing* but not *current* constitutional violations. But courts often use "ongoing" as shorthand for "current and ongoing." *See, e.g.*, *Guajardo v. Tex. Dep't of Crim. Just.*, 363 F.3d 392, 394–98 (5th Cir. 2004) (per curiam); *Ruiz*, 243 F.3d at 950–51 (using "ongoing" and "existing"); *Castillo*, 238 F.3d at 347. Moreover, "current" means "occurring in or existing at the present time," *Current*, MERRIAM WEBSTER (2024 ed.), and "ongoing" means "being actually in process," *Ongoing*, MERRIAM WEBSTER (2024 ed.). So, neither caselaw nor textual definitions support the County's theory that the DOJ has proven one adjective but not the other.

**1. Protection from Harm**

The first provision of the district court's injunction concerns "protection from harm," namely whether RDC's failure to prevent violence among inmates represents a current and ongoing constitutional violation. To be sure, unchecked prisoner-on-prisoner violence can amount to an Eighth Amendment violation. When "terror reigns," for instance, "[v]iolence and sexual assault among inmates may rise to a level rendering conditions cruel and unusual." *Alberti*, 790 F.2d at 1224 (internal quotations omitted) (quoting *Jones v. Diamond*, 636 F.2d 1364, 1373 (5th Cir. 1981), *overruled by Int'l Woodworkers of Am., AFL-CIO & its Loc. No. 5-376 v. Champion Int'l Corp.*, 790 F.2d 1174 (5th Cir. 1986)). In weighing whether inter-prisoner violence amounts to an Eighth Amendment violation, "[q]uantitative measures" of such violence are relevant to a court's analysis. *Id.* at 1226. "It is not necessary that every inmate be assaulted every day before a federal court may intervene"; rather, a "pattern of violence" combined with "inadequate supervision" can constitute an Eighth Amendment violation. *Id.*

Here, the district court held that RDC failed to protect inmates from harm during the relevant time period, citing the volume and nature of inmate deaths and assaults in 2021. That failure to protect, the court concluded, rose to the level of an Eighth Amendment violation under *Alberti*. In particular, the court explained, between October 2021 and January 2022, the court monitor calculated at least seventy-seven assaults, a figure that omits unreported assaults and thus likely "severely understated" the "full scale of violence at RDC" given the deficiencies in reporting instances of violence. Six detainees died in 2021, moreover, from causes including assault, suicide, overdose, and illness.

The safety issues in A-Pod alone are numerous. At the evidentiary hearing, testimony reflected as much: "It is no secret that RDC is unsafe,

especially A-Pod." Staff reportedly "call out sick or just [do] not show up for work" because they are "afraid to work a pod." The inmates in A-Pod, and C-Pod, Unit 3, have established "inmate committees" or "gang committees" that "essentially run the unit and among other things . . . decide if there's someone on the unit that they don't want on the unit." The committees deprive unwelcome detainees of food and "will harass, steal from, [and] assault that inmate" until the detainee requests to be moved. "There is no lighting, no way to see inside the cells from outside, and the cell doors don't lock." In fact, expert testimony from the monitoring team adduced at the evidentiary hearing further reflected as follows:

> A-Pod is a disaster. It's filthy; lights don't work; locks don't work; doors can't be secured; cells don't have lights inside them. Inmates since they can't even close the doors, end up hanging blankets down in front of them to have makeshift privacy to their cells. Showers don't work. Everything in the place is torn up. It's just a very bad mess. There's no fire extinguishers inside, of course, because the inmates control that place. There are no officers who work inside the housing units in Alpha. There are no fire hoses. There are not even fire hoses out in the corridors, around the control room in Alpha. That area is ill equipped across the board.

This testimony tracks the district court's own in-person observations during its February 2022 visit to the facility. The conditions in A-Pod at the time of the § 3626 hearing remained as bad as ever in the above-described respects and contributed to inter-prisoner violence.

But the district court's findings concerning the necessity of measures to address ongoing prisoner-violence issues were not limited to A-Pod conditions. Rather, the district court attributed much of the prisoner-violence problem to the jail's broader staffing issues.

As of January 2022, RDC staffing was at an "all-time low," with only 191 officers—"58% (or less) of the minimum level identified [as necessary for

RDC] by experts." A jailer's "disregard" for "precautions he kn[ows] should be taken" supports a finding of deliberate indifference. *Cope v. Cogdill*, 3 F.4th 198, 209 (5th Cir. 2021) (alteration in original) (quoting *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 397–98 (5th Cir. 2000)). Moreover, the district court found that the jail lacks a "robust rounds system" or an officer's station in A-Pod—again, the most dangerous wing of RDC. Further still, the court found, the County had failed to retain a qualified jail administrator. In a July 2021 incident, for example, a detainee was found bleeding after he had been stabbed seventeen times, and no officer was in the housing unit when the assault occurred.

RDC's staffing as of January 2022 was especially ill-equipped to prevent violence in view of the facility's design. RDC was designed to be a direct-supervision jail, which "requires placing detention officers inside housing units, where such officers have continuous direct contact with prisoners and are not routinely separated from prisoners by physical barriers." However, the Jail ceased operating as a direct-supervision facility in 2012, when a major riot occurred, after which staff were no longer placed full time in each of the units. In January 2022, for instance, for at least one weekend, RDC assigned only one officer to each housing pod, meaning that "each officer supervised about 250 detainees via video surveillance, exclusively." The former jail administrator testified that this under-assignment happens regularly, even though protocol requires that at least five officers monitor a pod at any given time. The district court found that this lack of direct supervision contributes to gang problems and assaults at RDC and that officers are often unaware of problems within the jail—such as the October 2021 death, which an inmate brought to an officer's attention hours after the fact. In light of all this, the district court held that it was unconstitutional for RDC not to be operated as a direct-supervision facility

and that the County, by failing to do so, was deliberately indifferent to the direct-supervision problem.

The County, for its part, argues that it responded reasonably to the prison's problems by increasing the salary for detention officers, making other improvements in the pay system, and hiring more staff. In addition to issuing a COVID pay supplement, for instance, the County twice increased the permanent salary for detention officers—once through a 5% increase in late 2021 and again by increasing the starting salary for detention officers to $31,000 in early 2022. In addition, the County made a series of changes to its officer-payment system, streamlining the process through which officers receive payment, approving overtime positions at the jail, and employing a recruiting coordinator.

A reasonable response to inadequate prison conditions is indeed sufficient to prevent a deliberate-indifference finding even if the County's attempts were unsuccessful or if the County did not choose the optimal approach to the problem. *See Farmer*, 511 U.S. at 844–45. However, the County had not yet implemented its above-described pay raises as of the evidentiary hearing. And, as for RDC supposedly hiring more staff, the record reflects that staffing issues have only worsened at RDC over the relevant time period, illustrated by a November 2021 staff walkout that left only a few people working inside the jail. In short, the record reflects that the County did not take reasonable steps to remedy the prison-violence issue during the relevant time period.

In view of the foregoing, we conclude that the district court correctly held that both the conditions in A-Pod and RDC's systemic staffing issues demonstrated the County's deliberate indifference toward inmate safety. The district court therefore properly retained its provisions regarding inter-prisoner violence in the new injunction. As to the specific requirement that the jail be overseen by a qualified jail administrator and that the County

implement direct supervision, we have previously upheld a court order that enjoined equally specific staffing decisions, namely by mandating "specific numbers of guards on duty on each floor for each shift." *Alberti*, 790 F.2d at 1227. *Alberti* was decided before the PLRA was enacted, but it still required narrow tailoring and the use of "the least intrusive remedy." *Id.* (internal quotations omitted). In light of *Alberti*, therefore, the district court's imposition of a jail administrator and mandated direct supervision is likewise proper.

## 2. Use of Force

Next, the injunction contains several provisions regarding the use of force by jail officials against inmates and how RDC prepares for and responds to such incidents.[7] In justifying its continued injunction as to use of force, the district court cited, *inter alia*, RDC officials' misuse of tasers, including an October 2021 incident in which officers tased a prone inmate to coerce him into submission. It is true that the October 2021 tasing was apparently a one-off incident and that establishing deliberate indifference normally requires a plaintiff to "allege a pattern of similar constitutional violations by untrained employees." *Hutcheson v. Dallas County*, 994 F.3d 477, 482 (5th Cir. 2021) (internal quotations omitted) (citation omitted). But *Alberti* and progeny instruct that we employ a "totality of conditions" test. *Alberti*, 790 F.2d at 1224. And, looking beyond the sole reported instance of excessive force at RDC, we observe a lack, or inadequacy, of use-of-force training.

---

[7] As it must, this opinion reviews each respective provision of the challenged injunction for compliance with § 3626(b)(3). *See Ruiz*, 243 F.3d at 950. We do, however, consolidate certain related provisions for ease of analysis, namely, "Use of Force Standards," "Use of Force Training," and "Use of Force Reporting," all of which we analyze in a collective section titled "Use of Force."

For example, as the district court found in its April 2022 contempt-sanction order, new hires historically "do not receive use-of-force training prior to beginning work at RDC," and instead receive only "roll call training"—that is, informal training that occurs *ad hoc* "when officers discuss new policies while transitioning between shifts."[8] Nor does the County employ any scenario-based training on the use of tasers. Yet, notwithstanding the historic lack of officer training on the use of force at RDC (either generally or taser-specific), the Jail issued a directive in January 2022 to issue tasers to supervisors.

With respect to reporting on instances of excessive force, the district court found that supervisors often fail to review incident reports concerning the use of force and that staff often fail to submit such reports. Furthermore, among the district court's findings on actual uses of force was the following incident: "officers armed with beanbag gun[s] shot a sleeping detainee 'in the face and in the stomach' because he did not rise for a shakedown conducted at 'two or three o'clock' in the morning."

---

[8] Granted, testimony at the evidentiary hearing indicated that "[a]ll new officers now receive eight hours of [use-of-force] training in the basic recruit academy," including "a continuum of appropriate force responses to escalating situation[s], de-escalation tactics and defensive tactics." Testimony likewise reflected that the County's Internal Affairs Division enforces the use-of-force policy at RDC, and documentary evidence showed that the jail requires officers, after every use of force, to complete an "accurate and detailed" use-of-force report preceding a review of the event. But the district court ultimately found that no such requirements exist in practice and noted, based on record evidence, that the actual training that new hires receive is not use-of-force training but rather roll-call training, which lasts just a few minutes. Where a district court makes findings of fact, we do not privilege record testimony over those findings unless the testimony clearly contradicts the findings. *See, e.g.*, *United States v. Bass*, 10 F.3d 256, 259 (5th Cir. 1993) ("Because we cannot say that the district court's credibility choices and fact findings are clearly erroneous, we must decline the defendant's invitation to credit his testimony."). That precept applies equally to each section of the district court's injunction.

22-60203
c/w Nos. 22-60301, 22-60332, 22-60527, 22-60597

Once again, each of these findings is subject to a clear-error standard. The County's proffered evidence on this subject, while relevant, does not render clearly erroneous the district court's findings, which are both thorough and supported by ample record evidence. In view of the foregoing, conditions at RDC indeed reflect a jail-wide constitutional violation with respect to use of force.

### 3. Incident Reporting and Review

As the district court observed, "neither the Constitution nor federal law mandates" that prisons utilize "reporting mechanisms or effective review of episodic events." Nevertheless, the district court retained some provisions regarding incident reporting and review on the basis that the failure to complete reports contributes to inmate violence at RDC. In support of that provision, the district court cited an instance where an inmate had been assaulted three times—including two stabbings—but was nevertheless returned to the same housing unit in which the violence occurred (granted, the district court did observe that officers created incident reports for the two stabbings). Although that incident appears to bear more on the facility's failure to protect than on incident reporting *per se*, the decision to return the inmate to the same unit in which the violence occurred also reflects inadequate post-incident review procedures.

Indeed, the district court found a lack of after-action reviews at RDC generally and concluded that the few after-action reviews that RDC officials did undertake revealed deficiencies in the prison's incident-reporting and -review procedures. In support of and consistent with that finding, testimony reflected that reports from RDC were described as "inept," "unintelligible," and "incomplete," with the witness adding that he had "never read worse incident reports than what [he] routinely read in Hinds County." The October 2021 death, for instance, revealed many such deficiencies and led to the firing of three officers.

19

In light of the foregoing, *Alberti*'s totality-of-the-circumstances test counsels in favor of allowing the incident-reporting provisions to remain in place.

### 4. Sexual Assault

Next, the injunction contains provisions concerning sexual assault. The district court noted that, although the County generally has improved in its compliance with the Prison Rape Elimination Act, 34 U.S.C. § 30301 *et seq.* (PREA), the PREA coordinator went on leave for several months (from mid-July to December 2021), leaving no one to cover her responsibilities. During this time, a number of PREA incidents occurred, which largely went unreported and uninvestigated. Otherwise, the district court cited as justification for the continued injunction on sexual-assault-related conditions at RDC the generally unsafe nature of the jail, especially the A-Pod—for example, the lack of lighting, working locks, and staff—as well as one instance of sexual assault that took place at the youth center in October 2021.

The PREA coordinator did return from leave, however, in January 2022—months prior to the district court's April 2022 order—and nothing in the record reflects PREA-noncompliance outside of the window where the coordinator went on leave. Further, as explained above, much of the district court's justification for retaining its sexual-assault-related provisions in the new injunction refer to the general risk of violence at RDC, which the injunction addresses in detail, and not sexual assault specifically.

In view of the foregoing, although the record reflects PREA-related constitutional violations in the twelve months prior to January 2022, the record does not reflect that any PREA-related constitutional violations that had occurred at RDC were "current and ongoing" as of the time termination was sought. Accordingly, we reverse the injunction on these points and remand for further proceedings to remove the PREA-related provisions and set the boundaries of continued compliance monitoring.

**5. Investigations**

Next, the injunction retained a provision regarding investigations by prison officials. In support of continued prospective relief on this issue, the district court cited the lack of functioning cameras necessary to aid investigations and the inadequacy of both investigatory staffing and procedures.

On the first point, the inter-prisoner violence section above, *see supra* Section III.A.1, describes the continued dearth of functional cameras in the County's prison facilities. On the second point, some background: The Hinds County Sheriff's Office has two investigative divisions. The Criminal Investigation Division (CID) "is intended to investigate criminal activity, typically involving an inmate that's being investigated." And the Internal Affairs Division (IAD) "involves investigati[on] of staff persons regarding potentially criminal activity, but also violations of policy and procedure."

Evidence adduced at the hearing reflected that the quality of RDC investigations was suspect during the relevant time period. For instance, expert testimony indicated that CID investigations "have improved over the years" but, as of the hearing, were "still not very thorough." And "[c]onsidering the significant number of assaults, the fact that none [of the investigations] resulted in a criminal indictment is unusual." This lack of follow-up action, despite the reports of widespread inter-prisoner violence, suggests that the CID's investigatory procedures remain inadequate.

As for the IAD, expert testimony revealed that "it's very difficult" for IAD to track ongoing investigations because staff "sometimes don't get any reports and sometimes get [them] very, very late." This failure to track investigations through consistent reports "certainly impacts the ability for that staff to take appropriate corrective or remedial action." To make matters worse, on November 30, 2021, the County's sole IAD investigator resigned. In his letter of resignation, he stated that he worked "long and hard to try to

keep up with the workload," "with tireless effort," "even though this work should have three people to get everything done in a proper time." As of the date of the evidentiary hearing, therefore, there was no IAD investigator, although a different employee was slated to fill that position.

As just one example of the inadequacy of IAD investigations, expert testimony indicated that in the IAD investigation of a suicide in July 2021, the report failed to mention that upon finding the inmate hanging in his cell, a sergeant and officer delayed cutting the detainee down: "Instead of going in and taking some action to cut him down, or do anything, they left him hanging there and went back to the control room in Charlie where the sergeant called up a shift commander in booking to let him know what was going on." The expert witness explained that this fact was quite material: "[T]he first action should have been to take him down, and that was with a supervisor right there." Yet "[t]here was nothing ever written up about that in the IAD investigation, and I questioned that. It didn't seem to me that the supervisor was being held accountable for his lack of action."

The district court acknowledged that prisoners do not have a due-process right to have their complaints investigated. *Geiger v. Jowers*, 404 F.3d 371, 373–74 (5th Cir. 2005). Nevertheless, it found, RDC's failure to investigate prior reports is actionable when such failure contributes to unconstitutional conditions at the jail. The district court's factual finding—that RDC's lack of a full-time investigator and the tools to complete investigations, such as functioning cameras, contributes to the dire violence issues at the prison—is not clearly erroneous. In view of the foregoing, we affirm the district court's determination that the injunction's investigations provision remains necessary to correct a current and ongoing constitutional violation.

22-60203
c/w Nos. 22-60301, 22-60332, 22-60527, 22-60597

### 6. Grievance and Prisoner-Information Systems

Next, the injunction contains provisions concerning RDC's systems for prisoners to submit grievances and receive information. In support of its continued prospective relief on this issue, the district court found that a high number of prisoner grievances still receive no response or late responses and that, instead, prisoners often set fires to prompt staff to pay attention to prisoners' complaints. The district court cited, as one example, a grievance in which an inmate reported a stabbing and conveyed his fear of being attacked again. "The Court finds that grievances like this—pleas for help and ignored requests for protective custody—provide clear indications that the recurrence of harm is obvious, predictable, and likely."

For similar reasons as the reporting and investigations requirements, the district court's conclusion that the inadequate grievance procedures contributed to the jail-wide violence problems at RDC is not clearly erroneous. Accordingly, the *Alberti* totality-of-the-circumstances framework supports the continued inclusion of this provision in the injunction.

### 7. Segregation

Next, we evaluate the injunction's provisions on so-called "segregation cells," which are used to house prisoners with unique issues separate and apart from the general population, and "booking cells," which are meant to be occupied only temporarily.

"Segregation, also referred to as isolation, is a single-cell housing area" comprised of high-security inmates and inmates with serious mental illnesses. Inmates in single-cell housing areas are let out of their cells for just one hour per day to shower and to use the telephone and then return to their cells for the remaining twenty-three hours. Booking cells, by contrast, "were designed to hold people for no more than eight hours." They have no recreation area or visitation space, and there is only one shower that services

the whole area, and it is not conveniently accessible. Simply put, booking cells are "not designed for housing[.]"

Nonetheless, RDC uses booking cells as long-term housing for inmates with serious mental health issues. The district court further found that two deaths occurred in booking cells in 2021 and that welfare checks for inmates housed in these isolated units—although theoretically required every fifteen minutes in booking and every thirty minutes in segregation—are being performed inadequately, if at all. As for the segregation cells, prison officials acknowledged their concern that inmates in segregation "were not receiving their meals and access to hygiene support," and a January 2022 report reflected that nursing staff found two seriously mentally ill detainees in segregation covered in feces and sores and having lost significant weight. In light of these conditions, and the fact that mental-health needs, like physical needs, enjoy Eighth Amendment protection, *see Gates*, 376 F.3d at 332, the consent-decree provisions retained by the district court focus on weekly mental-health rounds for prisoners in segregation units, developing and implementing restrictions on the segregation of prisoners with serious mental illness, and documenting the placement in and removal of prisoners from segregation.

We conclude that inclusion in the injunction of the provisions concerning the booking and segregation cells is proper.

## 8. Youth Detention

The County does not challenge the provisions relating to the youth-prisoner center.

## 9. Over-Detention

With respect to the injunction's provisions on over-detention, including imprisonment without a lawful basis for detention, the district court found that "Hinds County has not reached sustained or substantial

compliance with any of the Consent Decree provisions protecting persons from unlawful detention." The district court cited in support of that conclusion, *inter alia*, a lack of a functional database to monitor when exactly inmates must be released and unexplained delays in executing releases. The district court further found that "persons released by the court are returned to RDC, instead of being released immediately."

The County appears not to dispute that RDC held detainees after they became eligible for release and that this over-detention resulted from the County's subpar information-sharing systems. The County merely argues that this over-detention constitutes negligence and not deliberate indifference. But the district court explained, citing analogous Fifth Circuit caselaw, why communication errors that cause detainees to languish in jail for months amount to Eighth Amendment violations. The County fails to explain why the district court's finding on this matter was clearly erroneous or why the district court's application of law was wrong.

In light of the district court's factual findings and legal conclusions and the County's failure to explain its challenge to the same, we affirm the district court's decision to retain the provisions regarding over-detention.

**B.**

Next, we consider whether the district court's appointment of a receiver constitutes an appropriate sanction for contempt in this case and, if so, whether the scope of that receivership is proper. We hold in the affirmative on the first question and in the negative on the second question.

We "review a district court's appointment of a receiver for an abuse of discretion." *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012). In evaluating such an appointment, we "will not substitute our judgment for that of the district court," *United States v. City of Jackson*, 359 F.3d 727, 731 (5th Cir. 2004), and will find an abuse of discretion only if the trial court "(1) relies on clearly erroneous factual findings when deciding to grant or

deny the [prospective relief,] (2) relies on erroneous conclusions of law when deciding to grant or deny the [prospective relief,] or (3) misapplies the factual or legal conclusions when fashioning its [prospective] relief," *Ball v. LeBlanc*, 792 F.3d 584, 598 (5th Cir. 2015) (internal quotations omitted) (quoting *Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, 775 F.3d 242, 254 (5th Cir. 2014)); *see also Gates*, 376 F.3d at 333 ("If a constitutional violation is found, we employ an abuse of discretion standard in reviewing the equitable remedy itself.").

"If government fails to fulfill" its responsibility to provide prisoners with "basic sustenance, including adequate medical care," then "the courts have a responsibility to remedy the resulting Eighth Amendment violation." *Brown*, 563 U.S. at 511. Although "[c]ourts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals," "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Id.* To be sure, "the scope of a district court's equitable powers" to craft a remedy for constitutional violations uncorrected by state or local authorities "is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenberg Bd. of Educ.*, 402 U.S. 1, 15 (1971); *see also Brown*, 563 U.S. at 538 (same).

## 1.

First, we consider the appropriateness of appointing a receiver to address the above-described constitutional violations. We conclude that receivership appointment is an appropriate sanction here to remedy the County's repeated failures to ensure constitutional prison conditions. *See In re Bradley*, 588 F.3d 254, 265 (5th Cir. 2009) ("In *McComb*, the Court described civil contempt in broad terms, encompassing sanctions that

prevent 'experimentation with disobedience of the law,' and remedial powers 'determined by the requirements of full remedial relief,' as necessary 'to effect compliance with [the court's] decree.'" (alteration in original) (quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192, 193 (1949))).

"Courts faced with the sensitive task of remedying unconstitutional prison conditions must consider a range of available options, including appointment of special masters or receivers and the possibility of consent decrees." *Brown*, 563 U.S. at 511. A receiver is someone who is "appointed by the court to take over the day-to-day management of a prison system or a segment of it." *Plata v. Schwarzenegger* (*Plata II*), 603 F.3d 1088, 1094 (9th Cir. 2010). The Fifth Circuit has recognized the availability of receiverships "in the context of ensuring a governmental entity's compliance with court orders." *Baron*, 703 F.3d at 306. Nonetheless, a receivership in any context is an "extraordinary remedy that should be employed with the utmost caution." *Id.* at 305 (quoting 12 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2983 (3d ed. 2012)). The PLRA's requirement of need-narrowness-intrusiveness findings applies to any prospective relief, which would include a receivership appointment. *See* 18 U.S.C. § 3626(a)(1)(A).

Courts have appointed receivers to administer prisons where unconstitutional conditions persist despite repeated orders to remediate. In *Plata v. Schwarzenegger (Plata I)*, for instance, the district court ordered a receiver to manage the delivery of medical services to California state prisoners. *See* No. 01–1351, 2005 WL 2932253, at *33 (N.D. Cal. Oct. 3, 2005). The Ninth Circuit affirmed this order, citing, *inter alia*, the numerous courts that have appointed receivers to oversee prison conditions in light of widespread and continued constitutional violations in prison conditions. *Plata II*, 603 F.3d at 1093–98 (citing *Inmates of D.C. Jail v. Jackson,* 158 F.3d 1357, 1359 (D.C. Cir. 1998); *Newman v. Alabama*, 466 F. Supp. 628, 635

(M.D. Ala. 1979); *Shaw v. Allen*, 771 F. Supp. 760, 763–64 (S.D. W. Va. 1990); and *Wayne Cnty. Jail Inmates v. Wayne Cnty. Chief Exec. Officer,* 444 N.W.2d 549, 560–61 (Mich. Ct. App. 1989)); *see also Crain v. Bordenkircher*, 376 S.E.2d 140, 143–44 (W. Va. 1988) (appointing receiver to oversee closing of West Virginia penitentiary and construction of new facility).

Here, like in the above cases, the district court concluded that a receivership was necessary to remedy current and ongoing constitutional violations in the operation of state facilities and programs. In so holding, the district court relied on the seven factors outlined in *Plata I*, 2005 WL 2932253, at *23. These factors are: (1) "[w]hether there is a grave and immediate threat or actuality of harm"; (2) "[w]hether the use of less extreme measures of remediation have been exhausted or prove futile"; (3) "[w]hether continued insistence [on] compliance with the Court's orders would lead only to confrontation and delay"; (4) "[w]hether there is a lack of leadership to turn the tide within a reasonable period of time"; (5) "[w]hether there is bad faith"; (6) "[w]hether resources are being wasted"; and (7) "[w]hether a receiver is likely to provide a relatively quick and efficient remedy." *Id.* In applying these factors, the district court determined that they weigh in favor of appointing a receiver.

We conclude that this holding is not an abuse of discretion, *cf. Baron*, 703 F.3d at 305, for the reasons that we explored above in Section III.A. Although "federalism concerns are particularly acute in the context of prison management" and "[f]ederal judges are particularly ill-equipped to manage state prisons," *Valentine v. Collier*, 993 F.3d 270, 294 (5th Cir. 2021) (Oldham, J., concurring), the appointment of receivers by federal courts does not automatically trigger federalism concerns, and in fact, the Supreme Court has blessed receiverships that comply with the limitations of the PLRA. *See Brown*, 563 U.S. at 511, 530–41.

The PLRA instructs that any prospective relief must be "narrowly drawn," "extend[] no further than necessary to correct the violation of the Federal right," and serve as "the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). We explained above, *see supra* Section III.A, the severity and immediacy of the current and ongoing constitutional violations at RDC, the failure of less extreme measures to ensure inmate safety, the need for compliance with the court's orders, and the lack of leadership at RDC necessary to ensure compliance. Moreover, the district court considered other remedies, such as financial penalties or closing A-Pod, and concluded that financial penalties would be ineffective and that an order to close A-Pod was too extreme. There is also nothing specific to A-Pod in the new injunction, so closing A-Pod would not be well-tailored toward addressing the constitutional violations that serve as the basis for the new injunction. Given the foregoing considerations, the district court properly determined that appointing a receiver under these circumstances "extend[ed] no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1)(A).

In light of those determinations, and consistent with the trial court's thorough opinion, we conclude that the district court did not abuse its discretion by ordering a receivership.

**2.**

Finally, we consider whether the scope of the receivership was proper. We conclude that providing the receiver authority over the budget and related financial matters was not proper and that the district court's need-narrowness-intrusiveness analysis was not sufficiently specific as to the different powers given to the receiver.

Here, the district court granted the receiver broad-reaching authority over administration of the state facilities and programs at RDC. Specifically, per the governing injunction in this case, the receiver shall:

- "hold and exercise all executive, management, and leadership powers for the defendants with respect to the custody, care, and supervision of Hinds County detainees at RDC, including the power to admit, book release, transfer, and supervise detainees at RDC in a constitutional manner";
- "be in day-to-day charge of RDC operations";
- "have the duty to control, oversee, supervise, and direct all administrative, personnel, financial, accounting, contractual, and other operational functions for RDC";
- "determine the annual RDC budget, including for staff salaries and benefits, medical and mental health services (including the medical provider contract), physical plant improvements, fire safety, and any other remedies needed to address the constitutional deficiencies documented in this case"; and
- "establish personnel policies" and "negotiate new contracts and to renegotiate existing contracts."[9]

The district court also required that the County "bear all costs and expenses of establishing and maintaining the Receivership, including, as necessary, budgeted rent, office supplies, reasonable travel expenses, and the compensation of the Receiver and their personnel." This includes "salaries and consulting fees" for an uncapped number of staff.

The receiver's control over the budget and salaries and benefits for personnel essentially allows the receiver to dictate the state's authority over

---

[9] The district court's order caveats that "[t]he Receiver's authority and decisions are subject to review by the Court."

RDC by controlling the purse strings. *See Valentine*, 993 F.3d at 294–95 (Oldham, J., concurring). Giving the receiver power to set RDC's budget, subject to the district court's approval, would allow the receiver to ignore the budgetary constraints that the Hinds County Board of Supervisors has had to deal with in managing RDC. This goes beyond the limitations imposed by the PLRA. *Guajardo*, 363 F.3d at 394 ("[The PLRA's] 'fundamental purpose' was to extricate [federal courts] from managing state prisons."). Not only could this "burden . . . the government's budget," but it would also "assume a responsibility that should be left for the legislature." *Valentine*, 993 F.3d at 294–95 (Oldham, J., concurring) (alteration in original) (cleaned up) (quoting *Valentine v. Collier*, 490 F. Supp. 3d 1121, 1174 (S.D. Tex. 2020), *rev'd*, 993 F.3d 270). The federal intrusion into RDC's budget is compounded where, like here, the receivership has no end date. *Guajardo*, 363 F.3d at 394 ("The PLRA strongly disfavors continuing relief through the federal courts . . . ."). The receivership "will end as soon as the Court finds that Defendants have remedied [the Jail's] unconstitutional conditions and achieved substantial compliance with the Court's Orders."

Aside from the concern with the receiver's power over the budget and financial matters, there is a related concern applicable to the scope of all of the receiver's powers: The district court's failure to conduct a sufficient need-narrowness-intrusiveness analysis. On October 21, 2022, the district court entered an order explaining the scope of the receivership. That order did not include any reference to the need-narrowness-intrusiveness analysis. The Government then moved for clarification that the scope of the receivership was in fact "necessary to remedy contempt and ongoing

constitutional violations." The district court granted the motion[10] and drafted a second order.

The district court's analysis of the need-narrowness-intrusiveness requirement, however, barely did more than its initial order: At the end of the second order, the district court summarily concluded that the receiver's duties satisfy the PLRA's need-narrowness-intrusiveness requirements. The court did not explain this finding in any detail, nor did it discuss whether it would be feasible to institute a receivership with more limited powers that cover only the scope of the constitutional violations. The Supreme Court "has rejected remedial orders that unnecessarily reach out to improve prison conditions other than those that violate the Constitution." *Brown*, 563 U.S. at 531. The PLRA requires that "the scope of the order must be determined with reference to the constitutional violations established by the specific plaintiffs before the court." *Id.* The district court asserted this finding in a conclusory manner and failed to give the necessary explanation and justification to support it.

We therefore instruct the district court on remand to reevaluate de novo the scope of the receivership consistent with this opinion. The district court cannot grant the receiver power over RDC's budget and related financial matters, such as salaries and benefits, and the court should develop a new description of the receiver's powers after conducting a need-narrowness-intrusiveness analysis and in light of the receiver's loss of control over the budget and salaries.

---

[10] Before the district court granted the motion, the County appealed the district court's original order. This court remanded the case in part "to allow the district court to rule on the motions to clarify."

22-60203
c/w Nos. 22-60301, 22-60332, 22-60527, 22-60597

## IV.

For the foregoing reasons, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion. Specifically, we affirm the district court in all respects except for those described in Sections III.A.4 and III.B.2 of this opinion.

22-60203
c/w Nos. 22-60301, 22-60332, 22-60527, 22-60597

Leslie H. Southwick, *Circuit Judge*, concurring:

This appeal was assigned to a three-judge panel. On the day before oral argument, one judge of the panel recused. Argument was presented to the remaining two judges. This separate opinion addresses the validity of two judges' hearing the oral argument and then deciding the appeal.

By statute, a majority of the judges on a panel constitutes a quorum. 28 U.S.C. § 46(d). A quorum of judges may "legally transact judicial business." *Tobin v. Ramey*, 206 F.2d 505, 507 (5th Cir. 1953) (analyzing Section 46(d)). Precisely when three may become two was discussed by the Supreme Court in an opinion that quoted our *Tobin* opinion. *Nguyen v. United States*, 539 U.S. 69, 82 n.14 (2003). I review that discussion.

The *Nguyen* Court analyzed this statutory language: circuit courts of appeals "may authorize the hearing and determination of cases and controversies by separate panels, each consisting of three judges, at least a majority of whom shall be judges of that court." *Id.* at 82 n.16 (quotations omitted) (quoting 28 U.S.C. § 46(b)). The Court held that Section 46(b) "requires the inclusion of at least three judges in the first instance." *Id.* at 82. Requiring three judges "in the first instance" was a phrase used in a Second Circuit opinion cited by the Court, which had quoted the phrase from the Senate Report on what became the Federal Courts Improvement Act of 1982. *Id.* at 82-83 (citing *Murray v. Nat'l Broadcasting Co.*, 35 F.3d 45, 47 (2d Cir. 1994) (quoting S. Rep. No. 97-275, at 9 (1981), *as reprinted in* 13404 U.S. Cong. Serial Set (1981))).[1]

---

[1] This court often holds that legislative history, of which a Senate Report is a component, is unreliable. *See, e.g., Texas Democratic Party v. Abbott*, 978 F.3d 168, 185 (5th Cir. 2020). Nonetheless, the *Murray* court quoted this Report, and the Supreme Court took the "first instance" phrase from *Murray*. *Nguyen*, 539 U.S. at 82–83. The Report lamented: "Existing provisions in section 46 also permit appellate courts to sit in panels of

34

The Supreme Court agreed with the Second Circuit that "Congress apparently enacted [the 1982 revision of] § 46(b) in part 'to curtail the prior practice under which some circuits were routinely assigning some cases to two-judge panels.'" *Id.* (quoting *Murray*, 35 F.3d at 47). The "prior practice" was that some circuit "courts have used panels of two judges for

_____

less than three judges." S. REP. NO. 97-275, at 27. Therefore, the bill "amends 28 U.S.C. § 46(b) to require that all decisions be reached by at least three judges." *Id.* The Report, dated November 18, 1981, stated the amendment was in "Subsection (b) of section 204" of the bill. *Id.* The bill of that date had no Section 204(b). *See* Federal Courts Improvement Act of 1981, S. 1700, 97th Cong. (Nov. 18, 1981). The only revision to Section 46(b) in that bill was by Sections 103(b) and 205[(a)], each amending the wording that the "court may authorize the hearing and determination of cases and controversies by separate divisions, each consisting of three judges." S. 1700, §§ 103(b), 205[(a)]; 28 U.S.C. § 46(b) (1948) (amended 1978 and 1982). The bill substituted "panels" for "divisions." S. 1700, §§ 103(b), 205[(a)]. That change appeared in the Act. *See* Federal Courts Improvement Act of 1982, Pub. L. 97-164, § 103 (b), 96 Stat. 25 (1982).

"Divisions" was the word the Judicial Code of 1948 used to clarify the statutory phrase that "a circuit court of appeals . . . shall consist of three judges," language adopted in 1891 when all but one circuit had only two circuit judges and a circuit justice or district judge would complete a "court"; after almost all circuits had more than three judges, it was useful to distinguish between the full "court" and a three-judge "division" that heard a case. *See* Alexandra Sadinsky, *Redefining En Banc Review in the Federal Courts of Appeals*, 82 FORDHAM L. REV. 2001, 2009, 2011 (2014); 28 U.S.C. § 46, Historical Notes. The 1981 Senate Report did not indicate that substituting "panels" for "divisions" would bar two-judge panels; instead, that change removed ambiguity in "the use of the terms 'panel' and 'division,' especially following authorization of 'administrative divisions' in section 6 of P[ub]. L. No. 95–486 in 1978." S. REP. NO. 97-275, at 26.

The 1981 Report's stating that Section 46(b) would require *at least* three judges may be a remnant of the approach of a similar but failed bill in the preceding Congress that would have added "at least" before "three judges" in Section 46(b) (and left "divisions") and substituted "at least" for "not more than" in Section 46(c). Federal Courts Improvement Act of 1979, S. 1477, 96th Cong. §§ 112(a)–(b) (Aug. 3, 1979). Section 46(c) then and now states: "Cases and controversies shall be heard and determined by a court or panel of not more than three judges." 28 U.S.C. § 46(c).

The 1981 Senate Report did not clearly explain what barred two-judge panels. Text controls, anyway. Section 46(b) states that cases are to be heard and decided by panels "consisting of three judges." The requirement of three judges is clear; so is *Nguyen*.

motions and for disposition of cases in which no oral argument is permitted because the case is classified as insubstantial." S. REP. NO. 97-275, at 9.

Conversely, the Court found it to be "clear that the statute was not intended to preclude disposition by a panel of two judges in the event that one member of a three-judge panel to which the appeal is assigned becomes unable to participate." *Nguyen*, 539 U.S. at 83 (quotations omitted) (quoting *Murray*, 35 F.3d at 47). For that clarity, the *Murray* court quoted the Senate Report on the 1982 legislation, part of which we earlier quoted:

> The circuit courts could continue to adopt local rules permitting the disposition of an appeal in situations in which one of the three judges dies or becomes disabled and the remaining two agree on the disposition; but, *in the first instance*, all cases would be assigned to . . . panel[s] of at least three judges.

*Murray*, 35 F.3d at 47 (emphasis added in *Murray* opinion) (quoting S. REP. NO. 97-275, at 9). *Murray* held that even though the Senate Report lists death and disability, "unavailability because of late-discovered disqualification" would be an equally justifiable basis for a quorum. *Id.* *Murray* also held that there is no reason for a "distinction between unavailability occurring before and after oral argument." *Id.* The statutory text supports both conclusions.

In summary, this appeal was initially assigned to a three-judge panel. On the eve of oral argument, one judge determined he must recuse. Because the initial assignment was to a three-judge panel, it is proper after a recusal for a two-judge quorum of that panel to decide this case.