IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF MISSISSIPPI

NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.: 3:16-cv-00489-CWR-RHWR |
| | ) | |
| | ) | |
| HINDS COUNTY, ET AL., | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| _____ | ) | |

## Court-Appointed Monitor's Nineteenth Monitoring Report

Elizabeth E. Simpson
Court-Appointed Monitor

David M. Parrish                                    Dr. Richard Dudley
Corrections Operations                      Corrections Mental Health

## INTRODUCTION

In order to complete a site visit as promptly as possible, the Monitor did not request all of the documents normally requested prior to the site visit. A number of documents were requested at the time of the site visit some of which were reviewed during the site visit and some of which were not. Many of these have not yet been received. In some areas, this made it difficult to determine the status or confirm the status of compliance. These areas are identified in the text below. Some documents are coming in as the report is being finalized. To the extent possible, these are reviewed and incorporated, but the Monitor is attempting to provide a report that is also timely and at some point, the report had to be finalized without receiving or, in some cases, reviewing incoming documents. Because this report has already been reviewed by the parties the Monitor does not intend to revise this report once all of the documents are received. However, the Monitor will provide a supplemental report if warranted. The site visit itself went smoothly and interviewees were made available as requested. Jail and County staff were hospitable as always.

## EXECUTIVE SUMMARY

**Corrections Operations**

Since the last Monitoring Report there have been significant changes in the operation of the Hinds County Jail System.  The personnel assigned to the Jackson Detention Center (JDC), which is closed except for inmates going to and from court, now report to the Enforcement side of the Sheriff's Office.  At the Raymond Detention Center (RDC) A-Pod is permanently closed. As a result, 200 inmates are now housed in a jail in Tallahatchie, MS. Closing A-Pod was a significant improvement. Unfortunately, conditions in B and C-Pods have significantly deteriorated and detainees are being housed again in Booking.

The biggest problem that the RDC faces is the lack of staff.  It is even more critical than was reported in the 18th Monitoring Report. The shortage is so severe that supervisors must fill in for vacant correctional officers to perform their duties, making it impossible for them to properly supervise.  According to the Staffing Analysis of October 2021, a total of 246.4 personnel are required to operate both B & C Pods along with the Jail Administrator and related staff.  According to the HR Director only 99 positions are funded, some of which are assigned to the Work Center (WC) which is no longer a part of this Report under the New Injunction.  According to the RDC organizational chart, there are a total of 71 positions assigned.  That means that the facility is short by l74.6 positions.  It also means that only **28.8%** of the required positions are filled. The Sheriff is using Patrol officers to supplement detention personnel in performing some duties such

2

as patrolling the perimeter and conducting shakedown. This is helpful but cannot make up for the severity of the staff shortage.

C-Pod has been rebuilt/renovated two times since 2012, while B-Pod has been rebuilt/renovated once yet they have the same sort of problems that A-Pod experienced.  An example is C-4, where most of the cell door windows have been broken out by the inmates.

The Administrative positions suffer from the same lack of staffing with Records operating without a Supervisor and Classification operating with only four officers, one of whom is a trainee, instead of eight officers. It is not possible for either of those areas to stay up to date with the lack of staffing.

**Medical and Mental Health**

A combination of pre-existing and new staff are now providing medical and mental health services through a new contract agency, PROFICIENT. Contracted medical staffing is adequate, and the fact that the nurses are all regular employees (there are no longer any temporary nurses) is a very positive development. However, contracted mental health staffing is quite low, and so there continues to be a failure to provide the intensive mental health programming required to stabilize the more acutely ill SMI detainees and help them continue to be as stable as possible once they are stabilized.  In addition, the efforts of both medical and mental health staff continue to be compromised by the shortage of security staff support required for them to do their jobs. As a result of these and other issues noted in this report, some of the most acutely ill SMI detainees continue to be housed in segregation, which exacerbates their mental health difficulties and severely limits their access to the mental health services that should be made available to them.

**COMPLIANCE ACTIVITIES**
April 29-May 1, 2025

| Date and Time (CT) | Lisa Simpson | Dave Parrish | Dr. Rick Dudley |
|---|---|---|---|
| Tuesday, April 29 | | | |
| 9:00 | Jail Administrator Major Simon, Captain McBride, HSA Dominique Jackson, Receiver Wendell | Jail Administrator Major Simon, Captain McBride, HSA Dominique Jackson, Receiver Wendell France, | Jail Administrator Major Simon, Captain McBride, HSA Dominique Jackson, Receiver Wendell France, |

|  |  |  |  |
|---|---|---|---|
|  | France, Monitors and counsel | Monitors and counsel | Monitors and counsel |
| 10:00 | Major Simon, Captain McBride. Continue meeting and Start Tour | Major Simon, Captain McBride. Continue meeting and Start Tour | has Dominique Jackson |
| 1:00 | Tour RDC | Tour RDC | Medical Nurse Practitioner TaKenya Singleton |
| 2:00 |  |  | Medical Onsite Supervisor Latricia Williams |
| 3:00 |  |  | Director of Behavioral Health Angeline Williams |
| 3:30 | Records Jacquelin Buckley | Gary Chamblee, Sgt. Winter and Bo Flemming |  |
| Wednesday, April 30 |  |  |  |
| 9:00 | Inmate interviews | Tour RDC | Psychiatric Nurse Practitioner Debra Bell |
| 10:00 |  |  | All Mental Health Staff: Williams, Martin, Nicks, and Bell |
| 11:00 | Balinda Jackson Compliance Officer | Doris Coleman Personnel |  |
| 1:00 | Lt. Childs, IAD | Lt. Childs, IAD | Case Coordinator Specialist Doris Hines |
| 2:00 | County Administrator Lure Berry | Captain Laquinta Hollis and Investigator Jeremy Jackson CID | Mental Health Rounds/Inmate Interviews |

| | | | |
|---|---|---|---|
| 3:30 | Board of Supervisor President Robert Graham | Tour JDC transfer area | |
| 4:00 | Sheriff Tyree Jones | Sheriff Tyree Jones | EMR Review with Mental Health Staff |
| Thursday, May 1 | | | |
| 9:00 | Court Liaison, Misdemeanors, Constance Spann | Training Director Lt. Dave Brooks | Weekly Segregation Rounds with Mental Health Staff and continue EMR Review |
| 10:30 | Mazie Jones Grievance Officer | Mioka Laster, Fire Safety | |
| 1:00 | Sgt. Dotson Classification | Food Service Director Miriam Stevens | HSA Dominique Jackson |
| 3:00 | Jimikia Scott Administrative Supervisor | RDC Sgt from Housing John Lee Scott | |
| 4:00 | Sheriff Tyree Jones, Major Simon, Captain McBride and counsel | Lt. from Booking Caletha Tucker | |

## COMPLIANCE OVERVIEW

| Site Visit Date | Sustained Compliance | Substantial Compliance | Partial Compliance | NA at this time | Non-Compliant | Total |
|---|---|---|---|---|---|---|
| 2/7-10/17 | 0 | 1 | 4 | 2 | 85 | 92 |
| 6/13-16/17 | 0 | 1 | 18 | 2 | 71 | 92 |
| 10/16-20/17 | 0 | 1 | 26 | 1 | 64 | 92 |
| 1/26-2/2/18 | 0 | 1 | 29 | 0 | 62 | 92 |
| 5/22-25/18 | 0 | 1 | 30 | 0 | 61 | 92 |

5

| | | | | | | |
|---|---|---|---|---|---|---|
| 9/18-21/18 | 1 | 0 | 37 | 0 | 54 | 92 |
| 1/15-18/19 | 1 | 1 | 44 | 0 | 46 | 92 |
| 5/7-10/19 | 1 | 6 | 42 | 0 | 43 | 92 |
| 9/24-29/19 | 1 | 6 | 47 | 0 | 38 | 92 |
| 1/21-24/20 | 1 | 6 | 49 | 0 | 36 | 92 |
| 6/8-12/20 | 1 | 6 | 51 | 0 | 34 | 92 |
| 10/5-21/20 (corrected) | 1 | 6 | 54 | 0 | 31 | 92 |
| 2/8-11/21 | 2 | 6 | 53 | 1 | 30 | 92 |
| 6/7-11/21 | 2 | 2 | 59 | 1 | 28 | 92 |
| 10/4-8/21 | 3 | 0 | 59 | 1 | 29 | 92 |
| 1/24-28/22 & 1/31 to 2/3/22 | 3 | 0 | 59 | 1 | 29 | 92 |

### NEW INJUNCTION

| | Substantial Compliance | Partial Compliance | NA at this time | Non-compliant | Total |
|---|---|---|---|---|---|
| 5/31-6/24/22 | | 32 | | 6 | 38 |
| 10/18-21/22 | 2 | 27 | 1 | 8 | 38 |

### NEW INJUNCTION AFTER APPEAL

| | Substantial Compliance | Partial Compliance | NA at this time | Non-compliant | Total |
|---|---|---|---|---|---|
| 4/29-5/1/25 | 3 | 24 | 1 | 8 | 36 |

## SUBSTANTIVE PROVISIONS

### 1.    Protection from Harm

38. Ensure that the Jail is overseen by a qualified Jail Administrator and a leadership team with substantial education, training and experience in the management of a large jail.

6

**Substantial Compliance**

Major Simon is still the Jail Administrator. He has held that position for two-and one-half years. His assistant is now Captain McBride. The monitoring team has not reviewed Captain McBride's personnel file to know his full background but he is a longtime officer and supervisor with the Hinds County Sheriff's Office at increasing levels of responsibility.

39. Ensure that all Jail supervisors have the education, experience, training, credentialing, and licensing needed to effectively supervise both prisoners and other staff members.

**Partial Compliance**

The Monitor has requested the personnel files of the supervisors promoted since the last visit and still employed. These have not been received yet so this report cannot speak to their qualifications. New supervisors do not receive training specific to their new duties as supervisors. In this respect they do not have the training needed to effectively supervise.

41. Ensure that Jail policies and procedures provide for the "direct supervision" of all Jail housing units.

**Non-Compliant**

While policies and procedures have been developed that reflect the principles and dynamics of "Direct Supervision," as has been previously noted in each Monitoring Report since October 2020, there has not been implementation of that practice at the RDC. As was previously reported, the RDC was designed for and operated as a Direct Supervision jail from the mid 1990's until the (then) Sheriff pulled the officers out of the housing units in 2012, with disastrous results. Left without adequate supervision, the detainees rioted and destroyed a full third of the facility. Since then, C-Pod has been rebuilt twice and B-Pod once with the stated intention by HCSO to operate those pods with direct supervision when reopened. But staffing shortages have made that impossible. In fact, the shortages have become so severe that the RDC can no longer be classified as a remote surveillance jail because basic requirements, such as well being checks, are routinely handled by supervisors (acting as deputies) or not being performed at all. A-Pod was not renovated and the detainees that would have been housed there (approximately 200) are being housed pursuant to a contract with a facility in another County.

On a brighter note, the fire safety issues listed in the 17th and 18th Monitoring Reports have been corrected. The fire hose boxes in the areas controlled by staff, have been repaired.

42. Ensure that the Jail has sufficient staffing to adequately supervise prisoners, fulfill the terms of this Injunction, and allow for the safe operation of the Jail.

**Non-Compliant**

The critical lack of staff to operate the RDC was covered in detail in the 17th and 18th Monitoring Reports. Since then, it has gotten worse. In October 2022, the HR Director confirmed that there were just 176 positions filled for the RDC, WC and JDC. Even though the JDC is not used to house inmates it still serves as the transfer waiting/holding area for the courts, so some officers continue to work there. Now, however, the personnel assigned work on the enforcement side of the Sheriff's Office, so they are not counted. And since the WC is not covered under the New Injunction, the personnel assigned there are not counted.

Based on the staffing analysis of October 2021, a total of 246.4 personnel are required to keep both Pods B & C staffed along with the Jail Administrator and related staff. According to the HR Director, the County has authorized only 106 Pins (personnel identification numbers) of which 99 are funded, 4 are vacant, and 95 people are on board. This figure includes those officers assigned to the WC. It should be noted that each year the County removes unfilled Pins, thus the huge disparity between the present 99 and the previous 176 in October 2022. The County says that the Pins have not disappeared; that they will be reactivated if the Sheriff requests them, but to date the Sheriff has not requested that any of the vacated positions be funded and reinstated.

According to the RDC organizational chart, there are a total of 71 persons assigned, 10 of whom are trainees at the time the organizational chart was provided to the Monitor . Even counting the trainees that means that the facility is short by 174.6 positions. It also means that only **28.8%** of the required positions are filled.

During the most recent site visit the lack of enough staff to get the job done was readily apparent. On two of the three days staffing was limited to the control room officer. A Sergeant had to fill in for the deputies in Pods B & C on one day and two Sergeants had to fill in for the deputies in Pods B & C on the second day. That meant that on the first day one officer/Sergeant was covering 8 housing units and on the second day four units each. That also meant that as they were serving as unit officers, they were unable to do their jobs as supervisors.

The lack of adequate staff does not allow for the safety of the detainees. The incident reports provided for January 1, 2025 through March 30, 2025 show 34 assaults. (This includes incidents where the type of incident is listed as Assault or where the narrative describes an assault). Of these, 19 were transported to the hospital. The incident reports often do not describe the injuries

but some do including IR #25000032 (victim on floor not moving, covered in blood), IR #25000044 (victim stumbling and blood dripping, head injury), IR #25000060 (bleeding profusely from mouth), IR #2500192 (victim had blood on him and ear hanging loose), IR #2500198 (victim on floor with blood coming from mouth and nose). The hospital transport log describes some of the injuries as stab wounds or multiple stab wounds. Transport log for 2/14/25, 2/19/25,3/30/25. There continues to be some concern that not all assaults result in an incident report. The hospital transport log shows an individual transported to the hospital for a stab wound to the head for which there is no incident report in the spreadsheet provided to the Monitor. In addition, numerous detainees request to be moved from one unit to another because they fear for their safety. See, e.g., IR #25000018, 25000022, 25000027, 200164, 2500224. Or the other detainees in the unit say he has to be moved. See, e.g., IR #2500111, 2500244. The assaults continue in April. At the time of the document request before the site visit, the Monitor did not request the April incident reports. However, the April hospital transport logs continue to show assaults including April 3, 2025, head and facial injuries after altercation; April 7, 2025 multiple stab wounds to scalp, neck, LUE, and upper back; April 13, 2025 laceration to left side of head and puncture wound to neck. There was also an assault resulting in death of a detainee on April 22, 2025. The Monitor has requested documents related to this death but has not yet received any. The Criminal Investigations log reflects another death on February 12, 2025. The Monitor has requested documents related to this death but has not received them and does not know at this time whether that death is related to unsafe conditions in the jail. Similarly, there was a third death on May 9, 2025. The Monitor has requested documents related to this death as well but has not received them yet and, as a result, does not know if the death is related to unsafe conditions in the jail.

In addition to assaults, fires continue to be an ongoing problem. See, e.g., IR #250000001, 25000025, 25000034 (report references a fire on 1st shift for which there is no incident report), 25000052.

The Sheriff reported implementing several measures to assist with the lack of staffing, These include utilizing non-detention staff for staffing JDC and using law enforcement officers for patrolling the area around RDC, patrolling the perimeter, investigating any breaches in the facility and conducting shakedowns. The Sheriff reported that he also has law enforcement personnel doing walk throughs at RDC. The Sheriff has a recruitment officer for detention. He reports a raise was given to all levels of detention employees. The County has not offered bi-weekly pay and does not pay for uniforms. The Sheriff has not implemented and does not agree with pay equity between patrol and detention. And, of course, closing A-Pod and contracting to send about 200 detainees to another facility contributes significantly to reducing the number of needed staff. The Monitor has requested documentation regarding these measures but has not yet received any.

Even with these positive steps, as described above, the number of staff and their ability to adequately supervise the facility is still very deficient.

The measures taken by the Sheriff have reportedly reduced the amount of contraband in the facility. The Jail Administrator reported that shakedowns are now done by Patrol and no Shakedown logs are kept. As a result, the Monitoring team could not quantitatively confirm whether there has been a reduction in contraband. Through incident reports it appears that there are still many cell phones in the facility and shanks are still an issue. See, e.g., IR #2500259, 2500280.

Staffing levels for medical are adequate; all nurses are regular employees  (they are no longer using temporary contract nurses), which is a very positive thing; and the Medical Nurse Practitioner/prescriber is full-time.

On the other hand, staffing levels for mental health continue to be far too low. More specifically, by contract the mental health staff include about 2.2 FTE QMHPs (including the Director of Behavioral Health) and a part time (0.6 FTE) Mental Health Nurse Practitioner/prescriber. Given the size of the mental health caseload (currently at 137 detainees), at least 3.0 FTE QMHPs would be required to see each detainee on the caseload at least once/month, perform intake assessments on new detainees, develop initial individualized treatment plans and perform regular treatment plan reviews, perform weekly rounds in segregation, see detainees on suicide watch on a daily basis, attend weekly interdisciplinary team meetings, and perform other administrative tasks. Even more QMHPs would be required to provide much needed, more intensive/more frequent therapeutic contacts with more acutely ill SMI detainees who require such, and to provide therapeutic group therapy and psychoeducational group therapy to those who require that. In addition, if/when a formal disciplinary review process is established, which would include mental health assessments for SMI detainees undergoing disciplinary review, that too would be added to the list of tasks performed by QMHPs. Finally, if a mental health unit is ever established, designed to provide appropriate care to the most acutely ill SMI detainees, additional QMHP and Mental Health Nurse Practitioner/prescriber staffing would be required for that.

Security staff support for the provision of medical and mental health services is also far too low…dangerously so. Given the layout and various functions performed in the medical unit/infirmary, there should be two security officers assigned to the medical unit/infirmary during the day, and at least one officer at all other times.  This would be required to ensure the safety of medical and mental health staff (when detainees are brought down to the medical unit), as well as the safety of detainees who are housed in the infirmary (security staff must be there to unlock the door/allow medical staff access to detainees for both emergency and non-emergency assessments and treatments). However, there is rarely more than one security officer in the unit during the

day, and there are times when there are none, especially during the evenings and on weekends. Furthermore, if/when security staff have to be called to the medical unit, that can take some time, which is especially a problem if there is an emergency. For example, at the time of the site visit, there was a detainee locked in the infirmary with a seizure disorder, who would require immediate medical intervention if he had another seizure, and there was another detainee locked in the infirmary who had coded (his heart had stopped on more than one occasion), who would require immediate medical intervention if his heart should stop again.

Security staff support is also required when medical and mental health staff go on the housing units to pass medication, provide treatment or perform various types of well-being checks (such as segregation rounds, suicide rounds and treatment of suicidal detainees, and other therapeutic interventions). Here too, security staff must be contacted, which delays such efforts and wastes the time of medical and mental health staff while they wait for security staff, and there have been times when critical efforts, such as medication pass, have been significantly delayed (for example, there are 2 nurses passing medication at the same time on different units, and so if only one officer can be made available, the second nurse must wait to pass medication until the first nurse is done).

Security staff must also provide the level of observation prescribed for detainees on suicide watch which is sometimes constant observation. During our most recent site visit, the Medical/Mental Health expert of the Monitoring team found that detainees on suicide watch were not consistently being observed as prescribed. Suicidal detainees are generally placed in C-4 ISO. Several years ago an officer was posted in the day room of C-4 ISO to provide constant observation. This post was subsequently moved to a position outside the ISO window. The post is not assigned at all at this time due to the lack of staffing. Fifteen minute well-being checks are being required and are documented on a log in the control room. The Monitors did not observe an officer enter the ISO unit for well-being checks. One suicidal detainee was housed in a cell in C-4 ISO instead of being in the day room. He could not be observed without entering the ISO unit. One detainee was on suicide watch in Booking. As had been reported repeatedly, Booking is not an appropriate location for housing detainees. This includes suicidal individuals. In IR #25000063, a detainee in Booking threatened that he was going to use a razor to cut his neck and arm. The officer stated in the report that the doors are hard to open so he had to go get a wedge to open the door before he could respond to the threat of suicide.

Security staff are also needed to move and transport detainees when needed for medical treatment. In IR #2500158 the Sergeant was told by the nurse that a detainee needed to go to the hospital for a head injury that occurred on second shift. There is no explanation for why the detainee wasn't taken during second shift. However, the Sergeant preparing the report stated that because

of the short staff, he would advise the incoming supervisor of the need to take the detainee to the hospital.

44. Develop and implement policies and procedures to ensure that detention officers are conducting rounds as appropriate.

**Non-Compliant**
This paragraph continues to be carried as Non-Compliant even though policies and procedures have been developed; but as the case with the requirement to develop procedure regarding Direct Supervision, the failure to implement them in practice means the County does not meet the requirement of this paragraph.

During the most recent site visit the Corrections Operations member of the Monitoring Team toured JDC, which is still used to hold inmates going to and from court. The personnel now report to the enforcement side of the Sheriff's Office. However, the Sergeant there stated that the requirement to check on inmates every 15 minutes was now replaced with a log that was maintained by an officer who simply checked them in and out and does not document 15 minute welfare checks.

At the RDC the officer assigned to conduct well-being checks in Booking was under a similar lack of direction. (It should be noted that Booking is now used for housing problematic inmates again reinstituting the practice that had ceased two-and one-half years ago). The officer had one inmate housed on suicide watch, three on protective custody and one who was being processed through Booking. He had the suicide watch appropriately recorded every 15 minutes, but the three protective custody cases were every half hour and the inmate being processed through Booking was not recorded at all. Every person in a Booking holding cell should be monitored every 15 minutes. The Lieutenant in Booking had the same misconception.

Well-being checks in the Segregation Units in seg and other units are supposed to be made and logged every 30 minutes. Sometimes they are made every hour and sometimes they are not made at all. In the non-Segregation Units well-being checks are supposed to be made hourly. At least one was observed to be two hours late. All of the logs are maintained in the control rooms instead of on the units. As a result, entries are made after the fact possibly contributing to inaccuracies and they cannot be used to determine whether an officer actually went in the unit.

45. Ensure that all correctional officers receive adequate pre- and post-service training to provide for reasonably safe conditions in the Jail.

    c.     "Direct supervision" training. Detention officers must receive specific pre- and post service training on "direct supervision." Such training must include instruction on how to supervise prisoners in a "direct supervision" facility, including instruction in effective communication skills and verbal de-escalation. Supervisors must receive training on how to monitor and ensure that staff are providing effective "direct supervision."

**Non-Compliant**

This paragraph has been carried as Partial Compliance in the past, but the failure to maintain the Field Training Officer (FTO) program and the lack of follow through of Direct Supervision training are deficiencies. In addition, the lack of sufficient staff make post-service training essentially unavailable except for roll call presentations which by their nature are minimal. The deficiencies in training contribute to a lack of reasonably safe conditions at the jail and make Non-Compliant more appropriate.

Approximately four-and-one half years ago, the National Institute of Corrections (NIC) provided on site Direct Supervision "Train the Trainers" orientation for command staff, supervisors and officers.  Ultimately, that training was not put into practice when first C-Pod, and then B-Pod, were re-opened, even though the plan was to open and maintain them as Direct Supervision pods.

When talking to the new Director of Training, he confirmed that there is a Direct Supervision component in the state mandated 96 hour recruit academy, but it has no practical application at the RDC.  He further stated that he is responsible for running three academies per year.  The one that started May 5th has only five people in it.  He is also responsible for required in service training on CPR, but sometimes it is canceled due to lack of attendance.  All other in-service training in handled by the jail and that is done at shift change/roll call which allows for only brief training.  In addition, the FTO program has been allowed to die.  Now whenever a new officer is assigned to work alongside a seasoned officer there are no criteria by which success is measured.  The decision to "graduate" is arbitrary. As noted above, supervisors are not provided any formal training on performing supervisory duties.

46. Develop and implement policies and procedures for adequate supervisory oversight for the Jail.

**Non-Compliant**

This paragraph was previously carried as Partial Compliance, but the lack of personnel means that the supervisors are, of necessity, routinely filling in for missing officers.  That leaves little to no time to perform their jobs as supervisors.

13

The policies are already in place that require supervisors to review daily activities within the jail. In practice, the supervisors do not reject inadequate incident reports or recommend corrective action. The problem is now even worse than before due to the lack of staff. The incident reports are supposed to indicate review and approval or non-approval of the reports. In the spreadsheet provided to the Monitoring team, only about 20% indicated review by a supervisor.

Adequate supervisory oversight includes addressing physical plant issues. In addition, physical plant issues that arise from the actions of the detainees is an indication of the lack of adequate supervisory oversight. Pod A is now closed but Pods B and C now have significant maintenance issues even though they were rebuilt not long ago. In C-4, a segregation unit, almost all of the cell door windows are broken out. And this is in a pod that has been rebuilt **twice** in the past ten years. In B-4 the lights are out, it is hot with no air conditioning, water is standing on the floor and all of the doors are badly rusted. In B-3 one shower is missing and one runs continuously. A number of detainees in B-3 complained of mice and, in fact, one mouse was seen during the monitoring visit. In B-2 only two showers work. On the second floor shower area, the inmates have a home-made sign that says "Do Not Use". They reported that it had been out of service for a "long time". In B-1 there are still two topless tables bolted to the floor. They were supposed to have been removed almost three years ago. And finally, B-4 ISO has three cell doors unlocked, one locked, six inmates on the floor, and two in their cells. The inmates were sleeping on green sheets (possibly the suicidal smocks). There were no mattresses. There were three gallon bottles of bleach and a cleaning mop and bucket in the dayroom. This, in a small area that is supposed to house four problematic inmates. Also in this area was another topless table mounted to the floor. Similarly, there was an assault in B-1 ISO when one detainee hit another detainee with a bleach bottle. IR #2500010. A number of detainees on other units complained of a lack of mattresses and that some mattresses on the units had worn extremely thin. There were a number of cells where the bunks did not have mattresses. However, it was not possible to do a complete audit and the Monitor requested that the Jail Administrator audit the situation. There were also multiple complaints of non-functioning toilets and lights. A number of detainees also complained of having only one jumpsuit. In order to have it laundered, they would have to be in just their undergarments or wrap a blanket around them.

Hand operated deadbolts seem to have proliferated during the past two-and-one half years. They can be found on the entry door to B-1 ISO, the entry door to Booking, the Property Room door in Booking, the ID Room door in Booking and the Loading Dock door in Food Service. This requires key operation instead of electronic operation and leads to problems with doors being left open or unlocked.

The primary security door from the Great Hall to Booking has been out of service for an undetermined amount of time. Staff were unable to quantify it. From there, all the way around to the Sallyport, doors were open. Once again, a Sallyport door was out of service. Staff said for "a great deal of time". Continuing on around Booking every door was open including the Property Room door in the Booking Office, which would not close. The Lieutenant had it corrected by the next day.

Of great concern, the Control Room door closest to C-4, was found standing open when the Corrections Operations member of the Monitoring Team came through. That sort of security breach cannot be tolerated, especially when the jail is so short of staff.

Malfunctioning and inoperative cameras have long been a problem at the RDC. In the 18th Report 32 were out of service. When the log of working and/or malfunctioning cameras was reviewed it was determined that there are 202 cameras, excluding those in A-Pod. Of the 202, 97 were out of commission (86 had no connection and 11 were not clear or had broken glass) which means that 48% of the cameras were down. This includes all of the cameras in C-4 where the recent assault resulting in death occurred.

Two doors to the engineering spaces at the end of the administrative hallway were propped open with bricks because the doors had no locking mechanisms.

When going through the ID room of Booking it was noted that the Wristband machine was inoperable. When asked how long it had been down the answer was "three years". Yet on page four of the Inmate Handbook it says: "Your wristband must be worn and be visible to officers at all times."

The frustration of staff with the maintenance problems is evident in IR # 25000054. The reporting officer stated that she heard a noise from C-4 like someone was trying to pop the cage door. She states that she ignored it because it has become a daily situation and it has been reported to Maintenance several times and nothing has been done.

The issue of the non-working cameras in the medical unit/infirmary has still not been addressed. From the camera audit, there appear to be six cameras in the Medical unit that are non-functional This, coupled with the above noted failure to provide adequate security staff support in the medical unit/infirmary, significantly compromises the safety of medical and mental health staff, as well as the safety of detainees housed in the infirmary.

On a positive note, all of the units have new kiosks and phones and kiosks have been installed in the ISO units. A dedicated IT employee is officed at RDC. There is a new maintenance contract for RDC in addition to the Benchmark contract.

With regard to medical and mental health policies:

- There are various times when medical and/or mental health assessments are indicated, including at intake, as part of the disciplinary review process, and prior to placement in segregation, which are not adequately addressed in policies.
- Although mental health rounds for detainees being held in segregation are not to be a substitute for treatment, during our visit they were being presented as THE therapeutic contact. It was observed that the segregation rounds were, in fact, only segregation rounds; and they were not, in fact, treatment. So, this must be clarified in policy and changed in practice.
- The policy regarding the development of individualized mental health treatment plans and the need for regular treatment plan reviews should be reviewed and clarified as needed. Although treatment plans are reportedly reviewed on a monthly basis, they are not particularly 'individualized', and they don't include much in the way of therapeutic interventions other than medication.
- There are or there should be a group of policies that collectively result in avoiding the placement of SMI detainees in segregation, some of which have never been fully developed and some of which have been developed but not followed.  These include a disciplinary review process that includes mental health input for SMI detainees undergoing disciplinary review (policy not developed);, the medical and mental health assessment of detainees prior to their placement in segregation (this is not being done); medical and mental health segregation rounds; and a regularly scheduled segregation review process (performed, but confused with/considered to be treatment), focused on the goal of moving SMI detainees out of segregation as quickly as possible (not adequately done, and a process that is likely not adequately understood). Of course, a placement for SMI detainees that would be an appropriate alternative to segregation is also important here, which is as much a capacity/programming issue as it is a policy consideration.

In addition, it at least appears that the transfer of detainees to Core Civic was done without an adequate understanding of the availability and/or the quality of medical and mental health care at Core Civic  Detainees have been returned from Core Civic because of the facility's inability to manage their health care (for example, a returned detainee with sickle cell disease). It should also be noted that detainee returns have often been without accompanying medical records or even a reasonable medical transfer note, which is yet

16

another strong statement about the quality of care there (for example, a detainee in whom they had reportedly found a "mass" was returned without any additional medical information).

## 2.    Use of Force Standards

50. Develop and implement policies and procedures to regulate the use of force, including policies and procedures to ensure timely notification, documentation, and communication with supervisors and medical staff (including mental health staff) prior to and after any use of force.

**Partial Compliance**

The Use of Force Policy was put into effect almost six years ago, but compliance with its standards has fluctuated over time. The last Monitoring Report reflected better enforcement of the Policy. The closed IAD investigations since November 24, 2024, were 39 in number. Of that 9 involved the use of force or OC/taser. All of them were Exonerated. The Monitoring team has requested the investigation file of those 9 investigations. A review of the incident reports raise some concerns that call for further examination. In IR #250000002 the Sergeant states that the inmate swung at him and a short burst of OC was used. A Lieutenant submitted a supplemental report stating that the inmate became passive aggressive by making his body a dead weight and 3 bursts of OC were administered. OC is to be used only as a defensive measure; not to gain compliance. The Lieutenant's report would not support the use of OC and calls into question the accuracy of the Sergeant's report. The IAD investigation exonerated the use of force. This file has been requested. Another incident report raising concerns is IR #25000094. In this report an inmate refused to return to C-4 and attempted to run down the great hall. He was tased in the front torso. This should be investigated, but had not been referred for investigation. In several reports, the officer explicitly said that OC was used to gain compliance. In IR #25000048 at the time the OC spray was used the detainee was described as being verbally non-compliant and OC was used to better control the situation. In IR #2500208 the officer stated that the detainee was twisting his body so as to prevent being handcuffed. The officer states that he used OC to gain compliance. This incident was also not referred to IAD. The Monitoring team will review the investigation files when made available and has asked IAD to complete investigations on the uses of OC and tasers that were not referred to them.

It appears that Medical is called after the use of OC spray but only one incident report indicates that the detainee was decontaminated after being sprayed. IR #2500208. The other incident reports indicate that medical was called to the unit and cleared the detainee but with no report of

decontamination. See, e.g., IR #250000002 (nurse laid eyes on him), IR #25000048, 2500153. There were no incident reports indicating consultation with Medical before a use of force.

### 3.    Use of Force Training

52. The County must develop and implement a use of force training program.

**Partial Compliance**

There has been no change in the status of this paragraph.  UOF training continues to be provided to new recruits, but it has not been covered in follow up in-service training.  That training is typically limited to roll call, concentrating on newly approved policies.

53. Topics covered by use of force training must include:
      a.    Instruction on what constitutes excessive force;
      b.    De-escalation tactics;
      c.    Methods of managing prisoners with mental illness to avoid the use of force;
      d.    Defensive tactics;
      e.    All Jail use of force policies and procedures, including those related to documentation and review of use of force.

**Partial Compliance**

There has been no change in the status of this paragraph since the 18th Monitoring Report.  While UOF training includes a continuum of appropriate force responses to escalating situations, it does not yet include specific measures for managing inmates with mental illness nor does it include scenario-based training.

55. The County must update any use of force training after any revision to a use of force policy or procedure.

**Not Applicable**

As was explained in the last two Monitoring Reports, the UOF policy has not been revised since it was approved and implemented in 2020, but the increased use of tasers, since they were issued to sergeants and lieutenants, warrants a re-examination of their use. The County objects to the finding of Not Applicable stating that the policy was updated and training provided. It is the Monitor's understanding that the UOF policy provided by the County is the original policy reviewed by the Monitoring team and approved by DOJ. No updated policy has been provided.

### 4.    Use of Force Reporting

56. Develop and implement use of force reporting policies and procedures that ensure that Jail supervisors have sufficient information to analyze and respond appropriately to use of force.

**Partial Compliance**

There has been no change in the status of this paragraph for more than five years since the UOF Policy was adopted. The initial training on its requirements has not been supplemented over time as multiple officers were promoted to supervisory positions. There are several impediments to adequate supervisory review. Supervisors are significantly hampered by the lack of functioning cameras. As noted above there are currently 97 non-functioning cameras. When, as is the case in IR #250000002 there appear to be conflicting reports on the use of force, video footage would be most useful. Another impediment to adequate supervisory review is the lack of referrals to IAD on uses of force. In January through March there were 9 uses of OC or tasers that were not referred to IAD for investigation. The Monitor identified the instances of use of OC or tasers that were not referred to IAD but did not determine if there were hands on uses of force that were not referred to IAD. Another impediment is the lack of supplemental reports by officers who were involved or witnessed the use of force. See, e.g., IR #2500208 and IR #2500235. Finally, the lack of supervisory review of the incident reports or requests for additional information or supplemental reports where appropriate inhibits adequate supervisory review of uses of force. As noted above, only about 20% of the incident reports indicated supervisory review and there is no documentation made available to the Monitoring team that even in those cases, any substantive analysis took place.

57. Require each staff member who used or observed a use of force to complete a Use of Force Report as promptly as possible. Staff members must accurately complete all fields on a Use of Force Report.

**Partial Compliance**

There has been no significant change with regard to the status of this paragraph. There are very few supplemental reports in the incident report spread sheet. This may very well be that with the extreme staff shortage the officers frequently have to deal with an incident alone which no doubt also contributes to uses of a higher level of force. However, there are incidents which did involve multiple officers for which there are no supplemental reports. As noted above, see IR #2500208 and IR #2500235.

58. Ensure that Jail use of force reports include an accurate and detailed account of the events.

**Partial-Compliance**

As was noted previously, the quality of UOF reports still routinely lack witness statements and they never specify the classification of the housing area where the incident occurred. The previously stated standard—"Can your report stand alone?" has never been met. This same recommendation was made in the 16th, 17th and 18th Monitoring Reports. The discrepancy in IR #250000002 between the initial and supplemental report raise questions about the accuracy of the report. Again, the lack of video footage and referral to IAD for investigation makes it difficult to know if the incident reports are accurate.

59. The County must ensure that Jail supervisors review, analyze, and respond appropriately to use of force.

**Partial Compliance**

As has been stated in previous paragraphs, supervisors are busy doing the jobs of correctional officers, instead of supervising, because of the extreme shortage of staff. Only about 20% of the incident reports even had documentation of a review at the command level. There is no indication of any supervisory response to the uses of force reported some of which appear to call for a supervisory response.

61. All uses of force must be reviewed by supervisors who were neither involved in nor approved the use of force by the end of the supervisor's shift. All level 1 uses of force must also be reviewed by a supervisor who was neither involved in nor approved the use of force. The purposes of supervisor review are to determine whether the use of force violated Jail policies and procedures, whether the prisoner's rights may have been violated, and whether further investigation or disciplinary action is required.

**Partial Compliance**

As has been highlighted in previous paragraphs, supervisors are busy doing the jobs of correctional officers, instead of supervising, because of the extreme shortage of staff. Therefore, they are unable to fulfill the requirements of this paragraph. Although most of the reports do not appear to be reviewed by any supervisor, of the few that are there is one example of review by a supervisor who was involved in the incident. In IR #250000002, the Lieutenant was involved in the incident and wrote a supplemental report. He was the supervisor that signed off on the review of the report. It is of particular concern that he signed off on the report even though the initial officer's report is inconsistent with his supplemental report. There is no indication that the reports that were signed off on analyzed the issues required by this paragraph. And, as noted above, even though all uses of forces are reportedly supposed to be referred to IAD for further investigation, there were 9 uses of OC spray or tasers that were not referred for investigation.

20

### 5.    Incident Reporting and Review

63. Develop and implement incident reporting policies and procedures that ensure that Jail supervisors have sufficient information to respond appropriately to reportable incidents.

**Partial Compliance**

The status of this paragraph remains unchanged.  The policy governing the preparation of Incident Reports (1-500) was approved and adopted over four-and-one half years ago.  Training was then initiated, and it continues in the basic academy, but there has been no follow up for existing staff due to the lack of personnel, which makes in-service training problematic.

64. Ensure that Incident Reports include an accurate and detailed account of the events.

**Partial Compliance**

There continues to be a problem of missing information in the incident reports or in some cases, what appears to be missing reports. In IR #25000034, there is a report of a fire in C-4. The reporting officer identifies the detainees suspected of starting the fire and states that they are also suspected to have started a fire on first shift. There is no incident report for an earlier fire that date. Similarly, in IR #25000158, the reporting officer states that he was told by the nurse that a detainee had to go to the hospital for a head injury that occurred on 2nd shift. There is no incident report for an incident involving a head injury to that detainee earlier that day. The hospital transport log shows a detainee being transferred to the hospital for a stab wound to the head on February 14, 2025. There is no incident report for this. There is a lack of detail in many incident reports. In IR #2500149 the reporting officer states that he saw the detainee bleeding from the face and had him escorted to Medical. There is no indication that the detainee was asked about his injury, no information regarding the cause or suspected cause of the injury, no information relevant to understanding what had happened such as location, or other detainees involved. In IR #2500165 one detainee is seen holding the B-2 door open while another detainee is seen crawling back to B-2 from B-3. Again, there are many unanswered questions: how was the first detainee able to get and/or hold the B-2 door open, why was another B-2 detainee in B-3, how did the second detainee exit B-2, was he able to enter B-3, was any contraband involved? In IR #2500178, the only report is by a Sergeant responding to an assistance call. When he arrived, he found a nurse and several detainees carrying out another detainee on a stretcher. There is no report by whoever made the assistance call. Again, there are numerous unanswered questions including was the nurse on the unit without any officer on the unit, how was the nurse called to the unit, what were the apparent injuries to the detainee, was the detainee conscious, were any detainees asked what had happened. In IR #2500286 a deputy responded to an assault, entered the

unit and exited with the victim. He escorted the detainee to Medical. The deputy who responded to the assault did not write a report. The supervisor who responded to the assistance call prepared a report but it is unknown what the responding deputy saw including how the assault was noticed, what the injuries were, whether other detainees were involved, or what the victim described.

As noted, the incident reports often have little or no information regarding the extent of the injuries in incidents involving assaults, use of force or medical events. Information from Medical should be incorporated into the incident reports or provided through a separate mechanism in conjunction with the incident reports so that supervisors have a more complete understanding of the incident.

66. Ensure that Jail supervisors review and respond appropriately to incidents.

**Partial Compliance**

As has been the case with a number of paragraphs in this section there has been no change in status.  20% of  the incident reports show no indication that the incident report was reviewed. Even those that show a review there is no indication that there was any response to the incident or the reporting of the incident. Policy 1-500, Incident Reports was approved and adopted in April 2021, little has changed.  Most officers and supervisors received orientation training on it, but the quality of many incident reports, and the lack of follow up by supervisors, indicates that additional training is required.

### 6.    Sexual Misconduct Provision Eliminated by Appellate Court

### 7.    Investigations

68. The County shall ensure that it identifies, investigates, and corrects misconduct that has or may lead to a violation of the Constitution.

    a.    Develop and implement comprehensive policies, procedures, and practices for the thorough and timely investigation of alleged staff misconduct, sexual assaults, and physical assaults of prisoners resulting in serious injury.

    f.    Provide the Monitor and United States a periodic report of investigations conducted at the Jail every four months. The report will include the following information:

        i.    a brief summary of all completed investigations, by type and date;

        ii.    a listing of investigations referred for administrative investigation;

      iii.     a listing of all investigations referred to an appropriate law enforcement agency and the name of the agency; and

      iv.     a listing of all staff suspended, terminated, arrested or reassigned because of misconduct or violations of policy and procedures. This list must also contain the specific misconduct and/or violation.

      v.     a description of any corrective actions or changes in policies, procedures, or practices made as a result of investigations over the reporting period.

**Partial Compliance**

Investigations are handled by two separate units within the HCSO. Criminal Investigations (CID) handles incidents that occur within the jail facilities much as they would for offenses that happen on the street. The advantage of having dedicated investigators handle all Detention cases is that they are familiar with the operation of the facilities. Internal Affairs (IAD) handles cases that involve the actions of officers, such as UOF incidents, to determine the appropriateness of their actions.

Since the last site visit two-and-a half years ago, the Lt. in CID has been replaced by Capt. Laquinta Hollis. In addition, there is only one Investigator instead of two.

From September 5, 2024, through March 30, 2025, CID conducted 100 investigations. Of those 35 involved contraband, four were for arson, 12 for Aggravated Assault, 30 were Simple Assault, three for Assault on a LEO, two for Disorderly Conduct, one for Sexual Battery, one for Lost Property, two for Business Burglary, for Escape, one for Obstructing Justice, one for Property Damage, three for Sexual Battery, one for Information Only, one for Death Investigation, and one for Larceny.

A break down of where the incidents took place revealed 44 in C-Pod, 30 in B-Pod, four in the Kitchen, nine in Booking, three in the Front Lobby, one in the Great Hall, one in Medical, two on the Perimeter, one in the Court Room, and one in the Property Room. It was not possible to see which incidents were referred to other agencies or IAD because that information was not available on the CID spreadsheet.

The Monitor has requested the CID investigations for a number of referred cases, primarily assaults. These have not been received at this time and, as a result, this report cannot comment on the quality of the investigations. The Monitoring team has recommended in the past that the CID investigator independently review the incident reports to determine whether additional cases should be investigated. This is not being done.

From November 24, 2004, to April 25, 2025, IAD handled 40 cases; five were still under investigation.  They are classified as follows: one Habitual Absenteeism, six Employ Conduct, five Fact Finding, two No Call/No Show, 11 Violation of General Orders, 12 Violation of UOF, and one Attempted Suicide.  Of the completed UOF investigations, every one was Exonerated. Without the investigative files to compare against the spread sheet of cases, there is no way to tell whether or not the findings are valid. The Monitoring team could determine, as noted above, that not all uses of force were referred to IAD. From January 1, 2025 to March 30, 2025 there were 9 uses of OC or tasers that were not referred for IAD investigation. Also, as noted above, the number of non-functioning cameras limits the ability of IAD to fully investigate those cases referred to them.

### 8.    Grievance and Prisoner Information Systems

69. The grievance system must permit prisoners to confidentially report grievances without requiring the intervention of a detention officer.

**Partial Compliance**

The good news is that all of the units have new kiosks and the ISO units except C-4 ISO where suicidal detainees are housed now have kiosks. Unfortunately, there appear to be some problems with the system that make it less than functional. The grievance system is a new system installed in December 2024. The Grievance Office is new as of February 2025. Some of the problems hopefully can be resolved with IT assistance. Most notably, the spreadsheet generated by the system includes many grievances/requests as unassigned. These were consistently medical and mental health, law library, with a few exceptions, and some other areas inconsistently. The Grievance Officer stated that when she gets a grievance she assigns it promptly. This includes grievances for medical and mental health. When the Grievance Officer attempted to pull them up in the grievance system, they did not appear. The Health Services Administrator stated that she has not received any medical grievances since she started in March. According to the spreadsheet, there were numerous medical grievances/requests during this time. One detainee did show the Monitor that on the kiosk in his unit, he had a number of grievances that were listed as unassigned. This appears to be a serious problem if grievances/requests particularly medical grievances/requests are not getting referred to Medical and are disappearing in the system. It also appears that the detainees would have no way of knowing that their grievances were lost in the system. An additional problem is that there is no method for identifying a grievance as an emergency grievance which would require a shorter time frame for response. At present, this is probably the lesser problem given that the Grievance Officer also stated that she expected a response in 24 hours which is faster than required for a regular grievance and is the expected time period for an

emergency grievance. However, paragraph 71 below addresses the lack of any response, timely or otherwise in many cases.

There is an Inmate Handbook that has a brief paragraph on the grievance system and states that the kiosk system is for grievances and requests. It states that a handwritten grievance can also be submitted. There is no explanation of how the kiosk works or how to submit a handwritten grievance. A more detailed sheet on submitting a grievance is provided at booking but it predates the kiosk system and so is not useful. An updated grievance sheet should be made that explains how to submit a grievance through the kiosk as well as with a written form.

Providing written forms may be especially important if the new software is not functional especially for medical/mental health grievances and requests. There were written forms on B-Pod and Booking. The forms could not be found on C-Pod. There were no envelopes so the grievances could not be sealed by the detainee and no clear system for how the written grievances would get to the Grievance Officer although the Grievance Officer stated that she checks the pods. She stated that she had received no paper grievances since she started. With the extreme staff shortage there would also be issues with the detainees in general population having access to an officer to request a form, getting it from the officer and returning it to the officer. On segregation units, lack of staffing limits the time detainees are out of their cells with access to the kiosk.

Another system issue is that there appears to be no means for an appeal to a grievance response to be made. The Grievance Officer was not aware of an appeal process in the system. She thought that there was a way for the detainee to request further response but it would go back to the same person.

71. All grievances must receive appropriate follow-up.

**Partial Compliance**

The Monitor could not do a quantitative analysis of grievances with no response and those with late responses. The spreadsheet provided did not show that a grievance was responded to or the date of the response. The Grievance Officer stated that she can see a response but not the date. She does email reminders but can't run a report to identify all grievances that haven't had a response. She also cannot see whether a medical/mental health grievance has had a response. Not including grievances that could not be found in the system, there appeared to be 9 out of 15 grievances that had no response. There were also some that just said resolved without stating what the resolution was. When the Grievance Officer is able to run reports, including whether there is a response and the date of a response would be important so that the Grievance Officer

can ensure that grievances are being responded to and can track the grievance system and response more effectively.

The HSA reported that there had been no medical or mental health grievances since the end of March 2025. She also reported that when she started, she was unable to locate any file for past grievances, and so she has no way of knowing whether or not there were any unresolved grievances. The HSA did appear to know that if she received a grievance, such should be responded to in a timely manner.

72. The grievance system must accommodate prisoners who have physical or cognitive disabilities, are illiterate, or have LEP, so that these prisoners have meaningful access to the grievance system.

**Non-Compliant**

The grievance policy requires that if there are cognitive or communication barriers, the Detention Officer refer the issue to the Area Supervisor for communication assistance or problem resolution. There is no indication that the provision of the policy addressing those with cognitive impairments is being implemented or that inmates have been informed of this option. Neither the information sheet on grievances nor the inmate handbook currently given at booking includes this information. The Grievance Officer stated that the issue of accommodating persons with disabilities had not been brought to her attention.

Mental Health staff are similarly unaware of how to respond to possible grievances raised by SMI detainees including whether they should be referred to a particular process. SMI detainees, including those with cognitive deficits, often raise concerns with mental health staff. It doesn't appear as if mental health staff question whether or not any of those raised concerns actually constitute a grievance, and even if they did recognize that, it doesn't appear as if they know what to do with that.

## 9.    Restrictions on the Use of Segregation

74. Within 8 hours of intake, prisoners in the booking cells must be classified and housed in more appropriate long-term housing where staff will provide access to exercise, meals, and other services.

**Non-Compliant**

There are three areas addressed by this provision: Classification; appropriate long-term housing; and access to exercise, meals and other services.

As with other areas of the Jail, Classification suffers from a lack of staff. There are supposed to be eight classification officers. At the time of this site visit there were four with one being a trainee. The Classification Supervisor reported that for a while they had only two classification officers. With this number of staff it is not possible to classify all individuals within eight hours. A review of seven bookings disclosed that one was classified the next day which without the time of booking and classification being stated it can't be determined but could possibly be within eight hours. The other six were significantly longer than eight hours with one being al- most three months. The log which had previously been kept showing date of booking and date of classification is no longer kept so the Monitoring Team could only spot check the timeliness. There is no weekend coverage and the evenings and nights have not been covered for about a year. The current trainee is being trained to work nights. With this lack of coverage, classifica- tion is not always available when security staff consider it necessary to move a detainee. It ap- pears that Classification is notified when staff move a detainee but typically after the fact.

Classification continues to use the objective classification tool it has been using for several years now. The Monitor did not request the Classification forms ahead of the site visit and so could not use the time of the site visit to review criminal history scores, the area most prone to error. The forms reviewed with what could be determined did not have any errors. Of concern is that the Classification staff has reverted to using the JMS to score criminal history (NCIC is used to look for a prior sex offense). As previously noted, the JMS system does not include offenses from other jurisdictions so serious prior offenses would not be included in the scoring if only the JMS is used for criminal history.

The second aspect of this paragraph is that after classification, the inmate should be placed in ap- propriate housing. The Classification Supervisor stated that a high score does not determine where the detainee is housed within RDC. A medium or low score will result in placement at the Work Center. A high score results in placement at RDC or out of county. There are actually only two general population units (C-2 and C-3) at RDC now that A-Pod is closed. Two housing units are used for classification (B-1 and B-3). Two housing units (one lock down, B-4 and one open C-1) are used for medical and mental health. One unit is the segregation unit which includes some mental health and protective custody (C-4) and one unit (B-2) is used for inmate workers, older inmates, and some protective custody. The lack of general population units does not allow for a lot of housing decisions based on classification score. The Classification Supervisor stated that if the other inmates on the unit say someone has to go, he moves them and if they can't

make it anywhere, they go to C-4. Given the lack of staffing, this is probably necessary but not the normal use of classification scoring.

As has been repeatedly stated, Booking is not appropriate for housing. Detainees should not be housed in Booking as those cells do not meet the standard for long-term housing. They have no windows. They do not have beds. And there are none of the other amenities associated with housing such as telephone, kiosk, visitation space and recreations space. That is why detainees are expected to stay in Booking holding cells for no more than eight hours.  It appears from the January 2025 Segregation Log that one individual, D.T, was housed in Booking for a year. This might have been a typo given that he entered Booking in January. It is not possible to tell from the Segregation Log how long detainees have been held in Booking but they do not appear to be released from segregation in the month in which they are moved into Booking.

It must also be questioned whether B or C Pods are currently appropriate for housing. This had clearly been the case with A-Pod and to the County's credit, it closed A-Pod. However, the lack of staffing and maintenance issues have resulted in B and C-Pods being similarly less than appropriate. The physical plant issues are discussed in paragraph 46 and the safety issues in paragraph 42. There is still no "more appropriate long-term housing" for acutely ill SMI detainees, where they can receive appropriate mental health "services".  Instead, such detainees are placed in segregation; being locked down/isolated most of the time only exacerbates their mental health difficulties; and being locked down, along with the shortage of mental health staff, makes it virtually impossible for them to receive the mental health services they require.

The fact that isolation can exacerbate serious mental illness has been well established.  In addition, during interviews with SMI detainees being held in segregation, three detainees noted (unsolicited) that they were better able to manage and/or control the voices they were hearing when they were out of their cell and interacting with others. However, when they were locked down/isolated they were severely tormented by voices they were unable to control/manage. One of these detainees repeatedly flooded his cell; he would then lay down in the cold water; and as a result, he developed hypothermia that was severe enough to require medical attention..
Mental health staff noted that although medication, including the use of long-acting injectable medication, can help them stabilize acutely ill SMI detainees, the fact that they are essentially unable to bring them out of their segregation cells and have private/face-to-face sessions with them compromises efforts to stabilize them.

Food Service is headed by a new Director, Miriam Stevens.  She had been in service for 14 years at the WC before taking her new position one year ago.  They now post a bi-weekly menu, but it is a handwritten document and does not measure up to what was done in the past for record

28

keeping purposes.  Meal service is still two hot meals for breakfast and lunch, with a cold meal for dinner.  According to Director Stevens, the fact that 200 prisoners are now housed out of county, has lightened the burden on her staff and the budget.

Inmate visitation cannot be addressed because no records were provided.  When they were provided the RDC and WC were combined, so there was no way to differentiate between the two facilities.  With the reduced population the last recorded figure of 2.58 years for each inmate to have one visit, should be reduced by one third, or 1.72 years for each inmate to have one visit. That is still an unacceptable number.

Outdoor recreation is supposed to be overseen by an officer on the day and evening shifts.  In fact, there have never been any officers specifically assigned to perform that duty for years.  Instead, the control room officer merely opens the door leading from one housing unit for a certain amount of time and then records that recreation was provided.  Once again, we were not provided with records or logs.

In the Laundry, one of the four washers was out of service, and one of the four dryers had a sign that said it operated only intermittently.  As noted above, each detainee receives one jumpsuit. When it is laundered, the detainee has only his undergarments to wear.

The lack of sufficient mental health services is discussed in paragraph 42. The Classification Supervisor reported that only recently detainees housed in B-4 because of being SMI were allowed to get commissary. Prior to that they were subject to the same restrictions as detainees in segregation for reasons other than SMI. This restriction because of SMI status was not appropriate and should not be re-instituted.

75. The County must document the placement and removal of all prisoners to and from segregation.

**Partial Compliance**

The Classification Supervisor stated that RDC continues to maintain two separate logs with respect to documenting the placement and removal of detainees in segregation. One is called the Segregation Monthly Report and one is the Detainee/Inmate Disciplinary Report. The Monitor requested and received these documents as this report was being finalized. As stated in previous reports, the segregation log does document the placement and removal of individuals in segregation.  The Classification Supervisor had previously stated that the people ordered to segregation for discipline were not included in the Segregation Report. This appears to continue to be the case. The Disciplinary Report does not include the date when someone was released from

segregation. The Segregation Log has a column for the release from segregation date but a number of individuals are in segregation one month and not the next without any release date being given. A rolling log as opposed to a monthly log may be preferable for identifying release from segregation dates.

As previously stated, detainees should not be housed in Booking. This includes housing in Booking as a disciplinary measure. In IR #25000012 the Sergeant told the detainee that "his disciplinary time was up on the booking wall" and he would be placed on B-Pod for housing. The Classification Supervisor stated that Booking was not used for disciplinary housing but he could not pull up the incident report by number to explain the statement in the report.

76. Qualified Mental Health Professionals must conduct mental health rounds at least once a week (in a private setting if necessary, to elicit accurate information), to assess the mental health status of all prisoners in segregation and the effect of segregation on each prisoner's mental health, in order to determine whether continued placement in segregation is appropriate. These mental health rounds must not be a substitute for treatment.

**Partial Compliance**
A new approach to this has been initiated, in that the entire mental health team goes to perform this weekly round in segregation units, with each of them seeing some sub-set of the detainees housed in such units. Observation of the segregation rounds disclosed that they do appear to be checking on the mental health status of each detainee; they do appear to be considering whether or not each detainee requires additional mental health services (despite any limits in their ability to actually provide much in the way of additional services); but it is unclear to what extent any findings might impact on whether or not a detainee remains in segregation.

As noted above, a major concern is that the mental health team considers these rounds to be treatment, which is in direct conflict with this provision. As also noted above, there really is no appropriate housing and treatment program, geared to stabilizing such detainees as quickly as possible.

77. The County must develop and implement restrictions on the segregation of prisoners with serious mental illness.

**Non-Compliant**
In order to restrict the segregation of prisoners with serious mental illness, the County would need to develop a housing and treatment unit for such acutely ill SMI prisoners (i.e. a mental health unit) or at least develop a more aggressive mental health treatment program on

30

segregation units.  Either way, the program would need to be staffed with enough mental health staff to provide an intensive mental health treatment program, geared towards stabilization of such prisoners, and enough security staff, specially trained in working with SMI prisoners, so that prisoners would not need to be locked down most of the time and have adequate access to treatment. Neither one of these options has been undertaken.

In addition, the County would have to ensure that there is an adequate mental health treatment program, geared towards helping stabilized SMI prisoners remain stable. Such prisoners would require individualized treatment plans that might include individual therapy and various types of group therapy, including psychoeducational groups.  Given the shortage of mental health staff, these therapeutic interventions don't exist either (i.e., currently, there is no group therapy and limited access to individual therapy).

Furthermore, even with a program to help stabilized SMI prisoners remain stable, there will be some who deteriorate again, due to non-compliance, or other shifts in their illness or response to treatment. Therefore, mechanisms must be put in place to avoid placing such prisoners in segregation or at least limiting the time that they are placed in segregation. Such mechanisms would include a disciplinary review process with adequate mental health input, which has not yet been firmly established in policy or practice; the above noted weekly mental health rounds in segregation; and a rigorous segregation review process, focused on planning how to get SMI prisoners out of segregation as quickly as possible. With regard to a segregation review process, it should be noted that there is a weekly Interdisciplinary Team Meeting that involves medical, mental health and senior security staff; during that meeting they do, at times, discuss getting a prisoner off suicide watch; but there is a less than adequate focus on developing individualized plans for getting SMI individuals out of segregation during that meeting, and there is no other meeting specifically focused on that type of segregation review.

### 10.    Youthful Prisoners

Paragraphs 78-84. The Monitoring Team did not assess the compliance with the provisions regarding Youthful Prisoners because it is the Monitor's understanding that the team is monitoring at the request of the Receiver who does not oversee the youth facility. However, if the Court requests monitoring of the youth facility, the Team will make arrangements to provide such monitoring.

### 11.    Lawful Basis for Detention

31

85. The County will not accept or continue to house prisoners in the Jail without appropriate, completed paperwork such as an affidavit, arrest warrant, detention hold, or judge's written detention order.

**Partial Compliance**

Records is currently without a supervisor. It may be for this reason that the files are in some disarray and it is extremely difficult to determine the current legal status of the detainees. There is supposed to be a Chrono log on one side of the file showing the sequence of the legal events and a Status log on the other side of the file showing essentially what is currently holding the detainee in custody. In the case of J.G. the logs had not been updated since 2021. According to the records clerk, J.G. had been released on own recognizance before the mittimus ordering time to be served came in. He is now supposed to be released in May and the clerk thinks that the Administrative Lieutenant is tracking this. There was no booking sheet for the 4/11/25 booking. For C.M. the chrono and summary sheets had not been updated since 2022. He had been booked on 4/11/25 but there was no paperwork on the booking in the file. The JMS indicated he was picked up on an FTA warrant but this was not in the file. D.Y. was released on 4/18/25. The documentation of the release was not in the file. There were no status or chrono logs. C.T was released on 4/16/25. There are no logs. They were told from Madison that a hold had been dropped. There was no paperwork on this in the file. D.B. had no status or chrono logs. The file indicated that an unsecured bond was forfeited but then he was released. The file was unclear on the basis of the release. B.M. had status and chrono logs but they had not been updated since 2023. The documents on the current booking were not in the file but were located. The property paperwork was for a different inmate and the health screen was signed by a different arrestee then whited out and then signed by a second person that was not him. (The health screen appeared to be his but it identified no health issues when in fact this detainee has a colostomy bag). E.M. was not in custody. He was released 4/24/25. There was no paperwork in the file. D.L. had paperwork showing a $25,000 bond. This was in the file but not in the JMS system. The records clerk could not check the court records to determine whether he had a bond or not.

It will be necessary to devote some time and resources to updating and supplementing the files in order to determine whether all of the necessary paperwork is there.

86. No person shall be incarcerated in the Jail for failure to pay fines or fees in contravention of the protections of the United States Constitution as set forth and discussed in *Bearden v. Georgia*, 461 U.S. 660 (1983) and *Cassibry v. State*, 453 So. 2d 1298 (Miss. 1984).

**Substantial Compliance**

This paragraph continues to be carried in Substantial Compliance. However, as noted in previous monitoring reports there continue to be mittimuses received from Justice Court that appear to require the Jail to hold the individual until the fines and fees are paid. Jail staff have interpreted this to be as an alternative to the specific time in custody ordered but that is not the only interpretation. In fact, the records clerk assisting with the review of records stated that the individual would have to stay in custody if the fine wasn't paid. However, there was a notation in file that the individual should be released in May and the clerk stated that she thought the Administrative Lieutenant was tracking this. Based on this, the paragraph is continued as in substantial compliance but it would be good to encourage Justice Court to revise it's mittimus and make sure that all booking and records clerks understand the interpretation of these orders.

92. The County must ensure that the Jail timely releases from custody all individuals entitled to release. At minimum:

    a.    Prisoners are entitled to release if there is no legal basis for their continued detention. Such release must occur no later than 11:59 PM on the day that a prisoner is entitled to be released.

    b.    Prisoners must be presumed entitled to release from detention if there is a court order that specifies an applicable release date, or Jail records document no reasonable legal basis for the continued detention of a prisoner.

    c.    Examples of prisoners presumptively entitled to release include:

        i.    Individuals who have completed their sentences;

        ii.    Individuals who have been acquitted of all charges after trial;

        iii.    Individuals whose charges have been dismissed;

        iv.    Individuals who are ordered released by a court order; and

        v.    Individuals detained by a law enforcement agency that then fails to promptly provide constitutionally adequate, documented justification for an individual's continued detention.

**Partial Compliance**

It was not possible to reach a well founded conclusion on this paragraph in large part because of the state of the records. In addition, the records clerk assisting with the site visit did not have access to the court data base to check on certain events. Lastly, as mentioned above these are records that in the past have been requested prior to the site visit in order to identify potential concerns and focus the record review on those files. For example the Probation Violation log includes a column for date of release. This has been the date the individual was supposed to be released. At the time of the site visit the Records Supervisor would check the JMS system to determine when the individual was actually released and determine whether there was any over

detention. In order to complete the site visit promptly, this and other documents were not re-
quested prior to the site visit.

### 12.    Continuous Improvement and Quality Assurance
.
### 13.    Criminal Justice Coordinating Committee

### 14.    Implementation, Timing, and General Provisions

121. Within 30 days of the Effective Date of this Injunction, the County must distribute copies of
the Injunction to all prisoners and Jail staff, including all medical and security staff, with appro-
priate explanation as to the staff members' obligations under the Injunction. At minimum:

    a.    A copy of the Injunction must be posted in each unit (including booking/intake
    and medical areas), and program rooms (e.g., classrooms and any library).

    b.    Individual copies of the Injunction must be provided to prisoners upon reasonable
    request.

**Partial Compliance**

The previous kiosk system had the Consent Decree in the system. No one could confirm whether
the New Injunction is in the new kiosk system and the Monitor's attempt to locate it in the sys-
tem with the assistance of one detainee was unsuccessful. The Monitor did not see it posted in
any of the units. As the kiosk system is relatively new, this paragraph is continued as partial com-
pliance but this should be remedied.

### 15.    Policy and Procedure Review

130. The County must review all existing policies and procedures to ensure their compliance
with the constitutional violations addressed in this Injunction. Where RDC does not have a pol-
icy or procedure in place that complies with this Injunction, the County must revise or draft such
a policy or procedure.

**Partial Compliance**

As of the stay of the monitoring activities 38 policies had been approved and adopted and ac-
cording to jail staff an additional five policies had been approved and were awaiting signature.
The consultant and jail staff working on policy development had identified 94 policies to be de-
veloped. There appear to be 47 policies that are currently in place. This includes policies that
have been completed since the time of the stay. It is good that the development of policies is con-
tinuing. The person responsible for this was on medical leave at the time of the site visit and so
couldn't be interviewed. While not all 94 policies would necessarily be essential for compliance

34

with the New Injunction, some would be essential such as, among others, Discipline, Releasing, and Training.

### 16.    Monitoring

This Injunction must be monitored by an individual approved by the Court. Accordingly, paragraphs 136 through 158 of the Order Amending Consent Decree, and their subparagraphs, are hereby incorporated and remain in force.

141. The Monitor may contract or consult with other individuals or entities to assist in the evaluation of compliance. The Monitor will pay for the services out of his/her budget. These individuals and entities must be governed and bound by the terms of this Agreement as the Monitor is governed and bound by those terms. The Monitor may engage in ex parte communications with the County and the United States regarding this Agreement.

**Compliant**

142. The Monitor and United States will have full and complete access to the Jail, Jail documents and records, prisoner medical and mental health records, staff members, and prisoners.

**Partial Compliance**

The access to documents and records has been a slow process. Documents were made available on site but copies of those documents or additional documents that were not reviewed on site have been slow to be received. As this report is being finalized some are only now being received and some are still outstanding. Providing a rolling production is fine but it is not possible to provide a timely and accurate report without a more efficient process of document production.

In years past it was always possible to have direct contact with the Jail Administrator and subordinate commanders and supervisors in order to stay current with conditions since the previous site visit.  In anticipation of the next site visit phone calls were frequently made with the appropriate personnel.  During the site visit, staff is cooperative and communicative. However, between site visits staff appear to be instructed not to communicate with the monitoring team without the attorneys and there is no Compliance Coordinator with whom to assist with access.

144. The County must maintain sufficient records to document that the requirements of this Agreement are being properly implemented and must make such records available to the United States or Monitor at all reasonable times for inspection and copying. The County must maintain, and submit upon request, records or other documents to verify that the County has taken such actions as described in any self-assessment compliance reports (e.g., census summaries, policies,

35

procedures, protocols, training materials and incident re-ports).

**Partial Compliance**

The difficulty in obtaining timely access to documents has been previously stated.

145. The County will direct all employees, contractors, and agents to cooperate fully with the Monitor and United States.

**Not Measured**

This paragraph is carried as not-measured because it is not possible for the Monitor to know what guidance the County has given the employees, contractors and agents with respect to cooperation with the Monitor.

### 17.    County Assessment and Compliance Coordinator

### 18.    Emergent Conditions

161. The County must notify the Monitor and United States of any prisoner death, riot, escape, injury requiring hospitalization, or over-detention of a prisoner (i.e. failure to release a prisoner before 11:59 PM on the day she or he was entitled to be released), within 3 days of learning of the event.

**Partial Compliance**

The Monitor did not receive immediate notifications during the period the case was stayed and did not receive them when the case came back from the Fifth Circuit. Upon request, the Monitor is now receiving the immediate notifications and if that continues to be the case, the paragraph will be changed to Compliant. There has always been a problem with receiving notification of over-detention. This will also be reviewed going forward.