UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | PLAINTIFF |
| | § | |
| v. | § | Case No. 3:16cv489-CWR-BWR |
| | § | |
| HINDS COUNTY BOARD OF | § | DEFENDANTS |
| SUPERVISORS, HINDS COUNTY | § | |
| SHERIFF TYREE JONES | § | |

**MEMORANDUM IN OPPOSITION TO THE
GOVERNMENT'S [291] MOTION TO COMPEL**

The Government's [291] Motion to Compel is a blatant effort to sandbag Defendants[1] a mere four days prior to the beginning of site visit scheduled for May 5, 2026. This site visit was first discussed during a conference call on March 26 and has been confirmed since April 13. As sandbaggers do, the Government's counsel cherry picks communications leading up to both the site visit and the disputes underlying the ill-conceived [291] Motion, presenting a picture that is as incomplete as it is untimely. Once the complete picture is viewed, it is clear that the [291] Motion's request related to documents is premature and procedurally improper and its request related to detainee interviews adds language to the [282-1] 2025 New Injunction where it does not exist. The [291] Motion should be denied.

**Relevant Background**

On February 20, 2025, the Fifth Circuit mandate issued after this matter had been stayed pending appeal since December 28, 2022. *See* [246] Order; [263] Mandate. The Court held an initial status conference on February 28, 2025 during which the parties and the Court primarily

---

[1] Defendants the Hinds County Board of Supervisors and Hinds County Sheriff Tyree Jones will be collectively, referred to as "the County."

1

discussed how to proceed with respect to the receivership given the Fifth Circuit's mandate. That same day, the Government sent a list of document requests the majority of which related to Raymond Detention Center, but this list included documents related to three incidents that occurred at the County's Henley Young Patton Juvenile Justice Center ("Henley Young") on June 28, 2023, August 28-29, 2023, and January 8, 2024, respectively. *See* [291-1] Feb. 28, 2025 E-mail and attachment. The County provided documentation related to incidents occurring at Raymond Detention Center but did not provide documentation related to the three Henley Young incidents.

After the status conference on February 28, 2025, the Court held a follow-up conference on May 13, 2025. During the May 13 conference, the parties and the Court discussed Henley Young. Specifically, the County took the position that it did not believe Henley Young should be included in the scope of what the Court is focused on at this point. *See* [279] Transcript at 25:4-26:1. The Government took a contrary position but conceded that the receiver's authority is limited to the Raymond Detention Center: "you have remedial relief that covers the juveniles, but technically the receiver's authority is limited to Raymond." *Id*. at 26:2-17. The Government added that it believed it still had access authority related to Henley Young and that it also thought there should be monitoring of Henley Young through the provisions of the Court's injunction as opposed to the receivership. *Id*. at 26:18-27:19. The Government concluded its discussion of Henley Young by stating it believed it needed clarity as to whether its interpretation was correct. *Id*. at 27:20-28:11. The Court's monitor, Lisa Simpson, echoed the Government's sentiment, stating she was "unclear to what extent [she has] any responsibilities with respect to Henley Young . . . ." *Id*. at 30:2-7.

Two days after this conference, on May 15, 2025, the Government's counsel wrote the County's counsel, saying he was "brainstorming ideas" that included a stipulation by the parties to allow an interim assessment of Henley Young by a member of the Court's monitoring team, Jim

2

Moeser. *See* May 15-16, 2025, Email Correspondence, attached as **Exhibit A**. The parties exchanged emails related to a potential conflict that would arise if the Government paid for Moeser's visit, but the County reiterated its position from the May 13 status conference that it disputed Henley Young's inclusion in the New Injunction and, in any event, the Government had already conceded the receivership did not include Henley Young.[2] *See id.* The Government's counsel responded, in pertinent part, by saying that if the County would not allow Mr. Moeser to assess the juveniles charged as adults who are living at Henley Young, then the Government maintained it had separate authority to review those conditions and forwarded a "preliminary document request" dated May 15, 2025, seeking a plethora of documents related to Henley Young going back to February 2022. *See id.*; *see also* [292-2] Document Request. The parties had no further communication related to this set of requests for nearly one year, until the Government e-mailed the County at 2:26 p.m. on the afternoon of Friday, May 1, 2026, shortly before abruptly making those requests the subject of the [291] Motion to Compel filed later that evening.

On June 27, 2022, the Court issued four orders stemming from the Fifth Circuit's mandate. Most pertinent here, the Court issued its [282-1] 2025 New Injunction and its [282-2] Order on Receiver's Duties. From that point, the parties focused their efforts and attention on the receivership.

Then, on February 23, 2026, the Government's counsel e-mailed the County's attorneys to arrange "an introductory videoconference with James Woods, the new executive director of Henley Young," the Government, and "the Receiver's office." *See* Feb . 23, 2026, E-mail from Cheng, attached as **Exhibit B**. The Government proposed the introductory conference take place either the week of March 9-12 or the week of March 17-20. *Id.*

---

[2] This matters because the receivership is the only way that the monitor has any involvement at this point. [204] Order at 25; *see also* [247] Order.

Undersigned counsel was in the midst of a three-week trial in federal court in Oxford, Mississippi, that did not end until March 3. As a result, undersigned counsel did not respond to the February 23, 2026, e-mail. However, this was not intentional, and undersigned counsel took a call from the Government's counsel on March 9, undersigned counsel's first day back in the office after the trial. *See* Mar. 3-23, 2026, E-mail Correspondence between Morisani and Cheng, particularly the Mar. 9, 2026, E-mail from Morisani to Cheng (11:02 a.m.), attached as part of **Exhibit C**. During this call, undersigned counsel and the Government's counsel discussed whether the receivership included Henley Young and whether the Government had access to Henley Young pursuant to the 2025 New Injunction. *See id*. The County maintained its position that the receivership does not include Henley Young[3] and undersigned counsel posited that this could have been why no one else from the County responded to the Government's email asking for an introductory call between Mr. Woods, the Government, and the Receiver. *See id*. However, undersigned counsel acknowledged that the 2025 New Injunction afforded the Government access to Henley Young. *See id*. At the conclusion of their telephone call, undersigned counsel assured the Government's counsel that he would reach out to his client that same day. *See id*. Importantly, the Government's counsel did not raise any issue related to (or even mention anything about) the outstanding document requests made the subject of the [291] Motion to Compel.

The next day, March 10, 2026, undersigned counsel informed the Government's counsel that the County was good with moving forward with the introductory telephone conference between the Government, the County, Mr. Woods, and the receiver. *Id*. at Mar. 10, 2026 E-mail from Morisani (11:30 a.m.). The parties ultimately scheduled the introductory conference for March 26 at 3:00 p.m. ET, s*ee id*. at Mar. 23, 2026, E-mail from Cheng (3:56 p.m.), and the call

---

[3] Again, the Government's counsel had already conceded that the receivership does not include Henley Young during the May 13, 2025, status conference. *See* [279] Transcript at 26:2-17.

4

took place at that date and time without issue, although the receiver was not able to join the conference. *Id*. Once again, the Government's counsel said nothing about the outstanding document requests now made the subject of the [291] Motion to Compel throughout any of this e-mail correspondence leading up to the conference or during the conference.

On April 8, 2026, the Government informed the County that it intended to conduct a site visit of Raymond Detention Center and Henley Young on May 5, 2026. *See* Apr. 8, 2026, E-mail from Cheng (2:05 p.m.), attached as **Exhibit D**. The County responded that same day, confirming receipt, letting the Government know it would make sure that date worked for Henley Young, and inquiring whether the Government intended to visit both Raymond Detention Center and Henley Young the same day. *See id*. at Apr. 8, 2026 E-mail from Morisani (3:51 p.m.).

On April 13, 2026, the County confirmed that May 5 worked for the site visit but added that the County intended to attend any detainee interviews that the Government attempted to have during the site visit to Henley Young given the Government does not represent those detainees. *See* Apr. 13-14, 2026, E-mail Correspondence between Cheng, Morisani, and Hall, particularly the Apr. 13, 2026, E-mail from Morisani to Cheng (12:02 p.m.), attached as **Exhibit E**. The County also raised an issue related to the fact that each of the juvenile detainees at Henley Young was represented by defense counsel related to the criminal charges they are facing, and the County believed that those detainees' criminal defense counsel would need to agree to allow their clients to be interviewed by the Government. *See id*.

The Government responded that it believed that it, the receiver, and monitor all have "full access to detainees, *including ex parte access*" and the Government was not going to allow the County to attend its detainee interviews during the site visit. *See id*. at Apr. 13, 2026, E-mail from Cheng to Morisani (3:07 p.m.) (emphasis added). The County responded that it was not disagreeing that the Government had access to the detainees at Henley Young, but, by its terms, the 2025 New

5

Injunction does not state that the Government has "ex parte" access to detainees, and the language also does not provide that the monitor and the Government could join up to interview detainees together and exclude the County. *See id.* at Apr. 14, 2026, E-mail from Morisani to Cheng (12:46 p.m.). The Government then asked whether the County took the position that the receiver and "members of his team" could not interview detainees at Henley Young without the County's counsel being present, *see id.* at Apr. 14, 2026, E-mail from Cheng (1:52 p.m.), and the County responded that it had not received any correspondence from the receiver or the monitoring team at his direction requesting to meet with any juveniles charged as adults at Henley Young, *see id.* at Apr. 14, 2026, E-mail from Hall to Cheng (3:36 p.m.). The Government responded that it sent "the notice" on April 8, 2026, *see id.* at Apr. 14, 2026, E-mail from Cheng to Hall (2:38 p.m.), and the County replied, in pertinent part, that the April 8 "notice" only speaks to the Government's visit to Henley Young, and the County did not understand the Government as speaking for the receiver, *see id.* at Apr. 14, 2026, E-mail from Morisani to Cheng (4:00 p.m.). The Government acknowledged that it did not speak for the receiver but that "he was planning to attend." *See id.* at Apr. 14, 2026, E-mail from Cheng to Morisani, Hall (4:17 p.m.).  Again, the Government did not mention the outstanding document requests made the subject of the [291] Motion at any point during these e-mail exchanges.

The final communication from the Government to the County related to the May 5 site visit came on April 16, 2026, when the Government requested a set of documents "[f]or the day of the inspection . . . ." *See* Apr. 16-May 1, 2026, E-mail correspondence between Cheng and Morisani, attached as **Exhibit F**. Among the documents requested were also grievances and "investigation or serious incident reports" from Henley Young between January 1, 2026, and April 2026. *Id.* On May 1, 2026, and without any objection, the County produced the overwhelming majority of the documents requested on April 16, except for a staff roster, which the County assured the

6

Government it would supplement. *See id*. Once again, the Government made no mention of the outstanding document requests made the subject of the [291] Motion when it asked for documents on April 16, 2026.

Perhaps realizing it had not made any mention of the outstanding document requests made the subject of the [291] Motion to Compel, the Government's counsel emailed the County's counsel at 2:26 p.m. on the afternoon of Friday, May 1, 2026. *See* May 1, 2026 E-mail from Cheng to Morisani (2:26 p.m.), attached as **Exhibit G**. There, for the first time, the Government's counsel raised a question about the document requests made the subject of the [291] Motion. Within less than two hours, the Government filed its [291] Motion seeking to compel production of those same documents.

### Legal Standard

Federal Rule of Civil Procedure 37(a) governs motions to compel discovery responses. Rule 37(a)(3)(B) provides that a party seeking discovery may move for an order compelling production or answers against another party when the latter has failed to produce documents requested under Federal Rule of Civil Procedure 34 or to answer interrogatories under Federal Rule of Civil Procedure 33. *See* Fed. R. Civ. P. 37(a)(3)(B)(iii)–(iv). Only on notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery. The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action. Fed. R. Civ. P. 37(a)(1). A party's failure to include a such a certificate "will result in a denial of the motion without prejudice to the party . . . ." L.U. Civ. R. 37(c).

7

<strong><u>Argument</u></strong>

**A. The [291] Motion should be denied for failure to confer in good faith before seeking the Court's intervention.**

Initially, the Motion should be denied because it was filed without a meaningful good faith efforts or certification. Rule 37 requires a certification that the movant has in good faith conferred or attempted to confer to resolve the dispute without court action. Fed. R. Civ. P. 37(a)(1). The purpose of this requirement is to avoid unnecessary motion practice and to allow counsel to narrow disputes before petitioning the court for involvement. On April 13, 2026, the County notified the Government that they opposed confidential, unsupervised interviews of juveniles charged as adults without the County's counsel present. Although there was a brief exchange between counsel regarding this matter, the Government did not indicate that the issue was still disputed enough to warrant court intervention. Furthermore, it did not express any intention to seek the Court's intervention, and it did not request a conference or pursue further discussions to resolve this issue before abruptly filing the [291] Motion a mere four (4) days prior to a scheduled site visit. Given the sensitive nature of custodial interviews of juveniles, the County respectfully submits that the Court should first require the parties to confer in good faith and attempt to agree upon a viable solution or deny the Motion on this basis alone. *See* L.U. Civ. R. 37(c).

**B. The Government's reliance on CRIPA[4] is misplaced.**

Because the Government has already sued the County and this matter is in the midst of ongoing litigation, this dispute does not involve the Government's pre-suit investigatory authority under CRIPA. Thus, the Government's reliance on authority construing its pre-suit investigation authority under CRIPA is misplaced.

---

[4] The Civil Rights of Institutionalized Persons Act, 42 U.S.C. §§ 1997 through 1997j.

Rather, the Government's fact-finding must be carried out consistent with the Federal Rules of Civil Procedure. *See United States v. Cnty. of San Diego*, No. 91-0764-R(M), 1991 WL 642768, at *4 n.1 (S.D. Cal. July 22, 1991) (explaining there are two stages of investigation in the context of CRIPA litigation, with the first stage being pre-suit investigation to allow the Government to decide whether there are problems at an institution that can be resolved without a lawsuit and the second stage taking place after the Government initiates litigation and is conducted pursuant "to the usual discovery that must be permitted in trying to narrow the issues of a lawsuit"). As a result, many of the cases relied upon by the Government involve disputes over the Government's authority to conduct pre-suit investigations and thus are not controlling in the litigation context. *See, e.g.*, *United States v. Ward*, 667 F. Supp. 3d 1150, 1157-58 (N.D. Ga. 2023) (addressing dispute arising in the context of a pre-litigation investigation); *United States v. Hale*, 261 F. Supp. 3d 1169, 1171 (N.D. Ala. 2017) (addressing dispute arising from a CRIPA investigation and not in the context of litigation); *United States v. Los Angeles Cnty.*, 635 F. Supp. 588, 592 (C.D. Cal. 1986) (arising in the context of a pre-suit CRIPA investigation).

Moreover, *United States v. State of Illinois*, the one post-litigation authority relied upon by the Government in support of its CRIPA argument is distinguishable. 148 F.R.D. 587, 590 (N.D. Ill. 1993). There, the State of Illinois, in the context of litigation as opposed to a pre-suit investigation, attempted to exclude mental health records from discovery altogether, relying on a state statute rendering the records privileged under state law. *Id.* at 589. Importantly, the court looked to the Federal Rules of Civil Procedure as controlling the dispute, and the Court held that the "state created privilege . . . would thwart the Congressional intent and purpose of [CRIPA] to investigate and correct institutional Civil Rights Violations. *Id.* at 592.

Unlike *United States v. State of Illinois*, the County is not trying to preclude the Government from interviewing detainees at Henley Young. Instead, the County acknowledges the

9

Government's right to interview juvenile detainees provided those detainees' own counsel permit an interview, and there is no authority allowing the Government to prevent the County from attending those interviews of fact witnesses during a site visit

### C. Ethical rules bar *ex parte* communications with represented juveniles charged as adults.

According to Mississippi Rule of Professional Conduct 4.2, known as the no-contact rule, lawyers are prohibited from discussing matters related to their representation with individuals who are already represented by another attorney, unless the other lawyer gives permission or the communication is permitted by law or court order. *See* Miss. R. Prof. Conduct 4.2; *Secherest v. City of Lexington*, No. 3:24-CV-34-TSL-MTP, 2025 WL 1558856, at \*4–5 (S.D. Miss. June 2, 2025). In the context of juvenile detention, legal representation may result from the criminal charges those juveniles face. Any general instruction mandating that the County produce juveniles charged as adults for confidential interviews "without requiring the presence of defense counsel," poses a significant risk of improper communication and does not comply with Rule 4.2's requirement for consent.

When it comes to detainee interviews in the context of litigation as opposed to a pre-suit investigation, courts have warned against permitting informal interviews during prison inspections, because these unsworn "roving depositions" provide minimal value for uncovering facts. *Amos v. Taylor*, No. 4:20-CV-7-DMB-JMV, 2020 WL 618824, at \*5 (N.D. Miss. Feb. 10, 2020). In reality, the concerns likely are heightened here because the individuals to be interviewed by the Government are juvenile detainees charged with very serious crimes. These juvenile detainees may be represented in those criminal proceedings, may not fully appreciate the litigation stakes, and may experience greater pressure when questioned by the Government's attorneys in

PD.61733969.1

custody. As a result, they may unintentionally make statements that could later be used against their interests in adversarial litigation.

**D.  The 2025 New Injunction's access provision does not expressly authorize confidential, unsupervised interviews.**

The 2025 Injunction does not grant the Government the unilateral right to conduct confidential interviews of detained juveniles who the Government undisputedly does not represent and to the exclusion of the County's counsel. At most, it speaks in terms of "access" and information-sharing for compliance oversight. *See* Doc. 282-1 at § 16; [168] Order at ¶¶ 142, 143. This matter is in the midst of ongoing litigation, and nothing in the 2025 New Injunction purports to displace the Federal Rules' discovery framework or the ethical restrictions that apply to communications with represented persons. The Government seeks to expand the 2025 New Injunction beyond its text which could invite disputes regarding coercion, confidentiality, and the voluntariness of any statements obtained that may be utilized in this litigation or any other proceedings involving the juvenile detainees being interviewed in a confidential setting by the Government.

**E.  The Federal Rules provide formal mechanisms for testimony.**

The Government asks the Court to compel the County to "permit representatives of the [Government] to interview youth" "in a confidential setting" "without Henley-Young staff, or other county representatives present," and "without requiring the presence of defense counsel." [291] Motion at 1. In ordinary civil litigation, counsel may attempt to contact and interview willing third-party witnesses informally but those witnesses are free to decline, to insist on counsel, and to leave at any time. Detained juveniles are not similarly situated. A youth in custody cannot simply walk away, the custodial environment carries a risk of perceived authority and the youth may reasonably believe participation is required or will affect conditions of confinement. In addition,

11

juvenile detainees may be represented in their pending criminal proceedings and thus those juveniles have a right to have their counsel present before participating in interviews with the Government. For these reasons, the Government's requested format is not a routine "witness interview," but a form of compelled, off-the-record discovery in a custodial setting.

The Federal Rules establish appropriate procedures for obtaining testimony and information, including depositions on notice pursuant to Rule 30 or subpoenas under Rule 45. These rules create an objective record and facilitate participation by counsel for the parties. Accordingly, the Government should not be permitted to circumvent these established safeguards through general assertions of access and, at a minimum, by seeking interviews without the presence of juveniles detainees' defense counsel.

## Conclusion

For these reasons, Defendants respectfully request that the Court deny the Government's [291] Motion to Compel Access.

Respectfully submitted,

/s/ *Nicholas F. Morisani*
W. Thomas Siler, Jr. (MB # 6791)
Nicholas Morisani (MB # 104970)
Loden P. Walker (MB # 105996)
Taylor Weatherspoon (MB #106712)
Phelps Dunbar LLP
1905 Community Bank Way, Suite 200
Flowood, MS 39232
Tommy.Siler@phelps.com
Nick.Morisani@phelps.com
Loden.Walker@phelps.com
Taylor.Weatherspoon@phelps.com

**ATTORNEYS FOR HINDS COUNTY, MISSISSIPPI, AND SHERIFF TYREE JONES**

12

PD.61733969.1

## CERTIFICATE OF SERVICE

This will certify that the undersigned has this day filed the above and foregoing document with the Clerk of this Court using the CM/ECF filing system which sent notification of same to all counsel of record.


/s/ *Nicholas F. Morisani*
Nicholas F. Morisani

PD.61733969.1